# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
378 N. Main Avenue
Tucson, AZ 85701;

DEFENDERS OF WILDLIFE,
1130 17th Street, N.W.
Washington, D.C. 20036;

ANIMAL LEGAL DEFENSE FUND,
525 E. Cotati Ave.
Cotati, CA  94931;

          Plaintiffs,

v.

DONALD J. TRUMP,
in his official capacity as President of the United
States
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500;

PATRICK M. SHANAHAN,
in his official capacity as acting Secretary of
Defense
1000 Defense Pentagon
Washington, D.C.  20301;

STEVEN MNUCHIN,
In his official capacity as Secretary of the
Department of Treasury,
1500 Pennsylvania Avenue, NW,
Washington, D.C. 20220;

KIRSTJEN M. NIELSEN,
in her official capacity as Homeland Security
Secretary
245 Murray Lane, S.W.
Washington, D.C. 20528;

DAVID BERNHARDT,
in his official capacity as acting Secretary of the
Interior

Case No.: _____

1849 C Street, N.W.
Washington, D.C. 20240;

       Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      On February 15, 2019, President Donald J. Trump issued a "Presidential

Proclamation on Declaring a National Emergency Concerning the Southern Border of the United

States," (hereafter referred to as "emergency proclamation") pursuant to the purported authority

of the National Emergencies Act ("NEA"), 50 U.S.C. § 1601 *et seq*. Under the emergency

proclamation, the President directed the Secretary of Defense and the Secretary of Homeland

Security to undertake specific acts in furtherance of border wall construction. The President

further directed the reallocation of up to $601 million from the Treasury Forfeiture Fund, $3.6

billion in unspent funds appropriated for military construction projects, as well as up to $2.5

billion in unspent funds appropriated for support for counterdrug activity support, towards border

wall construction. *See* White House Press Office: "President Donald J. Trump's Border Security

Victory" (Feb. 15, 2019).[1]

2.      Though "emergency" is not defined under the NEA, its common usage typically

involves elements of suddenness and surprise. Emergencies generally require an urgent

response. The present situation sharply departs from both of these generalities. Here, the

President first declared his intent to invoke the NEA nearly two months prior to making the

proclamation. During the intervening time, he indicated his "absolute" right to declare an

---

[1] Plaintiffs use the terms "border wall," border fence," and "border barrier" interchangeably. Regardless of construction method (steel bollard is currently the most commonly utilized), these large structures have far reaching environmental impacts.

emergency, waffled as to whether he would exercise the authority, and repeatedly stated his intent to use an emergency proclamation should Congress continue to refuse to meet his $5.7 billion funding demand for a southern border wall.  When the President finally did announce his emergency proclamation in the White House Rose Garden, he concluded that "I could do the wall over a longer period of time.  I didn't need to do this [but] I'd rather do it much faster."

3.      Including recently enacted appropriations, the administration "has so far identified up to $8.1 billion that will be available to build the border wall once a national emergency is declared and additional funds have been reprogrammed"—far more than the $5.7 billion amount previously requested by the administration.  *See* White House Press Office: "President Donald J. Trump's Border Security Victory."

4.      Of the 58 times presidents have previously declared emergencies under the National Emergencies Act, none involved using the emergency powers to fund a policy goal after a president failed to meet that goal through foreign diplomacy (having Mexico pay for the wall) or the congressional appropriations process.  Never before has a president used the emergency powers granted to him by Congress in such a manner.

5.      Even under a validly declared emergency, the President must identify any available existing statutory authority triggered by that proclamation which would authorize the reprogramming of previously appropriated funds.  The National Emergencies Act does not permit a president to take *any* action, but instead unlocks a president's ability to invoke *specific* and *existing* emergency statutory authorities.  The President has failed to identify such statutory authority and Congress has not enacted any emergency legislation even remotely related to border wall construction, and thus the President's reallocation of funds is unlawful.

6.     The President's efforts to re-direct federal moneys set aside for combatting organized crime, 31 U.S.C. § 9705, military construction, 10 U.S.C. § 2808, and counterdrug support activities, 10 U.S.C. § 284, are squarely inconsistent with the plain language and broader statutory context of these provisions, and should be vacated and reversed.  The southern border wall cannot—under any reasonable interpretation—be considered eligible for emergency redirection of funds appropriated by Congress for other purposes.

7.     By unlawfully redirecting moneys from organized crime investigations, military construction, and counterdrug support appropriations to border wall construction, the emergency proclamation also exceeds President Trump's constitutional authority by usurping Congress's Article I Appropriation powers, Art. I, § 9, and by violating the President's obligation to "take care that the Laws be faithfully executed."  Art. II, § 3.

8.     The emergency proclamation is unlawful on its face.  Implementation of the emergency proclamation, agency actions taken or directed to be taken under the proclamation, and the expenditure of funds to construct a border wall pursuant to that proclamation should be enjoined.  Of particular concern to Plaintiffs and their members, border barriers prevent the passage of wildlife, and could result in the extirpation of jaguars, ocelots, and other endangered species within the United States.  The use of funds for such barriers that on information and belief are directed at least in part to investigating and where relevant prosecuting organized criminal activities related to illegal wildlife trafficking further harms Plaintiffs' interests in protecting and preserving biological diversity.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and can grant declaratory relief pursuant to 28 U.S.C. §§ 2201-2202.

10.     Venue properly vests in this Court pursuant to 28 U.S.C. § 1391(b) and (e), because the violations are occurring in this district, Defendants reside in this district, and a substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made by the Defendants.

## PARTIES

11.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit conservation organization with more than 1.4 million members and online activists dedicated to the protection of endangered species and wild places.  The Center is headquartered in Tucson, Arizona, with offices in Washington, D.C. and numerous other locations throughout the country, and an office in Baja California Sur, Mexico.

12.     The Center has worked for more than two decades to oppose environmentally harmful border fencing and other injurious border security projects along the U.S.-Mexico border generally, and within the specific Border Patrol sectors (San Diego, Calexico, Yuma, El Paso, Laredo, and Rio Grande Valley) impacted by the emergency proclamation specifically.  The Center also has a long history of advocating for the protection of rare wildlife habitat and specific species that would be impacted by the emergency proclamation, including jaguar, ocelot, peninsular bighorn sheep, Sonoran pronghorn, Mexican gray wolf, Quino checkerspot butterfly, and coastal California gnatcatcher, and is directly responsible for the protection of numerous borderland species and their critical habitats under the Endangered Species Act.  Center members Laiken Jordan and Michael Robinson enjoy observing wildlife and their habitat in borderlands areas that will be negatively affected by border wall construction.  Additionally, the Center works to combat wildlife trafficking—the fourth largest criminal activity worldwide— and the threats it poses to biological diversity preservation.

13. Plaintiff DEFENDERS OF WILDLIFE ("Defenders") is a nonprofit organization with nearly 1.8 million members and supporters across the nation, including more than 3,600 members in New Mexico. Defenders' mission is to preserve wildlife and emphasize appreciation and protection for all species in their ecological role. Through advocacy, litigation, and other efforts, Defenders works to preserve species and the habitats upon which they depend. Defenders has been closely involved in policy and litigation matters associated with border wall construction along the United States-Mexico border for more than a decade. Defenders has field offices across the country, including in Santa Fe, New Mexico.

14. Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a nonprofit 501(c)(3) organization with more than 200,000 members and supporters, including thousands of whom live in states located on the U.S.-Mexico border, and at least hundreds of whom live in towns that are located in close proximity to border areas at issue. This includes Elizabeth Walsh, who resides in El Paso, Texas near Sunland Park, New Mexico near the United States-Mexico border. Ms. Walsh has been a member of ALDF since at least 2012. She routinely visits the border areas that will be impacted by the emergency proclamation for professional and recreational purposes. Similarly, ALDF member Robert Knaier resides in San Diego County, California and regularly visits the border area in California for recreational purposes. ALDF represents its members interests by working to protect the lives of animals, including wildlife, through the legal system. This includes prior litigation challenging unlawful attempts to waive environmental and animal protection laws to facilitate border construction. ALDF is headquartered on Cotati, California.

15. Plaintiffs have organizational and membership-based interests in the preservation and conservation of specific areas of the U.S.-Mexico borderlands that have been declared a national emergency zone under the President's February 15, 2019 proclamation. Plaintiffs and

their members are harmed by the emergency proclamation, the invocation of emergency powers

arising from the proclamation, the agency actions taken or directed under the declaration, and the

unlawful reallocation of previously appropriated funds to border wall construction.  Plaintiffs'

members and staff live in or regularly visit the U.S.-Mexico borderlands region, including

specific areas within the San Diego, Calexico, Yuma, El Paso, Laredo, and Rio Grande Border

Patrol sectors that will be impacted by the emergency proclamation.  These specific areas include

numerous areas of federal, state, and local protected borderlands, including but not limited to

Cleveland National Forest, Cabeza Prieta National Wildlife Refuge, Coronado National Forest,

Lower Rio Grande Valley National Wildlife Refuge, and lands administered by the U.S. Bureau

of Land Management.  Plaintiffs' staff and members use these specific borderland areas for

hiking, camping, viewing and studying wildlife, photography, and other scientific, vocational

and recreational activities, and have specific intentions to continue to use and enjoy these areas

frequently and on an ongoing basis in the future.  Border wall construction, and associated

actions including stripping all vegetation within a 150-foot enforcement zone, road construction,

and high-intensity lighting, would harm Plaintiffs' members and these protected interests in

numerous ways.  These harms would include immediate impacts, such as precluding future

visitation of impacted areas, destroying wildlife habitat, and killing individual wildlife species.

Border wall construction would also result in longer term harm, by blocking connectivity

between wildlife populations in U.S. and Mexico, harming the long term viability of those

species, and in some cases, resulting in their extirpation from the United States.  These harms go

to Plaintiffs' central organizational purposes.

     16.    Plaintiffs further work to combat wildlife trafficking because illegal poaching,

trafficking, and sales or possession of wildlife species is the second greatest threat to biological

diversity.  The diversion of funds that would otherwise be used to combat organized crime—including wildlife trafficking—to border wall construction harms Plaintiffs' efforts to reduce such trafficking.  This diversion of funds will both force Plaintiffs to spend additional organizational resources on combatting wildlife trafficking and raising awareness about it.  It also harms Plaintiffs and their members' interests in observing, enjoying, and protecting frequently trafficked species and the intact ecosystems in which they reside.

17.     Defendant DONALD J. TRUMP, President of the United States, is sued in his official capacity.  President Trump issued the emergency proclamation on February 15, 2019.

18.     Defendant PATRICK M. SHANAHAN, Acting Secretary of Defense, is sued in his official capacity.  The February 15, 2019 emergency proclamation instructs the Defense Secretary to "take all appropriate actions" in support of the proclamation's directives, including taking action to reallocate military construction and counterdrug operations appropriated funds to border wall construction.

19.     Defendant STEVEN MNUCHIN, Department of Treasury Secretary, is sued in his official capacity. The Department of Treasury through its Treasury Executive Office for Asset Forfeiture administers the Treasury Forfeiture Fund.  The President has directed the reprogramming of $601 million from the Treasury Forfeiture Fund for border wall construction.

20.     Defendant KIRSTJEN M. NIELSEN, Homeland Security Secretary, is sued in her official capacity.  The February 15, 2019 emergency proclamation instructs the Homeland Secretary to "take all appropriate actions" in support of the proclamation's directives.

21.     Defendant DAVID BERNHARDT, Acting Secretary of the Interior, is sued in his official capacity.  The February 15, 2019 emergency proclamation instructs the Interior Secretary to "take all appropriate actions" in support of the proclamation's directives.

## LEGAL BACKGROUND

### A.    The National Emergencies Act

22.    The President's statutory authority to declare a national emergency is governed by the 1976 National Emergencies Act ("NEA").  50 U.S.C. § 1601 *et seq*.  The Act was designed to limit presidential power and reclaim authority that had been delegated from the legislative branch.  *See* Jules Lobel, *Emergency Power and the Decline of Liberalism*, 98 Yale L.J. 1385, 1412 (1989) (stating that NEA responded to "the twin disasters of Vietnam and Watergate" and the sense that "the pendulum had swung too far" in favor of the growth of executive power).

23.    The enactment of the NEA terminated all existing states of emergency and established a uniform procedural framework for the future exercise of such powers.  In addition, the NEA established other mechanisms intended to better ensure presidential accountability by establishing reporting and other requirements.

24.    A proclamation issued under the NEA triggers the President's authority to invoke *existing* Acts of Congress which authorize "the exercise, during the period of a national emergency, of any special or extraordinary power."  50 U.S.C. § 1621(a); *id*. § 1631 ("When the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act.").

25.    Accordingly, the scope of the President's emergency powers is limited to legislative enactments under which Congress has specifically granted those powers in advance.

26.    An emergency proclamation "shall immediately be transmitted to the Congress and published in the Federal Register."  *Id*. § 1621(a).

27.    The NEA does not define the term "emergency."

28.    The common usage of the term "emergency" involves an element of suddenness and unexpectedness.  Merriam-Webster, for example, states that an emergency is "an unforeseen combination of circumstances or the resulting state that calls for immediate action."  Similarly, Black's Law Dictionary defines the word as a "sudden, unexpected, or impending situation."

29.    NEA's legislative history shows that the emergency power conferred by Congress is not boundless.  In testimony before the Committee on Government Operations on February 25, 1976, co-sponsor Senator Frank Church stated that "Congress should be forewarned that it is inherent in the nature of modern government that the Executive will seek to enlarge its power in small ways and large," and advised that the president "should not be allowed to invoke emergency authorities or in any way utilize the provision of [the NEA] for frivolous or partisan matters, nor for that matter in cases where important but not 'essential' problems are at stake."

30.    There are currently an estimated 123 statutory authorities that may be invoked by an emergency proclamation under the NEA.  *See* Brennan Center for Justice, "A Guide to Emergency Powers and Their Use."  These provisions address disparate issues including public health; land management; military and national defense; federal employees; asset seizure, control, and transfer; criminal prosecution and detainment powers; and international relations.

31.    The NEA has been invoked at least 58 times from 1978-2012.  Nearly all of the declared emergencies (49 instances) relate to sanctions or export restrictions.  Four emergencies relate to weapons proliferation.  The remaining five emergencies did not fit into any specific category and involved the 2009 swine flu outbreak, the September 11 terrorist attacks, vessel movement near Cuba, rough diamonds from Sierra Leone, and sale of Iraq petroleum.

32.    None of the 123 emergency statutory authorities that may be invoked under an NEA proclamation address immigration or border wall construction.

B.      **Title 8 (Immigration), the Immigration and Naturalization Act, and the "Mass Influx" and "Emergency Situation Refugees" Provisions**

33.     Congress has not established any National Emergency Act authorities under Title 8 (Immigration) of the United States Code.

34.     The Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1101 *et seq.*, "established a comprehensive federal statutory scheme for regulation of immigration and naturalization and set the terms and conditions of admission to the country and subsequent treatment of aliens lawfully in the country." *Chamber of Commerce v. Whiting*, 563 U.S. 582, 587 (2011).

35.     While the INA does not contain any emergency provision triggered by the NEA, Congress did specifically consider the urgency of "an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border." 8 U.S.C. § 1103(a)(10).  In such a circumstance, the INA does not contemplate a military response, but instead authorizes the Attorney General to deputize any State or local law enforcement officer with the authority to perform federal immigration duties.

36.     The INA also addresses emergency refugee situations.  8 U.S.C. § 1157.  In such a circumstance, the INA again does not contemplate a military response, but instead allows the President to grant admissions beyond the maximum established by Congress in order to address humanitarian concerns, and directs the President to consult with Congress and the Cabinet.

C.      **DHS's Statutory Responsibility for Border Security and Border Fencing**

37.     The Department of Homeland Security ("DHS") and its component agency U.S. Customs and Border Protection ("CBP") are domestic agencies charged with preventing the entry of terrorists, securing the borders, and carrying out immigration functions.  Within CBP, the U.S. Border Patrol's mission is to prevent illegal entry across approximately 7,000 miles of

Mexican and Canadian international borders and 2,000 miles of coastal borders surrounding

Florida and Puerto Rico.

38.     Beginning with enactment of the Illegal Immigration Reform and Immigrant

Responsibility Act of 1996 ("IIRIRA"), P.L. 104-208, 8 U.S.C. § 1103 note, Congress has

periodically directed DHS to build fencing on the southern border.

39.     As originally enacted, section 102(b) of IIRIRA required the completion of a

triple-layer fence along a 14-mile stretch of border fencing in the San Diego sector where

construction had begun in the early 1990s.

40.     The Secure Fence Act of 2006, P.L. 109-367 (October 26, 2006) amended section

102(b) of IIRIRA to require DHS to construct at least two layers of reinforced fencing as well as

physical barriers, roads, lighting, cameras, and sensors on five specific sections of the southern

border totaling approximately 850 miles.

41.     Shortly thereafter, the DHS Appropriations Act, 2008, P.L. 110-161 (December

26, 2007) again amended section 102(b) of IIRIRA by removing the specific location and

double-layer fencing requirements, and instead directing DHS to construct not less than 700

miles of reinforced fencing where fencing would be most practical and effective.

**D.     Military Support for Civilian Law Enforcement Agencies (Title 10, Chapter 15)**

42.     The principle that the military cannot act as a domestic police force is deeply

rooted in U.S. history and law.  Under the Posse Comitatus Act, 18 U.S.C. § 1385, enacted in

1878, the use of "any part of the Army or Air Force as a posse comitatus (i.e., deputized by

civilian law enforcement officials to carry out the law) [is] a felony, except in cases of and under

circumstances expressly authorized by the Constitution or an act of Congress."  The law's reach

was subsequently extended to the Marines and Navy.

43.     Beginning in the early 1980s, Congress passed several Defense Authorization Acts that relaxed Posse Comitatus Act prohibitions by authorizing the use of military in specified domestic law enforcement activities.  These provisions are codified under a new chapter of the U.S. Code (Title 10, Chapter 15, "Military Support for Civilian Law Enforcement Agencies.").

44.     Under Chapter 15, Congress has *not* given the military *emergency* authority to assist in border wall construction or any other border security or immigration related task.

45.     Chapter 15 does authorize the military to, in a non-emergency situation, share information, 10 U.S.C. § 271; allow use of military equipment and facilities, *id*. § 272; train and advise civilian law enforcement officials, *id*. § 273; and maintain and operate equipment, *id*. § 274.  In addition, the military may provide various types of support for counterdrug activities and activities to counter transnational organized crime.  *Id*. § 284.  This support includes the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  *Id*. § 284(b)(7).

46.     The non-emergency military support authorized under Chapter 15 can only be provided to domestic law enforcement agencies subject to several prior conditions.  Such support, for example, may not be provided if it will adversely affect military preparedness.  *Id*. § 276.  In addition, the civilian law enforcement agency must normally reimburse Department of Defense for the costs of its support.  *Id*. § 277.

47.     Congress has specifically limited the military's support of domestic law enforcement agencies *in emergencies* to circumstances involving weapons of mass destruction, *id*. § 282, and situations involving bombings of places of public use, Government facilities, public transportation systems, and infrastructure facilities.  *Id*. § 283.  These emergency support provisions are subject to detailed procedures, and limited to situations that pose a serious threat

to the interests of the United States and involve violence causing or imminently threatening significant loss of civilian lives.

### E.      Military Construction (Title 10, Chapter 169)

48.      Military construction appropriations are provided in the annual Military Construction, Veterans Affairs, and Related Appropriations Act.  These appropriations fund military construction for the active and reserve components, as well as military family housing, U.S. contributions to NATO, and BRAC actions.

49.      Military construction activities have no relation to border wall construction and other support of DHS and other civilian law enforcement agencies, which are addressed under Title 10, Chapter 15.

50.      The Trump administration previously objected that the Department of Defense fiscal year 2019 appropriations bill, signed into law September 2018, provided $8.1 billion for military construction rather than the $8.9 billion requested by the administration.  *See* July 18, 2018 letter to Senate Appropriations Comm. ("By incrementally funding, rather than fully funding, military construction projects, the bill delays critical resources to complete high-priority projects initiated in 2019 and puts the burden on future budgets to make up the difference.").

51.      Congress has provided for an NEA emergency for military construction projects. 10 U.S.C. § 2808 provides:

> In the event of a proclamation of war or the proclamation by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces. Such projects may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated.

**F.      The Treasury Forfeiture Fund**

52.      The Treasure Forfeiture Fund is the receipt account for the deposit of non-tax

forfeitures as a result of laws enforced or administered by participating federal agencies, namely

Internal Revenue Service Criminal Investigations Division of the Department of the Treasury;

U.S. Immigration and Customs Enforcement of the Department of Homeland Security; U.S.

Customs and Border Protection of the Department of Homeland Security; U.S. Secret Service of

the Department of Homeland Security; and U.S. Coast Guard of the Department of Homeland

Security.

53.      The Treasury Forfeiture Fund contains no provision providing for the declaration

of war or national emergency.  31 U.S.C. § 9705.

54.      Instead, it provides funds that are earmarked by law for specific purposes as

delineated in the statute.

55.      These delineations include funding for: "proper expenses of seizure;" payment of

services (such as to contractors or reimbursing States); awards to informers; satisfaction of liens;

"[p]ayment of amounts authorized by law with respect to remission and mitigation;" payment of

certain claims; equitable sharing payments to States and others; State or local law enforcement

costs; and payments for the seizure and forfeiture program. *Id.* § 9705(a)(1).

56.      The Secretary also has discretion under the Act to fund: "payment of awards for

information or assistance" leading to forfeiture; purchases of evidence; publicizing awards;

"payment for equipment for any vessel, vehicle, or aircraft" for Treasury law enforcement

agencies or for coordinating State or local law enforcement entities; settlement of Custom

Service claims; and expenses of private collaborators; and trainings on seizures and forfeitures.

*Id.* § 9705(a)(2).

57.     The goal for these funds is to prosecute organized crime and specifically bring

seizure and forfeiture cases are intended to generate funds to bring more such cases with the

ultimate goal of disrupting and dismantling criminal enterprises.

58.     Examples of recent prosecutions include:  "Rabobank agreed to forfeit

$398,701,259 as a result of allowing illicit funds to be processed through the bank without

adequate Bank Secrecy Act (BSA) or AML review;" a New York man forfeited $1,624,172 as a

result of a biodiesel fraud scheme; and a St. Paul man forfeited $1,612,451 after defrauding the

Hmong community.[2]

59.     On information and belief, the funds are also used to combat wildlife related

crimes such as trafficking, illegal fishing, and the like.

60.     The fund is generated by forfeitures made by the Internal Revenue Service

Criminal Investigation division, U.S. Immigration and Customs Enforcement, CBP, and the U.S.

Secret Service.

61.     The funds are shared among specified federal agencies but also with the Coast

Guard, 31 U.S.C. § 9705(c), and some funds are allocated to State, local, and foreign authorities

for joint investigations and prosecutions.  *Id.* § 9705(a)(1)(B)(iii), (a)(1)(G), (c)(2)(B).

## CONSTITUTIONAL BACKGROUND

### A.     The Appropriations Clause

62.     Article I, § 9, cl. 7 provides that "no Money shall be drawn from the Treasury, but

in Consequence of Appropriations made by Law."

63.     The Appropriations Clause plays a critical role in the Constitution's separation of

powers among the three branches of government and the checks and balances between them.

---

[2] https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and%20Testimonies/OIG-19-022.pdf

64.     The Clause has a "fundamental and comprehensive purpose … to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual flavor of Government agents."  *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427-28 (1990); *id*. at 427 (without the Appropriations Clause, "the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure.") (*quoting* 2 J. Story, Commentaries on the Constitution of the United States § 1348 (3d ed. 1858)).

65.     If a Court finds that the executive branch is spending money in violation of a spending provision, "it would be drawing funds from the Treasury without authorization by statute and thus violating the Appropriations Clause."  *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016).

**B.     Take Care Clause**

66.     The President "shall take Care that the Laws be faithfully executed … ."  U.S. Const., Article II, § 3.

67.     The Take Care Clause places an obligation on the President and those under his supervision to comply with and execute clear statutory directives as enacted by Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.  The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad.").

68.     Under the Take Care Clause, the President and his subordinates may not create law by disregarding or repealing a validly enacted statute.  *See Clinton v. City of New York*, 524

U.S. 417, 488 (1998) ("There is no provision in the Constitution that authorizes the President to

enact, to amend, or the repeal statutes.").

## FACTUAL ALLEGATIONS

69.    On June 16, 2015, in a campaign announcement speech, then Mr. Donald Trump

stated:

> I would build a great wall.  And nobody builds walls better than me, believe me.
> And I'll build them very inexpensively.  I will build a great great wall on our
> southern border and I'll have Mexico pay for that wall.

70.    On January 25, 2019, at the end of the longest government shutdown, President

Trump stated:

> We really have no choice but to build a powerful wall or steel barrier.  If we don't
> get a fair deal from Congress, the government will either shut down on February
> 15 again or I will use the powers afforded to me under the laws and the
> Constitution of the United States to address this emergency.

71.    On February 15, 2019, in announcing the issuance of an emergency proclamation,

President Trump said:

> So we have a chance at getting close to $8 billion—whether its $8 billion
> or $2 billion or $1.5 billion, it's going to build a lot of wall.  We're getting
> it done.

**A.    The February 15, 2019 Emergency Proclamation**

72.    On February 15, 2019, President Trump issued a "Presidential Proclamation on

Declaring a National Emergency Concerning the Southern Border of the United States."

73.    The proclamation declares the "current situation at the southern border,"

including "large-scale unlawful migration" and "sharp increases in the number of family units

entering and seeking entry to the United States," as a "national emergency," and states that

"[b]ecause of the gravity of the current emergency situation, it is necessary for the Armed

Services to provide additional support to address the crisis."

74.     Relying on the NEA, the proclamation invokes the emergency military construction authority provided under 10 U.S.C. § 2808 ("the construction authority provided in section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense and, at the discretion of the Secretary of Defense, to the Secretaries of the military departments.").

75.     Section 2 of the proclamation directs that the Defense Secretary (as well as the DHS Secretary and Secretary of the Interior) "shall take all appropriate actions, consistent with applicable law, to use or support the use of the authorities herein invoked, including, if necessary, the transfer and jurisdiction over border lands."

76.     According to the administration, the emergency proclamation makes approximately $6 billion in funds that have been appropriated by Congress to other purposes to instead be directed to border wall construction.  These funds include $601 million from the Treasury Forfeiture Fund, $2.5 billion from counterdrug support funds, and $3.6 from military construction projects.

**B.      The Nation's Longest Government Shutdown, and the President's Abuse of the National Emergencies Act as a Negotiating Tactic**

77.     President Trump first raised the specter of an emergency proclamation on January 4, 2019, two weeks into the nation's longest federal shutdown, which began at midnight on December 21, 2018, and which would continue until January 25, 2019.

78.     The shutdown was the culmination of months of disagreement between the President and Congress over the administration's $5.7 billion demand for a border wall, and was the central dispute in the final, "lame duck" days of the 115th Congress.

79.     On December 11, 2018, President Trump met with House Minority Leader (Speaker to be) Nancy Pelosi and Senate Minority Leader Chuck Schumer, and on live television

proclaimed "I am proud to shut down the government for border security.  I will take the mantle.

I will be the one to shut it down."  The President had made numerous earlier statements

suggesting he would relish shutting down the government if Congress did not meet his precise

funding demands.  *See*, *e.g.*, July 30, 2018 ("I have no problem doing a shutdown"); September

12, 2018 ("If it happens, it happens").

80.　　On December 19, 2018, the Senate passed a continuing resolution providing

funding to DHS and other agencies (Agriculture, Commerce, Justice, the Interior, State,

Transportation, and Housing and Urban Development), until February 8, 2019, without border

wall funding, with the understanding that President Trump supported the bill.

81.　　On December 20, 2018 (one day before government funding for DHS and the

other agencies lapsed), after President Trump was attacked by conservative TV pundits and the

House Freedom Caucus, the President flipped his position and announced he would not sign the

Senate bill because it did not have any border wall funding.  That afternoon, House Republicans

passed a continuing resolution with $5.7 billion in border wall funds.

82.　　On December 21, 2018, President Trump encouraged Senator McConnell to

abolish the filibuster in order to pass the $5.7 billion spending bill in the Senate.  Acknowledging

that this would not occur, President Trump mused that there was a "very good" chance of a

government shutdown and that it could last a "very long time."  As the President predicted, the

Senate voted down the House version of the bill and the government shut down at midnight.

83.　　Two weeks later, on January 4, 2019, President Trump for the first time publicly

voiced his perceived authority to use the National Emergencies Act for emergency border wall

funding.

84.     Between that date and the February 15, 2019, emergency proclamation, the President repeatedly and clearly stated his belief that the NEA could be used as a negotiating tactic with Congress.  During this time, the President also vacillated on his ultimate intention to declare an emergency.

85.     On January 9, 2019, President Trump stated that "I have an absolute right to do national emergency if I want," and revealed that his "threshold" for invoking the emergency would be if he "can't make a deal with people that are unreasonable."

86.     On January 10, 2019, the President said that he was "maybe, definitely" planning on invoking an emergency proclamation to build the border wall.  President Trump explained that working with Democrats in Congress was "ridiculous" and that "[i]f we don't make a deal, I would say 100 percent, but I don't want to say 100 percent," and that "[i]f we don't make a deal, I would say it would be very surprising to me that I would not declare a national emergency and just fund it through the various mechanisms."

87.     On January 11, 2019, the President denied intent to immediately declare an emergency under the NEA, stating that "what we're not looking to do right now is national emergency."

88.     On January 25, 2019, President Trump and Congress reached an agreement to end the 35-day partial federal shutdown, providing funding for the affected agencies including DHS for three weeks, through February 15, 2019.

89.     In his January 25 speech announcing the temporary deal to end the shutdown, the President again threatened use of the NEA as a negotiating tactic, stating "[w]e really have no choice but to build a powerful wall or steel barrier.  If we don't get a fair deal from Congress, the

government will either shut down on February 15 again or I will use the powers afforded to me under the laws and the Constitution of the United States to address this emergency."

90.     On January 29, 2019, Undersecretary of Defense for Policy John Rood testified to the House Armed Services Committee that if President Trump declared an emergency and directed the Pentagon to act, that the military would build the wall "if we judged it to be a lawful order.  And I assume it would be."

91.     On January 31, 2019, President Trump stated that "we've set the stage for what's going to happen on February 15 [i.e. an emergency proclamation] if a deal is not made."

92.     On February 1, 2019, the President that "I think there's a good chance that we'll have to do" an emergency proclamation, while noting "tremendous obstruction by Democrats."

93.     The President would continue to threaten use of the NEA until issuing the emergency proclamation on February 15, 2019.  At the press conference on February 15, 2019, announcing the emergency proclamation, however, the President disclaimed the need to declare a national emergency, stating: "I could do the wall over a longer period of time—I didn't need to do this—but I would rather do it much faster. … I just want to get it done faster, that's all."

C.      **CBP Has Already Constructed More than 700 Miles of Border Barriers, and Congress Has Not Mandated New Border Fencing In More Than a Decade**

94.     CBP has considered its statutory fencing obligations under IIRIRA complete since 2010, when it had completed 654 miles of primary border fencing (as well as approximately 50 miles of secondary and tertiary fencing, for a total exceeding 700 miles).

95.     In 2010, Acting CBP Deputy Commissioner David Aguilar told a House committee, "[t]he Border Patrol has determined after extensive study that only 652 miles—not 700-miles—of fencing is operationally necessary to secure the southwest border."  Prior to the Trump administration, DHS had not constructed significant new border fencing since 2010.

Congress has not mandated new border fencing in well over a decade, since the enactment of the Secure Fence Act.



**D.**   **Congress Has Provided the Trump Administration with Funding for More Than 175 Miles of New or Replacement Border Wall Construction, the Large Majority of Which Remains Uncompleted**

96.   Congress has provided the Trump administration with nearly $3 billion in funding for border fence construction, the large majority of which remains uncompleted.

97.   In response to the administration's fiscal year 2017 budget amendment and request for supplemental appropriations, the Consolidated Appropriations Act, 2017, provided CBP with $292 million "for the replacement of primary pedestrian and vehicle fencing in high-priority areas, using previously deployed and operationally effective designs, such as currently deployed steel bollard designs … ."  Pub. L. No. 115-31, div. F, tit. VI.

98.   CBP directed those fiscal year 2017 funds to 40 miles of replacement wall construction in San Diego, El Centro, El Paso, and near Santa Teresa.  The constructed was expedited by the waiver of the National Environmental Policy Act ("NEPA"), Endangered Species Act ("ESA"), and more than 30 additional laws pursuant to IIRIRA §102(c).  *See* 82

Fed. Reg. 35,984, August 2, 2017 (San Diego); 82 Fed. Reg. 42,829, Sept. 12, 2017 (El Centro);

83 Fed. Reg. 3,012, Jan. 22, 2018 (Santa Teresa).

99.     In March 2018, Congress provided the Trump administration with an additional

$1.34 billion for secondary fencing replacement in the San Diego sector, new primary fencing in

the Rio Grande Valley sector, and replacement of existing pedestrian fencing in any location

along the southwest border.  Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div.

F, tit. II, § 230.

100.     CBP estimates that the fiscal year 2018 appropriations bill will fund

approximately 84 miles of border barrier construction.

101.     DHS issued two waivers under IIRIRA §102(c)  to expedite border wall

construction in the lower Rio Grande Valley sector, in Cameron County, Texas (83 Fed. Reg.

50,949), and Hidalgo County, Texas (83 Fed. Reg. 51,472) waiving NEPA, ESA, and more than

30 additional laws.

102.     DHS has issued two contracts to construct new border wall in the Rio Grande

sector using FY 2018 appropriations, both located in Hidalgo County: FY18 RGV-003 (six

miles) and FY 18 RGV-02 (five segments, eight miles).

103.     The construction on these two contracts will be the first of the estimated 84 miles

of border wall construction that is funded by the Fiscal Year 2018 Appropriations to be

commenced.

104.     On February 15, 2019, immediately after issuing the emergency proclamation, the

President signed H.J. Res. 31, Consolidated Appropriations Act, 2019, providing $1.3 billion in

border wall construction.

105.    Despite this funding, Congress has not provided additional funding demanded by President Trump for CBP specified border wall priorities.

**E.    The Emergency Proclamation Will Have Significant Environmental Impacts**

106.    The Trump administration has explained that its $5.7 billion request for border wall construction will "fund construction of a total of approximately 234 miles of new physical barrier and fully fund the top 10 priorities in CBP's Border Security Improvement Plan."  *See* Jan. 6, 2019 letter from Russell T. Vought, OMB Acting Director, to Senator Richard Shelby, Appropriations Committee Chairman.

107.    These "highest priority border wall miles" total 215 miles.  *See* DHS Press Release, "Walls Work" (Dec. 12, 2018).   Border Patrol has broken down the 215 miles by sector (Border Patrol divides responsibility for border security operations geographically among nine sectors, each with its own headquarters).  These highest priority areas are: San Diego sector-5 miles; El Centro sector-14 miles; Yuma sector-27 miles; El Paso sector-9 miles; Laredo sector-55 miles; and Rio Grande Valley sector-104 miles.

108.    CBP has not clarified what, if any, overlap exists between currently funded border wall mileage and the 215 miles of "highest priority border wall."  Currently funded new border wall mileage under the FY 2018 and FY 2019 appropriations bills is, however, limited to the Rio Grande Valley sector; thus, all of the construction within "highest priority areas" in the San Diego, El Centro, Yuma, El Paso, and Laredo sectors would not occur but for the unlawful appropriations reallocation under the emergency proclamation.

109.    The emergency proclamation provides the administration with access to a total of $8.1 billion, despite its consistently stated position that $5.7 billion would fund its border wall priority projects.

110.     The border wall construction funded by the emergency proclamation would directly harm Plaintiffs and their members.  The environmental harm from this construction will likely, among other concerns, impact threatened and endangered species listed under the Endangered Species Act, as well as their designated critical habitat; impact lands under federal jurisdiction, including National Parks, National Forests, National Wildlife Refuges, National Monuments, and other lands within the National Landscape Conservation System (administered by the Bureau of Land Management), Wilderness areas, Wild and Scenic Rivers, and other areas of high environmental value; and impact waters of the United States protected by the Clean Water Act.

111.     Of particular concern to Plaintiffs' core organizational interests, the border wall construction unlawfully funded by the emergency proclamation would result in severance of wildlife connectivity and cross-border movement between wildlife populations on either side of the U.S.-Mexico border.  Every endangered jaguar seen in the United States during the species' nascent recovery in the past two decades, for example, was born in Mexico.

112.     Given that approximately 700 miles of the southern border already has some form of fencing on it, the cumulative and irreversible impact of additional border fencing on wildlife populations becomes ever more heightened with each additional mile of border wall constructed. Indeed, the border wall construction funded by the emergency proclamation would likely result in the fencing of the final remaining gaps in at least two Border Patrol sectors.

113.     The emergency proclamation unlawfully funds as much as 5 miles of border barrier construction in the San Diego sector, which has an area of responsibility from the Pacific Ocean eastward to the Imperial County line.  The San Diego sector is already heavily fortified,

with primary fencing covering 46 of 60 miles, 30 percent of the miles of all secondary and tertiary fencing along the southwest border, and more than 300 miles of patrol roads.

114.    The remaining unfenced areas within the San Diego sector are of high environmental value, and are generally mountainous and rugged, including unfenced areas within the San Ysidro Mountains and the complex geography of southeastern San Diego County. This area include two major tributaries of the Tijuana River (Cottonwood Creek and Tecate Creek), and designated critical habitat under the Endangered Species Act for coastal California gnatcatcher, Quino checkerspot butterfly, and Arroyo toad.

115.    The emergency proclamation unlawfully funds as much as 14 miles of border barrier construction in the El Centro sector, which has an area of responsibility from the Jacumba Mountains in the west to the Imperial Sand Dunes in the east.  The El Centro sector is already heavily fortified, with primary fencing covering 59 of its 70 miles, and 214 miles of patrol roads.

116.    The remaining unfenced areas within the El Centro sector are of high environmental value.  The largest unfenced area is in highly rugged and mountainous terrain within the Jacumba Mountains and their sheer eastern escarpment.  This area is designated critical habitat for the peninsular bighorn sheep pursuant to the Endangered Species Act.  74 Fed. Reg. 17,288 (April 14, 2009).   The Jacumba Mountains "represent the southernmost portion of the Peninsular Ranges in the United States," and "represent the only area of habitat connecting the [U.S. population] with other bighorn sheep populations that occupy the Peninsular Ranges in Mexico."  *Id.* at 17,318.

117.    The emergency proclamation unlawfully funds as much as 27 miles of border barrier construction in the Yuma sector, which has an area of responsibility from the Imperial Sand Dunes in the west to the Yuma-Pima County line in Arizona to the east.  The Yuma sector

is already heavily fortified, with primary fencing covering 107 of 126 miles, as well as 209 miles of patrol roads.

118.     The remaining unfenced areas within the Yuma sector are located in Arizona, of high environmental value, and located on rugged and mountainous terrain within the Barry M. Goldwater Air Force Range and Cabeza Prieta National Wildlife Refuge.  The area includes essential habitat for endangered species including the Sonoran pronghorn.

119.     The emergency proclamation funds as much as 9 miles of border barrier construction in the El Paso sector, which has an area of responsibility including the entire border of New Mexico as well as the two counties within far western Texas. The El Paso sector is already heavily fortified, with primary fencing covering 166 of 180 miles, as well as 465 miles of patrol roads.

120.     The remaining unfenced areas within the El Paso sector are of high environmental value, including large sections of the remote New Mexico "bootheel."  This area contains designated critical habitat for jaguar and Chiricahua leopard frog, and is renowned for its wildlife including mule deer, mountain lions, antelope, and a bison herd.

121.     The emergency proclamation funds as much as 55 miles of border barrier construction in the Laredo sector, which has an area of responsibility from Webb County in the northwest through Zapata County in the southeast.  The Laredo sector is lightly fortified, with primary fencing covering 1 of 171 miles, and 144 miles of patrol roads.

122.     The Laredo sector is of  high environmental value, and like the entire southern Texas border, the international border is defined by the Rio Grande River.

123.     The emergency proclamation would unlawfully fund as much as 104 miles of border barrier construction in the Rio Grande Valley sector, though some of this mileage may

overlap with border wall construction that has already been funded in prior appropriations bills. The Rio Grande Valley sector, which encompasses the Lower Rio Grande Valley, is heavily fortified in some areas, with primary fencing covering 55 of 316 river miles, and 716 miles of patrol roads.

124.    The lower Rio Grande Valley is considered one of the most biologically diverse areas in North America, and is a particularly crucial area for migratory birds.  The remaining unfenced areas in the Rio Grande Valley sector are of high environmental value, and include protected federal lands including the Lower Rio Grande Valley National Wildlife Refuge and Santa Ana National Wildlife Refuge, and essential habitat for endangered species including ocelots.

125.    The emergency proclamation will have environmental impacts that extend beyond border wall construction.  According to the White House, the emergency proclamation will reprogram  $601 million from the Treasury Forfeiture Fund.  These funds are currently used to combat organized crime.

126.    INTERPOL and United Nations Environment classify "[a]buse of the environment [a]s the fourth largest criminal activity in the world. Worth up to USD 258 billion, it is increasing by five to seven per cent every year and converging with other forms of international crime" and is "a growing threat to peace, security and stability." Among these crimes is illegal wildlife trade, which the GAO has found to range "from $7 billion to $23 billion annually."

127.    The US Department of State classifies wildlife trafficking as a security threat. According to the GAO, "[t]he United States is one of the world's largest trafficking markets and is increasingly becoming a source for illegal wildlife and wildlife products . . . ."

128.     Wildlife trafficking is the second greatest threat to biological diversity after habitat destruction.  Plaintiffs dedicate organizational resources to addressing this threat.  They seek federal and state protections for heavily trafficked species being pushed toward the edge of extinction and work to enforce those protections once granted.  They work domestically and internationally to improve wildlife protections and raise awareness about the threats to wildlife from trafficking.  Plaintiffs and their members enjoy observing frequently trafficked species in the wild in their native ecosystems.  These species range from well-known animals such as elephants to numerous fish species, birds, reptiles, and amphibians.

129.     By redirecting funding used to combat organized criminal networks, on information and belief funding will be lost for wildlife trafficking investigations and prosecutions.  Of the $1.4 billion in funds identified by the Office of Inspector General available in the Treasury Forfeiture Fund for general law enforcement, the loss of any of those resources including up to $601 million for border wall construction, will harm Plaintiffs' interests.  Even if these funds are not specifically directed to wildlife trafficking, criminal networks often engage in drug, human, and wildlife trafficking simultaneously. This means a decrease in investigations and prosecutions is likely to negatively impact wildlife either directly or indirectly.  This loss will harm Plaintiffs and their members' interests in observing and enjoying frequently trafficked species in the wild.  It will also force Plaintiffs to spend additional organizational resources toward combatting wildlife trafficking and raising awareness about these criminal activities.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Unlawful Proclamation of Emergency

### Violation of the National Emergencies Act

130.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

131.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful Presidential action that is ultra vires.

132.    The President's authority to declare an emergency and redirect Congressional appropriations is limited to statutory delegations of such authority, such as the delegation made under the NEA.

133.    The President's own statements and the totality of surrounding circumstances show that the proclamation was made as a political negotiating tactic, not a valid "emergency" as Congress intended under the NEA.

134.    Because there is no national emergency across the southern border, President Trump's February 15, 2019 proclamation of emergency violates the NEA.

135.    Plaintiffs and their members will suffer irreparable injury if the emergency proclamation is not declared unlawful, and Plaintiffs and their members have no adequate remedy at law.

### SECOND CLAIM FOR RELIEF
### Unlawful Reallocation of Appropriated Funds

### Violation of 10 U.S.C. § 2808

136.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

137.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful Presidential action that is ultra vires.

138.    By its plain language, 10 U.S.C. § 2808 does not provide an emergency source of

funding for border wall construction.  10 U.S.C. § 2801(a) defines the term "military

construction" as including "any construction, development, conversion, or extension or any kind

carried out *with respect to a military installation* … or any acquisition of land or construction of

a defense access road."   In turn, "military installation" means a "base, camp, post, station, yard,

center, or other activity under the jurisdiction of the Secretary of a military department … ."

The vast majority, if not all, of the border wall construction that would be funded by the

proclamation occurs on lands that do *not* constitute a military installation, and the border wall is

not in any event a military construction project, and thus is now lawfully eligible for emergency

military construction reallocated appropriations.

139.    In addition, the military construction authority is limited to emergencies "that

require[] use of the armed forces," and "that are necessary to support such use of the armed

forces."  The dispute over border wall funding falls far short of an emergency requiring use of

the armed services, and in no way supports the armed forces.  The emergency proclamation

would in fact turn this requirement on its head, by using the armed forces to engage on a

domestic issue due to the President's failure to achieve his policy goals through the legislative

and constitutional framework of the appropriations process.

140.    The broader context of Title 10 also demonstrates that military construction funds

may not be directed to border wall construction.  Title 10, Chapter 15 (Military Support for

Civilian Law Enforcement Agencies) is a relatively new addition to the Armed Forces code

addressing the specific circumstances and conditions under which the military may support

domestic law enforcement agencies.  Chapter 15 represents a departure from longstanding

separation of military and domestic law enforcement functions, and thus its exceptions must be

read narrowly and exclusively.  The proclamation unlawfully provides for an emergency involving military support to domestic law enforcement agencies that has not been previously authorized by Congress.

141.    The NEA only provides Presidential authority to invoke provisions under which Congress has previously considered and addressed the specific emergency at hand.  Under Chapter 15, Congress has directly spoken to the circumstances in which the military may be called upon to support civilian law enforcement agencies, and limited those circumstances to emergency situations involving weapons of mass destruction, 10 U.S.C. § 282, and situations involving bombings of places of public use, government facilities, public transportation systems, and infrastructure facilities, 10 U.S.C. § 283.

142.    In addition, Congress has not enacted any NEA emergency provisions under the Immigration Law Code (Title 8).  Congress has, however, specifically considered the urgency of "an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border," and did not contemplate the involvement of the military, but instead focused on cooperation with local law enforcement officials, by allowing the Attorney General to authorize any State or local law enforcement officer to perform federal immigration duties  8 U.S.C. § 1103(a)(10).

143.    Under the plain language and broader statutory structure of the military and immigration codes, the President's invocation of 10 U.S.C. § 2808 to transfer emergency funds from military construction housing to border wall construction was unlawful Presidential action.

144.    Plaintiffs and their members will suffer irreparable injury if the proclamation's invocation of 10 U.S.C. § 2808 is not declared unlawful, and Plaintiffs and their members have no adequate remedy at law.

## THIRD CLAIM FOR RELIEF
## Unlawful Reallocation of Appropriated Funds

### Violation of 10 U.S.C. § 284

145.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

146.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful Presidential action that is ultra vires.

147.    10 U.S.C. § 284 (part of Chapter 15) does not provide an emergency source of funding for border wall construction, but is one example of the types of assistance the military may provide to civilian law enforcement agencies such as CBP in a non-emergency situation. *See*, *e.g.*, 10 U.S.C. § 271; allow use of military equipment and facilities, *id*. § 272; train and advise civilian law enforcement officials, *id*. § 273; and maintain and operate equipment, *id*. § 274.

148.    The non-emergency military support authorized under Chapter 15, including support under 10 U.S.C. § 284, can only be provided to domestic law enforcement agencies subject to several prior conditions.  Such support, for example, may not be provided if it will adversely affect military preparedness.  *Id*. § 276.  In addition, the civilian law enforcement agency must normally reimburse Department of Defense for the costs of its support.  *Id*. § 277.

149.    For the above reasons, and for the same reasons described under Claim II, under the plain language and broader statutory structure of the military and immigration codes, the President's invocation of 10 U.S.C. § 284 to transfer emergency funds from counterdrug activities to border wall construction was unlawful Presidential action.

150.    Plaintiffs and their members will suffer irreparable injury if the proclamation's invocation of 10 U.S.C. § 284 is not declared unlawful, and Plaintiffs and their members have no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF
### Unlawful Reallocation of Appropriated Funds

### Violation of 31 U.S.C. § 9705

151.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

152.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful Presidential action that is ultra vires.

153.    31 U.S.C. § 9705 does not provide an emergency source of funding for border wall construction.

154.    Even where the Secretary of Treasury has "discretion" to allocate funds, that discretion is limited to specified categories of funding, 31 U.S.C. § 9705(a)(2).  None of those categories are applicable here.

155.    For the above reasons, the announcement that funds from the Treasury Forfeiture Fund will be reprogrammed for border wall construction was unlawful Presidential action.

156.    Plaintiffs and their members will suffer irreparable injury if the reprogramming of funds from 31 U.S.C. § 9705 is not declared unlawful, and Plaintiffs and their members have no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF
### Constitutional Violation

### Violation of the Appropriations Clause of the U.S. Constitution
### Article I, Section 9, Clause 7

157.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

158.    Article I, § 9, cl. 7 of the U.S. Constitution provides that "no Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."

159.    Congress's "power of the purse" has been described as the "most important single curb" on presidential authority, because it vests the powers of public revenue and public

expenditures with the people's representatives in Congress. Edward S. Corwin, The Constitution and What It Means Today 134 (13th ed. 1975); *see Reeside v. Walker*, 52 U.S. 272, 291 (1850) (interpreting the Appropriations Clause to require that "however much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned.").

160.     In the absence of applicable statutory authority on which to transfer the military construction  and organized crime appropriations, the proclamation unlawfully reallocates money without satisfying the requirements of 10 U.S.C. § 2808, 33 U.S.C. § 2293, or 31 U.S.C. § 9705, and is thus violating the Appropriations Clause.

161.     Plaintiffs and their members will suffer irreparable injury if this constitutional violation is not declared unlawful, and Plaintiffs and their members have no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF**
**<u>Constitutional Violation</u>**

**<u>Violation of the Take Care Clause of the U.S. Constitution</u>**
**<u>Article II, Section 3</u>**

162.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

163.     Article II of the U.S. Constitution provides that "[t]he executive Power shall be vested in a President," and that he or she "shall take Care that the Laws be faithfully executed." U.S. Constitution Article II, § 3.

164.     The President has failed to comply with the requirements and limitations of law that the Executive Branch is required to "faithfully execute," including the National Emergencies Act, 10 U.S.C. § 2808, 10 U.S.C. § 283, and 31 U.S.C. § 9705.  Accordingly the President's

issuance of the emergency proclamation, as well as agency actions taken or directed to be taken under the emergency proclamation violate the Take Care Clause.

165.     Plaintiffs and their members will suffer irreparable injury if this constitutional violation is not declared unlawful, and Plaintiffs and their members have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

1.     Declare the Emergency Proclamation, and agency actions taken or directed to be taken under the proclamation, including the reallocation and expenditure of funds to construct a border wall pursuant to that proclamation, are unlawful under the National Emergencies Act;

2.     Declare the Emergency Proclamation, and agency actions taken or directed to be taken under the proclamation, including the reallocation and expenditure of funds to construct a border wall pursuant to that proclamation, are unlawful under the National Emergencies Act and the invoked emergency provisions including 10 U.S.C. § 2808, 10 U.S.C. § 284, and 31 U.S.C. § 9705;

3.     Declare the Emergency Proclamation, and agency actions taken or directed to be taken under the proclamation, including the reallocation and expenditure of funds to construct a border wall pursuant to that proclamation, are unconstitutional under the Article I Appropriations Clause and the Article II Take Care Clause;

4.     Set aside and vacate the Emergency Proclamation, and agency actions taken or directed to be taken under the proclamation, including the reallocation and expenditure of funds to construct a border wall pursuant to that proclamation;

5.      Enjoin all reallocation of appropriated funds taken under the Emergency

Proclamation;

6.      Retain jurisdiction to ensure compliance with the Court's Orders;

7.      Award Plaintiffs their reasonable costs of litigation, including reasonable

attorneys' fees, expert fees, and costs; and

8.      Grant such other and further relief as the Court may deem just and proper.

DATED:          February 16, 2019               Respectfully submitted,

/s/ Brian Segee

Brian Segee (CA Bar No. 200795)(Pro Hac Vice
Pending)
CENTER FOR BIOLOGICAL DIVERSITY
660 S. Figueroa St., Suite 1000
Los Angeles, CA 90017
Tel: (805) 750-8852
Email: bsegee@biologicaldiversity.org

/s/ Tanya Sanerib

Tanya Sanerib (D.C. Bar No. 473506)
CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th Street, #146
Seattle, WA 98117
Tel: (206) 379-7363
Email: tsanerib@biologicaldiversity.org

Anchun Jean Su (D.C. Bar No. CA285167)
Howard M. Crystal (D.C. Bar No. 446189)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street N.W., Suite 1300
Washington, D.C. 20005
Tel: (202) 849-8399
Email:  jsu@biologicaldiversity.org
hcrystal@biologicaldiversity.org

Jason C. Rylander (D.C. Bar No. 474995)
Michael P. Senatore (D.C. Bar No. 453116)
DEFENDERS OF WILDLIFE
1130 17th Street, NW

Washington, DC 20036
Tel: (202) 682-9400 x 145
Facsimile: (202) 682-1331
Email: jrylander@defenders.org
Email: msenatore@defenders.org

Anthony T. Eliesuson (IL Bar No. 6277427)
ANIMAL LEGAL DEFENSE FUND
150 South Wacker Drive, Suite 2400
Chicago, IL  60606
Tel: (707) 795-2533
Email: aeliseuson@aldf.org

Attorneys for Plaintiffs