**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY;
DEFENDERS OF WILDLIFE; ANIMAL LEGAL
DEFENSE FUND,

                            Plaintiffs,

            v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America; PATRICK
M. SHANAHAN, in his official capacity as Acting
Secretary of Defense; STEVEN MNUCHIN, in his
official capacity as Secretary of the Department of
Treasury; KIRSTJEN M. NIELSEN, in her official
capacity as Homeland Security Secretary; DAVID
BERNHARDT, in his official capacity as Acting
Secretary of the Interior,

                            Defendants.

Civil Action No. 1:19-cv-00408 (TNM)

## <u>DEFENDANTS' MOTION TO DISMISS</u>

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants respectfully

move to dismiss Plaintiffs' Complaint for lack of subject-matter jurisdiction and for failure to state a

claim upon which relief can be granted.  The bases for this Motion are set forth in the accompanying

Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss.  A proposed

order is also attached.

Dated:  April 2, 2019

                                        Respectfully submitted,

                                        JOSEPH H. HUNT
                                        Assistant Attorney General

                                        JOHN R. GRIFFITHS
                                        Director, Federal Programs Branch

                                        ANTHONY J. COPPOLINO
                                        Deputy Director, Federal Programs Branch

/s/ Andrew I. Warden
ANDREW I. WARDEN (IN Bar No. 23840-49)
Senior Trial Counsel, Federal Programs Branch

/s/ Leslie Cooper Vigen
LESLIE COOPER VIGEN (D.C. Bar No.
1019782)
KATHRYN C. DAVIS
MICHAEL J. GIRARDI
RACHAEL L. WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 305-0727
Fax: (202) 616-8470
Email: Leslie.Vigen@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; DEFENDERS OF WILDLIFE; ANIMAL LEGAL DEFENSE FUND, | |
| Plaintiffs, | Civil Action No. 1:19-cv-00408 (TNM) |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America; PATRICK M. SHANAHAN, in his official capacity as Acting Secretary of Defense; STEVEN MNUCHIN, in his official capacity as Secretary of the Department of Treasury; KIRSTJEN M. NIELSEN, in her official capacity as Homeland Security Secretary; DAVID BERNHARDT, in his official capacity as Acting Secretary of the Interior, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................. 1

BACKGROUND ............................................................................................................................. 3

I.     Congress's Express Authorization of Barrier Construction Along the U.S.-Mexico Border ................................................................................................................................ 3

II.    DHS's Recent Efforts to Expedite Border Barrier Construction ............................................ 5

III.   Congress's Authorization for U.S. Military Support of DHS's Border Security Efforts ............................................................................................................. 6

IV.   DoD's Current Support for DHS's Efforts to Secure the Southern Border ........................... 7

V.    The President's Proclamation Declaring a National Emergency at the Southern Border ................................................................................................... 8

VI.   The Use of Spending Authorities for Barrier Construction ..................................................... 10

STATUTORY FRAMEWORK ...................................................................................................... 11

I.     National Emergencies Act ...................................................................................................... 11

II.    The Treasury Forfeiture Fund and 31 U.S.C. § 9705 ............................................................. 15

III.   10 U.S.C. § 284 ...................................................................................................................... 16

IV.   10 U.S.C. § 2808 .................................................................................................................... 17

PLAINTIFFS' CLAIMS ................................................................................................................ 18

STANDARD OF REVIEW ........................................................................................................... 19

ARGUMENT ................................................................................................................................. 20

I.     The Court Lacks Jurisdiction .................................................................................................. 20

        A.    Plaintiffs' Challenge to the President's Declaration of a National Emergency Should Be Dismissed. ................................................................. 20

               1.    The NEA Evidences Congress's Intent to Preclude Judicial Review ............................................................................................ 21

               2.    Plaintiffs' Challenge to the President's National Emergency Declaration Presents a Nonjusticiable Political Question. ...................... 24

3.  The President Should Be Dismissed as a Party to this Lawsuit Because There is No Cause of Action Against the President and Plaintiffs Cannot Obtain Equitable Relief Against the President. ........... 28

B.  Plaintiffs Cannot Establish Article III Standing to Challenge Future Border Barrier Construction Under § 2808. .............................................................. 31

II.  Plaintiffs' Ultra Vires Review and Constitutional Counts Do Not State a Claim on Which Relief Can Be Granted. ................................................................................. 33

A.  Plaintiffs' "Ultra Vires" Claims Must Be Dismissed. .................................... 34

1.  Plaintiffs Fail To State a Claim for Ultra Vires Action Against the President. ................................................................................... 34

2.  Plaintiffs Must Raise Their Statutory Challenges Under the APA. ............... 35

3.  Plaintiffs Have Not Alleged Any Ultra Vires Actions. .................................. 37

a.  31 U.S.C. § 9705 ........................................................................ 37

b.  10 U.S.C. § 284 ......................................................................... 38

c.  10 U.S.C. § 2808 ....................................................................... 40

B.  Plaintiffs' Constitutional Claims Must Be Dismissed. ................................... 41

CONCLUSION ............................................................................................................ 43

# TABLE OF AUTHORITIES

## <u>CASES</u>

*AFL-CIO v. Kahn,*
  618 F.2d 784 (D.C. Cir. 1979) ................................................................43

*Al-Aulaqi v. Panetta,*
  35 F. Supp. 3d 56 (D.D.C. 2014) ..............................................................4

*Am. Butterfly Ass'n v. Nielsen,*
  2019 WL 634596 (D.D.C. Feb. 14, 2019) ..................................................5

*Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n,*
  135 S. Ct. 2652 (2015)............................................................................22

*Arizona v. United States,*
  567 U.S. 387 (2012) .........................................................................27, 38

*Armstrong v. Exceptional Child Ctr., Inc.,*
  135 S. Ct. 1378 (2015) ......................................................................29, 36

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................19

*\* Baker v. Carr,*
369 U.S. 186 (1962) .........................................................................25, 26

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,*
  502 U.S. 32 (1991) ..................................................................................36

*Beacon Prods. Corp. v. Reagan,*
  814 F.2d 1 (1st Cir. 1987)..........................................................14, 22, 24

*Beacon Prods. Corp. v. Regan,*
  633 F. Supp. 1191 (D. Mass. 1986) ....................................................22, 24

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................19

*Block v. Cmty. Nutrition Inst.,*
  467 U.S. 340 (1984) .........................................................................21, 23

*Byrd v. EPA,*
  174 F.3d 239 (D.C. Cir. 1999) ................................................................31

*CASA de Maryland, Inc. v. Trump,*
  355 F. Supp. 3d 307 (D. Md. 2018) ..........................................................30

*Cause of Action Inst. v. Eggleston,*
  224 F. Supp. 3d 63 (D.D.C. 2016) ...........................................................................20

*Centro Presente v. DHS,*
  332 F. Supp. 3d 393 (D. Mass. 2018) ......................................................................30

*Chamber of Commerce v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) ................................................................................36

*Chang v. United States,*
  859 F.2d 893 (Fed. Cir. 1988) ................................................................................24

*Chichakli v. Szubin,*
  2007 WL 9711515 (N.D. Tex. June 4, 2007) ..........................................................24

\* *Clapper v. Amnesty Int'l,*
  568 U.S. 398 (2013) ........................................................................................ 31, 32

*D & D Landholdings v. United States,*
  82 Fed. Cl. 329 (2008) ...........................................................................................3

\* *Dalton v. Specter,*
511 U.S. 462 (1994) ......................................................................................*passim*

*Defs. of Wildlife v. Chertoff,*
  527 F. Supp. 2d 119 (D.D.C. 2007) ..................................................................... 5, 28

*Dinh Tran v. Dep't of Treasury,*
  351 F. Supp. 3d 130 (D.D.C. 2019) ...........................................................................4

*Dist. No. 1, Pacific Coast Dist., Marine Engineer's Beneficial Ass'n v. Maritime Admin.,*
  215 F.3d 37 (D.C. Cir. 2000) ..................................................................................40

*Doe 2 v. Shanahan,*
  2019 WL 1086495 (D.C. Cir. Mar. 8, 2019) ...........................................................28

*Doe 2 v. Trump,*
  319 F. Supp. 3d 539 (D.D.C. 2018) .........................................................................30

*El-Shifa Pharm. Indus. Co. v. United States,*
  607 F.3d 836 (D.C. Cir. 2010) .......................................................................... 19, 26

*FCC v. NextWave Pers. Commc'ns Inc.,*
  537 U.S. 293 (2003) ..............................................................................................39

*Fiallo v. Bell,*
  430 U.S. 787 (1977) ..............................................................................................28

*Fla. Audubon Soc'y v. Bentsen,*
  94 F.3d 658 (D.C. Cir. 1996) ............................................................................31

\* *Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ................................................................................. 29, 35

\* *Griffith v. FLRA,*
  842 F.2d 487 (D.C. Cir. 1988) ................................................................37, 39, 40

*Gringo Pass, Inc. v. Kiewit Sw. Co.,*
  2012 WL 12905166 (D. Ariz. Jan. 11, 2012) .........................................................7

*Grupo Mexicano De Desarrollo v. All. Bond Fund,*
  527 U.S. 308 (1999) ...........................................................................................29

*Harvard Pilgrim Health Care of New Eng. v. Thompson,*
  318 F. Supp. 2d 1 (D.R.I. 2004) .........................................................................43

*Hawaii v. Trump,*
  859 F.3d 741 (9th Cir. 2017) .............................................................................30

*In re Border Infrastructure Envtl. Litig.,*
  915 F.3d  (9th Cir. 2019) .....................................................................................5

*INS v. Chadha,*
  462 U.S. 919 (1983) ...........................................................................................15

*Int'l Refugee Assistance Project v. Trump,*
  857 F.3d 554 (4th Cir. 2017) .............................................................................30

*J.E.M. AG Supply, Inc. v. Pioneer Hi–Bred Int'l, Inc.,*
  534 U.S. 124 (2001) ...........................................................................................39

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
  478 U.S. 221 (1986) ...........................................................................................25

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.,*
  58 F. Supp. 3d 1191 (D.N.M. 2014) ..................................................................43

*Jerome Stevens Pharm., Inc. v. Food & Drug Admin.,*
  402 F.3d 1249 (D.C. Cir. 2005) .........................................................................19

*Kaempe v. Myers,*
  367 F.3d 958 (D.C. Cir. 2004) ..................................................................... 4, 19

*Karahalios v. Nat'l Fed'n of Fed. Emps., Local,1263,*
  489 U.S. 527 (1989) ...........................................................................................23

*Kleindienst v. Mandel,*
  408 U.S. 753 (1972) ..................................................................................................27

*Leedom v. Kyne,*
  358 U.S. 184 (1958) ............................................................................................36, 37

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ..................................................................................................31

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ..................................................................................................19

*Mathews v. Diaz,*
  426 U.S. 67 (1976) ....................................................................................................28

*Mercy Hosp., Inc. v. Azar,*
  891 F.3d 1062 (D.C. Cir. 2018) ...............................................................................39

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n,*
  453 U.S. 1 (1981) ......................................................................................................21

* *Mississippi v. Johnson,*
  71 U.S. (4 Wall.) 475 (1866) ..............................................................................23, 29

*Mittleman v. Postal Regulatory Comm'n,*
  757 F.3d 300 (D.C. Cir. 2014) .................................................................................37

* *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. FSIP,*
  437 F.3d 1256 (D.C. Cir. 2006) ............................................................. 37, 38, 39, 40

*Nat'l Ass'n of Gov. Emps. v. Fed. Labor Relations Auth.,*
  179 F.3d 946 (D.C. Cir. 1999) .................................................................................34

*New Jersey v. United States,*
  91 F.3d 463 (3d Cir. 1996) .......................................................................................27

*Newdow v. Roberts,*
  603 F.3d 1002 (D.C. Cir. 2010) ...............................................................................30

*NFFE v. United States,*
  905 F.2d 400 (D.C. Cir. 1990) .................................................................................40

*Nixon v. Fitzgerald,*
  457 U.S. 731 (1982) ............................................................................................23, 29

*Nyunt v. Chairman, Broad. Bd. of Governors,*
  589 F.3d 445 (D.C. Cir. 2009) ............................................................................36, 37

*Plyler v. Doe,*
  457 U.S. 202 (1982) .................................................................................................26

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
  489 F.3d 1279 (D.C. Cir. 2007) .............................................................................19

*Puerto Rico v. United States,*
  490 F.3d 50 (1st Cir. 2007) ....................................................................................36

*Sadowski v. Bush,*
  293 F. Supp. 2d 15 (D.D.C. 2003) .........................................................................27

*Saget v. Trump,*
  345 F. Supp. 3d 287 (E.D.N.Y. 2018) ...................................................................31

*Santiago v. Rumsfeld,*
  2004 WL 3008724 (D. Or. Dec. 29, 2004) .............................................................24

*Sardino v. Fed. Reserve Bank of N.Y.,*
  361 F.2d 106 (2d Cir. 1966) ...................................................................................24

*Save Our Heritage v. Gonzalez,*
  533 F. Supp. 2d 58 (D.D.C. 2008) ...........................................................................5

*Sierra Club v. EPA,*
  292 F.3d 895 (D.C. Cir. 2002) ...............................................................................31

*Soudavar v. Bush,*
  46 F. App'x 731 (5th Cir. 2002) .............................................................................24

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ..................................................................................................31

*Susan B. Anthony List v. Driehaus,*
  134 S. Ct. 2334 (2014) ............................................................................................31

*Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996) ..................................................................29, 30, 31

*Trudeau v. FTC,*
  456 F.3d 178 (D.C. Cir. 2006) ...............................................................................37

*United States v. Amirnazmi,*
  645 F.3d 564 (3d Cir. 2011) ......................................................................15, 21, 24

*United States v. Brignoni-Ponce,*
  422 U.S. 873 (1975) ................................................................................................26

*United States v. Delgado-Garcia,*
   374 F.3d 1337 (D.C. Cir. 2004) .................................................................................28

*United States v. Groos,*
   616 F. Supp. 2d 777 (N.D. Ill. 2008) .......................................................................24

*United States v. Spawr Optical Research, Inc.,*
   685 F.2d 1076 (9th Cir. 1982) ............................................................................ 24, 26

*United States v. Yoshida Int'l, Inc.,*
   526 F.2d 560 (Cust. & Pat. App. 1975) ...................................................................24

*Veterans & Reservists for Peace in Vietnam v. Regional Comm'r of Customs, Region II,*
   459 F.2d 676 (3d Cir. 1972) .....................................................................................24

*Winpisinger v. Watson,*
   628 F.2d 133 (D.C. Cir. 1980) .................................................................................31

*Wise v. Glickman,*
   257 F. Supp. 2d 123 (D.D.C. 2003) .........................................................................36

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) .................................................................................................42

*Ziglar v. Abbasi,*
   137 S. Ct. 1843 (2017) ........................................................................................ 30, 36

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
   566 U.S. 189 (2012) .................................................................................................26

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. III, § 2 .................................................................................................31

## STATUTES

5 U.S.C. § 702 ..............................................................................................................35

5 U.S.C. § 706 ........................................................................................................ 35, 43

6 U.S.C. § 211 ..............................................................................................................38

8 U.S.C. § 1103 .................................................................................................... 3, 4, 38

8 U.S.C. § 1325 ............................................................................................................38

10 U.S.C. § 271 ..............................................................................................................6

10 U.S.C. § 272 ...............................................................................................................6

10 U.S.C. § 273 ...............................................................................................................6

10 U.S.C. § 274 ...............................................................................................................6

10 U.S.C. § 282 .............................................................................................................38

10 U.S.C. § 283 .............................................................................................................38

10 U.S.C. § 284 ........................................................................................................*passim*

10 U.S.C. § 2801 ............................................................................................17, 18, 41

10 U.S.C. § 2808 ......................................................................................................*passim*

10 U.S.C. § 12302 ...........................................................................................................9

18 U.S.C. § 545 .............................................................................................................38

21 U.S.C. § 865 .............................................................................................................38

31 U.S.C. § 2293 ...........................................................................................................42

31 U.S.C. § 9705 ......................................................................................................*passim*

50 U.S.C. § 1601 *et seq.* .........................................................................8, 11, 17

50 U.S.C. § 1621 ....................................................................................................11, 21

50 U.S.C. § 1622 .............................................................................13, 14, 15, 21, 22

50 U.S.C. § 1631 ....................................................................................................12, 21

50 U.S.C. § 1641 ....................................................................................................15, 21

Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601-1651)...............11

Pub. L. No. 97-99, 95 Stat. 1359 (1981) ......................................................................17

Pub. L. No. 97-214, 96 Stat. 153 (1982) (codifying 10 U.S.C. §§ 2801–08) .........................................17

Pub. L. No. 99-93, 99 Stat. 405, 448 (1985)................................................................14

Pub. L. No. 101-510, 104 Stat. 1485 (1991)................................................................16

Pub. L. No. 104-208, 110 Stat. 3009 (1996), as amended (codified at 8 U.S.C. § 1103). .......................4

Pub. L. No. 107-107, 115 Stat. 1012 (2001)................................................................................16

Pub. L. No. 109-13, 119 Stat. 231 (2005)....................................................................................4

Pub. L. No. 109-367, 120 Stat. 2638 (2006)........................................................................... 4, 38

Pub. L. No. 110-161, 121 Stat. 2090 (2007)..................................................................................4

Pub. L. No. 116-6, 133 Stat. 13 (2019) ......................................................................................10

## OTHER LEGISLATIVE AUTHORITIES

H.R. Rep. No. 97-44 (1981) .....................................................................................................17

H.R. Rep. No. 103-200 (1993).............................................................................................. 6, 16

H.R. Rep. No. 110-652 (2008) ..................................................................................................17

H.R. Rep. No. 114-840 (2016) ..................................................................................................17

S. Rep. No. 94-922 (1976) ........................................................................................................11

S. Rep. No. 94-1168 (1976) ......................................................................................................12

## RULES

Fed. R. Civ. P. 12 ...................................................................................... 19, 20, 33, 43

## EXECUTIVE ORDERS AND PROCLAMATIONS

Exec. Order No. 12722, 55 Fed. Reg. 31803 (Aug. 2, 1990)...........................................................18

Exec. Order No. 12734, 55 Fed. Reg. 48099 (Nov. 14, 1990) .........................................................18

Exec. Order No. 12735, 55 Fed. Reg. 48587 (Nov. 16, 1990) ...................................................... 2, 14

Exec. Order No. 12938, 59 Fed. Reg. 58099 (Nov. 14, 1994) .........................................................14

Exec. Order No. 12978, 60 Fed. Reg. 54579 (Oct. 21, 1995) .........................................................14

Exec. Order No. 13047, 62 Fed. Reg. 28301 (May 22, 1997) ...........................................................2

Exec. Order No. 13194, 66 Fed. Reg. 7389 (Jan. 18, 2001) ...........................................................13

Exec. Order No. 13235, 66 Fed. Reg. 58343 (Nov. 16, 2001) .........................................................18

Exec. Order No. 13405, 71 Fed. Reg. 35485 (June 16, 2006) ........................................2

Exec. Order No. 13581, 76 Fed. Reg. 44757 (July 24, 2011) ......................................14

Exec. Order No. 13712, 80 Fed. Reg. 73633 (Nov. 23, 2015) ...........................2, 13

Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017) ........................................5

Proc. No. 6867, 61 Fed. Reg. 8843 (Mar. 1, 1996) .....................................................13

Proc. No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001) ...............................................18

Proc. No. 8443, 74 Fed. Reg. 55439 (Oct. 23, 2009) .................................................13

Proc. No. 9398, 81 Fed. Reg. 9737 (Feb. 24, 2016) ...................................................13

Proc. No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019) .............................................*passim*

## OTHER AUTHORITIES

83 Fed. Reg. 3012 (Jan. 22, 2018) ..................................................................................5

83 Fed. Reg. 46067 (Sept. 10, 2018) ...........................................................................18

83 Fed. Reg. 50949 (Oct. 10, 2018) ...............................................................................5

83 Fed. Reg. 56251 (Nov. 8, 2018) ..............................................................................13
Cong. Research Serv., Military Construction Funding in the Event of a National Emergency
    (updated Jan. 11, 2019) ...........................................................................................18

Hr'g Before the H. Armed Servs. Comm. on Emerging Threats and Capabilities,
    1999 WL 258030 (Apr. 27, 1999) .......................................................................... 6, 16

Hr'g on DoD's Budget Posture, S. Comm. on Armed Servs. (Mar. 14, 2019) .......................8

Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin.
    Law and Governmental Relations, 94th Cong. 27 (March 6, 1975) ................................ 12

President Donald J. Trump's Border Security Victory (Feb. 15, 2019),
    www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-
    security-victory (Fact Sheet 1) .................................................................10, 34, 39

Presidential Memorandum,
    2018 WL 1633761 (Apr. 4, 2018) ..............................................................................7

S. Comm. on Gov't Operations & the Special Comm. on Nat'l Emergencies and Delegated
   Emergency Powers, 94th Cong., 2d Sess., The National Emergencies Act Source Book:
   Legislative History, Texts, and Other Documents (1976) ............................................... 11, 12, 14, 23

Summary, H.J. Res. 46, 116th Cong., (2009) https://www.congress.gov/bill/116th-congress/house-
   joint-resolution/46 ..................................................................................................................................22

The Funds Available to Address the Nat'l Emergency at Our Border (Feb. 26, 2019),
   www.whitehouse.gov/briefings-statements/funds-available-address-national-emergency-
   border (Fact Sheet 2) ....................................................................................................................... 11, 37

U.S. Border Patrol Mileage of Pedestrian and Vehicle Fencing by State,
   www.cbp.gov/document/stats/us-border-patrol-mileage-pedestrian-and-
   vehicle-fencing-state ...............................................................................................................................4

Veto Message for H.J. Res. 46 (Mar. 15, 2019) ................................................................................ 1, 9

## INTRODUCTION

On February 15, 2019, the President issued a proclamation declaring that a national emergency exists at the southern border. *See* Presidential Proclamation on Declaring a Nat'l Emergency Concerning the S. Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019) (Proclamation). Because the southern border is "a major entry point for criminals, gang members, and illicit narcotics" as well as "large-scale unlawful migration," the President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency." *Id.* As the President recently explained, tens of thousands of aliens are apprehended along the southern border each month and thousands of pounds of illegal drugs are smuggled across the border each year while, at the same time, migrants have begun organizing into caravans that include large numbers of families and unaccompanied children from Central American countries. *See* Veto Message for H.J. Res. 46 (Mar. 15, 2019).

The Government has been building barriers along the southern border since the 1990s pursuant to congressional authorization. To address the current national emergency at the southern border, three statutory authorities and sources of funding have been identified to continue the construction of additional barriers, in addition to the $1.375 billion recently appropriated by Congress for such construction: (1) the Treasury Forfeiture Fund (31 U.S.C. § 9705); (2) the Department of Defense's (DoD) counter-drug support authority (10 U.S.C. § 284); and (3) the authority to reallocate funding from military construction projects, made available through the President's national emergency declaration (10 U.S.C. § 2808). Only the last source of statutory authority—§ 2808— depends on the President's national emergency declaration. The other two sources of authority— §§ 9705 and 284—are available regardless of the emergency at the southern border.

The Proclamation follows a forty-year tradition of multiple Presidents of both parties declaring national emergencies to address a wide range of problems. Indeed, many of the declarations

concerned situations that did not involve suddenly emerging threats or the sort of national crisis that currently exists on the southern border. Thus, for example, President Obama declared a national emergency to address "political repression" in Burundi, Exec. Order No. 13712, 80 Fed. Reg. 73633 (Nov. 23, 2015); President George W. Bush declared a national emergency to address the "fundamentally undemocratic March 2006 elections" in Belarus, Exec. Order No. 13405, 71 Fed. Reg. 35485 (June 16, 2006); and President Clinton declared a national emergency because "the Government of Burma has committed large-scale repression of the democratic opposition in Burma," Exec. Order No. 13047, 62 Fed. Reg. 28301 (May 22, 1997). And Presidents similarly have used this power to address longstanding problems, such as when George H.W. Bush declared a national emergency in 1990 to address the "proliferation of chemical and biological weapons" around the world. Exec. Order No. 12735, 55 Fed. Reg. 48587 (Nov. 16, 1990). President Trump's Proclamation concerning the national emergency at our Nation's southern border is neither unprecedented nor fundamentally different from past uses of the same authority by his predecessors, and is in fact more closely tied to exigent circumstances.

Plaintiffs seek to challenge the Proclamation and the Government's reliance on all three statutory authorities in addressing the border crisis, but the Court lacks jurisdiction to do so, and the complaint fails to state claims upon which relief may be granted. As a threshold matter, judicial review of the Proclamation is not available under the National Emergencies Act (NEA), and in any event, such challenges raise political questions that courts are not equipped to answer, as courts overwhelmingly have recognized. Moreover, independent separation-of-powers concerns require dismissal of the President as a defendant because there is no cause of action against the President, and Plaintiffs may not obtain equitable relief directly against the President for his official conduct, particularly where, as here, relief could be provided by subordinate agency officials. Plaintiffs also lack standing to challenge DoD's use of its § 2808 authority, as the Acting Secretary of Defense has not

yet decided to undertake or authorize any barrier construction projects under § 2808.

Plaintiffs' nonstatutory ultra vires claims alleging the Government acted in excess of its authority under §§ 9705, 284, and 2808 also fail.  In addition to the fact that Plaintiffs cannot obtain relief against the President, these claims should be dismissed because the Administrative Procedure Act (APA) provides a congressionally authorized cause of action to challenge agency decisionmaking. Plaintiffs cannot evade the APA via the narrow doctrine of nonstatutory review of alleged ultra vires action.  Even if Plaintiffs could rely on the ultra vires framework, this is not the exceptional case where nonstatutory review is available to address a violation of a clear and mandatory statutory requirement.

Finally, Plaintiffs' constitutional claims should be dismissed because they merely repackage claims of statutory violations in constitutional terms.  Defendants are relying on express congressional authorization to fund border construction, not the President's independent Article II authority. Plaintiffs' effort to reframe alleged statutory violations as independent violations of the Appropriations and Take Care Clauses contravenes the principle that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims."  *Dalton v. Specter*, 511 U.S. 462, 473 (1994).

For these reasons, as explained further below, Plaintiffs' complaint should be dismissed.

## BACKGROUND

I.   <u>Congress's Express Authorization of Barrier Construction Along the U.S.-
Mexico Border</u>

In 1990, the U.S. Border Patrol, with the assistance of the National Guard, began construction of a border fence near San Diego under the authority Congress granted to the Attorney General "to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5); *see D & D Landholdings v. United States*, 82 Fed. Cl. 329, 332 (2008).  Since then, Congress repeatedly has authorized the construction of border barrier infrastructure to prevent illegal

entry of people and contraband.  In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which authorizes the Secretary of Homeland Security to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  Pub. L. No. 104-208, Div. C., Title I § 102(a), 110 Stat. 3009 (1996), as amended (codified at 8 U.S.C. § 1103 note).

Since then, Congress has amended IIRIRA on three occasions to expand the Government's authority to construct barriers along the southern border.  In 2005, Congress passed the REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, Title I § 102, 119 Stat. 231, 302, 306 (2005), which authorized the Secretary of Homeland Security to "to waive all legal requirements" that, in the "Secretary's sole discretion," are "necessary to ensure expeditious construction" of barriers and roads.  *Id.* § 102(c)(1). Congress again amended IIRIRA as part of the Secure Fence Act of 2006, requiring construction of "physical barriers, roads, lights, cameras, and sensors" across hundreds of miles of the southern border in five specified locations.  Pub. L. No. 109-367, § 3, 120 Stat. 2638 (2006).  In 2007, Congress expanded this requirement and directed "construct[ion of] reinforced fencing along not less than 700 miles of the southwest border."  Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 2090 (2007).

Relying on these authorities, the Department of Homeland Security (DHS) has installed 705 miles of vehicle and pedestrian barriers along the southern border since 1996.[1]  *See* U.S. Border Patrol Mileage of Pedestrian and Vehicle Fencing by State, www.cbp.gov/document/stats/us-border-patrol-

---

[1] The Court may consider facts outside the complaint on a motion to dismiss without converting the motion into a motion for summary judgment when the facts are subject to judicial notice.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).  The Court may take judicial notice of the publicly available information on official government websites cited herein.  *See Dinh Tran v. Dep't of Treasury*, 351 F. Supp. 3d 130, 133 n.5 (D.D.C. 2019); *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014).

mileage-pedestrian-and-vehicle-fencing-state.   DHS's efforts to construct border barriers under IIRIRA have been subject to a diverse array of legal challenges, but courts have uniformly dismissed every lawsuit.  *See, e.g.*, *In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1215 (9th Cir. 2019); *N. Am. Butterfly Ass'n v. Nielsen*, 2019 WL 634596 (D.D.C. Feb. 14, 2019); *Save Our Heritage v. Gonzalez*, 533 F. Supp. 2d 58 (D.D.C. 2008); *Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007), *cert. denied*, 554 U.S. 918 (2008).

## II.     DHS's Recent Efforts to Expedite Border Barrier Construction

On January 25, 2017, the President issued an Executive Order directing federal agencies "to deploy all lawful means to secure the Nation's southern border."  Border Security and Immigration Enforcement Improvements, Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017).   The Executive Order stated that it is the policy of the Executive Branch to "secure the southern border of the United States through the immediate construction of a physical wall on the southern border, monitored and supported by adequate personnel so as to prevent illegal immigration, drug and human trafficking, and acts of terrorism."  *Id.*  The Order required that agencies "take all appropriate steps to immediately plan, design and construct a physical wall along the southern border," including "[i]dentify and, to the extent permitted by law, allocate all sources of Federal funds" to that effort.  *Id.* at 8794.

In furtherance of these directives, DHS has worked to expedite construction of a variety of different border barrier projects over the past two years.  *See, e.g.*, Determination Pursuant to § 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 83 Fed. Reg. 50949 (Oct. 10, 2018) (construction in Rio Grande Valley Sector of Texas); Determination Pursuant to § 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 83 Fed. Reg. 3012 (Jan. 22, 2018) (construction in New Mexico).

**III.**      **Congress's Authorization for U.S. Military Support of DHS's Border Security Efforts**

Congress also has expressly authorized the U.S. military to provide a wide range of support to DHS at the southern border, including the "construction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284; *see id.* §§ 271–74. Since the early 1990s, military personnel have supported civilian law-enforcement agency activities to secure the border, counter the spread of illegal drugs, and respond to transnational organized crime and other transnational threats. *See* H. Armed Servs. Comm. Hr'g on S. Border Defense Support (Jan. 29, 2019) (Joint Statement of John Rood, Under Secretary of Defense for Policy, and Vice Admiral Michael Gilday, Director of Operations for the Joint Chiefs of Staff) (Joint Statement of Rood and Gilday), https://armedservices.house.gov/2019/1/department-of-defense-s-support-to-the-southern-border. Active, Reserve, and National Guard personnel have provided a wide range of assistance, including aerial reconnaissance, ground surveillance, search and rescue, engineering, communications, and medical support. *Id.*

Both Presidents Bush and Obama deployed military personnel to the southern border to support DHS's border security efforts. In 2006, President Bush directed DoD to provide between 3,000 and 6,000 National Guard personnel in support of CBP's Operation Jump Start. *Id.* Additionally, President Obama directed DoD to provide up to 1,200 National Guard personnel annually from 2010 to 2016 in support of CBP's Operation Phalanx. *Id.*

For decades, U.S. military forces have played an active role in barrier construction and reinforcement during their deployments to the southern border. Military personnel were critical to construction of the San Diego border barrier in the early 1990s as well as other border fence projects. *See* H.R. Rep. No. 103-200, at 330–31, 1993 WL 298896 (1993) (commending DoD's Joint Task Force 6 for its role in construction of the San Diego primary fence); Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Test. of

Barry R. McCaffrey, Dir. of the Office of Nat'l Drug Control Policy) ("Since 1990, Joint Task Force-Six and Team Engineer of the California National Guard Counter Drug Directorate have constructed over 55 miles of barrier fencing in urban areas and 10 miles of . . . barriers in rural settings.").  In 2006, the National Guard improved the southern border security infrastructure by building more than 38 miles of fence, 96 miles of vehicle barrier, more than 19 miles of new all-weather road, and road repairs exceeding 700 miles.  *See* Joint Statement of Rood and Gilday.  More recently, the U.S. Army Corps of Engineers (USACE) has assisted DHS by providing planning, engineering, and barrier construction support.  *See, e.g.*, *Gringo Pass, Inc. v. Kiewit Sw. Co.*, 2012 WL 12905166, at \*1 (D. Ariz. Jan. 11, 2012).

**IV.      DoD's Current Support for DHS's Efforts to Secure the Southern Border**

Building on this decades-long practice, on April 4, 2018, the President issued a memorandum to the Secretary of Defense, Secretary of Homeland Security, and the Attorney General titled, "Securing the Southern Border of the United States."  Presidential Memorandum, 2018 WL 1633761 (Apr. 4, 2018).  The President stated "[t]he security of the United States is imperiled by a drastic surge of illegal activity on the southern border" and pointed to the "anticipated rapid rise in illegal crossings," as well as "the combination of illegal drugs, dangerous gang activity, and extensive illegal immigration."  *Id.*  The President determined the situation at the border had "reached a point of crisis" that "once again calls for the National Guard to help secure our border and protect our homeland."  *Id.*  To address this crisis, the President directed the Secretary of Defense to support DHS in "securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens into this country."  *Id.*  The President also directed the Secretary of Defense to request the use of National Guard personnel to assist in fulfilling this mission.  *Id.*  Since April 2018, National Guard personnel have performed a range of administrative, logistical, and operational tasks in support of CBP's Operation Guardian Support.  *See* Joint Statement of Rood and Gilday.

In October 2018, the President expanded the military's support to DHS to include active duty military personnel. *See id.* Since then, active duty personnel have provided a range of support to DHS, including aviation and engineering support, hardening U.S. ports of entry, erecting temporary barriers, and emplacing concertina wire. *See id.* As of mid-March 2019, approximately 4,000 active duty personnel and 2,000 National Guard personnel were stationed at the southern border. *See* Hr'g on DoD's Budget Posture, S. Comm. on Armed Servs. (Mar. 14, 2019) (Test. of Gen. Joseph Dunford, Chairman of the Joint Chiefs of Staff).

## V.     The President's Proclamation Declaring a National Emergency at the Southern Border

On February 15, 2019, in accordance with requirements of the NEA, 50 U.S.C. § 1601 *et seq.*, the President issued a proclamation declaring that "a national emergency exists at the southern border of the United States." *See* Proclamation. The President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency." *Id.* The President explained:

> The southern border is a major entry point for criminals, gang members, and illicit narcotics. The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years. In particular, recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending. If not detained, such aliens are often released into the country and are often difficult to remove from the United States because they fail to appear for hearings, do not comply with orders of removal, or are otherwise difficult to locate.

*Id.* The President noted that in response to his April 4, 2018 memorandum, DoD has provided support and resources to DHS at the southern border. *Id.* Despite these efforts, "because of the gravity of the current emergency situation," the President determined that "this emergency requires use of the Armed Forces" and "it is necessary for the Armed Forces to provide additional support to address the crisis." *Id.*

To achieve its purpose, the Proclamation invokes and makes available two statutory authorities to be exercised by DoD as appropriate. First, the Proclamation makes available the authority under 10 U.S.C. § 12302 to order units or members of the Ready Reserve to active duty. *See id.*; 10 U.S.C. § 12302(a). Second, the Proclamation makes available to the Acting Secretary of Defense the authority under 10 U.S.C. § 2808, which provides that, "without regard to any other provision of law," the Secretary of Defense "may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces." *See id.*; 10 U.S.C. § 2808(a). The Proclamation directs the Secretaries of Defense, Interior, and Homeland Security and, subject to the Acting Secretary of Defense's discretion, the Secretaries of the Military Departments, to "take all appropriate actions, consistent with applicable law, to use or support the use of the authorities . . . invoked, including, if necessary, the transfer and acceptance of jurisdiction over border lands." *See* Proclamation.

On March 15, 2019, the President vetoed a joint resolution passed by Congress that would have terminated the President's national emergency declaration. *See* Veto Message. In doing so, the President relied upon statistics published by CBP as well as recent congressional testimony by the Secretary of Homeland Security to reaffirm that a national emergency exists along the southern border. *See id.* The President highlighted (1) the recent increase in the number of apprehensions along the southern border, including 76,000 CBP apprehensions in February 2019, the largest monthly total in the last five years; (2) CBP's seizure of more than 820,000 pounds of drugs in fiscal year 2018; and (3) arrests of 266,000 aliens previously charged with or convicted of crimes in fiscal years 2017 and 2018. *See id.* The President also emphasized that migration trends along the southern border have changed from primarily single adults from Mexico, who could be easily removed upon apprehension, to caravans that include record numbers of families and unaccompanied children from Central America.

*See id.*  The President explained that this shift requires frontline border enforcement personnel to divert resources away from border security to humanitarian efforts and medical care.  *See id.*  Further, the President stated that criminal organizations are taking advantage of the large flows of families and unaccompanied minors to conduct a range of illegal activity.  *See id.*  With new surges of migrants expected in the coming months, the President stated that border enforcement personnel and resources are strained "to the breaking point."  *See id.*  The President concluded that the "situation on our border cannot be described as anything other than a national emergency, and our Armed Forces are needed to help confront it."  *See id.*

## VI. <u>The Use of Spending Authorities for Barrier Construction</u>

On the same day the President issued the Proclamation, the White House publicly released a fact sheet setting forth the sources of funding that are to be used to construct additional barriers along the southern border.  In addition to the $1.375 billion appropriation in the Fiscal Year 2019 Consolidated Appropriations Act for the construction of border barriers in the Rio Grande Valley sector of Texas, *see* Pub. L. No. 116-6, § 230, 133 Stat. 13 (2019), the fact sheet identifies the following additional sources of funding for potential barrier construction, which it explains will be used sequentially and as needed:

A. About $601 million from the Treasury Forfeiture Fund;

B. Up to $2.5 billion under the Department of Defense funds transferred for Support for Counterdrug Activities (10 U.S.C. § 284);

C. Up to $3.6 billion reallocated from Department of Defense military construction projects under the President's declaration of a national emergency (10 U.S.C. § 2808).

*See* President Donald J. Trump's Border Security Victory (Feb. 15, 2019), www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory (Fact Sheet 1); *see also* The Funds Available To Address The Nat'l Emergency At Our Border (Feb. 26, 2019), www.whitehouse.gov/briefings-statements/funds-available-address-national-emergency-

border (Fact Sheet 2).

## STATUTORY FRAMEWORK

### I.   National Emergencies Act

The NEA, Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601-1651), was an effort by Congress to "establish procedural guidelines for the handling of future emergencies with provision for regular Congressional review." S. Rep. No. 94-922, at 1 (1976).[2] Title II of the NEA—codified at 50 U.S.C. § 1621—prescribes rules for the declaration of national emergencies by the President. Section 1621(a) authorizes the President to "declare [a] national emergency" with respect to statutes "authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a). Section 1621(b) states that "[a]ny provisions of law conferring powers and authorities to be exercised during a national emergency shall be effective and remain in effect (1) only when the President (in accordance with subsection (a) of this section), specifically declares a national emergency, and (2) only in accordance with [the NEA]." *Id.* § 1621(b).

Congress did not define the term "national emergency" or place any conditions on the President's ability to declare a national emergency. Instead, Congress intentionally left this determination to the President. As the co-chairmen of the Special Congressional Committee on National Emergencies that studied the issue and drafted the NEA explained, "[W]e did review this possibility of defining what national emergencies might be comprehended; and we decided you would cause more trouble by trying to define it than just saying 'national emergency' . . .". We felt it would

---

[2] The NEA was the culmination of a multi-year effort by Congress to examine the field of emergency statutes and procedures. *See* S. Comm. on Gov't Operations & the Special Comm. on Nat'l Emergencies and Delegated Emergency Powers, 94th Cong., 2d Sess., The National Emergencies Act Source Book: Legislative History, Texts, and Other Documents, at 3–9 (1976) (summarizing legislative history of NEA from 1972–1976, including extensive work conducted by the Senate Special Committee on National Emergencies) (hereinafter "NEA Source Book").

be wrong to try to circumscribe with words with what conditions a President might be confronted." Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Governmental Relations, 94th Cong. 27 (March 6, 1975) (statement of Sen. Mathias); *see id.* at 31 ("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers."); *see id.* at 27 (statement of Sen. Church) ("[O]nce we got into that thicket [of defining a national emergency] it became evident that we would be creating more problems than we would be solving."). And during the final debate on the NEA, the House of Representatives specifically rejected an amendment that would have limited the circumstances in which the President could declare a national emergency to times of war or attacks upon the United States only. *See* NEA Source Book at 278–80; *see id.* at 280 (statement of Rep. Moorhead) ("[T]his amendment would completely take away from the President the flexibility of acting in times of crisis or an emergency" and "it is important that we give our President some flexibility from time to time."). At the time of its passage, Congress therefore expressly recognized that the NEA "makes no attempt to define when a declaration of national emergency is proper." *Id.* at 9 (quoting S. Rep. No. 94-1168).

The NEA was "an effort by the Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers conferred upon him by other statutes." *See* S. Rep. No. 94-1168, at 3 (1976). Accordingly, the NEA provides that "[w]hen the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631. The NEA thus establishes procedural guidelines for the President to follow before he may invoke other statutory authorities.

In the more than 40 years since Congress enacted the NEA, Presidents have exercised broad discretion in determining what challenges amount to national emergencies, declaring nearly 60 national emergencies addressing a wide variety of national and international challenges. For example, prior

national emergency declarations have authorized the invocation of statutory powers to restrict the trade in uncut diamonds used to fund Sierra Leone's civil war, Exec. Order No. 13194, 66 Fed. Reg. 7389 (Jan. 18, 2001), to address the spread of swine flu in the United States, Proc. No. 8443, 74 Fed. Reg. 55439 (Oct. 23, 2009), and to promote democracy or conflict resolution in various countries around the world, *see, e.g.*, Exec. Order No. 13712, 80 Fed. Reg. 73633 (Nov. 22, 2015) (President Obama declared a national emergency to address "violence against civilians" and "political repression" in Burundi).

The NEA also authorizes the President to renew declared emergencies annually without limitation. *See* 50 U.S.C. § 1622(d). Thirty-one national emergencies remain in effect today, with many having been renewed by multiple Presidents over several decades. For example, President Clinton declared a national emergency in 1996 after Cuban military aircraft intercepted and destroyed two unarmed U.S.-registered civilian aircraft in international airspace north of Cuba. *See* Proc. No. 6867, 61 Fed. Reg. 8843 (Mar. 1, 1996). The emergency remains in effect today, having been renewed over the course of 23 years by Presidents Bush, Obama, and Trump, even though President Obama concluded in 2016 that "the descriptions of the national emergency set forth in Proclamations 6867 and 7757 no longer reflect the international relations of the United States related to Cuba." *See* Proc. No. 9398, 81 Fed. Reg. 9737 (Feb. 24, 2016). Indeed, the first national emergency declared under the NEA—President Carter's 1979 emergency declaration stemming from the Iran hostage crisis—has been in effect for 39 years and is now being continued because "relations with Iran have not yet normalized, and the process of implementing the agreements with Iran, dated January 19, 1981, is ongoing." *See* Cont. of Nat'l Emergency With Respect to Iran, 2016 WL 6518765 (Nov. 3, 2016) (Ltr. from President Obama); *see also* 83 Fed. Reg. 56251 (Nov. 8, 2018) (renewal by President Trump).

Nothing in the NEA requires that a national emergency be a sudden or unforeseen event, as some emergencies build through an accretion of events and exist over a considerable period of time.

In 1990, for example, President George H. W. Bush declared a national emergency arising from the "proliferation of chemical and biological weapons" around the world.  Exec. Order No. 12735, 55 Fed. Reg. 48587 (Nov. 16, 1990).  Four years later, President Clinton added nuclear weapons proliferation to that emergency declaration.  Exec. Order No. 12938, 59 Fed. Reg. 58099 (Nov. 14, 1994).  President Clinton also declared a national emergency arising from narcotics trafficking centered in Colombia, Exec. Order No. 12978, 60 Fed. Reg. 54579 (Oct. 21, 1995), and President Obama declared a national emergency arising from the activities of certain transnational criminal organizations, Exec. Order No. 13581, 76 Fed. Reg. 44757 (July 24, 2011).  These declarations, like the President's Proclamation, addressed long-standing policy challenges confronting the United States, even though they were neither new nor unforeseen at the time they were declared to be a national emergency.  Indeed, the President's Proclamation acknowledged that the situation at the southern border is a "long-standing" problem and builds on previous efforts of President Obama to use emergency powers to address the threats along the southern border by declaring a national emergency targeting a Mexican cartel known as Los Zetas.  *See id.*

Recognizing that, by their very nature, declarations of national emergency require the need for flexibility in policy choices that are the province of the political branches of the federal government, Congress gave itself the exclusive authority to exercise oversight of a President's national emergency declaration.  As a remedy to potential overreach, Congress has authority to terminate a national emergency by enacting into law "a joint resolution." 50 U.S.C. § 1622(a)(1).[3]  Emphasizing the political

---

[3] The original draft of the NEA would have automatically terminated a national emergency after six months unless extended by an act of Congress.  *See* NEA Source Book at 7.  Congress eliminated this provision during debate and replaced it with the requirement that Congress pass a "concurrent resolution" to terminate a national emergency.  *See id.*; *Beacon Prods. Corp. v. Reagan*, 814 F.2d 1, 4 (1st Cir. 1987) (Breyer, J.).  In 1985, Congress amended this provision and replaced the "concurrent resolution" requirement with one that calls for termination of a national emergency by "joint resolution."  Pub. L. No. 99-93, § 801, 99 Stat. 405, 448 (1985).  This amendment was the result of

judgment that Congress must make, the NEA expressly requires Congress to meet "[n]ot later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues, . . . to consider a vote on a joint resolution to determine whether that emergency shall be terminated." *Id.* § 1622(b); *see also id.* § 1622(c) (establishing procedure for both Houses of Congress to vote on a joint resolution terminating a national emergency). Additionally, Congress has imposed extensive reporting requirements on the Executive Branch when the President declares a national emergency. *See id.* § 1641(a)–(b) (requiring the President and each executive agency to maintain a file and index of, and transmit to Congress, certain orders, rules, and regulations); *id.* § 1641(c) (requiring the President to periodically transmit to Congress "a report on the total expenditures incurred by the United States Government . . . which are directly attributable to the exercise of powers and authorities conferred by such declaration"). The NEA does not provide any role for the courts in reviewing a national emergency declaration, as it does not create a private right of action or contain a civil enforcement mechanism.

## II.   The Treasury Forfeiture Fund and 31 U.S.C. § 9705

The Department of Treasury Forfeiture Fund (TFF) collects proceeds from "seizures and forfeitures made pursuant to any law (other than section 7301 or 7302 of the Internal Revenue Code of 1986) enforced or administered by the Department of the Treasury or the United States Coast Guard." 31 U.S.C. § 9705(a). Congress established the fund in 1992, and the authorizing legislation, 31 U.S.C. § 9705, sets forth the purposes for which the fund's revenue may be used. *See* S. Rep. No. 102-398 (1992). As relevant here, § 9705(g)(4)(B) states that any surplus unobligated funds (after reserving certain statutorily required amounts) "shall be available to the Secretary, without fiscal year limitation, . . . for obligation or expenditure in connection with the law enforcement activities of any

---

the Supreme Court's decision in *INS v. Chadha*, 462 U.S. 919, 959 (1983), which invalidated a similar provision as unconstitutional. *See United States v. Amirnazmi*, 645 F.3d 564, 581 n.26 (3d Cir. 2011).

Federal agency or of a Department of the Treasury law enforcement organization." If the Treasury Secretary intends to expend more than $500,000 under this authority, the Secretary must give the House and Senate Appropriations committees at least 15 days' notice. *See* 31 U.S.C. § 9705(g)(4)(C).

### III.   10 U.S.C. § 284

10 U.S.C. § 284 states that "[t]he Secretary of Defense may provide support for the counterdrug activities . . . of any other department or agency of the Federal Government," if requested by the relevant "official who has responsibility for [such] counterdrug activities." 10 U.S.C. § 284(a), (a)(1)(A). This support includes express authority for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." *Id.* § 284(b)(7). This authority may be invoked at any time and does not require a declaration of national emergency.

Congress first provided DoD this authority in the National Defense Authorization Act for Fiscal Year 1991. Pub. L. No. 101-510, § 1004, 104 Stat. 1485 (1991). As a specific fiscal year appropriation, § 1004 had to be periodically renewed to continue DoD's authority to support counter-drug activities. *See, e.g.*, Pub. L. No. 107-107, § 1004, 115 Stat. 1012 (2001). Not only did Congress regularly renew § 1004, it frequently praised DoD's involvement in building barrier fences along the southern border and allocated additional funds to DoD to encourage its support of counter-drug construction projects. For example, in 1993, Congress "commend[ed]" DoD's efforts to reinforce the border fence along a 14-mile drug smuggling corridor in the San Diego-Tijuana border area, calling the project "precisely the kind of federal-local cooperative effort the Congress had in mind in enacting section 1004." H.R. Rep. No. 103-200, at 330–31, 1993 WL 298896 (1993). Government officials and Congress alike have noted the particular importance of DoD's involvement in southern border enhancement projects to prevent drug smuggling. *See* Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Test. of Barry R.

McCaffrey, Dir. of the Office of Nat'l Drug Control Policy) (testifying about the "vital contributions" made by DoD to construct barrier fencing along the southern border); *see, e.g.*, H.R. Rep. No. 110-652, 420 (2008) (recommending a $5 million increase to DoD's funding to continue construction of a southern border fence, which was described as an "invaluable counter-narcotics resource").  In light of the continuing "threat posed by the production and trafficking of heroin, fentanyl . . . , and other illicit drugs" across our nation's borders, Congress permanently codified § 1004 at 10 U.S.C. § 284 in December 2016, directing DoD "to ensure appropriate resources are allocated to efforts to combat this threat."  H.R. Rep. No. 114-840, 1146 (2016).

## IV.     10 U.S.C. § 2808

First enacted as part of the 1982 Military Construction Authorization Act, Pub. L. No. 97-99, § 903, 95 Stat. 1359 (1981), and later amended by the Military Construction Codification Act of 1982, Pub. L. No. 97-214, § 2, 96 Stat. 153 (codifying 10 U.S.C. §§ 2801–08), 10 U.S.C. § 2808(a) provides:

> In the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces.  Such projects may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated.

In enacting this provision, Congress recognized that "it is impossible to provide in advance for all conceivable emergency situations" and wanted to fill "a gap that now exists with respect to restructuring construction priorities in the event of a declaration of war or national emergency."  H.R. Rep. No. 97-44, at 72 (1981).

The term "military construction" as used in § 2808 "includes any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land or construction of a defense

access road (as described in section 210 of title 23)." 10 U.S.C. § 2801(a).  Congress in turn defined the term "military installation" to mean "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the Secretary of a military department or the Secretary of Defense, without regard to the duration of operational control." *Id.* § 2801(c)(4).

Presidents have invoked the military construction authority under § 2808 on two prior occasions.  First, President George H.W. Bush authorized the use of § 2808 in 1990 following the Government of Iraq's invasion of Kuwait.  *See* Exec. Order No. 12722, 55 Fed. Reg. 31803 (Aug. 2, 1990); Exec. Order No. 12734, 55 Fed. Reg. 48099 (Nov. 14, 1990).  Second, President George W. Bush invoked § 2808 in response to the terrorist attacks against the United States on September 11, 2001.  *See* Proc. No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001); Exec. Order No. 13235, 66 Fed. Reg. 58343 (Nov. 16, 2001).  The national emergency declaration stemming from the terrorist attacks of September 11, 2001, remains in effect today, *see* 83 Fed. Reg. 46067 (Sept. 10, 2018), and DoD has used its § 2808 authority to build a wide variety of military construction projects, both domestically and abroad, over the past 17 years, *see* Cong. Research Serv., Military Construction Funding in the Event of a National Emergency at 1–3 & tbl. 1 (updated Jan. 11, 2019) (listing projects worth $1.4 billion performed domestically and abroad using § 2808 between 2001 and 2014).

## PLAINTIFFS' CLAIMS

Plaintiffs are three nonprofit environmental groups: the Center for Biological Diversity; Defenders of Wildlife; and the Animal Legal Defense Fund.  Compl. ¶¶ 11–14.  They bring this suit against the President, the Acting Secretary of Defense, the Secretary of the Treasury, the Secretary of Homeland Security, and the Acting Secretary of the Interior in their official capacities.  *Id.* ¶¶ 17–21.  Operating under a claimed "non-statutory right of action," *id.* ¶ 131, Plaintiffs allege violations of the NEA, *id.* ¶¶ 131–35 (Count One); 10 U.S.C. § 2808, *id.* ¶¶ 137–44 (Count Two); 10 U.S.C. § 284, *id.*

¶¶ 146–150 (Count Three); and 31 U.S.C. § 9705, *id.* ¶¶ 152–56 (Count Four).   Plaintiffs also bring

constitutional claims pursuant to the Appropriations Clause, *id.* ¶¶ 158–61 (Count Five); and the Take

Care Clause, *id.* ¶¶ 163–65 (Count Six).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) requires dismissal of any claim over which a court

lacks subject-matter jurisdiction.   The complaining party has the burden of establishing the predicates

to federal jurisdiction, including standing.   *See Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,

489 F.3d 1279, 1289 (D.C. Cir. 2007).   In the absence of standing, a matter is not justiciable.   *See id.*

Nor does a "justiciable 'controversy' exist[] when parties seek adjudication of a political question."   *El-*

*Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010) (en banc) (quoting

*Massachusetts v. EPA*, 549 U.S. 497, 516 (2007)).   Although in evaluating Rule 12(b)(1) motions, the

court must accept well-pleaded factual allegations as true, "the district court may consider materials

outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."   *Jerome*

*Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Federal Rule of Civil Procedure 12(b)(6) mandates dismissal for failure to state a claim upon

which relief can be granted.   To pass muster, a complaint must contain "sufficient factual matter" to

"state a claim to relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   A complaint that "tenders 'naked assertion[s]'

devoid of 'further factual enhancement'" warrants dismissal.   *Id.* (quoting *Twombly*, 550 U.S. at 557).

Although a court must accept as true well-pleaded factual allegations and construe them in the light

most favorable to the plaintiff, it need not accept "legal conclusions" or "mere conclusory statements."

*Id.*   Neither is a court required to accept as true a complaint's factual allegations if they "contradict

exhibits to the complaint or matters subject to judicial notice."   *Kaempe v. Myers*, 367 F.3d 958, 963

(D.C. Cir. 2004).   In addition to the facts alleged, a court may consider "documents attached as exhibits

or incorporated by reference in the complaint or documents upon which the plaintiff's complaint necessarily relies." *Cause of Action Inst. v. Eggleston*, 224 F. Supp. 3d 63, 70 (D.D.C. 2016) (internal quotation marks and citation omitted).

## ARGUMENT

### I.   The Court Lacks Jurisdiction.

Plaintiffs' complaint suffers from jurisdictional defects.  *First*, Plaintiffs' challenge to the President's decision to issue the Proclamation is nonjusticiable, both because the NEA impliedly precludes judicial review and because the declaration of a national emergency raises a political question courts are not equipped to answer.  Furthermore, the President must be dismissed as a party because there is no cause of action against the President, and Plaintiffs cannot obtain injunctive or declaratory relief against the President.  *Second*, Plaintiffs lack standing to bring a claim pursuant to § 2808 because the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction under § 2808.  Accordingly, the Court should dismiss the claims alleging violations of the NEA (Count One) and § 2808 (Count Two) pursuant to Rule 12(b)(1).

### A.   Plaintiffs' Challenge to the President's Declaration of a National Emergency Should Be Dismissed.

This Court lacks subject-matter jurisdiction over Plaintiffs' allegations concerning the NEA and the President's Proclamation.  Congress has placed no limitations on the President's authority to declare a national emergency.  Because the NEA does not define the term "national emergency," the text and structure of the statute evidence Congress's choice to leave this determination to the President, subject only to congressional oversight as provided by the NEA.  Whether viewed as a statutory or separation-of-powers matter, the President is entitled to make a determination about what circumstances constitute a national emergency in the political process without judicial second guessing.

1.     The NEA Evidences Congress's Intent to Preclude Judicial Review.

The Supreme Court has instructed that in determining whether a statute "precludes judicial review," a court must examine the "express language" of the statute as well as "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).  That Congress intended to preclude judicial review need only be "fairly discernible" from the evidence. *Id.* at 351.

Here, Congress's intent to preclude judicial review is evidenced by the text of NEA, which does not define the term national emergency or provide courts with any standards by which to evaluate the President's exercise of this authority.  *See* 50 U.S.C. § 1621.  The lack of a definition in the statute reflects Congress's intentional decision to leave to the President the determination about when and under what circumstances to declare a national emergency.  The absence of any judicially enforceable remedy is further supported by the fact that the NEA establishes procedural and reporting guidelines only that the President must follow when invoking other statutory authorities conditioned on a national emergency declaration.  *See* 50 U.S.C. §§ 1631, 1641.  Accordingly, the NEA does not provide a mechanism for litigants to have any role in the statutory process, let alone a role that Plaintiffs could enforce in court.  *See United States v. Amirnazmi*, 645 F.3d 564, 581 (3d Cir. 2011) (stating that the "NEA places the onus on Congress to ensure emergency situations remain anomalous").

The lack of a judicial enforcement mechanism to challenge a national emergency declaration is reinforced by the NEA's exclusive remedial scheme for Congress to challenge through political means the President's determination that a particular national emergency exists.  *See* 50 U.S.C. § 1622; *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.").  As explained above, Congress has the authority to terminate a national emergency by enacting into law "a joint resolution."  50 U.S.C. § 1622(a)(1).

21

Further, the NEA expressly requires Congress to vote on whether to terminate the declared emergency within six months of the President's declaration and establishes expedited procedures for Congress to vote on such a measure once a termination resolution is introduced. *Id.* § 1622(b), (c). Here, majorities of both houses of Congress attempted to terminate the President's national emergency declaration by passing a joint resolution, but the President vetoed that measure, and there was insufficient support for termination among members of Congress to override the President's veto to enact the joint resolution into law. *See* Summary, H.J. Res. 46, 116th Cong. (2019), https://www.congress.gov/bill/116th-congress/house-joint-resolution/46. The fact that there was insufficient congressional will to exercise its ability to terminate the Proclamation through the NEA's statutory procedures only underscores that this dispute should not be adjudicated by the Court. *Cf. Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 (2015) ("Having failed to prevail in their own Houses, the suitors could not repair to the Judiciary to complain.").

Moreover, when Congress had the opportunity to change the oversight structure of the NEA in response to the Supreme Court's *Chadha* decision that declared the "legislative veto" unconstitutional, Congress notably changed the termination threshold from a "concurrent resolution," which does not involve Presidential approval, to a "joint resolution," which requires either Presidential approval or adequate congressional support to override a Presidential veto in order to be enacted.[4] *See supra* pp. 14–15. Congress could have instituted a different mechanism, such as creating a judicial-enforcement regime, but Congress did not adopt other alternatives. *See Beacon Prods. Corp. v. Reagan*, 814 F.2d 1, 4 (1st Cir. 1987) (Breyer, J.) ("This legislative history makes clear that Congress intended to impose upon itself the burden of acting affirmatively to end an emergency."). Instead, Congress

---

[4] The NEA's "provision for termination by concurrent resolution is unconstitutional because, unlike a joint resolution, termination by concurrent resolution would enable Congress to take legislative action without presenting the action to the President for his signature." *Beacon Prods. Corp. v. Regan*, 633 F. Supp. 1191, 1196 (D. Mass. 1986), *aff'd*, 814 F.2d 1 (1st Cir. 1987); *see supra* note 3.

gave itself the power to oversee the President's use of statutory emergency authority, and there is no basis on which to create a new judicial remedy on top of Congress's carefully crafted framework. Where, as here, the statute expressly provides Congress with authority to terminate a national emergency, it is "an 'elemental canon' of statutory construction that . . . courts must be especially reluctant to provide additional remedies." *Karahalios v. Nat'l Fed'n of Fed. Emps., Local 1263*, 489 U.S. 527, 533 (1989) (citations omitted).

Further, the NEA was the product of a multi-year study by Congress to address the field of national emergency authorities, and nothing in that extensive legislative history suggests that Congress intended to allow judicial challenges to the President's national emergency declarations. To the contrary, the legislative history shows that Congress, not the courts, would be the branch of government to oversee the President's use of his emergency powers. *See* NEA Source Book at 338 ("every type and class of presidentially declared emergency will be subjected to congressional control" and "the legislative branch will be in a position to assert its ultimate authority"); *see also Block*, 467 U.S. at 349 (preclusion of judicial review may be implied from "specific legislative history" alone). Moreover, given the President's "unique position in the constitutional scheme," *Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982), any remedial scheme where litigants could sue the President to challenge a national emergency declaration would raise separation-of-powers concerns and create tension with the Supreme Court's admonition that federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 501 (1866). There is no indication in the legislative history that Congress gave consideration to those weighty issues or concluded that such lawsuits against the President should proceed. *See* NEA Source Book at 342 (stating that "there is [no] intent here to limit either the President's power or flexibility to declare a national emergency" and there is no intent to limit "the subject matter of the emergency or the timing of its declaration") (statements of Reps. Moorhead and Flowers). In the absence of clear

23

direction from Congress, the Court should not imply a remedy that would conflict with longstanding separation-of-powers principles.

In light of the NEA's text, structure, and legislative history, Congress has precluded judicial review of the President's national emergency Proclamation.

2. Plaintiffs' Challenge to the President's National Emergency Declaration Presents a Nonjusticiable Political Question.

Courts that have considered the issue have uniformly concluded that a Presidential declaration of a national emergency is a nonjusticiable political question. *See, e.g., Amirnazmi*, 645 F.3d at 581 ("[F]ederal courts have historically declined to review the essentially political questions surrounding the declaration or continuance of a national emergency." (citation omitted)); *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1081 (9th Cir. 1982) ("[W]e will not address these essentially-political questions . . . .").[5]   Since passage of the NEA in 1976, there have been nearly 60 national

---

[5] *See also Soudavar v. Bush*, 46 F. App'x 731 (5th Cir. 2002) (per curiam) (affirming district court decision dismissing a challenge to executive orders imposing national emergency sanctions on Iran as involving a "nonjusticiable political question"); *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 573 (Cust. & Pat. App. 1975) (courts will not "review the judgment of a President that a national emergency exists"); *Chichakli v. Szubin*, 2007 WL 9711515, at *4 (N.D. Tex. June 4, 2007) (holding that a challenge to President Bush's declaration of a national emergency with respect to the "unstable situation" in Liberia "presents a nonjusticiable political question"), *aff'd in part, vacated in part*, 546 F.3d 315 (5th Cir. 2008); *Beacon Prods. Corp. v. Reagan*, 633 F. Supp. at 1194–45 (whether national emergency existed with respect to Nicaragua presents a nonjusticiable political question), *aff'd*, 814 F.2d 1 (1st Cir. 1987); *Sardino v. Fed. Reserve Bank of N.Y.*, 361 F.2d 106, 109 (2d Cir. 1966) (concluding that President Truman's national emergency declaration concerning the situation in Korea is not justiciable and "courts will not review a determination so peculiarly within the province of the chief executive"); *Veterans & Reservists for Peace in Vietnam v. Regional Comm'r of Customs, Region II*, 459 F.2d 676, 679 (3d Cir. 1972) ("[A] President's declaration of national emergency is unreviewable."); *Santiago v. Rumsfeld*, 2004 WL 3008724, at *3 (D. Or. Dec. 29, 2004) (holding that plaintiffs challenge to "whether the national emergency declared by the President continues to apply to Afghanistan" has "raised an essentially political issue" and "[c]ourts should refrain from ruling on such issues"), *aff'd*, 403 F.3d 702 (9th Cir. 2005) and 407 F.3d 1018 (9th Cir. 2005); *United States v. Groos*, 616 F. Supp. 2d 777, 788–89 (N.D. Ill. 2008) ("The court cannot question the President's political decision" to declare a national emergency regarding "unrestricted access of foreign parties to U.S. goods and technology"); *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988) ("[T]o the extent that the plaintiffs' inquiry into the 'true facts' of the Libyan crisis would seek to examine the President's motives and justifications for declaring a national emergency, such an inquiry would likely present a nonjusticiable political question.").

emergencies declared by seven different Presidents, and even in the few instances where the declarations have been challenged, *see supra* note 5, no court has ever reviewed the merits.[6] Plaintiffs' request for this Court to take that unprecedented step is without merit, and this Court should not depart from this long line of unbroken authority.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). Both the separation-of-powers doctrine and the policy of judicial self-restraint require that federal courts refrain from intrusion into areas committed by the Constitution to the Legislative and Executive Branches of the Government. *See Baker v. Carr*, 369 U.S. 186, 217 (1962). The *Baker* Court set forth the factors that a court is to consider in determining whether a particular claim raises nonjusticiable political questions:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

---

[6] Past practice also belies Plaintiffs' suggestion that this national emergency declaration is both justiciable and invalid because the President stated that he "didn't need" to issue the declaration and "could do the wall over a longer period of time." *See* Compl. ¶¶ 93, 133. A national emergency declaration necessarily reflects an exercise of discretion, and Presidents have often chosen to declare national emergencies to address circumstances that were neither new nor unforeseen at the time the declaration issued. *See supra* pp. 12–14. No court has ever conducted the type of judicial second guessing that Plaintiffs propose here by evaluating whether an emergency could have been addressed without relying on emergency statutory authorities.

*Id.* The existence of any one of these factors indicates the existence of a political question. *Id.* Here, Plaintiffs' assertion that the situation along the southern border does not constitute a national emergency runs afoul of most, if not all, of these factors.

First, there are no judicially manageable standards to ascertain whether or when to declare a national emergency. As explained above, Congress intentionally chose not to define the term "national emergency" and left that determination to the President, subject only to oversight from Congress. *See supra* pp. 21–23. The NEA sets forth no criteria from which the Court could judge the President's action or make a determination about whether a particular issue constitutes a national emergency. *See Spawr Optical Research*, 685 F.2d at 1080 ("The statute contained no standards by which to determine whether a national emergency existed or continued."). Plaintiffs ask the Court to take the remarkable step of supplanting the President's determination with the "courts' own unmoored determination of what United States policy toward [the southern border] should be." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012). The Court could not decide this question "without first fashioning out of whole cloth some standard for when" a national emergency "is justified." *El-Shifa Pharm. Indus. Co.*, 607 F.3d at 845. To grant Plaintiffs' requested relief, the Court would have to make, with no judicially manageable standards to guide it, numerous political judgments about how the current humanitarian and security crisis at the border impacts immigration policy, foreign relations, public safety, and national security. "The judiciary lacks the capacity for such a task." *Id.*

Second, any such determinations would require precisely the sort of "policy determination of a kind clearly for nonjudicial discretion" that the Supreme Court has indicated is a hallmark of a political question. *Baker*, 369 U.S. at 217. As the Supreme Court has long recognized, illegal immigration creates "significant economic and social problems" in the United States. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *see also Plyler v. Doe*, 457 U.S. 202, 237 (1982) (Powell, J., concurring) (recognizing illegal immigration to be "a problem of serious national proportions"). More

recently, in *Arizona v. United States,* 567 U.S. 387 (2012), the Court emphasized that the problems posed by illegal immigration "must not be underestimated" and credited evidence in the record of various problems "associated with the influx of illegal migration across private land near the Mexican border," including "an epidemic of crime" and "safety risks." *Id.* at 397–98 (citation omitted).

The President has chosen to confront these and other challenges traceable to the current crisis at the border by declaring a national emergency and invoking the express powers delegated to him by Congress. *See* Proclamation. Under these circumstances, the Court cannot review the matter without second-guessing the President's policy determinations. Decisions "about how best to enforce the nation's immigration laws in order to minimize the number of illegal aliens crossing our borders patently involve policy judgments about resource allocation and enforcement methods." *New Jersey v. United States*, 91 F.3d 463, 470 (3d Cir. 1996). These "issues fall squarely within a substantive area clearly committed by the Constitution to the political branches; they are by their nature peculiarly appropriate to resolution by the political branches of government both because there are no judicially discoverable and manageable standards for resolving them." *Id.* (citation omitted); *see Sadowski v. Bush*, 293 F. Supp. 2d 15, 19 (D.D.C. 2003) ("[D]eciding how to best enforce existing immigration laws and policies and how to keep out illegal immigrants requires making policy judgments that are suited for nonjudicial discretion . . . ."). Accordingly, the President's Proclamation is not reviewable in this case.

Third, the type of policy decisions that Plaintiffs ask this Court to make are entrusted to the political branches, not the courts. "[T]he power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of the government." *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972). As the Supreme Court has explained:

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a

27

> wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.

*Mathews v. Diaz*, 426 U.S. 67, 81 (1976) (footnote omitted); *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977) ("Our cases have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."). Moreover, "[t]he political branches are far better equipped (and more accountable to the people) for making the types of decisions that arise in the military setting," and "[j]udges have long respected this allocation of powers." *Doe 2 v. Shanahan*, 2019 WL 1086495, at *21 (D.C. Cir. Mar. 8, 2019) (Williams, J., concurring). The President's decision to declare a national emergency is a quintessential policy decision in an area reserved to the political branches involving matters of immigration, foreign relations, use of military forces, and national security. *See, e.g.*, *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004) ("[T]his country's border-control policies are of crucial importance to the national security and foreign policy of the United States."); *Defs. of Wildlife*, 527 F. Supp. 2d at 129 (construction of border barriers "pertains to both foreign affairs and immigration control—areas over which the Executive Branch traditionally exercises independent constitutional authority"). There is no basis for the Court to substitute its judgment for that of the President on these sensitive policy issues that are nonjusticiable political questions.

3.     <u>The President Should Be Dismissed as a Party to this Lawsuit<br>Because There is No Cause of Action Against the President and<br>Plaintiffs Cannot Obtain Equitable Relief Against the President.</u>

Plaintiffs' claims against the President suffer from separate and independent problems: there is no cause of action against the President, and Plaintiffs may not obtain—and the Court may not order—equitable relief directly against the President for his official conduct.

Plaintiffs lack a cause of action to sue the President. The actions of the President are not reviewable under the APA, *see Dalton*, 511 U.S. at 479, and likewise there is no implied equitable cause

28

of action to do so.  Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 319 (1999).  Here, there is no tradition of equitable relief against the President.  To the contrary, the Supreme Court recognized over 150 years ago in *Mississippi v. Johnson* that federal courts lack jurisdiction to "enjoin the President in the performance of his official duties," 71 U.S. at 501, a principle the Court reaffirmed more recently in *Franklin v. Massachusetts*, 505 U.S. 788 (1992); *id.* at 827 (Scalia, J., concurring in part and concurring in the judgment) ("apparently unbroken historical tradition supports the view" that courts may not order the President to "perform particular executive . . . acts").

Moreover, the Supreme Court has twice held that causes of action that are available against other government officials should not be extended to the President absent a clear statement by Congress.  *See Nixon*, 457 U.S. at 748 n.27 (declining to assume that *Bivens* and other implied statutory damages "cause[s] of action run[] against the President of the United States"); *Franklin*, 505 U.S. at 801 (declining to find cause of action against the President under the APA "[o]ut of respect for the separation of powers and the unique constitutional position of the President").  Accordingly, in the absence of an express statutory cause of action against the President or a tradition of recognizing such suits as a matter of equity, there is no basis for the Court to infer equitable relief against the President.  "The reasons why courts should be hesitant to grant such relief are painfully obvious" given the President's unique constitutional role and the potential tension with the separation of powers.  *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).  Further, the Supreme Court has taken a "traditionally cautious approach to equitable powers, which leaves any substantial expansion of past practice to Congress."  *Grupo Mexicano*, 527 U.S. at 329.  Any expansion of an equitable remedy against the President here would create separation-of-powers problems by usurping "the role of Congress in

29

determining the nature and extent of federal-court jurisdiction under Article III." *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1858 (2017).

Lower courts have followed the logic of *Franklin* and *Massachusetts* by dismissing the President as a defendant in civil cases and declining to impose either declaratory or injunctive relief against him in his official capacity. *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017) ("In light of the Supreme Court's clear warning that such relief should be ordered only in the rarest of circumstances we find that the district court erred in issuing an injunction against the President himself."), *vacated and remanded*, 138 S. Ct. 353 (2017); *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) ("the extraordinary remedy of enjoining the President is not appropriate here"), *vacated as moot*, 138 S. Ct. 377 (2017); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief . . . ."); *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President himself as a party to this case").

In any event, Plaintiffs could potentially obtain the relief they seek against the agency Defendants because the gravamen of Plaintiffs' complaint is that the agencies, not the President, will construct or fund border barriers in excess of their statutory authorities or in violation of the Constitution. Accordingly, in addition to the reasons explained above, the President should be dismissed in order to avoid an unnecessary separation-of-powers conflict. *See Swan*, 100 F.3d at 978 ("In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials.").[7]

---

[7] Although district courts in some recent cases have declined to dismiss the President at the motion-to-dismiss stage on grounds that doing so would be premature in light of uncertainty about the relief that could be provided by the defendant agencies, that is not the situation here. *See Centro Presente v. DHS*, 332 F. Supp. 3d 393, 418 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d

**B.**     **Plaintiffs Cannot Establish Article III Standing to Challenge Future Border Barrier Construction Under § 2808.**

Plaintiffs lack standing to bring claims challenging border barrier construction under § 2808 because the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction projects under § 2808.

Article III requires that cases be decided in the concrete context of an actual case or controversy, not in the abstract.  U.S. Const. art. III, § 2, cl. 1.  And "a showing of standing is an 'essential and unchanging' predicate to any exercise of a court's jurisdiction."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  To demonstrate standing, Plaintiffs must satisfy a three-pronged test.  *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing *Defs. of Wildlife*, 504 U.S. at 560).  First, Plaintiffs must have suffered an injury-in-fact, defined as a harm that is "concrete and actual or imminent, not conjectural or hypothetical."  *Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)).  Second, the injury claimed must be fairly traceable to the governmental conduct alleged.  *Sierra Club*, 292 F.3d at 898.  No standing exists where the court "would have to accept a number of very speculative inferences and assumptions in any endeavor to connect the alleged injury with [the challenged conduct]."  *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980).  Finally, it must be likely that the requested relief will redress the alleged injury.  *Sierra Club*, 292 F.3d at 898.

"An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 n.5 (2013)).  "[A]llegations of *possible*

---

307 (D. Md. 2018); *Saget v. Trump*, 345 F. Supp. 3d 287, 297 (E.D.N.Y. 2018).  Here, in contrast, there is no question that relief against the agencies would be sufficient to redress Plaintiffs' claims seeking to halt border barrier construction.  *See Swan*, 100 F.3d at 978.

future injury are not sufficient." *Clapper*, 568 U.S. at 409 (citation omitted).  By limiting the judicial

power to instances in which specific individuals have suffered concrete injuries, standing requirements

"serve[] to prevent the judicial process from being used to usurp the powers of the political branches."

*Id.* at 408.

Here, Plaintiffs cannot demonstrate a certainly impending injury because the Acting Secretary

of Defense has not yet decided to undertake or to authorize any barrier construction projects under

§ 2808.  Declaration of Kenneth P. Rapuano, Assistant Secretary of Defense for Homeland Security

and Global Security (Rapuano Decl.) ¶¶ 4–5 (describing the internal review process DoD is

conducting to inform the Acting Secretary's decision) (attached hereto as Ex. 1).  Given the absence

of a decision by the Acting Secretary about § 2808 at this time, Plaintiffs are left with nothing but

allegations of contingent future injuries based on anticipated barrier construction in unidentified areas.

*See* Compl. ¶ 138.

The fact that the President invoked § 2808 in the Proclamation is not sufficient to establish

certainly impending injury where the decision to undertake or authorize barrier construction projects

under § 2808 lies with the Acting Secretary of Defense.  Article III jurisdiction cannot rest on

speculation that DoD may use § 2808 at some point in the future and might do so in a way that injures

Plaintiffs.  It is entirely possible that no barrier projects funded by § 2808 will be built in any location

where Plaintiffs would have a claim to a cognizable injury.  Accordingly, speculation about injuries

that might result from yet-to-be-identified barrier construction projects that might be funded under §

2808 is the type of "possible future injury" that is not sufficient to establish Article III jurisdiction.

*See Clapper*, 568 U.S. at 409.

The nature of DoD's decisionmaking regarding any future use of § 2808 further illustrates why

Plaintiffs lack standing to bring this claim.  Before authorizing § 2808 construction, the Acting

Secretary of Defense will determine that the project is "necessary to support such use of the armed

forces." 10 U.S.C. § 2808. That determination can be considered only within the context of the Acting Secretary of Defense authorizing specific military construction projects presented to him for approval; that process is ongoing. *See* Rapuano Decl. ¶ 4. Moreover, in order to fund any projects under § 2808, DoD will need to defer construction of an equal amount of appropriated, but unobligated, military construction projects, and consultation with the military departments is likewise ongoing. *Id.* ¶ 5. The Court should not decide Plaintiffs' § 2808 claim in the abstract when these specific decisions have not been made, let alone made in a manner that would injure Plaintiffs. Given the absence of any concrete harm, Plaintiffs lack standing to pursue their § 2808 claim.

## II.     <u>Plaintiffs' Ultra Vires Review and Constitutional Counts Do Not State a Claim on Which Relief Can Be Granted.</u>

In addition to the jurisdictional problems explained above, Plaintiffs fail to state a claim. First, Plaintiffs' challenges to the Government's actions under the NEA, § 2808, § 284, and § 9705 (Counts One, Two, Three, and Four) pursuant to a purported "non-statutory right of action to enjoin and declare unlawful Presidential action that is ultra vires" fail. They erroneously assert "Presidential action" where there is none. Moreover, they impermissibly pursue an implied nonstatutory cause of action where a proper statutory vehicle exists. But even if they could proceed pursuant to a nonstatutory cause of action to challenge "ultra vires" acts, the high standard to state such a claim is not met. Second, Plaintiffs' constitutional claims under the Appropriations and the Take Care Clauses (Counts Five and Six) fail because those claims are nothing more than alleged statutory violations dressed in constitutional garb. At bottom, Plaintiffs' artful pleading should be seen for what it is: an attempted end run around the typical rules for judicial review of agency action. The attempt is unsuccessful, and the complaint fails to state a claim under Rule 12(b)(6).

### A.     Plaintiffs' "Ultra Vires" Claims Must Be Dismissed.

       1.    Plaintiffs Fail To State a Claim for Ultra Vires Action Against the President.

Plaintiffs' allegations of ultra vires statutory action appear to be directed solely against the President. They allege that the Proclamation violated the NEA "[b]ecause there is no national emergency across the southern border," Compl. ¶ 134, and that "the President's invocation" of 10 U.S.C. § 2808, 10 U.S.C. § 284, and 31 U.S.C. § 9705 "was unlawful Presidential action," *id.* ¶¶ 143, 149, 155. As explained above, no suit for equitable relief can be maintained against the President. But even if it could be, Plaintiffs have failed to state any claim for ultra vires action against the President. The only action the President took here is to declare a national emergency pursuant to the NEA, and any claim that the President violated the NEA should be dismissed as nonjusticiable. Separately, the President is not responsible for administering § 2808, § 284, or § 9705, nor do Plaintiffs allege that the President has taken any action pursuant to these statutes. On these facts alone, Plaintiffs have failed to state a claim against the President for violations of § 2808, § 284, or § 9705.

That Plaintiffs allege Presidential "invocation" of these statutes does not alter this result. As an initial matter, the President invoked only § 2808 in the Proclamation. *See* Proclamation. A White House Fact Sheet explained that funds from the TFF and funds available under § 284 were also available for border wall construction. *See* Compl. ¶ 1 (citing Fact Sheet 1). These sources of funding were not invoked in the Proclamation, nor is their use predicated on a national emergency declaration. *See* 10 U.S.C. § 284; 31 U.S.C. § 9705. But even the President's invocation of § 2808 is not actionable because it did nothing more than "ma[ke] available . . . to the Secretary of Defense" the construction authority § 2808 provides. *See* Proclamation.

Regardless, whether the President invoked or otherwise requested action pursuant to these statutes, without more, is not actionable. That is because the statutes provide the Secretaries, not the President, with authority to act. *Cf. Nat'l Ass'n of Gov. Emps. v. Fed. Labor Relations Auth.*, 179 F.3d 946,

950 (D.C. Cir. 1999) ("[I]f the President orders the Secretary of State to terminate an employee, the order does not effect the termination—only the Secretary of State can terminate an employee whom the Secretary was statutorily authorized to appoint."). The authority to execute § 2808 and § 284 is granted to the Secretary of Defense. *See* 10 U.S.C. § 2808(a); 10 U.S.C. § 284(a). Likewise, the Secretary of the Treasury has the authority to utilize the TFF under 31 U.S.C. § 9705(a). The Secretaries determine how to act pursuant to the statutes—not the President. The complaint therefore fails to state a claim of statutory violation against the President, and Plaintiffs' claims of "unlawful Presidential action" in violation of § 2808, § 284, and § 9705, should be dismissed.

### 2.   Plaintiffs Must Raise Their Statutory Challenges Under the APA.

Given that Plaintiffs' claims of ultra vires statutory violations allege "unlawful Presidential action" only, it is unclear whether Plaintiffs intend to challenge the agencies' compliance with the statutes. Assuming they do, Plaintiffs' claims against the agency heads are properly raised pursuant to the APA only—not a purported "non-statutory right of action."[8]

At bottom, under a generous reading of the complaint, Plaintiffs challenge the decision to allocate funds pursuant to 31 U.S.C. § 9705, 10 U.S.C. § 284, and 10 U.S.C. § 2808 for the purpose of border wall construction. The APA provides a cause of action for any person "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Through the APA, Congress conferred express jurisdiction on reviewing courts to "hold unlawful" agency action that is "not in accordance with law," and "in excess of statutory jurisdiction, authority, or limitations." *Id.* § 706(2)(A), (C). Here, Plaintiffs seek precisely the type of review Congress provided in the APA—review of decisions made pursuant to authority under §§ 9705, 284, and 2808. Yet Plaintiffs do not allege any violation of the APA or

---

[8] As previously noted, the President's actions are not reviewable pursuant to the APA. *Franklin*, 505 U.S. at 801 (plurality opinion). Justice Scalia observed in *Franklin* that suits against agency officials is the proper means of challenging Presidential action. *See id.* at 828 (Scalia, J., concurring in part and concurring in the judgment).

identify another statutory cause of action under which to pursue their claims.

Instead, Plaintiffs bring their claims pursuant to a purported nonstatutory right of action to obtain equitable relief for ultra vires action.  Compl. ¶¶ 131, 137, 146, 152.  But Plaintiffs cannot invoke the doctrine of nonstatutory review for the actions complained of here.  Courts may review agency action under an independent ultra vires cause of action only when the plaintiff would otherwise be "wholly deprive[d]" of a "meaningful and adequate means of vindicating its statutory rights" and when Congress has not precluded judicial review.  *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43–44 (1991) (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)); *see also Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).  As a result, "a *Leedom v. Kyne* claim is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *Nyunt v. Chairman, Broad. Bd. of Governors,* 589 F.3d 445, 449 (D.C. Cir. 2009).

Plaintiffs have not been "wholly deprive[d]" of a means for review of their claims so long as APA review is available.  *See Puerto Rico v. United States*, 490 F.3d 50, 59–60 (1st Cir. 2007); *Wise v. Glickman*, 257 F. Supp. 2d 123, 127 n.1 (D.D.C. 2003).  And given the availability of the APA, this is not "a proper case" for courts to provide the "judge-made remedy" of an implied cause of action in equity to enjoin action by public officials.  *Armstrong*, 135 S. Ct. at 1384 (stating that the "power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations" and holding plaintiffs could not "circumvent" statutory restrictions "by invoking our equitable powers").  Indeed, inferring a cause of action under the Court's judicial power is a "significant step under separation-of-powers principles" because it intrudes upon "Congress, [which] has a substantial responsibility to determine" whether suit should lie. *Ziglar*, 137 S. Ct. at 1856.  There is no basis for the Court to take that step here in light of Congress's intent for claims such as these— i.e., that Defendants have exceeded their statutory authority—to be reviewed under the APA.  Accordingly, Plaintiffs' ultra vires claims—Counts One, Two, Three, and Four—should be dismissed

even if they challenge more than the mere "invocation" of the statutes at issue.

3.   Plaintiffs Have Not Alleged Any Ultra Vires Actions.

Even if the Court were to determine that the ultra vires framework is properly applied to Plaintiffs' claims, their allegations do not support a finding of ultra vires actions.  Courts review ultra vires claims under a "very stringent standard" and such claims "rarely succeed." *Nyunt*, 589 F.3d at 449; *see also Trudeau v. FTC*, 456 F.3d 178, 189–90 (D.C. Cir. 2006).  To give rise to such a claim, the agency must "patently . . . misconstru[e]" a statute, "disregard[] a specific and unambiguous statutory directive," or "violate[] some specific command of a statute." *Griffith v. FLRA*, 842 F.2d 487, 494 (D.C. Cir. 1988) (internal citations and quotation marks omitted).  Unless an agency violated a "clear and mandatory" statutory provision, ultra vires review is not warranted. *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. FSIP*, 437 F.3d 1256, 1264 (D.C. Cir. 2006) (*NATCA*) (quoting *Leedom*, 358 U.S. at 188).  Mere allegations that the agency improperly exercised its authority are not enough to justify ultra vires review. *See, e.g., Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 307–08 (D.C. Cir. 2014).  Plaintiffs' allegations fall well short of meeting this high standard.

a.   *31 U.S.C. § 9705*

Plaintiffs' allegations regarding the TFF are insufficient to support a claim of ultra vires agency action.  Plaintiffs allege that TFF funds are "earmarked by law for specific purposes" under 31 U.S.C. §§ 9705(a)(1) and (2), Compl. ¶¶ 54–56, and that "an emergency source of funding for border wall construction" is not one, *id.* ¶ 153.  In doing so, Plaintiffs fail to acknowledge § 9705(g)(4)(B), which authorizes the Secretary of the Treasury to distribute TFF funds not only for the specific purposes listed in § 9705(a), but also for "obligation or expenditure in connection with law enforcement activities of any Federal agency."  31 U.S.C. § 9705(g)(4)(B); *see also* Fact Sheet 2.  That construction of a border wall is not specifically listed in § 9705(a) is irrelevant to the determination of whether the Secretary of the Treasury lawfully exercised this authority to distribute TFF funds for law enforcement

activities.

Plaintiffs do not contest that construction of a barrier at the border is a law enforcement activity. Nor could they. CBP was established to "ensure the interdiction of persons and goods illegally entering or exiting the United States," "interdict . . . persons who may undermine the security of the United States," and "safeguard the borders of the United States," among other duties. 6 U.S.C. § 211(c)(2), (5), (6); *see Arizona*, 567 U.S. at 397. Moreover, Congress has recognized that barriers prevent unlawful entries by aliens and smuggling of contraband across the border, *see* Secure Fence Act of 2006, Pub. L. No. 109-367, §§ 2–3, 120 Stat. at 2638–39, and thus help enforce the laws that prohibit such activities, *e.g.*, 8 U.S.C. § 1325 (improper entry by an alien); 18 U.S.C. § 545 (smuggling goods); 21 U.S.C. § 865 (smuggling methamphetamine).

> b.      *10 U.S.C. § 284*

Nor have Plaintiffs pleaded facts sufficient to infer plausibly that Defendants have violated the "clear and mandatory" language of 10 U.S.C. § 284. *See NATCA*, 437 F.3d at 1264. Plaintiffs allege that use of § 284 in an emergency situation is unlawful because that provision allows the military to assist civilian law enforcement agencies in non-emergency situations only. Compl. ¶¶ 147, 149. They base this claim on the "broader statutory structure of the military and immigration codes," *id.* ¶ 149, alleging that other provisions of Title 10 state exclusively the emergency situations in which the military may provide support, *id.* ¶ 141 (citing 10 U.S.C. §§ 282, 283). Plaintiffs also contend that Congress considered in the Immigration and Nationality Act the urgency of mass migration of aliens near the border and limited the Government's permissible response to cooperation with local law enforcement. *Id.* ¶ 142 (citing 8 U.S.C. § 1103(a)(10)). Plaintiffs' claim fails for two reasons.

First, the claim is grounded on the inaccurate premise that § 284 is being invoked pursuant to the national emergency declaration. It is not. *See* Proclamation at 2. Funds to be transferred under § 284 are "additional funds" that will be made available for barrier construction at the southern border.

*See* Fact Sheet 1.  Such use of § 284 is consistent with the statute's plain language, which does not predicate its use on a national emergency.  Nor does § 284 include "clear and mandatory" language precluding its use where a separate, but related, national emergency is concurrently declared.

Second, even accepting Plaintiffs' faulty premise, their attempt to constrain the scope of § 284 runs contrary to well-established canons of statutory construction.  The other provisions of Title 10 Plaintiffs cite do not concern national emergency declarations.  The relevance of those provisions is therefore tenuous at best.  Moreover, Plaintiffs ignore that § 284, on its face, independently authorizes DoD to provide support to DHS's counterdrug activities regardless of whether a national emergency declaration has occurred.  There is no reason for the Court to infer that because Congress provided for military or other support to federal enforcement activities during certain types of "emergency" or "urgent" situations, that it meant all other support to be unavailable in the event of a national emergency declaration.  *See Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1069 (D.C. Cir. 2018).  Instead, each provision Plaintiffs cite provides for different types of military or other support in different situations under different requirements.  There is no inherent conflict between these independent provisions and § 284, and Plaintiffs have not shown that Congress intended to limit use of § 284 to "non-emergency" circumstances.  When statutory provisions "'are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'"  *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 304 (2003) (quoting *J.E.M. AG Supply, Inc. v. Pioneer Hi–Bred Int'l, Inc.*, 534 U.S. 124, 143–144 (2001)).  That is the case here.

In any event, Plaintiffs have not adequately alleged that Defendants "patently . . . misconstru[e]" § 284 or have "disregarded" its "specific and unambiguous . . . directive[s]."  *Griffith*, 842 F.2d at 493.  The fact that they cannot point to a violation of "clear and mandatory" language in § 284—and instead attempt to infer constraints on Defendants' § 284 authority by reference to other statutory sections—only proves that Plaintiffs' allegations are insufficient to state a claim to relief

under the extraordinary standard applied to an ultra vires claim.  *NATCA*, 437 F.3d at 1264.

        c.     *10 U.S.C. § 2808*

Plaintiffs' claim of ultra vires agency action in violation of 10 U.S.C. § 2808 likewise fails.  As explained above, the Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction projects under § 2808.  This fact mandates dismissal of Plaintiffs' § 2808 claim both because it creates a jurisdictional defect and because, without a decision by the Acting Secretary to undertake or authorize barrier construction projects pursuant to § 2808, there has been no violation of § 2808, much less a clear and egregious violation of the sort necessary to enjoin agency action under ultra vires review.  *See NATCA*, 437 F.3d at 1264.

But even putting aside this threshold issue, Plaintiffs have not alleged a violation of any "clear and mandatory" language in § 2808.  *See id.*  They claim that § 2808 "does not provide an emergency source of funding for border wall construction" because such activity is not "military construction," and because the national emergency does not require the use of the armed forces.  Compl. ¶¶ 138–39.  But nowhere do Plaintiffs point to a "specific and unambiguous statutory directive" that Defendants have disregarded.  *See Griffith*, 842 F.2d at 494.  And they cannot.  The statute does not include such clear and mandatory language.  Instead, § 2808 provides the Secretary of Defense with authority to "undertake military construction projects" that are "necessary to support such use of the armed forces."  10 U.S.C. § 2808(a).  The statute provides no guidance as to the meaning of what projects would be "necessary to support such use of the armed forces."  And this type of discretionary military decision is "better left to those more expert in issues of defense" and not subject to judicial second-guessing.  *See, e.g., Dist. No. 1, Pacific Coast Dist., Marine Engineer's Beneficial Ass'n v. Maritime Admin.*, 215 F.3d 37, 41–42 (D.C. Cir. 2000); *see also NFFE v. United States*, 905 F.2d 400, 405–06 (D.C. Cir. 1990) ("[T]he federal judiciary is ill-equipped to conduct reviews of the nation's military policy.").  Although "military construction project" is a statutorily defined term, its definition is broad and illustrative, not

specific or exclusive.  *See* 10 U.S.C. § 2801(b).  The term "military construction" is similarly broadly defined to "*include*[] any construction . . . of any kind carried out with respect to a military installation." *Id.* § 2801(a) (emphasis added).  A "military installation," in turn, "means a base, camp, post, station, yard, center, *or other activity* under the jurisdiction of a Secretary of a military department."  *Id.* § 2801(c)(4) (emphasis added).  Plaintiffs offer no explanation as to how any construction undertaken pursuant to the expansive provisions of § 2808 would contravene clear and mandatory statutory language.  Accordingly, Plaintiffs have not met the strict standard to state an ultra vires cause of action with respect to § 2808.

### B.   Plaintiffs' Constitutional Claims Must Be Dismissed.

Plaintiffs raise various constitutional challenges to the Executive and agency actions at issue here.  But these counts merely recast Plaintiffs' statutory claims in constitutional terms, and "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton*, 511 U.S. at 473.  The Government is not relying on independent Article II authority in order to undertake border construction; the actions alleged are being undertaken pursuant to statutory authority alone.  The President did not seek to reallocate appropriated funds based upon any claim of inherent constitutional authority.  Nor did the President claim that the declaration of a national emergency gave him any authority that had not been expressly conferred by Congress.  Rather, the Government relies solely upon available statutory authorities—31 U.S.C. § 9705, 10 U.S.C. § 284, and 10 U.S.C. § 2808—that Congress has delegated to the Executive.  The outcome of this case thus turns on whether the statutes authorize the Government's action.  Because disagreements about how to construe statutes do not raise constitutional problems, Counts Five and Six should be dismissed.

*Dalton* disposes of Plaintiffs' constitutional claims.  In *Dalton*, the Supreme Court specifically rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine."  *Id.* at 471.  The Court instead recognized

that the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration." *Id.* at 474.

By asserting that actions that allegedly exceed statutory authority are, for that reason alone, constitutional violations, Plaintiffs' complaint does precisely what the Court disapproved of in *Dalton.* Plaintiffs assert no constitutional violation separate from the alleged statutory violations. They do not allege that the Government's compliance with the statutes at issue would be unconstitutional. Instead, Plaintiffs assert that Defendants violated the statutes. For example, Plaintiffs' Appropriations Clause claim hinges on the assertion that the Government "unlawfully reallocate[d] money without satisfying the requirements of 10 U.S.C. § 2808, 31 U.S.C. § 2293, or 31 U.S.C. § 9705." Compl. ¶ 160. In the same vein, Plaintiffs' Take Care Clause claim turns on the conclusory allegation that the President and agencies did not "faithfully execute" the statutes at issue. *Id.* ¶ 164. These bare allegations of ultra vires statutory actions do not state constitutional claims. *See Dalton*, 511 U.S. at 473–74.

Plaintiffs do not allege that the President has exercised his inherent authority under Article II of the Constitution. Nor does the President purport to do so. Despite Plaintiffs' allusions, *see* Compl. ¶¶ 67–68, this case stands in sharp contrast to *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), in which the President issued an order directing the Secretary of Commerce to seize the nation's steel mills relying solely upon "the aggregate of his powers under the Constitution," thereby conceding a lack of statutory authority. *Id.* at 585–87. The Court held the action unconstitutional. *Id.* at 589. In his concurrence, Justice Jackson emphasized that the President had acted in the absence of congressional authorization, where his "power is at its lowest ebb" and such exercise of power must be "scrutinized with caution." *Id.* at 637–38 (Jackson, J. concurring). That is not the situation here. To the contrary, each action—including the Proclamation—is based on express statutory authority. The President and his agents are acting "pursuant to an express . . . authorization of

42

Congress," the situation in which "his authority is at its maximum." *Id.* at 635 (Jackson, J. concurring). *Youngstown* is therefore inapposite. *See AFL-CIO v. Kahn*, 618 F.2d 784, 787 (D.C. Cir. 1979) (en banc); *see also Dalton*, 511 U.S. at 473.

If Plaintiffs' allegations were found to rise to the level of constitutional issues, then *every* allegation that the President or his agents exceeded their statutory authority in some way could be repleaded as a constitutional separation-of-powers claim.  The Supreme Court has foreclosed such tactics, recognizing their inconsistency with well-established precedent "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Dalton*, 511 U.S. at 472.  Because where "the President concedes . . . that the only source of his authority is statutory, no constitutional question whatever is raised," this Court should dismiss all constitutional counts.[9]  *Id.* at 474 n.6. (internal quotation marks omitted).

## CONCLUSION

For these reasons, Plaintiffs' complaint should be dismissed in full pursuant to Rules 12(b)(1) and 12(b)(6).[10]

Dated:  April 2, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

---

[9] Even if this Court were to determine that the Complaint stated a constitutional cause of action, challenges to the constitutionality of agency action must be brought pursuant to the APA. *See* 5 U.S.C. § 706(2)(B); *see also, e.g., Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1237–38 (D.N.M. 2014).  The APA's procedural strictures apply to such constitutional challenges. *See, e.g., Jarita Mesa*, 58 F. Supp. 3d at 1237–38; *Harvard Pilgrim Health Care of New Eng. v. Thompson*, 318 F. Supp. 2d 1, 10–11 (D.R.I. 2004).

[10] This judicial district does not provide a procedure to notice a motion on the Court's calendar for a hearing; however, upon the completion of briefing, Defendants stand ready to appear for argument at the Court's earliest convenience.

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/ Andrew I. Warden
ANDREW I. WARDEN (IN Bar No. 23840-49)
Senior Trial Counsel, Federal Programs Branch

/s/ Leslie Cooper Vigen
LESLIE COOPER VIGEN (D.C. Bar No.
1019782)
KATHRYN C. DAVIS
MICHAEL J. GIRARDI
RACHAEL L. WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 305-0727
Fax: (202) 616-8470
Email: Leslie.Vigen@usdoj.gov

*Counsel for Defendants*