**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
378 N. Main Avenue
Tucson, AZ 85701;

DEFENDERS OF WILDLIFE,
1130 17th Street, N.W.
Washington, D.C. 20036;

ANIMAL LEGAL DEFENSE FUND,
525 E. Cotati Ave.
Cotati, CA  94931;

               Plaintiffs,

v.

DONALD J. TRUMP,
in his official capacity as President of the United
States
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500;

PATRICK M. SHANAHAN,
in his official capacity as acting Secretary of
Defense
Department of Defense
1000 Defense Pentagon
Washington, D.C.  20301;

LIEUTENANT GENERAL TODD T. SEMONITE,
in his official capacity as Commander and Chief of
Engineers
U.S. Army Corps of Engineers
441 G Street, N.W.
Washington, D.C.  20314-1000;

KEVIN McALEENAN,
in his official capacity as acting Homeland Security
Secretary
Department of Homeland Security
245 Murray Lane, S.W.
Washington, D.C. 20528;

Case No. 1:19-cv-00408-TNM

DAVID BERNHARDT,
in his official capacity as Secretary of the Interior
Department of the Interior
1849 C Street, N.W.
Washington, D.C.  20240;

       Defendants.

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      On February 15, 2019, President Donald J. Trump issued a "Presidential

Proclamation on Declaring a National Emergency Concerning the Southern Border of the United

States" (hereinafter, "emergency proclamation"), pursuant to the purported authority of the

National Emergencies Act ("NEA"), 50 U.S.C. § 1601 *et seq.*  84 Fed. Reg. 4949 (Feb. 20,

2019).  On the same day, the administration issued a statement that it had identified

approximately $6.7 billion in funds "available to build the border wall once a national

emergency is declared and additional funds have been reprogrammed."  *See* Fact Sheet, White

House Press Office, President Donald J. Trump's Border Security Victory (Feb. 15, 2019).[1]

These funds would originate from three separate sources:

- "About $601 million from the Treasury Forfeiture Fund";

- "Up to $2.5 billion under the Department of Defense funds transferred for

  Support for Counterdrug Activities (Title 10 United States Code, section

  284") (hereinafter, "counterdrug account"); and

---

[1] Plaintiffs use the terms "border wall and" and "border fence" interchangeably.  Regardless of construction method (steel bollard is currently the most commonly utilized), these large structures have far reaching environmental impacts.

- "Up to $3.6 billion reallocated from Department of Defense military construction projects under the President's declaration of a national emergency (Title 10 United States Code, section 2808)." *Id.*

2. Immediately after issuing the emergency proclamation, the President signed the Consolidated Appropriations Act, 2019, into law, which appropriates an additional $1.375 billion to U.S. Customs and Border Protection ("CBP") for border wall construction in the Rio Grande Valley, Texas. Pub. L. No. 116-6; H.R.J. Res. 31, 116th Cong. § 230(a)(1) (enacted) (hereinafter, "2019 Consolidated Appropriations Act").

3. The administration stated its intent to use these funds for border wall construction "sequentially and as needed" by source, in the following order: 2019 Consolidated Appropriations Act funds; Treasury Forfeiture Fund; counterdrug account funds; and emergency military construction funds. *See* Fact Sheet, Border Security Victory. Instead, the Department of Defense ("DoD") has already identified, transferred, and obligated appropriated funds into, and from, the counterdrug account funds despite the fact funds appropriated under the 2019 Consolidated Appropriations Act have not been fully obligated.

4. Of the 58 times presidents have previously declared emergencies under the NEA, none involved using emergency powers to fund a policy goal after a president failed to meet that goal through foreign diplomacy (having Mexico pay for the wall) or the congressional appropriations process. This abuse of the congressional delegated NEA authority renders the proclamation unlawful.

5. Even under a validly declared emergency, the President must identify any available statutory authority an emergency proclamation triggers in order to lawfully transfer Congressionally appropriated funds. The NEA does not permit a president to take *any* action,

but instead unlocks a president's ability to invoke *specific* and *existing* emergency statutory authorities.  Although the proclamation relies on military construction authority pursuant to 10 U.S.C. § 2808, both the plain language and broader statutory context of that provision demonstrate that it is inapplicable to border wall construction.  As the President has failed to identify any statutory authority pursuant to the NEA related to border wall construction, the emergency transfer of appropriated military construction funds to border wall construction is unlawful.

6.      The President's order that DoD transfer appropriated funds into, and from, the counterdrug account, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate appropriated funds to border wall construction, are also unlawful under the 2019 Consolidated Appropriations Act and DoD FY 19 Appropriations Act.

7.      Defendants have failed to meet the duties applicable to lead and cooperating agencies for projects involving multiple Federal agencies under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*  The agencies' failure to initiate and complete an environmental impact statement for the Trump administration's border wall project will promote secrecy where there should be transparency; divest Plaintiffs, local communities and other stakeholders of opportunities for public notice, review, and comment; and allow significant environmental harm to occur that could be avoided or mitigated if a lawful NEPA process were undertaken.

8.      By unlawfully transferring funds from the counterdrug support account and military construction appropriations to border wall construction, the emergency proclamation, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate appropriated funds to border wall construction, also exceed President

Trump's constitutional authority by usurping Congress's Article I Appropriation powers, U.S. CONST. art. I, § 9, and by violating the President's obligation to "take Care that the Laws be faithfully executed."  U.S. CONST. art. II, § 3.

9.      Implementation of the emergency proclamation, including the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, obligate, and transfer appropriated funds to border wall construction, should be declared unlawful and enjoined.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and can grant declaratory relief pursuant to 28 U.S.C. §§ 2201-2202, the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and its equitable powers.

11.     Venue properly vests in this Court pursuant to 28 U.S.C. § 1391(b) and (e), because the violations are occurring in this district, Defendants reside in this district, and a substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made by the Defendants.

## PARTIES

12.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit conservation organization dedicated to the protection of endangered species and their habitats through science, policy, and environmental law.  The Center is headquartered in Tucson, Arizona, with offices in Washington, D.C., and numerous other locations throughout the country, and an office in Baja California Sur, Mexico.  The Center has more than 68,000 members and more than one million supporters.

13.     The Center has worked for more than two decades to oppose environmentally harmful border fencing along the U.S.-Mexico border generally, and within the specific Border Patrol sectors (San Diego, El Centro, Tucson, Yuma, El Paso, Laredo, and Rio Grande Valley) where border wall construction will occur under the emergency proclamation, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate appropriated funds to border wall construction.  The Center also has a long history of advocating for the protection of rare wildlife habitat and specific species that would be impacted by the transfer and obligation of appropriated funds to border wall construction including jaguar, ocelot, peninsular bighorn sheep, Sonoran pronghorn, Mexican gray wolf, Quino checkerspot butterfly, and coastal California gnatcatcher—and is directly responsible for the protection of numerous borderland species and their critical habitats under the Endangered Species Act. Center members, including but not limited to, Laiken Jordan and Michael Robinson, enjoy observing wildlife and their habitat in borderlands areas and enjoy recreating on public lands and in public areas that will be negatively affected by border wall construction.

14.     Plaintiff DEFENDERS OF WILDLIFE ("Defenders") is a nonprofit organization with nearly 1.8 million members and supporters across the nation.  Defenders' mission is to preserve wildlife and emphasize appreciation and protection for all species in their ecological role.  Through advocacy, litigation, and other efforts, Defenders works to preserve species and the habitats upon which they depend.  Defenders has been closely involved in policy and litigation matters associated with border wall construction along the U.S.-Mexico border for more than a decade.  Defenders has field offices across the country, including in Santa Fe, New Mexico.

15.     Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a nonprofit 501(c)(3) organization with more than 200,000 members and supporters, including thousands of whom live in states located on the U.S.-Mexico border, and at least hundreds of whom live in towns that are located in close proximity to border areas at issue.  This includes Elizabeth Walsh, who resides in El Paso, Texas, near Sunland Park, New Mexico, and the U.S.-Mexico border.  Ms. Walsh has been a member of ALDF since at least 2012.  She routinely visits the border areas that will be impacted by the emergency proclamation for professional and recreational purposes.  Similarly, ALDF member Robert Knaier resides in San Diego County, California, and regularly visits the border area in California for recreational purposes.  ALDF represents its members interests by working to protect the lives of animals, including wildlife, through the legal system.  This includes prior litigation challenging unlawful attempts to waive environmental and animal protection laws to facilitate border construction.  ALDF is headquartered in Cotati, California.

16.     Plaintiffs have organizational and membership-based interests in the preservation and conservation of specific areas of the U.S.-Mexico borderlands impacted by the President's February 15, 2019 emergency proclamation and the transfer and obligation of appropriated funds to border wall construction.  Plaintiffs and their members are harmed by the emergency proclamation, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate appropriated funds to border wall construction.  Plaintiffs' members and staff live in or regularly visit the U.S.-Mexico borderlands region, including specific areas within the San Diego, El Centro, Tucson, Yuma, El Paso, Laredo, and Rio Grande Border Patrol sectors that will be impacted by the proposed border wall construction.  These specific areas include numerous areas of federal, state, and local protected borderlands, including but not limited to Cleveland National Forest, Cabeza Prieta National Wildlife Refuge, Organ

Pipe Cactus National Monument, Coronado National Forest, San Pedro Riparian National

Conservation Area, San Bernardino National Wildlife Refuge, Organ Mountains-Desert Peaks

National Monument, Lower Rio Grande Valley National Wildlife Refuge, and other lands

administered by the U.S. Bureau of Land Management.  Plaintiffs' staff and members use these

specific borderland areas for hiking; camping; viewing and studying wildlife; photography; and

other scientific, vocational, and recreational activities; and they have specific intentions to

continue to use and enjoy these areas frequently and on an ongoing basis in the future.  Border

wall construction resulting from the President's emergency proclamation, and the Defense

Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and

obligate appropriated funds to border wall construction, and associated actions including

stripping all vegetation within a 150-foot enforcement zone, road construction, and high-

intensity lighting, would harm Plaintiffs' members and these protected interests in numerous

ways.  The harm would include immediate impacts, such as precluding future visitation of

impacted areas, destroying wildlife habitat, and killing individual members of different wildlife

species.  Border wall construction would also result in longer term harm, by blocking

connectivity between wildlife populations in U.S. and Mexico, harming the long term viability of

those species, and in some cases, resulting in their extirpation from the United States.  These

harms go to Plaintiffs' central organizational purposes.

17.     Plaintiffs and their members are harmed by Defendants' failure to engage in a full

and legally adequate NEPA process, including the failure to consider alternatives and to

adequately study and disclose the direct, indirect, and cumulative adverse ecological, aesthetic,

and recreational impacts of border wall construction in the areas they enjoy.  By commencing

border wall construction activities, including identifying, transferring, and obligated appropriated

funds to border wall construction, without adequately considering and disclosing the environmental impacts of the resulting activities, Defendants have deprived Plaintiffs and their members of their procedural rights, under NEPA, to a NEPA process that fully discloses the effects of, and alternatives to, Defendants' actions.  Defendants have also deprived Plaintiffs of the information that would be developed through an adequate NEPA document, which Plaintiffs would use to educate their members and other concerned members of the public about the environmental impacts of border wall construction.  As a result, Plaintiffs must spend substantial resources pursuing alternative sources of information regarding Defendants' activities.  The harms to Plaintiffs' interests could be partially or entirely avoided or mitigated if Defendants engaged in a NEPA process.  Plaintiffs would certainly engage in that process in an effort to protect the wildlife species and habitat they have long endeavored to conserve as well as the natural areas in which they enjoy recreating.

18.     Defendant DONALD J. TRUMP, President of the United States, is sued in his official capacity.  President Trump issued the emergency proclamation on February 15, 2019.

19.     Defendant PATRICK M. SHANAHAN, Acting Secretary of Defense, is sued in his official capacity.  The February 15, 2019 emergency proclamation instructs the Defense Secretary to "take all appropriate actions" in support of the proclamation's directives, including taking action to transfer military construction and counterdrug operations appropriated funds to border wall construction.

20.     Defendant LIEUTENANT GENERAL TODD T. SEMONITE, Commander and Chief of Engineers of the U.S. ARMY CORPS OF ENGINEERS, is sued in his official capacity. The U.S. Army Corps of Engineers will receive transfers of appropriated funds, and implement DoD orders to obligate those funds to border wall construction.

21.     Defendant KEVIN McALEENAN, Acting Homeland Security Secretary, is sued

in his official capacity.  The February 15, 2019 emergency proclamation instructs the Homeland

Secretary to "take all appropriate actions" in support of the proclamation's directives.

22.     Defendant DAVID BERNHARDT, Secretary of the Interior, is sued in his official

capacity.  The February 15, 2019 emergency proclamation instructs the Interior Secretary to

"take all appropriate actions" in support of the proclamation's directives.

## LEGAL BACKGROUND

### A.     The National Emergencies Act

23.     The President's statutory authority to declare a national emergency is governed by

the 1976 NEA.  50 U.S.C. § 1601 *et seq*.  The NEA was designed to limit presidential power and

reclaim authority that had been delegated from the legislative branch.  *See* Jules Lobel,

*Emergency Power and the Decline of Liberalism*, 98 Yale L.J. 1385, 1412 (1989) (stating that

NEA responded to "the twin disasters of Vietnam and Watergate" and the sense that "the

pendulum had swung too far" in favor of the growth of executive power).

24.     The enactment of the NEA terminated all existing states of emergency and

established a uniform procedural framework for the future exercise of such powers.  In addition,

the NEA established other mechanisms intended to better ensure presidential accountability by

establishing reporting and other requirements.

25.     A proclamation issued under the NEA triggers the President's authority to invoke

*existing* Acts of Congress that authorize "the exercise, during the period of a national emergency,

of any special or extraordinary power."  50 U.S.C. § 1621(a); *id*. § 1631 ("When the President

declares a national emergency, no powers or authorities made available by statute for use in the

event of an emergency shall be exercised unless and until the President specifies the provisions

of law under which he proposes that he, or other officers will act.").

26.     Accordingly, the scope of the President's emergency powers is limited to

legislative enactments under which Congress has specifically granted those powers in advance.

27.     An emergency proclamation "shall immediately be transmitted to the Congress

and published in the Federal Register."  *Id.*  § 1621(a).

28.     The NEA does not define the term "emergency."

29.     The common usage of the term "emergency" involves an element of suddenness

and unexpectedness.  Merriam-Webster, for example, states that an emergency is "an unforeseen

combination of circumstances or the resulting state that calls for immediate action."  Similarly,

Black's Law Dictionary defines the word as a "sudden, unexpected, or impending situation."

30.     NEA's legislative history shows that the emergency power conferred by Congress

is not boundless.  In testimony before the Committee on Government Operations on February 25,

1976, co-sponsor Senator Frank Church stated that "Congress should be forewarned that it is

inherent in the nature of modern government that the Executive will seek to enlarge its power in

small ways and large," and advised that the president "should not be allowed to invoke

emergency authorities or in any way utilize the provision of [the NEA] for frivolous or partisan

matters, nor for that matter in cases where important but not 'essential' problems are at stake."

*National Emergency Act: Hearing on H.R. 3884 Before the S. Comm. on Government*

*Operations*, 94th Cong. 7 (1976) (statement of Sen. Frank Church).

31.     There are currently an estimated 123 statutory authorities that may be invoked by

an emergency proclamation under the NEA.  *See* BRENNAN CENTER FOR JUSTICE, A GUIDE TO

EMERGENCY POWERS AND THEIR USE (Dec. 5, 2018),

https://www.brennancenter.org/analysis/emergency-powers.  These provisions address disparate issues including public health; land management; military and national defense; federal employees; asset seizure, control, and transfer; criminal prosecution and detainment powers; and international relations.

32.     The NEA has been invoked at least 58 times from 1978-2012.  Nearly all of the declared emergencies (49 instances) relate to sanctions or export restrictions.  Four emergencies relate to weapons proliferation.  The remaining five emergencies did not fit into any specific category and involved the 2009 swine flu outbreak, the September 11 terrorist attacks, vessel movement near Cuba, rough diamonds from Sierra Leone, and sale of Iraq petroleum.

33.     None of the 123 emergency statutory authorities that may be invoked under an NEA proclamation address immigration or border wall construction.

**B.      Title 8 (Immigration), the Immigration and Nationality Act, and the "Mass Influx" and "Emergency Situation Refugees" Provisions**

34.     Congress has not established any NEA authorities under Title 8 (Immigration) of the United States Code.

35.     The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq*., "established a comprehensive federal statutory scheme for regulation of immigration and naturalization and set the terms and conditions of admission to the country and subsequent treatment of aliens lawfully in the country."  *Chamber of Commerce v. Whiting*, 563 U.S. 582, 587 (2011) (citation and internal quotation marks omitted).

36.     While the INA does not contain any emergency provision triggered by the NEA, Congress did specifically consider the urgency of "an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border."  8 U.S.C. § 1103(a)(10).  In such a circumstance, the INA does not contemplate a military response, but instead authorizes

the Attorney General to deputize any State or local law enforcement officer with the authority to

perform federal immigration duties.

37.     The INA also addresses emergency refugee situations.  *Id*. § 1157.  In such a

circumstance, the INA again does not contemplate a military response, but instead allows the

President to grant admissions beyond the maximum established by Congress in order to address

humanitarian concerns, and directs the President to consult with Congress and the Cabinet.

**C.     DHS's Statutory Responsibility for Border Security and Border Fencing**

38.     The Department of Homeland Security ("DHS") and its component agency CBP

are domestic agencies charged with preventing the entry of terrorists, securing the borders, and

carrying out immigration functions.  Within CBP, the U.S. Border Patrol's mission is to prevent

illegal entry across approximately 7,000 miles of Mexican and Canadian international borders

and 2,000 miles of coastal borders surrounding Florida and Puerto Rico.

39.     Beginning with enactment of the Illegal Immigration Reform and Immigrant

Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546 (8 U.S.C.

§ 1103 note), Congress has periodically directed DHS to build fencing on the southern border.

40.     As originally enacted, section 102(b) of IIRIRA required the completion of a

triple-layer fence along a 14-mile stretch of border fencing in the San Diego sector where

construction had begun in the early 1990s.

41.     The Secure Fence Act of 2006, Pub. L. No. 109-367, 120 Stat. 2638, amended

section 102(b) of IIRIRA to require DHS to construct at least two layers of reinforced fencing as

well as physical barriers, roads, lighting, cameras, and sensors on five specific sections of the

southern border totaling approximately 850 miles.

42.     Shortly thereafter, the Consolidated Appropriations Act, 2008, Pub. L. No. 110-

161, 121 Stat. 1844, 2090 (2007) again amended section 102(b) of IIRIRA by removing the specific location and double-layer fencing requirements, and instead directing DHS to construct not less than 700 miles of reinforced fencing where fencing would be most practical and effective.

### D.   Military Support for Civilian Law Enforcement Agencies (Title 10, Chapter 15)

43.   The principle that the military cannot act as a domestic police force is deeply rooted in U.S. history and law.  Under the Posse Comitatus Act, 18 U.S.C. § 1385, enacted in 1878, the use of "any part of the Army or Air Force as a posse comitatus" (i.e., deputized by civilian law enforcement officials to carry out the law) is unlawful, "except in cases of and under circumstances expressly authorized by the Constitution or Act of Congress."  The law's reach was subsequently extended to the Marines and Navy.

44.   Beginning in the early 1980s, Congress passed several Defense Authorization Acts that relaxed Posse Comitatus Act prohibitions by authorizing the use of military in specified domestic law enforcement activities.  These provisions are codified under a new chapter of the U.S. Code (Title 10, Chapter 15, "Military Support for Civilian Law Enforcement Agencies").

45.   Under Chapter 15, Congress has *not* given the military *emergency* authority to assist in border wall construction or any other border security or immigration related task.

46.   Chapter 15 authorizes the military to support civilian law enforcement officials in a non-emergency situation by, among other actions, sharing information, 10 U.S.C. § 271; allowing use of military equipment and facilities, *id*. § 272; providing training and advice, *id*. § 273; and maintaining and operating equipment, *id*. § 274.

47.   Congress has specifically limited the military's support of domestic law enforcement agencies *in emergencies* to circumstances involving weapons of mass destruction,

*id*. § 282, and "situations involving bombings of places of public use, Government facilities,

public transportation systems, and infrastructure facilities." *Id*. § 283(a).  These emergency

support provisions are subject to detailed procedures, and they are limited to situations that (1)

pose a serious threat to the interests of the United States and (2) involve violence causing or

imminently threatening significant loss of civilian lives.

      **E.**    **10 U.S.C. § 284**

    48.    The non-emergency military support authorized under Chapter 15 includes

various types of support for counterdrug activities and activities to counter transnational

organized crime, including the "[c]onstruction of roads and fences and installation of lighting to

block drug smuggling corridors across international boundaries of the United States."  10 U.S.C.

§ 284(b)(7).  In addition, section 284 separately authorizes "unspecified minor military

construction project[s]," but limits the cost of any such project to $750,000.  *Id*. § 284(b)(4),

(i)(3).

    49.    The Defense Secretary must provide the appropriate committees of Congress with

a detailed written and electronic notice of any proposed support under section 284 to civilian law

enforcement agencies at least 15 days prior to providing such support.  *Id*. § 284(h)(1).

    50.    Congress most recently appropriated $517,171,000 for counter-narcotics support

as part of the drug interdiction and counter-drug activities account.  Department of Defense and

Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing

Appropriations Act, 2019, Pub. L. No. 115-245, Title VI ("Defense FY19 Appropriations").

    51.    On information and belief, more than 90 percent of the fiscal year 2019 drug

counterdrug account appropriations have been obligated, leaving approximately $80 million.

52.     The counterdrug account will be used to hold funds transferred from other DoD accounts up to a total of $2.5 billion, while the Army Corps of Engineers will have authority to obligate the funds out of the account in order to execute border wall construction projects.

**F.     Military Construction (Title 10, Chapter 169)**

53.     Military construction ("MILCON") appropriations enable "the Secretary of Defense and the Secretaries of the Army, Air Force, and Navy to plan, program, design, and build the runways, piers, warehouses, barracks, schools, hospitals, child development centers, and other facilities needed to support U.S. military forces at home and abroad."  LYNN M. WILLIAMS, CONGRESSIONAL RESEARCH SERVICE, MILITARY CONSTRUCTION: PROCESS, OUTCOMES, AND FREQUENTLY ASKED QUESTIONS (May 16, 2018).

54.     The Trump administration previously objected that the Defense FY19 Appropriations Act, signed into law September 2018, provided $8.1 billion for military construction rather than the $8.9 billion the administration requested.  *See* Letter from Mick Mulvaney, Director, Office of Management and Budget, to Sen. Richard Shelby, Chair, Senate Comm. on Appropriations (July 18, 2018) ("By incrementally funding, rather than fully funding, military construction projects, the bill delays critical resources to complete high-priority projects initiated in 2019 and puts the burden on future budgets to make up the difference.").

55.     Congress has provided for an NEA emergency for military construction projects pursuant to 10 U.S.C. § 2808(a), which provides:

> In the event of a proclamation of war or the proclamation by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces. Such projects may be undertaken only within the total amount of funds that have been appropriated for

military construction, including funds appropriated for family housing, that have
not been obligated.

56.     Military construction activities have no relation to border wall construction and

other support of DHS and other civilian law enforcement agencies, which are addressed under

Title 10, Chapter 15, and thus the emergency provision is not available to border wall

construction.

**G.     Department of Defense Fiscal Year 2019 Authorizations and Appropriations**

57.     The John S. McCain National Defense Authorization Act for Fiscal Year 2019,

Pub. L. No. 115-232 ("Defense FY19 Authorizations"), includes authorizations for both the DoD

generally (Division A) and MILCON (Division B) specifically.  However, Congress addresses

the two in separate appropriations bills.  Defense FY19 Appropriations; Energy and Water,

Legislative Branch, and Military Construction and Veterans Affairs Appropriations Act, 2019,

Pub. L. No. 115-244 ("MILCON FY19 Appropriations Act").

58.     The Defense FY19 Authorizations Act includes a general transfer authority, under

which the Defense Secretary may "transfer amounts of authorizations made available to the

Department of Defense . . . for fiscal year 2019 between any such authorizations for that fiscal

year (or any subdivisions thereof)" upon a determination that such transfer is in the national

interest.  Defense FY19 Authorizations § 1001(a)(1); Defense FY19 Appropriations § 8005.

Except for transfers between military personnel, "the total amount of authorizations that the

Secretary may transfer under the authority of this section may not exceed $4,500,000,000."

Defense FY19 Authorizations § 1001(a)(2); Defense FY19 Appropriations § 8005 (limiting

general transfer authority to $4,000,000,000).

59.     The Defense Secretary's general transfer authority is not available for MILCON

funds and is further subject to two limitations: general transfer authority funds (1) "may only be

used to provide authority for items that have a higher priority than the items from which

authority is transferred"; and (2) "may not be used to provide authority for an item that has been

denied authorization by Congress."  Defense FY19 Authorizations § 1001(b)(1)-(2); Defense

FY19 Appropriations § 8005.

60.     "None of the funds available to the Department of Defense for any fiscal year for

drug interdiction or counter-drug activities may be transferred to any other department or agency

of the United States except as specifically provided in an appropriations law."  Defense FY19

Appropriations § 8045(a).

61.     "None of the funds made available [under the FY19 Appropriations Act] or any

other Act may be used to pay the salary of any officer or employee of any agency funded by this

Act who approves or implements the transfer of administrative responsibilities or budgetary

resources of any program, project, or activity financed by this Act to the jurisdiction of another

Federal agency not financed by this Act without express authorization of Congress . . . ."

Defense FY19 Appropriations § 8113.

**H.     2019 Consolidated Appropriations Act**

62.     The 2019 Consolidated Appropriations Act appropriates $1.375 billion to DHS

"for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the

Rio Grande Valley Sector."  Pub. L. No. 116-6;  H.R.J. Res. 31, 116th Cong. § 230(a)(1)

(enacted).

63.     In addition to specifically rejecting the President's budget request for $5.7 billion

in border wall funding, Congress put specific limits on the funds it did appropriate under the

2019 Consolidated Appropriations Act.

64.     Congress limited border wall appropriations to construction in the Rio Grande

Valley, and further, directed that "[n]one of the funds made available by this Act or prior Acts

are available for construction of pedestrian fencing—(1) within the Santa Ana National Wildlife

Refuge; (2) within the Bentsen-Rio Grande Valley State Park; (3) within La Lomita Historical

park; (4) within the National Butterfly Center; or (5) within or east of the Vista del Mar Ranch

tract of the Lower Rio Grande Valley National Wildlife Refuge."  *Id*. § 231.

65.     The 2019 Consolidated Appropriations Act also requires DHS to "confer and seek

to reach mutual agreement regarding the design and alignment of physical barriers" within the

cities of Roma, Rio Grande City, Escobares, and La Gruilla, Texas, as well as the unincorporated

community of Salineno, Texas.  In addition, DHS is required to provide a public notice and

comment period on proposed border wall construction within these areas, and to publish its

response to such comments in the Federal Register.  *Id*. § 232.

66.     The 2019 Consolidated Appropriations Act provides that "[n]one of the funds

made available in this or any other appropriations Act may be used to increase . . . funding for a

program, project, or activity as proposed in the President's budget request for a fiscal year until

such proposed change is subsequently enacted in an appropriation Act, or unless such change is

made pursuant to the reprogramming or transfer provisions of this or any other appropriations

Act."  *Id*. § 739.

**I.      National Environmental Policy Act**

67.     NEPA is the "basic national charter for protection of the environment."  40 C.F.R.

§ 1500.1(a).  It was enacted with the ambitious objectives of "encouraging productive and

enjoyable harmony between man and his environment . . . promoting efforts which will prevent

or eliminate damage to the environment and biosphere and stimulating the health and welfare of

man; and enriching the understanding of the ecological systems and natural resources important to the Nation . . . ." 42 U.S.C. § 4321.

68.     In order to achieve these goals, NEPA contains several "action forcing" procedures, most significantly the mandate to prepare an environmental impact statement ("EIS") on major Federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332(2)(C).

69.     The preparation and public circulation of EISs and other NEPA analyses promotes the statute's broad environmental objectives in two primary ways: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Methow Valley Citizens Council*, 490 U.S. at 349.

70.     NEPA requires that "agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts."  40 C.F.R. § 1501.2; *id*. § 1502.5 ("An agency shall commence preparation of an [EIS] as close as possible to the time the agency is developing or is presented with a proposal . . . .").

71.     The Council on Environmental Quality ("CEQ") was created to administer NEPA and has promulgated NEPA regulations, which are binding on all federal agencies.  *See* 42 U.S.C. §§ 4342, 4344; 40 C.F.R. §§ 1500–1508.

72.     NEPA regulations mandate disclosure and consideration of direct, indirect, and cumulative environmental effects, with the underlying purpose of ensuring that the agency has taken a "hard look" at the environmental impacts of proposed actions.  40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.27(b)(7).

73.     If more than one Federal agency "[p]roposes or is involved in the same action," or "[i]s involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity," then a "lead agency shall supervise the preparation of an environmental impact statement." *Id*. § 1501.5(a)(2).

74.     The "potential lead agencies shall determine by letter or memorandum which agency shall be lead agency" and "shall resolve the lead agency question so as not to cause delay." *Id*. § 1501.5(c).   In the event of disagreement among the agencies, a multi-factor test determines lead agency designation.  *Id*. § 1501.5(c)(1)-(5) (in descending order, factors to consider are magnitude of agency's involvement, project approval/disapproval authority, expertise concerning the action's environmental effects, duration of agency's involvement, and sequence of agency's involvement).

75.     The lead NEPA agency "shall request the participation of each cooperating agency in the NEPA process at the earliest possible time." *Id*. § 1501.6(a)(1).  Conversely, each cooperating agency "shall participate in the NEPA process at the earliest possible time." *Id*. § 1501.6(b)(1).

## CONSTITUTIONAL BACKGROUND

### A.     The Appropriations Clause

76.     The U.S. Constitution provides that "no Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7.

77.     The Appropriations Clause plays a critical role in the Constitution's separation of powers among the three branches of government and the checks and balances between them.

78.     The Clause has a "fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good, and not according to the individual favor of Government agents . . . ." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427-28 (1990); *id.* at 427 (without the Appropriations Clause, "the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure." (*quoting* 2 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1348 (3d ed. 1858))).

79.     If a Court finds that the executive branch is spending money in violation of a spending provision, "it would be drawing funds from the Treasury without authorization by statute and thus violating the Appropriations Clause." *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016).

## B.     Take Care Clause

80.     The President "shall take Care that the Laws be faithfully executed . . . ." U.S. CONST. art. II, § 3.

81.     The Take Care Clause places an obligation on the President and those under his supervision to comply with and execute clear statutory directives as enacted by Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.  The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad.").

82.     Under the Take Care Clause, the President and his subordinates may not create law by disregarding or repealing a validly enacted statute. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or the repeal statutes.").

## FACTUAL ALLEGATIONS

83.     On June 16, 2015, in a campaign announcement speech, then Mr. Donald Trump stated:

> I would build a great wall.  And nobody builds walls better than me, believe me. And I'll build them very inexpensively.  I will build a great great wall on our southern border and I'll have Mexico pay for that wall.

84.     On January 25, 2019, at the end of the longest government shutdown, President Trump stated:

> We really have no choice but to build a powerful wall or steel barrier.  If we don't get a fair deal from Congress, the government will either shut down on February 15 again or I will use the powers afforded to me under the laws and the Constitution of the United States to address this emergency.

85.     On February 15, 2019, in announcing the issuance of an emergency proclamation, President Trump said:

> So we have a chance at getting close to $8 billion—whether it's $8 billion or $2 billion or $1.5 billion, it's going to build a lot of wall.  We're getting it done.

**A.     The February 15, 2019 Emergency Proclamation and Administration Statement Identifying $6.7 Billion for Transfer to Border Wall Construction**

86.     On February 15, 2019, President Trump issued a "Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States."

87.     The proclamation declares the "current situation at the southern border"— including "large-scale unlawful migration" and "sharp increases in the number of family units

entering and seeking entry to the United States"—as a "national emergency." It further states that "[b]ecause of the gravity of the current emergency situation, it is necessary for the Armed Services to provide additional support to address the crisis."

88.     Relying on the NEA, the proclamation invokes the emergency military construction authority provided under 10 U.S.C. § 2808 ("the construction authority provided in section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense and, at the discretion of the Secretary of Defense, to the Secretaries of the military departments.").

89.     Section 2 of the proclamation directs that the Defense Secretary (as well as the DHS Secretary and Secretary of the Interior) "shall take all appropriate actions, consistent with applicable law, to use or support the use of the authorities herein invoked, including, if necessary, the transfer and jurisdiction over border lands."

90.     According to the administration, the emergency proclamation makes $3.6 billion available from funds that have been appropriated to military construction projects. *See* Fact Sheet, Border Security Victory.

91.     In addition to the emergency proclamation, the administration also identified approximately $3.1 billion in non-emergency funds that have been appropriated by Congress to other purposes to instead be directed to border wall construction, including $601 million from the Treasury Forfeiture Fund and $2.5 billion from the counterdrug account. *Id*.

**B.     The Nation's Longest Government Shutdown, and the President's Abuse of the National Emergencies Act as a Negotiating Tactic**

92.     President Trump first publicly threatened to issue an emergency proclamation on January 4, 2019, two weeks into the nation's longest federal shutdown, which began at midnight on December 21, 2018, and continued until January 25, 2019.

93.     The shutdown was the culmination of months of disagreement between the President and Congress over the administration's $5.7 billion demand for a border wall, and it was the central dispute in the final, "lame duck" days of the 115th Congress.

94.     On December 11, 2018, President Trump met with House Minority Leader (Speaker to be) Nancy Pelosi and Senate Minority Leader Chuck Schumer, and on live television proclaimed, "I am proud to shut down the government for border security.  I will take the mantle. I will be the one to shut it down."  The President had made numerous earlier statements suggesting he would relish shutting down the government if Congress did not provide all of the requested border wall funding.  *See*, e.g., July 30, 2018 ("I have no problem doing a shutdown"); September 12, 2018 ("If it happens, it happens").

95.     On December 19, 2018, the Senate passed a continuing resolution providing funding to DHS and other agencies (Agriculture, Commerce, Justice, the Interior, State, Transportation, and Housing and Urban Development) until February 8, 2019, without border wall funding and with the understanding that President Trump supported the bill.

96.     On December 20, 2018 (one day before government funding for DHS and the other agencies lapsed), after conservative TV pundits and the House Freedom Caucus criticized President Trump, the President flipped his position and announced he would not sign the Senate bill because it did not have any border wall funding.  That afternoon, House Republicans passed a continuing resolution with $5.7 billion in border wall funds.

97.     On December 21, 2018, President Trump encouraged Senator McConnell to abolish the filibuster in order to pass the $5.7 billion spending bill in the Senate.  Acknowledging that this would not occur, President Trump mused that there was a "very good" chance of a

government shutdown and that it could last a "very long time."  As the President predicted, the

Senate voted down the House version of the bill and the government shut down at midnight.

98.     Two weeks later, on January 4, 2019, President Trump for the first time publicly

voiced his perceived authority to use the NEA for emergency border wall funding.

99.     Between that date and the February 15, 2019 emergency proclamation, the

President repeatedly and clearly stated his belief that he could use the NEA as a negotiating

tactic with Congress.  During this time, the President also vacillated on his ultimate intention to

declare an emergency.

100.    On January 9, 2019, President Trump stated that "I have an absolute right to do

national emergency if I want," and revealed that his "threshold" for invoking the emergency

would be if he "can't make a deal with people that are unreasonable."

101.    On January 10, 2019, the President said that he was "maybe, definitely" planning

on invoking an emergency proclamation to build the border wall.  President Trump explained

that working with Democrats in Congress was "ridiculous" and that "[i]f we don't make a deal, I

would say 100 percent, but I don't want to say 100 percent," and that "[i]f we don't make a deal,

I would say it would be very surprising to me that I would not declare a national emergency and

just fund it through the various mechanisms."

102.    On January 11, 2019, the President denied intent to immediately declare an

emergency under the NEA, stating that "what we're not looking to do right now is national

emergency."

103.    On January 25, 2019, President Trump and Congress reached an agreement to end

the 35-day partial federal shutdown, providing funding for DHS and other affected agencies for

three weeks, through February 15, 2019.

104.     In his January 25 speech announcing the temporary deal to end the shutdown, the President again threatened to use the NEA as a negotiating tactic, stating, "[w]e really have no choice but to build a powerful wall or steel barrier.  If we don't get a fair deal from Congress, the government will either shut down on February 15 again or I will use the powers afforded to me under the laws and the Constitution of the United States to address this emergency."

105.     On January 29, 2019, Under Secretary of Defense for Policy John Rood testified to the House Armed Services Committee that if President Trump declared an emergency and directed the Pentagon to act, the military would build the wall "if we judged it to be a lawful order.  And I assume it would be."

106.     On January 31, 2019, President Trump stated that "we've set the stage for what's going to happen on February 15 [i.e., an emergency proclamation] if a deal is not made."

107.     On February 1, 2019, the President stated, "I think there's a good chance that we'll have to do" an emergency proclamation, while noting "tremendous obstruction by Democrats."

108.     The President would continue to threaten to use the NEA until issuing the emergency proclamation on February 15, 2019.  At the press conference on February 15, 2019, announcing the emergency proclamation, however, the President disclaimed the need to declare a national emergency, stating, "I could do the wall over a longer period of time—I didn't need to do this—but I would rather do it much faster. . . . I just want to get it done faster, that's all."

### C.     Congress Provided the Trump Administration with Funding for More Than 175 Miles of New or Replacement Border Wall Construction in Previous Appropriations Bills, Much of Which Remains Uncompleted

109.     Congress has provided the Trump administration with nearly $3 billion in funding for border fence construction, much of which remains uncompleted.

110.     In response to the administration's fiscal year 2017 budget amendment and request for supplemental appropriations, the Consolidated Appropriations Act, 2017, provided CBP with $341 million "to replace approximately 40 miles of existing primary pedestrian and vehicle border along the southwest border, using previously deployed and operationally effective designs, such as currently deployed steel bollard designs . . . ." Pub. L. No. 115-31, 131 Stat. 135, 434.

111.     CBP directed those fiscal year 2017 funds to 40 miles of replacement wall construction in San Diego, El Centro, El Paso, and near Santa Teresa. The construction was expedited by a waiver of NEPA, the Endangered Species Act ("ESA"), and more than 30 additional laws pursuant to IIRIRA § 102(c). *See* 82 Fed. Reg. 35,984 (Aug. 2, 2017) (San Diego); 82 Fed. Reg. 42,829 (Sept. 12, 2017) (El Centro); 83 Fed. Reg. 3012 (Jan. 22, 2018) (Santa Teresa).

112.     In March 2018, Congress provided the Trump administration with an additional $1.34 billion for secondary fencing replacement in the San Diego sector, new primary fencing in the Rio Grande Valley sector, and replacement of existing pedestrian fencing in any location along the southwest border. Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. F, tit. II, § 230(a)(1)-(4) ("DHS FY18 Appropriations ").

113.     CBP estimates that the DHS FY18 Appropriations will fund approximately 84 miles of border barrier construction.

114.     DHS issued two waivers under IIRIRA § 102(c) to expedite border wall construction in the lower Rio Grande Valley sector—in Cameron County, Texas (83 Fed. Reg. 50,949 (Oct. 10, 2018)), and Hidalgo County, Texas (83 Fed. Reg. 51,472 (Oct. 11, 2018))—waiving NEPA, ESA, and more than 30 additional laws.

115.   DHS has issued two contracts to construct new border wall in the Rio Grande sector using FY 2018 appropriations, both located in Hidalgo County: FY18 RGV-003 (six miles) and FY18 RGV-02 (five segments, eight miles).

116.   The construction on these two contracts will be the first commenced of the estimated 84 miles funded by the DHS FY18 Appropriations.

**D.     Congress Specifically Rejected the Trump Administration's Border Wall Budget Request, While Placing Geographic and Other Restrictions on the Money Appropriated**

117.   On February 15, 2019, immediately after issuing the emergency proclamation, the President signed the 2019 Consolidated Appropriations Act, (H.R.J. Res. 31, Pub. L. No. 116-6), providing an additional $1.375 billion for border wall construction.

118.   In enacting the 2019 Consolidated Appropriations Act, Congress specifically rejected the additional funding President Trump requested for CBP  border wall priorities.

119.   In addition, the 2019 Consolidated Appropriations Act (1) limits border wall construction to the Rio Grande Valley, § 230; (2) prohibits the funding of border wall construction in five specified areas, § 231; and (3) requires DHS to consult with local communities and provide for public notice and comment prior to border wall construction within five borderland cities in south Texas, § 232.

**E.     Agency Implementing Actions**

120.   On February 25, 2019, DHS wrote to DoD with a "Request for Assistance Pursuant to 10 U.S.C. § 284."  Memorandum from Christina Bobb, Exec. Sec'y, DHS, to Capt. Hallock N. Mohler Jr., Exec. Sec'y, DoD.  The Memorandum requests that DoD assist in the implementation of the Trump administration's border wall project by funding, planning, and executing the construction of eleven border wall segments (as well as associated roads and

lighting) totaling approximately 218 miles.  All 11 segments are proposed entirely on federal

land in the states of California, Arizona, or New Mexico, including protected areas owned and

administered by the Department of the Interior such as Cabeza Prieta National Wildlife Refuge,

Organ Pipe Cactus National Monument, San Pedro Riparian National Conservation Area, and

San Bernardino National Wildlife Refuge.

121.    On March 25, 2019, Acting Defense Secretary Shanahan wrote to then DHS

Secretary Nielsen approving the request, and directing the obligation of up to $1 billion from the

counterdrug account for the U.S. Army Corps of Engineers to immediately plan and execute

three border wall segments across 57 miles: Yuma Sector Projects 1 and 2 and El Paso Sector

Project 1.

122.    Acting Defense Secretary Shanahan's March 25, 2019 approval letter states that

"[a]s proponent of the requested action, CBP will serve as the lead agency for environmental

compliance."

123.    On April 9, 2019, DoD announced that the Army Corps of Engineers had awarded

two contracts totaling $1.178 billion for the construction of Yuma Sector Projects 1 and 2 and El

Paso Sector Project 1.

124.    More than 90 percent of the fiscal year 2019 appropriations for the counterdrug

account have been obligated, leaving approximately $80 million.  Accordingly, the vast majority

of the $2.5 billion to be drawn from this account are being transferred from other DoD

appropriations.  The Defense Secretary's March 25, 2019 authorization of $1 billion for the three

border wall projects is being transferred from funds appropriated to a military personnel account

into the counterdrug account, and then subsequently those funds are being obligated from that

account by Army Corps of Engineers to private contractors.

125.    On April 11, 2019, Acting Defense Secretary Shanahan issued a memorandum for the Under Secretary of Defense (Comptroller)/Chief Financial Officer, directing the Comptroller to identify, by May 10, 2019, existing military construction projects of sufficient value to provide up to $3.6 billion to transfer for border wall construction pursuant to 10 U.S.C. § 2808.  The Acting Secretary's memorandum excludes family housing, barracks, or dormitory projects; projects that have already been awarded; and projects that have fiscal year 2019 award dates.  The memorandum directs the Comptroller to be prepared to make the identified funds available if the Acting Secretary determines that military construction funds are necessary to address the proclaimed national emergency.

### F.    Defendants' Actions Will Have Significant Environmental Impacts

126.    The Trump administration previously explained that its $5.7 billion request for border wall construction will "fund construction of a total of approximately 234 miles of new physical barrier and fully fund the top 10 priorities in CBP's Border Security Improvement Plan."  *See* Letter from Russell T. Vought, Acting Director, OMB, to Sen. Richard Shelby, Chairman, Sen. Appropriations Comm. (Jan. 6, 2019).

127.    The administration's "highest priority border wall miles" total 215 miles.  *See* Press Release, DHS, Walls Work (Dec. 12, 2018).  Border Patrol has broken down the 215 miles by sector.  These highest priority areas are the San Diego sector (5 miles); El Centro sector (14 miles); Yuma sector (27 miles); El Paso sector (9 miles); Laredo sector (55 miles); and Rio Grande Valley sector (104 miles).

128.    CBP has not clarified what, if any, overlap exists between the miles of border wall already funded and the 215 miles of "highest priority border wall."  However, new border wall mileage under the DHS FY 18 Appropriations and 2019 Consolidated Appropriations Act is

limited to the Rio Grande Valley sector; thus, all of the construction within "highest priority areas" in the San Diego, El Centro, Yuma, El Paso, and Laredo sectors would not occur but for the unlawful appropriations transfers and obligations.

129.    DHS's February 25, 2019 request for DoD assistance proposes projects in addition to CBP's previously identified "highest priority border wall" segments, including projects within the Tucson sector that would not occur but for the unlawful appropriations transfers and obligations.

130.    If carried out, the border wall construction funded by the emergency proclamation, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate appropriated funds to border wall construction, would directly harm Plaintiffs and their members.  The environmental harm from this construction includes adverse impacts to: (1) threatened and endangered species listed under the Endangered Species Act, as well as their designated critical habitat; (2) lands under federal jurisdiction, including National Parks; National Forests; National Wildlife Refuges, National Monuments, and other lands within the National Landscape Conservation System (administered by the Bureau of Land Management); Wilderness areas; Wild and Scenic Rivers; and other areas of high environmental value; and (3) waters of the United States protected by the Clean Water Act.

131.    Of particular concern to Plaintiffs' core organizational interests is the fact that the unlawful identification, transfer, and obligation of appropriated funds for border wall construction would sever wildlife connectivity and cross-border movement between wildlife populations on either side of the U.S.-Mexico border.  Every endangered jaguar seen in the United States during the species' nascent recovery in the past two decades, for example, was born in Mexico.

132.    Given that approximately 700 miles of the southern border already has some form of fencing or "vehicle barriers" (passable to wildlife) on it, the cumulative and irreversible impact of additional border fencing on wildlife populations becomes ever greater with each additional mile of border wall constructed.  Under the February 25, 2019 DHS request for DoD assistance, the transfer and obligation of appropriated funds will result in border wall construction within areas that currently contain vehicle barriers on protected federal lands in Arizona and New Mexico, including Cabeza Prieta National Wildlife Refuge, Organ Pipe Cactus National Monument, Coronado National Forest, San Pedro Riparian National Conservation Area, and San Bernardino National Wildlife Refuge.   These protected lands contain essential habitat corridors and connectivity for endangered species with populations on both sides of the border, including jaguars.  These corridors and connectivity will be served by the conversion of vehicle barriers to border wall.

133.    The unlawful transfer and obligation of appropriated funds to border wall construction in the San Diego sector, which spans from the Pacific Ocean eastward to the Imperial County line, will harm Plaintiffs and their members.  The San Diego sector is already heavily fortified, with primary fencing covering 46 of 60 miles, 30 percent of the miles of all secondary and tertiary fencing along the southwest border, and more than 300 miles of patrol roads.

134.    The remaining unfenced areas within the San Diego sector are of high environmental value, and are generally mountainous and rugged, including unfenced areas within the San Ysidro Mountains and the complex geography of southeastern San Diego County. This includes two major tributaries of the Tijuana River (Cottonwood Creek and Tecate Creek)

and designated critical habitat under the Endangered Species Act for the coastal California gnatcatcher, Quino checkerspot butterfly, and Arroyo toad.

135.    The unlawful transfer and obligation of appropriated funds to border wall construction in the El Centro sector, which spans from the Jacumba Mountains in the west to the Imperial Sand Dunes in the east, will harm Plaintiffs and their members.  The El Centro sector is already heavily fortified, with primary fencing or vehicle barriers covering 59 of its 70 miles, and 214 miles of patrol roads.

136.    The areas within the El Centro sector that remain unfenced and/or have vehicle barriers passable to wildlife, are of high environmental value.  The largest unfenced area is in highly rugged and mountainous terrain within the Jacumba Mountains and their sheer eastern escarpment.  This area is designated critical habitat for the peninsular bighorn sheep pursuant to the Endangered Species Act.

137.    The unlawful transfer and obligation of appropriated funds to border wall construction in the Yuma sector, which spans from the Imperial Sand Dunes east to the Yuma-Pima County line in Arizona, will harm Plaintiffs and their members.  The Yuma sector is already heavily fortified, with primary fencing or vehicle barriers covering 107 of 126 miles, as well as 209 miles of patrol roads.

138.    The areas within the Yuma sector which remain unfenced and/or have vehicle barriers passable to wildlife, are of high environmental value, and located within the Barry M. Goldwater Air Force Range and Cabeza Prieta National Wildlife Refuge.  The area includes essential habitat for endangered species, including the Sonoran pronghorn.

139.    The unlawful transfer and obligation of appropriated funds to border wall construction in the Tucson sector, which spans from the Yuma-Pima County line in Arizona to

the state's boundary with New Mexico, will harm Plaintiffs and their members. The Tucson sector is already heavily fortified, with primary fencing or vehicle barriers covering 211 of 262 miles.

140.    The areas within the Tucson sector that remain unfenced and/or have vehicle barriers passable to wildlife, are of high environmental value, including lands within Organ Pipe Cactus National Monument, Coronado National Forest, San Pedro Riparian National Conservation Area, and San Bernardino National Wildlife Refuge. The areas include designated critical habitat for endangered species, including the jaguar.

141.    The unlawful transfer and obligation of appropriated funds to border wall construction in the El Paso sector, which includes the entire border of New Mexico with Mexico as well as two counties in far western Texas, harms Plaintiffs and their members. The El Paso sector is already heavily fortified, with primary fencing covering 166 of 180 miles, as well as 465 miles of patrol roads.

142.    The areas within the El Paso sector that remain unfenced and/or have vehicle barriers passable to wildlife, are of high environmental value, including large sections of the remote New Mexico "bootheel." This area contains designated critical habitat for jaguars and Chiricahua leopard frogs, and is renowned for its non-endangered wildlife including mule deer, mountain lions, antelope, and bison.

143.    The unlawful transfer and obligation of appropriated fund to border wall construction in the Laredo sector, which spans from Webb County, Texas, to Zapata County, Texas, harms Plaintiffs and their members. The Laredo sector is lightly fortified, with primary fencing covering 1 of 171 miles, and 144 miles of patrol roads.

144.    The Laredo sector is of high environmental value, and like the entire southern Texas border, its international border is defined by the Rio Grande River.

145.    The unlawful transfer and obligation of appropriated funds to as much as 104 miles of border wall construction in the Rio Grande Valley sector, though some of this mileage may overlap with border wall construction that was already been funded in prior appropriations bills, will harm Plaintiffs and their members.  The Rio Grande Valley sector, which encompasses the Lower Rio Grande Valley, is heavily fortified in some areas, with primary fencing covering 55 of 316 river miles and 716 miles of patrol roads.

146.    The Lower Rio Grande Valley is one of the most biologically diverse areas in North America and is particularly crucial for migratory birds.  The remaining unfenced areas in the Rio Grande Valley sector are of high environmental value and include protected federal lands like the Lower Rio Grande Valley National Wildlife Refuge and Santa Ana National Wildlife Refuge, as well as essential habitat for endangered species such as ocelots.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### Unlawful Proclamation of Emergency

#### Violation of the National Emergencies Act

147.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

148.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful Presidential action that is *ultra vires*.

149.    The President's own statements and the totality of surrounding circumstances show that the President abused the authority granted to him to issue proclamations under the NEA, by unlawfully using that authority as a political negotiating tactic.

150.    Even if the President's use of his proclamation as a negotiating tactic was lawful under the NEA, 10 U.S.C. § 2808 cannot be lawfully invoked to justify the emergency transfer of appropriated military construction funds to border wall construction.

151.    A proclamation issued under the NEA triggers the President's authority to invoke *existing* Acts of Congress that authorize "the exercise, during the period of a national emergency, of any special or extraordinary power."  50 U.S.C. § 1621(a); *id*. § 1631 ("When the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act.").

152.    Accordingly, the scope of the President's emergency powers is limited to legislative enactments under which Congress has specifically granted those powers in advance.

153.    10 U.S.C. § 2808 does not provide authority to conduct an emergency transfer of appropriated military construction funds to border wall construction, and therefore the proclamation's reliance on that provision is unlawful.

154.    Plaintiffs and their members will suffer irreparable injury if the emergency proclamation is not declared unlawful.  Plaintiffs and their members have no other adequate remedy at law.

### SECOND CLAIM FOR RELIEF
### Unlawful Transfer of Funds Appropriated to Military Construction

### Violation of 10 U.S.C. § 2808 and 2019 Consolidated Appropriations Act

155.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

156.    The APA requires courts to hold unlawful and set aside any agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B)

contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

157.    The Defense Secretary's and Army Corps of Engineers' implementing actions to

identify, transfer, and obligate funds appropriated for military construction to border wall

construction are arbitrary, capricious, an abuse of discretion, and not in accordance with law, in

contravention of the APA standards of review.

158.    By its plain language, 10 U.S.C. § 2808 does not provide an emergency source of

funding for border wall construction.  10 U.S.C. § 2801(a) defines the term "military

construction" as including "any construction, development, conversion, or extension or any kind

carried out *with respect to a military installation* … or any acquisition of land or construction of

a defense access road."  In turn, "military installation" means a "base, camp, post, station, yard,

center, or other activity under the jurisdiction of the Secretary of a military department . . . ."

(emphasis added).  The vast majority, if not all, of the border wall construction that the

proclamation would fund occurs on lands that do *not* constitute a military installation, and in any

event, the border wall is not a military construction project and thus is not lawfully eligible for

emergency military construction transferred appropriations.

159.    In addition, the military construction authority is limited to emergencies "that

require[ ] use of the armed forces," and "that are necessary to support such use of the armed

forces."  10 U.S.C. § 2801(a).  The dispute over border wall funding hardly qualifies as an

emergency requiring use of the armed services, and in no way supports the armed forces.  The

emergency proclamation would in fact turn this requirement on its head by using the armed

forces to engage on a domestic issue due to the President's failure to achieve his policy goals

through the legislative and constitutional framework of the appropriations process.

160.    The broader context of Title 10 also demonstrates that military construction funds may not be directed to border wall construction.  Title 10, Chapter 15 (Military Support for Civilian Law Enforcement Agencies) is a relatively new addition to the Armed Forces code addressing the specific circumstances and conditions under which the military may support domestic law enforcement agencies.  Chapter 15 represents a departure from longstanding separation of military and domestic law enforcement functions, and thus its exceptions must be read narrowly and exclusively.  The proclamation unlawfully provides for an emergency involving military support to domestic law enforcement agencies that has not been previously authorized by Congress.

161.    The NEA only provides Presidential authority to invoke provisions under which Congress has previously considered and addressed the specific emergency at hand.  Under Chapter 15, Congress has directly spoken to the circumstances in which the military may be called upon to support civilian law enforcement agencies, and it limited those circumstances to emergency situations involving weapons of mass destruction, *id*. § 282, and situations involving bombings of places of public use, government facilities, public transportation systems, and infrastructure facilities. *Id*. § 283.

162.    In addition, Congress has not enacted any NEA emergency provisions under the Immigration Law Code (Title 8).  Congress has, however, specifically considered the urgency of "an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border," and it did not contemplate the involvement of the military in those situations, but instead focused on cooperation with local law enforcement officials—allowing the Attorney General to authorize any State or local law enforcement officer to perform federal immigration duties.  8 U.S.C. § 1103(a)(10).

163.     The President's invocation of 10 U.S.C. § 2808 is unlawful under the plain language of that provision, and broader statutory structure of the military and immigration codes, as is the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate emergency funds from military construction housing to border wall construction.

164.     The Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate up to $3.6 billion of appropriated military construction funds to border wall construction violates the 2019 Consolidated Appropriations Act, by exceeding and falling outside of the Act's monetary and geographic limitations, respectively, on border wall funding.  § 230(a).

165.     The President's invocation of 10 U.S.C. § 2808, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate funds appropriated for military construction to border wall construction, violate the 2019 Consolidated Appropriations Act prohibition that "[n]one of the funds made available in this or any other appropriations Act may be used to increase . . . funding for a program, project, or activity  as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act."  2019 Consolidated Appropriations Act, § 739.

166.     Plaintiffs and their members will suffer irreparable injury if the President's invocation of 10 U.S.C. § 2808, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate funds appropriated for military

construction to border wall construction, are not declared unlawful.  Plaintiffs and their members have no other adequate remedy at law.

### THIRD CLAIM FOR RELIEF
### (IN THE ALTERNATIVE TO THE SECOND CLAIM FOR RELIEF)
### Unlawful Transfer of Funds Appropriated to Military Construction

#### Violation of 10 U.S.C. § 2808 and 2019 Consolidated Appropriations Act

167.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

168.     In the event the Court finds that the Defense Secretary's and Army Corps of Engineers' implementing actions are not subject to APA review, Plaintiffs have a non-statutory right of action to enjoin and declare those actions as *ultra vires*.

169.     For the same reasons described in the Second Claim for Relief, the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate funds appropriated for military construction to border wall construction is unlawful.

170.     Plaintiffs and their members will suffer irreparable injury if the President's invocation of 10 U.S.C. § 2808, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate funds appropriated for military construction to border wall construction, are not declared unlawful.

### FOURTH CLAIM FOR RELIEF
### Unlawful Transfer  of Appropriated Funds Into, and From, the Counterdrug Account

#### Violation of  Defense FY19 Appropriations and 2019 Consolidated Appropriations Act

171.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

172.     The APA requires courts to hold unlawful and set aside any agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B)

contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

173.    The Defense Secretary's and Army Corps of Engineers' implementing actions to

identify, transfer, and obligate up to $2.5 billion of appropriated funds into, and from, the

10 U.S.C. § 284 counterdrug account to border wall construction are arbitrary, capricious, an

abuse of discretion, and not in accordance with law, in contravention of the APA standards of

review.

174.    The Defense Secretary's implementing actions to identify and transfer up to $2.5

billion of appropriated funds into the counterdrug account violate the DoD FY19 Appropriations

Act general transfer authority, as the transfer would be an unlawful "case where the item for

which funds are requested has been denied by the Congress."  Defense FY Appropriations,

§ 8005.

175.    The Defense Secretary's and Army Corps of Engineers' implementing actions to

identify, transfer, and obligate up to $2.5 billion of appropriated funds into, and from, the

counterdrug account to fund border wall construction violate the 2019 Consolidated

Appropriations Act, by exceeding and falling outside of the Act's monetary and geographic

limitations, respectively, on border wall funding.  2019 Consolidated Appropriations Act,

§ 230(a).

176.    The Defense Secretary's and Army Corps of Engineers' implementing actions to

identify, transfer, and obligate up to $2.5 billion of appropriated funds into, and from, the

counterdrug account to fund border wall construction violate the 2019 Consolidated

Appropriations Act prohibition that "[n]one of the funds made available in this or any other

appropriations Act may be used to increase . . . funding for a program, project, or activity  as

proposed in the President's budget request for a fiscal year until such proposed change is

subsequently enacted in an appropriation Act, or unless such change is made pursuant to the

reprogramming or transfer provisions of this or any other appropriations Act."  2019

Consolidated Appropriations Act, § 739; *see also* 10 U.S.C. § 2214(b).

177.    Plaintiffs and their members will suffer irreparable injury if the Defense

Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and

obligate up to $2.5 billion of appropriated funds into, and from, the counterdrug account to

border wall construction are not declared unlawful.  Plaintiffs and their members have no other

adequate remedy at law.

**FIFTH CLAIM FOR RELIEF**
**(IN THE ALTERNATIVE TO THE FOURTH CLAIM FOR RELIEF)**
<u>**Unlawful Transfer of Appropriated Funds Into, and From, the Counterdrug Account**</u>

**Violation of Defense FY 19 Appropriations and 2019 Consolidated Appropriations Act**

178.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

179.    In the event the Court finds that the Defense Secretary's and Army Corps of

Engineers' implementing actions are not subject to APA review, Plaintiffs have a non-statutory

right of action to enjoin and declare those actions as *ultra vires*.

180.    For the same reasons described in the Fourth Claim for Relief, the Defense

Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and

obligate up to $2.5 billion of appropriated funds into, and from, the counterdrug account to

border wall construction are unlawful.

181.    Plaintiffs and their members will suffer irreparable injury if the Defense

Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and

obligate up to $2.5 billion of appropriated funds into, and from, the counterdrug account to border wall construction are not declared unlawful.

## SIXTH CLAIM FOR RELIEF
### Failure to Carry Out Duties as Lead Agency and Cooperating Agencies in Preparation of Environmental Impact Statement

### Violation of NEPA (40 C.F.R. § 1501.5 and § 1501.6)

182.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

183.     The APA requires courts to hold unlawful and set aside any agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

184.     Defendants have failed to meet the duties placed upon lead and cooperating agencies by NEPA and its implementing regulations, in contravention of APA standards of review.

185.     DHS has requested DoD to pay for border wall construction through the identification, transfer, and obligation of funds appropriated to other purposes.  In addition, DHS has requested that DoD execute the border wall projects though the construction of border wall fencing, the construction of roads, and the installation of lighting.  All of the requests received to date would result in border wall construction on federal lands, primarily protected federal lands owned and administered by the Department of the Interior.  DoD has approved assistance for specific border wall construction segments within the Trump administration's larger border wall project, including Yuma Sector Projects 1 and 2 and El Paso Project 1, and has identified, transferred, and obligated more than $1 billion into, and from, the counterdrug account to carry out these projects.

186.    DoD will identify up to $3.6 billion of funds appropriated for military construction by May 15, 2019, to be available for transfer and obligation to fund the Trump administration's border wall project pursuant to the purported emergency authority of 10 U.S.C. § 2808.

187.    NEPA requires that a lead agency be designated for the Trump administration's border wall project, including the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate appropriated funds to border wall construction, which is primarily planned for protected lands owned and administered by the Department of the Interior.  40 C.F.R. § 1501.5(a)(1)-(2).  The lead agency "shall supervise the preparation of an environmental impact statement," as more than one Federal agency "is involved in the same action," and the border wall project involves a "group of actions directly related to each other because of their functional interdependence or geographical proximity."  40 C.F.R. § 1501.5(a)(1)-(2).

188.    The lead agency "shall [r]equest the participation of each cooperating agency in the NEPA process at the earliest possible time."  *Id*. § 1501.6(a)(1).  Conversely, "[e]ach cooperating agency shall [p]articipate in the NEPA process at the earliest possible time."  *Id*. § 1501.6(b)(1).

189.    Acting Secretary Shanahan's March 25, 2019 letter approving the DHS February 25, 2019 request for assistance states that "CBP will serve as the lead agency for environmental compliance," despite the fact that DoD and the Army Corps of Engineers are funding, implementing, and constructing the border wall projects.

190.    Despite the DoD actions already taken to identify, transfer, and obligate funds appropriated to other purposes, the specific identification of border wall project areas, and the

apparent imminence of project related construction, CBP has not initiated the NEPA process, in violation of its duties as lead agency to "supervise the preparation of an environmental impact statement," and to "[r]equest the participation of each cooperating agency in the NEPA process at the earliest possible time." 40 C.F.R. § 1501.5 (a)(1)-(2), § 1501.6(a)(1).

191.     Conversely, DoD, the Army Corps of Engineers, and the Department of the Interior have acted in violation of their NEPA duties as cooperating agencies to "[p]articipate in the NEPA process at the earliest possible time." *Id.* § 1501.6(b)(1).

192.     On information and belief, CBP has no intention of conducting any NEPA review, but instead intends to issue waivers of NEPA and other laws pursuant to IIRIRA  102(c).  Any such waivers would represent an unlawful bootstrapping of the waiver authority, which is directed to actions of DHS.  *See* § 102(a) ("*The Secretary of Homeland Security* shall take such actions as may be necessary to install additional barriers and roads . . .") (emphasis added).  The border wall projects are being carried out (with little to no DHS involvement or expenditure) by DoD and Army Corps of Engineers, on lands owned and administered by the Department of the Interior.[2]  As more than one Federal agency is "involved in the same action" and the border wall projects are "a group of actions directly related to each other because of their functional interdependence or geographical proximity," the Trump administration's border wall project creates cooperating agency duties for DoD, the Army Corps of Engineers, and Department of the Interior that are beyond the scope of the IIRIRA waiver authority.  40 C.F.R. § 1501.5(a)-(c), § 1501.6.

193.     Plaintiffs and their members will suffer irreparable injury if Defendants' failures to meet their duties as lead agency and cooperating agencies under NEPA are not declared

---

[2] Border wall projects are also proposed for lands within the Coronado National Forest, administered by the U.S. Forest Service, an agency of the Department of Agriculture. The Forest Service should also serve as a cooperating agency.

unlawful, and unless those agencies are not thereby directed to immediately begin preparation of an environmental impact statement.  Plaintiffs and their members have no other adequate remedy at law

### SEVENTH CLAIM FOR RELIEF
### Constitutional Violation

### Violation of the Appropriations Clause of the U.S. Constitution
### Article I, Section 9, Clause

194.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

195.    Article I of the U.S. Constitution provides that "no Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. CONST. art. I, § 9, cl. 7.

196.    Congress's "power of the purse" has been described as the "most important single curb" on presidential authority, because it vests the powers of public revenue and public expenditures with the people's representatives in Congress.  EDWARD S. CORWIN, THE CONSTITUTION AND WHAT IT MEANS TODAY 134 (13th ed. 1975); *see Reeside v. Walker*, 52 U.S. 272, 291 (1850) ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned.").

197.    The proclamation and agency implementing actions to identify, transfer, and obligate appropriated funds violate 10 U.S.C. § 2808, DoD FY19 Defense Appropriations Act, and 2019 Consolidated Appropriations Act.  Congress has not appropriated the funds being transferred and obligated to border wall construction for that purpose, and limited the funds it has appropriated to border wall construction to projects within the Rio Grande Valley that are subject to several additional restrictions.  Defendants' unlawful transfer and obligation of appropriated funds for border wall construction violates the Appropriations Clause.

198.    Plaintiffs and their members will suffer irreparable injury if this constitutional

violation is not declared unlawful.  Plaintiffs and their members have no other adequate remedy

at law.

## EIGHTH CLAIM FOR RELIEF
### Constitutional Violation

### Violation of the Take Care Clause of the U.S. Constitution
### Article II, Section 3

199.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

200.    Article II of the U.S. Constitution provides that "[t]he executive Power shall be

vested in a President," and that he or she "shall take Care that the Laws be faithfully executed."

U.S. CONST. art. II, § 3.

201.    The President has failed to comply with the requirements and limitations of law

that the Executive Branch is required to "faithfully execute," including the NEA, 10 U.S.C.

§ 2808,  FY 19 Defense Appropriations Act, and 2019 Consolidated Appropriations Act.

Accordingly, the President's issuance of the emergency proclamation, and the Defense

Secretary's and Army Corps' implementing actions to identify, transfer, and obligate

appropriated funds to border wall construction, violate the Take Care Clause.

202.    Plaintiffs and their members will suffer irreparable injury if this constitutional

violation is not declared unlawful.  Plaintiffs and their members have no other adequate remedy

at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.      Declare the Emergency Proclamation unlawful under the National Emergencies Act;

2.      Declare the  Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate funds appropriated to other purposes in order to construct a border wall, are unlawful under  10 U.S.C. § 2808, Defense FY19 Appropriations, and 2019 Consolidated Appropriations Act;

3.      Declare that Defendants' failure to meet their respective duties as lead agency and cooperating agencies under NEPA as unlawful, and Order the immediate initiation of an environmental impact statement;

4.      Declare the Emergency Proclamation, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer and obligate funds appropriated to other purposes in order to construct a border wall—are unconstitutional under the Article I Appropriations Clause and the Article II Take Care Clause;

5.      Set aside and vacate the Emergency Proclamation, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer and obligate funds appropriated to other purposes in order to construct a border wall pursuant to that proclamation;

6.      Enjoin all transfers and obligations of appropriated funds;

7.      Retain jurisdiction to ensure compliance with the Court's Orders;

8.      Award Plaintiffs their reasonable costs of litigation, including reasonable attorneys' fees, expert fees, and costs; and

9.      Grant such other and further relief as the Court may deem just and proper.

DATED:      April 15, 2019                 Respectfully submitted,

*/s/ Brian Segee*

Brian Segee (CA Bar No. 200795)(Pro Hac Vice)
CENTER FOR BIOLOGICAL DIVERSITY
660 S. Figueroa St., Suite 1000
Los Angeles, CA 90017
Tel: (805) 750-8852
Email: bsegee@biologicaldiversity.org

*/s/ Tanya Sanerib*

Tanya Sanerib (D.C. Bar No. 473506)
CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th Street, #146
Seattle, WA 98117
Tel: (206) 379-7363
Email: tsanerib@biologicaldiversity.org

Anchun Jean Su (D.C. Bar No. CA285167)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street N.W., Suite 1300
Washington, D.C. 20005
Tel: (202) 849-8399
Email:  jsu@biologicaldiversity.org

Jason C. Rylander (D.C. Bar No. 474995)
Michael P. Senatore (D.C. Bar No. 453116)
DEFENDERS OF WILDLIFE
1130 17th Street, NW
Washington, DC 20036
Tel: (202) 682-9400 x 145
Facsimile: (202) 682-1331
Email: jrylander@defenders.org
Email: msenatore@defenders.org

Anthony T. Eliesuson (IL Bar No. 6277427)
ANIMAL LEGAL DEFENSE FUND
150 South Wacker Drive, Suite 2400
Chicago, IL  60606
Tel: (707) 795-2533
Email: aeliseuson@aldf.org

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
378 N. Main Avenue
Tucson, AZ 85701;

DEFENDERS OF WILDLIFE,
1130 17th Street, N.W.
Washington, D.C. 20036;

ANIMAL LEGAL DEFENSE FUND,
525 E. Cotati Ave.
Cotati, CA  94931;

       Plaintiffs,

v.

DONALD J. TRUMP,
in his official capacity as President of the United States
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500;

PATRICK M. SHANAHAN,
in his official capacity as acting Secretary of Defense
Department of Defense
1000 Defense Pentagon
Washington, D.C.  20301;

STEVEN MNUCHIN,
In LIEUTENANT GENERAL TODD T. SEMONITE, in his official capacity as SecretaryCommander and Chief of the Engineers DepartmentU.S. Army Corps of Treasury, Engineers
1500 Pennsylvania Avenue, NW,
441 G Street, N.W.
Washington, D.C. 20220 20314-1000;

KIRSTJEN M. NIELSEN,
KEVIN McALEENAN,
in herhis official capacity as acting Homeland Security Secretary
Department of Homeland Security

Case No.: _____.
1:19-cv-00408-TNM

245 Murray Lane, S.W.
Washington, D.C. 20528;

DAVID BERNHARDT,
in his official capacity as ~~acting~~ Secretary of the
Interior
Department of the Interior
1849 C Street, N.W.
Washington, D.C.  20240;

               Defendants.

# FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

~~1.~~  On February 15, 2019, President Donald J. Trump issued a "Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States~~," (hereafter referred to as~~" (hereinafter, "emergency proclamation~~"~~")"), pursuant to the purported authority of the National Emergencies Act ("NEA"), 50 U.S.C. §_1601 *et seq*.  84 Fed. Reg. ~~Under the emergency proclamation, the President directed the Secretary of Defense and the Secretary of Homeland Security to undertake specific acts in furtherance of border wall construction.  The President further  directed the reallocation of up to $601 million from the Treasury Forfeiture Fund, $3.6 billion in unspent funds appropriated for military construction projects, as well as up to $2.5 billion in unspent funds appropriated for support for counterdrug activity support, towards border wall construction.  *See* White House Press Office: "President Donald J. Trump's Border Security Victory"~~4949 (Feb. ~~15~~20, 2019).[1]

---

[1] ~~Plaintiffs use the terms "border wall," border fence," and "border barrier" interchangeably. Regardless of construction method (steel bollard is currently the most commonly utilized), these large structures have far reaching environmental impacts.~~

2. ~~Though "emergency" is not defined under the NEA, its common usage typically involves elements of suddenness and surprise. Emergencies generally require an urgent response. The present situation sharply departs from both of these generalities. Here, the President first declared his intent to invoke the NEA nearly two months prior to making the proclamation. During the intervening time, he indicated his "absolute" right to declare an emergency, waffled as to whether he would exercise the authority, and repeatedly stated his intent to use an emergency proclamation should Congress continue to refuse to meet his $5.7 billion funding demand for a southern border wall. When the President finally did announce his emergency proclamation in the White House Rose Garden, he concluded that "I could do the wall over a longer period of time. I didn't need to do this [but] I'd rather do it much faster."~~

~~3.~~1. ~~Including recently enacted appropriations~~  On the same day, the administration "~~has so far~~issued a statement that it had identified ~~up to $8.1~~approximately $6.7 billion ~~that will be~~ in funds "available to build the border wall once a national emergency is declared and additional funds have been reprogrammed"  ~~far more than the $5.7 billion amount previously requested by the administration.~~." *See* Fact Sheet, White House Press Office:~~ "~~, President Donald J. Trump's Border Security Victory.~~"~~ (Feb. 15, 2019).[2] These funds would originate from three separate sources:

- "About $601 million from the Treasury Forfeiture Fund";

- "Up to $2.5 billion under the Department of Defense funds transferred for Support for Counterdrug Activities (Title 10 United States Code, section 284") (hereinafter, "counterdrug account"); and

---

[2] Plaintiffs use the terms "border wall and" and "border fence" interchangeably. Regardless of construction method (steel bollard is currently the most commonly utilized), these large structures have far reaching environmental impacts.

- "Up to $3.6 billion reallocated from Department of Defense military construction projects under the President's declaration of a national emergency (Title 10 United States Code, section 2808)." *Id.*

2.      Immediately after issuing the emergency proclamation, the President signed the Consolidated Appropriations Act, 2019, into law, which appropriates an additional $1.375 billion to U.S. Customs and Border Protection ("CBP") for border wall construction in the Rio Grande Valley, Texas.  Pub. L. No. 116-6; H.R.J. Res. 31, 116th Cong. § 230(a)(1) (enacted) (hereinafter, "2019 Consolidated Appropriations Act").

3.      The administration stated its intent to use these funds for border wall construction "sequentially and as needed" by source, in the following order: 2019 Consolidated Appropriations Act funds; Treasury Forfeiture Fund; counterdrug account funds; and emergency military construction funds.  *See* Fact Sheet, Border Security Victory.  Instead, the Department of Defense ("DoD") has already identified, transferred, and obligated appropriated funds into, and from, the counterdrug account funds despite the fact funds appropriated under the 2019 Consolidated Appropriations Act have not been fully obligated.

4.      Of the 58 times presidents have previously declared emergencies under the National Emergencies Act, NEA, none involved using the emergency powers to fund a policy goal after a president failed to meet that goal through foreign diplomacy (having Mexico pay for the wall) or the congressional appropriations process.  Never before has a president used the emergency powers granted to him by Congress in such a mannerThis abuse of the congressional delegated NEA authority renders the proclamation unlawful.

5.      Even under a validly declared emergency, the President must identify any available existing statutory authority triggered by thatan emergency proclamation which would

4

authorize the reprogramming of previously triggers in order to lawfully transfer Congressionally appropriated funds.  The National Emergencies Act NEA does not permit a president to take *any* action, but instead unlocks a president's ability to invoke *specific* and *existing* emergency statutory authorities.  The Although the proclamation relies on military construction authority pursuant to 10 U.S.C. § 2808, both the plain language and broader statutory context of that provision demonstrate that it is inapplicable to border wall construction.  As the President has failed to identify such statutory authority and Congress has not enacted any emergency legislation even remotely statutory authority pursuant to the NEA related to border wall construction, and thus the President's reallocation of the emergency transfer of appropriated military construction funds to border wall construction is unlawful.

6.      The President's efforts to re-direct federal moneys set aside for combatting organized crime, 31 U.S.C. § 9705, military construction, 10 U.S.C. § 2808, and counterdrug support activities, 10 U.S.C. § 284, are squarely inconsistent with the plain language and broader statutory context of these provisions, and should be vacated and reversed.  The southern border wall cannot—under any reasonable interpretation—be considered eligible for emergency redirection of funds appropriated by Congress for other purposes.

6.      By unlawfully redirecting moneys from organized crime investigations, The President's order that DoD transfer appropriated funds into, and from, the counterdrug account, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate appropriated funds to border wall construction, are also unlawful under the 2019 Consolidated Appropriations Act and DoD FY 19 Appropriations Act.

7.      Defendants have failed to meet the duties applicable to lead and cooperating agencies for projects involving multiple Federal agencies under the National Environmental

Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* The agencies' failure to initiate and complete an environmental impact statement for the Trump administration's border wall project will promote secrecy where there should be transparency; divest Plaintiffs, local communities and other stakeholders of opportunities for public notice, review, and comment; and allow significant environmental harm to occur that could be avoided or mitigated if a lawful NEPA process were undertaken.

7.8. By unlawfully transferring funds from the counterdrug support account and military construction, and counterdrug support appropriations to border wall construction, the emergency proclamation also exceeds, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate appropriated funds to border wall construction, also exceed President Trump's constitutional authority by usurping Congress's Article I Appropriation powers, Art.U.S. CONST. art. I, § 9, and by violating the President's obligation to "take eCare that the Laws be faithfully executed." Art.U.S. CONST. art. II, § 3.

8. The emergency proclamation is unlawful on its face. Implementation of the emergency proclamation, agency actions taken or directed to be taken under the proclamation, and the expenditure of funds to construct a border wall pursuant to that proclamation should be enjoined. Of particular concern to Plaintiffs and their members, border barriers prevent the passage of wildlife, and could result in the extirpation of jaguars, ocelots, and other endangered species within the United States. The use of funds for such barriers that on information and belief are directed at least in part to investigating and where relevant prosecuting organized criminal activities related to illegal wildlife trafficking further harms Plaintiffs' interests in protecting and preserving biological diversity.

9.      Implementation of the emergency proclamation, including the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, obligate, and transfer appropriated funds to border wall construction, should be declared unlawful and enjoined.

**JURISDICTION AND VENUE**

9.10.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and can grant declaratory relief pursuant to 28 U.S.C. §§ 2201-2202, the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and its equitable powers.

10.11.  Venue properly vests in this Court pursuant to 28 U.S.C. § 1391(b) and (e), because the violations are occurring in this district, Defendants reside in this district, and a substantial part of the events or omissions giving rise to the claims have occurred in this district due to decisions made by the Defendants.

**PARTIES**

11.12.  Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit conservation organization with more than 1.4 million members and online activists dedicated to the protection of endangered species and wild places.their habitats through science, policy, and environmental law.  The Center is headquartered in Tucson, Arizona, with offices in Washington, D.C., and numerous other locations throughout the country, and an office in Baja California Sur, Mexico.  The Center has more than 68,000 members and more than one million supporters.

12.13.  The Center has worked for more than two decades to oppose environmentally harmful border fencing and other injurious border security projects along the U.S.-Mexico border generally, and within the specific Border Patrol sectors (San Diego, CalexicoEl Centro, Tucson,

Yuma, El Paso, Laredo, and Rio Grande Valley) ~~impacted by~~where border wall construction will occur under the emergency proclamation ~~specifically~~, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate appropriated funds to border wall construction.  The Center also has a long history of advocating for the protection of rare wildlife habitat and specific species that would be impacted by the ~~emergency proclamation,~~transfer and obligation of appropriated funds to border wall construction including jaguar, ocelot, peninsular bighorn sheep, Sonoran pronghorn, Mexican gray wolf, Quino checkerspot butterfly, and coastal California gnatcatcher~~,~~  and is directly responsible for the protection of numerous borderland species and their critical habitats under the Endangered Species Act.  Center members, including but not limited to, Laiken Jordan and Michael Robinson, enjoy observing wildlife and their habitat in borderlands areas and enjoy recreating on public lands and in public areas that will be negatively affected by border wall construction. ~~Additionally, the Center works to combat wildlife trafficking—the fourth largest criminal activity worldwide—and the threats it poses to biological diversity preservation.~~

~~13.~~14.  Plaintiff DEFENDERS OF WILDLIFE ("Defenders") is a nonprofit organization with nearly 1.8 million members and supporters across the nation~~, including more than 3,600 members in New Mexico.~~.  Defenders' mission is to preserve wildlife and emphasize appreciation and protection for all species in their ecological role.  Through advocacy, litigation, and other efforts, Defenders works to preserve species and the habitats upon which they depend.  Defenders has been closely involved in policy and litigation matters associated with border wall construction along the ~~United States~~ U.S.-Mexico border for more than a decade.  Defenders has field offices across the country, including in Santa Fe, New Mexico.

14.15.  Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a nonprofit 501(c)(3)
organization with more than 200,000 members and supporters, including thousands of whom live
in states located on the U.S.-Mexico border, and at least hundreds of whom live in towns that are
located in close proximity to border areas at issue.  This includes Elizabeth Walsh, who resides
in El Paso, Texas, near Sunland Park, New Mexico near, and the United States U.S.-Mexico
border.  Ms. Walsh has been a member of ALDF since at least 2012.  She routinely visits the
border areas that will be impacted by the emergency proclamation for professional and
recreational purposes.  Similarly, ALDF member Robert Knaier resides in San Diego County,
California, and regularly visits the border area in California for recreational purposes.  ALDF
represents its members interests by working to protect the lives of animals, including wildlife,
through the legal system.  This includes prior litigation challenging unlawful attempts to waive
environmental and animal protection laws to facilitate border construction.  ALDF is
headquartered on in Cotati, California.

15.16.  Plaintiffs have organizational and membership-based interests in the preservation
and conservation of specific areas of the U.S.-Mexico borderlands that have been declared a
national emergency zone under the impacted by the President's February 15, 2019 emergency
proclamation. and the transfer and obligation of appropriated funds to border wall construction.
Plaintiffs and their members are harmed by the emergency proclamation, the invocation of
emergency powers arising from and the proclamation, the agency Defense Secretary's and Army
Corps of Engineers' implementing actions taken or directed under the declaration, and the
unlawful reallocation of previously to identify, transfer, and obligate appropriated funds to border
wall construction.  Plaintiffs' members and staff live in or regularly visit the U.S.-Mexico
borderlands region, including specific areas within the San Diego, Calexico El Centro, Tucson,

Yuma, El Paso, Laredo, and Rio Grande Border Patrol sectors that will be impacted by the ~~emergency proclamation~~proposed border wall construction.  These specific areas include numerous areas of federal, state, and local protected borderlands, including but not limited to Cleveland National Forest, Cabeza Prieta National Wildlife Refuge, Organ Pipe Cactus National Monument, Coronado National Forest, San Pedro Riparian National Conservation Area, San Bernardino National Wildlife Refuge, Organ Mountains-Desert Peaks National Monument, Lower Rio Grande Valley National Wildlife Refuge, and other lands administered by the U.S. Bureau of Land Management.  Plaintiffs' staff and members use these specific borderland areas for hiking~~,~~; camping~~,~~; viewing and studying wildlife~~,~~; photography~~,~~; and other scientific, vocational, and recreational activities~~,~~; and they have specific intentions to continue to use and enjoy these areas frequently and on an ongoing basis in the future.  ~~Border~~Border wall construction resulting from the President's emergency proclamation, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate appropriated funds to border wall construction, and associated actions including stripping all vegetation within a 150-foot enforcement zone, road construction, and high-intensity lighting, would harm Plaintiffs' members and these protected interests in numerous ways.  ~~These harms~~The harm would include immediate impacts, such as precluding future visitation of impacted areas, destroying wildlife habitat, and killing individual members of different wildlife species.  Border wall construction would also result in longer term harm, by blocking connectivity between wildlife populations in U.S. and Mexico, harming the long term viability of those species, and in some cases, resulting in their extirpation from the United States.  These harms go to Plaintiffs' central organizational purposes.

16.17.  Plaintiffs further work to combat wildlife trafficking because illegal poaching, trafficking, and sales or possession of wildlife species is the second greatest threat to biological diversity.  The diversion of funds that would otherwise be used to combat organized crime — including wildlife trafficking — to border wall construction harms Plaintiffs' efforts to reduce such trafficking.  This diversion of funds will both force Plaintiffs to spend additional organizational resources on combatting wildlife trafficking and raising awareness about it.  It also harms Plaintiffs and their members' interests in observing, enjoying, and protecting frequently trafficked species and the intact ecosystems in which they reside. Plaintiffs and their members are harmed by Defendants' failure to engage in a full and legally adequate NEPA process, including the failure to consider alternatives and to adequately study and disclose the direct, indirect, and cumulative adverse ecological, aesthetic, and recreational impacts of border wall construction in the areas they enjoy.  By commencing border wall construction activities, including identifying, transferring, and obligated appropriated  funds to border wall construction, without adequately considering and disclosing the environmental impacts of the resulting activities, Defendants have deprived Plaintiffs and their members of their procedural rights, under NEPA, to a NEPA process that fully discloses the effects of, and alternatives to, Defendants' actions.  Defendants have also deprived Plaintiffs of the information that would be developed through an adequate NEPA document, which Plaintiffs would use to educate their members and other concerned members of the public about the environmental impacts of border wall construction.  As a result, Plaintiffs must spend substantial resources pursuing alternative sources of information regarding Defendants' activities.  The harms to Plaintiffs' interests could be partially or entirely avoided or mitigated if Defendants engaged in a NEPA process.  Plaintiffs

would certainly engage in that process in an effort to protect the wildlife species and habitat they have long endeavored to conserve as well as the natural areas in which they enjoy recreating.

17.18.  Defendant DONALD J. TRUMP, President of the United States, is sued in his official capacity.  President Trump issued the emergency proclamation on February 15, 2019.

18.19.  Defendant PATRICK M. SHANAHAN, Acting Secretary of Defense, is sued in his official capacity.  The February 15, 2019 emergency proclamation instructs the Defense Secretary to "take all appropriate actions" in support of the proclamation's directives, including taking action to reallocatetransfer military construction and counterdrug operations appropriated funds to border wall construction.

19.20.  Defendant STEVEN MNUCHIN, DepartmentLIEUTENANT GENERAL TODD T. SEMONITE, Commander and Chief of Treasury SecretaryEngineers of the U.S. ARMY CORPS OF ENGINEERS, is sued in his official capacity.  The Department of Treasury through its Treasury Executive Office for Asset Forfeiture administers the Treasury Forfeiture Fund.  The President has directed the reprogrammingU.S. Army Corps of $601 million from the Treasury Forfeiture Fund forEngineers will receive transfers of appropriated funds, and implement DoD orders to obligate those funds to border wall construction.

20.21.  Defendant KIRSTJEN M. NIELSEN,KEVIN McALEENAN, Acting Homeland Security Secretary, is sued in herhis official capacity.  The February 15, 2019 emergency proclamation instructs the Homeland Secretary to "take all appropriate actions" in support of the proclamation's directives.

21.22.  Defendant DAVID BERNHARDT, Acting Secretary of the Interior, is sued in his official capacity.  The February 15, 2019 emergency proclamation instructs the Interior Secretary to "take all appropriate actions" in support of the proclamation's directives.

## LEGAL BACKGROUND

**A.      The National Emergencies Act**

~~22.~~23.   The President's statutory authority to declare a national emergency is governed by the 1976 ~~National Emergencies Act ("~~NEA~~").~~.  50 U.S.C. §_1601 *et seq*.  The ~~Act~~NEA was designed to limit presidential power and reclaim authority that had been delegated from the legislative branch.  *See* Jules Lobel, *Emergency Power and the Decline of Liberalism*, 98 Yale L.J. 1385, 1412 (1989) (stating that NEA responded to "the twin disasters of Vietnam and Watergate" and the sense that "the pendulum had swung too far" in favor of the growth of executive power).

~~23.~~24.   The enactment of the NEA terminated all existing states of emergency and established a uniform procedural framework for the future exercise of such powers.  In addition, the NEA established other mechanisms intended to better ensure presidential accountability by establishing reporting and other requirements.

~~24.~~25.   A proclamation issued under the NEA triggers the President's authority to invoke *existing* Acts of Congress ~~which~~that authorize "the exercise, during the period of a national emergency, of any special or extraordinary power."  50 U.S.C. §_1621(a); *id*. §_1631 ("When the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act.").

~~25.~~26.   Accordingly, the scope of the President's emergency powers is limited to legislative enactments under which Congress has specifically granted those powers in advance.

~~26.~~27.   An emergency proclamation "shall immediately be transmitted to the Congress and published in the Federal Register."  *Id*.  §_1621(a).

27.28.  The NEA does not define the term "emergency."

28.29.  The common usage of the term "emergency" involves an element of suddenness and unexpectedness.  Merriam-Webster, for example, states that an emergency is "an unforeseen combination of circumstances or the resulting state that calls for immediate action."  Similarly, Black's Law Dictionary defines the word as a "sudden, unexpected, or impending situation."

29.30.  NEA's legislative history shows that the emergency power conferred by Congress is not boundless.  In testimony before the Committee on Government Operations on February 25, 1976, co-sponsor Senator Frank Church stated that "Congress should be forewarned that it is inherent in the nature of modern government that the Executive will seek to enlarge its power in small ways and large," and advised that the president "should not be allowed to invoke emergency authorities or in any way utilize the provision of [the NEA] for frivolous or partisan matters, nor for that matter in cases where important but not 'essential' problems are at stake." *National Emergency Act: Hearing on H.R. 3884 Before the S. Comm. on Government Operations*, 94th Cong. 7 (1976) (statement of Sen. Frank Church).

30.31.  There are currently an estimated 123 statutory authorities that may be invoked by an emergency proclamation under the NEA.  *See* Brennan Center for Justice, "A Guide to Emergency Powers and Their Use" (Dec. 5, 2018), https://www.brennancenter.org/analysis/emergency-powers.  These provisions address disparate issues including public health; land management; military and national defense; federal employees; asset seizure, control, and transfer; criminal prosecution and detainment powers; and international relations.

31.32.  The NEA has been invoked at least 58 times from 1978-2012.  Nearly all of the declared emergencies (49 instances) relate to sanctions or export restrictions.  Four emergencies

relate to weapons proliferation.  The remaining five emergencies did not fit into any specific category and involved the 2009 swine flu outbreak, the September 11 terrorist attacks, vessel movement near Cuba, rough diamonds from Sierra Leone, and sale of Iraq petroleum.

32.33.  None of the 123 emergency statutory authorities that may be invoked under an NEA proclamation address immigration or border wall construction.

**B.    Title 8 (Immigration), the Immigration and ~~Naturalization~~Nationality Act, and the ———"Mass Influx" and "Emergency Situation Refugees" Provisions**

33.34.  Congress has not established any ~~National Emergency Act~~NEA authorities under Title 8 (Immigration) of the United States Code.

34.35.  The Immigration and ~~Naturalization~~Nationality Act ("INA"), 8 U.S.C. §̲ 1101 *et seq*., "established a comprehensive federal statutory scheme for regulation of immigration and naturalization and set the terms and conditions of admission to the country and subsequent treatment of aliens lawfully in the country."  *Chamber of Commerce v. Whiting*, 563 U.S. 582, 587 (2011~~).~~) (citation and internal quotation marks omitted).

35.36.  While the INA does not contain any emergency provision triggered by the NEA, Congress did specifically consider the urgency of "an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border."  8 U.S.C. §̲ 1103(a)(10).  In such a circumstance, the INA does not contemplate a military response, but instead authorizes the Attorney General to deputize any State or local law enforcement officer with the authority to perform federal immigration duties.

36.37.  The INA also addresses emergency refugee situations.  ~~8 U.S.C. §~~ *Id.* § 1157.  In such a circumstance, the INA again does not contemplate a military response, but instead allows the President to grant admissions beyond the maximum established by Congress in order to

address humanitarian concerns, and directs the President to consult with Congress and the Cabinet.

### C.   DHS's Statutory Responsibility for Border Security and Border Fencing

~~37.~~38.   The Department of Homeland Security ("DHS") and its component agency ~~U.S. Customs and Border Protection ("CBP")~~CBP are domestic agencies charged with preventing the entry of terrorists, securing the borders, and carrying out immigration functions.  Within CBP, the U.S. Border Patrol's mission is to prevent illegal entry across approximately 7,000 miles of Mexican and Canadian international borders and 2,000 miles of coastal borders surrounding Florida and Puerto Rico.

~~38.~~39.   Beginning with enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), P~~ub~~. L. ~~No.~~ 104-208, 110 Stat. 3009-546 (8 U.S.C. § 1103 note~~,~~). Congress has periodically directed DHS to build fencing on the southern border.

~~39.~~40.   As originally enacted, section 102(b) of IIRIRA required the completion of a triple-layer fence along a 14-mile stretch of border fencing in the San Diego sector where construction had begun in the early 1990s.

~~40.~~41.   The Secure Fence Act of 2006, P~~ub.~~ L. ~~No.~~ 109-367 ~~(October 26, 2006)~~, 120 Stat. 2638, amended section 102(b) of IIRIRA to require DHS to construct at least two layers of reinforced fencing as well as physical barriers, roads, lighting, cameras, and sensors on five specific sections of the southern border totaling approximately 850 miles.

~~41.~~42.   Shortly thereafter, the ~~DHS~~Consolidated Appropriations Act, 2008, P~~ub.~~ L. ~~No.~~ 110-161 ~~(December 26,~~ , 121 Stat. 1844, 2090 (2007) again amended section 102(b) of IIRIRA by removing the specific location and double-layer fencing requirements, and instead directing DHS to construct not less than 700 miles of reinforced fencing where fencing would be most

practical and effective.

### D.     Military Support for Civilian Law Enforcement Agencies (Title 10, Chapter **15)** ~~15)~~

~~42.~~43.   The principle that the military cannot act as a domestic police force is deeply rooted in U.S. history and law.  Under the Posse Comitatus Act, 18 U.S.C. §_1385, enacted in 1878, the use of "any part of the Army or Air Force as a posse comitatus" (i.e., deputized by civilian law enforcement officials to carry out the law) ~~[is] a felony,~~ unlawful, "except in cases of and under circumstances expressly authorized by the Constitution or ~~an act~~Act of Congress." The law's reach was subsequently extended to the Marines and Navy.

~~43.~~44.   Beginning in the early 1980s, Congress passed several Defense Authorization Acts that relaxed Posse Comitatus Act prohibitions by authorizing the use of military in specified domestic law enforcement activities.  These provisions are codified under a new chapter of the U.S. Code (Title 10, Chapter 15, "Military Support for Civilian Law Enforcement Agencies~~").~~.").

~~44.~~45.   Under Chapter 15, Congress has *not* given the military *emergency* authority to assist in border wall construction or any other border security or immigration related task.

~~45.~~   Chapter 15 ~~does authorize~~authorizes the military to: support civilian law enforcement officials in a non-emergency situation~~, share~~ by, among other actions, sharing information, 10 U.S.C. §_271; allow~~ing~~ use of military equipment and facilities, *id*. §_272; ~~train~~providing training and ~~advise civilian law enforcement officials~~advice, *id*. §_273; and maintain~~ing~~ and operate~~ing~~ equipment, *id*. §_274.  ~~In addition, the military may provide various types of support for counterdrug activities and activities to counter transnational organized crime.  Id. § 284.  This support includes the "[c]onstruction of roads and fences and installation~~

of lighting to block drug smuggling corridors across international boundaries of the United States."  *Id.* § 284(b)(7).

46.    The non-emergency military support authorized under Chapter 15 can only be provided to domestic law enforcement agencies subject to several prior conditions.  Such support, for example, may not be provided if it will adversely affect military preparedness .  *Id.* § 276.  In addition, the civilian law enforcement agency must normally reimburse Department of Defense for the costs of its support.  *Id.* § 277.

47.    Congress has specifically limited the military's support of domestic law enforcement agencies *in emergencies* to circumstances involving weapons of mass destruction, *id.* § 282, and "situations involving bombings of places of public use, Government facilities, public transportation systems, and infrastructure facilities."  *Id.* § 283(a).  These emergency support provisions are subject to detailed procedures, and they are limited to situations that (1) pose a serious threat to the interests of the United States and (2) involve violence causing or imminently threatening significant loss of civilian lives.

**E.     10 U.S.C. § 284**

48.    The non-emergency military support authorized under Chapter 15 includes various types of support for counterdrug activities and activities to counter transnational organized crime, including the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  10 U.S.C. § 284(b)(7).  In addition, section 284 separately authorizes "unspecified minor military construction project[s]," but limits the cost of any such project to $750,000.  *Id.* § 284(b)(4), (i)(3).

49.     The Defense Secretary must provide the appropriate committees of Congress with a detailed written and electronic notice of any proposed support under section 284 to civilian law enforcement agencies at least 15 days prior to providing such support.  *Id.* §~~E~~ 284(h)(1).

50.     Congress most recently appropriated $517,171,000 for counter-narcotics support as part of the drug interdiction and counter-drug activities account.  Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, Title VI ("Defense FY19 Appropriations").

51.     On information and belief, more than 90 percent of the fiscal year 2019 drug counterdrug account appropriations have been obligated, leaving approximately $80 million.

52.     The counterdrug account will be used to hold funds transferred from other DoD accounts up to a total of $2.5 billion, while the Army Corps of Engineers will have authority to obligate the funds out of the account in order to execute border wall construction projects.

**F**.     **Military Construction (Title 10, Chapter 169)**

~~48.     Military construction appropriations are provided in the annual Military Construction, Veterans Affairs, and Related Appropriations Act.  These appropriations fund military construction for the active and reserve components, as well as military family housing, U.S. contributions to NATO, and BRAC actions.~~

~~49.~~53.   Military construction ~~activities have no relation to border wall construction and other support of DHS and other civilian law enforcement agencies, which are addressed under Title 10, Chapter 15.~~("MILCON") appropriations enable "the Secretary of Defense and the Secretaries of the Army, Air Force, and Navy to plan, program, design, and build the runways, piers, warehouses, barracks, schools, hospitals, child development centers, and other facilities needed to support U.S. military forces at home and abroad."  LYNN M. WILLIAMS,

19

CONGRESSIONAL RESEARCH SERVICE, MILITARY CONSTRUCTION: PROCESS, OUTCOMES, AND FREQUENTLY ASKED QUESTIONS (May 16, 2018).

~~50.~~54.  The Trump administration previously objected that the ~~Department of~~ Defense ~~fiscal year 2019 appropriations bill~~FY19 Appropriations Act, signed into law September 2018, provided $8.1 billion for military construction rather than the $8.9 billion ~~requested by~~ the administration requested.  *See* ~~July 18, 2018 letter~~Letter from Mick Mulvaney, Director, Office of Management and Budget, to Sen. Richard Shelby, Chair, Senate Comm. on Appropriations (July 18, 2018)~~Comm.~~ ("By incrementally funding, rather than fully funding, military construction projects, the bill delays critical resources to complete high-priority projects initiated in 2019 and puts the burden on future budgets to make up the difference.").

~~51.~~55.  Congress has provided for an NEA emergency for military construction projects~~.~~ pursuant to 10 U.S.C. §~~.~~2808(a), which provides:

> In the event of a proclamation of war or the proclamation by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces. Such projects may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated.

**F.      ~~The Treasury Forfeiture Fund~~**

56.      ~~The Treasure Forfeiture Fund is~~Military construction activities have no relation to border wall construction and other support of DHS and other civilian law enforcement agencies, which are addressed under Title 10, Chapter 15, and thus the ~~receipt account~~ emergency provision is not available to border wall construction.

**G.      Department of Defense Fiscal Year 2019 Authorizations and Appropriations**

57.     The John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232 ("Defense FY19 Authorizations"), includes authorizations for both the ~~deposit of non-tax forfeitures as a result of laws enforced or administered by participating federal agencies, namely Internal Revenue Service Criminal Investigations~~ DoD generally (Division ~~of the Department of~~ A) and MILCON (Division B) specifically.  However, Congress addresses the two in separate appropriations bills.  Defense FY19 Appropriations; Energy and Water, Legislative Branch, and Military Construction and Veterans Affairs Appropriations Act, 2019, Pub. L. No. 115-244 ("MILCON FY19 Appropriations Act").

58.     The Defense FY19 Authorizations Act includes a general transfer authority, under which the ~~Treasury; U.S. Immigration and Customs Enforcement of~~ Defense Secretary may "transfer amounts of authorizations made available to the Department of ~~Homeland Security; U.S. Customs and Border Protection~~ Defense . . . for fiscal year 2019 between any such authorizations for that fiscal year (or any subdivisions thereof)" upon a determination that such transfer is in the national interest.  Defense FY19 Authorizations § 1001(a)(1); Defense FY19 Appropriations § 8005.  Except for transfers between military personnel, "the total amount of authorizations that the Secretary may transfer under the authority of this section may not exceed $4,500,000,000."  Defense FY19 Authorizations § 1001(a)(2); Defense FY19 Appropriations § 8005 (limiting general transfer authority to $4,000,000,000).

59.     The Defense Secretary's general transfer authority is not available for MILCON funds and is further subject to two limitations: general transfer authority funds (1) "may only be used to provide authority for items that have a higher priority than the items from which authority is transferred"; and (2) "may not be used to provide authority for an item that has been

denied authorization by Congress."  Defense FY19 Authorizations § 1001(b)(1)-(2); Defense FY19 Appropriations § 8005.

60.     "None of the funds available to the Department of ~~Homeland Security; U.S. Secret Service~~Defense for any fiscal year for drug interdiction or counter-drug activities may be transferred to any other department or agency of the ~~Department~~United States except as specifically provided in an appropriations law."  Defense FY19 Appropriations § 8045(a).

~~52.~~61.  "None of ~~Homeland Security; and U.S. Coast Guard~~the funds made available [under the FY19 Appropriations Act] or any other Act may be used to pay the salary of ~~the Department~~any officer or employee of ~~Homeland Security~~any agency funded by this Act who approves or implements the transfer of administrative responsibilities or budgetary resources of any program, project, or activity financed by this Act to the jurisdiction of another Federal agency not financed by this Act without express authorization of Congress . . . ."  Defense FY19 Appropriations § 8113.

~~The Treasury Forfeiture Fund~~**H.     2019 Consolidated Appropriations Act**

62.     The 2019 Consolidated Appropriations Act appropriates $1.375 billion to DHS "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector."  Pub. L. No. 116-6;  H.R.J. Res. 31, 116th Cong. § 230(a)(1) (enacted).

63.     In addition to specifically rejecting the President's budget request for $5.7 billion in border wall funding, Congress put specific limits on the funds it did appropriate under the 2019 Consolidated Appropriations Act.

64.     Congress limited border wall appropriations to construction in the Rio Grande Valley, and further, directed that "[n]one of the funds made available by this Act or prior Acts

are available for construction of pedestrian fencing—(1) within the Santa Ana National Wildlife Refuge; (2) within the Bentsen-Rio Grande Valley State Park; (3) within La Lomita Historical park; (4) within the National Butterfly Center; or (5) within or east of the Vista del Mar Ranch tract of the Lower Rio Grande Valley National Wildlife Refuge." *Id.* § 231.

65.     The 2019 Consolidated Appropriations Act also requires DHS to "confer and seek to reach mutual agreement regarding the design and alignment of physical barriers" within the cities of Roma, Rio Grande City, Escobares, and La Gruilla, Texas, as well as the unincorporated community of Salineno, Texas.  In addition, DHS is required to provide a public notice and comment period on proposed border wall construction within these areas, and to publish its response to such comments in the Federal Register.  *Id.* § 232.

53.     The 2019 Consolidated Appropriations Act provides that "[n]one of the funds made available in this or any other appropriations Act may be used to increase . . . funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act."  *Id.* § contains no provision providing for the declaration of war or national emergency.  31 U.S.C. § 9705.

54.     Instead, it provides funds that are earmarked by law for specific purposes as delineated in the statute.

66.     These delineations include funding for: "proper expenses of seizure;" payment of services (such as to contractors or reimbursing States); awards to informers; satisfaction of liens; "[p]ayment of amounts authorized by law with respect to remission and mitigation;" payment of

certain claims; equitable sharing payments to States and others; State or local law enforcement costs; and payments for the seizure and forfeiture program. 739.

**I.     National Environmental Policy Act**

67.     NEPA is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  It was enacted with the ambitious objectives of "encouraging productive and enjoyable harmony between man and his environment . . . promoting efforts which will prevent or eliminate damage to the environment and biosphere and stimulating the health and welfare of man; and enriching the understanding of the ecological systems and natural resources important to the Nation . . . ." 42 U.S.C. § 4321.

68.     In order to achieve these goals, NEPA contains several "action forcing" procedures, most significantly the mandate to prepare an environmental impact statement ("EIS") on major Federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332(2)(C).

69.     The preparation and public circulation of EISs and other NEPA analyses promotes the statute's broad environmental objectives in two primary ways: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed *Id.* information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Methow Valley Citizens Council*, 490 U.S. at 349.

70.     NEPA requires that "agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental

values, to avoid delays later in the process, and to head off potential conflicts."  40 C.F.R. § 1501.2; *id*. § 1502.5 ("An agency shall commence preparation of an [EIS] as close as possible to the time the agency is developing or is presented with a proposal . . . .").

71.     The Council on Environmental Quality ("CEQ") was created to administer NEPA and has promulgated NEPA regulations, which are binding on all federal agencies.  *See* 42 U.S.C. §§ 4342, 4344; 40 C.F.R. §§ 1500–1508.

72.     NEPA regulations mandate disclosure and consideration of direct, indirect, and cumulative environmental effects, with the underlying purpose of ensuring that the agency has taken a "hard look" at the environmental impacts of proposed actions.  40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.27(b)(7).

73.     If more than one Federal agency "[p]roposes or is involved in the same action," or "[i]s involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity," then a "lead agency shall supervise the preparation of an environmental impact statement." *Id*. § 1501.5(a)(2).

55.     The "potential lead agencies shall determine by letter or memorandum which agency shall be lead agency" and "shall resolve the lead agency question so as not to cause delay." *Id*. § 1501.5(c).   In the event of disagreement among the agencies, a multi-factor test determines lead agency designation. *Id*. §§ 9705(a)(1).

74.     The Secretary also has discretion under the Act to fund: "payment of awards for information or assistance" leading to forfeiture; purchases of evidence; publicizing awards; "payment for equipment for any vessel, vehicle, or aircraft" for Treasury law enforcement agencies or for coordinating State or local law enforcement entities; settlement of Custom Service claims; and expenses of private collaborators; and trainings on seizures and

forfeitures 1501.5(c)(1)-(5) (in descending order, factors to consider are magnitude of agency's involvement, project approval/disapproval authority, expertise concerning the action's environmental effects, duration of agency's involvement, and sequence of agency's involvement).

75.     The lead NEPA agency "shall request the participation of each cooperating agency in the NEPA process at the earliest possible time." *Id*. § 1501.6(a)(1).  Conversely, each cooperating agency "shall participate in the NEPA process at the earliest possible time." *Id*. § 1501.6(b)(1).

56.      . *Id*. § 9705(a)(2).

57.     The goal for these funds is to prosecute organized crime and specifically bring seizure and forfeiture cases are intended to generate funds to bring more such cases with the ultimate goal of disrupting and dismantling criminal enterprises.

58.     Examples of recent prosecutions include:  "Rabobank agreed to forfeit $398,701,259 as a result of allowing illicit funds to be processed through the bank without adequate Bank Secrecy Act (BSA) or AML review;" a New York man forfeited $1,624,172 as a result of a biodiesel fraud scheme; and a St. Paul man forfeited $1,612,451 after defrauding the Hmong community.[3]

59.     On information and belief, the funds are also used to combat wildlife related crimes such as trafficking, illegal fishing, and the like.

60.     The fund is generated by forfeitures made by the Internal Revenue Service Criminal Investigation division, U.S. Immigration and Customs Enforcement, CBP, and the U.S. Secret Service.

---

[3] https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and%20Testimonies/OIG-19-022.pdf

61.     The funds are shared among specified federal agencies but also with the Coast Guard, 31 U.S.C. § 9705(c), and some funds are allocated to State, local, and foreign authorities for joint investigations and prosecutions. *Id.* § 9705(a)(1)(B)(iii), (a)(1)(G), (c)(2)(B).

## CONSTITUTIONAL BACKGROUND

### A.     The Appropriations Clause

62.76.   Article I, § 9, cl. 7The U.S. Constitution provides that "no Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7.

63.77.   The Appropriations Clause plays a critical role in the Constitution's separation of powers among the three branches of government and the checks and balances between them.

64.78.   The Clause has a "fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good, and not according to the individual flavor of Government agents . . . ." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427-28 (1990); *id.* at 427 (without the Appropriations Clause, "the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure.") (*quoting* 2 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1348 (3d ed. 1858))).

65.79.   If a Court finds that the executive branch is spending money in violation of a spending provision, "it would be drawing funds from the Treasury without authorization by statute and thus violating the Appropriations Clause." *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016).

**B.    Take Care Clause**

66.80.  The President "shall take Care that the Laws be faithfully executed . . . ." U.S. CONST. art. II, § 3.

67.81.  The Take Care Clause places an obligation on the President and those under his supervision to comply with and execute clear statutory directives as enacted by Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.  The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad.").

68.82.  Under the Take Care Clause, the President and his subordinates may not create law by disregarding or repealing a validly enacted statute.  *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or the repeal statutes.").

## FACTUAL ALLEGATIONS

69.83.  On June 16, 2015, in a campaign announcement speech, then Mr. Donald Trump stated:

> I would build a great wall.  And nobody builds walls better than me, believe me.
> And I'll build them very inexpensively.  I will build a great great wall on our
> southern border and I'll have Mexico pay for that wall.

70.84.  On January 25, 2019, at the end of the longest government shutdown, President Trump stated:

> We really have no choice but to build a powerful wall or steel barrier.  If we don't
> get a fair deal from Congress, the government will either shut down on February
> 15 again or I will use the powers afforded to me under the laws and the
> Constitution of the United States to address this emergency.

71.85.  On February 15, 2019, in announcing the issuance of an emergency proclamation, President Trump said:

> So we have a chance at getting close to $8 billion—whether it's $8 billion or $2 billion or $1.5 billion, it's going to build a lot of wall.  We're getting it done.

## A.     The February 15, 2019 Emergency Proclamation and Administration Statement Identifying $6.7 Billion for Transfer to Border Wall Construction

72.86.  On February 15, 2019, President Trump issued a "Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States."

73.87.  The proclamation declares the "current situation at the southern border,"—including "large-scale unlawful migration" and "sharp increases in the number of family units entering and seeking entry to the United States,"—as a "national emergency, and." It further states that "[b]ecause of the gravity of the current emergency situation, it is necessary for the Armed Services to provide additional support to address the crisis."

74.88.  Relying on the NEA, the proclamation invokes the emergency military construction authority provided under 10 U.S.C. § 2808 ("the construction authority provided in section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense and, at the discretion of the Secretary of Defense, to the Secretaries of the military departments.").

75.89. Section 2 of the proclamation directs that the Defense Secretary (as well as the DHS Secretary and Secretary of the Interior) "shall take all appropriate actions, consistent with applicable law, to use or support the use of the authorities herein invoked, including, if necessary, the transfer and jurisdiction over border lands."

90.    According to the administration, the emergency proclamation makes approximately $6 billion in$3.6 billion available from funds that have been appropriated to military construction projects.  *See* Fact Sheet, Border Security Victory.

76.91.  In addition to the emergency proclamation, the administration also identified approximately $3.1 billion in non-emergency funds that have been appropriated by Congress to other purposes to instead be directed to border wall construction.  These funds include, including $601 million from the Treasury Forfeiture Fund, and $2.5 billion from the counterdrug support funds, and $3.6 from military construction projectsaccount.  *Id*.

**B.    The Nation's Longest Government Shutdown, and the President's Abuse of the National Emergencies Act as a Negotiating Tactic**

77.92.  President Trump first raised the specter ofpublicly threatened to issue an emergency proclamation on January 4, 2019, two weeks into the nation's longest federal shutdown, which began at midnight on December 21, 2018, and which would continuecontinued until January 25, 2019.

78.93.  The shutdown was the culmination of months of disagreement between the President and Congress over the administration's $5.7 billion demand for a border wall, and it was the central dispute in the final, "lame duck" days of the 115th Congress.

79.94.  On December 11, 2018, President Trump met with House Minority Leader (Speaker to be) Nancy Pelosi and Senate Minority Leader Chuck Schumer, and on live television proclaimed, "I am proud to shut down the government for border security.  I will take the mantle.  I will be the one to shut it down."  The President had made numerous earlier statements suggesting he would relish shutting down the government if Congress did not meet his precise provide all of the requested border wall funding demands.  *See*, e.g., July 30, 2018 ("I have no problem doing a shutdown"); September 12, 2018 ("If it happens, it happens").

80.95.  On December 19, 2018, the Senate passed a continuing resolution providing funding to DHS and other agencies (Agriculture, Commerce, Justice, the Interior, State, Transportation, and Housing and Urban Development),) until February 8, 2019, without border wall funding, and with the understanding that President Trump supported the bill.

81.96.  On December 20, 2018 (one day before government funding for DHS and the other agencies lapsed), after President Trump was attacked by conservative TV pundits and the House Freedom Caucus criticized President Trump, the President flipped his position and announced he would not sign the Senate bill because it did not have any border wall funding. That afternoon, House Republicans passed a continuing resolution with $5.7 billion in border wall funds.

82.97.  On December 21, 2018, President Trump encouraged Senator McConnell to abolish the filibuster in order to pass the $5.7 billion spending bill in the Senate.  Acknowledging that this would not occur, President Trump mused that there was a "very good" chance of a government shutdown and that it could last a "very long time."  As the President predicted, the Senate voted down the House version of the bill and the government shut down at midnight.

83.98.  Two weeks later, on January 4, 2019, President Trump for the first time publicly voiced his perceived authority to use the National Emergencies ActNEA for emergency border wall funding.

84.99.  Between that date and the February 15, 2019, emergency proclamation, the President repeatedly and clearly stated his belief that he could use the NEA could be used as a negotiating tactic with Congress.  During this time, the President also vacillated on his ultimate intention to declare an emergency.

85.100.     On January 9, 2019, President Trump stated that "I have an absolute right to do national emergency if I want," and revealed that his "threshold" for invoking the emergency would be if he "can't make a deal with people that are unreasonable."

86.101.     On January 10, 2019, the President said that he was "maybe, definitely" planning on invoking an emergency proclamation to build the border wall.  President Trump explained that working with Democrats in Congress was "ridiculous" and that "[i]f we don't make a deal, I would say 100 percent, but I don't want to say 100 percent," and that "[i]f we don't make a deal, I would say it would be very surprising to me that I would not declare a national emergency and just fund it through the various mechanisms."

87.102.     On January 11, 2019, the President denied intent to immediately declare an emergency under the NEA, stating that "what we're not looking to do right now is national emergency."

88.103.     On January 25, 2019, President Trump and Congress reached an agreement to end the 35-day partial federal shutdown, providing funding for theDHS and other affected agencies including DHS for three weeks, through February 15, 2019.

89.104.     In his January 25 speech announcing the temporary deal to end the shutdown, the President again threatened to use of the NEA as a negotiating tactic, stating, "[w]e really have no choice but to build a powerful wall or steel barrier.  If we don't get a fair deal from Congress, the government will either shut down on February 15 again or I will use the powers afforded to me under the laws and the Constitution of the United States to address this emergency."

90.105.     On January 29, 2019, UndersecretaryUnder Secretary of Defense for Policy John Rood testified to the House Armed Services Committee that if President Trump

declared an emergency and directed the Pentagon to act, ~~that~~ the military would build the wall "if we judged it to be a lawful order.  And I assume it would be."

91.106.      On January 31, 2019, President Trump stated that "we've set the stage for what's going to happen on February 15 [i.e~~.~~., an emergency proclamation] if a deal is not made."

92.107.      On February 1, 2019, the President ~~st~~hat~~ed~~, "I think there's a good chance that we'll have to do" an emergency proclamation, while noting "tremendous obstruction by Democrats."

93.108.      The President would continue to threaten to use ~~of~~ the NEA until issuing the emergency proclamation on February 15, 2019.  At the press conference on February 15, 2019, announcing the emergency proclamation, however, the President disclaimed the need to declare a national emergency, stating~~:~~, "I could do the wall over a longer period of time—I didn't need to do this—but I would rather do it much faster.~~. . .~~ . . . I just want to get it done faster, that's all."

~~C.    CBP Has Already Constructed More than 700 Miles of Border Barriers, and Congress Has Not Mandated New Border Fencing In More Than a Decade~~

~~94.    CBP has considered its statutory fencing obligations under IIRIRA complete since 2010, when it had completed 654 miles of primary border fencing (as well as approximately 50 miles of secondary and tertiary fencing, for a total exceeding 700 miles).~~

~~95.    In 2010, Acting CBP Deputy Commissioner David Aguilar told a House committee, "[t]he Border Patrol has determined after extensive study that only 652 miles—not 700 miles—of fencing is operationally necessary to secure the southwest border."  Prior to the Trump administration, DHS had not constructed significant new border fencing since 2010. Congress has not mandated new border fencing in well over a decade, since the enactment of the Secure Fence Act.~~



Figure 1: Total Miles of Primary Fencing on the Southwest Border, Fiscal Years 2005 to 2015

Source: U.S. Customs and Border Protection. | GAO-17-331

**~~D.      Congress Has~~C.      Congress Provided the Trump Administration with Funding for More    Than 175 Miles of New or Replacement Border Wall Construction~~, the      Large Majority~~ in    Previous Appropriations Bills, Much of Which Remains Uncompleted**

~~96.~~109.          Congress has provided the Trump administration with nearly $3 billion in funding for border fence construction, ~~the large majority~~much of which remains uncompleted.

~~97.~~110.          In response to the administration's fiscal year 2017 budget amendment and request for supplemental appropriations, the Consolidated Appropriations Act, 2017, provided CBP with $~~292~~341 million "~~for the replacement~~to replace approximately 40 miles of existing primary pedestrian and vehicle ~~fencing in high-priority areas~~border along the southwest border, using previously deployed and operationally effective designs, such as currently deployed steel bollard designs ~~. . . .~~ . . . ."  Pub. L. No. 115-31, ~~div. F, tit. VI~~131 Stat. 135, 434.

~~98.~~111.          CBP directed those fiscal year 2017 funds to 40 miles of replacement wall construction in San Diego, El Centro, El Paso, and near Santa Teresa.  The construct~~ed~~ion was expedited by ~~the~~a waiver of ~~the National Environmental Policy Act ("NEPA"),~~, the Endangered Species Act ("ESA"), and more than 30 additional laws pursuant to IIRIRA § 102(c).  *See* 82 Fed. Reg. 35,984~~,~~ (Aug~~ust~~. 2, 2017~~)~~ (San Diego); 82 Fed. Reg. 42,829~~,~~ (Sept. 12, 2017~~)~~ (El Centro); 83 Fed. Reg. ~~3,012,~~3012 (Jan. 22, 2018~~)~~ (Santa Teresa).

99.112.      In March 2018, Congress provided the Trump administration with an additional $1.34 billion for secondary fencing replacement in the San Diego sector, new primary fencing in the Rio Grande Valley sector, and replacement of existing pedestrian fencing in any location along the southwest border.  Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. F, tit. II, § 230 (a)(1)-(4) ("DHS FY18 Appropriations ").

100.113.      CBP estimates that the fiscal year 2018 appropriations bill DHS FY18 Appropriations will fund approximately 84 miles of border barrier construction.

101.114.      DHS issued two waivers under IIRIRA § 102(c) to expedite border wall construction in the lower Rio Grande Valley sector, in Cameron County, Texas (83 Fed. Reg. 50,949), (Oct. 10, 2018)), and Hidalgo County, Texas (83 Fed. Reg. 51,472) (Oct. 11, 2018)) waiving NEPA, ESA, and more than 30 additional laws.

102.115.      DHS has issued two contracts to construct new border wall in the Rio Grande sector using FY 2018 appropriations, both located in Hidalgo County: FY18 RGV-003 (six miles) and FY 18 FY18 RGV-02 (five segments, eight miles).

103.116.      The construction on these two contracts will be the first commenced of the estimated 84 miles of border wall construction that is funded by the Fiscal Year 2018 DHS FY18 Appropriations to be commenced.

**D.      Congress Specifically Rejected the Trump Administration's Border Wall Budget Request, While Placing Geographic and Other Restrictions on the Money Appropriated**

104.      On February 15, 2019, immediately after issuing the emergency proclamation, the President signed H. the 2019 J. Res. 31, Consolidated Appropriations Act, 2019, (H.R.J. Res. 31, Pub. L. No. 116-6), providing $1.3 billion in border wall construction.

117.      Despite this funding, Congress has not provided an additional funding demanded

by $1.375 billion for border wall construction.

105.118.	In enacting the 2019 Consolidated Appropriations Act, Congress specifically rejected the additional funding President Trump requested for CBP specified border wall priorities.

119.	In addition, the 2019 Consolidated Appropriations Act (1) limits border wall construction to the Rio Grande Valley, § 230; (2) prohibits the funding of border wall construction in five specified areas, § 231; and (3) requires DHS to consult with local communities and provide for public notice and comment prior to border wall construction within five borderland cities in south Texas, § 232.

**E.	Agency Implementing Actions**

120.	On February 25, 2019, DHS wrote to DoD with a "Request for Assistance Pursuant to 10 U.S.C. § 284."  Memorandum from Christina Bobb, Exec. Sec'y, DHS, to Capt. Hallock N. Mohler Jr., Exec. Sec'y, DoD.  The Emergency ProclamationMemorandum requests that DoD assist in the implementation of the Trump administration's border wall project by funding, planning, and executing the construction of eleven border wall segments (as well as associated roads and lighting) totaling approximately 218 miles.  All 11 segments are proposed entirely on federal land in the states of California, Arizona, or New Mexico, including protected areas owned and administered by the Department of the Interior such as Cabeza Prieta National Wildlife Refuge, Organ Pipe Cactus National Monument, San Pedro Riparian National Conservation Area, and San Bernardino National Wildlife Refuge.

121.	On March 25, 2019, Acting Defense Secretary Shanahan wrote to then DHS Secretary Nielsen approving the request, and directing the obligation of up to $1 billion from the counterdrug account for the U.S. Army Corps of Engineers to immediately plan and execute

three border wall segments across 57 miles: Yuma Sector Projects 1 and 2 and El Paso Sector Project 1.

122.    Acting Defense Secretary Shanahan's March 25, 2019 approval letter states that "[a]s proponent of the requested action, CBP will serve as the lead agency for environmental compliance."

123.    On April 9, 2019, DoD announced that the Army Corps of Engineers had awarded two contracts totaling $1.178 billion for the construction of Yuma Sector Projects 1 and 2 and El Paso Sector Project 1.

124.    More than 90 percent of the fiscal year 2019 appropriations for the counterdrug account have been obligated, leaving approximately $80 million.  Accordingly, the vast majority of the $2.5 billion to be drawn from this account are being transferred from other DoD appropriations.  The Defense Secretary's March 25, 2019 authorization of $1 billion for the three border wall projects is being transferred from funds appropriated to a military personnel account into the counterdrug account, and then subsequently those funds are being obligated from that account by Army Corps of Engineers to private contractors.

125.    On April 11, 2019, Acting Defense Secretary Shanahan issued a memorandum for the Under Secretary of Defense (Comptroller)/Chief Financial Officer, directing the Comptroller to identify, by May 10, 2019, existing military construction projects of sufficient value to provide up to $3.6 billion to transfer for border wall construction pursuant to 10 U.S.C. § 2808.  The Acting Secretary's memorandum excludes family housing, barracks, or dormitory projects; projects that have already been awarded; and projects that have fiscal year 2019 award dates.  The memorandum directs the Comptroller to be prepared to make the identified funds

available if the Acting Secretary determines that military construction funds are necessary to address the proclaimed national emergency.

### G.     Defendants' Actions Will Have Significant Environmental Impacts ——

~~106.~~126.     The Trump administration ~~has~~previously explained that its $5.7 billion request for border wall construction will "fund construction of a total of approximately 234 miles of new physical barrier and fully fund the top 10 priorities in CBP's Border Security Improvement Plan." *See* ~~Jan. 6, 2019 letter~~Letter from Russell T. Vought, ~~OMB~~ Acting Director, OMB, to Sen~~ator.~~ Richard Shelby, Chairman, Sen. Appropriations ~~Committee Chairman.~~Comm. (Jan. 6, 2019).

~~107.~~127.     ~~These~~The administration's "highest priority border wall miles" total 215 miles.  *See* ~~DHS~~ Press Release, "~~DHS,~~ Walls Work" (Dec. 12, 2018).  ~~-~~Border Patrol has broken down the 215 miles by sector ~~(Border Patrol divides responsibility for border security operations geographically among nine sectors, each with its own headquarters).~~.  These highest priority areas are~~:~~ the San Diego sector ~~-~~ (5 miles~~;~~); El Centro sector ~~-~~ (14 miles~~;~~); Yuma sector ~~-~~ (27 miles~~;~~); El Paso sector ~~-~~ (9 miles~~;~~); Laredo sector ~~-~~ (55 miles~~;~~); and Rio Grande Valley sector ~~-~~ (104 miles~~.~~).

~~108.~~128.     CBP has not clarified what, if any, overlap exists between ~~currently funded~~ the miles of border wall ~~mileage~~already funded and the 215 miles of "highest priority border wall." ~~Currently funded~~However, new border wall mileage under the DHS FY ~~2018~~18 Appropriations and ~~FY~~ 2019 ~~appropriations bills~~Consolidated Appropriations Act is~~, however,~~ limited to the Rio Grande Valley sector; thus, all of the construction within "highest priority areas" in the San Diego, El Centro, Yuma, El Paso, and Laredo sectors would not occur but for

the unlawful appropriations ~~reallocation under the emergency proclamation~~transfers and obligations.

109.   The emergency proclamation provides the administration with access to a total of $8.1 billion, despite its consistently stated position that $5.7 billion would fund its border wall priority projects.

129.   The~~The~~DHS's February 25, 2019 request for DoD assistance proposes projects in addition to CBP's previously identified "highest priority border wall" segments, including projects within the Tucson sector that would not occur but for the unlawful ~~appropriations~~ transfers and obligations.

~~110.~~130.   If carried out, the border wall construction funded by the emergency proclamation, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate appropriated funds to border wall construction, would directly harm Plaintiffs and their members.  The environmental harm from this construction ~~will likely, among other concerns, impact~~includes adverse impacts to: (1) threatened and endangered species listed under the Endangered Species Act, as well as their designated critical habitat; ~~impact~~(2) lands under federal jurisdiction, including National Parks~~,~~; National Forests~~,~~; National Wildlife Refuges, National Monuments, and other lands within the National Landscape Conservation System (administered by the Bureau of Land Management~~),~~);; Wilderness areas~~,~~; Wild and Scenic Rivers~~,~~; and other areas of high environmental value; and ~~impact~~(3) waters of the United States protected by the Clean Water Act.

~~111.~~131.   Of particular concern to Plaintiffs' core organizational interests~~,~~ is the fact that the unlawful identification, transfer, and obligation of appropriated funds for border wall construction ~~unlawfully funded by the emergency proclamation~~ would ~~result in severance~~

~~of~~sever wildlife connectivity and cross-border movement between wildlife populations on either side of the U.S.-Mexico border.  Every endangered jaguar seen in the United States during the species' nascent recovery in the past two decades, for example, was born in Mexico.

~~112.~~132.        Given that approximately 700 miles of the southern border already has some form of fencing or "vehicle barriers" (passable to wildlife) on it, the cumulative and irreversible impact of additional border fencing on wildlife populations becomes ever ~~more heightened with each additional mile of border wall constructed.  Indeed, the border wall construction funded by the emergency proclamation would likely result in the fencing of the final remaining gaps in at least two Border Patrol sectors.~~ greater with each additional mile of border wall constructed.  Under the February 25, 2019 DHS request for DoD assistance, the transfer and obligation of appropriated funds will result in border wall construction within areas that currently contain vehicle barriers on protected federal lands in Arizona and New Mexico, including Cabeza Prieta National Wildlife Refuge, Organ Pipe Cactus National Monument, Coronado National Forest, San Pedro Riparian National Conservation Area, and San Bernardino National Wildlife Refuge.   These protected lands contain essential habitat corridors and connectivity for endangered species with populations on both sides of the border, including jaguars.  These corridors and connectivity will be served by the conversion of vehicle barriers to border wall.

~~113.~~133.        The ~~emergency proclamation unlawfully~~unlawful transfer and obligation of appropriated funds ~~as much as 5 miles of~~to border ~~barrier~~wall construction in the San Diego sector, which ~~has an area of responsibility~~spans from the Pacific Ocean eastward to the Imperial County line, will harm Plaintiffs and their members.  The San Diego sector is already heavily

fortified, with primary fencing covering 46 of 60 miles, 30 percent of the miles of all secondary

and tertiary fencing along the southwest border, and more than 300 miles of patrol roads.

114.134.     The remaining unfenced areas within the San Diego sector are of high

environmental value, and are generally mountainous and rugged, including unfenced areas

within the San Ysidro Mountains and the complex geography of southeastern San Diego County.

This area includeincludes two major tributaries of the Tijuana River (Cottonwood Creek and

Tecate Creek),) and designated critical habitat under the Endangered Species Act for the coastal

California gnatcatcher, Quino checkerspot butterfly, and Arroyo toad.

115.135.     The emergency proclamation unlawfullyunlawful transfer and obligation

of appropriated funds as much as 14 miles of to border barrierwall construction in the El Centro

sector, which has an area of responsibilityspans from the Jacumba Mountains in the west to the

Imperial Sand Dunes in the east., will harm Plaintiffs and their members.  The El Centro sector is

already heavily fortified, with primary fencing or vehicle barriers covering 59 of its 70 miles,

and 214 miles of patrol roads.

116.136.     The remaining unfenced areas within the El Centro sector that remain

unfenced and/or have vehicle barriers passable to wildlife, are of high environmental value.  The

largest unfenced area is in highly rugged and mountainous terrain within the Jacumba Mountains

and their sheer eastern escarpment.  This area is designated critical habitat for the peninsular

bighorn sheep pursuant to the Endangered Species Act.  74 Fed. Reg. 17,288 (April 14, 2009).

The Jacumba Mountains "represent the southernmost portion of the Peninsular Ranges in the

United States," and "represent the only area of habitat connecting the [U.S. population] with

other bighorn sheep populations that occupy the Peninsular Ranges in Mexico." Id. at 17,318.

~~117.~~137.    The ~~emergency proclamation unlawfully~~unlawful transfer and obligation of appropriated funds ~~as much as 27 miles of~~ to border ~~barrier~~wall construction in the Yuma sector, which ~~has an area of responsibility~~spans from the Imperial Sand Dunes ~~in the west~~east to the Yuma-Pima County line in Arizona ~~to the east.~~, will harm Plaintiffs and their members.  The Yuma sector is already heavily fortified, with primary fencing or vehicle barriers covering 107 of 126 miles, as well as 209 miles of patrol roads.

~~118.~~138.    The ~~remaining unfenced~~ areas within the Yuma sector which remain unfenced and/or have vehicle barriers passable to wildlife, are ~~located in Arizona,~~ of high environmental value, and located ~~on rugged and mountainous terrain~~ within the Barry M. Goldwater Air Force Range and Cabeza Prieta National Wildlife Refuge.  The area includes essential habitat for endangered species, including the Sonoran pronghorn.

139.    The ~~emergency proclamation~~unlawful transfer and obligation of appropriated funds ~~as much as 9 miles of~~ to border ~~barrier~~wall construction in the Tucson sector, which spans from the Yuma-Pima County line in Arizona to the state's boundary with New Mexico, will harm Plaintiffs and their members.  The Tucson sector is already heavily fortified, with primary fencing or vehicle barriers covering 211 of 262 miles.

140.    The areas within the Tucson sector that remain unfenced and/or have vehicle barriers passable to wildlife, are of high environmental value, including lands within Organ Pipe Cactus National Monument, Coronado National Forest, San Pedro Riparian National Conservation Area, and San Bernardino National Wildlife Refuge.  The areas include designated critical habitat for endangered species, including the jaguar.

~~119.~~141.    The unlawful transfer and obligation of appropriated funds to border wall construction in the El Paso sector, which ~~has an area of responsibility including~~ includes the

entire border of New Mexico with Mexico as well as ~~the~~ two counties ~~withi~~n far western Texas, harms Plaintiffs and their members. The El Paso sector is already heavily fortified, with primary fencing covering 166 of 180 miles, as well as 465 miles of patrol roads.

~~120.~~142.    The ~~remaining unfenced~~ areas within the El Paso sector that remain unfenced and/or have vehicle barriers passable to wildlife, are of high environmental value, including large sections of the remote New Mexico "bootheel."  This area contains designated critical habitat for jaguar~~s~~ and Chiricahua leopard frog~~s~~, and is renowned for its non-endangered wildlife including mule deer, mountain lions, antelope, and ~~a~~ bison ~~herd~~.

~~121.~~143.    The ~~emergency proclamation funds as much as 55 miles~~unlawful transfer and obligation of appropriated fund to border ~~barrier~~wall construction in the Laredo sector, which ~~has an area of responsibility~~spans from Webb County ~~in the northwest through~~, Texas, to Zapata County ~~in the southeast~~, Texas, harms Plaintiffs and their members.  The Laredo sector is lightly fortified, with primary fencing covering 1 of 171 miles, and 144 miles of patrol roads.

~~122.~~144.    The Laredo sector is of ~~ ~~high environmental value, and like the entire southern Texas border, ~~the~~its international border is defined by the Rio Grande River.

~~123.~~145.    The ~~emergency proclamation would unlawfully fund~~unlawful transfer and obligation of appropriated funds to as much as 104 miles of border ~~barrier~~wall construction in the Rio Grande Valley sector, though some of this mileage may overlap with border wall construction that ~~h~~was already been funded in prior appropriations bills, will harm Plaintiffs and their members.  The Rio Grande Valley sector, which encompasses the Lower Rio Grande Valley, is heavily fortified in some areas, with primary fencing covering 55 of 316 river miles~~,~~ and 716 miles of patrol roads.

~~124.~~146.      The ~~l~~Lower Rio Grande Valley is ~~considered~~ one of the most biologically diverse areas in North America~~,~~ and is ~~a~~ particularly crucial ~~area~~ for migratory birds.  The remaining unfenced areas in the Rio Grande Valley sector are of high environmental value~~,~~ and include protected federal lands ~~including~~like the Lower Rio Grande Valley National Wildlife Refuge and Santa Ana National Wildlife Refuge, ~~and~~as well as essential habitat for endangered species ~~including~~such as ocelots.

~~125.    The emergency proclamation will have environmental impacts that extend beyond border wall construction.  According to the White House, the emergency proclamation will reprogram  $601 million from the Treasury Forfeiture Fund.  These funds are currently used to combat organized crime.~~

~~126.    INTERPOL and United Nations Environment classify "[a]buse of the environment [a]s the fourth largest criminal activity in the world. Worth up to USD 258 billion, it is increasing by five to seven per cent every year and converging with other forms of international crime" and is "a growing threat to peace, security and stability." Among these crimes is illegal wildlife trade, which the GAO has found to range "from $7 billion to $23 billion annually."~~

~~127.    The US Department of State classifies wildlife trafficking as a security threat. According to the GAO, "[t]he United States is one of the world's largest trafficking markets and is increasingly becoming a source for illegal wildlife and wildlife products . . . ."~~

~~128.    Wildlife trafficking is the second greatest threat to biological diversity after habitat destruction.  Plaintiffs dedicate organizational resources to addressing this threat.  They seek federal and state protections for heavily trafficked species being pushed toward the edge of extinction and work to enforce those protections once granted.  They work domestically and~~

internationally to improve wildlife protections and raise awareness about the threats to wildlife from trafficking.  Plaintiffs and their members enjoy observing frequently trafficked species in the wild in their native ecosystems.  These species range from well-known animals such as elephants to numerous fish species, birds, reptiles, and amphibians.

129.   By redirecting funding used to combat organized criminal networks, on information and belief funding will be lost for wildlife trafficking investigations and prosecutions.  Of the $1.4 billion in funds identified by the Office of Inspector General available in the Treasury Forfeiture Fund for general law enforcement, the loss of any of those resources including up to $601 million for border wall construction, will harm Plaintiffs' interests.  Even if these funds are not specifically directed to wildlife trafficking, criminal networks often engage in drug, human, and wildlife trafficking simultaneously. This means a decrease in investigations and prosecutions is likely to negatively impact wildlife either directly or indirectly.  This loss will harm Plaintiffs and their members' interests in observing and enjoying frequently trafficked species in the wild.  It will also force Plaintiffs to spend additional organizational resources toward combatting wildlife trafficking and raising awareness about these criminal activities.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Unlawful Proclamation of Emergency

### Violation of the National Emergencies Act

~~130.~~147.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

~~131.~~148.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful Presidential action that is *ultra vires*.

~~132.   The President's authority to declare an emergency and redirect Congressional appropriations is limited to statutory delegations of such authority, such as the delegation made under the NEA.~~

149.   The President's own statements and the totality of surrounding circumstances show that the ~~proclamation was made~~President abused the authority granted to him to issue proclamations under the NEA, by unlawfully using that authority as a political negotiating tactic~~, not a valid "emergency" as Congress intended~~.

~~133.~~150.    Even if the President's use of his proclamation as a negotiating tactic was lawful under the NEA, 10 U.S.C. § 2808 cannot be lawfully invoked to justify the emergency transfer of appropriated military construction funds to border wall construction.

~~134.   Because there is no national emergency across the southern border, President Trump's February 15, 2019 proclamation of emergency violates the NEA.~~

151.    A proclamation issued under the NEA triggers the President's authority to invoke *existing* Acts of Congress that authorize "the exercise, during the period of a national emergency, of any special or extraordinary power."  50 U.S.C. § 1621(a); *id*. § 1631 ("When the President declares a national emergency, no powers or authorities made available by statute for use in the

46

event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act.").

152.    Accordingly, the scope of the President's emergency powers is limited to legislative enactments under which Congress has specifically granted those powers in advance.

153.    10 U.S.C. § 2808 does not provide authority to conduct an emergency transfer of appropriated military construction funds to border wall construction, and therefore the proclamation's reliance on that provision is unlawful.

135.154.     Plaintiffs and their members will suffer irreparable injury if the emergency proclamation is not declared unlawful, and.  Plaintiffs and their members have no other adequate remedy at law.

## SECOND CLAIM FOR RELIEF
## Unlawful ~~Reallocation~~Transfer of Funds Appropriated ~~Funds~~to Military Construction

## Violation of 10 U.S.C. § 2808 and 2019 Consolidated Appropriations Act

136.155.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

156.    ~~Plaintiffs have a non-statutory right of action to enjoin and declare~~The APA requires courts to hold unlawful ~~Presidential~~and set aside any agency action that is ~~ultra vires.~~"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

137.157.     The Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate funds appropriated for military construction to border wall construction are arbitrary, capricious, an abuse of discretion, and not in accordance with law, in contravention of the APA standards of review.

138.158.      By its plain language, 10 U.S.C. §  2808 does not provide an emergency

source of funding for border wall construction.  10 U.S.C. §  2801(a) defines the term "military

construction" as including "any construction, development, conversion, or extension or any kind

carried out *with respect to a military installation* … or any acquisition of land or construction of

a defense access road."   In turn, "military installation" means a "base, camp, post, station, yard,

center, or other activity under the jurisdiction of the Secretary of a military department . . .

." . . . ."  (emphasis added).  The vast majority, if not all, of the border wall construction that

would be funded by the proclamation would fund occurs on lands that do *not* constitute a

military installation, and in any event, the border wall is not in any event a military construction

project, and thus is nowt lawfully eligible for emergency military construction

reallocatedtransferred appropriations.

139.159.      In addition, the military construction authority is limited to emergencies

"that require[]  [ ] use of the armed forces," and "that are necessary to support such use of the

armed forces."   10 U.S.C. § 2801(a).  The dispute over border wall funding falls far short

ofhardly qualifies as an emergency requiring use of the armed services, and in no way supports

the armed forces.  The emergency proclamation would in fact turn this requirement on its head,

by using the armed forces to engage on a domestic issue due to the President's failure to achieve

his policy goals through the legislative and constitutional framework of the appropriations

process.

140.160.      The broader context of Title 10 also demonstrates that military

construction funds may not be directed to border wall construction.  Title 10, Chapter 15

(Military Support for Civilian Law Enforcement Agencies) is a relatively new addition to the

Armed Forces code  addressing the specific circumstances and conditions under which the

military may support domestic law enforcement agencies.  Chapter 15 represents a departure from longstanding separation of military and domestic law enforcement functions, and thus its exceptions must be read narrowly and exclusively.  The proclamation unlawfully provides for an emergency involving military support to domestic law enforcement agencies that has not been previously authorized by Congress.

141.161.      The NEA only provides Presidential authority to invoke provisions under which Congress has previously considered and addressed the specific emergency at hand.  Under Chapter 15, Congress has directly spoken to the circumstances in which the military may be called upon to support civilian law enforcement agencies, and it limited those circumstances to emergency situations involving weapons of mass destruction, id. § 10 U.S.C. § 282, and situations involving bombings of places of public use, government facilities, public transportation systems, and infrastructure facilities, 10 U.S.C. §. Id. § 283.

142.162.      In addition, Congress has not enacted any NEA emergency provisions under the Immigration Law Code (Title 8).  Congress has, however, specifically considered the urgency of "an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border," and it did not contemplate the involvement of the military in those situations, but instead focused on cooperation with local law enforcement officials, by  allowing the Attorney General to authorize any State or local law enforcement officer to perform federal immigration duties.  8 U.S.C. §. 1103(a)(10).

143.163.      UnderThe President's invocation of 10 U.S.C. § 2808 is unlawful under the plain language of that provision, and broader statutory structure of the military and immigration codes, the President's invocation of 10 U.S.C. § 2808as is the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate

emergency funds from military construction housing to border wall construction was unlawful Presidential action.

164.    The Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate up to $3.6 billion of appropriated military construction funds to border wall construction violates the 2019 Consolidated Appropriations Act, by exceeding and falling outside of the Act's monetary and geographic limitations, respectively, on border wall funding.  § 230(a).

165.    The President's invocation of 10 U.S.C. § 2808, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate funds appropriated for military construction to border wall construction, violate the 2019 Consolidated Appropriations Act prohibition that "[n]one of the funds made available in this or any other appropriations Act may be used to increase . . . funding for a program, project, or activity  as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act."  2019 Consolidated Appropriations Act, § 739.

144.166.         Plaintiffs and their members will suffer irreparable injury if the proclamation's invocation of 10 U.S.C. § 2808 is President's invocation of 10 U.S.C. § 2808, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate funds appropriated for military construction to border wall construction, are not declared unlawful, and.  Plaintiffs and their members have no other adequate remedy at law.

**THIRD CLAIM FOR RELIEF**
**(IN THE ALTERNATIVE TO THE SECOND CLAIM FOR RELIEF)**
Unlawful ~~Reallocation~~Transfer of Funds Appropriated ~~Funds~~to Military Construction

**Violation of 10 U.S.C. § ~~284~~ 2808 and 2019 Consolidated Appropriations Act**

~~145.~~167.        Plaintiffs incorporate by reference the allegations in all preceding

paragraphs.

~~146.~~168.        In the event the Court finds that the Defense Secretary's and Army Corps

of Engineers' implementing actions are not subject to APA review, Plaintiffs have a non-

statutory right of action to enjoin and declare ~~unlawful Presidential action that is~~ those actions as

*ultra vires*.

~~147.    10 U.S.C. § 284 (part of Chapter 15) does not provide an emergency source of~~

~~funding for border wall construction, but is one example of the types of assistance the military~~

~~may provide to civilian law enforcement agencies such as CBP in a non-emergency situation.~~

~~*See, e.g.*, 10 U.S.C. § 271; allow use of military equipment and facilities, *id*. § 272; train and~~

~~advise civilian law enforcement officials, *id*. § 273; and maintain and operate equipment, *id*. §~~

~~274.~~

~~148.    The non-emergency military support authorized under Chapter 15, including~~

~~support under 10 U.S.C. § 284, can only be provided to domestic law enforcement agencies~~

~~subject to several prior conditions.  Such support, for example, may not be provided if it will~~

~~adversely affect military preparedness.  *Id*. § 276.  In addition, the civilian law enforcement~~

~~agency must normally reimburse Department of Defense for the costs of its support.  *Id*. § 277.~~

~~149.~~169.        For the ~~above reasons, and for the~~ same reasons described ~~under~~in the

Second Claim ~~II, under the plain language and broader statutory structure of the military and~~

~~immigration codes, the President's invocation of 10 U.S.C. § 284 to~~for Relief, the Defense

Secretary's and Army Corps of Engineers' implementing actions to identify, transfer emergency, and obligate funds from counterdrug activitiesappropriated for military construction to border wall construction was is unlawful Presidential action. .

150.170.    Plaintiffs and their members will suffer irreparable injury if the proclamation's invocation of 10 U.S.C. § 284 isPresident's invocation of 10 U.S.C. § 2808, and the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate funds appropriated for military construction to border wall construction, are not declared unlawful, and Plaintiffs and their members have no adequate remedy at law.

**FOURTH CLAIM FOR RELIEF**
**Unlawful Reallocation Transfer  of Appropriated Funds Into, and From, the Counterdrug Account**

**Violation of 31 U.S.C. § 9705 Defense FY19 Appropriations and 2019 Consolidated Appropriations Act**

151.171.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

152.    Plaintiffs have a non-statutory right of actionThe APA requires courts to enjoin and declarehold unlawful Presidentialand set aside any agency action that is ultra vires.

153.    31 U.S.C. § 9705 does not provide"(A) arbitrary, capricious, an emergency source of funding for border wall construction.

154.172.    Even where the Secretary of Treasury has "abuse of discretion", or otherwise not in accordance with law; (B) contrary to allocate funds, that discretion is limited to specified categories of funding, 31constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 9705(a)( 706(2). None of those categories are applicable here.

155.    For the above reasons, the announcement that funds from the Treasury Forfeiture Fund will be reprogrammed for border wall construction was unlawful Presidential action.

173.    The Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate up to $2.5 billion of appropriated funds into, and from, the 10 U.S.C. § 284 counterdrug account to border wall construction are arbitrary, capricious, an abuse of discretion, and not in accordance with law, in contravention of the APA standards of review.

174.    The Defense Secretary's implementing actions to identify and transfer up to $2.5 billion of appropriated funds into the counterdrug account violate the DoD FY19 Appropriations Act general transfer authority, as the transfer would be an unlawful "case where the item for which funds are requested has been denied by the Congress."  Defense FY Appropriations, § 8005.

175.    The Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate up to $2.5 billion of appropriated funds into, and from, the counterdrug account to fund border wall construction violate the 2019 Consolidated Appropriations Act, by exceeding and falling outside of the Act's monetary and geographic limitations, respectively, on border wall funding.  2019 Consolidated Appropriations Act, § 230(a).

176.    The Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate up to $2.5 billion of appropriated funds into, and from, the counterdrug account to fund border wall construction violate the 2019 Consolidated Appropriations Act prohibition that "[n]one of the funds made available in this or any other appropriations Act may be used to increase . . . funding for a program, project, or activity  as

proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act." 2019 Consolidated Appropriations Act, § 739; *see also* 10 U.S.C. § 2214(b).

156.177.      Plaintiffs and their members will suffer irreparable injury if the reprogramming of funds from 31 U.S.C. § 9705 is Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate up to $2.5 billion of appropriated funds into, and from, the counterdrug account to border wall construction are not declared unlawful, and.  Plaintiffs and their members have no other adequate remedy at law.

## FIFTH CLAIM FOR RELIEF
## (IN THE ALTERNATIVE TO THE FOURTH CLAIM FOR RELIEF)
### Unlawful Transfer of Appropriated Funds Into, and From, the Counterdrug Account

### Violation of Defense FY 19 Appropriations and 2019 Consolidated Appropriations Act

178.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

179.    In the event the Court finds that the Defense Secretary's and Army Corps of Engineers' implementing actions are not subject to APA review, Plaintiffs have a non-statutory right of action to enjoin and declare those actions as *ultra vires*.

180.    For the same reasons described in the Fourth Claim for Relief, the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate up to $2.5 billion of appropriated funds into, and from, the counterdrug account to border wall construction are unlawful.

181.    Plaintiffs and their members will suffer irreparable injury if the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and

obligate up to $2.5 billion of appropriated funds into, and from, the counterdrug account to border wall construction are not declared unlawful.

### SIXTH CLAIM FOR RELIEF
### Failure to Carry Out Duties as Lead Agency and Cooperating Agencies in Preparation of Environmental Impact Statement

### Violation of NEPA (40 C.F.R. § 1501.5 and § 1501.6)

182.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

183.    The APA requires courts to hold unlawful and set aside any agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

184.    Defendants have failed to meet the duties placed upon lead and cooperating agencies by NEPA and its implementing regulations, in contravention of APA standards of review.

185.    DHS has requested DoD to pay for border wall construction through the identification, transfer, and obligation of funds appropriated to other purposes.  In addition, DHS has requested that DoD execute the border wall projects though the construction of border wall fencing, the construction of roads, and the installation of lighting.  All of the requests received to date would result in border wall construction on federal lands, primarily protected federal lands owned and administered by the Department of the Interior.  DoD has approved assistance for specific border wall construction segments within the Trump administration's larger border wall project, including Yuma Sector Projects 1 and 2 and El Paso Project 1, and has identified, transferred, and obligated more than $1 billion into, and from, the counterdrug account to carry out these projects.

186.     DoD will identify up to $3.6 billion of funds appropriated for military construction by May 15, 2019, to be available for transfer and obligation to fund the Trump administration's border wall project pursuant to the purported emergency authority of 10 U.S.C. § 2808.

187.     NEPA requires that a lead agency be designated for the Trump administration's border wall project, including the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer, and obligate appropriated funds to border wall construction, which is primarily planned for protected lands owned and administered by the Department of the Interior.  40 C.F.R. § 1501.5(a)(1)-(2).  The lead agency "shall supervise the preparation of an environmental impact statement," as more than one Federal agency "is involved in the same action," and the border wall project involves a "group of actions directly related to each other because of their functional interdependence or geographical proximity."  40 C.F.R. § 1501.5(a)(1)-(2).

188.     The lead agency "shall [r]equest the participation of each cooperating agency in the NEPA process at the earliest possible time."  *Id*. § 1501.6(a)(1).  Conversely, "[e]ach cooperating agency shall [p]articipate in the NEPA process at the earliest possible time."  *Id*. § 1501.6(b)(1).

189.     Acting Secretary Shanahan's March 25, 2019 letter approving the DHS February 25, 2019 request for assistance states that "CBP will serve as the lead agency for environmental compliance," despite the fact that DoD and the Army Corps of Engineers are funding, implementing, and constructing the border wall projects.

190.     Despite the DoD actions already taken to identify, transfer, and obligate funds appropriated to other purposes, the specific identification of border wall project areas, and the

apparent imminence of project related construction, CBP has not initiated the NEPA process, in violation of its duties as lead agency to "supervise the preparation of an environmental impact statement," and to "[r]equest the participation of each cooperating agency in the NEPA process at the earliest possible time."  40 C.F.R. § 1501.5 (a)(1)-(2), § 1501.6(a)(1).

191.    Conversely, DoD, the Army Corps of Engineers, and the Department of the Interior have acted in violation of their NEPA duties as cooperating agencies to "[p]articipate in the NEPA process at the earliest possible time."  *Id*. § 1501.6(b)(1).

192.    On information and belief, CBP has no intention of conducting any NEPA review, but instead intends to issue waivers of NEPA and other laws pursuant to IIRIRA  102(c).  Any such waivers would represent an unlawful bootstrapping of the waiver authority, which is directed to actions of DHS.  *See* § 102(a) ("*The Secretary of Homeland Security* shall take such actions as may be necessary to install additional barriers and roads . . .") (emphasis added).  The border wall projects are being carried out (with little to no DHS involvement or expenditure) by DoD and Army Corps of Engineers, on lands owned and administered by the Department of the Interior.[4]  As more than one Federal agency is "involved in the same action" and the border wall projects are "a group of actions directly related to each other because of their functional interdependence or geographical proximity," the Trump administration's border wall project creates cooperating agency duties for DoD, the Army Corps of Engineers, and Department of the Interior that are beyond the scope of the IIRIRA waiver authority.  40 C.F.R. § 1501.5(a)-(c), § 1501.6.

---

[4] Border wall projects are also proposed for lands within the Coronado National Forest, administered by the U.S. Forest Service, an agency of the Department of Agriculture. The Forest Service should also serve as a cooperating agency.

193.    Plaintiffs and their members will suffer irreparable injury if Defendants' failures to meet their duties as lead agency and cooperating agencies under NEPA are not declared unlawful, and unless those agencies are not thereby directed to immediately begin preparation of an environmental impact statement.  Plaintiffs and their members have no other adequate remedy at law

### SEVENTH CLAIM FOR RELIEF
**Constitutional Violation**

**Violation of the Appropriations Clause of the U.S. Constitution
Article I, Section 9, Clause 7**

157.194.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

158.195.    Article I, § 9, cl. 7 of the U.S. Constitution provides that "no Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. CONST. art. I, § 9, cl. 7.

159.196.    Congress's "power of the purse" has been described as the "most important single curb" on presidential authority, because it vests the powers of public revenue and public expenditures with the people's representatives in Congress.  EDWARD S. CORWIN, THE CONSTITUTION AND WHAT IT MEANS TODAY 134 (13th ed. 1975); *see Reeside v. Walker*, 52 U.S. 272, 291 (1850) (interpreting the Appropriations Clause to require that "however("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned.").

160.   In the absence of applicable statutory authority on which to transfer the military construction- and organized crime appropriations, the proclamation unlawfully reallocates money

~~without satisfying the requirements of 10 U.S.C. § 2808, 33 U.S.C. § 2293, or 31 U.S.C. § 9705, and is thus violating the Appropriations Clause.~~

197.    The proclamation and agency implementing actions to identify, transfer, and obligate appropriated funds violate 10 U.S.C. § 2808, DoD FY19 Defense Appropriations Act, and 2019 Consolidated Appropriations Act.  Congress has not appropriated the funds being transferred and obligated to border wall construction for that purpose, and limited the funds it has appropriated to border wall construction to projects within the Rio Grande Valley that are subject to several additional restrictions.  Defendants' unlawful transfer and obligation of appropriated funds for border wall construction violates the Appropriations Clause.

~~161.~~198.    Plaintiffs and their members will suffer irreparable injury if this constitutional violation is not declared unlawful~~, and~~.  Plaintiffs and their members have no other adequate remedy at law.

**~~S~~EI~~X~~GHTH CLAIM FOR RELIEF**
**Constitutional Violation**

**Violation of the Take Care Clause of the U.S. Constitution**
**Article II, Section 3**

~~162.~~199.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

~~163.~~200.    Article II of the U.S. Constitution provides that "[t]he executive Power shall be vested in a President," and that he or she "shall take Care that the Laws be faithfully executed."  U.S. ~~Constitution Article~~CONST. art. II, §~~-~~3.

~~164.~~201.    The President has failed to comply with the requirements and limitations of law that the Executive Branch is required to "faithfully execute," including the ~~National Emergencies Act,~~ NEA, 10 U.S.C. §~~-~~2808, ~~10 U.S.C. § 283,~~ FY 19 Defense Appropriations

Act, and 31 U.S.C. § 9705 2019 Consolidated Appropriations Act.  Accordingly, the President's issuance of the emergency proclamation, as well as agency and the Defense Secretary's and Army Corps' implementing actions taken or directed to be taken under the emergency proclamation identify, transfer, and obligate appropriated funds to border wall construction, violate the Take Care Clause.

165. 202.          Plaintiffs and their members will suffer irreparable injury if this constitutional violation is not declared unlawful, and.  Plaintiffs and their members have no other adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.      Declare the Emergency Proclamation~~,~~ unlawful under the National Emergencies Act;

~~1.~~2.     Declare the  Defense Secretary's and ~~agency~~ Army Corps of Engineers' implementing actions ~~taken or directed~~ to ~~be taken under the proclamation, including the reallocation~~identify, transfer, and ~~expenditure of~~obligate funds appropriated to other purposes in order to construct a border wall ~~pursuant to that proclamation~~, are unlawful under ~~the National Emergencies~~ 10 U.S.C. § 2808, Defense FY19 Appropriations, and 2019 Consolidated Appropriations Act;

3.      Declare that Defendants' failure to meet their respective duties as lead agency and cooperating agencies under NEPA as unlawful, and Order the immediate initiation of an environmental impact statement;

~~2.~~     Declare the Emergency Proclamation, and ~~agency~~the Defense Secretary's and Army Corps of Engineers' implementing actions ~~taken or directed to be taken under the proclamation, including the reallocation and expenditure of~~ to identify, transfer and obligate funds appropriated to other purposes in order to construct a border wall ~~pursuant to that proclamation, are unlawful under the National Emergencies Act and the invoked emergency provisions including 10 U.S.C. § 2808, 10 U.S.C. § 284, and 31 U.S.C. § 9705;~~

~~3.~~4.     ~~Declare the Emergency Proclamation, and agency actions taken or directed to be taken under the proclamation, including the reallocation and expenditure of funds to construct a border wall pursuant to that proclamation, ~~are unconstitutional under the Article I Appropriations Clause and the Article II Take Care Clause;

~~4.~~5.     Set aside and vacate the Emergency Proclamation, and ~~agency actions taken or directed to be taken under the proclamation, including the reallocation and expenditure of funds~~the Defense Secretary's and Army Corps of Engineers' implementing actions to identify, transfer and obligate funds appropriated to other purposes in order to construct a border wall pursuant to that proclamation;

~~5.~~6.     Enjoin all ~~reallocation~~transfers and obligations of appropriated funds ~~taken under the Emergency Proclamation~~;

~~6.~~7.     Retain jurisdiction to ensure compliance with the Court's Orders;

~~7.~~8.     Award Plaintiffs their reasonable costs of litigation, including reasonable attorneys' fees, expert fees, and costs; and

~~8.~~9.     Grant such other and further relief as the Court may deem just and proper.

DATED:        ~~February 16~~April 15, 2019            _____Respectfully submitted,

                                        */s/ Brian Segee*_____

                                        Brian Segee (CA Bar No. 200795)(Pro Hac Vice ~~Pending~~)
                                        CENTER FOR BIOLOGICAL DIVERSITY
                                        660 S. Figueroa St., Suite 1000
                                        Los Angeles, CA 90017
                                        Tel: (805) 750-8852
                                        Email: bsegee@biologicaldiversity.org

                                        */s/ Tanya Sanerib*_____

                                        Tanya Sanerib (D.C. Bar No. 473506)
                                        CENTER FOR BIOLOGICAL DIVERSITY
                                        2400 NW 80th Street, #146
                                        Seattle, WA 98117
                                        Tel: (206) 379-7363
                                        Email: tsanerib@biologicaldiversity.org

                                        Anchun Jean Su (D.C. Bar No. CA285167)
                                        ~~Howard M. Crystal (D.C. Bar No. 446189)~~
                                        CENTER FOR BIOLOGICAL DIVERSITY

1411 K Street N.W., Suite 1300
Washington, D.C. 20005
Tel: (202) 849-8399
Email:  jsu@biologicaldiversity.org
~~hcrystal@biologicaldiversity.org~~

Jason C. Rylander (D.C. Bar No. 474995)
Michael P. Senatore (D.C. Bar No. 453116)
DEFENDERS OF WILDLIFE
1130 17th Street, NW
Washington, DC 20036
Tel: (202) 682-9400 x 145
Facsimile: (202) 682-1331
Email: jrylander@defenders.org
Email: msenatore@defenders.org

Anthony T. Eliesuson (IL Bar No. 6277427)
ANIMAL LEGAL DEFENSE FUND
150 South Wacker Drive, Suite 2400
Chicago, IL  60606
Tel: (707) 795-2533
Email: aeliseuson@aldf.org

*Attorneys for Plaintiffs*