## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; DEFENDERS OF WILDLIFE; ANIMAL LEGAL DEFENSE FUND,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America; PATRICK M. SHANAHAN, in his official capacity as Acting Secretary of Defense; LIEUTENANT GENERAL TODD T. SEMONITE, in his official capacity as Commander and Chief of Engineers, U.S. Army Corps of Engineers; KEVIN McALEENAN, in his official capacity as Acting Homeland Security Secretary; DAVID BERNHARDT, in his official capacity as Secretary of the Interior,<br><br>    Defendants. | Civil Action No. 1:19-cv-00408 (TNM) |

### DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants respectfully move to dismiss Plaintiffs' Amended Complaint for lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted. The bases for this Motion are set forth in the accompanying Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss. A proposed order is also attached.

Dated: May 10, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/ Andrew I. Warden
ANDREW I. WARDEN (IN Bar No. 23840-49)
Senior Trial Counsel, Federal Programs Branch

/s/ Leslie Cooper Vigen
LESLIE COOPER VIGEN (D.C. Bar No.
1019782)
KATHRYN C. DAVIS
MICHAEL J. GIRARDI
RACHAEL L. WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 305-0727
Fax: (202) 616-8470
Email: Leslie.Vigen@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

CENTER FOR BIOLOGICAL DIVERSITY;
DEFENDERS OF WILDLIFE; ANIMAL LEGAL
DEFENSE FUND,

                    Plaintiffs,

      v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America; PATRICK
M. SHANAHAN, in his official capacity as Acting
Secretary of Defense; LIEUTENANT GENERAL
TODD T. SEMONITE, in his official capacity as
Commander and Chief of Engineers, U.S. Army
Corps of Engineers; KEVIN McALEENAN, in his
official capacity as Acting Homeland Security
Secretary; DAVID BERNHARDT, in his official
capacity as Secretary of the Interior,

                  Defendants.

---

Civil Action No. 1:19-cv-00408 (TNM)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 4

  I.    Congress's Express Authorization of Barrier Construction Along the U.S.-Mexico
      Border ........................................................................................................................ 4

  II.   DHS's Recent Efforts to Expedite Border Barrier Construction ....................................... 6

  III.  Congress's Authorization for U.S. Military Support of DHS's Border Security
      Efforts ........................................................................................................................ 6

  IV.  DoD's Current Support for DHS's Efforts to Secure the Southern Border ..................... 8

  V.    The President's Proclamation Declaring a National Emergency at the Southern
      Border ........................................................................................................................ 9

  VI.  The Use of Spending Authorities for Barrier Construction ........................................... 11

STATUTORY FRAMEWORK ............................................................................................. 12

  I.    National Emergencies Act ........................................................................................ 12

  II.   10 U.S.C. § 284 and § 8005 of the DoD Act ................................................................ 17

  III.  10 U.S.C. § 2808 ...................................................................................................... 19

PLAINTIFFS' CLAIMS ..................................................................................................... 20

STANDARD OF REVIEW ................................................................................................. 21

ARGUMENT .................................................................................................................... 23

  I.    Plaintiffs' Challenge to the President's Declaration of a National Emergency
      Should Be Dismissed. ............................................................................................... 22

      A.    The NEA Evidences Congress's Intent to Preclude Judicial Review. .................. 22

      B.    Plaintiffs' Challenge to the President's National Emergency Declaration
           Presents a Nonjusticiable Political Question. ..................................................... 26

      C.    The President Should Be Dismissed as a Party to this Lawsuit Because
           There is No Cause of Action Against the President and Plaintiffs Cannot
           Obtain Equitable Relief Against the President. ................................................... 31

II.   Plaintiffs Cannot Establish Article III Standing to Challenge an Alleged Violation of § 8005 of the DoD Act. ............................................................................... 34

III.  The Court Lacks Jurisdiction To Hear Plaintiffs' NEPA Claims Because NEPA Has Been Waived................................................................................................... 36

IV.   Plaintiffs Have Not Satisfied the APA's Threshold Requirements for Review of Agency Action. ...................................................................................................... 39

      A.    No "Final Agency Action" Exists With Respect to § 2808. .................................. 39

      B.    Even If There Were Final Agency Action, the Use of § 2808 Authority Is Committed to Agency Discretion by Law. ........................................................... 40

      C.    Plaintiffs Do Not Fall Within the "Zone of Interests" of § 8005.......................... 43

V.    Plaintiffs Have Not Stated a Statutory Claim. ..................................................... 45

      A.    Plaintiffs Fail To State a Claim Under the APA...................................................... 46

            1.    Section 2808.................................................................................................46

            2.    Section 8005................................................................................................48

            3.    The Consolidated Appropriations Act .......................................................49

      B.    Plaintiffs' Ultra Vires Claims Must Be Dismissed. ............................................... 52

VI.   Plaintiffs' Constitutional Claims Must Be Dismissed. ..................................... 53

CONCLUSION.................................................................................................................... 55

## TABLE OF AUTHORITIES

### <u>CASES</u>

*AFL-CIO v. Kahn*,
    618 F.2d 784 (D.C. Cir. 1979) ............................................................................................ 55

*Al-Aulaqi v. Panetta*,
    35 F. Supp. 3d 56 (D.D.C. 2014) ......................................................................................... 6

*Am. Butterfly Ass'n v. Nielsen*,
    2019 WL 634596 (D.D.C. Feb. 14, 2019) ........................................................................ 6, 38

*Ange v. Bush*,
    752 F. Supp. 509 (D.D.C. 1990) ......................................................................................... 42

*Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*,
    135 S. Ct. 2652 (2015) ........................................................................................................ 25

*Arizona v. United States*,
    567 U.S. 387 (2012) ............................................................................................................ 30

*Armstrong v. Exceptional Child Ctr., Inc.*,
    135 S. Ct. 1378 (2015) .................................................................................................. 32, 44

*\*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................... 22, 47, 48

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*,
    397 U.S. 150 (1970) ............................................................................................................ 44

*Baker v. Carr*,
    369 U.S. 186 (1962) ...................................................................................................... 28, 30

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*,
    502 U.S. 32 (1991) .............................................................................................................. 52

*Beacon Prods. Corp. v. Regan*,
    633 F. Supp. 1191 (D. Mass. 1986), *aff'd*, 814 F.2d 1 (1st Cir. 1987) .............................. 25, 27

*Beacon Prods. Corp. v. Reagan*,
    814 F.2d 1 (1st Cir. 1987) ........................................................................................ 16, 25, 27

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................ 22

*Bennett v. Spear,*
520 U.S. 154 (1997)..................................................................................................... 40

*Block v. Cmty. Nutrition Inst.,*
467 U.S. 340 (1984).............................................................................................. 23, 26

*Building & Const. Trades Dep't., AFL-CIO v. Martin,*
961 F.2d 269 (D.C. Cir. 1992).................................................................................... 51

*Byrd v. EPA,*
174 F.3d 239 (D.C. Cir. 1999).................................................................................... 34

*CASA de Maryland, Inc. v. Trump,*
355 F. Supp. 3d 307 (D. Md. 2018)............................................................................ 34

*Cause of Action Inst. v. Eggleston,*
224 F. Supp. 3d 63 (D.D.C. 2016).............................................................................. 23

*Centro Presente v. DHS,*
332 F. Supp. 3d 393 (D. Mass. 2018)......................................................................... 34

*Chang v. United States,*
859 F.2d 893 (Fed. Cir. 1988).................................................................................... 28

*Chichakli v. Szubin,*
2007 WL 9711515 (N.D. Tex. June 4, 2007),
*aff'd in part, vacated in part,* 546 F.3d 315 (5th Cir. 2008).................................... 27

*City of Arlington v. FCC,*
569 U.S. 290 (2013)............................................................................................. 46, 48

*D & D Landholdings v. United States,*
82 Fed. Cl. 329 (2008) ............................................................................................... 4

*Dalton v. Specter,*
511 U.S. 462 (1994)....................................................................................... *passim*

*Dinh Tran v. Dep't of Treasury,*
351 F. Supp. 3d 130 (D.D.C. 2019)......................................................................... 5-6

*Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.,*
215 F.3d 37 (D.C. Cir. 2000)................................................................................ 41, 43

*Doe 2 v. Shanahan,*
917 F.3d 694 (D.C. Cir. 2019).................................................................................... 31

*Doe 2 v. Trump*,
    319 F. Supp. 3d 539 (D.D.C. 2018) .......................................................................... 34

*Donovan v. Carolina Stalite Co.*,
    734 F.2d 1547 (D.C. Cir. 1984) ............................................................................... 51

*E.E.O.C. v. St. Francis Xavier Parochial Sch.*,
    117 F.3d 621 (D.C. Cir. 1997) ............................................................................ 18-19

*El-Shifa Pharm. Indus. Co. v. United States*,
    607 F.3d 836 (D.C. Cir. 2010) ................................................................... 22, 29, 42

*FCC v. NextWave Pers. Commc'ns Inc.*,
    537 U.S. 293 (2003) ................................................................................................ 48

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ................................................................................................ 31

*Fla. Audubon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996) .................................................................................. 34

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ........................................................................................... 32, 33

*Gilligan v. Morgan*,
    413 U.S. 1 (1973) ............................................................................................... 42, 45

*Griffith v. FLRA*,
    842 F.2d 487 (D.C. Cir. 1988) ................................................................................ 53

*Gringo Pass, Inc. v. Kiewit Sw. Co.*,
    2012 WL 12905166 (D. Ariz. Jan. 11, 2012),
    *aff'd sub nom. Gringo Pass, Inc. v. United States*, 542 F. App'x 642 (9th Cir. 2013).............. 8

*Grupo Mexicano De Desarrollo v. All. Bond Fund*,
    527 U.S. 308 (1999) ........................................................................................... 32, 33

*Gunpowder Riverkeeper v. FERC*,
    807 F.3d 267 (D.C. Cir. 2015) ................................................................................ 45

*Hawaii v. Trump*,
    859 F.3d 741 (9th Cir. 2017, *vacated as moot and remanded*, 138 S. Ct. 377 (2017) ............. 33

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ........................................................................................... 40, 41

*Hein v. Freedom From Religion Found., Inc.*,
   551 U.S. 587 (2007) ................................................................................. 36

*In re Border Infrastructure Envtl. Litig.*,
   915 F.3d  (9th Cir. 2019) ..................................................................... 6, 39

*In re Korean Air Lines Disaster*,
   597 F. Supp. 613 (D.D.C. 1984) ............................................................... 42

*Industria Panificadora, S.A. v. United States*,
   763 F. Supp. 1154 (D.D.C. 1991), *aff'd on other grounds*, 957 F.2d 886 (D.C. Cir. 1992) .... 42

*INS v. Chadha*,
   462 U.S. 919 (1983) ................................................................................. 16

*Int'l Refugee Assistance Project v. Trump*,
   857 F.3d 554 (4th Cir. 2017),
   *vacated and remanded*, 138 S. Ct. 353 (2017) ...................................... 33

*J.E.M. AG Supply, Inc. v. Pioneer Hi–Bred Int'l, Inc.*,
   534 U.S. 124 (2001) ........................................................................... 48, 49

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
   478 U.S. 221 (1986) ................................................................................. 28

*Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*,
   402 F.3d 1249 (D.C. Cir. 2005) ............................................................... 22

*Kaempe v. Myers*,
   367 F.3d 958 (D.C. Cir. 2004) ............................................................. 5, 22

*Karahalios v. Nat'l Fed'n of Fed. Emps., Local, 1263*,
   489 U.S. 527 (1989) ................................................................................. 26

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ................................................................................. 31

*Kontrick v. Ryan*,
   540 U.S. 443 (2004) ................................................................................. 37

*Leedom v. Kyne*,
   358 U.S. 184 (1958) ........................................................................... 52, 53

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*,
   104 F.3d 1349 (D.C. Cir. 1997) ............................................................... 41

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ................................................................................ 44

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................................................ 34, 35

*\*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ..................................................................... *passim*

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ................................................................................ 22

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ........................................................................ 44, 45

*Mathews v. Diaz*,
426 U.S. 67 (1976) .................................................................................. 31

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
453 U.S. 1 (1981) .................................................................................... 24

*Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel*,
792 F.2d 1172 (D.C. Cir. 1986) ............................................................ 36

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) ........................................................... 26, 32

*Mittleman v. Postal Regulatory Comm'n*,
757 F.3d 300 (D.C. Cir. 2014) .............................................................. 53

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................................................. 46

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. FSIP*,
437 F.3d 1256 (D.C. Cir. 2006) ............................................................ 53

*New Jersey v. United States*,
91 F.3d 463 (3d Cir. 1996) .................................................................... 30

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) ............................................................ 33

*NFFE v. United States*,
905 F.2d 400 (D.C. Cir. 1990) ........................................................ 41, 43

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) .......................................................................................... 26, 32

*North Dakota v. United States*,
  495 U.S. 423 (1990) ................................................................................................ 43

*Nyunt v. Chairman, Broad. Bd. of, Govs.*,
  589 F.3d 445 (D.C. Cir. 2009) .......................................................................... 46, 52

*Orloff v. Willoughby*,
  345 U.S. 83 (1953) .................................................................................................. 43

*Plyler v. Doe*,
  457 U.S. 202 (1982) ................................................................................................ 30

*Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
  489 F.3d 1279 (D.C. Cir. 2007) .............................................................................. 22

*Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n*,
  324 F.3d 726 (D.C. Cir. 2003) .......................................................................... 39, 40

*Robbins v. Reagan*,
  780 F.2d 37 (D.C. Cir. 1985) .................................................................................. 37

*Sadowski v. Bush*,
  293 F. Supp. 2d 15 (D.D.C. 2003) .......................................................................... 30

*Saget v. Trump*,
  345 F. Supp. 3d 287 (E.D.N.Y. 2018) ..................................................................... 34

*Salazar v. Ramah Navajo Chapter*,
  567 U.S. 182 (2012) ................................................................................................ 50

*Santiago v. Rumsfeld*,
  2004 WL 3008724 (D. Or. Dec. 29, 2004),
  *aff'd*, 403 F.3d 702 (9th Cir. 2005) and 407 F.3d 1018 (9th Cir. 2005) ................... 27

*Sardino v. Fed. Reserve Bank of N.Y.*,
  361 F.2d 106 (2d Cir. 1966) .................................................................................... 27

*Save Our Heritage Org. v. Gonzalez*,
  533 F. Supp. 2d 58 (D.D.C. 2008) ............................................................................ 6

*Sears, Roebuck & Co. v. USPS*,
  844 F.3d 260 (D.C. Cir. 2016) .......................................................................... 46, 52

*Sec'y of Labor v. Twentymile Coal Co.*,
    456 F.3d 151 (D.C. Cir. 2006) ........................................................... 41

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. Cir. 2011) ...................................................... 49, 50

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) ..................................................... 34, 35

*Sierra Club v. Jackson*,
    648 F.3d 848 (D.C. Cir. 2011) ..................................................... 41, 42

*Soudavar v. Bush*,
    46 F. App'x 731 (5th Cir. 2002) ........................................................ 27

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ............................................................................ 35

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ..................................................... 33, 34

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) .......................................................... 53

*United States v. Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011) .............................................. 16, 24, 27

*United States v. Brignoni-Ponce*,
    422 U.S. 873 (1975) .......................................................................... 30

*United States v. Delgado-Garcia*,
    374 F.3d 1337 (D.C. Cir. 2004) ........................................................ 31

*United States v. Groos*,
    616 F. Supp. 2d 777 (N.D. Ill. 2008) ................................................ 27

*United States v. Spawr Optical Research, Inc.*,
    685 F.2d 1076 (9th Cir. 1982) ..................................................... 27, 29

*United States v. Yoshida Int'l, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975) ........................................................... 27

*Vietnam v. Reg'l Comm'r of Customs, Region II*,
    459 F.2d 676 (3d Cir. 1972) ............................................................. 27

*Wildlife v. Chertoff,*
    527 F. Supp. 2d 119 (D.D.C. 2007) ............................................................. 6, 31, 38

*Winpisinger v. Watson,*
    628 F.2d 133 (D.C. Cir. 1980) ............................................................................ 35

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ...................................................................................... 54-55

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017) ................................................................................. 27, 33

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
    566 U.S. 189 (2012) ........................................................................................... 29

## CONSTITUTIONS

U.S. Const. art. III, § 2, cl. 1 ....................................................................................... 34

## STATUTES

5 U.S.C. § 701(a)(2) ........................................................................................... 39, 40

5 U.S.C. § 704 ......................................................................................................... 39

5 U.S.C. § 706(2) ..................................................................................................... 46

8 U.S.C. § 1103 .................................................................................................... 4, 5

10 U.S.C. § 101(f)(4) ............................................................................................... 48

10 U.S.C. § 284 ............................................................................................... *passim*

10 U.S.C. § 2801 ............................................................................................... 21, 48

10 U.S.C. § 2808 ............................................................................................. *passim*

10 U.S.C. § 12302 ................................................................................................... 10

31 U.S.C. § 9705 ....................................................................................................... 2

50 U.S.C. § 1601 ................................................................................................. 9, 19

50 U.S.C. § 1621 ........................................................................................... 12, 13, 24

50 U.S.C. § 1622 ....................................................................................... 15, 16, 17, 25

50 U.S.C. § 1631 ............................................................................................. 14

50 U.S.C. §§ 1631, 1641 ............................................................................... 24

NEA,
  Pub. L. No. 94-412, 90 Stat. 1255 (1976)
  (codified as amended at 50 U.S.C. §§ 1601-1651) ................................. 12

Military Construction Authorization Act, 1982,
  |Pub. L. No. 97-99, § 903, 95 Stat. 1359 (1981) .......................................... 19

Military Construction Codification Act of 1982,
  Pub. L. No. 97-214, § 2, 96 Stat. 153
  (codifying 10 U.S.C. §§ 2801–08), 10 U.S.C. § 2808(a) ............................ 19

Pub. L. No. 99-93, § 801, 99 Stat. 405, 448 (1985) ......................................... 16

National Defense Authorization Act for Fiscal Year 1991,
  Pub. L. No. 101-510, § 1004, 104 Stat. 1485 (1991) ................................... 17

Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), 1996,
  Pub. L. No. 104-208, Div. C., Title I § 102(a), 110 Stat. 3009 (1996), *as amended*
  (codified at 8 U.S.C. § 1103 note) .......................................................... 4, 5

Pub. L. No. 107-107, § 1004, 115 Stat. 1012 (2001) ....................................... 18

REAL ID Act of 2005,
  Pub. L. No. 109-13, Div. B, Title I § 102, 119 Stat. 231, 302, 306 ............. 5

Secure Fence Act of 2006,
  Pub. L. No. 109-367, § 3, 120 Stat. 2638 (2006) .......................................... 5

Consolidated Appropriations Act, 2008,
  Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 1844 (2007) ............. 5

John S. McCain National Defense Authorization Act for Fiscal Year 2019,
  Pub. L. No. 115-232, § 1001, 132 Stat. 1636, 1945 (Aug. 13, 2018) ........... 19

DoD Appropriations Act 2019,
  Pub. L. No. 115-245, 132 Stat. 2981 (2018) (DoD Act) ..................... *passim*

Consolidated Appropriations Act 2019,
  Pub. L. No. 116-6, 132 Stat. 2981 (2019) (CAA) .............................. *passim*

## FEDERAL RULES

Federal Rule of Civil Procedure 12(b) .................................................................. 22, 55

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

40 C.F.R. § 1501.6(b) ............................................................................................. 39

83 Fed. Reg. 46067 (Sept. 10, 2018) ...................................................................... 21

83 Fed. Reg. 56251 (Nov. 8, 2018) (renewal by President Trump) ......................... 15

Exec. Order No. 12722, 55 Fed. Reg. 31803 (Aug. 2, 1990) ................................... 20

Exec. Order No. 12734, 55 Fed. Reg. 48099 (Nov. 14, 1990) ................................. 20

Exec. Order No. 12735, 55 Fed. Reg. 48587 (Nov. 16, 1990) ............................. 2, 15

Exec. Order No. 12938, 59 Fed. Reg. 58099 (Nov. 14, 1994) ................................. 16

Exec. Order No. 12978, 60 Fed. Reg. 54579 (Oct. 21, 1995) .................................. 16

Exec. Order No. 13047, 62 Fed. Reg. 28301 (May 22, 1997) .................................... 2

Exec. Order No. 13235, 66 Fed. Reg. 58343 (Nov. 16, 2001) ................................. 20

Exec. Order No. 13194, 66 Fed. Reg. 7389 (Jan. 18, 2001) .................................... 14

Exec. Order No. 13405, 71 Fed. Reg. 35485 (June 16, 2006) .................................... 2

Exec. Order No. 13581, 76 Fed. Reg. 44757 (July 24, 2011) .................................. 16

Exec. Order No. 13712, 80 Fed. Reg. 73633 (Nov. 22, 2015) .......................... 2, 14-15

Border Security and Immigration Enforcement Improvements,
 Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017) .................................... 6

Presidential Proclamation on Declaring a Nat'l Emergency Concerning the S. Border
 of the United States,
 84 Fed. Reg. 4949 (Feb. 15, 2019) (Proclamation) .................................................. 1

Proc. No. 6867, 61 Fed. Reg. 8843 (Mar. 1, 1996) .................................................. 15

Proc. No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001) .............................................. 20

Proc. No. 8443, 74 Fed. Reg. 55439 (Oct. 23, 2009) ............................................... 14

Proc. No. 9398, 81 Fed. Reg. 9737 (Feb. 24, 2016) ..................................................... 15

**LEGISLATIVE MATERIALS**

S. Rep. No. 94-922 (1976) ............................................................................................. 12

S. Rep. No. 94-1168 (1976) ........................................................................................... 14

H.R. Rep. No. 97-44 (1981) ........................................................................................... 20

H.R. Rep. No. 103-200, 1993 WL 298896 (1993) .................................................... 7, 18

H.R. Rep. No. 110-652 (2008)........................................................................................ 18

H.R. Rep. No. 114-840 (2016) ....................................................................................... 18

H.J. Res. 46, 116th Cong. (2019),
    https://www.congress.gov/bill/116th-congress/house-joint-resolution/46 ........................ 1, 25

**OTHER AUTHORITIES**

83 Fed. Reg. 3012 (Jan. 22, 2018) ................................................................................... 6

83 Fed. Reg. 50949 (Oct. 10, 2018)................................................................................. 6

84 Fed. Reg. 17185-88 (Apr. 24, 2019)......................................................................... 38

Cont. of Nat'l Emergency With Respect to Iran,
    2016 WL 6518765 (Nov. 3, 2016) (Ltr. from President Obama)........................................... 15

Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities,
    1999 WL 258030 (Apr. 27, 1999) (Test. of Barry R. McCaffrey, Dir. of the Office of Nat'l
    Drug Control Policy)...................................................................................................... 7, 18

Letter from then-Secretary of Homeland Security Kirstjen M. Nielsen to the U.S. Senate and
    House of Representatives (Mar. 28, 2019),
    https://www.dhs.gov/sites/default/files/publications/19_0328_Border-Situation-
    Update.pdf....................................................................................................................... 1, 11

President Donald J. Trump's Border Security Victory (Feb. 15, 2019),
    www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory
    (Fact Sheet 1) ...................................................................................................................... 12

Presidential Memorandum to Secretary of Defense, Secretary of Homeland Security, and the
    Attorney General, *"Securing the Southern Border of the United States,"*
    2018 WL 1633761 (Apr. 4, 2018) ......................................................................................... 8

*S. Appropriations Hr'g on the DHS FY 2018 Budget*,
   2017 WL 2311065 (May 25, 2017) ........................................................................................... 5

The Funds Available To Address The Nat'l Emergency At Our Border (Feb. 26, 2019),
   www.whitehouse.gov/briefings-statements/funds-available-address-national-emergency-
   border (Fact Sheet 2).................................................................................................................... 12

## INTRODUCTION

On February 15, 2019, the President issued a proclamation declaring that a national emergency exists at the southern border.  *See* Presidential Proclamation on Declaring a Nat'l Emergency Concerning the S. Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019) (Proclamation).  Because the southern border is "a major entry point for criminals, gang members, and illicit narcotics" as well as "large-scale unlawful migration," the President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency." *Id.*  As the President has explained, tens of thousands of aliens are apprehended along the southern border each month and thousands of pounds of illegal drugs are smuggled across the border each year while, at the same time, migrants have begun organizing into caravans that include large numbers of families and unaccompanied children from Central American countries.  *See* Veto Message for H.J. Res. 46 (Mar. 15, 2019).  The increasing surge of migrants, the highest in over a decade, has placed a tremendous strain on the limited resources of the Department of Homeland Security (DHS) and exacerbated the risks to border security, public safety, and the safety of the migrants themselves.  *See* Letter from then-Secretary of Homeland Security Kirstjen M. Nielsen to the U.S. Senate and House of Representatives (Mar. 28, 2019), https://www.dhs.gov/sites/default/files/ publications/19_0328_Border-Situation-Update.pdf.   Facilities are overcrowded, officers are stretched too thin, and resources are being redirected away from law enforcement to address this humanitarian and security crisis.  *Id.*

The Government has been building barriers along the southern border since the 1990s pursuant to congressional authorization.  To address the current national emergency at the southern border, the Government has identified three statutory authorities and sources of funding to continue the construction of additional barriers, in addition to the $1.375 billion recently

appropriated by Congress to DHS for such construction:  (1) the Treasury Forfeiture Fund (31 U.S.C. § 9705); (2) the Department of Defense's (DoD) counter-drug support authority (10 U.S.C. § 284); and (3) the authority to spend unobligated military construction funds to undertake military construction projects necessary to support the use of the armed forces in response to a national emergency declaration (10 U.S.C. § 2808). Only the latter two sources of funding are at issue here; only the availability of § 2808 is dependent upon a national emergency declaration.

The Proclamation follows a forty-year tradition of multiple Presidents of both parties declaring national emergencies to address a wide range of problems.  Indeed, many of the declarations concerned situations that did not involve suddenly emerging threats or the sort of national crisis that currently exists on the southern border.  Thus, for example, President Obama declared a national emergency to address "political repression" in Burundi, Exec. Order No. 13712, 80 Fed. Reg. 73633 (Nov. 23, 2015); President George W. Bush declared a national emergency to address the "fundamentally undemocratic March 2006 elections" in Belarus, Exec. Order No. 13405, 71 Fed. Reg. 35485 (June 16, 2006); and President Clinton declared a national emergency because "the Government of Burma has committed large-scale repression of the democratic opposition in Burma," Exec. Order No. 13047, 62 Fed. Reg. 28301 (May 22, 1997). And Presidents similarly have used this power to address longstanding problems, such as when George H.W. Bush declared a national emergency in 1990 to address the "proliferation of chemical and biological weapons" around the world.  Exec. Order No. 12735, 55 Fed. Reg. 48587 (Nov. 16, 1990).   President Trump's Proclamation concerning the national emergency at our Nation's southern border is neither unprecedented nor fundamentally different from past uses of the same authority.  It is, in fact, more closely tied to exigent circumstances.

Plaintiffs seek to challenge the Proclamation and the Government's reliance on statutory

authorities in addressing the border crisis, but the Court lacks jurisdiction to do so, and the Amended Complaint fails to state claims upon which relief may be granted.  As a threshold matter, judicial review of the Proclamation is not available under the National Emergencies Act (NEA), and in any event, such challenges raise political questions that courts are not equipped to answer, as courts overwhelmingly have recognized.   Moreover, independent separation-of-powers concerns require dismissal of the President as a defendant because there is no cause of action against the President, and Plaintiffs may not obtain equitable relief directly against the President for his official conduct, particularly where, as here, relief could be provided by subordinate agency officials.  Nor do Plaintiffs have standing to challenge DoD's transfer of funds under § 8005 of the DoD Appropriations Act 2019, Pub. L. No. 115-245, 132 Stat. 2981 (2018) (DoD Act), where Plaintiffs have no entitlement to the funds, and the mere transfer of funds, without more, does not affect Plaintiffs.   And the Court lacks jurisdiction to hear Plaintiffs' claims of National Environmental Policy Act (NEPA) violations due to the Acting Secretary of Homeland Security's decision to exercise his statutory authority to waive that law with respect to the specific border construction projects challenged in the Amended Complaint.

Even if Plaintiffs' claims were justiciable, they fail on the merits.  Their statutory claims are deficient for numerous reasons.  Plaintiffs' Administrative Procedure Act (APA) claims fail at the threshold because they have not alleged any final agency action with respect to DoD's use of § 2808, and any such action would be committed to agency discretion by law.  Plaintiffs also lack the prerequisites to bring an APA claim for violation of § 8005 because their interests fall outside the zone of interests of that provision.  Even looking beyond these threshold issues, Plaintiffs fail to state a claim under the APA for violation of §§ 2808, 8005, or the Consolidated Appropriations Act 2019, Pub. L. No. 116-6, 132 Stat. 2981 (2019) (CAA), because they do not identify agency

action that is arbitrary or capricious, nor do they plausibly allege that any agency has exceeded its statutory authority.  Plaintiffs' alternative claims alleging a nonstatutory right to review ultra vires agency action do not meet the high standard required to bring such claims.

Finally, Plaintiffs' constitutional claims should be dismissed because they merely repackage claims of statutory violations in constitutional terms.  Defendants are relying on express congressional authorization to fund border construction, not the President's independent Article II authority.  Plaintiffs' effort to reframe alleged statutory violations as independent violations of the Appropriations and Take Care Clauses contravenes the principle that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims."  *Dalton v. Specter*, 511 U.S. 462, 473 (1994).

For these reasons, explained further below, the Amended Complaint should be dismissed.

## BACKGROUND

I.  **Congress's Express Authorization of Barrier Construction Along the U.S.-Mexico Border**

In 1990, the U.S. Border Patrol, with the assistance of the National Guard, began construction of a border fence near San Diego under the authority Congress granted to the Attorney General "to control and guard the boundaries and borders of the United States against the illegal entry of aliens."  8 U.S.C. § 1103(a)(5); *see D & D Landholdings v. United States*, 82 Fed. Cl. 329, 332 (2008).  Since then, Congress repeatedly has authorized the construction of border barrier infrastructure to prevent illegal entry of people and contraband.  In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which authorizes the Secretary of Homeland Security to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into

4

the United States."  Pub. L. No. 104-208, div. C., § 102(a), 110 Stat. 3009 (1996), as amended (codified at 8 U.S.C. § 1103 note).

Congress subsequently amended IIRIRA on three occasions to expand the Government's authority to construct barriers along the southern border.  In 2005, Congress grew frustrated by "[c]ontinued delays caused by litigation" preventing border barrier construction and thus authorized the Secretary of Homeland Security to waive any "laws that might impede the expeditious construction of security infrastructure along the border."  *See* H.R. Rep. No. 109-72, at 171 (May 3, 2005).  The REAL ID Act of 2005, Pub. L. No. 109-13, div. B, § 102, 119 Stat. 231, 302, 306, empowers the Secretary of Homeland Security "to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section."

Congress again amended IIRIRA as part of the Secure Fence Act of 2006, requiring construction of "physical barriers, roads, lighting, cameras, and sensors" across hundreds of miles of the southern border in five specified locations.  Pub. L. No. 109-367, § 3, 120 Stat. 2638 (2006). In 2007, Congress expanded this requirement and directed "construct[ion of] reinforced fencing along not less than 700 miles of the southwest border."  Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. E, § 564, 121 Stat. 1844 (2007).

Relying on these authorities, DHS has installed approximately 650 miles of barriers along the southern border.[1]  *See* S. Appropriations Hr'g on the DHS FY 2018 Budget, 2017 WL 2311065

---

[1] The Court may consider facts outside the complaint on a motion to dismiss without converting the motion into a motion for summary judgment when the facts are subject to judicial notice.  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).  The Court may take judicial notice of the publicly available information on official government websites cited herein.  *See Dinh Tran v. Dep't of Treasury*, 351 F. Supp. 3d 130, 133 n.5 (D.D.C. 2019); *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014).

(May 25, 2017) (Testimony of then-Secretary of Homeland Security John Kelly).  DHS's efforts to construct border barriers under IIRIRA have been subject to a diverse array of legal challenges, but courts have uniformly dismissed every lawsuit.  *See, e.g.*, *In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1215 (9th Cir. 2019); *N. Am. Butterfly Ass'n v. Nielsen*, 2019 WL 634596 (D.D.C. Feb. 14, 2019); *Save Our Heritage Org. v. Gonzalez*, 533 F. Supp. 2d 58 (D.D.C. 2008); *Defs. of Wildlife v. Chertoff*, 527 F. Supp. 2d 119 (D.D.C. 2007).

## II.      **DHS's Recent Efforts to Expedite Border Barrier Construction**

On January 25, 2017, the President issued an Executive Order directing federal agencies "to deploy all lawful means to secure the Nation's southern border."  Border Security and Immigration Enforcement Improvements, Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017).  In order to "prevent illegal immigration, drug and human trafficking, and acts of terrorism," *id.*, the Order required that agencies "take all appropriate steps to immediately plan, design and construct a physical wall along the southern border," including "[i]dentify and, to the extent permitted by law, allocate all sources of Federal funds" to that effort.  *Id.* at 8794.  In furtherance of this directive, DHS has worked to expedite construction of a variety of border barrier projects over the past two years.  *See, e.g.*, Determination Pursuant to § 102 of the IIRIRA, as Amended, 83 Fed. Reg. 50949 (Oct. 10, 2018) (construction in Texas); Determination Pursuant to § 102 of the IIRIRA, as Amended, 83 Fed. Reg. 3012 (Jan. 22, 2018) (construction in New Mexico).

## III.     **Congress's Authorization for U.S. Military Support of DHS's Border Security Efforts**

Congress also has expressly authorized the U.S. military to provide a wide range of support to DHS at the southern border, including the "construction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284; *see id.* §§ 271–84.  Since the early 1990s, military personnel have supported

civilian law-enforcement agency activities to secure the border, counter the spread of illegal drugs, and respond to transnational organized crime and other transnational threats. *See* H. Armed Servs. Comm. Hr'g on S. Border Defense Support (Jan. 29, 2019) (Joint Statement of John Rood, Under Secretary of Defense for Policy, and Vice Admiral Michael Gilday, Director of Operations for the Joint Chiefs of Staff) (Joint Statement of Rood and Gilday), https://armedservices.house.gov/2019/1/department-of-defense-s-support-to-the-southern-border. Active, Reserve, and National Guard personnel have provided a wide range of assistance, including aerial reconnaissance, ground surveillance, search and rescue, engineering, communications, and medical support. *Id.*

Both Presidents Bush and Obama deployed military personnel to the southern border to support DHS's border security efforts. In 2006, President Bush directed DoD to provide between 3,000 and 6,000 National Guard personnel in support of the U.S. Customs and Border Protection's (CBP) Operation Jump Start. *Id.* President Obama later directed DoD to provide up to 1,200 National Guard personnel annually from 2010 to 2016 in support of CBP's Operation Phalanx. *Id.*

For decades, U.S. military forces have played an active role in barrier construction and reinforcement during their deployments to the southern border. Military personnel were critical to construction of the San Diego border barrier in the early 1990s as well as other border fence projects. *See* H.R. Rep. No. 103-200, at 330–31, 1993 WL 298896 (1993) (commending DoD for its role in construction of the San Diego primary fence); Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Test. of Barry R. McCaffrey, Dir. of the Office of Nat'l Drug Control Policy) (military personnel constructed over 65 miles of barrier fencing). In 2006, the National Guard improved the southern border security infrastructure by building more than 38 miles of fence, 96 miles of vehicle barrier,

more than 19 miles of new all-weather road, and road repairs exceeding 700 miles.  *See* Joint

Statement of Rood and Gilday.  More recently, the U.S. Army Corps of Engineers (USACE) has

assisted DHS by providing planning, engineering, and barrier construction support.  *See, e.g.*,

*Gringo Pass, Inc. v. Kiewit Sw. Co.*, 2012 WL 12905166, at *1 (D. Ariz. Jan. 11, 2012), *aff'd sub*

*nom. Gringo Pass, Inc. v. United States*, 542 F. App'x 642 (9th Cir. 2013).

## IV.      DoD's Current Support for DHS's Efforts to Secure the Southern Border

Building on this decades-long practice, on April 4, 2018, the President issued a

memorandum to the Secretary of Defense, Secretary of Homeland Security, and the Attorney

General titled, "Securing the Southern Border of the United States."  Presidential Memorandum,

2018 WL 1633761 (Apr. 4, 2018).  The President stated "[t]he security of the United States is

imperiled by a drastic surge of illegal activity on the southern border" and pointed to the

"anticipated rapid rise in illegal crossings," as well as "the combination of illegal drugs, dangerous

gang activity, and extensive illegal immigration."  *Id.* at 1.  The President determined the situation

at the border had "reached a point of crisis" that "once again calls for the National Guard to help

secure our border and protect our homeland."  *Id.*  To address this crisis, the President directed the

Secretary of Defense to support DHS in "securing the southern border and taking other necessary

actions to stop the flow of deadly drugs and other contraband, gang members and other criminals,

and illegal aliens into this country."  *Id.* at 2.  The President also directed the Secretary of Defense

to request the use of National Guard personnel to assist in fulfilling this mission.  *Id.*  Since April

2018, National Guard personnel have performed a range of tasks in support of CBP's Operation

Guardian Support.  *See* Joint Statement of Rood and Gilday.

In October 2018, the President expanded the military's support to DHS to include active

duty military personnel.  *See id.*  Since then, active duty personnel have provided a range of support

to DHS, including aviation and engineering support, hardening U.S. ports of entry, erecting

temporary barriers, and emplacing concertina wire.  *See id.*

**V.    The President's Proclamation Declaring a National Emergency at the Southern Border**

On February 15, 2019, in accordance with requirements of the NEA, 50 U.S.C. § 1601 *et seq.*, the President issued a proclamation declaring that "a national emergency exists at the southern border of the United States."  *See* Proclamation.  The President determined that "[t]he current situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency."  *Id.*  The President explained:

> The southern border is a major entry point for criminals, gang members, and illicit narcotics.  The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years. In particular, recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending.  If not detained, such aliens are often released into the country and are often difficult to remove from the United States because they fail to appear for hearings, do not comply with orders of removal, or are otherwise difficult to locate.

*Id.*  The President noted that in response to his April 4, 2018 memorandum, DoD has provided support and resources to DHS at the southern border.  *Id.*  Despite these efforts, "because of the gravity of the current emergency situation," the President determined that "this emergency requires use of the Armed Forces" and "it is necessary for the Armed Forces to provide additional support to address the crisis."  *Id.*

To achieve its purpose, the Proclamation invokes and makes available two statutory authorities to be exercised by DoD as appropriate.  First, the Proclamation makes available the authority under 10 U.S.C. § 12302 to order units or members of the Ready Reserve to active duty. *See id.*; 10 U.S.C. § 12302(a).  Second, the Proclamation makes available to the Acting Secretary of Defense the authority under 10 U.S.C. § 2808, which provides that, "without regard to any other

provision of law," the Secretary of Defense "may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces." *See id.*; 10 U.S.C. § 2808(a).   The Proclamation directs the Secretaries of Defense, Interior, and Homeland Security and, subject to the Acting Secretary of Defense's discretion, the Secretaries of the Military Departments, to "take all appropriate actions, consistent with applicable law, to use or support the use of the authorities . . . invoked, including, if necessary, the transfer and acceptance of jurisdiction over border lands." *See* Proclamation.

On March 15, 2019, the President vetoed a joint resolution passed by Congress that would have terminated the President's national emergency declaration. *See* Veto Message.  In doing so, the President relied upon statistics published by CBP as well as recent congressional testimony by the Secretary of Homeland Security to reaffirm that a national emergency exists along the southern border. *See id.*  The President highlighted (1) the recent increase in the number of apprehensions along the southern border, including 76,000 CBP apprehensions in February 2019, the largest monthly total in the last five years; (2) CBP's seizure of more than 820,000 pounds of drugs in fiscal year 2018; and (3) arrests in fiscal years 2017 and 2018 of 266,000 aliens previously charged with or convicted of crimes. *See id.*  The President also emphasized that migration trends along the southern border have changed from primarily single adults from Mexico, who could be easily removed upon apprehension, to caravans that include record numbers of families and unaccompanied children from Central America. *See id.*  The President explained that this shift requires frontline border enforcement personnel to divert resources away from border security to humanitarian efforts and medical care. *See id.*  Further, the President stated that criminal organizations are taking advantage of the large flows of families and unaccompanied minors to

conduct a range of illegal activity. *See id.* With new surges of migrants expected in the coming months, the President stated that border enforcement personnel and resources are strained "to the breaking point." *See id.* The President concluded that the "situation on our border cannot be described as anything other than a national emergency, and our Armed Forces are needed to help confront it." *See id.*

The situation at the southern border has continued to deteriorate, to the point where DHS is facing "a system-wide meltdown." *See* Letter from then-Secretary of Homeland Security Kirstjen M. Nielsen to the U.S. Senate and House of Representatives (Mar. 28, 2019). "DHS facilities are overflowing, agents and officers are stretched too thin, and the magnitude of arriving and detained aliens has increased the risk of life threatening incidents." *Id.*

## VI.      The Use of Spending Authorities for Barrier Construction

In the Department of Homeland Security Appropriations Act, 2019—a component of the CAA—Congress appropriated $1.375 billion of the total amount made available under the "U.S. Customs and Border Protection—Procurement, Construction, and Improvements" appropriation for "the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector." Pub. L. No. 116-6, § 230(a), 133 Stat. 13 (2019). The Act provided that these funds "shall only be available for operationally effective designs." *Id.* § 230(b). It further required, prior to the use of these appropriated funds for barrier construction within the limits of five specified cities or census-designated places, that DHS consult with local elected officials. *Id.* § 232. Finally, the Act proscribed the use of "funds made available by this Act or prior Acts . . . for the construction of pedestrian fencing" in five specific areas in the Rio Grande Valley. *Id.* § 231. The Act did not otherwise restrict the use of appropriated funds for border barrier construction.

On the same day the President issued the Proclamation, the White House publicly released

a fact sheet setting forth the sources of funding that are to be used to construct additional barriers along the southern border. In addition to the $1.375 billion appropriation to DHS in the CAA, the fact sheet identifies the following additional statutory sources of funding for potential barrier construction, which it explains will be used sequentially and as needed:

A. About $601 million from the Treasury Forfeiture Fund;

B. Up to $2.5 billion under the Department of Defense funds transferred for Support for Counterdrug Activities (10 U.S.C. § 284);

C. Up to $3.6 billion reallocated from Department of Defense military construction projects for military construction pursuant to 10 U.S.C. § 2808, made available by the President's declaration of a national emergency.

*See* President Donald J. Trump's Border Security Victory (Feb. 15, 2019), www.whitehouse.gov/briefings-statements/president-donald-j-trumps-border-security-victory; *see also* The Funds Available To Address The Nat'l Emergency At Our Border (Feb. 26, 2019), www.whitehouse.gov/briefings-statements/funds-available-address-national-emergency-border.

## STATUTORY FRAMEWORK

### I. <u>National Emergencies Act</u>

The NEA, Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601-1651), was an effort by Congress to "establish procedural guidelines for the handling of future emergencies with provision for regular Congressional review." S. Rep. No. 94-922, at 1 (1976).[2] Title II of the NEA—codified at 50 U.S.C. § 1621—prescribes rules for Presidential declarations of national emergencies. Section 1621(a) authorizes the President to "declare [a]

---

[2] The NEA was the culmination of a multi-year effort by Congress to examine the field of emergency statutes and procedures. *See* S. Comm. on Gov't Operations & the Special Comm. on Nat'l Emergencies and Delegated Emergency Powers, 94th Cong., 2d Sess., The National Emergencies Act Source Book: Legislative History, Texts, and Other Documents, at 3–9 (1976) (summarizing legislative history of NEA from 1972–1976, including extensive work conducted by the Senate Special Committee on National Emergencies) (hereinafter "NEA Source Book").

national emergency" with respect to statutes "authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a).  Section 1621(b) states that "[a]ny provisions of law conferring powers and authorities to be exercised during a national emergency shall be effective and remain in effect (1) only when the President (in accordance with subsection (a) of this section), specifically declares a national emergency, and (2) only in accordance with [the NEA]."  *Id.* § 1621(b).

Congress did not define the term "national emergency" or place any conditions on the President's ability to declare a national emergency.  Instead, Congress intentionally left this determination to the President.  As the co-chairmen of the Special Congressional Committee on National Emergencies that studied the issue and drafted the NEA explained, "[W]e did review this possibility of defining what national emergencies might be comprehended; and we decided you would cause more trouble by trying to define it than just saying 'national emergency' . . .".  We felt it would be wrong to try to circumscribe with words with what conditions a President might be confronted."  Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Governmental Relations, 94th Cong. 27 (March 6, 1975) (statement of Sen. Mathias); *see id.* at 31 ("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers."); *see id.* at 27 (statement of Sen. Church) ("[O]nce we got into that thicket [of defining a national emergency] it became evident that we would be creating more problems than we would be solving.").  And during the final debate on the NEA, the House of Representatives specifically rejected an amendment that would have limited the circumstances in which the President could declare a national emergency to times of war or attacks upon the United States only.  *See* NEA Source Book at 278–80; *see id.* at 280 (statement of Rep. Moorhead) ("[T]his amendment would completely take away from the President the flexibility of acting in

times of crisis or an emergency" and "it is important that we give our President some flexibility from time to time."). At the time of its passage, Congress therefore expressly recognized that the NEA "makes no attempt to define when a declaration of national emergency is proper." *Id.* at 9 (quoting S. Rep. No. 94-1168).

The NEA was "an effort by the Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers conferred upon him by other statutes." *See* S. Rep. No. 94-1168, at 3 (1976). Accordingly, the NEA provides that "[w]hen the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631. The NEA thus establishes procedural guidelines for the President to follow before he may invoke other statutory authorities.

In the more than 40 years since Congress enacted the NEA, Presidents have exercised broad discretion in determining what challenges amount to national emergencies, declaring nearly 60 national emergencies addressing a wide variety of national and international challenges. For example, prior national emergency declarations have authorized the invocation of statutory powers to restrict the trade in uncut diamonds used to fund Sierra Leone's civil war, Exec. Order No. 13194, 66 Fed. Reg. 7389 (Jan. 18, 2001), to address the spread of swine flu in the United States, Proc. No. 8443, 74 Fed. Reg. 55439 (Oct. 23, 2009), and to promote democracy or conflict resolution in various countries around the world, *see, e.g.*, Exec. Order No. 13712, 80 Fed. Reg. 73633 (Nov. 22, 2015) (President Obama declared a national emergency to address "violence against civilians" and "political repression" in Burundi).

The NEA also authorizes the President to renew declared emergencies annually without limitation. *See* 50 U.S.C. § 1622(d). Thirty-one national emergencies remain in effect today, with

14

many having been renewed by multiple Presidents over several decades.  For example, President Clinton declared a national emergency in 1996 after Cuban military aircraft intercepted and destroyed two unarmed U.S.-registered civilian aircraft in international airspace north of Cuba. *See* Proc. No. 6867, 61 Fed. Reg. 8843 (Mar. 1, 1996).  The emergency remains in effect today, having been renewed over the course of 23 years by Presidents Bush, Obama, and Trump, even though President Obama concluded in 2016 that "the descriptions of the national emergency set forth in Proclamations 6867 and 7757 no longer reflect the international relations of the United States related to Cuba."  *See* Proc. No. 9398, 81 Fed. Reg. 9737 (Feb. 24, 2016).  Indeed, the first national emergency declared under the NEA—President Carter's 1979 emergency declaration stemming from the Iran hostage crisis—has been in effect for 39 years and is now being continued because "relations with Iran have not yet normalized, and the process of implementing the agreements with Iran, dated January 19, 1981, is ongoing."  *See* Cont. of Nat'l Emergency With Respect to Iran, 2016 WL 6518765 (Nov. 3, 2016) (letter from President Obama); *see also* 83 Fed. Reg. 56251 (Nov. 8, 2018) (renewal by President Trump).

Nothing in the NEA requires that a national emergency be a sudden or unforeseen event, as some emergencies build through an accretion of events and exist over a considerable period of time.  In 1990, for example, President George H. W. Bush declared a national emergency arising from the "proliferation of chemical and biological weapons" around the world.  Exec. Order No. 12735, 55 Fed. Reg. 48587 (Nov. 16, 1990).  Four years later, President Clinton added nuclear weapons proliferation to that emergency declaration.  Exec. Order No. 12938, 59 Fed. Reg. 58099 (Nov. 14, 1994).  President Clinton also declared a national emergency arising from narcotics trafficking centered in Colombia, Exec. Order No. 12978, 60 Fed. Reg. 54579 (Oct. 21, 1995), and President Obama declared a national emergency arising from the activities of certain transnational

criminal organizations, Exec. Order No. 13581, 76 Fed. Reg. 44757 (July 24, 2011). These declarations, like the President's Proclamation, addressed long-standing policy challenges confronting the United States, even though they were neither new nor unforeseen at the time they were declared to be a national emergency. Indeed, the President's Proclamation acknowledged that the situation at the southern border is a "long-standing" problem and builds on previous efforts of President Obama to use emergency powers to address the threats along the southern border by declaring a national emergency targeting a Mexican cartel known as Los Zetas. *See id.*

Recognizing that, by their very nature, declarations of national emergency require the need for flexibility in policy choices that are the province of the political branches of the federal government, Congress gave itself the exclusive authority to exercise oversight of a President's national emergency declaration. As a remedy to potential overreach, Congress has authority to terminate a national emergency by enacting into law "a joint resolution." 50 U.S.C. § 1622(a)(1).[3] Emphasizing the political judgment that Congress must make, the NEA expressly requires Congress to meet "[n]ot later than six months after a national emergency is declared, and not later than the end of each six-month period thereafter that such emergency continues, . . . to consider a vote on a joint resolution to determine whether that emergency shall be terminated." *Id.* § 1622(b); *see also id.* § 1622(c) (establishing procedure for both Houses of Congress to vote on a joint

---

[3] The original draft of the NEA would have automatically terminated a national emergency after six months unless extended by an act of Congress. *See* NEA Source Book at 7. Congress eliminated this provision during debate and replaced it with the requirement that Congress pass a "concurrent resolution" to terminate a national emergency. *See id.*; *Beacon Prods. Corp. v. Reagan*, 814 F.2d 1, 4 (1st Cir. 1987) (Breyer, J.). In 1985, Congress amended this provision and replaced the "concurrent resolution" requirement with one that calls for termination of a national emergency by "joint resolution." Pub. L. No. 99-93, § 801, 99 Stat. 405, 448 (1985). This amendment was the result of the Supreme Court's decision in *INS v. Chadha*, 462 U.S. 919, 959 (1983), which invalidated a similar provision as unconstitutional. *See United States v. Amirnazmi*, 645 F.3d 564, 581 n.26 (3d Cir. 2011).

resolution terminating a national emergency). Additionally, Congress has imposed extensive reporting requirements on the Executive Branch when the President declares a national emergency. *See id.* § 1641(a)–(b) (requiring the President and each executive agency to maintain a file and index of, and transmit to Congress, certain orders, rules, and regulations); *id.* § 1641(c) (requiring the President to periodically transmit to Congress "a report on the total expenditures incurred by the United States Government . . . which are directly attributable to the exercise of powers and authorities conferred by such declaration"). The NEA does not provide any role for the courts in reviewing a national emergency declaration, as it does not create a private right of action or contain a civil enforcement mechanism.

## II.    10 U.S.C. § 284 and § 8005 of the DoD Act

10 U.S.C. § 284 states that "[t]he Secretary of Defense may provide support for the counterdrug activities . . . of any other department or agency of the Federal Government," if requested by the relevant "official who has responsibility for [such] counterdrug activities." 10 U.S.C. § 284(a), (a)(1)(A). This support includes express authority for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." *Id.* § 284(b)(7). This authority may be invoked at any time and does not require a declaration of national emergency.

Congress first provided DoD this authority in the National Defense Authorization Act for Fiscal Year 1991. Pub. L. No. 101-510, § 1004, 104 Stat. 1485 (1991). As a time-limited authority, § 1004 had to be periodically renewed to continue DoD's authority to support counter-drug activities. *See, e.g.*, Pub. L. No. 107-107, § 1004, 115 Stat. 1012 (2001). Not only did Congress regularly renew § 1004, it frequently praised DoD's involvement in building barrier fences along the southern border and allocated additional funds to DoD to encourage its support of counter-drug construction projects. For example, in 1993, Congress "commend[ed]" DoD's

efforts to reinforce the border fence along a 14-mile drug smuggling corridor in the San Diego-Tijuana border area, calling the project "precisely the kind of federal-local cooperative effort the Congress had in mind in enacting section 1004." H.R. Rep. No. 103-200, at 330–31, 1993 WL 298896 (1993). Executive Branch officials and Congress alike have noted the particular importance of DoD's involvement in southern border enhancement projects to prevent drug smuggling. *See* Hr'g Before the S. Comm. on Armed Servs. Subcomm. on Emerging Threats and Capabilities, 1999 WL 258030 (Apr. 27, 1999) (Test. of Barry R. McCaffrey, Dir. of the Office of Nat'l Drug Control Policy) (testifying about the "vital contributions" made by DoD to construct barrier fencing along the southern border); *see, e.g.*, H.R. Rep. No. 110-652, 420 (2008) (recommending a $5 million increase to DoD's funding to continue construction of a southern border fence, which was described as an "invaluable counter-narcotics resource"). In light of the continuing threat posed by illegal drug trafficking across our nation's borders, Congress permanently codified § 1004 at 10 U.S.C. § 284 in 2016, directing DoD "to ensure appropriate resources are allocated to efforts to combat this threat." H.R. Rep. No. 114-840, 1146 (2016).

In accordance with § 284, on February 25, 2019, DHS requested DoD's assistance in blocking 11 specific drug-smuggling corridors on Federal land along certain portions of the southern border. *See* Declaration of Kenneth P. Rapuano ¶ 3, Ex. A (Exhibit 1).[4] The request sought the replacement of existing vehicle barricades or dilapidated pedestrian fencing with new pedestrian fencing, the construction of new and improvement of existing patrol roads, and the installation of lighting. *Id.* On March 25, 2019, the Acting Secretary of Defense approved two

---

[4] This declaration discusses DoD decisions incorporated by reference in the Amended Complaint. *See* Am. Compl. ¶¶ 120–25; *see also E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim, we may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice.").

projects in Arizona and one in New Mexico.  *Id. ¶* 4.

In order to devote additional resources to border barrier construction, on March 25, 2019, the Acting Secretary of Defense authorized the transfer of $1 billion to the counter-narcotics support appropriation from Army personnel funds that had been identified as excess to current requirements.  *See* Rapuano Decl. ¶ 5.  The Acting Secretary of Defense directed the transfer of funds pursuant to DoD's general transfer authority under § 8005 of the DoD Act, Pub. L. No. 115-245, div. A, 132 Stat. 2981, 2999, and § 1001 of the John S. McCain National Defense Authorization Act 2019, Pub. L. No. 115-232, § 1001, 132 Stat. 1636, 1945 (2018).  *Id.*  The Acting Secretary concluded the requirements of those statutes were satisfied because the transfer was "for higher priority items, based on unforeseen military requirements, than those for which originally appropriated" and "the item for which funds are requested" had not "been denied by the Congress."  *Id.*, Ex. C.

## III.    <u>10 U.S.C. § 2808</u>

First enacted as part of the 1982 Military Construction Authorization Act, Pub. L. No. 97-99, § 903, 95 Stat. 1359 (1981), and later amended by the Military Construction Codification Act of 1982, Pub. L. No. 97-214, § 2, 96 Stat. 153 (codifying 10 U.S.C. §§ 2801–08), 10 U.S.C. § 2808(a) provides:

> In the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces.  Such projects may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated.

In enacting this provision, Congress recognized that "it is impossible to provide in advance for all conceivable emergency situations" and wanted to fill "a gap that now exists with respect to

restructuring construction priorities in the event of a declaration of war or national emergency." H.R. Rep. No. 97-44, at 72 (1981).

The term "military construction" as used in § 2808 "includes any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land or construction of a defense access road (as described in section 210 of title 23)."  10 U.S.C. § 2801(a).  Congress in turn defined the term "military installation" to mean "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the Secretary of a military department or the Secretary of Defense, without regard to the duration of operational control."  *Id.* § 2801(c)(4).

Presidents have invoked the military construction authority under § 2808 on two prior occasions.  First, President George H.W. Bush authorized the use of § 2808 in 1990 following the Government of Iraq's invasion of Kuwait.  *See* Exec. Order No. 12722, 55 Fed. Reg. 31803 (Aug. 2, 1990); Exec. Order No. 12734, 55 Fed. Reg. 48099 (Nov. 14, 1990).  Second, President George W. Bush invoked § 2808 in response to the terrorist attacks against the United States on September 11, 2001.  *See* Proc. No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001); Exec. Order No. 13235, 66 Fed. Reg. 58343 (Nov. 16, 2001).  The national emergency declaration stemming from the terrorist attacks of September 11, 2001, remains in effect today, *see* 83 Fed. Reg. 46067 (Sept. 10, 2018), and DoD has used its § 2808 authority to build a wide variety of military construction projects, both domestically and abroad, over the past 17 years, *see* Cong. Research Serv., Military Construction Funding in the Event of a Nat'l Emergency at 1–3 & tbl. 1 (updated Jan. 11, 2019).

## PLAINTIFFS' CLAIMS

Plaintiffs are three nonprofit environmental groups: the Center for Biological Diversity;

Defenders of Wildlife; and the Animal Legal Defense Fund.  Am. Compl. ¶¶ 12–15, ECF No. 16.

They bring this suit against the President, the Acting Secretary of Defense, the Chief of Engineers

and Commanding General of USACE, the Acting Secretary of Homeland Security, and the

Secretary of the Interior in their official capacities.  *Id.* ¶¶ 17–21.  Plaintiffs allege violations of

the NEA pursuant to a claimed "non-statutory right of action to enjoin and declare unlawful

Presidential action that is *ultra vires*."  *Id.* ¶¶ 148–54 (Count One).  They allege pursuant to the

APA that use of 10 U.S.C. § 2808 for border barrier construction violates that statute and two

provisions of the CAA, *id.* ¶¶ 156–66 (Count Two), or in the alternative, pursuant to a nonstatutory

right of action, *id.* ¶¶ 168–70 (Count Three).  They next allege pursuant to the APA that DoD's

transfer of funds under § 8005 of the DoD Act violates that provision, and that its use of those

funds pursuant to 10 U.S.C. § 284 violates two provisions of the CAA, *id.* ¶¶ 172–77 (Count Four),

or in the alternative, pursuant to a nonstatutory right of action, *id.* ¶¶ 179–81 (Count Five).

Plaintiffs further allege violations of NEPA pursuant to the APA.  *Id.* ¶¶ 183–93 (Count Six).

Finally, Plaintiffs bring constitutional claims pursuant to the Appropriations Clause, *id.* ¶¶ 195–98

(Count Seven); and the Take Care Clause, *id.* ¶¶ 200–02 (Count Eight).  They seek declaratory

and injunctive relief.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) requires dismissal of any claim over which a court

lacks subject-matter jurisdiction.  The complaining party has the burden of establishing the

predicates to federal jurisdiction, including standing.  *See Public Citizen, Inc. v. Nat'l Highway

Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007).  In the absence of standing, a matter

is not justiciable.  *See id.*  Nor does a "justiciable 'controversy' exist[] when parties seek

adjudication of a political question."  *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836,

841 (D.C. Cir. 2010) (en banc) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007)).

Although in evaluating Rule 12(b)(1) motions, the court must accept well-pleaded factual allegations as true, "the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Federal Rule of Civil Procedure 12(b)(6) mandates dismissal for failure to state a claim upon which relief can be granted.  To pass muster, a complaint must contain "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" warrants dismissal. *Id.* (quoting *Twombly*, 550 U.S. at 557).  Although a court must accept as true well-pleaded factual allegations and construe them in the light most favorable to the plaintiff, it need not accept "legal conclusions" or "mere conclusory statements." *Id.*  Neither is a court required to accept as true a complaint's factual allegations if they "contradict exhibits to the complaint or matters subject to judicial notice." *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).  In addition to the facts alleged, a court may consider "documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies." *Cause of Action Inst. v. Eggleston*, 224 F. Supp. 3d 63, 70 (D.D.C. 2016) (internal quotation marks omitted).

## ARGUMENT

### I. Plaintiffs' Challenge to the President's Declaration of a National Emergency Should Be Dismissed.

This Court lacks subject-matter jurisdiction over Plaintiffs' allegations concerning the NEA and the President's Proclamation.  Plaintiffs' challenge to the President's decision to issue the Proclamation is nonjusticiable, both because the NEA impliedly precludes judicial review and because the declaration of a national emergency raises a political question courts are not equipped

22

to answer.  Congress has placed no limitations on the President's authority to declare a national emergency.  Because the NEA does not define the term "national emergency," the text and structure of the statute evidence Congress's choice to leave this determination to the President, subject only to congressional oversight as provided by the NEA.  But whether viewed as a statutory or separation-of-powers matter, the President is entitled to make a determination about what circumstances constitute a national emergency without judicial second guessing.  Furthermore, the President must be dismissed as a party because there is no cause of action against the President, and Plaintiffs cannot obtain injunctive or declaratory relief against the President.  For these reasons, Count One should be dismissed.

### A.      The NEA Evidences Congress's Intent to Preclude Judicial Review.

The Supreme Court has instructed that in determining whether a statute "precludes judicial review," a court must examine the "express language" of the statute as well as "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved."  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).  That Congress intended to preclude judicial review need only be "fairly discernible" from the evidence.  *Id.* at 351.

Here, Congress's intent to preclude judicial review is evidenced by the text of NEA, which does not define the term national emergency or provide courts with any standards by which to evaluate the President's exercise of this authority.  *See* 50 U.S.C. § 1621.  The lack of a definition in the statute reflects Congress's intentional decision to leave to the President the determination about when and under what circumstances to declare a national emergency.  The absence of any judicially enforceable remedy is further supported by the fact that the NEA establishes procedural and reporting guidelines only that the President must follow when invoking other statutory authorities conditioned on a national emergency declaration.  *See* 50 U.S.C. §§ 1631, 1641. Accordingly, the NEA does not provide a mechanism for litigants to have any role in the statutory

23

process, let alone a role that Plaintiffs could enforce in court.  *See United States v. Amirnazmi*, 645 F.3d 564, 581 (3d Cir. 2011) (stating that the "NEA places the onus on Congress to ensure emergency situations remain anomalous").

The lack of a judicial enforcement mechanism to challenge a national emergency declaration is reinforced by the NEA's exclusive remedial scheme for Congress to challenge through political means the President's determination that a particular national emergency exists. *See* 50 U.S.C. § 1622; *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.").   As explained above, Congress has the authority to terminate a national emergency by enacting into law "a joint resolution."   50 U.S.C. § 1622(a)(1).   Further, the NEA expressly requires Congress to vote on whether to terminate the declared emergency within six months of the President's declaration and establishes expedited procedures for Congress to vote on such a measure once a termination resolution is introduced.   *Id.* § 1622(b), (c).   Here, majorities of both houses of Congress attempted to terminate the President's national emergency declaration by passing a joint resolution, but the President vetoed that measure, and there was insufficient support for termination among members of Congress to override the President's veto to enact the joint resolution into law. *See* Summary, H.J. Res. 46, 116th Cong. (2019), https://www.congress.gov/bill/116th-congress/house-joint-resolution/46.   The fact that there was insufficient congressional will to exercise its ability to terminate the Proclamation through the NEA's statutory procedures only underscores that this dispute should not be adjudicated by the Court.  *Cf. Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 (2015) ("Having failed to prevail in their own Houses, the suitors could not repair to the Judiciary to complain.").

Moreover, when Congress had the opportunity to change the oversight structure of the NEA in response to the Supreme Court's *Chadha* decision that declared the "legislative veto" unconstitutional, Congress notably changed the termination threshold from a "concurrent resolution," which does not involve Presidential approval, to a "joint resolution," which requires either Presidential approval or adequate congressional support to override a Presidential veto in order to be enacted.[5] *See supra* pp. 16–17.  Congress could have instituted a different mechanism, such as creating a judicial-enforcement regime, but Congress did not adopt other alternatives.  *See Beacon Prods. Corp. v. Reagan*, 814 F.2d 1, 4 (1st Cir. 1987) (Breyer, J.) ("This legislative history makes clear that Congress intended to impose upon itself the burden of acting affirmatively to end an emergency.").  Instead, Congress gave itself the power to oversee the President's use of statutory emergency authority, and there is no basis on which to create a new judicial remedy on top of Congress's carefully crafted framework.  Where, as here, the statute expressly provides Congress with authority to terminate a national emergency, it is "an 'elemental canon' of statutory construction that . . . courts must be especially reluctant to provide additional remedies." *Karahalios v. Nat'l Fed'n of Fed. Emps., Local 1263*, 489 U.S. 527, 533 (1989) (citations omitted).

Further, the NEA was the product of a multi-year study by Congress to address the field of national emergency authorities, and nothing in that extensive legislative history suggests that Congress intended to allow judicial challenges to the President's national emergency declarations. To the contrary, the legislative history shows that Congress, not the courts, would be the branch of government to oversee the President's use of his emergency powers.  *See* NEA Source Book at

---

[5] The NEA's "provision for termination by concurrent resolution is unconstitutional because, unlike a joint resolution, termination by concurrent resolution would enable Congress to take legislative action without presenting the action to the President for his signature." *Beacon Prods. Corp. v. Regan*, 633 F. Supp. 1191, 1196 (D. Mass. 1986), *aff'd*, 814 F.2d 1 (1st Cir. 1987); *see supra* note 3.

338 ("every type and class of presidentially declared emergency will be subjected to congressional control" and "the legislative branch will be in a position to assert its ultimate authority"); *see also Block*, 467 U.S. at 349 (preclusion of judicial review may be implied from "specific legislative history" alone). Moreover, given the President's "unique position in the constitutional scheme," *Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982), any remedial scheme where litigants could sue the President to challenge a national emergency declaration would raise separation-of-powers concerns and create tension with the Supreme Court's admonition that federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 501 (1866). There is no indication in the legislative history that Congress gave consideration to those weighty issues or concluded that such lawsuits against the President should proceed. *See* NEA Source Book at 342 (stating that "there is [no] intent here to limit either the President's power or flexibility to declare a national emergency" and there is no intent to limit "the subject matter of the emergency or the timing of its declaration") (statements of Reps. Moorhead and Flowers). In the absence of clear direction from Congress, the Court should not imply a remedy that would conflict with longstanding separation-of-powers principles. *Cf. Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017) (emphasizing that inferring a cause of action is a "significant step under separation-of-powers principles" because in doing so, courts intrude on the prerogatives of the entire Congress).

In light of the NEA's text, structure, and legislative history, Congress has precluded judicial review of the President's national emergency Proclamation.

### B.    Plaintiffs' Challenge to the President's National Emergency Declaration Presents a Nonjusticiable Political Question.

Courts that have considered the issue have uniformly concluded that a Presidential declaration of a national emergency is a nonjusticiable political question. *See, e.g., Amirnazmi,*

26

645 F.3d at 581 ("[F]ederal courts have historically declined to review the essentially political questions surrounding the declaration or continuance of a national emergency." (citation omitted)); *United States v. Spawr Optical Research, Inc.*, 685 F.2d 1076, 1081 (9th Cir. 1982) ("[W]e will not address these essentially-political questions . . . .").[6]  Since passage of the NEA in 1976, there have been nearly 60 national emergencies declared by seven different Presidents, and even in the few instances where the declarations have been challenged, *see supra* note 6, no court has ever reviewed the merits.[7]  Plaintiffs' request for this Court to take that unprecedented step is without merit, and this Court should not depart from this long line of unbroken authority.

---

[6] *See also Soudavar v. Bush*, 46 F. App'x 731 (5th Cir. 2002) (per curiam) (affirming district court decision dismissing a challenge to executive orders imposing national emergency sanctions on Iran as involving a "nonjusticiable political question"); *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 579 (C.C.P.A. 1975) (courts will not "review the judgment of a President that a national emergency exists"); *Chichakli v. Szubin*, 2007 WL 9711515, at *4 (N.D. Tex. June 4, 2007) (holding that a challenge to President Bush's declaration of a national emergency with respect to the "unstable situation" in Liberia "presents a nonjusticiable political question"), *aff'd in part, vacated in part*, 546 F.3d 315 (5th Cir. 2008); *Beacon Prods. Corp.*, 633 F. Supp. at 1194–45 (whether national emergency existed with respect to Nicaragua presents a nonjusticiable political question); *Sardino v. Fed. Reserve Bank of N.Y.*, 361 F.2d 106, 109 (2d Cir. 1966) (concluding that President Truman's national emergency declaration concerning the situation in Korea is not justiciable and "courts will not review a determination so peculiarly within the province of the chief executive"); *Veterans & Reservists for Peace in Vietnam v. Reg'l Comm'r of Customs, Region II*, 459 F.2d 676, 679 (3d Cir. 1972) ("[A] President's declaration of national emergency is unreviewable."); *Santiago v. Rumsfeld*, 2004 WL 3008724, at *3 (D. Or. Dec. 29, 2004) (holding that plaintiffs challenge to "whether the national emergency declared by the President continues to apply to Afghanistan" has "raised an essentially political issue" and "[c]ourts should refrain from ruling on such issues"), *aff'd*, 403 F.3d 702 (9th Cir. 2005) and 407 F.3d 1018 (9th Cir. 2005); *United States v. Groos*, 616 F. Supp. 2d 777, 788–89 (N.D. Ill. 2008) ("The court cannot question the President's political decision" to declare a national emergency regarding "unrestricted access of foreign parties to U.S. goods and technology"); *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988) ("[T]o the extent that the plaintiffs' inquiry into the 'true facts' of the Libyan crisis would seek to examine the President's motives and justifications for declaring a national emergency, such an inquiry would likely present a nonjusticiable political question.").

[7] Past practice also belies Plaintiffs' suggestion that this national emergency declaration is both justiciable and invalid because the President stated that he "didn't need" to issue the declaration and "could do the wall over a longer period of time."  *See* Am. Compl. ¶ 108.  A national emergency declaration necessarily reflects an exercise of discretion, and Presidents have often

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). Both the separation-of-powers doctrine and the policy of judicial self-restraint require that federal courts refrain from intrusion into areas committed by the Constitution to the Legislative and Executive Branches of the Government. *See Baker v. Carr*, 369 U.S. 186, 217 (1962). The *Baker* Court set forth the factors that a court is to consider in determining whether a particular claim raises nonjusticiable political questions:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* The existence of any one of these factors indicates the existence of a political question. *Id.* Here, Plaintiffs' assertion that the situation along the southern border does not constitute a national emergency runs afoul of most, if not all, of these factors.

First, there are no judicially manageable standards to ascertain whether or when to declare a national emergency. As explained above, Congress intentionally chose not to define the term "national emergency" and left that determination to the President, subject only to oversight from Congress. *See supra* pp. 13–14. The NEA sets forth no criteria from which the Court could judge

---

chosen to declare national emergencies to address circumstances that were neither new nor unforeseen at the time the declaration issued. *See supra* pp. 15–16. No court has ever conducted the type of judicial second guessing that Plaintiffs propose here by evaluating whether an emergency could have been addressed without relying on emergency statutory authorities.

the President's action or make a determination about whether a particular issue constitutes a national emergency. *See Spawr Optical Research*, 685 F.2d at 1080 ("The statute contained no standards by which to determine whether a national emergency existed or continued."). Plaintiffs ask the Court to take the remarkable step of supplanting the President's determination with the "courts' own unmoored determination of what United States policy toward [the southern border] should be." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012). The Court could not decide this question "without first fashioning out of whole cloth some standard for when" a national emergency "is justified." *El-Shifa Pharm. Indus. Co.*, 607 F.3d at 845. To grant Plaintiffs' requested relief, the Court would have to make, with no judicially manageable standards to guide it, numerous political judgments about how the current humanitarian and security crisis at the border impacts immigration policy, foreign relations, public safety, and national security. "The judiciary lacks the capacity for such a task." *Id.*

Second, any such determinations would require precisely the sort of "policy determination of a kind clearly for nonjudicial discretion" that the Supreme Court has indicated is a hallmark of a political question. *Baker*, 369 U.S. at 217. As the Supreme Court has long recognized, illegal immigration creates "significant economic and social problems" in the United States. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *see also Plyler v. Doe*, 457 U.S. 202, 237 (1982) (Powell, J., concurring) (recognizing illegal immigration to be "a problem of serious national proportions"). More recently, in *Arizona v. United States*, 567 U.S. 387 (2012), the Court emphasized that the problems posed by illegal immigration "must not be underestimated" and credited evidence in the record of various problems "associated with the influx of illegal migration across private land near the Mexican border," including "an epidemic of crime" and "safety risks." *Id.* at 397–98 (citation omitted).

29

The President has chosen to confront these and other challenges traceable to the current crisis at the border by declaring a national emergency and invoking the express powers delegated to him by Congress. *See* Proclamation. Under these circumstances, the Court cannot review the matter without second-guessing the President's policy determinations. Decisions "about how best to enforce the nation's immigration laws in order to minimize the number of illegal aliens crossing our borders patently involve policy judgments about resource allocation and enforcement methods." *New Jersey v. United States*, 91 F.3d 463, 470 (3d Cir. 1996). These "issues fall squarely within a substantive area clearly committed by the Constitution to the political branches; they are by their nature peculiarly appropriate to resolution by the political branches of government both because there are no judicially discoverable and manageable standards for resolving them." *Id.* (citation omitted); *see Sadowski v. Bush*, 293 F. Supp. 2d 15, 19 (D.D.C. 2003) ("[D]eciding how to best enforce existing immigration laws and policies and how to keep out illegal immigrants requires making policy judgments that are suited for nonjudicial discretion . . . ."). Accordingly, the President's Proclamation is not reviewable in this case.

Third, the type of policy decisions that Plaintiffs ask this Court to make are entrusted to the political branches, not the courts. "[T]he power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of government." *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972). As the Supreme Court has explained:

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently

30

> of a character more appropriate to either the Legislature or the Executive than
> to the Judiciary.

*Mathews v. Diaz,* 426 U.S. 67, 81 (1976) (footnote omitted); *see also Fiallo v. Bell*, 430 U.S. 787,

792 (1977) ("Our cases have long recognized the power to expel or exclude aliens as a fundamental

sovereign attribute exercised by the Government's political departments largely immune from

judicial control.").   Moreover, "[t]he political branches are far better equipped (and more

accountable to the people) for making the types of decisions that arise in the military setting," and

"[j]udges have long respected this allocation of powers."  *Doe 2 v. Shanahan*, 917 F.3d 694, 719

(D.C. Cir. 2019) (Williams, J., concurring).   The President's decision to declare a national

emergency is a quintessential policy decision in an area reserved to the political branches involving

matters of immigration, foreign relations, use of military forces, and national security.  *See, e.g.*,

*United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004) ("[T]his country's border-

control policies are of crucial importance to the national security and foreign policy of the United

States."); *Defs. of Wildlife*, 527 F. Supp. 2d at 129 (construction of border barriers "pertains to

both foreign affairs and immigration control—areas over which the Executive Branch traditionally

exercises independent constitutional authority").   There is no basis for the Court to substitute its

judgment for that of the President on these sensitive policy issues that are nonjusticiable political

questions.

**C.    The President Should Be Dismissed as a Party to this Lawsuit Because
There is No Cause of Action Against the President and Plaintiffs
Cannot Obtain Equitable Relief Against the President.**

Plaintiffs' claims against the President suffer from separate and independent problems:

there is no cause of action against the President, and Plaintiffs may not obtain—and the Court may

not order—equitable relief directly against the President for his official conduct.

Plaintiffs lack a cause of action to sue the President.  The actions of the President are not reviewable under the APA, *see Dalton*, 511 U.S. at 479, and likewise there is no implied equitable cause of action to do so.  Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers," *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015), the availability of such relief depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 319 (1999).  Here, there is no tradition of equitable relief against the President.  To the contrary, the Supreme Court recognized over 150 years ago in *Mississippi v. Johnson* that federal courts lack jurisdiction to "enjoin the President in the performance of his official duties," 71 U.S. at 501, a principle the Court reaffirmed more recently in *Franklin v. Massachusetts*, 505 U.S. 788 (1992); *id.* at 827 (Scalia, J., concurring in part and concurring in the judgment) ("apparently unbroken historical tradition supports the view" that courts may not order the President to "perform particular executive . . . acts").

Moreover, the Supreme Court has twice held that causes of action that are available against other government officials should not be extended to the President absent a clear statement by Congress.  *See Nixon*, 457 U.S. at 748 n.27 (declining to assume that *Bivens* and other implied statutory damages "cause[s] of action run[] against the President of the United States"); *Franklin*, 505 U.S. at 801 (declining to find cause of action against the President under the APA "[o]ut of respect for the separation of powers and the unique constitutional position of the President").  Accordingly, in the absence of an express statutory cause of action against the President or a tradition of recognizing such suits as a matter of equity, there is no basis for the Court to infer equitable relief against the President.  "The reasons why courts should be hesitant to grant such relief are painfully obvious" given the President's unique constitutional role and the potential

tension with the separation of powers. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). Further, the Supreme Court has taken a "traditionally cautious approach to equitable powers, which leaves any substantial expansion of past practice to Congress." *Grupo Mexicano*, 527 U.S. at 329. Any expansion of an equitable remedy against the President here would create separation-of-powers problems by usurping "the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *See Abbasi*, 137 S. Ct. at 1858.

Lower courts have followed the logic of *Franklin* and *Massachusetts* by dismissing the President as a defendant in civil cases and declining to impose either declaratory or injunctive relief against him in his official capacity. *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017) ("In light of the Supreme Court's clear warning that such relief should be ordered only in the rarest of circumstances we find that the district court erred in issuing an injunction against the President himself."), *vacated and remanded*, 138 S. Ct. 353 (2017); *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) ("[T]he extraordinary remedy of enjoining the President is not appropriate here . . . ."), *vacated as moot and remanded*, 138 S. Ct. 377 (2017); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief . . . ."); *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President as a party to this case").

In any event, Plaintiffs could potentially obtain the relief they seek against the agency Defendants because the gravamen of Plaintiffs' complaint is that the agencies, not the President, will construct or fund border barriers in excess of their statutory authorities or in violation of the Constitution. Accordingly, in addition to the reasons explained above, the President should be dismissed in order to avoid an unnecessary separation-of-powers conflict. *See Swan*, 100 F.3d at

978 ("In most cases, any conflict between the desire to avoid confronting the elected head of a

coequal branch of government and to ensure the rule of law can be successfully bypassed, because

the injury at issue can be rectified by injunctive relief against subordinate officials.").[8]

## II.   Plaintiffs Cannot Establish Article III Standing to Challenge an Alleged Violation of § 8005 of the DoD Act.

Article III requires that cases be decided in the concrete context of an actual case or

controversy, not in the abstract.  U.S. Const. art. III, § 2, cl. 1.  And "a showing of standing is an

'essential and unchanging' predicate to any exercise of jurisdiction."  *Fla. Audubon Soc'y v.

Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (citing *Lujan v. Defs. of Wildlife*, 504 U.S.

555, 560 (1992)).  To demonstrate standing, Plaintiffs must satisfy a three-pronged test.  *Sierra

Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing *Defs. of Wildlife*, 504 U.S. at 560).  First,

Plaintiffs must have suffered an injury-in-fact, defined as a harm that is "concrete and actual or

imminent, not conjectural or hypothetical."  *Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999)

(quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)).  Second, the injury

claimed must be fairly traceable to the governmental conduct alleged.  *Sierra Club*, 292 F.3d at

898.  No standing exists where the court "would have to accept a number of very speculative

inferences and assumptions in any endeavor to connect alleged injury with [challenged conduct]."

*Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980).  Finally, it must be likely that the

requested relief will redress the alleged injury.  *Sierra Club*, 292 F.3d at 898.

Plaintiffs cannot establish standing to challenge DoD's use of § 8005 to effectuate an

---

[8] Although district courts in some recent cases have declined to dismiss the President at the motion-to-dismiss stage on ground that doing so would be premature in light of uncertainty about the relief that could be provided by the defendant agencies, that is not the situation here.  *See Centro Presente v. DHS*, 332 F. Supp. 3d 393, 418 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018); *Saget v. Trump*, 345 F. Supp. 3d 287, 297 (E.D.N.Y. 2018).  There is no question in this case that relief against the agencies would be sufficient to redress Plaintiffs' claims seeking to halt border barrier construction.  *See Swan*, 100 F.3d at 978.

internal transfer of funds between DoD appropriations.  That provision permits the Secretary of

Defense to

> transfer not to exceed $4,000,000,000 of working capital funds of the Department
> of Defense or funds made available in this Act to the Department of Defense for
> military function (except military construction) between such appropriations or
> funds or any subdivision thereof, to be merged with and to be available for the same
> purposes, and for the same time period, as the appropriation or fund to which
> transferred: *Provided*, That such authority to transfer may not be used unless for
> higher priority items, based on unforeseen military requirements, than those for
> which originally appropriated and in no case where the item for which funds are
> requested has been denied by the Congress . . . .

Pub. L. No. 115-245, § 8005.  DoD has transferred funds to its "Drug Interdiction and Counter-

Drug Activities, Defense" appropriation pursuant to § 8005.  *See* Rapuano Decl. ¶ 5.  Plaintiffs

cannot establish injury arising from such transfer because they have no legally protected interest

in the transferred funds and because the use of § 8005's transfer authority does not directly result

in the border barrier construction Plaintiffs claim will injure them.

Plaintiffs allege no interest in the funds transferred from one DoD appropriation to another.

They claim no entitlement to the money transferred.  Nor are Plaintiffs the "object" of the § 8005

transfer, which simply moved funds among DoD's accounts.  *Lujan*, 504 U.S. at 562.  Accordingly,

their standing to challenge the transfer of funding from one DoD appropriation to another is no

greater than that of any taxpayer to challenge any expenditure of taxpayer money from a particular

budget account. Other than in extremely limited circumstances not presented here, such taxpayer

injury cannot supply standing.  As the Supreme Court has explained, "federal courts would cease

to function as courts of law and would be cast in the role of general complaint bureaus" if "every

federal taxpayer could sue to challenge any Government expenditure."  *Hein v. Freedom From*

*Religion Found., Inc.*, 551 U.S. 587, 593 (2007).  And indeed, even if taxpayer standing were

available here, which it is not, Plaintiffs' claim to standing would be even weaker than that of a

taxpayer challenging a particular expenditure because DoD's transfer under § 8005 is not an expenditure—it is simply a transfer of already-appropriated funds.

Section 8005 is not a source of statutory authority pursuant to which funds will be expended on border barrier construction. Instead, § 8005 authorizes the transfer of funds to the appropriation for counter-drug activities, and border barrier construction is being undertaken utilizing the funds in that appropriation pursuant to authority provided by 10 U.S.C. § 284. Plaintiffs' alleged injury stems entirely from the construction of border barriers. *See, e.g.*, Am. Compl. ¶¶ 130–32. The intervening step of invoking § 284 is necessary to connect DoD's use of § 8005 to the border barrier construction that is the source of Plaintiffs' alleged injuries. Indeed, DoD could permissibly use funds transferred to the counter-drug appropriation on a variety of projects that Plaintiffs would have no basis to challenge. Yet the transfer of funds pursuant to § 8005 is the "particular agency action" Plaintiffs challenge, *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990), and the Amended Complaint alleges no violation of § 284, *see generally* Am. Compl. Plaintiffs have thus established no injury-in-fact arising from the transfer of funds. *Cf. Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1178 (D.C. Cir. 1986) ("[T]he presence of an independent variable between either the harm and the relief or the harm and the conduct makes causation sufficiently tenuous that standing should be denied."). And Plaintiffs cannot invoke their alleged harm from the separate act of constructing barriers utilizing authority provided by § 284 to establish standing for a claimed violation of § 8005. *See Nat'l Wildlife Fed'n*, 497 U.S. at 891–94 (holding that APA review is limited to review of discrete agency action and multiple actions cannot be aggregated together).

III.   **The Court Lacks Jurisdiction To Hear Plaintiffs' NEPA Claims Because NEPA Has Been Waived.**

Plaintiffs' NEPA claim should be dismissed because the Acting Secretary of Homeland

Security has waived NEPA's requirements for the barrier construction projects identified as Yuma Sector Projects 1 and 2 as well as El Paso Sector Project 1, depriving the Court of jurisdiction over these claims. "Only Congress may determine a lower federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004). Courts lack subject-matter jurisdiction to review claims brought pursuant to the APA where Congress has explicitly precluded judicial review. *Robbins v. Reagan*, 780 F.2d 37, 42 (D.C. Cir. 1985). Through IIRIRA, Congress has authorized the Secretary of Homeland Security to "take such actions as may be necessary" to install "physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a). It also requires DHS to "construct reinforced fencing along not less than 700 miles of the southwest border." *Id.* § 102(b)(1)(A). IIRIRA seeks to ensure expeditious construction by permitting the Secretary of Homeland Security to waive a broad array of legal impediments: "Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." *Id.* at § 102(c)(1).

Here, DHS determined that additional border infrastructure is necessary to fulfill its statutory mandate under § 102, and requested that DoD use its authority pursuant to § 284 to assist with constructing border barriers. *See* Rapuano Decl. ¶ 3, Ex. A. DoD agreed to provide the requested support and authorized two projects in Arizona and one project in New Mexico. *Id.* ¶¶ 4, 7, 9. On April 24, 2019, the Acting Secretary of Homeland Security exercised his authority under § 102(c)(1) to issue waivers for these projects. *See* Determination Pursuant to § 102 of the IIRIRA, as Amended, 84 Fed. Reg. 17185-88 (Apr. 24, 2019). As relevant here, the waived laws include NEPA and the APA, along with "all federal, state, or other laws, regulations, and legal

requirements of, deriving from, or related to the subject of, the [listed] statutes." *Id.* at 17187.

Issuance of those IIRIRA waivers "deprives the Court of jurisdiction to hear [Plaintiffs'] NEPA"

claims. *N. Am. Butterfly Ass'n*, 2019 WL 634596 at *4; *see also In re Border Infrastructure*

*Environmental Litigation*, 915 F.3d at 1221, 1225.

Nothing in the text of IIRIRA limits DHS's waiver solely to DHS's activities.  IIRIRA

provides that the Secretary of Homeland Security has the authority to "take such actions as may

be necessary to install additional physical barriers" and to "waive all legal requirements" that he

determines are necessary to "ensure expeditious construction."  IIRIRA § 102(a), (c)(1).  It would

be inconsistent with this broad language for NEPA to apply, subsequent to waiver, to other

agencies assisting DHS with its statutory mandate.  Indeed, other agencies are typically involved

in the construction of border barriers when IIRIRA waivers are issued, and this does not affect the

validity of the waiver. *See Defs. of Wildlife*, 527 F. Supp. 2d at 121, 129 (applying IIRIRA waiver

where the Army Corps of Engineers constructed border fencing "on behalf of DHS" and

dismissing NEPA claim against Bureau of Land Management after DHS issued IIRIRA waiver).

Moreover, Plaintiffs' allegation that, despite DHS's waiver, the planned construction

"creates cooperating agency duties . . . .that are beyond the scope of the IIRIRA waiver authority,"

Am. Compl. ¶ 192, is inconsistent with both NEPA and IIRIRA's statutory schemes.  Under

NEPA, cooperating agencies are required only to "participate in the NEPA process" and assist the

lead agency with "portions of the environmental impact statement."  40 C.F.R. § 1501.6(b).  A

cooperating agency could not possibly do so if no agency is undertaking a NEPA process.  Because

DHS waived NEPA obligations for these projects, there is no NEPA process to "cooperate" with

here.  Given the IIRIRA waivers issued for the projects at issue, Count Six should be dismissed.

**IV.**     **Plaintiffs Have Not Satisfied the APA's Threshold Requirements for Review of Agency Action.**

Plaintiffs challenge under the APA the use of § 2808 and § 284 for barrier construction, alleging that Defendants have violated § 2808, that the use of transfer authority to make additional funds available for use pursuant to § 284 violates § 8005 of the DoD Act, and that the use of either source of funding for barrier construction violates two different provisions of the CAA.  Certain of these challenges fail at the threshold of APA review.  With respect to § 2808, Plaintiffs fail to allege "final agency action" for the Court to review, as required under the APA.  5 U.S.C. § 704. Furthermore, any decision by DoD to engage in construction under § 2808 would be of a sort "committed to agency discretion by law" and thus excluded from judicial review by the APA. 5 U.S.C. § 701(a)(2).  Finally, Plaintiffs are not within the zone of interests protected by § 8005 of the DoD Act.  For these reasons, Plaintiffs are not entitled to APA review of these provisions.

**A.**     **No "Final Agency Action" Exists With Respect to § 2808.**

Because § 2808 does not directly provide for judicial review, APA review, if available at all, is permitted only if there has been "final agency action."  *See, e.g.*, *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 882 (1990); *Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003).  Final agency action is marked by two characteristics.  First, final agency action "mark[s] the consummation of the agency's decisionmaking process"; it is not "tentative" or "interlocutory."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citation omitted).  Second, the action "must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* at 178 (internal citation omitted).  This requires a final agency action to have "an actual or immediately threatened effect."  *Nat'l Wildlife Fed.*, 497 U.S. at 894.  Thus, preparatory activities, without more, are not final agency action under the APA.  *See, e.g.*, *Reliable Automatic Sprinkler*, 324 F.3d at 731 (finding "a statement of the

agency's intention to make a preliminary determination" was not final agency action).

Here, Plaintiffs have failed to allege any action that represents the consummation of DoD's decisionmaking process with respect to § 2808. At best, they point to a memorandum directing the Under Secretary of Defense to identify, by May 10, 2019, existing military construction projects that could provide funding for border barrier construction pursuant to § 2808. Am. Compl. ¶ 125. By Plaintiffs' own allegations, the memorandum "directs the Comptroller *to be prepared* to make the identified funds available *if* the Acting Secretary determines that military construction funds are necessary to address the proclaimed national emergency." *Id.* (emphases added). These allegations demonstrate preparation for possible future action, not final action. Such preparatory actions do not have "an actual or immediately threatened effect." *Nat'l Wildlife Fed.*, 497 U.S. at 894. And the APA does not entitle Plaintiffs to challenge the Acting Secretary of Defense's decision until it is final.

### B. Even If There Were Final Agency Action, the Use of § 2808 Authority Is Committed to Agency Discretion by Law.

Even if there were final agency action, any decision by the Acting Secretary of Defense to undertake military construction under § 2808 is not reviewable because it is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Under the APA, the Court may not review final agency action "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action." *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (quoting *Heckler*, 470 U.S. at 830). The determination of whether a matter has been committed to agency discretion takes into account "both the nature of the administrative action at

issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011) (quoting *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006)). This Court has held that determinations requiring military expertise and those dealing with foreign policy issues are not proper subjects of judicial intervention. *See, e.g.*, *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 41–42 (D.C. Cir. 2000) (finding that "determinations regarding military value" and "judgments on questions of foreign policy and national interest" are "not subjects fit for judicial involvement"); *NFFE v. United States*, 905 F.2d 400, 406 (D.C. Cir. 1990) ("[T]he federal judiciary is ill-equipped to conduct reviews of the nation's military policy.").

The text of § 2808 makes clear that there is no meaningful standard by which to judge any decision by the Acting Secretary of Defense to exercise his authority. The use of § 2808 is predicated on a *Presidential declaration* of a national emergency "that requires use of the armed forces," and provides the Secretary of Defense with authority to "undertake military construction projects" that are "necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). The statutory scheme leaves to the President the determination of whether a national emergency "requires use of the armed forces," and courts have uniformly concluded that a Presidential declaration of a national emergency is a nonjusticiable political question. *See supra* pp. 23–31. The fact that § 2808 imposes an additional requirement that the national emergency "require[] use of the armed forces" does not change the conclusion that this determination is nonjusticiable. The Commander-in-Chief's decision to deploy the armed forces to address a national emergency is a quintessential political question. "'To attempt to decide such a matter without the necessary expertise and in the absence of judicially manageable standards would be to entangle the court in matters constitutionally given to the [other] branch[es].'" *Industria Panificadora, S.A. v. United*

*States*, 763 F. Supp. 1154, 1160 (D.D.C. 1991) (quoting *In re Korean Air Lines Disaster*, 597 F. Supp. 613, 616 (D.D.C. 1984)), *aff'd on other grounds*, 957 F.2d 886 (D.C. Cir. 1992); *Ange v. Bush*, 752 F. Supp. 509, 512 (D.D.C. 1990) (finding nonjusticiable a challenge to President's deployment orders and activities in Persian Gulf). Here, the Court is without judicially manageable standards to evaluate the President's determination to deploy the armed forces to the southern border. "[C]ourts lack the competence to assess the strategic decision to deploy" the armed forces "or to create standards to determine" whether the use of the armed forces "was justified or well-founded." *El-Shifa Pharm. Indus. Co.*, 607 F.3d at 844.

The statute likewise gives significant discretion to the Acting Secretary of Defense, providing only that, in the event of a declaration of national emergency, the Secretary "may" authorize military construction projects "that are necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). This is a quintessential military judgment, and the statute does not specify any criteria that the Secretary must consider in making his determination. *See Gilligan*, 413 U.S. at 10 ("The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments . . . ."). Nor does it include any specific prohibitions limiting the Secretary's determination of what would constitute a project "necessary" to support the use of the armed forces. *See Sierra Club*, 648 F.3d at 856 (finding administrative action unreviewable where, among other things, "[t]here [was] no guidance to the Administrator or to a reviewing court as to what action is 'necessary'").

Even if § 2808 contained "standards to apply," such standards would not be "judicially manageable" because the determination regarding what is "necessary to support such use of the armed forces" is an inherent military judgment to which courts have routinely deferred. *See North Dakota v. United States*, 495 U.S. 423, 443 (1990) ("[W]e properly defer to the judgment of those

who must lead our Armed Forces in battle."); *Orloff v. Willoughby*, 345 U.S. 83, 93 (1953) ("[J]udges are not given the task of running the Army.").   Judicial review of any decision by the Acting Secretary of Defense to authorize border barrier construction under § 2808 as necessary to support the use of the armed forces would necessarily require this Court to second-guess the Acting Secretary's considered judgment on core military matters such as allocation of military resources, readiness, and the relative value of various military construction projects within the military's global national security strategy.   There are no judicially manageable standards for conducting that type of review.   *See NFFE*, 905 F.2d at 405–06 (concluding that decisions about which military bases to close were committed to agency discretion by law).   Such judgment is "better left to those more expert in issues of defense," *id.* at 406, and inherently requires a determination of the "military value" of the proposed construction projects.   *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n*, 215 F.3d at 41–42.   For these reasons, there are no judicially manageable standards to apply, and any determination by the Acting Secretary regarding the use of § 2808 will be committed to agency discretion by law under the APA.

### C.   Plaintiffs Do Not Fall Within the "Zone of Interests" of § 8005.

Plaintiffs also cannot challenge § 8005 under the APA because they do not fall within the zone of interests to be protected by that provision.   "A person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).   The "zone of interests" test thus serves "as a limitation on the cause of action for judicial review conferred by the [APA]."   *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).   It forecloses suit "when a plaintiff's interests are so marginally related to or

inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225. Plaintiffs bear the burden of establishing injury that "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for [their] complaint[s]." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. at 883.

Section 8005 forms the legal basis for Plaintiffs' claims, and is thus the relevant text to consider when assessing the zone of interests. It is a provision in a DoD appropriations act that does nothing more than permit, when certain criteria are met and within certain limitations, transfers of funds from one DoD appropriation to another. Pub. L. No. 115-245, § 8005. Section 8005 is entirely focused on internal DoD fiscal activities, and its limitations are designed to "tighten congressional control of the re-programming process." H.R. Rep. No. 93-662 at 16–17.

Plaintiffs seek to enforce the portion of § 8005 that proscribes the transfer of funds where an item has been denied by Congress. The limitation is "phrased as a directive to" DoD, "not as a conferral of the right to sue upon" those who take issue with DoD's transfer of funds. *See Armstrong*, 135 S. Ct. at 1387. Any dispute regarding the scope of DoD's authority under this provision would constitute, at its core, a disagreement between DoD and Congress about defense spending. There is no indication in the text of § 8005 that Congress intended it to be a vehicle for any private party to sue for any reason. Congress never contemplated third parties inserting themselves into the DoD funding process through litigation. Indeed, the Constitution puts Congress and the Executive at the center of military policy. *See* U.S. Const., art. I, § 8, cl. 12. "The ultimate responsibility for these decisions" about the allocation of limited resources appropriated to DoD "is appropriately vested in branches of the government which are periodically subject to electoral accountability"—not the courts. *Gilligan*, 413 U.S. at 10.

44

Even if there were some role for private parties to play in enforcement of § 8005, it is not these Plaintiffs.  Here, Plaintiffs are not even arguably within the zone of interests of § 8005 because they have no stake in DoD appropriations, § 8005 does not authorize the construction that is the source of Plaintiffs' alleged harm, and the provision has absolutely nothing to do with environmental or wildlife preservation.  The interests Plaintiffs seek to protect in this lawsuit focus entirely on the protection of wildlife habitats and other areas they claim to be of high environmental value.  *See, e.g.*, Am. Compl. ¶¶ 130–46.  Plaintiffs have not fulfilled their burden to show how these interests have any connection whatsoever to the fiscal interests protected by § 8005.  *See Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 273 (D.C. Cir. 2015).  Nor could they.  Plaintiffs' purported injuries are not caused by the use of § 8005.  *See supra* pp. 34–36.  Plaintiffs' interest in the funding transfer process is thus "'so marginally related to . . . the purposes implicit in'" § 8005 "that it cannot reasonably be assumed that Congress intended to permit the suit" when it enacted that provision.  *See Match-E-Be-Nash-She-Wish*, 567 U.S. at 225.  Because Plaintiffs' interests fall outside the zone of interests of § 8005, the APA does not provide a cause of action.

## V.      Plaintiffs Have Not Stated a Statutory Claim.

Plaintiffs claim that DoD's use of § 2808 and DoD's transfers of funds for border construction are "arbitrary" and "capricious," "contrary to constitutional right," and "in excess of statutory jurisdiction," in violation of the APA.[9]  *See* 5 U.S.C. § 706(2); Am. Compl. ¶¶ 155–66; 171–77.  For the reasons discussed, *see supra* pp. 39–45, Plaintiffs' § 2808 and § 8005 transfer claims are not reviewable under the APA.  In any event, Counts Two and Four are meritless because Plaintiffs have not alleged plausible violations of the statutory schemes challenged.

Tacitly acknowledging that APA review is unavailable, Plaintiffs alternatively seek

---

[9] Plaintiffs do not bring an APA claim against the President.  *See* Am. Compl. ¶¶ 157, 173, 190–91.  The President's actions are not subject to APA review.  *Dalton*, 511 U.S. at 469.

nonstatutory review of Defendants' actions as ultra vires. *See* Am. Compl. ¶¶ 167–70; 178–81. But the standard for ultra vires review is even more demanding than that of the APA, *see Sears, Roebuck & Co. v. USPS*, 844 F.3d 260, 265 (D.C. Cir. 2016), and ultra vires claims "rarely succeed," *Nyunt v. Chairman, Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009). Thus, for the same reasons that Plaintiffs fail to state an APA claim, Plaintiffs' ultra vires claims fail, and Counts Three and Five should be dismissed.

## A.   Plaintiffs Fail To State a Claim Under the APA.

Plaintiffs have failed to state a claim on which relief can be granted under the APA. They offer no allegation whatsoever that Defendants acted arbitrarily and capriciously by "rel[ying] on factors which Congress has not intended [them] to consider, entirely fail[ing] to consider an important aspect of the problem, or offer[ing] an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nor do Plaintiffs plausibly allege that "the statutory text forecloses [Defendants'] assertion of authority." *City of Arlington v. FCC*, 569 U.S. 290, 301 (2013). To the contrary, Defendants have acted consistent with their statutory mandate.

### 1.   Section 2808

Even putting aside the threshold issue that Plaintiffs have not alleged final agency action with respect to § 2808, *see supra* pp. 39–40, their APA claim fails. As an initial matter, they make no concrete allegation that Defendants acted arbitrarily or capriciously with respect to § 2808. Plaintiffs conclusorily allege that the "implementing actions" of the Acting Secretary of Defense and the Chief of Engineers and Commanding General of USACE were arbitrary and capricious. Am. Compl. ¶ 157. But they offer no further explanation as to *which* specific actions are allegedly arbitrary or capricious or *why*. Instead, Plaintiffs provide no more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at

678. Such allegations "do not suffice" to state a claim. *Id.*

Neither can Plaintiffs support their allegation that DoD exceeded its statutory authority. Plaintiffs allege that DoD's "implementing actions" with respect to § 2808 violate the APA because the underlying emergency does not "require use of the armed forces," Am. Compl. ¶ 159; border barriers are not "military construction," *id.* at ¶ 158; and the use of § 2808 funds is inconsistent with the statutory scheme, *id.* at ¶¶ 160–62. As to the first claim, the President's determination that a national emergency "requires use of the armed forces" is a nonjusticiable political question, and a determination by the Acting Secretary of Defense that specific construction projects would be "necessary to support such use of the armed forces" is vested in the expertise of the Acting Secretary, and both are thus committed to agency discretion by law. *See supra* pp. 40–43. Because such statutory language provides no judicially manageable standards, Plaintiffs cannot plausibly allege that DoD has violated these requirements of § 2808.

Nor can Plaintiffs plausibly allege that Plaintiffs have violated § 2808's other statutory terms. Although "military construction project" is a statutorily defined term, its definition is broad and illustrative, not specific or exclusive. *See* 10 U.S.C. § 2801(b). The term "military construction" is broadly defined to "*include*[] any construction . . . of any kind carried out with respect to a military installation." *Id.* § 2801(a) (emphasis added). A "military installation," in turn, "means a base, camp, post, station, yard, center, *or other activity* under the jurisdiction of the Secretary of a military department." *Id.* § 2801(c)(4) (emphasis added). This broad definition of military construction as "includ[ing]" (but not limited to, *see* 10 U.S.C. § 101(f)(4)) construction with respect to a military installation, and defining a military installation to include non-specified "other activity," does not "foreclose" the inclusion of border barrier construction. *See City of Arlington*, 569 U.S. at 301. In the face of such expansive statutory language, Plaintiffs offer

47

nothing more than the bare allegations that "[t]he vast majority, if not all of the border wall construction that the proclamation would fund occurs on lands that do *not* constitute a military installation" and that "the border wall is not a military construction project."  Am. Compl. ¶ 158. Such allegations are "nothing more than conclusions" unsupported by factual allegations. *Twombly*, 556 U.S. at 679.  They cannot survive a motion to dismiss.  *See id.*

In a final attempt to buttress their claim, Plaintiffs allege that the use of § 2808 for border construction is inconsistent with the broader statutory scheme for the military and immigration codes.  But these allegations are entirely irrelevant to DoD's undertaking pursuant to § 2808. Plaintiffs' cited examples are limited to situations in which DoD is "support[ing]" or "assist[ing]" domestic law enforcement agencies.  Am. Compl. ¶¶ 160–64.  In contrast, a decision by the Acting Secretary of Defense to undertake or authorize barrier construction under § 2808 will be made pursuant to a determination that such construction is "necessary to support such use of the armed forces," not to aid local law enforcement.  There is thus no apparent conflict between § 2808 and Chapter 15 or the immigration code and thus, the only relevant question is whether Plaintiffs have alleged that the predicate requirements of § 2808 are not satisfied.  *See FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 304 (2003); *J.E.M. AG Supply, Inc. v. Pioneer Hi–Bred Int'l, Inc.*, 534 U.S. 124, 143–144 (2001).  Because they have not done so here, Plaintiffs fail to state an APA claim for violation of § 2808.

### 2.   Section 8005

Nor have Plaintiffs stated a claim that Defendants violated the APA by transferring "up to $2.5 billion of appropriated funds into the counterdrug account."  Am. Compl. ¶ 171–74.  Plaintiffs allege that this transfer violated § 8005 of the DoD Act because it is a "case where the item for which funds are requested has been denied by Congress."  *Id.* at ¶ 174 (quoting Pub. L. No. 115-245, § 8005).  But Congress has not "denied" any request by DoD to fund "the item" referenced

in the transfer—namely counter-drug activities funding, including fence construction, under § 284. Plaintiffs mistakenly assume that § 8005 should be interpreted as a legislative judgment concerning the appropriation of funds for a different agency under different statutory authorities. But Congress's affirmative appropriation of $1.375 billion to CBP for the construction of "primary pedestrian fencing" in the Rio Grande Valley Sector in furtherance of CBP's mission under IIRIRA, Pub. L. No. 116-6, div. A, § 230, does not constitute a "denial" of appropriations to DoD for its counter-drug activities in furtherance of DoD's mission under § 284. The statutory language of § 8005 is focused on DoD funding, and nothing in the DHS appropriations act indicates that Congress "denied" a request to fund DoD's statutorily authorized counter-drug activities, which expressly include fence construction. 10 U.S.C. § 284(b)(7). Nor did Congress otherwise restrict the use of available appropriations for that purpose. *See* Pub. L. No. 116-6. When as here, the statute's text is "plain and unambiguous," the Court's inquiry ends. *See Sherley v. Sebelius*, 644 F.3d 388, 400 (D.C. Cir. 2011) (internal citation and quotation omitted). Because Congress never denied DoD funds to undertake the § 284 projects at issue, Plaintiffs' claim should be dismissed.

### 3.   The Consolidated Appropriations Act

Plaintiffs also fail to state a claim under the APA that Defendants' actions violate the CAA. Plaintiffs allege that DoD's use of § 2808 and use, pursuant to § 284, of funds transferred pursuant to § 8005, for border barrier construction violate two sections of the CAA. First, Plaintiffs allege that DoD's actions violate § 230(a) "by exceeding and falling outside of the Act's monetary and geographic limitations, respectively, on border wall funding." Am. Compl. ¶¶ 164, 175. Second, Plaintiffs allege that DoD's actions violate § 739's restriction on the use of appropriated funds for items proposed in the President's budget. *Id.* at ¶¶ 165, 176. Again, Plaintiffs impermissibly ignore "plain and unambiguous" statutory language. *Sherley*, 644 F.3d at 400.

 Section 230(a) of the Department of Homeland Security Appropriations Act, 2019 (part

of the CAA) provides that "[o]f the total amount made available under 'U.S. Customs and Border Protection—Procurement, Construction, and Improvements,'" $1.375 billion "shall be available only," as relevant here, for "the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector." Pub. L. No. 116-6, div. A, § 230(a). By its plain terms, this provision limits the use of funds within a certain CBP appropriation for border barrier construction.[10] But it does no more. Contrary to Plaintiffs' claims, Congress's decision not to appropriate to DHS the full amount of funds requested by the President for fiscal year 2019 border barrier construction does not limit the Acting Secretary of Defense's ability to utilize other available statutory authorities for such construction. "An agency's discretion to spend appropriated funds is cabined only by the text of the appropriation." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012) (quotation omitted). Plaintiffs have identified no restriction in the CAA on the funding of border barrier construction pursuant to other statutory authorities, nor does its plain text include one. *See generally* Pub. L. No. 116-6. Congress did not modify any of the statutes at issue here in the CAA. *See id.* And the CAA's funding provisions do not otherwise alter the meaning or availability of permanent statutes already in effect. *See Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1558 (D.C. Cir. 1984) ("[W]hen appropriations measures arguably conflict with the underlying authorizing legislation, their effect must be construed narrowly."); *see also Building & Const. Trades Dep't., AFL-CIO v. Martin*, 961 F.2d 269, 273–74 (D.C. Cir. 1992).

Had Congress wanted to restrict all other border barrier construction—including construction where other statutory authorities authorized funding—it could have done so by

---

[10] Plaintiffs allege no violation of other provisions in the Act that further restrict the use of funds for border barrier construction. *See* Pub. L. No. 116-6, div. A, § 231 (prohibiting barrier construction in five specific areas in the Rio Grande Valley); *id.* at § 232 (requiring consultation prior to barrier construction using FY 2019 CBP appropriated funds in certain places).

imposing appropriations riders, as it has done in the past, including elsewhere in the very same appropriations act. *See, e.g.*, Pub. L. No. 116-6, div. A, § 219 ("None of the funds made available to the United States Secret Service by this Act or by previous appropriations Acts may be made available for the protection of the head of a Federal agency other than the Secretary of Homeland Security . . . ."). The President made clear prior to the CAA's passage his intention to use alternative statuory sources to fund barrier construction, *see* Am. Compl. ¶¶ 104–07, but Congress nonetheless included no rider forbidding it. At bottom, absent language to the contrary, the grant of a specific appropriation does not restrict the use of other appropriated funds for similar purposes pursuant to other statutory authority.

Nor are DoD's actions prohibited by § 739 of the Financial Services and General Government Appropriations Act, 2019 (another component of the CAA). That provision states:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

Pub. L. No. 116-6, div. D, § 739.

Plaintiffs' allegations rest upon a faulty premise: that any funds used for barrier construction are necessarily adding to a CBP appropriation. That is untrue. Any funds utilized for border barrier construction pursuant to § 2808 or § 284 will be used for the purpose for which they were appropriated—military construction and counter-drug activities, respectively—and consistently with their underlying statutes, not to increase funding for a CBP program, project, or activity as proposed in the President's budget request. The mere fact that appropriations to different agencies can be used for similar purposes does not transform a valid use of one source of appropriated funds into an improper expenditure simply because another agency may request funds

51

for a similar purpose.  Plaintiffs' allegations to the contrary are meritless.  The use of funds at issue here complies with § 739.  Plaintiffs have thus not stated a claim for violation of the CAA.

### B.    Plaintiffs' Ultra Vires Claims Must Be Dismissed.

In the event that the Court agrees that Plaintiffs' statutory claims are unreviewable under the APA, Plaintiffs claim that alleged violations of § 2808, § 8005 transfer authority, and the CAA may be reviewed under a nonstatuory right of action for agency activities that are ultra vires.  As Plaintiffs seem to concede, the Court can only reach the merits of the ultra vires claims if APA review is unavailable.  *See Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43–44 (1991) (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)) (review under an independent ultra vires cause of action is available only where the plaintiff would otherwise be "wholly deprive[d]" of a "meaningful and adequate means of vindicating its statutory rights").

Should the Court apply the ultra vires framework here, Plaintiffs' ultra vires claims fail for the same reason as their APA claims: their allegations do not plausibly allege a violation of the statute.  Indeed, the scope of ultra vires review is narrower than that of APA review.  *See Sears, Roebuck & Co.*, 844 F.3d at 265 ("The scope of non-APA review is narrow.").  Courts review ultra vires claims under a "very stringent standard" and such claims "rarely succeed."  *Nyunt*, 589 F.3d at 449; *see also Trudeau v. FTC*, 456 F.3d 178, 189–90 (D.C. Cir. 2006).  To give rise to such a claim, the agency must "patently . . . misconstru[e]" a statute, "disregard[] a specific and unambiguous statutory directive," or "violate[] some specific command of a statute."  *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988) (internal citations and quotation marks omitted).  Unless an agency has violated a "clear and mandatory" statutory provision, ultra vires review is not warranted.  *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. FSIP*, 437 F.3d 1256, 1263 (D.C. Cir. 2006) (quoting *Leedom*, 358 U.S. at 188).  Mere allegations that the agency improperly exercised its authority are not enough to justify ultra vires review.  *See, e.g., Mittleman v. Postal Regulatory*

*Comm'n,* 757 F.3d 300, 307–08 (D.C. Cir. 2014).   Because the standard to state a claim for ultra vires review is more demanding, for the same reasons that Plaintiffs have failed to state a claim that Defendants exceeded their statutory authority in violation of the APA, *see supra* pp. 46–52, Plaintiffs have not alleged the violation of a clear and mandatory statutory provision.   Plaintiffs' ultra vires claims should be dismissed.

## VI.      Plaintiffs' Constitutional Claims Must Be Dismissed.

Plaintiffs raise constitutional challenges to the Executive and agency actions at issue here. But these counts merely recast Plaintiffs' statutory claims in constitutional terms, and "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton*, 511 U.S. at 473.   The Government is not relying on independent Article II authority in order to undertake border construction; the actions alleged are being undertaken pursuant to statutory authority alone.   The President did not seek to reallocate appropriated funds based upon any claim of inherent constitutional authority.   Nor did the President claim that the declaration of a national emergency gave him any authority that had not been expressly conferred by Congress.   Rather, the Government relies solely upon available statutory authorities that Congress has delegated to the Executive.   The outcome of this case thus turns on whether the statutes authorize the Government's action.   Because disagreements about how to construe statutes do not raise constitutional problems, Counts Seven and Eight should be dismissed.

*Dalton* disposes of Plaintiffs' constitutional claims.   In *Dalton*, the Supreme Court specifically rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471.   The Court instead recognized that the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration." *Id.* at 474.

By asserting that actions that allegedly exceed statutory authority are, for that reason alone, constitutional violations, Plaintiffs' Amended Complaint does precisely what the Court disapproved of in *Dalton*.  Plaintiffs assert no constitutional violation separate from the alleged statutory violations.  They do not allege that the Government's compliance with the statutes at issue would be unconstitutional.  Instead, Plaintiffs assert that Defendants violated the statutes. Plaintiffs' Appropriations Clause claim is predicated on the allegation that "the proclamation and agency implementing actions to identify, transfer, and obligate appropriated funds violate 10 U.S.C. § 2808, DoD FY19 Defense Appropriations Act, and 2019 Consolidated Appropriations Act."  Am. Compl. ¶ 197.  In the same vein, Plaintiffs' Take Care Clause claim turns on the conclusory allegation that the President and agencies did not "faithfully execute" the statutes at issue.  *Id.* ¶ 201.  These bare allegations of ultra vires statutory actions do not state constitutional claims.  *See Dalton*, 511 U.S. at 473–74.

Plaintiffs do not allege that the President has exercised his inherent authority under Article II of the Constitution.  Nor does the President purport to do so.  Despite Plaintiffs' allusions, *see* Am. Compl. ¶ 81, this case stands in sharp contrast to *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), in which the President issued an order directing the Secretary of Commerce to seize the nation's steel mills relying solely upon "the aggregate of his powers under the Constitution," thereby conceding a lack of statutory authority.  *Id.* at 585–87.  The Court held the action unconstitutional.  *Id.* at 589.  In concurrence, Justice Jackson emphasized that the President had acted in the absence of congressional authorization, where his "power is at its lowest ebb" and such exercise of power must be "scrutinized with caution."  *Id.* at 637–38 (Jackson, J. concurring). To the contrary, here the President and his agents are acting "pursuant to an express . . . authorization of Congress," the situation in which "his authority is at its maximum."  *Id.* at 635

(Jackson, J. concurring).  *Youngstown* is therefore inapposite.  *See AFL-CIO v. Kahn*, 618 F.2d

784, 787 (D.C. Cir. 1979) (en banc); *see also Dalton*, 511 U.S. at 473.

If Plaintiffs' allegations were found to rise to the level of constitutional issues, then *every*

allegation that the President or his agents exceeded their statutory authority in some way could be

repleaded as a constitutional separation-of-powers claim.  The Supreme Court has foreclosed such

tactics, recognizing their inconsistency with well-established precedent "distinguish[ing] between

claims of constitutional violations and claims that an official has acted in excess of his statutory

authority."  *Dalton*, 511 U.S. at 472.  Because where "the President concedes . . . that the only

source of his authority is statutory, no constitutional question whatever is raised," this Court should

dismiss all constitutional counts.  *Id.* at 474 n.6 (internal quotation marks omitted).

## CONCLUSION

For these reasons, Plaintiffs' Amended Complaint should be dismissed in full pursuant to

Rules 12(b)(1) and 12(b)(6).[11]

Dated:  May 10, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

---

[11] This judicial district does not provide a procedure to notice a motion on the Court's calendar for a hearing; however, upon the completion of briefing, Defendants stand ready to appear for argument at the Court's earliest convenience.

*/s/ Andrew I. Warden*
ANDREW I. WARDEN (IN Bar No. 23840-49)
Senior Trial Counsel, Federal Programs Branch

*/s/ Leslie Cooper Vigen*
LESLIE COOPER VIGEN (D.C. Bar No. 1019782)
KATHRYN C. DAVIS
MICHAEL J. GIRARDI
RACHAEL L. WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 305-0727
Fax: (202) 616-8470
Email: Leslie.Vigen@usdoj.gov

*Counsel for Defendants*

EXHIBIT 1

DECLARATION OF KENNETH P. RAPUANO

I, KENNETH P. RAPUANO, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Assistant Secretary of Defense for Homeland Defense and Global Security (ASD(HD&GS)). Among other duties, which are generally reflected in Department of Defense (DoD) Directive 5111.13, I am responsible for developing, coordinating, and overseeing implementation of DoD policy for plans and activities related to defense support of civil authorities. On April 5, 2018, the Secretary of Defense designated the ASD(HD&GS) to manage the then-newly established DoD Border Security Support Cell. The DoD Border Security Support Cell is the focal point and integrator for all requests for assistance, taskings, and information related to DoD support pursuant to the President's April 4, 2018, memo, "Securing the Southern Border of the United States."

2. This declaration is based on my own personal knowledge and information made available to me in the course of my official duties.

## 10 U.S.C. § 284

3. On February 25, 2019, the Department of Homeland Security (DHS) submitted a request to DoD for assistance in blocking up to 11 specific drug-smuggling corridors along certain portions of the southern border of the United States, pursuant to 10 U.S.C. § 284. The request sought assistance through the replacement of existing vehicle barricades or dilapidated pedestrian fencing with new pedestrian fencing, the construction of new patrol roads and the improvement of existing patrol roads, and the installation of lighting on Federal land. *See* Exhibit A.

4. On March 25, 2019, the Acting Secretary of Defense approved three projects to block drug-smuggling corridors based on this February 25, 2019, DHS request. *See* Exhibit B. Two projects are located in Arizona, and one project is located in New Mexico. The approved projects were identified as: Yuma Sector Project 1 (maximum of 5 miles/18-foot fence); Yuma Sector Project 2 (maximum of 6 miles/18-foot fence); and El Paso Sector Project 1 (maximum of 46 miles/18-foot fence).

5. Also on March 25, 2019, the Acting Secretary of Defense decided to use DoD's general transfer authority under section 8005 of the Department of Defense Appropriations Act, 2019, and section 1001 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 to transfer funds between DoD appropriations to fund the approved projects. Specifically, he determined that the above projects he approved for DHS will be funded through a transfer of $1 billion to the counter-narcotics support line of the Drug Interdiction and Counter-Drug Activities, Defense, account from fiscal year 2019 Army military personnel accounts that were excess to current military personnel requirements. *See* Exhibit C. Army personnel funds were available for transfer because expenditures for service member pay and compensation, retirement benefits, food, and moving expenses through the end of fiscal year 2019 will be lower than originally budgeted. Congress was notified of this transfer on March 25, 2019. *See* Exhibit D.

6. On March 26, 2019, the designated $1 billion was transferred from the Drug Interdiction and Counter-Drug Activities, Defense, account to the Operation and Maintenance, Army, account for use by the U.S. Army Corps of Engineers to undertake fence and road construction and lighting installation for the approved projects. Of the $1 billion, $2.5 million is for U.S. Army Corps of Engineers planning and surveys of the areas where border barriers will be constructed under section 284.

7. On March 29, 2019, DHS requested that DoD modify certain technical specifications for the three projects approved on March 25, 2019. Specifically, DHS requested that all fencing constructed by DoD include a 5-foot anti-climb steel plate and that DoD construct 30-foot fencing for Yuma Sector Project 1 and El Paso Sector Project 1. The fence for Yuma Sector Project 2 will remain 18 feet. *See* Exhibit E. The Acting Secretary of Defense approved this modification on April 9, 2019. *See* Exhibit F.

8. On April 9, 2019, DoD announced that the U.S. Army Corps of Engineers had awarded contracts to SLSCO Ltd. of Galveston, Texas ($789 million) to perform work in support of El Paso Sector Project 1, and to Barnard Construction Co. Inc. of Bozeman, Montana ($187 million), to perform work to support the Yuma Sector projects.

9. On April 12, 2019, DHS determined that it has sufficient appropriated funding to address approximately four (4) of the six (6) miles identified for Yuma Project 2. Based on the availability of this appropriated funding, DHS modified its request by removing 4 miles from the Yuma Project 2 requirements for DoD. *See* Exhibit G. On April 18, 2019, I approved this modification, which permitted funding additional miles of 30-foot bollard fencing, roads, and lighting in the El Paso Sector 1 project. *See* Exhibit H.

. 10. The U.S. Army Corps of Engineers currently plans that construction of the approved section 284 projects will begin no earlier than May 25, 2019.

11. As part of the DoD Comptroller's review of available funding, additional funds may be identified that are excess to need or are otherwise appropriate to use for additional section 284 projects. In that case, DoD could approve the transfer of up to an additional $1.5 billion to the counter-narcotics support line of the Drug Interdiction and Counter-Drug Activities, Defense, account. Decisions by the Acting Secretary of Defense regarding future transfer of funds and approval of additional DHS-requested projects under § 284 are expected in May 2019.

12. DoD will not use any DoD counter-narcotics funding for the drug-demand-reduction program, the National Guard counter-drug program, or the National Guard counter-drug schools program to provide support to DHS under 10 U.S.C. § 284(b)(7).

## <u>10 U.S.C. § 2808</u>

13. On February 15, 2019, the President of the United States, in accordance with the National Emergencies Act, 50 U.S.C. §§ 1601-1651, declared that a national emergency exists at the southern border of the United States. In accordance with that declaration, the President invoked

10 U.S.C. § 12302 and made that statutory authority available, according to its terms, to the Secretaries of the military departments concerned, subject to the direction of the Secretary of Defense in the case of the Secretaries of the Army, Navy, and Air Force. To provide additional authority to DoD in support of the Federal Government's response to the national emergency at the southern border, the President also declared that this emergency requires use of the armed forces and, in accordance with section 301 of the National Emergencies Act (50 U.S.C. § 1631), that the construction authority provided in 10 U.S.C. § 2808 is made available, according to its terms, to the Secretary of Defense and, at the discretion of the Secretary of Defense, to the Secretaries of the military departments.

14.   Under section 2808, whenever the President declares a national emergency "that requires use of the armed forces," the Secretary of Defense may undertake or authorize military construction projects "not otherwise authorized by law that are necessary to support such use of the armed forces" 10 U.S.C. § 2808(a).  The Acting Secretary of Defense has not yet decided to undertake or authorize any barrier construction projects under section 2808.  To inform the Acting Secretary's decision, on March 20, 2019, the Secretary of Homeland Security provided a prioritized list of proposed border-barrier-construction projects that DHS assesses would improve the efficiency and effectiveness of the armed forces supporting DHS in securing the southern border.  On April 11, 2019, as a follow-up to the Chairman's preliminary assessment of February 10, 2019, the Acting Secretary instructed the Chairman of the Joint Chiefs of Staff to provide, by May 10, 2019, a detailed assessment of whether and how specific military construction projects could support the use of the armed forces in addressing the national emergency at the southern border.

15.   Also on April 11, 2019, the Acting Secretary instructed the DoD Comptroller, in consultation with the Secretaries of the military departments, the Chairman of the Joint Chiefs of Staff, the Under Secretary of Defense for Acquisition and Sustainment, the Under Secretary of Defense for Policy, and the heads of any other relevant DoD components to identify, by May 10, 2019, existing military construction projects of sufficient value to provide up to $3.6 billion of funding for his consideration.  When evaluating the potential funding sources for potential section 2808 construction projects, the Comptroller was instructed not to consider family housing, barracks, or dormitory projects; projects that have already been awarded; or projects that have fiscal year 2019 award dates.

***

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on:  April 25, 2019

_____
KENNETH P. RAPUANO

3

# EXHIBIT A



*Executive Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

February 25, 2019

MEMORANDUM FOR:    CAPT Hallock N. Mohler Jr.
                                Executive Secretary
                                Department of Defense (DoD)

FROM:                       Christina Bobb
                                Executive Secretary
                                Department of Homeland Security (DHS)

SUBJECT:                Request for Assistance Pursuant to 10 U.S.C. § 284

## I. Overview

As the government department tasked with border security, the Department of Homeland Security (DHS), through U.S. Customs and Border Protection (CBP), is requesting that the Department of Defense assist DHS in its efforts to secure the southern border. The Secretary has directed me to transmit this request for assistance to your attention. This memorandum supersedes the February 22, 2019 version.

In Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended (IIRIRA), 8 U.S.C. § 1103 note, Congress has directed DHS to construct border infrastructure in areas of high illegal entry to deter illegal crossing of both drugs and people into the United States. Pursuant to Section 102, DHS has identified the areas set forth in Section II below as areas of high illegal entry where CBP must take action (the Project Areas).

Within the Project Areas, DHS is experiencing large numbers of individuals and narcotics being smuggled into the country illegally. The Project Areas are also used by individuals, groups, and transnational criminal organizations as drug smuggling corridors. Mexican Cartels continue to remain dominant in these areas, influencing and controlling narcotics and human smuggling operations, within their respective strongholds.

DHS must use its authority under Section 102 of IIRIRA to install additional physical barriers and roads in the vicinity of the United States border in order to deter and prevent illegal crossings within the Project Areas. The construction of border infrastructure within the Project Areas will support DHS's ability to impede and deny illegal entry and drug smuggling activities within the Project Areas.

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 2

The Project Areas identified are adjacent to some of the most densely populated metropolitan areas of Mexico and are also home to some of the strongest and most violent drug cartels in the world. Deterring and preventing illegal cross-border activity will help stem the flow of illegal narcotics and entries in these areas. Similarly, the improved ability to impede, deny, and be mobile within the Project Areas creates a safer operational environment for law enforcement.

To support DHS's action under Section 102 of IIRIRA, DHS is requesting that DoD, pursuant to its authority under 10 U.S.C. § 284(b)(7), assist with the construction of fences roads, and lighting within the Project Areas to block drug-smuggling corridors across the international boundary between the United States and Mexico.

## II. Capabilities Requested

Within the Project Areas there is existing vehicle fence and dilapidated pedestrian fencing. Vehicle fencing is intended to stop vehicles from illegally entering the United States, but can be climbed over or under by individuals. Pedestrian fencing is intended to prevent and deter individuals and vehicles from illegally crossing into the United States.

DHS requests that DoD assist in the execution of projects, within the Project Areas set forth below, to: (1) replace existing vehicle barriers or dilapidated pedestrian fencing with new pedestrian fencing; (2) construct roads; and (3) install lighting.

The new pedestrian fencing includes a Linear Ground Detection System, which is intended to, among other functions, alert Border Patrol agents when individuals attempt to damage, destroy or otherwise harm the barrier. The road construction includes the construction of new roads and the improvement of existing roads. The lighting that is requested has an imbedded camera that works in conjunction with the pedestrian fence. The lighting must be supported by grid power.

The segments of fence within the Project Areas identified below are situated on federal property. DHS will be responsible for securing, to the extent required, any other real estate interest or instrument that is required for project execution. In the event a real estate interest or instrument that is needed for project execution cannot be obtained for a segment of fence within a Project Area in a time frame that is within the requirements of this request for assistance, the segment may be withdrawn from this request. In addition, DHS will be responsible for any applicable environmental planning and compliance to include stakeholder outreach and consultation associated with the projects.

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 3

**Project Areas:**

**II.A.  El Centro Sector**

Within the United States Border Patrol El Centro Sector (El Centro Sector) DHS is requesting that DoD assist by undertaking road construction, by replacing approximately 15 miles of existing vehicle barrier with new pedestrian fencing, and by installing lighting in the specific locations identified below.

The specific Project Area identified below is located in Imperial County, California and has been identified by the Office of National Drug Control Policy (ONDCP) as a High Intensity Drug Trafficking Area (HIDTA).  Multiple local transnational criminal organizations known for smuggling drugs into Calexico from Mexico using a variety of tactics, techniques, procedures, and varying concealment methods operate in this area, including *Cartel De Jalisco Nueva Generacion* (CJNG) as well as remnants of the *Beltran Leyva* Organization and *La Familia Michoacana* organizations.  CJNG, based in Jalisco, was previously a faction of the *Sinaloa* Cartel. CJNG broke away from the *Sinaloa* Cartel and has become an established Mexican Cartel.  The Mexican government has declared CJNG as one of the most dangerous cartels in the country.

Due to the close proximity of urban areas on both sides of the border, the El Centro Sector suffers from some of the quickest vanishing times – that is, the time it takes to illegally cross into the United States and assimilate into local, legitimate traffic.  These quick vanishing times enable the illegal activities of transnational criminal organizations, whether they are smuggling people or narcotics.

Border Patrol's own experience with apprehensions between border crossings bears this out.  In fiscal year 2018, there were over 29,000 apprehensions of illegal entrants attempting to enter the United States between border crossings in the El Centro Sector.  Also in fiscal year 2018, Border Patrol had approximately 200 separate drug-related events between border crossings in the El Centro Sector, through which it seized over 620 pounds of marijuana, over 165 pounds of cocaine, over 56 pounds of heroin, and over 1,600 pounds of methamphetamine.

The specific Project Area is as follows:

- *El Centro Project 1:*

    o  The project begins approximately 10 miles west of the Calexico Port of Entry continuing west 15.25 miles in Imperial County.
    o  Start coordinate: 32.63273, -115.922787; End coordinate: 32.652563, -115.662399

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 4

## II.B.  Yuma Sector

Within the United States Border Patrol Yuma Sector (Yuma Sector) DHS is requesting that DoD assist by undertaking road construction, by replacing approximately 36 miles of existing vehicle barrier and approximately 6 miles of dilapidated pedestrian fencing with new pedestrian fencing, and by installing lighting in the specific locations identified below.  The specific areas identified below are located in Yuma County, Arizona.

Yuma County has been identified by the ONDCP as a HIDTA.  Of particular note is the operation of the *Sinaloa* Cartel in this area.  The *Sinaloa* Cartel continues to be the most powerful cartel in the country and controls illicit networks and operations in the United States. Despite the arrest of Joaquin "El Chapo" Guzman-Loera, its narcotics business has continued uninterrupted.  As a result, there have been no significant changes within the *Sinaloa* Cartel's hierarchy, or any changes in the illicit operations conducted by the *Sinaloa* Cartel.

Border Patrol's own experience with apprehensions between border crossings bears this out.  In fiscal year 2018, there were over 26,000 apprehensions of illegal entrants attempting to enter the United States between border crossings in the Yuma Sector. Also during fiscal year 2018, Border Patrol had over 1,400 separate drug-related events between border crossings in the Yuma Sector, through which it seized over 8,000 pounds of marijuana, over 78 pounds of cocaine, over 102 pounds of heroin, over 1,700 pounds of methamphetamine, and over 6 pounds of fentanyl.

The replacement of ineffective pedestrian fencing in this area is necessary because the older, wire mesh design is easily breached and has been damaged to the extent that it is ineffective.  Additionally, this area is notorious for border violence and narcotics smuggling.  Furthermore, while the deployment of vehicle barrier in the Yuma Sector initially curtailed the volume of illegal cross-border vehicular traffic, transnational criminal organizations quickly adapted their tactics switching to foot traffic, cutting the barrier, or simply driving over it to smuggle their illicit cargo into the United States. Thus, in order to respond to these changes in tactics, DHS now requires pedestrian fencing.

The specific Project Areas are as follows:

- *Yuma Project 1:*

  o The project begins approximately 1 mile southeast of the Andrade Port of Entry continuing along the Colorado River for approximately 5 miles in Yuma County.
  o Start coordinate: 32.704197, -114.726013; End coordinate: 32.642102, -114.764632)

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 5

- *Yuma Project 2:*

  o  The project involves the replacement of two segments of primary
     pedestrian fencing in Yuma Sector for a total of approximately 6 miles.
     This includes approximately 2 miles of fencing along the Colorado River.
  o  Start coordinate: 32.37755528, -114.4268201; End coordinate:
     32.3579244, -114.3623999;
  o  The project also includes replacement of primary pedestrian fencing
     approximately 17 miles east of the San Luis Port of Entry, on the
     Barry M Goldwater Range, continuing east for approximately 4 miles.
  o  Start coordinate: 32.51419938, -114.8011175; End coordinate:
     32.49350559, -114.8116619

- *Yuma Project 3:*

  o  The project begins approximately 0.4 miles east of the
     Barry M. Goldwater Range continuing approximately 31 miles east
     through the Cabeza Prieta National Wildlife Refuge in Yuma County.
  o  Start coordinate: 32.232935, -113.955211; End coordinate: 32.039033,
     -113.33411

### III.C.  Tucson Sector

Within the United States Border Patrol Tucson Sector (Tucson Sector) DHS is requesting
that DoD assist by undertaking road construction, by replacing approximately 86 miles of
existing vehicle barrier with new pedestrian fencing, and by installing lighting in the
specific locations identified below.  The specific areas identified below are located in
Pima, Cochise, and Santa Cruz Counties, Arizona.

Pima, Cochise and Santa Cruz Counties have been identified by the ONDCP as a
HIDTA.  The *Sinaloa* Cartel relies on their local associates to coordinate, direct, and
support the smuggling of illegal drugs and aliens from Mexico to the United States.
Since Arizona is contiguous with the U.S.-Mexico International Boundary, the Tucson
and Phoenix metropolitan areas are major trans-shipment and distribution points for
contraband smuggling. Plaza bosses operate as a *Sinaloa* Cartel leader within their
specific area of operation along the Sonora-Arizona corridor of the U.S.-Mexico
International Boundary.

Border Patrol's own experience with apprehensions between border crossings bears this
out.  In fiscal year 2018, there were over 52,000 apprehensions of illegal entrants
attempting enter the United States between the border crossings in the Tucson Sector.
Also in fiscal year 2018 Border Patrol had over 1,900 separate drug-related events
between border crossings in the Tucson Sector, through which it seized over 1,600
pounds of marijuana, over 52 pounds of cocaine, over 48 pounds of heroin, over 902
pounds of methamphetamine, and over 11 pounds of fentanyl.

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 6

In addition, the absence of adequate pedestrian fencing, either due to the presence of vehicle barrier only or ineffective pedestrian designs, in the Tucson sector continues to be particularly problematic as it pertains to the trafficking of illegal narcotics. Rival transnational criminal organizations frequently employ "rip crews" who leverage the remote desert environment and lack of infrastructure to steal one another's illicit cargo resulting in increased border violence.

The terrain also provides high ground to scouts seeking to protect and warn smuggling loads being passed through the area. Transnational criminal organizations have successfully utilized this advantage in furtherance of their illicit activity and for this reason the area is in need of an improved capability to impede and deny illegal crossings or people and narcotics. In addition, the area hosts a number of tourist attractions that allow illegal activity to blend into legitimate activity; avoiding detection and evading interdiction.

The specific Project Areas are as follows:

- *Tucson Project 1:*
  - o The project includes replacement of two segments of vehicle barriers. The first segment begins approximately 2 miles west of the Lukeville Port of Entry continuing west approximately 30 miles.
  - o Start coordinate: 32.038278, -113.331716; End coordinate: 31.890032, -112.850162
  - o The second segment project begins approximately 3 miles east of the Lukeville Port of Entry and continues east approximately 8 miles in Pima County, Arizona.
  - o Start coordinate: 31.8648, -112.76757; End coordinate: 31.823911, -112.634298

- *Tucson Project 2:*
  - o The project includes approximately 5 miles of primary pedestrian fence replacement around the Lukeville Port of Entry extending from approximately 2 miles west of the port to approximately 3 miles east of the port.
  - o Start coordinate: 31.88999921, -112.850162; End coordinate: 31.8648, -112.76757

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 7

- *Tucson Project 3*:

    o   The project includes three segments of vehicle barrier replacement
        beginning approximately 18 miles west of the Naco Port of Entry and
        continuing to approximately 25 miles east of the Douglas Port of Entry (or
        approximately 5 miles west of the Arizona/New Mexico state line) for
        approximately 20 miles of non-contiguous vehicle barrier replacement in
        Cochise County, Arizona.
    o   Start coordinate: 31.333754, -110.253863; End coordinate: 31.333767,
        -110.250286;
    o   Start coordinate: 31.334154, -110.152548; End coordinate: 31.334137,
        -110.147464;
    o   Start coordinate: 31.333995, -109.453305; End coordinate: 31.332759,
        -109.129344

- *Tucson Project 4:*

    o   The project begins approximately 9 miles east of the Nogales Port of Entry
        and continues eastward for approximately 30 miles with approximately 26
        miles of non-contiguous vehicle barrier replacement in Santa Cruz and
        Cochise Counties, Arizona.
    o   Start coordinate: 31.333578, -110.79579; End coordinate: 31.333511,
        -110.775333;
    o   start coordinate:  31.33328, -110.70545; End coordinate: 31.333602,
        -110.288665)
    o   Note: An additional approximately 0.3 miles of new pedestrian fence
        could be built between the existing segmented vehicle barrier locations to
        fill existing gaps if appropriate real estate interest can be verified

- *Tucson Project 5:*

    o   The project includes approximately 2 miles of vehicle barrier replacement
        beginning approximately 4.5 miles east of the Sasabe Port of Entry
        continuing east in six non-continuous segments for approximately 15
        miles in Pima and Santa Cruz Counties, Arizona.
    o   Start Coordinate: 31.460175, -111.473171; End Coordinate: 31.459673,
        -111.471584;
    o   Start Coordinate: 31.453091, -111.450959; End Coordinate: 31.449633,
        -111.440132;
    o   Start Coordinate: 31.440683, -111.412054; End Coordinate: 31.437351,
        -111.40168;
    o   Start Coordinate: 31.423471, -111.358336; End Coordinate: 31.422541,
        -111.355444;
    o   Start Coordinate: 31.42221, -111.354379; End Coordinate: 31.421321,
        -111.351608;

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 8

   o Start Coordinate: 31.386813, -111.243966; End Coordinate: 31.385462, -111.239759)

## II.D.  El Paso Sector

Within the United States Border Patrol El Paso (El Paso Sector) DHS is requesting that DoD assist by undertaking road construction, by replacing approximately 70 miles of existing vehicle barrier with new pedestrian fencing, and by installing lighting in the specific locations identified below.  The specific areas identified below are located in Luna, Hidalgo and Doña Ana Counties, New Mexico.  Luna, Hidalgo and Doña Ana Counties have been identified by the ONDCP as a HIDTA.

There are three specific transnational criminal organizations of interest operating in the El Paso Sector - the *Sinaloa* Cartel as well as remnants of the *Juarez* Cartel and the *Beltran Leyva* Organization.  In the El Paso Sector the *Sinaloa* Cartel employs a variety of tactics, techniques and procedures depending upon the terrain and environment to move drugs across the border.  While the *Sinaloa* Cartel has a strong presence and control of territories at the flanks of the Sector, it does not have full control of the territory throughout the El Paso Sector.  The *Juarez* Cartel, traditionally a major trafficker of marijuana and cocaine, has become an active member in opium cultivation and heroin production.

Border Patrol's own experience with apprehensions between border crossings bears this out.  In fiscal year 2018, there were over 31,000 apprehensions of illegal entrants attempting to enter the United States between border crossings in the El Paso Sector.  Also in fiscal year 2018, Border Patrol had over 700 separate drug-related events between border crossings in the El Paso Sector, through which it seized over 15,000 pounds of marijuana, over 342 pounds of cocaine, over 40 pounds of heroin, and over 200 pounds of methamphetamine.

Although the deployment of vehicle barrier in the El Paso Sector initially curtailed the volume of illegal cross-border vehicular traffic, transnational criminal organizations quickly adapted their tactics switching to foot traffic, cutting the barrier, or simply driving over it to smuggle their illicit cargo into the United States.

Thus, in order to respond to these changes in tactics, CBP now requires pedestrian fencing.  Successfully impeding and denying illegal activities or transnational criminal organizations in this area is further complicated by the close proximity of New Mexico Highway 9 to the border.  In some cases the highway is less than a half a mile, allowing illegal cross-border traffic to evade detection and apprehension and quickly vanish from the border area.

Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 9

The specific Project Areas are as follows:

- *El Paso Project 1:*
  - o The project includes 46 miles of vehicle barrier replacement beginning approximately 17.5 miles west of the Columbus Port of Entry continuing east in non-contiguous segments to approximately 35 miles east of the Columbus Port of Entry within the Luna and Doña Ana Counties, New Mexico.
  - o Start Coordinate: 31.7837, -107.923151; End Coordinate: 31.783689, -107.679049;
  - o Start Coordinate: 31.783672, -107.573919; End Coordinate: 31.783741, -107.038154

- *El Paso Project 2:*
  - o The project includes 23.51 miles of Vehicle Barrier replacement in non-contiguous segments within Hidalgo and Luna Counties, New Mexico. The first segment begin approximately 5.1 miles east of the New Mexico/Arizona Border continuing east 4.55 miles.
  - o Start Coordinate: 31.332323, -108.962631; End Coordinate: 31.332292, -108.885946;
  - o The second segment begins approximately 3 miles west of the Antelope Wells Port of Entry to 3 miles east of the port of entry for 6.12 miles of Vehicle Barrier replacement.
  - o Start Coordinate: 31.333368, -108.582412; End Coordinate: 31.333407, -108.47926;
  - o The third segment begins approximately 20 miles west of the Columbus Port of Entry extending west 12.84 miles.
  - o Start Coordinate: 31.783722, -108.182442; End Coordinate: 31.783708, -107.963193;

## III. Technical Specifications

As set forth above, DHS requires road construction, installation of lighting, and the replacement of existing vehicle barrier or dilapidated pedestrian fencing with new pedestrian fencing within the Project Areas. DHS will provide DoD with more precise technical specifications as contract and project planning moves forward.

Given DHS's experience and technical expertise, DHS plans to coordinate closely with DoD throughout project planning and execution, to include review and approval of design specifications, barrier alignment and location, and other aspects of project planning and execution.

Subject:  Request for Assistance Pursuant to 10 U.S.C. § 284
Page 10

## IV.  Sequencing

The DHS request for assistance includes approximately 218 miles in which DHS requires road construction, the installation of lighting, and the replacement of existing vehicle fencing or dilapidated pedestrian fencing with new pedestrian fencing within the Project Areas.  DHS requests that DoD's support under 10 U.S.C. § 284 address the requirements in order of priority as DoD resources allow.  The DHS order of priority is as follows:

1.  Yuma Sector Project 1
2.  Yuma Sector Project 2
3.  El Paso Sector Project 1
4.  El Centro Sector Project 1
5.  Tucson Sector Project 1
6.  Tucson Sector Project 2
7.  Tucson Sector Project 3
8.  Tucson Sector Project 4
9.  Yuma Sector Project 3
10. El Paso Sector Project 2
11. Tucson Sector Project 5

## V.  Funding

DHS requests that DoD provide the above-referenced border fences, roads, and lighting on a non-reimbursable basis as support to block drug smuggling corridors.

DHS will accept custody of the completed infrastructure and account for that infrastructure in its real property records.

DHS will operate and maintain the completed infrastructure.

## VI.  Conclusion

DHS requests DoD assistance under 10 U.S.C. § 284 to construct fences, roads, and to install lighting in order to block drug smuggling corridors in the Project Areas set forth above.  The Projects Areas set forth above are also areas of high illegal entry under IIRIRA § 102(a), and the requested fences, roads, and lighting will assist in deterring illegal crossings in the Project Areas.

# EXHIBIT B



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

**MAR 2 5 2019**

The Honorable Kirstjen Nielsen
Secretary of Homeland Security
Washington, DC  20528

Dear Madam Secretary:

Thank you for your February 25, 2019 request that the Department of Defense provide support to your Department's effort to secure the southern border by blocking up to 11 drug-smuggling corridors along the border through the construction of roads and fences and the installation of lighting.

10 U.S.C. § 284(b)(7) gives the Department of Defense the authority to construct roads and fences and to install lighting to block drug-smuggling corridors across international boundaries of the United States in support of counter-narcotic activities of Federal law enforcement agencies.  For the following reasons, I have concluded that the support you request satisfies the statutory requirements:

- The Department of Homeland Security (DHS)/Customs and Border Protection (CBP) is a Federal law enforcement agency;

- DHS has identified each project area as a drug-smuggling corridor; and

- The work requested by DHS to block these identified drug smuggling corridors involves construction of fences (including a linear ground detection system), construction of roads, and installation of lighting (supported by grid power and including imbedded cameras).

Accordingly, at this time, I have decided to undertake Yuma Sector Projects 1 and 2 and El Paso Sector Project 1 by constructing 57 miles of 18-foot-high pedestrian fencing, constructing and improving roads, and installing lighting as described in your February 25, 2019 request.

As the proponent of the requested action, CBP will serve as the lead agency for environmental compliance and will be responsible for providing all necessary access to land.  I request that DHS place the highest priority on completing these actions for the projects identified above.  DHS will accept custody of the completed infrastructure, account for that infrastructure in its real property records, and operate and maintain the completed infrastructure.

The Commander, U.S. Army Corps of Engineers, is authorized to coordinate directly with DHS/CBP and immediately begin planning and executing up to $1B in support to DHS/CBP by undertaking the projects identified above.

Additional support may be available in the future, subject to the availability of funds and other factors.

Patrick M. Shanahan
Acting

# EXHIBIT C



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

**MAR 2 5 2019**

MEMORANDUM FOR UNDER SECRETARY OF DEFENSE (COMPTROLLER)/CHIEF
FINANCIAL OFFICER

SUBJECT:   Funding Construction in Support of the Department of Homeland Security Pursuant
to 10 U.S.C. § 284

On February 25, 2019 the Secretary of Homeland Security requested that the DoD
provide support to the Department of Homeland Security's (DHS) effort to secure the southern
border by blocking up to 11 drug-smuggling corridors along the border through the construction
of roads and fences and the installation of lighting. I have determined that the requirements of
title 10, U.S.C., section 284, have been satisfied. Accordingly, I have approved DoD support for
Yuma Sector Projects 1 and 2 and El Paso Sector Project 1 (DHS Priority Projects 1, 2, and 3)
and have authorized up to $1B in funding for the construction of 18-foot high pedestrian fencing,
the construction and improvement of roads, and the installation of lighting to block drug-
smuggling corridors along the southern border.

I have also decided that the Department will reprogram funds to provide the support
described above. This support will be funded through a transfer of $1B of FY 2019 Army
military personnel appropriations into the "Drug Interdiction and Counter-Drug Activities,
Defense" appropriation. I am advised that this amount is excess to the Army's current
programmatic needs with respect to military personnel. You should undertake a reprogramming
action to effectuate such transfer, as authorized by law.

The reprogramming action that I am directing satisfies the statutory requirements. I have
determined that a transfer of funds and authorizations of appropriations for the construction of
fences and roads and the installation of lighting to block drug-smuggling corridors is in the
national interest. In an April 4, 2018 memorandum, "Securing the Southern Border of the United
States," the President directed DoD to assist DHS in stopping the flow of illegal drugs into the
United States. The reprogramming action is necessary to advance that goal. I have also
determined that the other requirements of Section 8005 of the DoD Appropriations Act, 2019,
and Section 1001 of the John S. McCain National Defense Authorization Act for FY 2019 are
met as set forth below:

- The items to be funded (Yuma Sector Projects 1 and 2 and El Paso Sector Project 1)
are a higher priority than the item for which funds and authority are transferred (excess
Army military personnel funds) because Yuma Sector Projects 1 and 2 and El Paso
Sector Project 1 are necessary in the national interest to prevent the flow of drugs into the
United States and the Army military personnel funds are excess to need due to under-
execution and lower-than-expected end-strength.

- Support to law enforcement under Section 284 for the construction of fences and
roads and the installation of lighting to block drug-smuggling corridors is a military
requirement assigned by statute. The need to provide support for Yuma Sector Projects 1

and 2 and El Paso Sector Project 1 was an unforeseen military requirement not known at the time of the FY 2019 budget request.

- Support under Section 284 for construction of roads and fences and the installation of lighting, including for Yuma Sector Projects 1 and 2 and El Paso Sector Project 1, has not been denied by Congress.

The funds that will be used for this project are excess to the need for which they were appropriated, and therefore, the use of such funds will not have a negative impact on joint force readiness. As such, I have determined that providing the requested support for Yuma Sector Projects 1 and 2 and El Paso Sector Project 1 will not adversely affect the military preparedness of the United States.

This $1B in funds will be allocated to the Department of the Army with instructions to allocate it further to the U.S. Army Corps of Engineers to undertake fence and road construction and lighting installation for the approved project.

No funds may be transferred or re-programmed from the drug-demand-reduction program, the National Guard counter-drug program, or the National Guard counter-drug schools program in order to fund subsection 284(b)(7) support to DHS.

You will comply with all statutory requirements, but will do so without regard to comity-based DoD policies that prescribe prior approval from congressional committees.

My point of contact is Kenneth Rapuano, Assistant Secretary of Defense for Homeland Defense and Global Security.

Patrick M. Shanahan
Acting

cc:
Secretary of the Army
Chairman of the Joint Chiefs of Staff
Under Secretary of Defense for Policy
General Counsel of the Department of Defense
Assistant Secretary of Defense for Legislative Affairs
Assistant to the Secretary of Defense for Public Affairs
Commander, U.S. Army Corps of Engineers

2

# EXHIBIT D



OFFICE OF THE UNDER SECRETARY OF DEFENSE
1100 DEFENSE PENTAGON
WASHINGTON, DC  20301-1100

COMPTROLLER
(Program/Budget)

MAR 2 5 2019

Mr. Mark Sandy
Deputy Associate Director,
    National Security Division
Office of Management and Budget
Washington, DC  20503

Dear Mr. Sandy:

Enclosed is a Reprogramming Action for the Department's Support for the Department of
Homeland Security (DHS) Counter-Drug Activity.

Pursuant to section 8005 of division A of Public Law 115-245, the Department of Defense
(DoD) Appropriations Act, 2019; and section 1001 of Public Law 115-232, the John S, McCain
National Defense Authorization Act for Fiscal Year (FY) 2019; as delegated, the Deputy Under
Secretary of Defense (Comptroller) has determined that it is in the national interest to effect a
transfer of funds between appropriations of the Department of Defense, as depicted on the enclosed
reprogramming action.

Upon your approval, the reprogramming action will be forwarded to the congressional
committees.

Sincerely,

Anne J. McAndrew
DoD Deputy Comptroller (Program/Budget)

Enclosure:
As stated

Under the authority vested in the Office of Management and Budget by section 8005 of
division A of Public Law 115-245, the DoD Appropriations Act, 2019, the transfers in the enclosed
reprogramming action for Support for the DHS Counter-Drug Activity are approved and can be
transmitted to the congressional committees.

OMB Approval: _____   Date: 3/25/2019



*Unclassified*                **REPROGRAMMING ACTION**                Page 1 of 3

| Subject: Support for DHS Counter-Drug Activity Reprogramming Action | | | | | | DoD Serial Number: FY 19-01 RA | |
|---|---|---|---|---|---|---|---|
| Appropriation Title: Various Appropriations | | | | | | Includes Transfer? Yes | |
| Component Serial Number: | | *(Amounts in Thousands of Dollars)* | | | | | |
| | Program Base Reflecting Congressional Action | | Program Previously Approved by Sec Def | | Reprogramming Action | | Revised Program | |
| Line Item | Quantity | Amount | Quantity | Amount | Quantity | Amount | Quantity | Amount |
| a | b | c | d | e | f | g | h | i |

This reprogramming action is submitted because this action uses general transfer authority. This reprogramming action provides funding in support of higher priority items, based on unforeseen military requirements, than those for which originally appropriated; and is determined to be necessary in the national interest. It meets all administrative and legal requirements, and none of the items has previously been denied by the Congress.

This reprogramming action transfers $1,000.000 million from the Military Personnel, Army, 19/19, and Reserve Personnel, Army, 19/19, appropriations to the Drug Interdiction and Counter-Drug Activities, Defense, 19/19, appropriation. This reprogramming action uses $1,000.000 million of general transfer authority pursuant to section 8005 of division A of Public Law 115-245, the Department of Defense (DoD) Appropriations Act, 2019; and section 1001 of Public Law 115-232, the John S. McCain National Defense Authorization Act for Fiscal Year (FY) 2019.

**FY 2019 REPROGRAMMING INCREASE:**                **+1,000,000**

**Drug Interdiction and Counter-Drug Activities, Defense, 19/19**                **+1,000,000**
Budget Activity 01: Counter-Narcotics Support
                238,306                238,306                **+1,000,000**                1,238,306

Explanation: Funds are required to provide support for counter-drug activities of the Department of Homeland Security (DHS). DHS has identified areas along the southern border of the United States that are being used by individuals, groups, and transnational criminal organizations as drug smuggling corridors, and determined that the construction of additional physical barriers and roads in the vicinity of the United States border is necessary in order to impede and deny drug smuggling activities. DHS requests DoD assistance in the execution of projects to replace existing vehicle barriers or dilapidated pedestrian fencing with new pedestrian fencing, construct roads, and install lighting. Title 10, U.S.Code, Section 284(b)(7) authorizes the DoD to support counterdrug activities of other Federal agencies through the construction of roads and fences, and the installation of lighting, to block drug smuggling corridors across international boundaries of the United States. Such support is funded using DoD's Drug Interdiction and Counter-Drug Activities appropriation. This is a base budget requirement.

Approved (Signature and Date)
*Elaine McCusker*                3/25/19

DD 1415-1                *UNCLASSIFIED*

*Unclassified* **REPROGRAMMING ACTION**

| Subject: Support for DHS Counter-Drug Activity Reprogramming Action | | | | | | DoD Serial Number: FY 19-01 RA | |
|---|---|---|---|---|---|---|---|
| Appropriation Title: Various Appropriations | | | | | | | |
| | | | | | | Includes Transfer? Yes | |

| Component Serial Number: | *(Amounts in Thousands of Dollars)* | | | | | | |
|---|---|---|---|---|---|---|---|
| | Program Base Reflecting Congressional Action | | Program Previously Approved by Sec Def | | Reprogramming Action | | Revised Program | |
| Line Item | Quantity | Amount | Quantity | Amount | Quantity | Amount | Quantity | Amount |
| a | b | c | d | e | f | g | h | i |

**FY 2019 REPROGRAMMING DECREASES:**          **-1,000,000**

**Military Personnel, Army, 19/19**          **-993,627**

Budget Activity 01: Pay and Allowances of Officers

|  | 14,000,263 | 14,000,263 | **-56,440** | 13,943,823 |
|---|---|---|---|---|

Explanation: Funds are available due to lower than expected Thrift Savings Plan (TSP) automatic and matching contributions ($-38.9 million) and Continuation Pay (CP) ($-17.5 million) for military members enrolled in the new Blended Retirement System (BRS) as a result of fewer than planned opt-ins from the legacy retirement system. This is base budget funding.

Budget Activity 02: Pay and Allowances of Enlisted

|  | 27,151,209 | 27,151,209 | **-754,212** | 26,396,997 |
|---|---|---|---|---|

Explanation: Funds are available due to a 9,500 Soldier reduction to Army's overall end strength target (478,000 vice 487,500) as Army refocuses on smart, modest annual growth without compromising quality in a highly challenging recruiting and retention market. Funds are available from the following programs stemming from strength reductions and rate-driven adjustments observed in execution to date. This is base budget funding.

- $325.9 million in basic pay, primarily driven by the decrease in projected average strength
- $135.1 million in retired pay accrual, primarily driven by the decrease in projected average strength
- $15.9 million in clothing allowances, stemming from reduced requirements for non-accession related uniform purchases
- $13.3 million in incentive pays and family separation allowances, reflecting current base budget execution trends showing a shift toward higher Overseas Contingency Operations execution
- $141.3 million in separation payments, driven by nearly 10 thousand fewer projected separations than seen in fiscal year 2018, fewer Soldiers eligible for disability separation in the Integrated Disability Evaluation System, and fewer projected involuntary separations
- $29.0 million in social security tax employer contributions, primarily driven by the decrease in projected average strength
- $27.6 million in enlistment and reenlistment incentives, due to projections for fewer recruitment contracts with bonus options compared to prior year execution and a smaller than expected cohort eligible for reenlistment
- $66.1 million due to lower than expected Thrift Savings Plan (TSP) automatic and matching contributions ($-41.4 million) and Continuation Pay (CP) ($-24.7 million) for military members enrolled in the new Blended Retirement System (BRS) as a result of fewer than planned opt-ins from the legacy retirement system

*Unclassified*        **REPROGRAMMING ACTION**        Page 3 of 3

| Subject: Support for DHS Counter-Drug Activity Reprogramming Action | | | | | | DoD Serial Number: | |
|---|---|---|---|---|---|---|---|
| Appropriation Title: Various Appropriations | | | | | | FY 19-01 RA | |
| | | | | | | Includes Transfer? Yes | |

| Component Serial Number: | *(Amounts in Thousands of Dollars)* | | | | | | |
|---|---|---|---|---|---|---|---|
| | Program Base Reflecting Congressional Action | | Program Previously Approved by Sec Def | | Reprogramming Action | | Revised Program | |
| Line Item | Quantity | Amount | Quantity | Amount | Quantity | Amount | Quantity | Amount |
| a | b | c | d | e | f | g | h | i |

Budget Activity 04:  Subsistence of Enlisted Personnel
|  | 2,269,930 |  | 2,269,930 |  | **-57,420** |  | 2,212,510 |

Explanation:  Funds are available due to a decrease in projected average enlisted strength, lower than budgeted rate increases (no inflation in 2019 vice 3.4% budgeted), and a slight increase in the amount of realized collections for members subsisting in Army dining facilities.  This is base budget funding.

Budget Activity 05:  Permanent Change of Station Travel
|  | 1,785,401 |  | 1,785,401 |  | **-115,726** |  | 1,669,675 |

Explanation:  Funds are available due to lower than budgeted rates of execution that have been realized in recent move expenditures.  This is base budget funding.  Specifically:
- $36.9 million is available in accession moves
- $26.1 million is available in rotational moves
- $52.7 million is available in separation moves

Budget Activity 06:  Other Military Personnel Costs
|  | 317,883 |  | 317,883 |  | **-9,829** |  | 308,054 |

Explanation:  Funds are available due to a lower-than-projected number of former soldiers receiving unemployment compensation payments.  This is base budget funding.

**Reserve Personnel, Army, 19/19**                    **-6,373**
Budget Activity 01:  Reserve Component Training and Support
|  | 4,874,662 |  | 4,871,312 |  | **-6,373** |  | 4,864,939 |

Explanation:  Funds are available due to lower than expected Thrift Savings Plan (TSP) automatic and matching contributions for military members enrolled in the new Blended Retirement System (BRS) as a result of fewer than planned opt-ins from the legacy retirement system.  This is base budget funding.

DD 1415-1                    *UNCLASSIFIED*

*Unclassified*     **REPROGRAMMING ACTION - INTERNAL REPROGRAMMING**     Page 1 of 1

| Subject: Drug Interdiction and Counter-Drug Activities, Defense | | | | | | DoD Serial Number: FY 19-11 IR | |
|---|---|---|---|---|---|---|---|
| Appropriation Title: Various Appropriations | | | | | | Includes Transfer? Yes | |

| Component Serial Number: | *(Amounts in Thousands of Dollars)* | | | | | | |
|---|---|---|---|---|---|---|---|
| | Program Base Reflecting Congressional Action | | Program Previously Approved by Sec Def | | Reprogramming Action | | Revised Program | |
| Line Item | Quantity | Amount | Quantity | Amount | Quantity | Amount | Quantity | Amount |
| a | b | c | d | e | f | g | h | i |

This reprogramming action transfers $1,000.000 million from the Drug Interdiction and Counter-Drug Activities, Defense, 19/19, appropriation to Operation and Maintenance, Army, 19/19, appropriation for drug interdiction and counter-drug activities consistent with the provisions in division A of Title VI of Public Law 115-245, the Department of Defense (DoD) Appropriations Act, 2019.

Realignment of funds between Drug Interdiction projects may be accomplished only with the concurrence of the Office of the Deputy Assistant Secretary of Defense, Counternarcotics and Global Threats.  No funds made available in this reprogramming action may be obligated for projects pursuant to sections 321, 322, or 333 of Title 10, United States Code.  This prohibition will be noted on all Funding Authorization Documents.

**FY 2019 REPROGRAMMING INCREASE:**                    **+1,000,000**

**Operation and Maintenance, Army, 19/19**              **+1,000,000**
Budget Activity 01:  Operating Forces
Counter-Narcotics Support                 -         216,874      **+1,000,000**      1,216,874

**FY 2019 REPROGRAMMING DECREASE:**                    **-1,000,000**

**Drug Interdiction and Counter-Drug Activities, Defense, 19/19**     **-1,000,000**
Budget Activity 01:  Counter-Narcotics Support
                        1,238,306     1,238,306      **-1,000,000**       238,306

Explanation:  Transfers funds from the Drug Interdiction and Counter-Drug Activities, Defense, 19/19, appropriation to Operation and Maintenance, Army, 19/19, appropriation to support the Department of Homeland Security (DHS) request for DoD to support drug interdiction and counter-drug activities through the construction of roads and fences, and the installation of lighting, to block drug smuggling corridors across international boundaries of the United States.  This is a base budget requirement.

Approved (Signature and Date)

*Elaine McCusky*                        3/25/19

**DD 1415-3**                    *UNCLASSIFIED*

# EXHIBIT E



*Executive Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

March 29, 2019

MEMORANDUM FOR:    CAPT Hallock N. Mohler Jr.
Executive Secretary
Department of Defense

FROM:    Christina Bobb
Executive Secretary
Department of Homeland Security

SUBJECT:    Modification Request: Section 284 funding for Border Barrier
Construction

REFERENCE:    (a) February 25, 2019, DHS Request for Assistance Pursuant to 10
U.S.C. §284
(b) March 25, 2019, DoD Response to DHS Request for Assistance
Pursuant to 10 U.S.C. §284

## Overview

The Department of Homeland Security (DHS) thanks the Department of Defense for both the
response and approval of the use of Section 284 funding for the construction of border
fencing and roads and the installation of lighting as characterized in the Request for
Assistance. The completion of these projects will assist CBP significantly in controlling the
flow of migrants in between the Ports of Entry (POE) on the Southwest Border.

## Clarifications

Prior to construction for border barrier projects, Customs and Border Protection (CBP)
conducts an Alternatives Analysis (AA), which compares operational data against the
known and tested impedance value of barrier and other related design attributes.  The
analysis examines key operational data points, including but not limited to:
- Vanishing time
- Response time
- Current staffing
- Presence and effectiveness of existing technology and infrastructure
- Subject matter expertise of agents intimately familiar with operations in these areas

Such analyses have often demonstrated that higher barriers and/or barriers augmented with
anticlimb features significantly increase the amount of time that migrants require to reach a

**www.dhs.gov**

FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE

vanishing point.  A more robust barrier solution (i.e. 30 foot steel bollard vice 18 foot steel bollard and features), increases the vanishing time and provides USBP agents with a greater ability to with vice without anticlimb interdict migrants.

CBP undertook AAs for the proposed Section 284-funded projects; two of these AAs have been completed, with the following conclusions:

- Sector Yuma Project 2: Requirement for 18 foot steel bollard fencing with 5 foot anticlimb steel plate
- Sector El Paso Project 1: Requirement for 30 foot steel bollard fencing with 5 foot anticlimb steel plate

The AA for Sector Yuma Project 1, USBP's highest priority project, is still underway, with results expected the week of April 1st.  Preliminary indications from the analysis, however, indicate 30 foot bollard with anticlimb features is the likely requirement.  DHS will communicate to OSD the finalized requirements for Sector Yuma Project upon completion of the AA.

In light of the analyses summarized above, DHS requests that specifications for the Sector El Paso Project 1 be amended to 30ft bollard with anticlimb features, and that DoD be prepared to likewise amend the specifications for Sector Yuma Project 1. DHS also requests DoD directly follow the prioritization set forth in Reference (a) as closely as possible even if that means completing partial projects.

Please direct any questions to Ntina K. Cooper, Deputy Executive Director, Strategic Planning & Analysis, USBP, CBP (202) 344-1417.

**EXHIBIT F**



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

APR - 9 2019

MEMORANDUM FOR ACTING SECRETARY OF HOMELAND SECURITY

SUBJECT:  Modification of Department of Defense Support to Block Drug-Smuggling
          Corridors

Thank you for your April 5, 2019 request that the Department of Defense provide modified specifications on projects approved for construction under 10 U.S.C. § 284 in order to support more effectively the Department of Homeland Security's efforts to secure the southern border.

10 U.S.C. § 284(b)(7) authorizes the Department of Defense to construct roads and fences, and to install lighting, to block drug-smuggling corridors across international boundaries of the United States in support of counter-narcotic activities of Federal law enforcement agencies.  For the following reasons, I have concluded that this modified request continues to satisfy the statutory requirements:

- The Department of Homeland Security (DHS)/Customs and Border Protection (CBP) is a Federal law enforcement agency;

- DHS has identified each project area as a drug-smuggling corridor; and

- The work requested by DHS to block these identified drug-smuggling corridors involves construction of fences (including a linear ground detection system), construction of roads, and installation of lighting (supported by grid power and including imbedded cameras).

Accordingly, I have approved construction of pedestrian fencing for Yuma Sector Projects 1 and El Paso Sector Project 1 with 30-foot steel bollard with anti-climb plate, and Yuma Sector Project 2, with 18-foot steel bollard with anti-climb plate, as requested in your April 5, 2019 request.  Road construction and improvements, and lighting installation, will be included as described in your February 25, 2019 request.

As the proponent of the requested action, CBP will serve as the lead agency for environmental compliance and will be responsible for providing all necessary access to land.  I request that DHS place the highest priority on completing these actions for the projects identified above.  DHS will accept custody of the completed infrastructure, account for that infrastructure in its real property records, and operate and maintain the completed infrastructure.

I have authorized the Commander, U.S. Army Corps of Engineers, to coordinate directly with DHS/CBP and immediately begin planning and executing support to DHS/CBP by

undertaking the projects identified above in clearly defined segments to maximize the number of miles of barrier projects within the available funds (up to $1 billion).

Additional support may be provided in the future, subject to the availability of funds and other factors.

Patrick M. Shanahan
Acting

# EXHIBIT G



# DEPARTMENT OF DEFENSE



LEGACY HOMEPAGE > NEWS > CONTRACTS > CONTRACT VIEW

# Contracts for April 9, 2019

**April 9, 2019**
Contracts
Release No: CR-066-19

---

**ARMY**

SLSCO Ltd., Galveston, Texas, was awarded a $789,000,000 firm-fixed-price contract for border replacement wall construction. Nine bids were solicited with six bids received. Work will be performed in Santa Teresa, New Mexico, with an estimated completion date of Oct. 1, 2020. Fiscal 2019 operations and maintenance, Army funds in the amount of $388,999,999 were obligated at the time of the award. U.S. Army Corps of Engineers Albuquerque, New Mexico, is the contracting activity (W912PP-19-C-0018).

Barnard Construction Co. Inc., Bozeman, Montana, was awarded an $187,000,000 firm-fixed-price contract for design-bid-build construction project for primary pedestrian wall replacement. Four bids were solicited with three bids received. Work will be performed in Yuma, Arizona, with an estimated completion date of Sept. 30, 2020. Fiscal 2019 operations and maintenance, Army funds in the amount of $93,499,999 were obligated at the time of the award. U.S. Army Corps of Engineers, Los Angeles, California, is the contracting activity (W912PL-19-C-0013).

The Dutra Group, San Rafael, California, was awarded a $10,000,000 firm-fixed-price contract for rental of hopper dredge with attendant plant and operators for maintenance dredging in Alabama, Mississippi, and Florida. Bids were solicited via the internet with two received. Work locations and funding will be determined with each order, with an estimated completion date of June 9, 2020. U.S. Army Corps of Engineers, Mobile, Alabama, is the contracting activity (W91278-19-D-0019).

**DEFENSE LOGISTICS AGENCY**

Vital Images Inc., Minnetonka, Minnesota, has been awarded a maximum $100,000,000 firm-fixed-price, indefinite-delivery/indefinite-quantity contract for radiology and imaging systems, maintenance and training services.  This is a five-year base contract with one five-year option.  This was a competitive acquisition with 27 responses received.  Location of performance is Minnesota, with an April 8, 2024, performance completion date.  Using customers are Army, Navy, Air Force, Marine Corps and federal civilian agencies.  Type of appropriation is fiscal 2019 through 2020 defense working capital funds.  The contracting activity is the Defense Logistics Agency Troop Support, Philadelphia, Pennsylvania (SPE2D1-19-D-0012).

AAR Aircraft Services, Oklahoma City, Oklahoma, has been awarded a minimum $13,701,177 fixed-price with economic-price-adjustment contract for fuel.  This was a competitive acquisition with 148 responses received.  This is a 47-month base contract with a six-month option period.  Location of performance is Oklahoma, with a March 31, 2023, performance completion date.  Using customers are Army, Navy, Air Force, Marine Corps and federal civilian agencies.  Type of appropriation is fiscal 2019 through fiscal 2023 defense working capital funds.  The contracting activity is the Defense Logistics Agency Energy, Fort Belvoir, Virginia (SPE607-19-D-0061).

**AIR FORCE**

Pergravis LLC, Tampa, Florida, has been awarded an estimated $73,220,000 firm-fixed-price contract for power converting and continuation interfacing equipment emergency maintenance/preventative maintenance.  This contract provides for support of 700 uninterruptable power supply systems across every Air Force major command.  Work will be performed in various locations in the U.S. and overseas, and is expected to be complete by April 13, 2024.  This contract is the result of a competitive acquisition and three offers were received.  Fiscal 2019 other station funds in the amount of $137,440 are being obligated at

the time of award.  Air Force Life Cycle Management Center, Hill Air Force Base, Utah, is the contracting activity (FA8217-19-D-0002).

Al Qabandi United Co. W.L.L., Kuwait City, Kuwait, is being awarded an estimated $30,000,000 firm-fixed-price contract for vehicle lease services. This contracts provides Ali Al Salem Air Base, Kuwait, and surrounding tenant units, with non-tactical vehicles for transportation purposes.  Work will be performed at Ali Al Salem Air Base, Kuwait, and is expected to be complete by April 12, 2024. This award is the result of a competitive acquisition and 67 offers were received. Fiscal 2019 operations and maintenance funds in the amount of $16,000 are being obligated on a task order at the time of award.  The 386th Expeditionary Contracting Squadron, Ali Al Salem AB, Kuwait, is the contracting activity (FA5703-19-D-0001).

Textron Aviation Defense LLC, Wichita, Kansas, has been awarded a $15,350,000 firm-fixed-price modification (P00007) to previously awarded contract FA8617-17-C-6225 for continued support for the completion of the reconstitution of 15 T-6A aircraft.  This modification provides for a schedule extension to complete the reconstitution of 15 T-6A aircraft and procure cartridge actuated devices and propellant actuated devices.  Work will be performed at Imam Ali Air Base, Iraq, and is expected to be complete by July 31, 2019.  This modification involves 100 percent foreign military sales to Iraq, and brings the total cumulative face value of the contract to $35,338,422.  Foreign military sales funds in the full amount are being obligated at the time of award.  Air Force Life Cycle Management Center, Training Aircraft Division, Wright-Patterson Air Force Base, Ohio, is the contracting activity.

2101 LLC, doing business as Intercontinental Truck Body, Anaconda, Montana, has been awarded a $10,566,494 firm-fixed-price delivery order for tow tractors. This delivery order provides for the procurement of flight line tow tractors used to tow fighter aircraft, munition trailers and ground support equipment.  Work will be performed in Anaconda, Montana, and is expected to be complete by Sept. 1, 2021.  Fiscal 2018 and 2019 procurement funds in the full amount are being obligated at the time of award.  Air Force Life Cycle Management Center, Robins Air Force Base, Georgia, is the contracting activity (FA8534-19-F-0017).

**NAVY**

Raytheon Intelligence, Information and Services, Indianapolis, Indiana, is awarded a $47,378,485 firm-fixed-price contract to procure 99 LAU-115 and 100 LAU-116 guided missile launchers for the Navy as well as 62 LAU-115 and 68 LAU-116 guided missile launchers for the government of Kuwait to enable F/A-18 aircraft to carry and launch AIM-120 and AIM-9X missiles.  Work will be performed in Indianapolis, Indiana, and is expected to be completed in July 2022.  Fiscal 2017 and 2018 aircraft procurement (Navy); and foreign military sales funds in the amount of $47,378,485 will be obligated at time of award, $17,285,182 of which will expire at the end of the current fiscal year.  This contract was not competitively procured pursuant to Federal Acquisition Regulation 6.302-1.  The Naval Air Systems Command, Patuxent River, Maryland, is the contracting activity (N00019-19-C-0056).

Raytheon Co., Portsmouth, Rhode Island, is awarded a $33,347,011 firm-fixed-priced, indefinite-delivery/indefinite supply quantity contract, for up to 28 electronic throttle control units and auxiliary components to support Naval Surface Warfare Center Philadelphia Division.  This contract is for the purpose of supporting the Virginia class submarine program.  The proposed contract is for procurement of replacement electronic throttle control unit (ETCU) hardware which is currently obsolete and can no longer be efficiently supported.  The proposed contract includes the hardware fabrication for new construction platforms and all back-fit systems to mitigate parts obsolescence, update/maintain the ETCU technical data package, and design verification testing on limited production units for quality assurance.  Work will be performed in Portsmouth, Rhode Island, and is expected to be completed by April 2024.  Fiscal 2018 shipbuilding and conversion (Navy) funding in the amount of $9,165,306 will be obligated at time of award and will not expire at the end of the current fiscal year.  This contract was solicited competitively via the Federal Business Opportunities website, with one offer received.  The Naval Surface Warfare Center, Philadelphia Division, Philadelphia, Pennsylvania, is the contracting activity (N64498-19-D-4016).

Marshall Communications Corp.,* Ashburn, Virginia, is awarded $9,805,873 for firm-fixed-price delivery order N0042119F0555 against a previously issued NASA Solutions for Enterprise-wide procurements contract (NNG15SD82B).  This order provides for information technology supplies and services in support of the Teamcenter Product Lifecycle Management configuration for the Commander, Fleet Readiness Centers business process, enabling digital data updates, sharing and visibility across all levels of aviation maintenance.  Work will be performed at the Naval Air Station, Patuxent River, Maryland (70 percent); and the Fleet Readiness Center East, Cherry Point, North Carolina (30 percent), and is expected to be completed in April 2020.  Fiscal 2019 research, development, test and evaluation (Navy); and Section 852 funds in the amount of $9,805,873 will be obligated at time of award, none of which will expire at the end of the current fiscal year.  The Naval Air Warfare Center Aircraft Division, Patuxent River, Maryland, is the contracting activity.

Barnhart-Reese Construction, Inc.,* San Diego, California, is awarded $8,137,970 for firm-fixed-price task order N6247319F4452 under a previously awarded multiple award construction contract (N62473-17-D-4635) for construction of a full motion trainer facility at Marine Corps Base, Camp Pendleton.  This project will construct a new 10,828 SF facility to centralize infrastructures, to consolidate all aspects of training in one physical location, to provide operational support for home ported detachments, virtual and hands-on maintenance training, operator training, and to support contingencies in accordance with combatant and commander tasking.  The task order also contains two planned modifications, which if exercised would increase cumulative task order value to $8,171,720.  Work will be performed in Oceanside, California, and is expected to be completed by October 2020.  Fiscal 2019 military construction (Navy) contract funds in the amount of $8,137,970 are obligated on this award and will not expire at the end of the current fiscal year.  Four proposals were received for this task order.  Naval Facilities Engineering Command Southwest, San Diego, California, is the contracting activity.

BAE Systems Jacksonville Ship Repair, Jacksonville, Florida, is awarded an $8,123,072 cost-plus-award-fee modification to previously awarded contract N00024-16-C-2302 to exercise options for the USS Wichita (LCS 13) post-

shakedown availability (PSA).  A PSA is accomplished within a period of approximately 10-16 weeks between the time of ship custody transfer to the Navy and the shipbuilding and conversion, Navy obligation work limiting date. The PSA encompasses all of the manpower, support services, material, non-standard equipment and associated technical data and documentation required to prepare for and accomplish the PSA.  The work to be performed will include correction of government-responsible trial card deficiencies, new work identified between custody transfer and the time of PSA and incorporation of approved engineering changes that were not incorporated during the construction period which are not otherwise the building yard's responsibility under the ship construction contract.  Work will be performed in Jacksonville, Florida, and is expected to be complete by March 2020.  Fiscal 2019 shipbuilding and conversion (Navy) funding in the amount of $5,896,048; fiscal 2013 shipbuilding and conversion (Navy) funding in the amount of $1,482,102; and fiscal 2018 other procurement (Navy) funding in the amount of $293,384 will be obligated at time of award and will not expire at the end of the current fiscal year.  The Naval Sea Systems Command, Washington, District of Columbia, is the contracting activity.

Huntington-Ingalls Industries - Ingalls Shipbuilding, Pascagoula, Mississippi, is awarded a $7,889,490 cost-plus-fixed-fee modification to previously awarded contract N00024-17-C-2473 to exercise an option for the accomplishment of emergent work as required, including management and labor efforts for the post-delivery planning yard services in support of the LHA-7 amphibious assault ship.  Work will be performed in Pascagoula, Mississippi, and is expected to be completed December 2019.  Fiscal 2019 shipbuilding and conversion (Navy) funding in the amount of $7,889,490 will be obligated at time of award and will not expire at the end of the current fiscal year.  The Naval Sea Systems Command, Washington, District of Columbia, is the contracting activity.

## MISSILE DEFENSE AGENCY

Lockheed Martin Rotary and Mission Systems, Moorestown, New Jersey, is awarded a $7,438,922 cost-plus-incentive-fee modification (P00322) to previously awarded contract HQ0276-10-C-0001.  Under this modification, the contractor

will provide software maintenance support, identify, analyze, correct, test, and merge/rebase of the Common Source Library infrastructure and software discrepancies originating from heritage Aegis Ballistic Missile Defense Computer Programs.  This modification increases the total cumulative face value of the contract from $2,973,087,008 to $2,980,525,930.  Work will be performed in Moorestown, New Jersey, with an expected completion date of Oct. 31, 2019. Fiscal 2019 operations and maintenance funds in the amount of $1,045,902 will be obligated at the time of award.  The Missile Defense Agency, Dahlgren, Virginia, is the contracting activity.

*Small business

**SHARE CONTRACTS**

# EXHIBIT H



**ASSISTANT SECRETARY OF DEFENSE**
2600 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-2600

HOMELAND DEFENSE &
GLOBAL SECURITY

APR 1 8 2019

MEMORANDUM FOR MILITARY ADVISOR, DEPARTMENT OF HOMELAND
SECURITY

SUBJECT:  Modification of DHS Request for Assistance Pursuant to 10 U.S.C. § 284

Thank you for your April 12, 2019, memorandum requesting that DoD de-scope approximately four (4) of the six (6) miles for Yuma Sector Project 2.

I have reviewed and approved your request, and will instruct the U.S. Army Corps of Engineers to take the necessary contracting action in response to your request.  DoD will use those funds previously approved by the Acting Secretary of Defense that are no longer required for Yuma Sector Project 2 to fund additional miles of 30-foot bollard fencing, roads, and lighting in the El Paso Sector 1 project.  As previously agreed, DHS retains the responsibility to address environmental compliance for all construction undertaken pursuant to 10 U.S.C. § 284 and to provide the necessary access to land (i.e., real estate rights).

I appreciate the opportunity to support the Department of Homeland Security's mission of securing and managing our Nation's southern border.

Kenneth P. Rapuano
Assistant Secretary of Defense
Homeland Defense & Global Security

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; DEFENDERS OF WILDLIFE; ANIMAL LEGAL DEFENSE FUND, <br><br>           Plaintiffs, <br><br>    v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America; PATRICK M. SHANAHAN, in his official capacity as Acting Secretary of Defense; LIEUTENANT GENERAL TODD T. SEMONITE, in his official capacity as Commander and Chief of Engineers, U.S. Army Corps of Engineers; KEVIN McALEENAN, in his official capacity as Acting Homeland Security Secretary; DAVID BERNHARDT, in his official capacity as Secretary of the Interior, <br><br>           Defendants. | Civil Action No. 1:19-cv-00408 (TNM) |

---

### [PROPOSED] ORDER

Upon consideration of Defendants' Motion to Dismiss, it is hereby **ORDERED** that the

Motion is **GRANTED**.

     **SO ORDERED.**


Dated: _____, 2019


                         _____

                         TREVOR  N. McFADDEN
                         United States District Judge