# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY,** *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **DONALD J. TRUMP,** *President of the United States, et al.*, <br><br> **Defendants.** | No. 1:19-cv-0408-TNM |

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS BY *AMICUS CURIAE* REP. ANDY BARR</u>

CHRISTOPHER J. HAJEC
Immigration Reform Law Institute
25 Massachusetts Ave. NW, Suite 335
Washington, DC 20001
(202) 232-5590
chajec@irli.org

LAWRENCE J. JOSEPH
Law Office of Lawrence J. Joseph
1250 Connecticut Ave. NW, Suite 700-1A
Washington, DC 20036
(202) 355-9452
ljoseph@larryjoseph.com

*Counsel for Rep. Andy Barr*

## TABLE OF CONTENTS

Table of Contents ................................................................................................................. ii

Table of Authorities ............................................................................................................ iv

Identity and Interest of *Amicus Curiae* ...............................................................................1

Introduction ..........................................................................................................................1

Statement of Facts ................................................................................................................2

Argument ..............................................................................................................................2

I.      This Court lacks jurisdiction to hear Plaintiffs' claims. ..........................................2

        A.      This Court lacks federal-question jurisdiction for settled questions ............3

        B.      Plaintiffs lack an Article III case or controversy. .......................................3

                1.      Plaintiffs lack standing for their claims. .........................................4

                        a.      Plaintiffs lack standing for their appropriations- and
                                NEA-based arguments. ......................................................5

                        b.      Plaintiffs lack standing for programmatic relief and
                                for border-wall sections for which Plaintiffs have not
                                identified affected members. ..............................................7

                        c.      Plaintiffs' diverted resources do not provide
                                Plaintiffs with standing in their own right. ........................7

                2.      Some of Plaintiffs' claims are not ripe. ...........................................9

                3.      Plaintiffs' NEA claims are non-justiciable political
                        questions. ........................................................................................10

                        a.      The NEA provides the President with flexibility and
                                Congress — not private parties — with oversight. ...........11

                        b.      Even if the switch from concurrent to joint
                                resolutions would have changed some votes in 1976,
                                Congress ratified the current NEA with the post-
                                *Chadha* amendment in 1985. ...........................................14

        C.      Sovereign immunity bars this action ...........................................................16

                1.      The United States has not waived sovereign immunity for
                        this action. ......................................................................................16

                        a.      This Court lacks judicially manageable standards to
                                review this matter. ............................................................17

                        b.      Plaintiffs have not challenged a final agency action
                                and lack statutory review. ................................................18

                2.      Plaintiffs' adequate future remedies displace some equity
                        claims. .............................................................................................19

II.     Plaintiffs lack a viable action on the merits. ........................................................20

        A.      The President's NEA proclamation complies with the NEA.................................20

        B.      Plaintiffs do not state a statutory claim to relief under the
                appropriations statutes. .........................................................................21

                1.      The Government has not violated 10 U.S.C. § 284. ..................................21

                2.      The Government has not violated 10 U.S.C. § 2808. .............................22

        C.      Plaintiffs do not state a statutory claim to relief under NEPA.............................23

        D.      Plaintiffs do not state a claim under the Appropriations or Take Care
                Clauses of the Constitution. ..................................................................24

Conclusion ....................................................................................................24

## TABLE OF AUTHORITIES

### CASES

*Action Alliance of Senior Citizens v. Heckler*,
  789 F.2d 931 (D.C. Cir. 1986) ........................................................................9

*Air New Zealand Ltd. v. C.A.B.*,
  726 F.2d 832 (D.C. Cir. 1984) ......................................................................17

*Allen v. Wright*,
  468 U.S. 737 (1984) .................................................................................... 3-4

*Bender v. Williamsport Area Sch. Dist.*,
  475 U.S. 534 (1986) ........................................................................................2

*Campbell v. Clinton*,
  203 F.3d 19 (D.C. Cir. 2000) ................................................................ 5-6, 24

\* *Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ..................................................................................2, 17

*Clapper v. Amnesty Int'l USA*,
  133 S.Ct. 1138 (2013) .....................................................................................8

*Council of and for the Blind of Delaware County Valley, Inc., v. Regan*,
  709 F.2d 1521 (D.C. Cir. 1983) (*en banc*) ...................................................19

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ........................................................................................5

*Daughtrey v. Carter*,
  584 F.2d 1050 (D.C. 1978) .............................................................................5

*Defenders of Wildlife v. Chertoff*,
  527 F. Supp. 2d 119 (D.D.C. 2007) ..............................................................23

*Dep't of Army v. Blue Fox, Inc.*,
  525 U.S. 255 (1999) ......................................................................................16

*Ex parte Young*,
  209 U.S. 123 (1908) ......................................................................................20

*FDIC v. Meyer*,
  510 U.S. 471 (1994) ......................................................................................16

*Fleming v. Mohawk Co.*,
  331 U.S. 111 (1947) ......................................................................................15

*Friends of the Capital Crescent Trail v. Fed. Transit Admin.*,
  49 ELR 20038 (D.D.C. 2019) .......................................................................20

*FTC v. Standard Oil Co.*,
  449 U.S. 232 (1980) ......................................................................................12

*FW/PBS, Inc. v. City of Dallas,*
   493 U.S. 215 (1990) ............................................................4, 5, 7

*Gladstone, Realtors v. Bellwood,*
   441 U.S. 91 (1979) ....................................................................8

*Gray v. Powell,*
   314 U.S. 402 (1941) .................................................................17

*Green v. Mansour,*
   474 U.S. 64 (1985) ...................................................................20

\* *Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ................................................................8-9

*Heckler v. Chaney,*
   470 U.S. 821 (1985) .................................................................17

*Hunt v. Washington Apple Advertising Comm'n,*
   432 U.S. 333 (1977) ...................................................................4

*In re Border Infrastructure Envtl. Litig.,*
   915 F.3d 1213 (9th Cir. 2019) .............................................23-24

*INS v. Cardoza-Fonseca,*
   480 U.S. 421 (1987) .................................................................18

*INS v. Chadha,*
   462 U.S. 919 (1983) ............................................................14-15

*Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,*
   456 U.S. 694 (1982) ...................................................................2

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
   511 U.S. 375 (1994) ...................................................................2

*Lance v. Coffman,*
   549 U.S. 437 (2007) ...................................................................7

*Lane v. Pena,*
   518 U.S. 187 (1996) .................................................................16

*Lewis v. Casey,*
   518 U.S. 343 (1996) ...................................................................5

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ...............................................................4, 7

*Luther v. Borden,*
   48 U.S. 1 (1849) .......................................................................10

*Marbury v. Madison,*
   5 U.S. (1 Cranch) 137 (1803) ..................................................19

\* *Mountain States Legal Found. v. Glickman,*
   92 F.3d 1228 (D.C. Cir. 1996) ...............................................5, 9

*Muskrat v. United States,*
219 U.S. 346 (1911) ....................................................................................... 3

\* *Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
551 U.S. 644 (2007) ......................................................................................22

*Nat'l Labor Relations Bd. Union v. Fed. Labor Relations Auth.,*
834 F.2d 191 (D.C. Cir. 1987) .....................................................................20

*Ortiz v. Fibreboard Corp.,*
527 U.S. 815 (1999) ......................................................................................20

*Panama Canal Co. v. Grace Line, Inc.,*
356 U.S. 309 (1958) ......................................................................................18

*Pennsylvania v. New Jersey,*
426 U.S. 660 (1976) ........................................................................................8

*People for the Ethical Treatment of Animals v. U.S. Dept. of Agriculture,*
797 F.3d 1087 (D.C. Cir. 2015) ......................................................................8

*Raines v. Byrd,*
521 U.S. 811 (1997) ........................................................................................6

*Red Lion Broad. Co. v. FCC,*
395 U.S. 367 (1969) ......................................................................................15

*Renne v. Geary,*
501 U.S. 312 (1991) ........................................................................................4

*Russell v. DeJongh,*
491 F.3d 130 (3d Cir. 2007) ...........................................................................6

*Sea-Land Serv., Inc. v. Alaska R.R.,*
659 F.2d 243 (D.C. Cir. 1982) .....................................................................16

*Secretary of State of Md. v. Joseph H. Munson Co.,*
467 U.S. 947 (1984) ........................................................................................5

*Sierra Club v. Morton,*
405 U.S. 727 (1972) ........................................................................................8

*Steel Co. v. Citizens for a Better Env't.,*
523 U.S. 83 (1998) ..........................................................................................2

\* *Summers v. Earth Island Institute,*
555 U.S. 488-89 (2009) ...............................................................................5, 7

*Texas v. United States,*
523 U.S. 296 (1998) ....................................................................................9-10

*U.S. House of Representatives v. Burwell,*
130 F. Supp. 3d 53 (D.D.C. 2015) .........................................................5-7, 24

*United Presbyterian Church v. Reagan,*
738 F.2d 1375 (D.C. Cir. 1984) ......................................................................6

*United States v. Sherwood,*
    312 U.S. 584 (1941) ................................................................................................16

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) ..................................................................................................5

*Verizon Md., Inc. v. Public Serv. Comm'n of Md.,*
    535 U.S. 635 (2002) ................................................................................................20

*Vieth v. Jubelirer,*
    541 U.S. 267 (2004) .........................................................................................10, 18

*Warth v. Seldin,*
    422 U.S. 490 (1975) ...............................................................................................8-9

*Younger v. Harris,*
    401 U.S. 37 (1971) ..................................................................................................19

## <u>STATUTES</u>

U.S. CONST. art. I, § 9, cl. 7 .............................................................................5-6, 24

U.S. CONST. art. II, § 3 .............................................................................................24

U.S. CONST. art. III ........................................................................3-5, 8, 16-19

U.S. CONST. art. III, § 2 ...........................................................................................3

Administrative Procedure Act,
    5 U.S.C. §§ 551-706 ................................................................................2, 12, 16

5 U.S.C. § 701 .........................................................................................................12

5 U.S.C. § 701(a)(1) ................................................................................................17

* 5 U.S.C. § 701(a)(2) ...........................................................................................2, 17

5 U.S.C. § 702 ..............................................................................................2, 12, 16

5 U.S.C. § 702(2) ....................................................................................................17

5 U.S.C. § 703 .........................................................................................................17

* 5 U.S.C. § 704 .............................................................................2, 12, 17-18

10 U.S.C. § 284 ....................................................................................................1, 21

10 U.S.C. § 284(a) ..................................................................................................21

10 U.S.C. § 284(b)(7) .............................................................................................21

10 U.S.C. § 2808 ...............................................................................1, 10, 22-23

10 U.S.C. § 2808(a) ................................................................................................22

10 U.S.C. § 2801(b) ................................................................................................22

10 U.S.C. § 2801(a) ................................................................................................22

10 U.S.C. § 2801(c)(4) ............................................................................................22

28 U.S.C. § 1361 ...............................................................................................................17

National Environmental Policy Act,
    42 U.S.C. §§ 42 U.S.C. § 4331-4347 .................................... 1, 8-10, 19, 23-24

National Emergencies Act,
    50 U.S.C. §§ 1601-1651 ..............................1-2, 5, 10-18, 20-21, 24

\* 50 U.S.C. § 1621(a) ..................................................................................11, 21

\* 50 U.S.C. § 1621(b) ..................................................................................17, 21

PUB. L. NO. 80-772, § 1, 62 Stat. 683, 765 (1948) ...............................................12

PUB. L. NO. 94-412, 90 Stat. 1255 (1976) ..........................................................10

PUB. L. NO. 94-574, § 1, 90 Stat. 2721 (1976)....................................................16

PUB. L. NO. 99-93, § 801, 99 Stat. 405, 448 (1985) ............................................15

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    PUB. L. NO. 104-208, Div. C, 110 Stat. 3009, 3009-546 to 3009-724 (1996) .................23

PUB. L. NO. 104-208, Div. C, § 102(c)(1),
    110 Stat. 3009, 3009-546 to 3009-724, 3009-555 (1996).................................23

Real ID Act of 2005, PUB. L. NO. 109-13, Tit. I, Div. B,
    119 Stat. 231, 302-11 (2005) ..............................................................23

PUB. L. NO. 109—13, Tit. I, Div. B, § 102,
    119 Stat. 231, 306 (2005) (codified at 8 U.S.C. § 1103 note) .........................23

DoD Appropriations Act for Fiscal Year 2019,
    PUB. L. NO. 115-245, div. A, § 8005, 132 Stat. 2981, 2999 (Sept. 28, 2018) .................22

Consolidated Appropriations Act 2019,
    PUB. L. NO. 116-6, 132 Stat. 2981 (2019).................................................22

8 U.S.C. § 1254(c)(2) (1982) ...........................................................................14

18 U.S.C. § 1383 (1970) ....................................................................... 12-13

## LEGISLATIVE HISTORY

S. Comm. on Gov't Operations & the Special Comm. on Nat'l Emergencies and
    Delegated Emergency Powers, 94th Cong., 2d Sess., The National Emergencies
    Act Source Book: Legislative History, Texts, and Other Documents (1976) ....... 11-14, 18

H.R. REP. NO. 99-240 (1985)...........................................................................15

S. REP. NO. 93-1170 (1974) ............................................................................12

120 CONG. REC. 29,975, 29,983 (Aug. 22, 1974) ................................................ 11-12

120 CONG. REC. 34,011, 34,013 (Oct. 7, 1974) ......................................................10

121 CONG. REC. 27,632, 27,636 (Sept. 4, 1975)......................................................11

121 CONG. REC. 27,632, 27,645 (Sept. 4, 1975).................................................11, 13,18

121 CONG. REC. 27,632, 27,646 (Sept. 4, 1975) ..................................................... 13-14

122 CONG. REC. 28,466 (Aug. 31, 1976) ...................................................................14

131 CONG. REC. 14,671, 14,947 (June 7, 1985) ..........................................................15

## RULES AND REGULATIONS

Local Rule 7(o)(5) ............................................................................................................1

FED. R. APP. P. 29(a)(4)(E) ..............................................................................................1

Presidential Proclamation on Declaring a National Emergency Concerning the Southern
    Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019) ........................................1

## OTHER AUTHORITIES

Kenneth Culp Davis, *"Nonreviewable Administrative Action,"* 96 U. PA. L. REV.
    749 (1948) ............................................................................................................. 17-18

Louis L. Jaffee, *The Right to Judicial Review I,* 71 HARV. L. REV. 401 (1958) ...........................19

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Rep. Andy Barr seeks the Court's leave to file this brief for the reasons set forth in the accompanying motion for leave to file.[1] As explained in the motion for leave to file, Rep. Barr (hereinafter, "*Amicus*") has an ongoing interest in federal immigration policy both as the Representative elected to the 116th Congress for Kentucky's Sixth Congressional District and as a citizen. For these reasons, Rep. Barr has direct interests in the issues here.

## INTRODUCTION

Several environmental groups (collectively, "Plaintiffs") have sued various federal Executive officers and offices (collectively, the "Government") to challenge the Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019), as well as future actions by the Department of Defense ("DoD") under 10 U.S.C. §§ 284, 2808. In the Proclamation, the President relied on authority delegated by Congress in the National Emergencies Act, 50 U.S.C. §§ 1601-1651 ("NEA"). Although Plaintiffs premise their standing on aesthetic injuries and assert a claim under the National Environmental Policy Act, 42 U.S.C. §§ 42 U.S.C. § 4331-4347 ("NEPA"), the primary driver of this litigation appears to be Plaintiffs' policy dispute with the Government on whether an emergency exists at the southern border and on immigration policy generally.

The NEA provides the President with flexibility and Congress with oversight, leaving no room for private enforcement. By leaving one political actor's discretion bounded only by the discretion of another political actor, the NEA provides a reviewing court "no law to apply" in an

---

[1]     Consistent with FED. R. APP. P. 29(a)(4)(E) and Local Rule 7(o)(5), counsel for movant and *amicus curiae* authored the motion and brief in whole, and no counsel for a party authored the motion or brief in whole or in part, nor did any person or entity, other than the movant/*amicus* and his counsel, make a monetary contribution to preparation or submission of the motion or brief.

action for judicial review. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Thus, NEA actions fall outside the ambit of not only the Administrative Procedure Act, 5 U.S.C. §§ 551-706 ("APA"), but also the APA's waiver of sovereign immunity. 5 U.S.C. §§ 701(a)(2), 702. Further, some of the challenged actions here — *i.e.*, both NEA and non-NEA actions — fall outside the APA's waiver of sovereign immunity because the Government has not yet taken final agency action. 5 U.S.C. §§ 702, 704. This Court accordingly should conclude that it lacks jurisdiction to hear Plaintiffs' claims.

Even if this Court concludes that it has jurisdiction, Plaintiffs' claims should be dismissed for failure to state a claim upon which relief can be granted. In issuing his Proclamation and in vetoing the joint resolution to terminate it, the President faithfully followed the statutory framework enacted by Congress.

## STATEMENT OF FACTS

*Amicus* adopts the facts as stated by the Government. Gov't Memo. at 1-12.

## ARGUMENT

## I. THIS COURT LACKS JURISDICTION TO HEAR PLAINTIFFS' CLAIMS.

Federal courts are courts of limited jurisdiction. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The parties cannot confer jurisdiction by consent or waiver, *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 (1982), and federal courts instead have the obligation to assure themselves of jurisdiction before reaching the merits. *Steel Co. v. Citizens for a Better Env't.,* 523 U.S. 83, 95 (1998). As explained below, Plaintiffs' claims suffer from several jurisdictional defects.

### A.   This Court lacks federal-question jurisdiction for settled questions.

Although Plaintiffs' complaint cites various federal statutory and constitutional provisions as a basis for relief, that alone does not necessarily bring this case within this Court's federal-question jurisdiction:

> A claim invoking federal-question jurisdiction under 28 U.S.C. § 1331, … may be dismissed for want of subject-matter jurisdiction if it is not colorable, *i.e.*, if it is immaterial and made solely for the purpose of obtaining jurisdiction or is wholly insubstantial and frivolous.

*Arbaugh v. Y & H Corp.*, 546 U.S. 500, 513 n.10 (2006) (interior quotation marks and citations omitted). Claims can become too insubstantial for federal review if they are "so attenuated and unsubstantial as to be absolutely devoid of merit," "wholly insubstantial," "obviously frivolous," "plainly unsubstantial," or "no longer open to discussion" based on controlling precedent. *Hagans v. Lavine*, 415 U.S. 528, 536-37 (1974). Significantly, this settled-question basis for dismissal applies to Circuit precedent, as well as Supreme Court precedent. *Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 471-72 (D.C. Cir. 2014). As explained below, binding precedent foreclose some of Plaintiffs' case. Thus, those claims fall outside this Court's federal-question jurisdiction.

### B.   Plaintiffs lack an Article III case or controversy.

Under Article III, federal courts cannot issue advisory opinions, *Muskrat v. United States*, 219 U.S. 346, 356-57 (1911), but must instead focus on the cases or controversies presented by affected parties before the court. U.S. CONST. art. III, § 2. "'All of the doctrines that cluster about Article III — not only standing but mootness, ripeness, political question, and the like — relate in part, and in different though overlapping ways, to … the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.'" *Allen v. Wright,* 468 U.S. 737, 750 (1984) (quoting *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178-79 (D.C. Cir.

1983) (Bork, J., concurring)). Moreover, federal courts "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record," *Renne v. Geary*, 501 U.S. 312, 316 (1991), and parties cannot confer jurisdiction by consent or waiver, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). Accordingly, Plaintiffs have the burden to show Article III jurisdiction.

As the Government argues, this Court has ample basis under Article III to dismiss this action. Gov't Memo. at 34-36. *Amicus* generally supports the Government's arguments on Article III, supplementing those arguments with the following points on the overlapping issues of standing, ripeness, and the political-question doctrine.

### 1.    Plaintiffs lack standing for their claims.

At its constitutional minimum, standing presents the tripartite test of whether the party invoking a court's jurisdiction raises a sufficient "injury in fact" under Article III: (a) legally cognizable injury, (b) caused by the challenged action, and (c) redressable by a court. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561-62 (1992). Moreover, to qualify as "an invasion of a legally protected interest," an injury in fact must be both "concrete and particularized" to the plaintiff and "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation marks and citations omitted). As relevant here, the opposite of a "concrete and particularized" injury is "a generalized grievance" that is "plainly undifferentiated" to the plaintiff and "common to all members of the public." *United States v. Richardson*, 418 U.S. 166, 176-77 (1974) (interior quotation marks omitted). Further, a plaintiff's "'some day' intentions — without any description of concrete plans, or indeed even any specification of when the some day will be — do not support a finding of the 'actual or imminent' injury that our cases require." *Defenders of Wildlife*, 504 U.S. at 564. Membership groups like Plaintiffs can sue on behalf of their members if the members have standing, *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977), but — with exceptions not relevant here — Article III requires associational plaintiffs to identify specific

4

members with standing to ensure the court that the parties include an affected person, *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 235 (1990); *Summers v. Earth Island Institute,* 555 U.S. 488-89, 495 (2009).

In addition to the constitutional limits on standing, the judiciary has adopted prudential limits on standing that bar review even when the plaintiff meets Article III's minimum criteria. *See, e.g.*, *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 475 (1982) (zone-of-intertest test); *Secretary of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 955 (1984) (litigants must raise their own rights). Moreover, all of these constitutional and prudential criteria must align to provide standing for a given injury, *Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1232 (D.C. Cir. 1996), and plaintiffs must establish standing separately for each form of relief they request. *Lewis v. Casey,* 518 U.S. 343, 358 n.6 (1996) ("standing is not dispensed in gross,"); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 & n.5 (2006).

### a.     Plaintiffs lack standing for their appropriations- and NEA-based arguments.

Although *U.S. House of Representatives v. Burwell*, 130 F. Supp. 3d 53 (D.D.C. 2015), recognized the unique injury that the House of Representatives can suffer from constitutional violations of the Appropriations Clause, even *Burwell* recognized that that standing does not extend to statutory violations. *Burwell*, 130 F. Supp. 3d at 74-75. And Circuit precedent is clear that *individual legislators* lack that institutional injury and thus suffer both types of violations – statutory and constitutional – as a generalized grievance insufficient to confer standing: "Once a bill becomes law, a Congressman's interest in its enforcement is shared by, and indistinguishable from, that of any other member of the public." *Daughtrey v. Carter*, 584 F.2d 1050, 1057 (D.C. 1978); *Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000) ("legislators [do not] have standing

whenever the government does something Congress voted against, still less [do] congressmen …

have standing anytime a President allegedly acts in excess of statutory authority"). "[T]he

authorities appear to hold uniformly that an official's mere disobedience or flawed execution of a

law for which a legislator voted ... is not an injury in fact for standing purposes." *Russell v.*

*DeJongh*, 491 F.3d 130, 134-35 (3d Cir. 2007); *United Presbyterian Church v. Reagan*, 738 F.2d

1375, 1382 (D.C. Cir. 1984) ("allegedly illegal [Executive] activities [are] a generalized grievance

about the conduct of government") (internal quotation marks omitted). Unlike the House *as an*

*institution*, Plaintiffs here stand in no higher position — *vis-à-vis* injuries under the Appropriations

Clause or appropriations statutes — than individual members of Congress. Without the House's

institutional interests under the Constitution, even legislators assert "a generalized grievance about

the conduct of government." *Reagan*, 738 F.2d at 1382. Accordingly, Plaintiffs lack standing for

their *statutory* claims.

Plaintiffs' so-called constitutional arguments fare no better because they are merely

statutory arguments. Congress clearly appropriated the funds at issue, and the only question is

whether the relevant *statutes* allow the Government to transfer and use the funds under the

statutory processes that the Government has invoked. *See* Sections II.B, *infra*. The argument that

these claims are constitutional — as opposed to statutory — easily qualifies as one "made solely

for the purpose of obtaining jurisdiction," which this Court must reject. *Arbaugh*, 546 U.S. at 513

n.10 (interior quotation marks and citations omitted). If every alleged statutory transgression

violated the Constitution, this action would not be as unprecedented as it is. *Compare Raines v.*

*Byrd*, 521 U.S. 811, 829 (1997) ("their attempt to litigate this dispute at this time and in this form

is contrary to historical experience") with *Burwell*, 130 F. Supp. 3d at 66 ("no authority … answers

the questions posed by the Secretaries' motion"). Indeed, even *Burwell* rejected analogous

statutory claims masquerading as constitutional ones. *Burwell*, 130 F. Supp. 3d at 74-75; *cf. Lance v. Coffman*, 549 U.S. 437, 441-42 (2007) (rejecting constitutional challenge based on a generalized grievance). Accordingly, this Court should reject Plaintiffs' effort to mischaracterize their statutory dispute with the Government as a constitutional claim.

**b.      Plaintiffs lack standing for programmatic relief and for border-wall sections for which Plaintiffs have not identified affected members.**

Plaintiffs' complaint mentions several members who claim to suffer injury from specific planned border-wall sections. *See* 1st Am. Compl. ¶¶ 15-16 (ECF #16). Because the various border-wall sections and projects allegedly will impact Plaintiffs' members at various sites along the southern border, Plaintiffs must identify specific members for each affected — or potentially affected — site. *Summers,* 555 U.S. at 495, 498-99. Without listing individual members at a given site, Plaintiffs lack associational standing to review the Government's action at that site. *Id.*; *FW/PBS*, 493 U.S. at 235. For example, in *Summers*, the plaintiffs adequately supported standing at one site, but their standing evaporated when the dispute became moot at that site. *Summers*, 555 U.S. at 495. Moreover, for each allegedly affected specific member, injury must flow from concrete plans, not "'some day' intentions." *Defenders of Wildlife*, 504 U.S. at 564. Standing to challenge one section of border-wall construction does not equate to standing to challenge *all* border-wall sections.

**c.      Plaintiffs' diverted resources do not provide Plaintiffs with standing in their own right.**

In addition to arguing for injuries to the aesthetic interests of Plaintiffs' members, Plaintiffs also claim injury in the form of their increased expenditures to counteract the Government's failure to follow Plaintiffs' understanding of the applicable laws. 1st Am. Compl. ¶ 17. Under Circuit precedent, such diverted-resource injuries can qualify for standing, *People for the Ethical*

*Treatment of Animals v. U.S. Dept. of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015) ("*PETA*"), even though such injuries should be mere self-inflicted injuries that do not provide standing. *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1152-53 (2013); *Pennsylvania v. New Jersey,* 426 U.S. 660, 664 (1976). If mere spending could manufacture standing, any private advocacy group could establish standing against any government action, but that clearly is not the law. *Sierra Club v. Morton,* 405 U.S. 727, 739 (1972) (organizations lack standing to defend "abstract social interests").

This diverted-resource form of standing derives from *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372-73 (1982), and — as Judge Millett explained in her *PETA* dissent — "[t]he problem is not *Havens*[; the] problem is what our precedent has done with *Havens*." 797 F.3d at 1100-01 (Millett, J., dissenting). Under the unique statutory and factual situation in *Havens*, a housing-rights organization's diverted resources provided it standing, but in most other settings such diverted resources are mere self-inflicted injuries. As applied here, the diverted-resource basis for standing extends — *at most* — to Plaintiffs' NEPA claims.

Relying on *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 102-09 (1979), *Havens* held that the Fair Housing Act at issue there extends "standing under § 812 … to the full limits of Art. III," so that "courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section," 455 U.S. at 372, thereby collapsing the standing inquiry into the question of whether the alleged injuries met the Article III minimum of injury in fact. *Id.* The typical organizational plaintiff and typical statute lack several critical criteria from *Havens*.

First, the *Havens* organization had a statutory right (backed by a statutory cause of action) to truthful information that the defendants denied to it. Because "Congress may create a statutory right … the alleged deprivation of [those rights] can confer standing." *Warth v. Seldin,* 422 U.S.

490, 514 (1975). Under a typical statute, a typical organizational plaintiff has no claim to any rights related to its own voluntarily diverted resources.

Second, and related to the first issue, the injury that an organizational plaintiff claims must align with the other components of its standing, *Mountain States,* 92 F.3d at 1232, including the allegedly cognizable right. In *Havens,* the statutorily protected right to truthful housing information aligned with the alleged injury (costs to counteract false information, in violation of the statute). By contrast, under a typical statute, there will be no rights even *remotely* related to a third-party organization's spending.

Third, and most critically, the *Havens* statute eliminated prudential standing, so the zone-of-interest test did not apply. When a plaintiff — whether individual or organizational — sues under a statute that does not eliminate prudential standing, that plaintiff cannot bypass the zone-of-interest test or other prudential limits on standing.[2] Typically, it would be fanciful to suggest that a statute has private, third-party spending in its zone of interests. Here, this Court might — or might not — find that NEPA sought to ease Plaintiffs' mission by protecting Plaintiffs' spending to review alleged NEPA violations, but none of Plaintiffs' other claims fall within the zone of interests of the cited statutory or constitutional provisions. *See* Gov't Memo. at 43-45.

### 2. Some of Plaintiffs' claims are not ripe.

As a variant of the lack of concrete threats to Plaintiffs' concrete interests, it also appears that some of Plaintiffs' claims are not ripe for review: "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at

---

[2]     For example, applying *Havens* to diverted resources in *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 939 (D.C. Cir. 1986) (R.B. Ginsburg, J.), then-Judge Ginsburg correctly recognized the need to ask whether those diverted resources fell within the zone of interests of the Age Discrimination Act. 789 F.2d at 939.

all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotations and citations omitted). For example, it is not clear whether the Government will attempt to use funds under 10 U.S.C. § 2808 for a military construction project in connection with the emergency at the southern border, so it is premature to attempt to assess the lawfulness of that future action. Many facets of the future project remain unknown at this time, including the terms of the military's involvement and whether the Government will have waived NEPA for the project.

### 3.     Plaintiffs' NEA claims are non-justiciable political questions.

Plaintiffs ask this Court to delve into several areas that the NEA leaves to Congress and the President, including "a textually demonstrable constitutional commitment of the issue to a coordinate political department" and "a lack of judicially discoverable and manageable standards for resolving [the case]." *Vieth v. Jubelirer,* 541 U.S. 267, 277-78 (2004) (quoting *Baker v. Carr,* 369 U.S. 186, 217 (1962). As explained in Section I.C.1.a, *infra*, the lack of manageable standards for resolving these issues also goes to the Court's jurisdiction under the APA's waiver of sovereign immunity. As the only unelected branch of government, courts are the *least* fit to answer such questions: "making judges supreme arbiters in political controversies … [would] dethrone [the people] and [make them] lose one of their … invaluable birthrights." *Luther v. Borden,* 48 U.S. 1, 52-53 (1849).

Congress enacted the NEA in 1976, PUB. L. NO. 94-412, 90 Stat. 1255 (1976), culminating a review of emergency legislation begun by the Senate's formation of the Special Committee on the Termination of the National Emergency — later renamed the Special Committee on National Emergencies and Delegated Emergency Powers (hereinafter, the "Special Committee") — in 1973 to study national emergencies that remained "on the books" even though the triggering emergency had passed. 120 CONG. REC. 34,011, 34,013 (Oct. 7, 1974) (Sen. Mathias), *reprinted in* S. Comm. on Gov't Operations & the Special Comm. on Nat'l Emergencies and Delegated Emergency

Powers, 94th Cong., 2d Sess., The National Emergencies Act Source Book: Legislative History, Texts, and Other Documents, at 84-85 (1976) (hereinafter, "NEA Source Book"). Sens. Church and Mathias co-chaired the Special Committee, which also included several other Senators, including — as relevant here — Sen. Pearson. Representatives Morehead and Flowers were the floor managers for the bill in the House.

<strong>a.      The NEA provides the President with flexibility and Congress — not private parties — with oversight.</strong>

Congress contemplated that the NEA would provide the President unfettered discretion to *declare* an emergency, subject only to the power of Congress under the NEA to *terminate* an emergency by concurrent resolution:

> As a firm believer in a strong Presidency and Executive flexibility, I could not support this bill if it would impair any of the rightful constitutional powers of the President. [The bill] will have no impact on the flexibility to declare a national emergency and to quickly respond if the necessity arises.

121 CONG. REC. 27,632, 27,636 (Sept. 4, 1975) (Rep. Hutchinson), *reprinted in* NEA Source Book, at 252-53; 121 CONG. REC. 27,632, 27,645 (Sept. 4, 1975) (Red. Drinan), *reprinted in* NEA Source Book, at 279 ("H.R. 3884 [has] no standard really, whatsoever, when and why the President can proclaim a national emergency"). Consistent with the statutory text, 50 U.S.C. § 1621(a) ("the President is authorized to declare such national emergency"), a President has full discretion to declare an emergency in the first instance.

As enacted, the NEA relied on congressional oversight, 121 CONG. REC. 27,632, 27,636 (Sept. 4, 1975) (Rep. Morehead), *reprinted in* NEA Source Book, at 254 ("Congress would assume the major role of reviewing and overseeing the conduct of the Executive branch in a national emergency situation"), not on judicial review:

> Unlike inherent Presidential powers which can be reviewed by the Supreme Court, emergency powers are specific legal delegations of authority to a President. The Supreme Court has generally given deference to such delegations

11

of authority. The laws are viewed as persuasive evidence of Congressional intent that the President should be permitted special latitude during crises. Thus, *unless the Congress itself imposes controls, emergency powers shall remain largely unchecked.*

120 CONG. REC. 29,975, 29,983 (Aug. 22, 1974) (Sen. Pearson), *reprinted in* NEA Source Book, at 84-85 (emphasis added). NEA's legislative history addresses APA review — obliquely — in two places. In an interim report, the Special Committee used the example of the reviewability of arrests under former 18 U.S.C. § 1383 (1970):[3]

> Would these arrests be reviewable in court? It is not clear. Judicial review of agency action is guaranteed in 5 USC 702, but 5 USC 701 excludes action taken under declarations of martial law.

S. REP. NO. 93-1170, at 2 (1974), *reprinted in* NEA Source Book, at 20; Special Committee Report, at 3, *reprinted in* NEA Source Book, at 35 (same). While the NEA did not resolve whether pre-NEA law would allow judicial review of hypothetical arrests under § 1383, this example raises two important issues. First, the Special Committee recognized that in addition to the APA's generous review, the question of reviewability also hinged on the APA's *limits* to that review.[4]

Second, the Special Committee hypothesized APA review of the *arrests*, not of the underlying

---

[3]    When the NEA was enacted, § 1383 provided as follows: "Whoever, contrary to the restrictions applicable thereto, enters, remains in, leaves, or commits any act in any military area or military zone prescribed under the authority of an Executive order of the President, by the Secretary of the Army, or by any military commander designated by the Secretary of the Army, shall, if it appears that he knew or should have known of the existence and extent of the restrictions or order and that his act was in violation thereof, be fined not more than $5,000 or imprisoned not more than one year, or both." PUB. L. NO. 80-772, § 1, 62 Stat. 683, 765 (1948).

[4]    Although the Special Committee cited 5 U.S.C. § 701 as a relevant limitation on APA review, *Amicus* submits that 5 U.S.C. § 704 would provide another potential limit to review in the scenario outlined by the Special Committee. *FTC v. Standard Oil Co.*, 449 U.S. 232, 246 (1980) ("complaint averring reason to believe that [defendant] has violated the Act is not 'final agency action' under [5 U.S.C. § 704], it is not judicially reviewable before administrative adjudication concludes").

*Executive order* that triggered § 1383 in the first place.

Rep. Drinan introduced an amendment to limit the President's authority to initiate an NEA emergency to instances during wartime or attack, with all other emergencies requiring a joint resolution of the two houses of Congress authorizing the President to declare an emergency. 121 CONG. REC. 27,632, 27,645 (Sept. 4, 1975), *reprinted in* NEA Source Book, at 278. Rep. Drinan introduced his amendment to trim the President's flexibility: "In H.R. 3884 there is no standard really, whatsoever, when and why the President can proclaim a national emergency." *Id.*, *reprinted in* NEA Source Book, at 279 (Rep. Drinan). Rep. Moorhead opposed the Drinan amendment because it "would completely take away from the President the flexibility of acting in times of crisis or an emergency." 121 CONG. REC. 27,632, 27,646 (Sept. 4, 1975), *reprinted in* NEA Source Book, at 280 (Rep. Moorhead). These rival positions appear to have been resolved by the power that the NEA gave the Congress to terminate a presidentially declared emergency with a concurrent resolution:

> Mr. Conyers. … What happens if the President of the United States vetoes the congressional termination of the emergency power? Is that contemplatable within the purview of this legislation? …
>
> Mr. Flowers. Mr. Chairman, on the advice of counsel we have researched that thoroughly. A concurrent resolution would not require Presidential signature or acceptance. It would be an impossibility that it would be vetoed.
>
> Mr. Conyers. So there is no way that the President could interfere with the Congress.
>
> Mr. Flowers. The gentleman is correct.

121 CONG. REC. 27,632, 27,646 (Sept. 4, 1975), *reprinted in* NEA Source Book, at 280. After that colloquy, the Drinan amendment was rejected. *Id.* In a later colloquy, Rep. Moorhead asked Rep. Flowers to "tell the House whether there is any intent here to limit either the President's power or flexibility to declare a national emergency," and Rep. Flowers replied that "there is not" and that

"I do not think that we want to do that by legislation in any event." 122 CONG. REC. 28,466 (Aug. 31, 1976), *reprinted in* NEA Source Book, at 342 (Reps. Moorhead and Flowers). In sum, as passed in 1976, the NEA allowed the President full discretion to declare emergencies, subject only to the ability of the two houses of Congress to terminate an emergency by a veto-proof concurrent resolution.[5]

> **b.** **Even if the switch from concurrent to joint resolutions would have changed some votes in 1976, Congress ratified the current NEA with the post-*Chadha* amendment in 1985.**

*Amicus* does not doubt that some members of the 94th Congress voted for the NEA because, under it, Congress would retain the power unilaterally to terminate a presidentially declared emergency through a concurrent resolution (*i.e.*, one passed by a majority vote in each house, without presentment to the President). *See* 121 CONG. REC. 27,632, 27,646 (Sept. 4, 1975), *reprinted in* NEA Source Book, at 280 (Reps. Conyers and Flowers). In *INS v. Chadha,* 462 U.S. 919, 946 (1983), however, the Supreme Court rejected the one-house veto provisions of former 8 U.S.C. § 1254(c)(2) (1982) for failing to meet the constitutional requirements of bicameralism and presentment. In doing so, *Chadha* cast grave doubt on the ability of Congress to void presidential action by a concurrent resolution (*i.e.*, without presentment to the President). Simply put, bicameralism alone is insufficient: either the President must sign the bill, or Congress must override a veto.

If Congress had not acted to address the NEA's revealed constitutional infirmity, this Court might well have to consider whether the remainder of the NEA was severable from the

---

[5]     Although congressional review appears to have been very relevant — if not critical — to the NEA's passage, Congress later ultimately accepted and ratified the current NEA, with its less stringent congressional review via joint resolutions. *See* Section I.B.3.b, *infra*.

unconstitutional concurrent-resolution provision. In 1985, however, the 99th Congress amended

the NEA to replace oversight via *concurrent* resolution with oversight via *joint* resolution, PUB. L.

NO. 99-93, § 801, 99 Stat. 405, 448 (1985), and that amendment ratified the rest of the NEA as

enacted. *See Fleming v. Mohawk Co.*, 331 U.S. 111, 118-19 (1947); *cf. Red Lion Broad. Co. v.

FCC,* 395 U.S. 367, 380-81 (1969) (post-enactment history is "entitled to great weight in statutory

construction" of the original statute). As interesting as severability and vetoed resolutions might

be, they are irrelevant.

Specifically, the 1985 amendment expressly addressed the NEA's *Chadha* problem and

provided a legislative fix:

> In the past year and a half, … the constitutional validity of the use of concurrent
> resolutions to terminate statutory delegations of power has been called into
> question. In particular, the so-called *Chadha* case, *INS versus Chadha*,
> invalidated in that case the one-house veto of an administrative action. The
> reasoning of the Court is based on the view that "every bill" as well as "every
> order, resolution, or both, to which the concurrence of the Senate and the House
> of Representatives may be necessary" shall be presented to the President for the
> opportunity to approve or disapprove the letter subject to override by a two-
> thirds vote of both Houses.
>
> I am of the view that we in the Congress should respond to the opinion of the
> Court and determine if a joint resolution procedure, which would meet the
> constitutional test set forth by the Court, would adversely affect the purposes of
> the National Emergencies Act as they originally intended. Upon reflection, I
> have concluded that we should amend the National Emergencies Act and replace
> the use of the concurrent resolution for termination of a State or national
> emergency with the procedure of a joint resolution.

131 CONG. REC. 14,671, 14,947 (June 7, 1985) (Sen. Mathias). Senator Mathias's amendment

passed the Senate and was added to the House bill in Conference. *Id.*; H.R. REP. NO. 99-240, at 86

(1985) (Conf. Rep.) ("Senate amendment amends the National Emergencies Act to stipulate that a

national emergency may be terminated by joint resolution of the Congress," and "Conference

Substitute is identical to the Senate amendment"). Because of the 1985 amendment, a resolution

passed by both houses of Congress to terminate a presidentially declared emergency is irrelevant,

unless the President signs the bill or both houses override a presidential veto.

### C.      Sovereign immunity bars this action.

In addition to the lack of Article III jurisdiction, Plaintiffs' claims also fall outside the scope of the APA's waiver of sovereign immunity and thus are subject to an independent jurisdictional bar. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature"). Accordingly, this Court must consider immunity, even if the Government's briefs did not raise it.

### 1.      The United States has not waived sovereign immunity for this action.

"The United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit," without regard to any perceived unfairness, inefficiency, or inequity. *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999). Moreover, the scope of such waivers is strictly construed in favor of the sovereign. *Lane v. Pena*, 518 U.S. 187, 192 (1996). Here, Plaintiffs lack a waiver of sovereign immunity for an APA action.

In the 1976 APA amendments to 5 U.S.C. § 702,[6] Congress "*eliminat[ed]* the sovereign immunity defense in *all equitable actions* for specific relief against a Federal agency or officer acting in an official capacity." *Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1982) (quoting S. REP. NO. 996, 94th Cong., 2d Sess. 8 (1976); H.R. REP. NO. 1656, 94th Cong., 2d Sess. 9 (1976), 1976 U.S. Code Cong. & Admin. News 6121, 6129) (R.B. Ginsburg, J.). But that waiver has several restrictions that preclude review *in this action*.[7]

---

[6]      PUB. L. NO. 94-574, § 1, 90 Stat. 2721 (1976).

[7]      In addition to the generally applicable limits in the APA's waiver of sovereign immunity, the NEA also provides that "[n]o law enacted after September 14, 1976, shall supersede this [the

*(Footnote cont'd on next page)*

As relevant here, the APA excludes review for "statutes [that] preclude judicial review," those that commit agency action to agency discretion, and ones with "special statutory review." 5 U.S.C. §§ 701(a)(1)-(2), 703.[8] In addition, the waiver of immunity extends only to actions either made reviewable by statute or for which there is no other adequate remedy in court. 5 U.S.C. § 704. Plaintiffs' claims fall outside the APA's waiver of sovereign immunity because the defendants' actions are committed to agency discretion and because Plaintiffs do not challenge a final agency action.

> ### a.    This Court lacks judicially manageable standards to review this matter.

Judicial review is precluded "to the extent that … agency action is committed to agency discretion by law." 5 U.S.C. § 702(2); *accord id.* § 701(a)(2). One sign that Congress has committed an issue to executive officers' discretion is when a reviewing court would have "no law to apply" in reviewing the agency action. *Overton Park*, 401 U.S. at 410. Similarly, "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. 821, 830 (1985). Indeed, this principle predates the APA, *Gray v. Powell,* 314 U.S. 402, 412 (1941), and forms a "common law" of "nonreviewability." Kenneth Culp Davis, *Nonreviewable Administrative Action,* 96 U. PA.

---

NEA] unless it does so in specific terms, referring to [the NEA], and declaring that the new law supersedes the provisions of [the NEA]." 50 U.S.C. § 1621(b). The APA's waiver was enacted after September 14, 1976, *see* PUB. L. NO. 94-574, 90 Stat. at 2721, and does not supersede the NEA expressly.

[8]    With the advent of general-purpose review statutes like the APA, the term "nonstatutory" has become something of a "misnomer." *Air New Zealand Ltd. v. C.A.B.,* 726 F.2d 832, 836-37 (D.C. Cir. 1984) (Scalia, J.). "Statutory review" means review pursuant the governing substantive statute, and "nonstatutory review" means review pursuant to a general-purpose provision (*e.g.*, originally equity, but now also the APA or 28 U.S.C. § 1361).

L. REV. 749, 750-51 (1948). Review is particularly outside judicial expertise when, as here, "the duty to act turns on matters of doubtful or highly debatable inference from large or loose statutory terms." *Panama Canal Co. v. Grace Line, Inc.,* 356 U.S. 309, 318 (1958).

The NEA has not given a reviewing court the "law to apply." As Rep. Drinan candidly acknowledged in trying to amend the NEA bill to give Congress control over non-wartime emergencies, "H.R. 3884 [has] no standard really, whatsoever, when and why the President can proclaim a national emergency." 121 CONG. REC. 27,632, 27,645 (Sept. 4, 1975) (Red. Drinan), *reprinted in* NEA Source Book, at 279.

> Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.

*INS v. Cardoza-Fonseca,* 480 U.S. 421, 442-43 (1987) (citation omitted). Because Congress purposefully enacted legislation that gives the President complete flexibility — and thus gives a reviewing court "no law to apply" to measure the President's exercise of that discretion — this Court should thus find the President's declarations unreviewable and outside the APA's waiver of sovereign immunity.[9]

### b.    Plaintiffs have not challenged a final agency action and lack statutory review.

The Government argues that the NEA displaces APA review, but even if the Court were to reject that argument, the NEA plainly does not make Presidential actions *reviewable by statute* within the ambit of the APA. *See* 5 U.S.C. § 704. Thus, for this action to be reviewable under the APA, Plaintiffs must point to a "final agency action for which there is no other adequate remedy

---

[9]    Alternatively, the lack judicially manageable standards provides a basis for rejecting the claims here as non-justiciable political questions. *See Vieth,* 541 U.S. at 277; Section I.B, *supra*.

in a court." *Id.* Without either a statutorily reviewable action or a final action with no adequate remedy, this Court lacks authority to review the Government's actions. *Council of and for the Blind of Delaware County Valley, Inc., v. Regan,* 709 F.2d 1521, 1531 (D.C. Cir. 1983) (*en banc*). The Government's actions here are not final and, to the extent that Plaintiffs are truly aggrieved by future actions, Plaintiffs may have an adequate remedy at that time (*e.g.*, to challenge a taking of land).

### 2.   Plaintiffs' adequate future remedies displace some equity claims.

Even assuming *arguendo* that Plaintiffs could state a ripe claim for whatever future injuries they claim to fear, the potential availability of an action to redress those injuries — if and when they become imminent or concrete — would displace a current action in equity. *Younger v. Harris*, 401 U.S. 37, 43-44 (1971). For example, Plaintiffs may have NEPA claims for future border-wall projects, although the Government has authority to waive those claims to the extent that the Government ever decides to carry out future border-wall projects. *See* Section II.C, *infra*. Accordingly, *Amicus* sees no reason why these Plaintiffs can resort to equity to avoid the limitations of APA review.

Long before the 1976 APA amendment waiving sovereign immunity for judicial review, our political and legal tradition allowed suit to compel government officers to comply with the government's laws and Constitution:

> that the King's courts… could order his officers to account for their conduct []
> was the essence of… "the rule of law." Whatever the logical contradictions
> between this doctrine and sovereign immunity, [it] had become firmly
> established [and] as much a part of the law as… sovereign immunity.

Louis L. Jaffee, *The Right to Judicial Review I,* 71 HARV. L. REV. 401, 433 (1958); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 165 (1803) ("the law… entertains no respect or delicacy [for the Crown's officers]; but furnishes various methods of detecting the errors and misconduct of those

agents, by whom the king has been deceived and induced to do a temporary injustice") (*quoting* 3 WILLIAM BLACKSTONE, COMMENTARIES *255). Plaintiffs' problem here is not that they lack a cause of action *per se* but that they lack a *viable* cause of action.

Significantly, "inquiry into whether suit lies [for judicial review] under *Ex parte Young* does not include [merits] analysis." *Verizon Md., Inc. v. Public Serv. Comm'n of Md.,* 535 U.S. 635, 636-37 (2002). To succeed, however, that type of review requires an *ongoing violation* of federal law. *Green v. Mansour,* 474 U.S. 64, 66-67 (1985). At best, Plaintiffs here might fear a future violation of federal law, but make no credible claim of an *ongoing violation* of federal law. This type of ancient and important exception to the doctrine of sovereign immunity does not authorize private plaintiffs to air their policy disputes with the Government. *Cf. Nat'l Labor Relations Bd. Union v. Fed. Labor Relations Auth.,* 834 F.2d 191, 196-97 (D.C. Cir. 1987) (distinguishing between review of *ultra vires* actions and review of arbitrary and capricious actions). While invoking *Ex parte Young* can avoid a jurisdictional dismissal in an appropriate case, Plaintiffs' complaint does not state a claim under *Ex parte Young*.

## II.    PLAINTIFFS LACK A VIABLE ACTION ON THE MERITS.

Assuming *arguendo* that this Court reaches the merits, this Court should reject Plaintiffs' claims on the merits. Indeed, a federal court may dismiss for lack of statutory standing — *i.e.*, failure to qualify under the relevant statute — before analyzing jurisdiction. *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 830-31 (1999); *cf. Friends of the Capital Crescent Trail v. Fed. Transit Admin.*, 49 ELR 20038, ___ n.3, 2019 U.S. Dist. LEXIS 34997, *7 n.3 (D.D.C. Mar. 1, 2019) (zone of interests). Thus, this Court could dismiss these claims with prejudice and on the merits.

### A.    The President's NEA proclamation complies with the NEA.

The President's Proclamation complies with the NEA, which provides — without any substantive limits — that "the President is authorized to declare such national emergency" with

regard to any statutes "authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a). Procedurally, the NEA requires that the "proclamation shall immediately be transmitted to the Congress and published in the Federal Register." *Id.* If a President did not transmit or publish a proclamation, a court perhaps could enforce a right of access to a proclamation. *Substantively*, however, neither a reviewing court nor Plaintiffs can argue that the President violated anything. Moreover, "[n]o law enacted after September 14, 1976, shall supersede [the NEA] unless it does so in specific terms, referring to [the NEA], and declaring that the new law supersedes the provisions of [the NEA]." 50 U.S.C. § 1621(b). Plaintiffs cannot cite a law that expressly supersedes presidential authority under the NEA.

**B.**    **Plaintiffs do not state a statutory claim to relief under the appropriations statutes.**

If Plaintiffs survive the jurisdictional barriers to their statutory appropriations claims, this Court should rule against them on the statutory merits.

**1.**    **The Government has not violated 10 U.S.C. § 284.**

As the Government explains and Plaintiffs cannot dispute, funds under **§** 284 are available for "the counterdrug activities … of any other department or agency of the Federal Government," 10 U.S.C. § 284(a), expressly including "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." *Id.* § 284(b)(7). Insofar as a border barrier falls within § 284(b)(7)'s ambit as a fence to block smuggling corridors across the border, that ends the inquiry with respect to **§** 284 funds.

Indeed, Plaintiffs do not dispute that DoD may expend appropriated funds for border-wall construction, but rather argue that DoD cannot replenish its available funds by reprogramming – or transferring – appropriated funds, which Plaintiffs claim would violate DoD's fiscal 2019

appropriations bill, DoD Appropriations Act for Fiscal Year 2019, PUB. L. NO. 115-245, div. A, §

8005, 132 Stat. 2981, 2999 (Sept. 28, 2018), and DHS-related provisions of the Consolidated

Appropriations Act 2019, PUB. L. NO. 116-6, 132 Stat. 2981 (2019). *Amicus* respectfully submits

that the Government handily dispatches Plaintiffs' arguments by showing that DHS requested

DoD's assistance months after Congress enacted the 2019 DoD appropriation and that

appropriating DHS $1.375 billion for DHS border-wall construction did not repeal by implication

DoD's separate, existing authority.

With respect to repeals by implication, the Supreme Court recently has explained that a

court will not presume repeal "unless the intention of the legislature to repeal is clear and manifest"

and "unless the later statute expressly contradicts the original act or … such a construction is

absolutely necessary in order that the words of the later statute shall have any meaning at all."

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007) (interior alterations,

citations, and quotation marks omitted). Given its silence on DoD transfers and expenditures for

border-wall funding, a DHS appropriation cannot implicitly repeal DoD's existing authority.

## 2.      The Government has not violated 10 U.S.C. § 2808.

As the Government explains and Plaintiffs cannot dispute, funds under **§** 2808 are available

during declared emergencies for "military construction projects," 10 U.S.C. § 2808(a), which are

defined to "include[] all military construction work," *id.* § 2801(b), which is defined to "include[]

any construction, development, conversion, or extension of any kind carried out with respect to a

military installation, whether to satisfy temporary or permanent requirements, or any acquisition

of land or construction of a defense access road." *Id.* § 2801(a). In turn, "military installation" is

defined as "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the

Secretary of a military department." *Id.* § 2801(c)(4). *Amicus* respectfully submits that a border

barrier meets these definitions. If the Army is sent to the border, its activity there will of course be

under the jurisdiction of the Secretary of the Army, and the construction of a border barrier would be "construction" "with respect to [the] military installation" consisting of the Army's activity.

While *Amicus* supports the Government's plans under § 2808, those plans are not justiciable at this time because those plans have not been reduced to a final agency action and are, thus, unripe and insufficiently concrete. *See* Sections I.B.1 (standing), I.B.2 (ripeness), I.C.1.b (final action), *supra*. It is premature to reach the merits because nothing has happened yet. Until there is a specific military deployment, supported by a specific military construction project, this Court has nothing to review.

### C. Plaintiffs do not state a statutory claim to relief under NEPA.

Plaintiffs' NEPA claims fail, either because they are premature for border-wall sectors where the Government has not yet formalized any plans to act or because — where the Government has formed plans — the Department of Homeland Security ("DHS") has waived NEPA. *See* Gov't Memo. at 36-38. Either way, Plaintiffs' NEPA claims fail.

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996, PUB. L. NO. 104-208, Div. C, 110 Stat. 3009, 3009-546 to 3009-724 ("IIRIRA"), gave DHS's predecessor the discretionary (and unreviewable) authority to waive NEPA for certain border-wall projects, *id.* at § 102(c)(1), 110 Stat. at 3009-555, and the Real ID Act of 2005, PUB. L. NO. 109-13, Tit. I, Div. B, 119 Stat. 231, 302-11, broadened that waiver authority, and transferred it to DHS. *Id.* § 102, 119 Stat. at 306 (codified at 8 U.S.C. § 1103 note); *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 122 n.3 (D.D.C. 2007). Where the border-wall projects are unripe and non-final, this Court must dismiss Plaintiffs' NEPA claims on those jurisdictional bases. *See* Sections I.B.2, I.C.1.b, *supra*. Where DHS has waived NEPA's applicability, there may be tension as to whether this Court should dismiss jurisdictionally or on the merits, *compare In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1221-26 (9th Cir. 2019) (majority found jurisdiction and dismissed on the merits)

*with id.* at 1226-27 (Callahan, J., dissenting) (no jurisdiction), but this Court clearly must dismiss the NEPA claims.

>   D.   <u>Plaintiffs do not state a claim under the Appropriations or Take Care Clauses of the Constitution.</u>

Plaintiffs' constitutional claims are baseless because their statutory claims are baseless. *See* Sections II.A-II.B, *supra*. The President is faithfully executing his obligation to defend the Nation with appropriated funds. In doing so, moreover, he has followed a procedure — *viz.*, declaring a national emergency and vetoing a joint resolution to terminate that emergency — that is set forth plainly in the NEA and the relevant appropriations statutes. Though his actions may displease some, those actions can hardly be considered an end-run around Congress as an institution or branch of government, since the actions were taken pursuant to authority that Congress has delegated to the President and has not withdrawn in any law. The Government has dealt exclusively with appropriated funds and the statutorily permitted transfer of appropriated funds, so the Government has not violated the Appropriations Clause, and the President has not violated the Take Care Clause.

As the Government explains, Plaintiffs cannot transform their *statutory* arguments into a constitutional claim. *See* Gov't Memo. at 53-55 (citing *Dalton v. Specter*, 511 U.S. 462, 473 (1994)); *accord Campbell*, 203 F.3d at 22; *Burwell*, 130 F. Supp. 3d at 74-75. Congress has appropriated the funds in question and authorized the Executive Branch to reprogram those funds. Accordingly, Plaintiffs can only make claims of statutory violations in this case, and those are not enough to state a claim under the Constitution.

<u>CONCLUSION</u>

For the foregoing reasons and those cited by the Government, this Court should dismiss Plaintiffs' claims.

Dated: May 23, 2019                          Respectfully submitted,


                                               /s/ Lawrence J. Joseph
Christopher J. Hajec                         Lawrence J. Joseph, D.C. Bar No. 464777
Immigration Reform Law Institute             1250 Connecticut Av NW Suite 700-1A
25 Massachusetts Ave. NW, Suite 335          Washington, DC 20036
Washington, DC 20001                         Telephone: (202) 355-9452
Telephone: (202) 232-5590                    Facsimile: (202) 318-2254
chajec@irli.org                              ljoseph@larryjoseph.com

                                             *Counsel for Rep. Andy Barr*