# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; DEFENDERS OF WILDLIFE; and ANIMAL LEGAL DEFENSE FUND, | Case No.: 1:19-cv-00408 (TNM) |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America; PATRICK M. SHANAHAN, in his official capacity as Acting Secretary of Defense; LIEUTENANT GENERAL TODD T. SEMONITE, in his official capacity as Commander and Chief of Engineers, U.S. Army Corps of Engineers; KEVIN McALEENAN, in his official capacity as Acting Homeland Security Secretary; DAVID BERNHARDT, in his official capacity as Secretary of the Interior, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ................................................................................................................1

BACKGROUND ..................................................................................................................3

I.     The February 15, 2019 Emergency Proclamation and Administration Statement Identifying $6.7 Billion in Appropriated Funds for Transfer to Border Wall Construction ...........................................................................................................3

II.    The 2019 Consolidated Appropriations Act and its Limitations on Border Wall Funding ...................................................................................................................4

III.   Department of Defense Funds Are Primarily Being Used to Replace "Vehicle Barriers" With Border Walls on Protected Federal Borderlands in California, Arizona, and New Mexico ......................................................................................5

     A.     Protected Public Lands in the Borderlands ................................................7

     B.     Vehicle Barriers Installed Within National Monuments, National Wildlife Refuges, National Forests, and Other Protected Federal Lands Have Served as an Effective Border Security Measure While Also Incorporating Environmental Considerations ...............................................8

ARGUMENT .....................................................................................................................10

I.     PLAINTIFFS HAVE ASSOCIATIONAL ARTICLE III STANDING ...............10

     A.     Plaintiffs' Standing Allegations Are Sufficient for the Pleading Stage ........................................................................................................11

     B.     Plaintiffs' Declarations Establish Injury-in-Fact ......................................11

     C.     Plaintiffs Have Standing to Bring their Counterdrug Account Pass-Through Claims (Claims IV and V) .................................................13

     D.     Plaintiffs Have Standing to Bring their Emergency Proclamation and Agency Action § 2808 Implementation Claims (Claims I-III)...........17

     E.     Plaintiffs Have Standing to Bring their NEPA Claim (Claim VI) ............21

     F.     Plaintiffs Have Standing to Bring their Constitutional Claims (Claims VII-VIII) ......................................................................................22

II.     PLAINTIFFS MEET THE ZONE OF INTERESTS STANDARD ....................22

III.    PLAINTIFFS' NATIONAL EMERGENCY ACT CLAIM IS JUSTICIABLE ...26

     A.     The NEA Does Not Preclude Judicial Review ..........................................26

     B.     The NEA Claim Is Not Barred by the Political Question Doctrine ..........32

     C.     The President Is a Proper and Necessary Party ........................................35

IV.    IN THE ABSENCE OF FINAL AGENCY ACTION IMPLEMENTING THE
PROCLAMATION'S EMERGENCY INVOCATION OF 10 U.S.C. § 2808,
PLAINTIFFS MAY CHALLENGE THE PRESIDENT'S RELIANCE ON
§ 2808 DIRECTLY ........................................................................................38

     A.     The Requirement of Final Agency Action is Limited to the APA ...........39

     B.     Department of Defense Implementing Actions are Not Committed to
Agency Discretion by Law .......................................................................40

V.     IIRIRA WAIVERS DO NOT REMOVE THIS COURT'S JURISDICTION
TO HEAR PLAINTIFFS' NEPA CLAIM ...........................................................41

VI.    PLAINTIFFS HAVE PLED VALID APA CLAIMS ..........................................45

     A.     Section 2808 ..............................................................................................46

     B.     Section 8005 ..............................................................................................47

     C.     Consolidated Appropriations Act .............................................................49

VII.   PLAINTIFFS HAVE PLED VALID ULTRA VIRES CLAIMS ........................51

VIII.  PLAINTIFFS HAVE PLED VALID CONSTITUTIONAL
CLAIMS .........................................................................................................52

CONCLUSION ...............................................................................................................55

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ............................................................................................26, 40

*Aertsen v. Landrieu*,
637 F.2d 12 (1st Cir. 1980) .........................................................................................43

\* *AFL-CIO v. Kahn*,
618 F.2d 784 (D.C. Cir. 1979) ...................................................................................27

*Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*,
724 F.3d 243 (D.C. Cir. 2013) ...................................................................................10

*Andrade v. Lauer*,
729 F.2d 1475 (D.C. Cir. 1984) .................................................................................22

*Ange v. Bush*,
752 F. Supp. 509 (D.D.C. 1990) ................................................................................33

*Animal Legal Def. Fund v. Glickman*,
154 F.3d 426 (D.C. Cir. 1998) ...................................................................................12

*ASARCO, Inc. v. Kadish*,
490 U.S. 605 (1989) ...................................................................................................15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................45, 46

*Ass'n of Battery Recyclers v. EPA*,
716 F.3d 667 (D.C. Cir. 2013) ...................................................................................23

*Ass'n of Data Processing Serv. Orgs. v. Camp*,
397 U.S. 150 (1970) ............................................................................................22, 23

*Attias v. CareFirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) ...................................................................................18

*Baker v. Carr*,
369 U.S. 186 (1962) ............................................................................................32, 33

*Beacon Products Corp. v. Reagan*,
814 F.2d 1 (1st Cir. 1987).............................................................................................31

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ......................................................................................45, 46

*Bengzon v. Sec'y of Justice,*
    299 U.S. 410 (1937) ...............................................................................................48

*Bennett v. Spear,*
    520 U.S. 154 (1997) ......................................................................................14, 23

*Block v. Cmty. Nutrition Inst.,*
    467 U.S. 340 (1984) ............................................................................... 28, 29-30

*Bowen v. Mich. Acad. of Family Physicians,*
    476 U.S.  667 (1986) .............................................................................................44

*Campbell v. Clinton,*
    203 F.3d 19 (2000) ...............................................................................................39

*Centro Presente v. United States Dep't of Homeland Sec.,*
    332 F. Supp. 393 (D. Mass. 2018) .......................................................................36

\* *Chamber of Commerce v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) .....................................................................51, 52

*Citizens to Preserve Overton Park v. Volpe,*
    401 U.S. 402 (1971) .............................................................................................40

*City of Olmsted Falls v. FAA,*
    292 F.3d 261 (D.C. Cir. 2002) .............................................................................12

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .............................................................................................18

*Clarke v. Sec. Indus. Ass'n,*
    479 U.S. 388 (1987) .............................................................................................23

*Cole v. Young,*
    351 U.S. 536 (1956) .......................................................................................27-28

*Dalton v. Specter,*
    511 U.S. 462 (1994) ................................................................................ 36, 51, 53-54

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981) .............................................................................................52

*Dart v. United States,*
    848 F.3d 217 (D.C. Cir. 1988) .............................................................................52

*Defenders of Wildlife v. Chertoff*,
  527 F. Supp. 2d 119 (D.D.C. 2007) ............................................................45

\* *Defenders of Wildlife v. Lujan*,
  504 U.S. 555 (1992)................................................................... passim

*Donovan v. Carolina Stalite Co.*,
  734 F.2d 1547 (D.C. Cir. 1984) ................................................................50

*Dunlop v. Bachowski*,
  421 U.S. 560 (1975) ................................................................................26

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.D.C. 2010) ...................................................32, 33, 35

*Five Flags Pipe Line Co. v. Dep't of Transp.*,
  854 F.2d 1438 (D.C. Cir. 1988) ................................................................52

*Fla. Audubon Soc'y v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) ...........................................................10, 21

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ................................................................36, 39, 53

*Friends of the Earth, Inc. v. Laidlaw Envt'l Services, Inc.*,
  528 U.S. 167 (2000) ................................................................................10

*Gilligan v. Morgan*,
  413 U.S. 1 (1973) ..................................................................................32

*Grocery Mfrs. Ass'n v. EPA*,
  693 F.3d 169 (D.C. Cir. 2012) ................................................................10

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) ................................................................................32

*Hancock v. Urban Outfitters, Inc.*,
  830 F.3d 511 (D.C. Cir. 2016) ................................................................26

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ................................................................................40

*Hispanic Affairs Project v. Perez*,
  206 F. Supp. 3d 348 (D.D.C. 2016) ........................................................23

*Hi-Tech Furnace Sys., Inc. v. FCC,*
  224 F.3d 781 (D.C. Cir. 2000) ................................................................40

*Industria Panificadora, S.A. v. United States,*
  763 F. Supp. 1154 (D.D.C. 1991) ....................................................33, 34

*In re Border Infrastructure Envtl. Litig.,*
  284 F. Supp. 3d 1092 (S.D. Cal. 2018) ............................................44, 45

\* *In re Idaho Conservation League,*
  811 F.3d 502 (D.C. Cir. 2016) .......................................................... 19-20

*Int'l Refugee Assistance Project v. Trump,*
  857 F.3d 555 (4th Cir. 2017) ..................................................................37

*James B. Beam Distilling Co. v. Georgia,*
  501 U.S. 529 (1991) ................................................................................54

*Japan Whaling Ass'n v. American Cetacean Soc'y,*
  478 U.S. 221 (1986) ..........................................................................35, 41

*Jubelirer v. Rendell,*
  598 Pa. 16 (2008) ...................................................................................48

*Knights First Amendment Inst. at Columbia Univ. v. Trump,*
  302 F. Supp. 3d 541 (S.D.N.Y. 2018) ...................................................36

*Leedom v. Kyne*
  358 U.S. 184 (1958) ...............................................................................52

\* *Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) ..........................................................................23, 25

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ..........................................................................11, 17

*Mackie v. Bush,*
  809 F. Supp. 144 (D.D.C. 1993) ............................................................36

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) .......................................................................... 22-23

*Micei Int'l v. DOC,*
  613 F.3d 1147 (D.C. Cir. 2010) .............................................................31

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n,*
  453 U.S. 1 (1981) ............................................................................. 29-30

*Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel*,
  792 F.2d 1172 (D.C. Cir. 1986) ............................................................15

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1866) ..............................................................35

*Mitchell v. Harmony*,
  13 How. 115, 54 U.S. 15 (1851) .........................................................34

*Mountain States Legal Found. v. Bush*,
  306 F.3d 1132 (D.C. Cir. 2002) .....................................................41, 51

\* *Nat'l Parks Conservation Ass'n v. Manson*,
  414 F.3d 1 (D.C. Cir. 2005) ......................................................12, 16, 21

\* *Nat'l Treasury Employees Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ............................................................35

*Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*,
  677 F.2d 883 (D.C. Cir. 1981) ............................................................43

*Nevada v. DOE*,
  400 F.3d 9 (D.C. Cir. 2005) ...............................................................50

*Otay Mesa Prop., L.P. v. United States DOI*,
  144 F. Supp. 3d 35 (D.D.C. 2015) ......................................................25

*Panama Refining Co. v. Ryan*,
  293 U.S. 388 (1935) ..........................................................................39

*Perrin v. United States*,
  444 U.S. 37 (1979) ............................................................................27

*Physicians for Soc. Responsibility v. Wheeler*,
  359 F. Supp. 3d 27 (D.D.C. 2019) .................................................11, 28

*Public Employees for Envt'l Resp. v. United States DOI*,
  832 F. Supp. 2d 5 (D.D.C. 2011)..................................................12, 13

*Ramirez de Arellano v. Weinberger*,
  745 F.2d 1500 (D.C. Cir. 1984) ..........................................................32

*Robbins v. Reagan*,
  780 F.2d 37 (D.C. Cir. 1985) .............................................................41

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ...................................................................................41, 42

*Saget v. Trump*,
345 F. Supp. 2d 287 (E.D.N.Y. 2018) ............................................... 36-37

*Scolaro v. D.C. Bd. of Elections & Ethics*,
104 F. Supp. 2d 18 (D.D.C. 2000) .............................................................3

*Sierra Club v. Jackson*,
648 F3d 848 (D.C. Cir. 2011) ..................................................................40

*Sierra Club v. Morton*,
405 U.S. 727 (1972) ..................................................................................12

*Sierra Club v. Trump*,
No. 19-892, 2019 U.S. Dist. LEXIS 88210 (N.D. Cal. May 24, 2019) ...........................3, 7, 45

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976) ..............................................................................15, 16

* *Sterling v. Constantin*,
278 U.S. 378 (1932) ..................................................................................34

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ..................................................................................18

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) .................................................................36

*Teton Historic Aviation Found. v. United States DOD*,
785 F.3d 719 (D.C. Cir. 2015) .................................................................16

*Town of Barnstable v. FAA*,
659 F.3d 28 (D.C. Cir. 2011)....................................................................20

*Tulare County v. Bush*,
185 F. Supp. 2d 18 (D.D.C. 2001) ...........................................................52

*United States v. Amirnazmi*,
645 F.3d 565 (3d Cir. 2011) .....................................................................31

*United States v. Lee*,
106 U.S. 196 (1882) ..................................................................................37

* *United States v. MacCollum*,
426 U.S. 317 (1976) .............................................................................48, 49

*United States v. Richardson,*
   418 U.S. 166 (1974) .......................................................................................................14

*United States v. Russell,*
   13 Wall. 623, 80 U.S. 623 (1871) ..................................................................................34

*U.S. Ordnance, Inc. v. United States Dep't of State,*
   432 F. Supp. 2d 94 (D.D.C. 2006) .................................................................................33

*Watervale Marine Co. v. United States Dep't of Homeland Sec.,*
   55 F. Supp. 124 (D.D.C. 2014) ......................................................................................40

*Watts v. SEC,*
   482 F.3d 501 (D.C. Cir. 2007) .......................................................................................27

*White Stallion Energy Ctr. v. EPA,*
   748 F.3d 1222 (D.C. Cir. 2014) ...............................................................................23, 25

*WildEarth Guardians v. Zinke,*
   No. 16-1724, 2019 U.S. Dist. LEXIS 449 (D.D.C. Mar. 19, 2019) ..............................12

*William Bright Marine v. Bush,*
   53 Fed. Appx. 123 (D.C. Cir. 2002) ..............................................................................22

*Winpisinger v. Watson,*
   628 F.2d 133 (D.C. Cir. 1980) .......................................................................................15

*Wis. Pub. Intervenor v. Mortier,*
   501 U.S. 597 (1991)........................................................................................................28

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) .......................................................................................................39

* *Zivotofsky v. Clinton,*
   566 U.S. 189 (2012) ..................................................................................................33, 34

## CONSTITUTION

U.S. CONST. art. I, § 8, cl. 1 ...............................................................................................54

U.S. CONST. art. II, § 3 .......................................................................................................54

U.S. CONST. art. III, § 2, cl. 1 ............................................................................................10

# STATUTES

5 U.S.C. § 701(a)(2) ...................................................................................................40

5 U.S.C. § 702 ............................................................................................................22

10 U.S.C. § 284 .................................................................................................... passim

10 U.S.C. § 2801(a) ...................................................................................................41

10 U.S.C. § 2808 ................................................................................................... passim

16 U.S.C. § 668dd(a)(2) ...............................................................................................8

16 U.S.C. § 1604(g)(3)(B) .............................................................................................8

16 U.S.C. § 7202 ...........................................................................................................8

42 U.S.C. § 4332(2)(C) ...............................................................................................41

50 U.S.C. §§ 1601-1651 .......................................................................................26-35

50 U.S.C. § 1621(a) .....................................................................................................28

54 U.S.C. § 100101 .......................................................................................................8

Act of August 26, 1950, 64 Stat. 476, 5 U.S.C.S. § 22 ..............................................28

* Consolidated Appropriations Act, 2019
    Pub. L. No. 116-6, 132 Stat. 2981 ...................................................... passim
    § 230 ................................................................................................5, 24
    § 230(a) .................................................................................................24
    § 230(a)(1) ..............................................................................................5
    § 231 ......................................................................................................24
    § 231(1) ...........................................................................................24, 50
    § 231(5) ...........................................................................................24, 50
    § 232 ........................................................................................................5

DoD Appropriations Act 2019,
    Pub. L. No. 115-245, 132 Stat. 2981 (2018) ................................... passim
    * § 8005 ......................................................................................... passim
    § 8005(b)(2) ...........................................................................................47
    § 9002 ....................................................................................................15

IIRIRA Section 102, 8 U.S.C. § 1103 note............................................................42-43
    § 102(a) ..................................................................................................44
    § 102(b) ..................................................................................................44
    § 102(b)(4) .............................................................................................44
    § 102(c)(1) .......................................................................................44, 45

John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232,
    § 317 ......................................................................................................25

## EXECUTIVE AND ADMINISTRATIVE MATERIALS

Presidential Proclamation on Declaring a National Emergency Concerning the
Southern Border of the United States, 84 Fed. Reg. 4949 (Feb. 20, 2019) .................4, 10, 20

40 C.F.R. § 1501.5(a)(1)-(2) ...............................................................................42
§ 1501.6 ............................................................................................42
§ 1501.6(a) ........................................................................................42
§ 1501.6(b)(1) ...................................................................................42

84 Fed. Reg. 17185 (April 24, 2019) (El Paso 1 project IIRIRA waiver) ............................ 42-43

84 Fed. Reg. 17187 (April 24, 2019) (Yuma 1 project IIRIRA waiver) ......................................43

84 Fed. Reg. 21798 (May 15, 2019) (Tucson 1, 2, and 3 projects IIRIRA waiver) ....................43

84 Fed. Reg. 21800 (May 15, 2019) (El Centro 1 project IIRIRA waiver) .................................43

## COURT RULES

FED. R. CIV. P. 12(B)(1) .......................................................................................55

FED. R. CIV. P. 12(B)(6) .......................................................................................55

LCvR 7.1(n) .......................................................................................................17

## LEGISLATIVE MATERIALS

*Securing the Border: Fencing, Infrastructure, and Technology Force Multipliers*, *Hearing
Before the S. Comm. on Homeland Security*, 114th Cong., 1st Sess. (2015) (statement of Ronald
Vitiello, Deputy Chief, CBP Office of Border Patrol)...................................................8

S. REP. NO. 94-1168, at 3 (1976) ...........................................................................29

### MISCELLANEOUS LEGAL REFERENCES

CONG. RESEARCH SERV., BORDER SECURITY: BARRIERS ALONG THE U.S. INTERNATIONAL
BORDER (March 16, 2009)(Segee Decl. Ex. 4) ............................................7, 8, 9, 47

Government Accountability Office, Office of the General Counsel, Principles of Federal
Appropriations Law (4th Ed. 2017)(GAO Red Book) ..................................................50

### LAW REVIEWS

Jules Lobel, "Emergency Power and the Decline of Liberalism,"
98 Yale L.J. 1384 (1989) ...............................................................................29

Kevin M. Stack, "The Statutory President,"
90 Iowa L. Rev. 539 (2005) .......................................................................20, 40

**MISCELLANEOUS**

Brian Everstine, *USAF Takes Big Hit as DOD Reprograms Funds to Pay for Border Wall*, AIR FORCE MAGAZINE, May 13, 2019 ...............................................................................................20

Corinne Purtill, *New Fences Protecting Fragile Areas on Border*, ARIZ. REPUBLIC, Aug. 26, 2006.............................................................................................................................................9

Fact Sheet, White House Press Office, President Donald J. Trump's Border Security Victory (Feb. 15, 2019)(Segee Decl. Ex. 3)..........................................................................................4, 38

Fed. Respondents' Opp. to Pet. for Writ of Cert., *Animal Legal Def. Fund v. Dep't of Homeland Sec*. (No. 18-247) .......................................................................................................................45

Jeremy Diamond and Pamela Brown, *White House Moves Forward with Funding Despite Lawsuits*, CNN.COM (Feb. 19, 2019) ...........................................................................................38

Kyle Mittan, *Playing a New Tune: Organ Pipe Monument Now Completely Open for Tours,* MOHAVE VALLEY DAILY NEWS, Jan. 2, 2015 ...............................................................................10

Letter from Russell T. Vought, Acting Director, OMB, to Sen. Richard Shelby, Chairman, Sen. Appropriations Comm. (Jan 6, 2019) (Segee Decl. Ex. 1) ........................................................3, 4

Press Release, DHS, Walls Work (Dec. 12, 2018)(Segee Decl. Ex. 2) .........................................4

# TABLE OF EXHIBITS

**Declaration of Brian Segee**

<u>Exhibit 1</u>   Letter from Russell T. Vought, Acting Director, OMB, to Sen. Richard Shelby, Chairman, Sen. Appropriations Comm. (Jan 6, 2019)

<u>Exhibit 2</u>   Press Release, DHS, Walls Work (Dec. 12, 2018)

<u>Exhibit 3</u>   Fact Sheet, White House Press Office, President Donald J. Trump's Border Security Victory (Feb. 15, 2019)

<u>Exhibit 4</u>   Cong. Research Serv., Border Security: Barriers Along the U.S. International Border (March 16, 2009) (excerpts)

**Declaration of Kara Clauser**

<u>Exhibit 1</u>    Border wall projects overview map

<u>Exhibit 2</u>    El Centro 1 project map

<u>Exhibit 3</u>    Yuma 1 project map

<u>Exhibit 4</u>    Yuma 2 project map

<u>Exhibit 5</u>    Yuma 3 project map

<u>Exhibit 6</u>    Tucson 1-2 projects map

<u>Exhibit 7</u>    Tucson 5 project map

<u>Exhibit 8</u>    Tucson 4 project map

<u>Exhibit 9</u>    Tucson 3 project map

<u>Exhibit 10</u>   El Paso 2 project map

<u>Exhibit 11</u>   El Paso 1 project map

**Standing Declarations:** Ileene Anderson; Bryan Bird; Diana Hadley; Sky Jacobs; Laiken Jordahl; Taylor McKinnon; Michael Robinson; Isaac Russell; Krista Schlyer; Robin Silver; Gabriel Vasquez; Elizabeth Walsh

## INTRODUCTION

After Congress repeatedly rejected his specific demands for border wall funding and instead enacted legislation providing a fraction of the requested funds and limiting construction to the Rio Grande Valley, on February 15, 2019, President Trump declared a national emergency at the southern border and announced that his administration had identified $6.7 billion in additional emergency and non-emergency appropriated funds that could be transferred to border wall construction.  More than 100 days have now passed since this Proclamation, yet the Department of Defense ("DoD") has not formally approved any of the emergency spending ordered by the President.  During this same period, however, DoD has moved expeditiously to identify, transfer, and obligate $2.5 billion in "non-emergency" DoD funds to border wall construction through the Drug Interdiction and Counter-Drug Activities account ("counterdrug account").  These $2.5 billion in DoD funds will be expended on five border wall "projects" located on federally-owned public lands—including Organ Pipe Cactus National Monument and several other protected areas—in California, Arizona, and New Mexico.

Defendants now move to dismiss all of Plaintiffs' statutory and constitutional claims under various theories of jurisdiction and justiciability, including Article III standing, the zone of interests standard, judicial review preclusion, the political question doctrine, legal waivers, and Administrative Procedure Act ("APA") requirements of finality.  As this brief addresses, these arguments should be rejected and this case should instead proceed to the merits of Plaintiffs' arguments that the Proclamation and DoD implementing actions are unlawful under the National Emergencies Act; the emergency military construction statute; the DoD and Department of Homeland Security ("DHS") appropriations acts; the National Environmental Policy Act ("NEPA"); and the Appropriations and Take Care Clauses of the Constitution.

Plaintiffs have Article III standing with respect to all of their claims. The border wall construction funded through the DoD appropriations transfers will impact numerous areas of federal public lands established to protect the mountains, deserts, forests, valleys, rivers, streams, plants, and wildlife of the southern border region, significantly harming Plaintiffs' core organizational interests. Plaintiffs' member declarations demonstrate injury-in-fact to their protected interests within the specific areas that will be impacted by the border wall projects already approved with DoD funds transferred through the counterdrug account, as well as the emergency spending border wall projects soon to be approved. These harms are directly traceable to the Proclamation and Defendants' challenged appropriations transfers, and would be redressed by a court Order for declaratory and injunctive relief, and thus Plaintiffs have demonstrated Article III standing. Plaintiffs also demonstrate that they meet the generous zone of interests standard.

Defendants' arguments that claims involving the National Emergencies Act ("NEA") are judicially unreviewable must also fail. Congress enacted the NEA to *constrain* presidential use of emergency powers, and there is no direct or implied evidence that it intended to preclude judicial review of alleged violations of the NEA. Plaintiffs' NEA claim, and related challenges to the President's invocation of the emergency authorities and DoD actions to implement that authority under 10 U.S.C. § 2808, are also not barred by the political question doctrine, but instead involve straightforward questions of statutory interpretation. Plaintiffs have properly named the President as a party to this action, particularly here where they do not have an alternative avenue to challenge the President's emergency actions through agency implementation decisions (as DoD has not yet taken action to transfer the emergency funds).

Finally, Plaintiffs have adequately pled all of their claims—APA, ultra vires, and constitutional. Defendants attempt to move beyond the low threshold for properly stating a

claim to instead argue the merits, but Plaintiffs have provided more than sufficient detail in support of each of these claims.  In fact, even at this stage, the available evidence strongly indicates that the President's Proclamation and DoD's actions to transfer DoD appropriated funds to border wall construction are unlawful and unconstitutional.

## BACKGROUND

I.  **The February 15, 2019 Emergency Proclamation and Administration Statement Identifying $6.7 Billion of Appropriated Funds for Transfer to Border Wall Construction**

President Trump has made construction of a border wall along the U.S. southern border a signature issue of his candidacy and a priority of his administration.  His view as to the proper funding levels, location, and overall extent of the border wall has not been shared by Congress. As detailed in Plaintiffs' First Amended Complaint ("FAC"), ECF No. 16, the President's border wall funding demands precipitated the longest "shutdown" of the federal government in history. FAC, ¶¶ 92-108.[1]

As the administration explained during the shutdown, the President was requesting "$5.7 billion for construction of a steel barrier for the Southwest border."  Segee Decl. Ex. 1 (Letter from Russell T. Vought, Acting Director, OMB, to Sen. Richard Shelby, Chairman, Sen. Appropriations Comm. (Jan 6, 2019)); and *see* FAC, ¶¶ 126-127.[2]  The administration stated that the funds would be directed to "a total of approximately 234 miles of new physical barrier and

---

[1] For a detailed background of the factual circumstances leading up to the Proclamation, *see Sierra Club v. Trump*, No. 19-00892-HSG, 2019 U.S. Dist. LEXIS 88210, *5-14 (N.D. Cal. May 24, 2019).

[2] In deciding a motion to dismiss for lack of subject matter jurisdiction, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case" without converting to a motion for summary judgment.  *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000).  In accordance with this standard, Plaintiffs submit 12 standing declarations, maps of the border wall construction project areas (attached to Clauser Decl.), and 4 additional exhibits (attached to Segee Decl.), introduced as relevant to Plaintiffs' injury-in-fact.

fully fund the top 10 priorities in [the U.S. Customs and Border Protection's] Border Security Improvement Plan."  Segee Decl. Ex. 1; and *see id.,* Ex. 2 (Press Release, DHS, Walls Work (Dec. 12, 2018)).

On February 15, 2019, the President issued a Presidential Proclamation on "Declaring a National Emergency Concerning the Southern Border of the United States" (hereinafter, "Proclamation").  84 Fed. Reg. 4949 (Feb. 20, 2019).  Pursuant to the authority of the NEA, the Proclamation declares "that the construction authority provided in section 2808 of Title 10, United States Code, is invoked and made available," and directs that the Defense Secretary (and other Secretaries) "shall take all appropriate actions, consistent with applicable law, to use or support the use of the authorities invoked herein."  *Id.* at 4949-50.

On the same day, the administration issued a statement saying that it had identified $6.7 billion in funds "available to build the border wall once a national emergency is declared and additional funds have been reprogrammed."  Segee Decl. Ex. 3 (Fact Sheet, White House Press Office, President Donald J. Trump's Border Security Victory (Feb. 15, 2019)).  These funds originate from three separate sources: (1) "[a]bout $601 million from the Treasury Forfeiture Fund[;]" (2) "[u]p to $2.5 billion under the Department of Defense funds transferred for Support for Counterdrug Activities (Title 10 United States Code, section 284)" [hereinafter, "counterdrug account"]; and (3) "[u]p to $3.6 billion reallocated from Department of Defense military construction projects under the President's declaration of a national emergency (Title 10 United States Code, section 2808)."  *Id*.

## II.     The 2019 Consolidated Appropriations Act and its Limitations on Border Wall Funding

Immediately after issuing the emergency Proclamation, the President signed into law the Department of Homeland Security Appropriations Act, 2019, as part of the Consolidated Appropriations Act, which appropriates $1.375 billion to U.S. Customs and Border Protection

("CBP") for border wall construction in the Rio Grande Valley, Texas. Pub. L. No. 116-6; 133 Stat. 13 § 230(a)(1) [hereinafter, "CAA"]. In enacting the CAA, Congress specifically rejected the additional funding President Trump requested for CBP border wall priorities. In addition, the CAA (1) limits border wall construction to the Rio Grande Valley, § 230; (2) prohibits the funding of border wall construction in five specified areas, § 231; and (3) requires DHS to consult with local communities and provide for public notice and comment prior to border wall construction within five borderland cities in south Texas, § 232.

### III. Department of Defense Funds Are Primarily Being Used to Replace "Vehicle Barriers" With Border Walls on Protected Federal Borderlands in California, Arizona, and New Mexico

On February 25, 2019, DHS submitted a formal memorandum to DoD entitled "Request for Assistance Pursuant to 10 U.S.C. § 284."[3] First Rapuano Decl. Ex. A, ECF No. 22-1. In it, DHS requested DoD to fund and oversee the construction of border infrastructure on approximately 218 miles, including "road construction, the installation of lighting, and the replacement of existing vehicle fencing or dilapidated pedestrian fencing with new pedestrian fencing" within 11 project areas. *Id*. at 10. The 11 projects are listed in a portion of the request entitled "Sequencing," and are listed in "[t]he DHS order of priority."[4] *Id*.

All of "[t]he segments of fence within the Project Areas . . . are situated on federal property" within California, Arizona, or New Mexico. *Id*. at 2. These properties include numerous areas of protected federal land primarily administered by the Department of the Interior, but also National Forest lands administered by the U.S. Forest Service ("USFS"), an agency of the Department of Agriculture. From west to east, these specific areas by project

---

[3] The February 25 request superseded an early February 22, 2019 version.
[4] The project names correspond to the U.S. Border Patrol Sector in which the border wall construction will occur.

segment include: El Centro project 1 (Cleveland National Forest (USFS) and Yuha Basin Area of Critical Environmental Concern  (Bureau of Land Management ("BLM")); Yuma project 3 (Cabeza Prieta National Wildlife Refuge (U.S. Fish and Wildlife Service ("FWS")); Tucson project 1 (Cabeza Prieta National Wildlife Refuge)(FWS)); Tucson project 2 (Organ Pipe Cactus National Monument (National Park Service ("NPS")); Tucson project 5 (Buenos Aires National Wildlife Refuge (FWS) and Coronado National Forest (USFS)); Tucson project 4 (Coronado National Forest (USFS) and Coronado National Memorial (NPS)); Tucson project 3 (Coronado National Forest (USFS), San Pedro Riparian National Conservation Area (BLM), and San Bernardino National Wildlife Refuge) (FWS)); El Paso project 2 (in close proximity to BLM and Coronado National Forest (USFS)); and El Paso Project 1 (in close proximity to Organ Mountains-Desert Peaks National Monument and West Potrillo Mountains Wilderness Study Area (BLM)).  *See* Clauser Decl., Exs. 1-12.[5]

Defendants have now authorized and transferred the full $2.5 billion of DoD appropriated funds through the counterdrug account to border wall construction.  Defs' Notice of Statement Ex. 2, ECF No. 26-2 (Third Rapuano Decl. ¶ 3) (originally filed in case number 4:19-cv-00872-HSG).  The first $1 billion was transferred to the counterdrug account pursuant to a March 25, 2019 decision by the Acting Defense Secretary, to be directed to the Yuma 1 and 2 projects, and El Paso 1 project.  First Rapuano Decl. ¶ 5.  On March 26, 2019, the designated $1 billion was transferred out of the counterdrug account to the Army Corps' operation and maintenance account.  First Rapuano Decl. ¶ 6.  On April 9, 2019, DoD announced that Army Corps had

---

[5] The maps are intended as a demonstrative aid regarding the location of proposed wall construction in relation to protected federal lands and endangered species critical habitat designations, which is relevant to Plaintiffs' injury-in-fact.

awarded contracts to perform work in support of the El Paso 1 and Yuma Sector 1 projects.  First Rapuano Decl. ¶ 8.[6]

The remaining $1.5 billion was transferred to the counterdrug account pursuant to a May 9, 2019 decision by the Acting Defense Secretary, to be directed to the El Centro 1 project, and the Tucson 1, 2, and 3 projects.  Second Rapuano Decl. ¶ 7.  On May 10, 2019, the designated $1.5 billion was transferred out of the counterdrug account to the Army Corps' Operation and Maintenance account.  Second Rapuano Decl. ¶ 9.

Yuma projects 2-3, El Paso project 2, and Tucson projects 4-5 were not funded by DoD moneys transferred through the counterdrug account, and they are not eligible for any remaining unobligated funds Congress appropriated to DHS for border wall construction.  On information and belief, Defendants intend to use some or all of the § 2808 military construction moneys for these remaining federal lands projects, as well as other "priority areas" within the San Diego, El Paso, Laredo, and Rio Grande Valley Sectors.  *See* Segee Decl. Ex. 2 (Walls Work).

A.      **Protected Public Lands in the Borderlands**

The National Park Service, U.S. Fish and Wildlife Service, Bureau of Land Management, or U.S. Forest Service manage more than 40 percent of the United States-Mexico border— approximately 820 linear miles.  These lands are predominantly concentrated in California, Arizona, and New Mexico, and contain habitat for numerous threatened and endangered species. *See* Segee Decl. Ex. 4, at 16 (CONG. RESEARCH SERV., BORDER SECURITY: BARRIERS ALONG THE U.S. INTERNATIONAL BORDER (March 16, 2009) [hereinafter, "CRS Border Barriers Report"].

---

[6] CBP later clarified that Yuma project 2 will not be funded or constructed under these authorities.  Second Rapuano Decl. ¶ 4, ECF No. 25-1.  The El Paso 1 and Yuma 1 Projects are preliminarily enjoined pursuant to a May 24, 2019 Order in *Sierra Club v. Trump*, No. 19-00892-HSG, 2019 U.S. Dist. LEXIS 88210 (N.D. Cal. May 24, 2019).

Each of the four agencies is governed by a distinct statutory mission and set of

responsibilities, including to "conserve the scenery, natural and historic objects, and wild life in

the System units and to provide for the enjoyment of the scenery, natural and historic objects,

and wild life in such manner and by such means as will leave them unimpaired for the enjoyment

of future generations[,]" 54 U.S.C. § 100101(a) (NPS—National Park System); "administer a

national network of lands and waters for the conservation . . . of the fish, wildlife, and plant

resources and their habitats within the United States for the benefit of present and future

generations of Americans[,]" 16 U.S.C. § 668dd(a)(2) (FWS—National Wildlife Refuge

System); "provide for diversity of plant and animal communities," 16 U.S.C. § 1604(g)(3)(B)

(USFS—National Forest System); and "conserve, protect, and restore nationally significant

landscapes that have outstanding cultural, ecological, and scientific values for the benefit of

current and future generations," 16 U.S.C. § 7202(a) (BLM—National Landscape Conservation

System).

### B.   Vehicle Barriers Installed Within National Monuments, National Wildlife Refuges, National Forests, and Other Protected Federal Lands, Have Served as an Effective Border Security Measure While Also Incorporating Environmental Considerations

Approximately 300 miles of vehicle barriers (also sometimes called "vehicle bollards")

have been installed on the southern border.  *Securing the Border: Fencing, Infrastructure, and

Technology Force Multipliers*, *Hearing Before the S. Comm. on Homeland Security*, 114th

Cong., 1st Sess. (2015) (statement of Ronald Vitiello, Deputy Chief, CBP Office of Border

Patrol).  These barriers are made of steel—typically range from four to six feet in height—and as

their name reflects, they block vehicles.  Segee Decl. Ex. 4, at 40-41 (CRS Border Barriers

Report) (schematic and photograph of vehicle barrier).  The environmental impacts of vehicle

barriers on wildlife populations are fundamentally distinguishable from the impacts of border

walls, as these structures allow for movement of wildlife between populations in the U.S. and

Mexico. *Id.* at 38 (photographs of border fencing); FAC ¶ 134. This habitat connectivity is particularly important for endangered species such as jaguars, as well as many additional wildlife species that occur nowhere else in the country but these federal borderlands, due to the region's location at the confluence of tropical and temperate ecosystems. FAC ¶¶ 130-146.[7] The "replacement" of vehicle barriers with border walls thus has new, additive, and profoundly significant environmental impacts, including the potential extirpation of species from the United States.

Vehicle barriers were primarily installed on protected federal lands in California, Arizona, and New Mexico in an effort to balance border security considerations with preservation of the region's natural resources. *See*, e.g., Segee Decl. Ex. 4, at 24 (CRS Border Barriers Report) ("They are spaced so as to allow foot and animal traffic but not vehicular traffic."). Subsequent to their installation, vehicle barriers have been praised as both effective and compatible with the environmental considerations inherent to protected federal lands:

> For now, barriers are the best compromise available for land managers who want to protect their battered parks, Border Patrol agents who want to keep illegal immigrants out and environmentalists who are concerned that solid border walls will destroy protected species and impede animal migration. They are proving effective, too, reducing illegal vehicle traffic by more than 90 percent in some areas . . . Vehicle barriers . . . seem to be an answer to one point on which environmentalists and Border Patrol agree: The success of a border wall on Arizona's public lands is doubtful.

Corinne Purtill, *New Fences Protecting Fragile Areas on Border*, ARIZ. REPUBLIC, Aug. 26, 2006. The National Park Service paid to install vehicle barriers at Organ Pipe Cactus National Monument out of its own budget. Segee Decl. Ex. 4, at 24 (CRS Border Barriers Report). In 2015, the Monument was fully reopened to the public, an achievement partially attributable to

---

[7] Plaintiffs use the terms "border wall" and "border fence" interchangeably. As relevant to Plaintiffs' wildlife conservation interests, both terms refer to structures that block wildlife movement, in contrast to "vehicle barriers," which generally allow such movement.

the success of vehicle barriers.  Kyle Mittan, *Playing a New Tune: Organ Pipe Monument Now Completely Open for Tours,* MOHAVE VALLEY DAILY NEWS, Jan. 2, 2015 ("Though much of the fence remains crossable on foot, the office's responsibility . . . is protecting the natural resources, which includes allowing animals to cross the border freely.").[8]

## ARGUMENT

## I.  PLAINTIFFS HAVE ASSOCIATIONAL ARTICLE III STANDING

Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies.  U.S. CONST. art. III, § 2, cl. 1; *see Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (a showing of Article III standing "is an essential and unchanging predicate to any exercise of [a court's] jurisdiction.").[9]  As part of this inquiry, plaintiffs must meet the "irreducible constitutional minimum of standing," consisting of three requirements: (1) "the party has suffered 'injury in fact,'" (2) "the injury is 'fairly traceable' to the challenged action of the defendant," and (3) "it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"  *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012) (quoting *Defs. of Wildlife v. Lujan*, 504 U.S. 555, 560-61 (1992) [hereinafter, *Defs. of Wildlife]*); *see Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.,* 528 U.S. 167, 180-81 (2000).  "An association has standing to sue under Article  III . . . only if (1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit."  *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013).

[8] Section 2 of the Emergency Proclamation also directs the Secretaries to "transfer and accept[ ] jurisdiction over border lands."  84 Fed. Reg. 4949.  Defendants have not yet provided any information regarding agency actions planned or taken to implement this directive.
[9] Unless otherwise noted, all internal quotation marks and citations are omitted from case law citations.

A.      **Plaintiffs' Standing Allegations Are Sufficient for the Pleading Stage**

As a threshold matter, Defendants' challenge ignores the fact that at the pleading stage,

general factual allegations of injury are sufficient.  *See Defs. of Wildlife*, 504 U.S. at 561 (when

deciding a motion to dismiss, courts "presume that general allegations embrace those specific

facts that are necessary to support the claim."); *Physicians for Soc. Responsibility v. Wheeler*,

359 F. Supp. 3d 27, 35-36 (D.D.C. 2019).   In contrast, in response to a summary judgment

motion, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by

affidavit or other evidence "specific facts" in support of its standing claims.  *Id*. (quoting *Lujan*

*v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

Plaintiffs' FAC alleges facts sufficient for the pleading stage.  ¶¶ 12-17; ¶¶ 130-146; ¶ 16

(identifying use of specific public lands areas where border wall construction with DoD funds

will occur); ¶ 131 ("Of particular concern to Plaintiffs' core organizational interests is the fact

that the unlawful identification, transfer, and obligation of appropriated funds for border wall

construction would sever wildlife connectivity and cross-border movement between wildlife

populations on either side of the U.S.-Mexico border.").   Additionally, attached to this response

brief are 12 declarations sufficient to establish associational standing at the summary judgment

stage.  *See* Anderson Decl.; Bird Decl.; Hadley Decl.; Jacobs Decl.; Jordahl Decl.; McKinnon

Decl.; Robinson Decl.; Russell Decl.; Schlyer Decl.; Silver Decl.; Vasquez Decl.; and Walsh

Decl.

B.      **Plaintiffs' Declarations Establish Injury-In-Fact**

The first of the triad of requirements for constitutional standing is showing injury-in-fact,

characterized as an "invasion of a legally protected interest which is (a) concrete and

particularized, and (b) actual and imminent, not conjectural or hypothetical."  *Defs. of Wildlife*,

504 U.S. at 560.  An interest in "[c]onservation of those public lands plaintiffs' members use" is

a recognized protected interest for standing purposes. *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 4 (D.C. Cir. 2005).  It is also "well-established that aesthetic damage can constitute 'injury in fact.'" *Public Employees for Envt'l Resp. v. U.S. Dept. of Interior*, 832 F. Supp. 2d 5, 18 (D.D.C. 2011) (citing *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972)).  In cases alleging environmental interests, plaintiffs "must show 'concrete and particularized injury' which has occurred or is imminent *due to* geographic proximity to the action challenged." *WildEarth Guardians v. Zinke*, No. 16-1724, 2019 U.S. Dist. LEXIS 449, *26 (D.D.C. Mar. 19, 2019) (quoting *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267 (D.C. Cir. 2002) (emphasis in original)).

The "key requirement" for demonstrating injury-in-fact is a declarant's showing that she will suffer injury in a "personal and individual way." *Animal Legal Def. Fund v. Glickman*, 154 F.3d 426, 433-34 & n. 6 (D.C. Cir. 1998)(*en banc*); *Defs. of Wildlife*, 504 U.S. at 582 ("In my opinion a person who has visited the critical habitat of an endangered species, has a professional interest in preserving the species and its habitat, and intends to revisit them in the future has standing to challenge agency action that threatens their destruction.")(Stevens, J., concurring in the judgment).  Here, Plaintiffs' Declarations demonstrate aesthetic, conservation, recreational, scientific and other personal and individual interests in, and use of, particular areas that will be harmed by Defendants' violations of law.  These specific areas are predominantly comprised of federal lands of California, Arizona, and New Mexico, which in turn correspond to the eleven projects identified in the DHS February 25, 2019 Request for Assistance.  In the case of the Yuma 1 and El Paso 2 projects, these specific areas include private lands that surround the strip of federal land where the border wall construction will occur.  Unlike Plaintiffs who "lack standing because they attest to using only 'unspecified portions of an immense tract of territory,' the declarants here "attest[] to their present and continued use of specific areas." *Public*

12

*Employees for Envt'l Resp.*, 832 F. Supp. 2d at 18 (quoting *Lujan v. NWF*, 497 U.S. at 889).  See

Anderson Decl. (El Centro 1); Bird Decl. (Tucson 1-5, Yuma 3);  Hadley Decl. (El Paso 2);

Jacobs Decl. (Tucson 1-5); Jordahl Decl. (Tucson 1-3, El Paso 1); McKinnon Decl. (Tucson 2-3,

Yuma 3); Robinson Decl. (El Paso 1-2); Russell Decl. (Yuma 1); Schlyer (El Paso 2); Silver

Decl. (Tucson 3); Vasquez Decl. (El Paso 1); Walsh Decl. (Tucson 1-5, Yuma 3, El Paso 1-2).[10]

### C.    Plaintiffs Have Standing to Bring Their Counterdrug Account Pass-Through Claims (Claims IV-V)

Defendants specifically contest Plaintiffs' standing to challenge DoD's use of the § 8005

general transfer provision, asserting that they "cannot establish injury arising from such transfer

because they have no legally protected interest in the transferred funds and because the use of

§ 8005's transfer authority does not directly result in the border barrier construction."  Defs. Mot.

Dismiss ("MTD"), at 35.  (*citing* Department of Defense and Labor, Health and Human Services,

and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No.

115-245, Title VI, § 8005 ("DoD FY19 Appropriations Act")).  Both arguments fail.

First, the fact that Plaintiffs are not entitled to the transferred funds, and are not the

"object" of those funds, *Defs. of Wildlife*, 504 U.S. at 562, does not mean they lack standing  "to

challenge the transfer of funding from one DoD appropriation to another . . . .."  MTD, at 35.[11]

As demonstrated by Plaintiffs' detailed member Declarations addressing harm on the 11 border

---

[10] Plaintiffs have also alleged harm sufficient for the pleading stage from border wall construction in locations outside of the 11 project areas that will likely be funded by transferred emergency military construction funds, including portions of the San Diego, El Paso, Laredo, and Rio Grande Valley Sectors.  FAC ¶¶ 134, 142-146.

[11] The Court's finding of no standing in *Defs. of Wildlife* was focused on the fact that causation and redressability in that case "hinge[d] on response of the regulated [or regulable] third party to the government action . . . and perhaps on the response of others as well."  504 U.S. at 562; *id.* at 571 ("A further impediment to redressability is the fact that the agencies generally only supply a fraction of the funding for a foreign project.  AID, for example, has provided less than 10% of the funding for the Mahaweli project.").  In contrast, all of the challenged actions in this case will be undertaken directly by defendant federal agencies.

wall projects, including the five specific projects already funded by the transfers through the counterdrug account, Plaintiffs can and do meet this standard.  This case thus bears no resemblance to a generic "taxpayer" suit, or the Supreme Court's underlying concerns regarding allowing such suits, and the government's attempt to characterize this case as such should be rejected.  *Cf. United States v. Richardson*, 418 U.S. 166, 189 (1974) ("*Unrestrained standing* in federal taxpayer or citizen suits would create a remarkably illogical system of judicial supervision of the coordinate branches of the federal government.") (Powell, J., concurring) (emphasis added).

Defendants' assertion that Plaintiffs cannot challenge the use of the § 8005 transfer authority because it "does not directly result in the border barrier construction" also falls short. Under the three-part test articulated in *Defs. of Wildlife*, standing does not turn on whether the challenged action is the last link in the causal chain of harm, but whether plaintiff's injury is "fairly traceable" to the challenged action of the defendant.  504 U.S. at 560.  Justice Scalia would subsequently again emphasize this point in *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997) ("This wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation.").

Here, DoD's reliance on the § 8005 general transfer authority is obviously "fairly traceable" to the ultimate action of border wall construction, and Plaintiffs' alleged harms arising from that construction.  Although there are subsequent actions separating the Acting Secretary's specific March 25, 2019 and May 9, 2019 § 8005 transfer decisions from the ultimate agency decisions to obligate and expend funds for border wall construction and the ensuing construction, those subsequent actions are interrelated and have been carried out in rapid succession.

In both instances, the Acting Defense Secretary approved the relevant projects (for the March 25 approval, Yuma projects 1 and 2, and El Paso project 1; for the May 9 decision, El

Centro project 1 and Tucson projects 1, 2, and 3), and invoked the general transfer authority under DoD FY19 Appropriations section 8005 to transfer the identified moneys ($1 billion for the March 25 decision; $1.5 billion for the May 9 decision) into the counterdrug account from other appropriated DoD funds on the same day.  First Rapuano Decl. ¶¶ 4-5; Second Rapuano Decl. ¶¶ 6-7.[12]  And in both instances, the designated moneys were transferred out of the counterdrug account into an account administered by the Army Corps the very next day.  First Rapuano Decl. ¶ 6; Second Rapuano Decl. ¶ 9.

The direct links in this causal chain, relatively few steps in the chain, and lack of independent private actors within the chain all distinguish the present situation from *Winpisinger v. Watson*, 628 F.2d 133, 138 (D.C. Cir. 1980).  There, plaintiffs' alleged harm was "the dilution of their efforts on Senator Kennedy's behalf by the actions of the federal defendants in utilizing the vast resources available to the Administration to promote President Carter's quest for renomination."  *Id.*  In concluding that no standing existed, the court noted that the "endless numbers of diverse factors potentially contributing to the outcome of state presidential primary elections, caucuses and conventions forecloses any reliable conclusion that voter support of a candidate is 'fairly traceable' to any particular event," and concluded that "Courts are powerless to confer standing when the causal link is too tenuous." *Id.* at 139; *see also Mideast Sys. & China Civil Const. Saipan Joint Venture v. Hodel*, 792 F.2d 1172, 1178 (D.C. Cir. 1986) (rejecting plaintiffs' claims against Department of the Interior where the requested "relief depends on 'independent action of some third party not before the court.'")(*quoting Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42 (1976)); *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (rejecting standing that "depends on the unfettered choices made by independent actors not

---

[12] The May 9, 2019 decision cited the transfer authority of both § 9002 and § 8005 of the DoD FY19 Appropriations Act.  Both are subject to the same restrictions.

before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.").[13]

Here, the Acting Secretary's transfer decisions are in fact the crux moment for the interrelated agency actions to move DoD funds to border wall construction. The government has, for example, provided the Acting Secretary's specific decisions and associated memoranda for the § 8005 transfer decisions to transfer money into the counterdrug account. In contrast, the subsequent decisions to transfer the billions of dollars out of the counterdrug account (the so-called "284 decisions") are referred to generally, without identification of a specific decisionmaker, and without corresponding documentation. *See* First Rapuano Decl. ¶ 6; Second Rapuano Decl. ¶ 9.

In short, the record demonstrates that the counterdrug account is being used as a mere pass-through account for prior decisions to transfer appropriated DoD funds to border wall construction through the § 8005 transfer actions. *See Teton Historic Aviation Found. v. United States DOD*, 785 F.3d 719, 725 (D.C. Cir. 2015) (finding traceability where intervening third party not before court was "a mere instrument of the Department's decisions without an independent role," and a "mere pass-through" for the Department's financial transactions). And in any event, the subsequent actions to move moneys out of the counterdrug account and to

---

[13] However, even the presence of such independent third party actors does not necessarily foreclose the finding of traceability necessary to support standing. *See Nat'l Parks Conservation Ass'n*, 414 F.3d at 6 ("By contrast, when Interior acts in its capacity as Federal Land Manager, the agency exerts legal authority over the Montana DEQ; in determining whether to release an adverse impact report, Interior expects and intends its decision to influence the permitting authority. The Montana DEQ is therefore not the sort of truly independent actor who could destroy the causation required for standing." (*citing Defs. of Wildlife*, 504 U.S. at 560-61; *Simon*, 426 U.S. at 41-42).

obligate those moneys, like the initiating § 8005 transfer actions, are being undertaken by DoD and Army Corps, defendants before this court and not independent actors.[14]

Finally, the government states that "Plaintiffs cannot invoke their alleged harm from the separate act of constructing barriers utilizing authority provided by § 284 to establish standing for a claimed violation of § 8005," relying on the holding in *Lujan v. NWF*, 497 U.S. at 891-94 (1990), that APA review is limited to review of discrete agency action.  MTD, at 36.  As explained above, Plaintiffs *have* sought review of discrete and individual final agency actions (the Acting Secretary's March 25 and May 9, 2019 decisions to transfer funds pursuant to § 8005), and shown that these actions are "fairly traceable" to Plaintiffs' harm.[15]  The fact that some of the challenged actions are not the last link in the causal chain of border wall construction does not transform a challenge to these discrete agency actions into an impermissible programmatic challenge similar to that rejected by the Court in *Nat'l Wildlife Fed'n*.

### D.      Plaintiffs Have Standing to Bring Their Emergency Proclamation and Agency Action § 2808 Implementation Claims (Claims I-III)

Although the government does not directly challenge Plaintiffs' Article III standing in relation to its § 2808 claims, Defendants argue that Plaintiffs have failed to identify "final agency action" as required for APA review.  MTD, at 40 ("Plaintiffs have failed to allege any action that represents the consummation of DoD's decisionmaking process with respect to § 2808").  However, Plaintiffs allege two claims pertaining to § 2808 violations.  Only Claim II is based on an APA cause of action; in contrast, Claim III is based on the right to nonstatutory review, which

---

[14] Plaintiffs also challenge the DoD March 26 and May 10, 2019 actions to transfer moneys out of the counterdrug account as violations of the CAA under Claims IV and V, and Plaintiffs' FAC added the Army Corps as a Defendant.

[15] These final agency actions should be accompanied by an administrative record. Defendants have not filed a list of the content of such record as required by LCvR 7.1(n).

is not subject to the APA finality requirement.  And regardless of whether DoD has taken final agency implementing action, Plaintiffs have also challenged the legality of the Proclamation itself under the NEA and 10 U.S.C. § 2808.

While the government's argument against Plaintiffs' standing in relation to its counterdrug account claims focused on alleged causation defects due to intervening actions, the implicit attack on Plaintiffs' standing in relation to its emergency-related claims is lack of imminence.  Similar to determinations as to whether a plaintiff's harm is "fairly traceable" to defendant's conduct, plaintiffs must allege unattenuated harm in relation to future injury.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) ("respondents' theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury be certainly impending.").  Accordingly, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *Clapper*, 568 U.S. at 409, 414 n. 5); *see also Attias v. CareFirst, Inc.*, 865 F.3d 620, 626-27 (D.C. Cir. 2017) ("[T]he [Supreme] Court [has] clarified that a plaintiff can establish standing by satisfying *either* the 'certainly impending' test *or* the 'substantial risk' test.") (emphasis in original).

Here, Defendants have already identified, transferred, and obligated $2.5 billion of appropriated DoD funds for border wall construction through the counterdrug account.  DoD will not be obligating additional funds in this manner during the next six months.  Third Rapuano Decl. ¶ 3.

In addition, DoD has already identified the list of military construction projects which may be subject to transfer, and the Acting Secretary has taken additional actions to establish parameters and establish deadlines for the final identification.  Third Rapuano Decl. ¶¶ 5-6.  By all indications, DoD's actions to implement the Proclamation's 10 U.S.C. § 2808 Order is

"certainly impending" or at the very least, there is a "substantial risk" of those actions occurring. Thus, even though the precise timing and location of DoD border wall construction projects utilizing § 2808 emergency military construction has not yet been publicly announced (and may still be subject to internal review processes), those details can reasonably be anticipated through other sources.

In particular, the $2.5 billion in appropriated funds that were moved through the counterdrug account has funded six of the eleven border wall projects identified in the DHS February 25, 2019 Request for Assistance: Yuma 1, El Paso 1, El Centro 1, and Tucson 1-3.  The remaining five border wall projects remain unfunded; furthermore, these projects are not eligible for congressionally appropriated funds to DHS because Congress has specifically limited the use of those funds to border wall construction in the Rio Grande Valley Sector.  There is a substantial risk that these remaining five projects (Yuma 2-3, Tucson 4-5, El Paso 2) will be funded by § 2808 emergency construction funds, even if the specific approvals have not yet been announced.  There is also a substantial risk that border wall projects in the San Diego, El Paso, Laredo, and Rio Grande Valley Sectors will be funded by § 2808 emergency construction moneys, even if the specific approvals have not yet been announced.

In considering standards of future harm ("certainly impending" or "substantial risk") in environmental litigation, the D.C. Circuit has found standing for plaintiffs under far more uncertain circumstances than the present case.  In *In re Idaho Conservation League*, 811 F.3d 502 (D.C. Cir. 2016), for example, plaintiffs challenged the EPA's failure to promulgate financial assurance regulations in the hardrock mining industry.  The panel found that the "substantial risk" standard for injury-in-fact was met based on a member declaration detailing harm from two future mining operations, one of which "still in the planning stage," where "the record establishes that the mine is likely to go forward."  *Id*. at 509 ("The mine may not be

completed for some time, but Robison has presented concrete evidence substantiating a significant risk he will harmed by the proposed mine.").

And aside from agency implementing actions, the Proclamation and its invocation of 10 U.S.C. § 2808, on its own, creates injury to Plaintiffs' interests sufficient to confer Article III standing.  The plain language of the Proclamation is immediate and hortatory.  It specified that "in accordance with … [the NEA] … the construction authority provided in section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense and, at the discretion of the Secretary of Defense, to the Secretaries of the military departments."  84 Fed. Reg. 4949.  The presidential orders pertaining to § 2808 contained within the Proclamation thus have their own legal effect sufficient to provide a basis for Plaintiffs' standing.  *See* Kevin M. Stack, *The Statutory President*, 90 Iowa L. Rev. 539 (2005) ("[W]ith appropriate constitutional or statutory authorization, [presidential] orders may have the force and effect of law.  As a result, presidential orders often leave other institutions, such as Congress, administrative agencies and the courts, as well as the public in the position of responding to or implementing the policy and law they embody.").

Here, there can be no realistic debate as to whether the Acting Defense Secretary will carry out the President's directive in the Proclamation to transfer $3.6 billion in appropriated military construction funds to border wall construction through the emergency provision of 10 U.S.C. § 2808.  *See* Brian Everstine, *USAF Takes Big Hit as DOD Reprograms Funds to Pay for Border Wall*, Air Force Magazine, May 13, 2019 (quoting the Acting Secretary as stating "[w]e have a crisis at the border, a national emergency declared by the president. The commander in chief has given me a direct, legal order to secure the border. I'm securing the border."); *cf. Town of Barnstable v. FAA*, 659 F.3d 28, 32 (D.C. Cir. 2011) (finding standing when relevant third-party would consider court-ordered action by the defendant "very, very

seriously" in determining its own conduct.).  The pending border wall projects, as well as other CBP wall construction priorities, such as the Laredo Sector, are known and identified.  And it has now been more than three months since the President declared a national emergency through the Proclamation; during the intervening time, DoD has transferred and obligated $2.5 billion in "non-emergency" funds.  The decision to save the "emergency" funds for last is an internally inconsistent foundation to start from, and the Defendants' attempt to now toss Plaintiffs' challenge to the emergency aspects of this case should not be countenanced by this Court (but does provide additional evidence that the Proclamation is facially invalid).

### E.     Plaintiffs Have Standing to Bring Their NEPA Claim (Claim VI)

In a procedural rights case, "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."  *Defs. of Wildlife*, 504 U.S. at 572 n. 7.  The type of injuries included within these "procedural rights" line of cases includes "an agency's failure to prepare a statutorily required environmental impact statement before taking action with potential adverse consequences to the environment."  *Nat'l Parks Conservation Ass'n*, 414 F.3d at 5.  However, the "mere violation of a procedural requirement," standing alone, is not sufficient to confer Article III standing.  *Fla. Audubon Soc'y*, 94 F.3d at 664.

As described in detail above, Plaintiffs have submitted Declarations demonstrating injury-in-fact to conservation, professional, aesthetic, recreational, and other interests arising from Defendants' violations of law in declaring the emergency, and identifying, transferring, and obligating appropriated moneys to border wall construction.  These harms are exacerbated by the additional and separate harms to Plaintiffs' protected interests arising from Defendants' failure to comply with NEPA.  Defendants, however, argue that the Court lacks jurisdiction to hear Plaintiffs' NEPA claims because the Acting Homeland Security Secretary "has waived NEPA's

requirements for the barrier construction projects identified in Yuma projects 1 and 2 as well as

El Paso project 1, depriving the Court of jurisdiction over these claims." MTD, at p. 37. This

argument is addressed in Section V, *infra*.

F.      **Plaintiffs Have Standing to Bring Their Constitutional Claims (Claims VII-VIII)**

Courts considering standing for constitutional claims apply the same three-part test used

for determining statutory standing. *William Bright Marine v. Bush*, 53 Fed. Appx. 123, 124

(D.C. Cir. 2002) (*citing Defs. of Wildlife*, 504 U.S. at 560-61); *Andrade v. Lauer*, 729 F.2d 1475,

1494-96 (D.C. Cir. 1984) (applying three-part test to reverse district court holding that plaintiffs

did not have standing to bring claim alleging violation of the Appointments Clause). As

described in detail above, Plaintiffs are submitting Declarations demonstrating injury-in-fact to

protected interests in relation to Defendants' violations of statutory as well as Constitutional

requirements.

II.      **PLAINTIFFS MEET THE ZONE OF INTERESTS STANDARD**

The APA provides judicial review to a person "aggrieved by agency action within the

meaning of the relevant statute." 5 U.S.C. § 702. In defining whether a plaintiff's interest is

encompassed "within the meaning of the relevant statute," such interest "may reflect aesthetic,

conservational, and recreational as well as economic values." *Ass'n of Data Processing Serv.*

*Orgs. v. Camp*, 397 U.S. 150, 153 (1970). The test was developed by the Supreme Court as part

of a "trend . . . toward enlargement of the class of people who may protest administrative

action." *Id*. at 154. Accordingly, the zone of interests test is not "especially demanding." As

the Supreme Court recently summarized:

> We apply the test in keeping with Congress's evident intent when enacting
> the APA to make agency action presumptively reviewable. We do not
> require any indication of congressional purpose to benefit the would-be
> plaintiff. And we have always conspicuously included the word
> 'arguably' in the test to indicate that the benefit of any doubt goes to the

> plaintiff.  The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012); *see also White Stallion Energy Ctr. v. EPA*, 748 F.3d 1222, 1272 (D.C. Cir. 2014) (Kavanaugh, J., dissenting) (noting that *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* "reaffirmed—in line with *Data Processing* and *Clarke*—that the plaintiff need not be among a class that Congress intended to benefit in the statute at hand.") (*citing Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987)); *Bennett v. Spear*, 520 U.S. at 166 (finding that plaintiffs "seeking to prevent application of environmental restrictions rather than to implement" them under the Endangered Species Act nonetheless fall within that law's zone of interests).

The zone of interests test is not jurisdictional.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n. 4 (2014).[16]  Instead, it is prudential doctrine under which the court "determine[s], using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id*. at 127.  Accordingly, the Court is "not limited to considering the statute under which [plaintiffs] sued, but may consider any provision that helps [it] understand Congress' overall purposes" in enacting that statute.  *Clarke*, 479 U.S. at 401.

Defendants only specifically allege that Plaintiffs do not fall within the zone of interests of § 8005.  Defendants argue that "Section 8005 forms the legal basis for Plaintiffs' claims, and is thus the relevant text to consider when assessing the zone of interests."  However, only one of Plaintiffs' § 8005 Claims is APA-based (Claim IV), and the nonstatutory review claim in the

---

[16] Thus, an argument that a plaintiff does not fall within the zone of interests "may be waived."  *Hispanic Affairs Project v. Perez*, 206 F. Supp. 3d 348, 367 (D.D.C. 2016)(citing *Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 675-76 (D.C.Cir.2013)).

alternative (Claim V) is not subject to the zone of interests standard.  In addition, both § 8005 claims (Claims IV and V) are more broadly cast as the "unlawful transfer of funds into, and from the counterdrug account," and also include alleged violations of the CAA.  FAC ¶¶ 171-181.  As addressed in Section I.C, *supra*, the DoD transfer and obligation of appropriated DoD funds to border wall construction through the use of the counterdrug account as a pass-through vehicle was accomplished through a series of interrelated agency actions taken in short succession. Accordingly, Plaintiffs' Claims IV and V appropriately frame the challenge to this interrelated series of events as a violation of both § 8005 (the transfer of moneys into the counterdrug account) and the CAA (the subsequent transfer and obligation of funds out of the counterdrug account).

Accordingly, the zone of interests inquiry in this instance should not focus exclusively on § 8005, but also include the provisions of the CAA that are also at issue.  The specific prohibitions of CAA § 231 apply to protected areas of private, state, and federal lands, including the Santa Ana National Wildlife Refuge and Lower Rio Grande Valley National Wildlife Refuge.  The plain language of §§ 230-232 communicates Congressional intent to place specific and numerous restrictions on border wall construction in order to protect specific areas of the natural environment (and to attempt to mitigate those impacts on the populated human environment as well).  The restrictions prohibit any border wall construction outside of the Rio Grande Valley, including all of the federal lands in California, Arizona, and New Mexico where border wall construction would be funded with transferred DoD appropriations.  These environmental interests are at the core of Plaintiffs' organizational missions, including the protection of federal lands and the endangered species which commonly inhabit those lands, and thus Plaintiffs' interests fall comfortably within the "relevant statutes" as defined by the APA.

Even if Plaintiffs' ability to meet the zone of interests standard was determined solely in relation to § 8005, they would still be able to meet its "lenient approach" to the zone of interests inquiry.  Although the government argues that "[t]here is no indication in the text of § 8005 that Congress intended it to be a vehicle for any private party to sue for any reason," MTD, at 44, this framing flips the proper inquiry on its head.  Instead, the zone of interests standard "is particularly generous as applied to plaintiffs who bring suit under the APA."  *Otay Mesa Prop., L.P. v. United States DOI*, 144 F. Supp. 3d 35, 58 (D.D.C. 2015)(*quoting Lexmark Int'l*, 572 U.S. at 130).  Thus, "there need be no indication of congressional purpose to benefit the would-be plaintiff" for the court to find that the plaintiff falls within the statute's zone of interests. *Clarke*, 479 U.S. at 399-400; *see also White Stallion Energy Ctr.*, 748 F.3d at 1272 (broad zone of interests test "is an appropriate means of preserving the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review.") (Kavanaugh, J., dissenting) (*quoting Lexmark Int'l*, 405 U.S. at 130).

In enacting the DoD FY19 Appropriations Act, Congress did not provide any indication that Plaintiffs' environmental interests are inconsistent with the purposes of enacting that law. Although the Appropriations Act primarily focuses on the funding of DoD needs and operations with little direct relation to Plaintiffs' interests (or border wall construction, for that matter), the law does include environmental provisions.  *See*, *e.g.*, John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 317 (environmental restoration programs).  Although DoD does not appear to have directly transferred funds from any environmental initiatives, this funding is within the reach of the general transfer provision.  Even if only considering section 8005 of the DoD FY19 Appropriations Act, Plaintiffs' interests are

not so marginally related to the purpose of that provision so as to fall outside the zone of interests.

### III.   PLAINTIFFS' NATIONAL EMERGENCY ACT CLAIM IS JUSTICIABLE

Defendants move to dismiss Plaintiffs' Claims alleging Presidential violations of the NEA, 16 U.S.C. §§ 1601-1651 (Claim I), and Presidential and agency violations of 10 U.S.C. § 2808 and the CAA (Claim II-III).  MTD, at p. 22-23.  As described in detail below, under governing law and the unique and largely unprecedented factual circumstances of this case, Defendants' arguments should be rejected, and Plaintiffs' Claims alleging violations of the NEA, § 2808, and CAA in relation to the Proclamation  allowed to proceed against all Defendants.  *See Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 513-14 (D.C. Cir. 2016)(on motion to dismiss, court must "accept facts alleged in the complaint as true and draw all reasonable inferences from those facts in the plaintiff's favor.").

#### A.   The NEA Does Not Preclude Judicial Review

Defendants "bear[] the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review." *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975); *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967) (requiring "clear and convincing evidence" of a preclusive purpose).  Defendants' argument that Congress intended to preclude any judicial review under the National Emergencies Act should be rejected, as there is *no* evidence, express or implied, that Congress intended such preclusion, let alone the clear evidence required to upholding a finding of unreviewability.

Defendants first argue that "Congress's intent to preclude judicial review is evidenced by the text of the NEA, which does not define the term national emergency or provide courts with any standards by which to evaluate the President's exercise of that authority."  MTD, at 23.

However, a statutory term's lack of definition—even a term central to that statute—does not preclude judicial review of agency action or leave the court without standards by which to review such acts.

To the contrary, determining the meaning of language not specifically defined by statute is a prosaic facet of judicial review.  In these familiar circumstances, the court must begin its inquiry with the term's plain meaning.  *Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.") (using Black's Law Dictionary to define statutory term); *Watts v. SEC*, 482 F.3d 501, 506 (D.C. Cir. 2007) (case "hinge[]d on interpretation of the term 'order' used  in Section 9 of the Securities Act and Section 25 of the Exchange Act," but "[n]either the Securities Act nor the Exchange Act defines the term.").

Courts utilize this approach to considering the lawfulness of presidential action just as they do with respect to agency action under the APA.  For example, in *AFL-CIO v. Kahn*, 618 F.2d 784, 787 (D.C. Cir. 1979), an en banc panel considered whether the Federal Property and Administrative Services Act of 1949 ("Procurement Act") authorized President Carter to deny government contracts to companies failing to meet wage and price standards.  *Id.*  ("Although the separation of powers between Congress and the President was the dominant issue in *Youngstown*, here we primarily face a difficult problem of statutory interpretation.").  In order to assess the legality of the President's actions, the Court had to determine the meaning of undefined phrases under the Procurement Act.  *Id*. at 788 ("Because this language is open-ended, it is important to examine its genesis"); *id.* at 789 ("To define the President's powers under Section 205(a), some content must be injected into the general phrases 'not inconsistent with' the [Procurement Act] and 'to effectuate the provisions' of the Act."); *see also Cole v. Young*, 351 U.S. 536, 544 (1956)

("While that term ['national security'] is not defined in the Act, we think it clear from the statute as a whole that the term was intended to comprehend only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the strength of the Nation only through their impact on the general welfare.").[17]

Similarly here, Congress's decision not to define the term "emergency" under the NEA does not impliedly foreclose judicial review.  Plaintiffs' FAC provides detailed allegations that the President abused the authority delegated to him under the NEA by attempting to use the declaration of an emergency as a threat to cajole Congress into appropriating more money for a border wall; and then, when that threat failed, using the NEA as a means to circumvent congressional  appropriations enactments.  FAC ¶¶ 92-108.  *See* 50 U.S.C. § 1621(a) (authorizing emergency declaration "during the period of a national emergency.").

The legislative history also provides no indication, express or implied, that Congress intended to foreclose judicial review of NEA actions.  *See Block v. Cmty. Nutrition Inst*., 467 U.S. 340, 345 (1984) ("[w]hether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.").[18]  Instead, "the purpose of the law, evident in every facet of the legislative history, was to place limits on presidential use of emergency powers."  Brennan Ctr. for Justice Amicus

---

[17] The Court was considering the Act of August 26, 1950, 64 Stat. 476, 5 U.S.C.S. § 22 ("[N]otwithstanding any other personnel laws, the head of any agency to which the Act applies may, in his absolute discretion and when deemed necessary in the interest of national security, suspend, without pay, any civilian officer or employee of his agency.").

[18] *But see Physicians for Soc. Responsibility*, 359 F. Supp. 3d at 38 n. 4 ("The use of legislative history 'for the purpose of giving authoritative content to the meaning of statutory text' is a dubious practice.") (*quoting Wis. Pub. Intervenor v. Mortier¸* 501 U.S. 597, 622 (1991)) (Scalia, J., concurring in the judgment)).

Brief, ECF No. 30, at 5; S. Rep. No. 94-1168, at 3 (1976), *reprinted in NEA Source Book*, at p. 292 ("The Committee decided that the definition of when a President is authorized to declare a national emergency should be left to the various statutes which give him extraordinary powers. The National Emergencies Act is not intended to enlarge or add to Executive power.  Rather the statute is an effort by Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers conferred upon him by other statutes.").  By all indications, the last thing on Congress's mind was insulating Presidential action from judicial oversight.

The cases relied upon by the government where courts have found agency action to be unreviewable are readily distinguishable from Plaintiffs' NEA claim (and associated § 2808 claims).  For example, in *Block*, the Supreme Court held that the overall statutory scheme of the Agricultural Marketing Agreement Act of 1937 precluded milk consumers from participating in agency actions related to the development of milk market orders issued by the Agriculture Secretary.  467 U.S. at 345.  Under that Act, Congress had prescribed detailed processes for milk handlers to obtain review of the Secretary's market orders, including formal administrative remedies and specific provision for judicial review.  *Id*. at 346.  While the Court found it "clear that Congress did not intend to strip the judiciary of all authority to review the Secretary's milk market orders," its decision was based on the conclusion that "[i]n a complex scheme of this type, the omission of [a specific provision] is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process."  *Id*. at 347.  The court found that the law precluded consumers from pursuing judicial review, because "[allowing] consumers to sue the Secretary would severely disrupt [the] complex and delicate administrative scheme."  *Id*. at 348.

Similarly, in *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981), the Supreme Court declined an invitation to read an implied cause of action into the

federal Clean Water Act or Marine Protection, Research, and Sanctuaries Act of 1972.  Like the

decision in *Block*, the Court's holding did not turn on the statutes' *absence* of judicial review

mechanisms, but on its interpretation of the complex mechanisms that were affirmatively

provided.  *Middlesex County*, 453 U.S. at 14 ("In view of these elaborate enforcement provisions

it cannot be assumed that Congress intended to authorize by implication additional judicial

remedies for private citizens suing under MPRSA and FWPCA.").

The National Emergencies Act bears little resemblance to either the Agricultural

Marketing Agreement Act's "complex and delicate" scheme of judicial review considered by the

Court in *Block*, or the "elaborate enforcement provisions" of the environmental laws at issue in

*Middlesex County*.  The NEA is much simpler than those laws, containing only six sections, none

of which address judicial review.  And the first step in assessing the merits of Plaintiffs' NEA

Claim would be neither complicated nor esoteric, but instead presumably start with the ordinary

meaning of "emergency."  *Emergency*.  Merriam-Webster Dictionary (an "unforeseen

combination of circumstances or the resulting state that calls for immediate action.").

The NEA has been subject to relatively little prior litigation—not because of its

unreviewability, but because past presidential use of NEA authorities has almost exclusively

involved economic foreign affairs matters without significant domestic on-the-ground impacts.

Of the 60 times presidents have declared emergencies since enactment of the NEA, 54 of those

have been for the primary or sole purpose of imposing economic sanctions under the

International Emergency Economic Powers Act ("IEEPA") and related legislation.  FAC ¶ 32;

Brennan Ctr. for Justice Amicus Brief, ECF No. 30, at 9.[19]  None have involved anything

---

[19] The IEEPA also lacks a judicial review provision.  Litigation which has been conducted under the IEEPA has thus been governed by general APA principles of review.  *Micei Int'l v. DOC*, 613 F.3d 1147, 1151-52 (D.C. Cir. 2010) ("The IEEPA is silent regarding the availability

resembling the peculiar circumstances of this case, where the President is quite openly using the emergency powers as a means to circumvent congressional appropriations enactments.

The government's contention that Congress only "gave itself the power to oversee" the President's use of the NEA is also off the mark.  MTD, at 24-25.  For example, Defendants rely on *Beacon Products Corp. v. Reagan*, 814 F.2d 1 (1st Cir. 1987) (Breyer, J.), in which the court affirmed that "Congress intended to impose upon itself the burden of acting affirmatively to end an emergency" through the section 1622(b) six-month termination review process, rather than having the emergency automatically terminate in the event that Congress does not fulfill those obligations.  The issue of automatic termination of emergencies and congressional inaction, however, has no relevance to the role of judicial review in challenging the legality of Presidential Proclamations in the first instance.[20]  *See United States v. Amirnazmi*, 645 F.3d 565, 581 (3d Cir. 2011) (noting that political considerations "do not preclude enforcing compliance with statutory dictates," but in the specific termination review process, "NEA places the onus on Congress to ensure emergency situations remain anomalous and do not quietly evolve into default norms.").[21]

In light of the general presumption of reviewability, and Congress's overriding intent in enacting the NEA in order to constrain presidential action through the establishment of processes

---

and forum for judicial review of action taken under its auspices," but the APA "authorizes judicial review of final agency action.").

[20] Notably, the *Beacon* decision did not turn on justiciability, and the court engaged in a merits discussion despite its ultimate mootness holding.  There is also no indication that the court questioned the propriety of naming President Reagan as a defendant in his official capacity.

[21] The implementation of the NEA has been described as "dismal" and "in shambles … wrecked by presidential defiance, congressional acquiescence, and judicial undermining."  Jules Lobel, "Emergency Power and the Decline of Liberalism," 98 Yale L.J. 1384, 1413 (1989).  For example, the Act's "procedural requirements for reporting and congressional oversight have simply not been followed by either the executive or Congress."  *Id*. at 1415.  In any event, the NEA's congressional oversight provisions cannot substitute for, and have no relation to, the availability of judicial review for alleged violations of the law.

for future declarations of emergency, there is no basis for concluding that NEA claims are beyond the reach of the judiciary.

### B.      The NEA Claim is Not Barred by the Political Question Doctrine

The political question doctrine is "essentially a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 217 (1962).  Its "shifting contours and uncertain underpinnings make it susceptible to indiscriminate and overbroad application to claims properly before the federal courts."  *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1514 (D.C. Cir. 1984).  The doctrine is based on the principle that the courts "are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security."  *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.D.C. 2010).

In contrast, claims "presenting purely legal issues such as whether the government had legal authority to act" are reviewable.  *Id*.; *Hamdi v. Rumsfeld*, 542 U.S. 507, 535 (2004) ("[I]t does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims like those presented here."); *Gilligan v. Morgan*, 413 U.S. 1, 11-12 (1973) ("[I]t should be clear we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law or for specific unlawful conduct of military personnel … We hold only that no such questions are presented in this case.").  The applicability of the political question doctrine thus "turns not on the nature of the government conduct under review but more precisely on the question the plaintiff raises about the challenged action."  *El-Shifa Pharm.*, 607 F.3d at 842; *Ramirez de Arellano*, 745 F.2d at 1514 ("*Baker v. Carr* admonishes that the doctrine is one of 'political question,' not one of 'political cases.'").

Here, Plaintiffs' challenge to the legality and constitutionality of Defendants' actions is based on specific statutory language of the NEA, 10 U.S.C. § 2808, DoD FY19 Appropriations Act, and CAA, and thus does not implicate the *Carr* factors. Plaintiffs' claims, though grounded in environmental concerns and interests, also have bearing on matters involving border security, immigration, and the military. This intersection does not shield Defendants' actions from judicial review as unreviewable political questions. *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (duty of judicial review "will sometimes involve the resolution of litigation challenging the constitutional authority of one of the three branches, but courts cannot avoid their responsibility merely because the issues have political implications.").

The specificity and statutory basis of Plaintiffs' claims is far different from the cases cited by the government in which the political question doctrine was used to preclude review of often vague claims arising from more discretionary statutes or common law causes of action. *See*, *e.g.*, *El-Shifa Pharm.*, 607 F.3d at 845 (under "law of nations claim," court asked to determine whether missile strike on pharmaceutical plant in Sudan in retaliation for Osama bin Laden 1998 bombings of U.S. embassies in Kenya and Tanzania was "mistaken and not justified."); *U.S. Ordnance, Inc. v. United States Dep't of State*, 432 F. Supp. 2d 94, 98 (D.D.C. 2006) ("In particular, if the statute uses language that permits an executive official, such as the President or another agency official, to take action that the official 'deems' in the 'national interest,' these statutes have been consistently interpreted to preclude judicial review under the APA."); *Ange v. Bush*, 752 F. Supp. 509, 514 (D.D.C. 1990) (Ange "asks the court to find that President's deployment of U.S. forces in the Persian Gulf constitutes 'war,' 'imminent hostilities,' or even the prelude to offensive war."); *Industria Panificadora, S.A. v. United States*, 763 F. Supp. 1154, 1161 (D.D.C. 1991) ("the facts show that plaintiffs' action involves

judicial review of executive branch decisions pertaining to the nature, conduct, and

implementation of a presidentially-directed military operation in a foreign country.").

Here, Plaintiffs do not ask this Court to weigh the wisdom of the President's

Proclamation or the decisions transferring appropriated DoD funds to border wall construction,

but instead to determine whether those decisions were taken in contravention of specific legal

requirements under § 2808, § 8005, and the CAA.

And Plaintiffs' NEA claim does not ask this Court to second guess whether the

conditions at the southern border are truly an "emergency" or not; instead, Plaintiffs ask this

Court to consider whether this case presents the unprecedented circumstance in which the

President has violated the NEA by abusing its authorities to circumvent congressional

appropriations enactments, while also overtly delaying the declaration of the initial emergency

Proclamation as well as the subsequent emergency action ordered under that proclamation. *See*

*Sterling v. Constantin*, 278 U.S. 378, 401 (1932) ("It is the emergency that gives the right, and

the emergency must be shown to exist before the taking can be justified.") (*citing Mitchell v.*

*Harmony*, 13 How. 115, 134, 54 U.S. 15 (1851) and *United States v. Russell*, 13 Wall. 623, 628,

80 U.S. 623, 628 (1871)).  Resolving Plaintiffs' claims is a matter of statutory interpretation, not

asking the Court to "fashion [a remedy] out of whole cloth."  *El-Shifa Pharm.*, 607 F.3d at 845;

*Zivotofsky*, 566 U.S. at 195 ("This misunderstands the issue presented.  Zivotofsky does not ask

the courts to determine whether Jerusalem is the capital of Israel.  He instead seeks to determine

whether he may vindicate his statutory right, under § 214(d), to choose to have Israel recorded on

his passport as his place of birth.").

Finally, "[t]he Supreme Court has never applied the political question doctrine in a case

involving alleged *statutory* violations.  Never." *El-Shifa Pharm.*, 607 F.3d at 856-857

(Kavanaugh, J., concurring) (emphasis in original).  Applying the political question doctrine in

statutory cases would "systematically favor the Executive Branch over the Legislative Branch—

without the courts' acknowledging as much or grappling with the critical separation of powers

and Article II issues." *Id.*  In this case, "the Government relies solely upon available statutory

authorities that Congress has delegated to the Executive," and "the outcome of this case thus

turns on whether the statutes authorize the Government's action."  MTD, at 53.  Accordingly,

Plaintiffs' claims are reviewable.  *See Japan Whaling Ass'n v. American Cetacean Soc'y*, 478

U.S. 221, 230 (1986) (finding no political question where "[t]he Court must first determine the

nature and scope of the duty imposed upon the Secretary by the [statute], a decision which calls

for applying no more than the traditional rules of statutory construction, and then applying this

analysis to the particular set of facts presented below."); *Nat'l Treasury Employees Union v.*

*Nixon*, 492 F.2d 587, 603 (D.C. Cir. 1974) ("All that is involved in this case is interpretation of

the interrelation of federal statutes concerning federal pay and determination of the President's

duty under those statutes.  Such interpretation and determination is the essence of judicial

duty.").

### C.    The President is a Proper and Necessary Party

Plaintiffs have properly named the President as a party, especially because there is no

alternative avenue to challenge the President's Proclamation through agency implementation

decisions.  Judicial relief can be provided through a declaratory order that the Proclamation is

unlawful, accompanied by injunctive relief prohibiting agency implementation.

Although the Supreme Court has not directly addressed the issue of "enjoin[ing] the

President in the performance of his official duties" since *Mississippi v. Johnson*, 71 U.S. (4

Wall.) 475, 501 (1866), the Court's more contemporaneous statements unanimously refrain from

announcing any blanket prohibitions against the potential of obtaining judicial relief against a

president in his official capacity.  Instead, those decisions consistently affirm the reviewability of

presidential action, while noting that challenges to agency implementing actions will *typically* provide adequate relief.  *See Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."); *Dalton v. Specter*, 511 U.S. 462, 477 (1994) (decision not a blanket repudiation of the judicial review principles announced in *Marbury*, but instead the Court's "conclusion that judicial review is not available for respondents' claim follows from our interpretation of an act of Congress."); *see also Nat'l Treas. Employees Union*, 492 F.2d at 609 ("no immunity established under any case known to this Court bars every suit against the President for injunctive, declaratory or mandamus relief."); *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) ("*In most cases*, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, *because the injury at issue can be rectified by injunctive relief against subordinate officials*.") (emphasis added); *Mackie v. Bush*, 809 F. Supp. 144, 146 (D.D.C. 1993).

More recent lower court decisions have continued to recognize the appropriateness of suing the President in his official capacity in some circumstances.  *Knights First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 577-78 (S.D.N.Y. 2018) ("Defendants suggest that we categorically lack authority to enjoin the President, a proposition we do not accept."); *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393,418 (D. Mass. 2018) ("Injunctive relief against the President is an 'extraordinary' remedy, but one that may be available in limited circumstances.  The factors to consider … are whether injunctive relief against a lower official or declaratory relief would be an adequate remedy and the level of intrusion into the President's authority."); *Saget v. Trump*, 345 F. Supp. 3d 287, 297 (E.D.N.Y. 2018) ("However, the Supreme Court has never held that a court may *never* enjoin the President

with regard to his official behavior, only that there is something unique about litigation against the President *eo nomine* that should cause a special judicial hesitation.") (emphasis in original).

Like earlier decisions, the more recent judicial considerations of granting relief against the President in his official capacity have maintained the possibility for situations where such relief cannot be obtained against a subordinate officer.  Here, relief against a subordinate officer is clearly obtainable in relation to Plaintiffs' claims pertaining to the transfer of DoD appropriated funds to border wall construction through the counterdrug account (Claim IV and V), as DoD has taken agency implementing actions.

In contrast, Defendants expressly argue that DoD has not consummated its decisionmaking process with respect to § 2808 transfers.  MTD, at 39-40.  And in any event, Plaintiffs' Claim I seeks declaratory relief against the President regardless and independent of agency implementing actions.  Plaintiffs acknowledge that this is not a commonly sought remedy.  *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 555, 605 (4th Cir. 2017) ("In light of the Supreme Court's clear warning that such relief *should only be granted in the rarest of circumstances* we find that the district court erred in issuing an injunction against the President himself.").  But this case *is* the rarest of circumstances.  *See* Brennan Ctr. for Justice Amicus Brief, ECF No. 30, at 7-8 ("A review of the law's exercise from 1978 to the present shows that Proclamation 9844 is unprecedented, both in the absence of any arguable emergency and in the declaration's underlying purpose: to sidestep a Congress that would not bend to the president's will."); *United States v. Lee*, 106 U.S. 196, 220 (1882) ("All the officers of the government, from the highest to the lowest, are creatures of law, and are bound to obey it.").  The President should not be dismissed.

IV.    **IN THE ABSENCE OF FINAL AGENCY ACTION IMPLEMENTING THE PROCLAMATION'S EMERGENCY INVOCATION OF 10 U.S.C. § 2808, PLAINTIFFS MAY CHALLENGE THE PRESIDENT'S RELIANCE ON § 2808 DIRECTLY**

It has now been more than 100 days since the President's February 15, 2019 Emergency Proclamation invoking the funding authorities of 10 U.S.C. § 2808.  Although the DoD Comptroller has "identified existing unawarded military construction projects of sufficient value to provide up to $3.6 billion of funding for potential border barrier construction pursuant to section 2808," the "Acting Secretary of Defense has taken no action on this information and has not yet decided to undertake or authorize any barrier construction projects under section 2808." Third Rapuano Decl. ¶¶ 5-6.

This long lapse between the President's Proclamation and ultimate implementing action is by design, as the Administration made the identification and expenditure of these *emergency* military construction funds the *lowest* priority amongst the identified funding sources.  *See* Segee Decl. Ex. 3 (Fact sheet) (stating intent to use the "identified" funds "sequentially and as needed" by source, in the following order: 2019 CAA funds; Treasury Forfeiture Fund; counterdrug account funds; and emergency military construction funds.); Jeremy Diamond and Pamela Brown, *White House Moves Forward with Funding Despite Lawsuits*.  CNN.COM (Feb. 19, 2019) ("So why lump the national emergency in with the other actions?  It comes down to branding, a source close to the White House said.  The President wanted to show his supporters that he was taking drastic action to build the wall in spite of Congress's refusal to appropriate those funds and the national emergency declaration was one way to do that.").  Thus, during the same 100 days in which Defendants have not spent a dollar of "emergency" military construction funds, DoD has identified, transferred, and obligated $2.5 billion in "non-emergency" DoD appropriated funds to border wall construction through the counterdrug account.

38

### A.   The Requirement of Final Agency Action is Limited to the APA

In its motion to dismiss, the government pushes this perplexing posture to its extreme,

arguing in the standing context that Plaintiffs' § 2808 emergency claims are brought "in the

abstract," MTD, at 31, and that DoD implementing actions taken to date do not meet the standard

for final agency action pursuant to the APA.   MTD, at 43.   However, even if DoD has not taken

final *agency* action sufficient for APA review, Plaintiffs have pled their § 2808 claims in the

alternative; if APA review is not available pursuant to Claim IV, then Claim V includes an

allegation of a non-statutory right of action that seeks to declare unlawful the President's

invocation of § 2808 standing alone.[22]

The APA requirement of "final agency action" is not applicable to Presidential action.

*Franklin v. Massachusetts*, 505 U.S. at 796.   This, "of course, [does] not in any way suggest[]

that Presidential action is *unreviewable*."   *Id*. at 828 (Scalia, J., concurring) (emphasis in

original) (*citing Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) and *Panama*

*Refining Co. v. Ryan*, 293 U.S. 388 (1935)); *see also Campbell v. Clinton*, 203 F.3d 19, 40-41

(2000) (Tatel, J., concurring) ("Did the President exceed his constitutional authority as

Commander in Chief? Did he intrude on Congress's power to declare war? Did he violate the

War Powers Resolution? Presenting purely legal issues, these questions call on us to perform one

of the most important functions of Article III courts: determining the proper constitutional

---

[22] FAC, Claim II, ¶ 163 ("The President's invocation of 10 U.S.C. § 2808 is unlawful under the plain language of that provision, and broader statutory structure of the military and immigration codes, as is the Defense Secretary's and Army Corps of Engineers' implementing actions to identify,  transfer, and obligate emergency funds from military construction to border wall construction"); FAC, Claim III, ¶¶ 169-170 ("For the same reasons described in the Second Claim for Relief, the Defense Secretary's and the Army Corps of Engineers' implementing actions to identify, transfer, and obligate funds appropriated for military construction to border wall construction is unlawful.  Plaintiffs and their members will suffer irreparable injury if the President's invocation of 10 U.S.C. § 2808" and agency implementing actions are not declared unlawful.)

allocation of power among the branches of government.").   Although the standards for

nonstatutory review of presidential action vary, such variance does not foreclose review.   *The*

*Statutory President*, 90 Iowa L. Rev. at 559-568 (describing the varying levels of deference

courts have afforded to non-APA challenges to presidential action).   As also discussed in Section

III.C, *supra*, the claims involving the President are properly pled.

### B.   Department of Defense Implementing Actions Are Not Committed to Agency Discretion By Law

DoD's final implementing actions (when taken) are reviewable.   Generally speaking,

there exists "a basic presumption of judicial review" in APA cases.   *Abbott Labs*, 387 U.S. at

140.   This presumption can be overcome if the challenged agency action "is committed to agency

discretion by law."   5 U.S.C. § 701(a)(2).   This exception is a "very narrow one."   *Hi-Tech*

*Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 788 (D.C. Cir. 2000) (*quoting Citizens to Preserve*

*Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)).   Accordingly, "[t]he Supreme Court has

identified only two related scenarios in which this exception applies: (1) in those rare instances

where statutes are drawn in such broad terms that in a given case there is no law to apply; and (2)

when the statute is drawn so that a court would have no meaningful standard against which to

judge the agency's exercise of discretion."   *Watervale Marine Co. v. United States Dep't of*

*Homeland Sec.*, 55 F. Supp. 3d 124, 135 (D.D.C. 2014).   In particular, "cases that involve agency

decisions not to take enforcement action [] begin with the presumption that the agency's action is

unreviewable."   *Sierra Club v. Jackson*, 648 F3d 848, 855 (D.C. Cir. 2011) (*citing Heckler v.*

*Chaney*, 470 U.S. 821, 831-32 (1985)).

This case does not include claims attempting to compel an agency enforcement action,

and does not involve statutory language beyond interpretation.   Looking to the plain language of

§ 2808, it can hardly be argued that there is "no law to apply" or no "meaningful standard" by

which to measure the legality of the President's Proclamation and agency implementing actions. § 2808 is part of a broader statutory subchapter dedicated to military construction; this subchapter includes a specific definition of the term "military construction." 10 U.S.C. § 2801(a). The statutory language of § 2808 specifically, as well as the larger statutory context of the military construction subchapter more generally, provide more than sufficient detail to provide a basis for the court's interpretation of its provisions. *Cf. Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (the committed to agency discretion by law exception does not apply merely because "a statute grants broad discretion to an agency.").

Here, Plaintiffs' § 2808 claims are grounded in detailed statutory text and, at their root, involve everyday issues of statutory interpretation. *See American Cetacean Soc'y*, 478 U.S. at 230 (the interpretation of legislation is a "recurring and accepted task for the federal courts."). Plaintiffs' claims do not require the Court to weigh the wisdom of Defendants' decisions or to make determinations concerning policy matters. Such claims are eminently reviewable. *Cf. Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) ("A somewhat different case is presented, however, where the authorizing statute or another statute places discernible limits on the President's discretion.").

## V.   IIRIRA WAIVERS DO NOT REMOVE THIS COURT'S JURISDICTION TO HEAR PLAINTIFFS' NEPA CLAIM

NEPA is the nation's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA requires agencies to prepare an environmental impact statement ("EIS") on major Federal actions "significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989); 42 U.S.C. § 4332(2)(C). The EIS requirement is an "action-forcing" provision designed to "ensure[] that important effects will not be overlooked or underestimated only to be discovered after resources

have been committed or the die otherwise cast." *Id*. at 349.

If more than one agency "proposes or is involved in the same action," or if a federal undertaking involves a "group of actions directly related to each other because of their functional interdependence or geographical proximity," then NEPA directs that a lead agency "shall supervise the preparation of an environmental impact statement," 40 C.F.R. § 1501.5(a)(1)-(2). "The purpose of this section is to emphasize agency cooperation early in the NEPA process." *Id*. § 1501.6.  Accordingly, the lead agency "shall [r]equest the participation of each cooperating agency in the NEPA process at the earliest possible time." *Id*. § 1501.6(a)(1).  Conversely, "[e]ach cooperating agency shall [p]articipate in the NEPA process at the earliest possible time." *Id*. § 1501.6(b)(1).

The Acting Defense Secretary issued March 25, 2019 and May 9, 2019 memorandum decisions approving the transfer of $1 billion and $1.5 billion in appropriated funds, respectively, through the counterdrug account.  Both decisions state that "CBP will serve as the lead agency for environmental compliance," despite the fact that DoD and the Army Corps of Engineers are funding, implementing, and constructing the border wall projects.  First Rapuano Decl. Ex. B; Second Rapuano Decl. Ex. A.

On April 8, 2019, CBP issued separate requests for public input regarding the potential impacts of the El Paso 1 project and Yuma 1 project "to the environment, culture and commerce,[] and quality of life," announcing that it would accept comments until May 8, 2019.[23] Before that comment period ended, on April 24, 2019, CBP issued Determinations pursuant to section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), waiving NEPA and other laws in relation to the El Paso 1 project, 84 Fed. Reg.

---

[23] Available at: https://www.cbp.gov/about/environmental-cultural-stewardship/cbp-environmental-documents.

17185, and the Yuma 1 project, 84 Fed. Reg. 17187.  Pub. L. No. 104-208, Div. C., Title I §

102(a), 110 Stat. 3009 (1996), *as amended* (*codified at* 8 U.S.C. § 1103 note).

On May 6, 2019, CBP issued separate requests for public input regarding environmental

and other impacts of the El Centro 1 project, and Tucson 1, 2, and 3 projects, and announcing

that it would accept comments until June 6, 2019.  Before that comment period ended, on May

15, 2019, CBP issued IIRIRA Determinations waiving NEPA and other laws in relation to the El

Centro 1 project, 84 Fed. Reg. 21800, and the Tucson 1, 2, and 3 projects, 84 Fed. Reg. 21798.[24]

Defendants assert that these IIRIRA waivers "depriv[e] the Court of jurisdiction" over

Plaintiffs' NEPA claim.  MTD, at p. 37.  Defendants' unlawful attempt to apply the DHS IIRIRA

waiver authority to border wall construction projects funded and implemented by DoD should be

rejected on several grounds.

First, the government claims that "[n]othing in the text of IIRIRA limits DHS's waiver

solely to DHS's activities."  MTD, at 38.  However, nothing in the text of IIRIRA § 102

*authorizes* the extension of the waiver's sweeping authorities to DoD border wall construction

projects.  This silence cannot be read to expand the DHS waiver authority to border wall

construction projects undertaken with DoD funds and characterized by the government as DoD

---

[24] As pointed out in Plaintiffs' FAC, ¶ 192, despite its designation as lead agency, CBP never intended to adhere to NEPA (or any other environmental law), but instead to use that lead agency status in order to avoid environmental review by invoking the IIRIRA waiver authority. Although NEPA provides federal agencies with discretion to choose the lead agency in a multi-agency proposal, this discretion is intended to facilitate efficiency in environmental review, not as a means to avoid such review entirely.  Here, the designation of DHS as lead agency despite its minimal role in the funding and execution of DoD border wall projects was done with the "conscious design" of avoiding NEPA's requirements.  *Cf. Aertsen v. Landrieu*, 637 F.2d 12, 19 (1st Cir. 1980) (finding no evidence of "conscious design to circumvent the requirements of NEPA as would amount to bad faith.")(*cited in Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 889 n. 34 (D.C. Cir. 1981)).

projects.  *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 680-81 (1986) ("strong

presumption" of reviewability in the absence of "clear and convincing" evidence to the contrary).

Section 102 of IIRIRA authorizes DHS to construct border infrastructure, and consists of

three sections: (1) section 102(a) describes the general purpose of the statute; (2) section 102(b)

specifies Congress' mandate for specific border barrier construction; and (3) section 102(c)

grants the Secretary the discretion to waive "all legal requirements" he or she "determines

necessary to ensure construction of the barriers and roads *under this section*."  IIRIRA § 102, 8

U.S.C. § 1103 note (emphasis added); *In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d

1092, 1103-1104 (S.D. Cal. 2018).  At its *outer reaches*, the phrase "under this section" in

§ 102(c)(1) refers to DHS border construction authorized under any provision *of section 102*.  *Id.*

at 1116 ("Defendants argue that the words 'under this section' refer to section 102 as a whole

and are not limited to subsection 102(b)," while "Plaintiffs respond that the waiver authority

must be interpreted as limited to specific border barriers specified in section 102(b)").  This

limitation is further supported by the broader context of § 102, which contains its own permanent

appropriations authorization.  *Id.* § 102(b)(4)("There are authorized to be appropriated such sums

as may be necessary to carry out this subsection.").

Here, DoD is constructing border wall projects using DoD funds transferred from other

appropriations pursuant to the DoD FY19 Appropriations Act general transfer authority and the

10 U.S.C. § 2808 military construction emergency authority, not construction projects

undertaken pursuant to IIRIRA § 102 and funded by DHS appropriations.  *See* MTD, at 49

(characterizing DoD wall construction as "counter-drug activities in furtherance of DoD's

mission under § 284.").  This posture distinguishes this case from all previous litigation

involving the scope of the waiver authority.  *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d

119 (D.D.C. 2007).  The DHS waiver authority cannot be bootstrapped to border wall

construction completed with funds appropriated outside of the DHS appropriations process, particularly when a specific funding authorization is contained within IIRIRA section 102.

The government itself has consistently argued that the waiver authority is limited to IIRIRA § 102 border wall construction projects, as a means of enforcing the provision's "consultation" requirement as well as its overall constitutionality.  *See*, *e.g.*, *In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d at 1125 (noting that Defendants "assert Congress intended the [IIRIRA § 102(b)(1)(C) consultation provision to be enforced through its appropriations power").[25]  As stated by the government in its opposition to a writ of certiorari seeking review of the court's decision in *Border Infrastructure Envtl. Litig.*, "any construction project by the Secretary requires the appropriations of funds by Congress."  Fed. Respondents' Opp. to Pet. for Writ of Cert., *Animal Legal Def. Fund v. Dep't of Homeland Sec.* (No. 18-247), at 25 (emphasis added).  As the IIRIRA waiver does not apply, Defendants' motion to dismiss Plaintiffs' NEPA claim should be denied.

## VI.   PLAINTFFS HAVE PLED VALID APA CLAIMS

At the pleading stage, Plaintiffs need only provide "enough facts to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the plaintiff pleads facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. at 678.  Defendants' arguments go well beyond this standard to dispute the merits with respect to each of Plaintiffs' APA-based claims.  Although Plaintiffs respectfully urge the Court to decline this invitation, and instead defer briefing for the summary judgment

---

[25] The limitation of the IIRIRA waiver authority to border wall projects funded through DHS appropriations demonstrates the flaw in the Court's finding in *Sierra Club v. Trump*, 2019 U.S. Dist. LEXIS 88210, *85, that "DoD's authority under Section 284 is derivative."

stage after a full administrative record or its equivalent has been provided, Plaintiffs respond below.

### A.      Section 2808

Plaintiffs' Claims II and III allege that Defendants (including the President) have violated 10 U.S.C. § 2808.  FAC ¶¶ 155-170.  Plaintiffs specifically allege that "[t]he Defense Secretary's and Army Corps' of Engineers' implementing actions to identify, transfer, and  obligate funds appropriated for military construction" are in violation of APA standards.  FAC  ¶ 157. Plaintiffs further allege that "[t]he President's invocation of 10 U.S.C. § 2808 is unlawful under the plain language of that provision."  FAC  ¶ 163.  These claims are supported by specific arguments based on the provision's plain language, FAC ¶¶ 158-159; the broader statutory context of Title 10, Chapter 15 and its emergency provisions, FAC ¶¶ 160-161; and the statutory context provided by emergencies defined under the Immigration Code, FAC ¶ 162.  Plaintiffs' Claim III, presented in the alternative, presents its challenge as ultra vires rather than APA, but based on the "same reasons described in the Second Claim for Relief."  FAC ¶ 169.  The detail in Plaintiffs' FAC is more than sufficient to meet governing standards for 12(b)(6) motions, by allowing the court to draw the reasonable inference that Defendants are liable for the misconduct alleged.  *Iqbal*, 556 U.S. at 678 (a "pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do'") (*quoting Twombly*, 550 U.S. at 555). Plaintiffs also address the interpretation of § 2808 in Section IIB, *supra*.

Defendants  incorrectly assert that Plaintiffs' allegations regarding the broader military and immigration codes "are entirely irrelevant to DoD's undertaking pursuant to § 2808," because "Plaintiffs' cited example are limited to situations in which DoD is 'supporting' or 'assisting' domestic law enforcement agencies," and the Acting Secretary's decision "will be made pursuant to a determination that such construction is 'necessary to support such use of the

armed forces,' not to aid local law enforcement."  MTD, at 48.   The government's characterization of the respective roles played by DHS and DoD in this process is inconsistent; DoD's role is emphasized when addressing the legality of transfer actions, but minimized when addressing environmental compliance with NEPA, as discussed in Section V, *supra*.

These inconsistent positions must be reconciled, but also highlight the inappropriateness of dismissing Plaintiffs' § 2808 claims and the need for further factual development at summary judgment.

### B.      Section 8005

Section 8005 of the DoD FY19 Appropriations Act provides the Acting Secretary with "general transfer authority," of appropriated funds "not [to] exceed $4,500,000,000."   Funds transferred pursuant to this authority "may not be used for an item that has been denied authorization by Congress." § 8005(b)(2).  Plaintiffs' Claim IV and Claim V allege that Defendants' "implementing actions to identify and transfer up to $2.5 billion of appropriated funds into, and from, the counterdrug account to fund border wall construction violate [§ 8005], as the transfer would be unlawful [because] the items for which funds are requested has been denied by the Congress."  FAC ¶ 174; *id.* ¶ 180.

Defendants argue that "Plaintiffs mistakenly assume that § 8005 should be interpreted as a legislative judgment concerning the appropriation of funds for a different agency under different statutory authorities," and that the specific restrictions on border wall construction in the CAA (discussed *infra*) "does not constitute a 'denial' of appropriations to DoD for its counter-drug activities in further of DoD's mission under § 284."  MTD, at 49.  Defendants thus conclude that "Congress has not 'denied' any request by DoD to fund 'the item' referenced in the transfer—namely, counter-drug activities funding, including fence construction, under § 284." MTD, at 48-49.

The invocation of the § 284 fence construction authority, however, does not qualify as an appropriations "item." *Bengzon v. Sec'y of Justice*, 299 U.S. 410, 414-15 (1937) ("[E]ven if it be conceded that the bill could be characterized as an appropriation bill, § 7 is not an 'item' within the meaning of [the relevant statute].  An item of an appropriation bill obviously means an item which in itself is a specific appropriation of money, not some general provision of law which happens to be put into an appropriations bill."); *Jubelirer v. Rendell*, 598 Pa. 16 (2008)("[O]ur understanding of 'item' [] as a sum of money directed by the General Assembly to be spent for a particular purpose is consistent with interpretations rendered by a multitude of courts of last resort in various other jurisdictions.").  Instead, the "item" at issue is the border wall.  And when Congress has chosen to fund the border wall, it has done so through DHS appropriations.[26]

In FY 2019, Congress provided specific funding amounts and geographic limitations, as well as other limitations, on its funding of border wall construction in the CAA.  It thus rejected any border fence construction at funding levels in excess of this appropriation, or in geographic areas contrary to its limitations.  *United States v. MacCollom*, 426 U.S. 317, 321 (1976) ("The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.").  As Plaintiffs

---

[26] *See* Segee Decl. Ex. 4, at 19 (Table 1).  Annual border wall appropriations exceeded $1 billion during the second term of the Bush administration, but then were greatly reduced during the Obama administration.  Although the Army Corps has consistently supported DHS in border wall construction, MTD, at 6-8, that work has almost exclusively been funded through DHS appropriations.  Congress has also periodically directly funded Army Corps border wall construction assistance efforts though specific line item DoD appropriations to a "Southwest Border Fence" subaccount within the 10 U.S.C. § 284 counterdrug account, in amounts as high as $5 *million* (i.e. at a small fraction of the funds appropriated to DHS), though it does not appear to have made such an appropriation since FY 2009.  Segee Decl. Ex. 4., at 20-21 (Table 2).  The $2.5 billion in DoD appropriated funds which were transferred through the counterdrug account dwarf the specific line item amounts Congress has chosen to provide to Army Corps for border wall construction assistance in the past.

have adequately pled violations of § 8005 in Claims IV and V, the motion to dismiss should be denied.

## C.   Consolidated Appropriations Act

Defendants bring a merits based challenge to Plaintiffs' CAA arguments under the guise of a motion to dismiss for a failure to state a claim.  Plaintiffs' FAC alleges CAA violations in relation to both its § 2808 and counterdrug account challenges, Claims II-V, ¶¶ 164-165; ¶ 169; ¶¶ 175-176; ¶ 180.  In each instance, Plaintiffs allege violations of CAA § 230(a) (by exceeding and falling outside of the Act's monetary and geographic restrictions, respectively) and § 739 (violating prohibition on use of any appropriated funds to increase funding for a program, project, or activity.).

Defendants acknowledge the specific limitations placed on border wall construction under the CAA.  But they insist that "this provision limits the use of funds within a certain CBP appropriation for border wall construction," and that "it does no more."  MTD, at 50.  This mere assertion without more is insufficient to dismiss Claims II-V for failure to state a claim. Congress cannot be expected to specifically legislate or prohibit for every possible contingency, but instead must affirmatively provide an appropriation.  *MacCollom*, 426 U.S. at 321.

Defendants further insist that the CAA's "funding provisions do not alter the meaning or availability of permanent statutes already in effect," and cite to *Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1558 (D.C. Cir. 1984) for the principle that "when appropriations measures arguably conflict with the underlying authorizing legislation, their effect must be construed narrowly."  That ruling is inapposite, as this circumstance involves a conflict between provisions in two separate appropriations enactments, not between an appropriations bill and its underlying authorization legislation.

Instead, the first principle in resolving such conflicts is to seek to harmonize the conflict. Government Accountability Office, Office of the General Counsel, Principles of Federal Appropriations Law (4th Ed. 2017) (GAO Red Book), at 1-64 ("First, we assume that the legislature intended to enact a consistent body of law, and so we try to harmonize conflicting statutes to give full force to each of them.").[27]

Here, Defendants' proposed interpretation would adopt an expansive view of the DoD FY19 general transfer authority that would essentially render the specific monetary and geographic limitations placed on border wall construction by the CAA without effect.  For example, while Congress expressly prohibited border wall construction within all of one, and a portion of another National Wildlife Refuge within the Rio Grande Sector under CAA § 231(1) and (5), the government's argument here would sanction the use of the DoD FY19 Appropriations Act § 8005 general transfer authority to construct border walls on numerous protected federal borderlands in California, Arizona, and New Mexico, including National Wildlife Refuges, without restriction.

In contrast, Plaintiffs' proposed interpretation would harmonize and preserve both the DoD FY19 Appropriations Act and CAA.  Under that interpretation, § 8005 would continue to provide broad general transfer authority, with only its specific unlawful inapplicability to border wall construction confirmed.  At the same time, Congress's specifically defined limits it placed

---

[27] "If harmonizing the different statutes and giving full force to all of them solves the issue at hand, the analysis ends there.  Only when harmonization does not resolve an issue do we turn to the second principle, which is that more specific enactments control over more general ones … If two statutes may not be harmonized and one statute is not more specific that another, there is a final principle to which we may turn, which is that a later enactment supersedes an earlier one." GAO Red Book, at 1-64.  Here, the second principle also supports Plaintiffs' interpretation, as the specific limiting prohibitions of the CAA should control over the DoD FY19 Appropriations Act transfer authority, which by its plain terms is "general."  *See Nevada v. DOE*, 400 F.3d 9, 16 (D.C. Cir. 2005)("According to the GAO, [] specific appropriations preclude the use of general ones even when the two appropriations come from different accounts.").

on the money it did appropriate under the CAA will also be given effect.  In any event, Plaintiffs'

have adequately pled violations of the CAA, and Defendants' motion to dismiss for failure to

state a claim should be denied.

### VIII.   PLAINTIFFS HAVE PLED VALID ULTRA VIRES CLAIMS

Plaintiffs' FAC relies on a non-statutory, ultra vires right of action in support of Claim I

(NEA), Claim III (violations of § 2808, in the alternative to APA right of action under Claim II),

and Claim V (violations of § 8005 and CAA, in the alternative to APA right of action under

Claim IV).  The government states that "Plaintiffs' ultra vires claims fail for the same reason as

their APA claims: their allegations do not plausibly allege a violation of the statute."  MTD, at

52.  As detailed above, however, Plaintiffs have adequately pled legal violations to survive a

motion to dismiss.

The "enactment of the APA did not repeal the review of ultra vires action recognized

long before," and thus "[w]hen an executive acts ultra vires, courts are normally available to

reestablish the limits on his authority."  *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328

(D.C. Cir. 1996); *Mountain States Legal Found. v. Bush*, 306 F.3d at 1136 ("It would be

untenable to conclude . . . that there are no judicially enforceable limitations on presidential

actions, besides actions that run afoul of the Constitution or which contravene direct statutory

prohibitions, so long as the President *claims* that he is acting pursuant to a statutory directive.")

(emphasis in original) (*quoting Reich*, 74 F.3d at 1332); *Dalton v. Specter*, 511 U.S. at 474 ("We

may assume for the sake of argument that some claims that the President has violated a statutory

mandate are judicially reviewable outside the framework of the APA.") (*citing Dames & Moore v. Regan*, 453 U.S. 654, 667 (1981)).[28]

Here, Congress has not spoken at all to judicial review under the NEA, 10 U.S.C. § 2808, DoD FY19 Appropriations Act, or the CAA.  *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988).  Plaintiffs are thus not subject to the stringent "clear and mandatory" standard governing cases in which plaintiffs seeks remedies outside of an often complex existing statutory judicial review scheme.  *See Leedom v. Kyne*, 358 U.S. 184 (1958).  As stated in *Reich*, "we have never held that a lack of a statutory cause of action is *per se* a bar to judicial review."  74 F.3d at 1328 (*citing Five Flags Pipe Line Co. v. Dep't of Transp.*, 854 F.2d 1438, 1439 (D.C. Cir. 1988) ("If Congress makes no specific choice of this type in the statute pursuant to which the agency action is taken, or in another statute applicable to it, then an aggrieved person may get 'nonstatutory review'—a confusing misnomer—in federal district court pursuant to the general 'federal question' jurisdiction of that court.").  Plaintiffs' non-statutory, ultra vires claims are thus adequately and appropriately pled.

## VIII.   PLAINTIFFS HAVE PLED VALID CONSTITUTIONAL CLAIMS

Finally, the Court should reject Defendants' motion to dismiss Plaintiffs' constitutional claims.  The fact that "[t]he outcome of this case [] turns on whether the statutes authorize the Government's action," MTD at 53, does not mean that those alleged statutory violations do not also conflict with constitutional directives.  Here, the President's invocation of 10 U.S.C. § 2808 in the Proclamation, as well as the agency actions to implement the Proclamation and the "non-

---

[28] Ultra vires review may also be necessary to the extent agency implementing actions are characterized as presidential action outside of APA review.  *See Tulare County v. Bush*, 185 F. Supp. 2d 18, 28-29 (D.D.C. 2001) (action of Forest Service in establishing management direction for Grand Sequoia National Monument was "merely carrying out directives of the President" and thus not reviewable under APA).

emergency" actions to transfer appropriated DoD funds to border wall construction through the counterdrug account, are in violation of statutory provisions as described *supra*, but are also counter to constitutional constraints on the President and agency officials that are enshrined under the Appropriations and Take Care Clauses.

The government asserts that "*Dalton* disposes of Plaintiffs' constitutional claims," and that "[b]y asserting that actions that allegedly exceed statutory authority are, for that reason alone, constitutional violations, [the FAC] does precisely what the Court disapproved of in *Dalton*." MTD, at 54.   *Dalton*, however, does not stand for so broad a proposition. In the odd procedural posture of that case, the Court of Appeals had "sought to determine whether non-APA review, based on either common law or constitutional principles, was available" even though "respondents [] sought review exclusively under the APA," and "focused [] on whether the President's actions [] were reviewable, even though respondents did not name the  President as a defendant." *Dalton*, 511 U.S. at 471.  Having thus redefined plaintiffs' case, the Court of Appeals then concluded that "there is a constitutional aspect to the exercise of judicial review" inherent to *every* case asserting that the President acts in excess of statutory authority.  *Id.*  The Supreme Court reversed, holding that "if *every* claim alleging that the President exceeded his statutory authority were considered a constitutional claim, the exception identified in *Franklin* would be broadened beyond recognition."  *Id.* at 474 (emphasis added).

The government's argument seeks to transmute *Dalton's* holding that statutory-based claims against the President are not *automatically* or even *presumptively* also constitutional claims into a *prohibition* on the connection between such claims.  In contrast to the ill-defined, conclusory, and vague (as well as judicially created) "claim" of constitutional separation of powers violation in *Dalton*, Plaintiffs here have pled two specific and separate constitutional

violations, under the Appropriations Clause and the Take Care Clause.  Thus, *Dalton* does not provide a basis for dismissal of Plaintiffs' constitutional claims.

Although the statutory violations alleged here share the same underlying factual basis as the constitutional violations, the Constitutional violations are also properly pled.  FAC ¶ 197 ("Congress has not appropriated the funds being transferred and obligated to border wall construction for that purpose, and limited the funds it has appropriated to border wall construction to projects within the Rio Grande Valley that are subject to several additional restrictions.  Defendants' unlawful transfer and obligation of appropriated funds for border wall construction violates the Appropriations Clause.").  In hearing this Claim, the Court would not be opening the floodgates to "*every* allegation that the President or his agents exceeded their statutory authority in some way . . . [repled] as a constitutional separation-of-power claim." MTD, at 55.  This is true even though allegations under either the Appropriations Clause or Take Care Clause will inherently concern the executive's failure to undertake, or a violation of, a statutory duty.  U.S. CONST. art. I, § 8, cl. 1 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"); U.S. CONST. art. II, § 3 ("he shall take care that the Laws be faithfully executed"); FAC ¶ 201 (alleging President has failed to faithfully executive legal requirements under the NEA, DoD FY19 Appropriations Act, and Consolidated Appropriations Act); *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 549 (1991)(Scalia, J., concurring) ("The Executive [] in addition to 'taking Care that the laws be faithfully executed,' Art II., § 3, has no power to bind private conduct in areas not specifically committed to his control by Constitution or statute; such as perception of the 'Executive power' may be familiar to other legal systems, but is alien to our own.").  This case presents a rare (perhaps unprecedented) set of circumstances that may never be replicated.  Respectfully, the Court should allow Plaintiffs' constitutional claims to go forward.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) should be denied.[29]

DATED:     May 31, 2019        Respectfully Submitted,

*/s/ Brian Segee*

Brian Segee (CA Bar No. 200795)(Pro Hac Vice)
CENTER FOR BIOLOGICAL DIVERSITY
660 S. Figueroa St., Suite 1000
Los Angeles, CA 90017
Tel: (805) 750-8852
Email: bsegee@biologicaldiversity.org

*/s/ Tanya Sanerib*

Tanya Sanerib (D.C. Bar No. 473506)
CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th Street, #146
Seattle, WA 98117
Tel: (206) 379-7363
Email: tsanerib@biologicaldiversity.org

Anchun Jean Su (D.C. Bar No. CA285167)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K Street N.W., Suite 1300
Washington, D.C. 20005
Tel: (202) 849-8399
Email:  jsu@biologicaldiversity.org

Jason C. Rylander (D.C. Bar No. 474995)
Michael P. Senatore (D.C. Bar No. 453116)
DEFENDERS OF WILDLIFE
1130 17th Street, NW
Washington, DC 20036
Tel: (202) 682-9400 x 145
Facsimile: (202) 682-1331
Email: jrylander@defenders.org
Email: msenatore@defenders.org

---

[29] Plaintiffs also welcome the opportunity to appear for argument in the event the Court chooses to hold a hearing on the motion.

Anthony T. Eliesuson (IL Bar No. 6277427)
ANIMAL LEGAL DEFENSE FUND
150 South Wacker Drive, Suite 2400
Chicago, IL  60606
Tel: (707) 795-2533
Email: aeliseuson@aldf.org

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; DEFENDERS OF WILDLIFE; and ANIMAL LEGAL DEFENSE FUND, | Case No.: 1:19-cv-00408 (TNM) |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America; PATRICK M. SHANAHAN, in his official capacity as Acting Secretary of Defense; LIEUTENANT GENERAL TODD T. SEMONITE, in  his official capacity as Commander and Chief of Engineers, U.S. Army Corps of Engineers; KEVIN McALEENAN, in his official capacity as Acting  Homeland Security Secretary; DAVID BERNHARDT, in his official capacity as Secretary of the Interior, | |
| Defendants. | |

<u>**DECLARATION OF BRIAN SEGEE**</u>

I, Brian Segee, declare as follows:

1.  I am a senior attorney with Center for Biological Diversity, and am counsel for Plaintiffs in the above-captioned matter.  I submit this declaration in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss.

2.  Attached hereto as Exhibits 1-4 to this Declaration are true and correct copies of the following:

Exhibit 1: Letter from Russell T. Vought, Acting Director, OMB, to Sen. Richard Shelby, Chairman, Sen. Appropriations Comm. (Jan 6, 2019).

Exhibit 2: Press Release, DHS, Walls Work (Dec. 12, 2018).

Exhibit 3: Fact Sheet, White House Press Office, President Donald J. Trump's Border Security Victory (Feb. 15, 2019).

Exhibit 4  CONG. RESEARCH SERV., BORDER SECURITY: BARRIERS ALONG THE U.S. INTERNATIONAL BORDER (March 16, 2009) (excerpts).

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 30, 2019

Brian Segee

# Exhibit 1



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

January 6, 2019

The Honorable Richard Shelby
Chairman
Committee on Appropriations
United States Senate
Washington, DC 20510

Dear Mr. Chairman:

The President continues to stress the need to pass legislation that will both reopen the Federal Government and address the security and humanitarian crisis at our Nation's Southwest border. The Administration has previously transmitted budget proposals that would support his ongoing commitment to dramatically reduce the entry of illegal immigrants, criminals, and drugs; keep out terrorists, public safety threats, and those otherwise inadmissible under U.S. law; and ensure that those who do enter without legal permission can be promptly and safely returned home.

Appropriations bills for fiscal year (FY) 2019 that have already been considered by the current and previous Congresses are inadequate to fully address these critical issues. Any agreement for the current year should satisfy the following priorities:

- *Border Wall, Customs and Border Protection (CBP)*: The President requests $5.7 billion for construction of a steel barrier for the Southwest border. Central to any strategy to achieve operational control along the southern border is physical infrastructure to provide requisite impedance and denial. In short, a physical barrier—wall—creates an enduring capability that helps field personnel stop, slow down and/or contain illegal entries. In concert with the U.S. Army Corps of Engineers, CBP has increased its capacity to execute these funds. The Administration's full request would fund construction of a total of approximately 234 miles of new physical barrier and fully fund the top 10 priorities in CBP's Border Security Improvement Plan. **This would require an increase of $4.1 billion over the FY 2019 funding level in the Senate version of the bill.**

- *Immigration Judge Teams – Executive Office for Immigration Review (EOIR)*: The President requests at least $563 million for 75 additional Immigration Judges and support staff to reduce the backlog of pending immigration cases. The Administration appreciates that the Senate's FY 2019 bill provides this level of funding, and looks forward to working with the Congress on further increases in this area to facilitate an expansion of in-country processing of asylum claims.

- *Law Enforcement Personnel, Border Patrol Agent Hiring, CBP:* The President requests $211 million to hire 750 additional Border Patrol Agents in support of his promise to keep our borders safe and secure. While the Senate's FY 2019 bill supports some Border

Patrol Agent hiring, fulfilling this request **requires an increase of $100 million over the FY 2019 funding level in the Senate version of the bill.**

- *Law Enforcement Personnel, Immigration and Customs Enforcement (ICE):* The President requests $571 million for 2,000 additional law enforcement personnel, as well as support staff, who enforce our U.S. immigration laws and help address gang violence, smuggling and trafficking, and the spread of drugs in our communities. **This would require an increase of $571 million over the FY 2019 funding level in the Senate version of the bill.**

- *Detention Beds, ICE:* The President requests $4.2 billion to support 52,000 detention beds. Given that in recent months, the number of people attempting to cross the border illegally has risen to 2,000 per day, providing additional resources for detention and transportation is essential. **This would require an increase of $798 million over the FY 2019 funding level in the Senate version of the bill.**

- *Humanitarian Needs:* **The President requests an additional $800 million to address urgent humanitarian needs.** This includes additional funding for enhanced medical support, transportation, consumable supplies appropriate for the population, and additional temporary facilities for processing and short-term custody of this vulnerable population, which are necessary to ensure the well-being of those taken into custody.

- *Counter-narcotics/weapons Technology:* Beyond these specific budgetary requests, the Administration looks forward to working with Congress to provide resources in other areas to address the unprecedented challenges we face along the Southwest border. Specifically, $675 million would provide Non-Intrusive Inspection (NII) technology at inbound lanes at U.S. Southwest Border Land Ports of Entry (LPOE) would allow CBP to deter and detect more contraband, including narcotics, weapons, and other materials that pose nuclear and radiological threats. **This would require an increase of $631 million over the FY 2019 funding level in the Senate version of the bill.**

In addition, to address the humanitarian crisis of unaccompanied alien children (UACs), Democrats have proposed in-country asylum processing for Central American Minors. This would require a statutory change, along with reallocation of State Department funds to establish in-country processing capacities at Northern Triangle consulates and embassies. Furthermore, for the new procedure to achieve the desired humanitarian result, a further corresponding statutory change would be required to ensure that those who circumvent the process and come to the United States without authorization can be promptly returned home. Without the latter change, in-country processing will not reduce the unauthorized flow or successfully mitigate the humanitarian crisis."

2

These upfront investments in physical barriers and technology, as well as legislation to close loopholes in our immigration system, will reduce illegal immigration, the flow of illicit drugs entering our country and reduce the long term costs for border and immigration enforcement activities.

The Administration looks forward to advancing these critical priorities as part of legislation to reopen the Government.

Sincerely,

Russell T. Vought
Acting Director

Identical Letter Sent to:

    The Honorable Richard Shelby
    The Honorable Patrick Leahy
    The Honorable Nita Lowey
    The Honorable Kay Granger

# Exhibit 2

 Official website of the Department of Homeland Security

 **U.S. Department of Homeland Security**



# Walls Work

Release Date:  December 12, 2018

WE ARE BUILDING THE FIRST NEW BORDER WALL IN A DECADE.

DHS is committed to building a wall at our southern border and building a wall quickly. Under this President, we are building a new wall for the first time in a decade that is 30-feet high to prevent illegal entry and drug smuggling.

FACT: Prior to President Trump taking office, we have never built a border wall that high.

Once funding was provided, DHS began construction of a border wall quickly, in some locations in as little as nine months from funding to building – a process that commonly takes two years or more in other parts of Government. By the end of FY 2019, DHS expects to have construction completed or underway for more than 120 miles in the areas it's most needed by the U.S. Border Patrol. The pace of construction has picked up as initial limiting factors like land acquisition and funding have been addressed.

*Before*          *After*

 

*The El Centro Sector built approximately two miles of 30' steel bollard wall west of the Calexico West Port of Entry. The contract was awarded in November 2017, construction started in February 2018 and was completed in October 2018.*

In FY 2017 Congress provided DHS $292 million to build 40 miles of a steel bollard wall in the San Diego, El Centro and El Paso Sectors – Border Patrol's highest priority locations – in place of an outdated and operationally ineffective barrier. DHS received its FY17 funding for border wall construction in May 2017. DHS awarded the first contract against that funding in November 2017 and began construction three months later in February 2018. As of November 21, 2018, CBP has constructed more than 31 of the 40 miles with the remaining 9 miles scheduled for completion by early 2019.

- El Centro Project (2.25 miles): Completed.
- El Paso Project (20 miles): Completed
- San Diego Primary Project (14 miles): Completion anticipated in May 2019.
- El Paso Project (4 miles): Construction started in September.

*Before* *After*

 

*The El Centro Sector built approximately two miles of 30' steel bollard wall west of the Calexico West Port of Entry. The contract was awarded in November 2017, construction started in February 2018 and was completed in October 2018.*

*How effective is this new border wall?* On Sunday, when a violent mob of 1,000 people stormed our Southern border, we found the newly constructed portions of the wall to be very effective.  In the area of the breach, a group of people tore a hole in the old landing mat fence constructed decades ago and pushed across the border.  U.S. Border Patrol agents who responded to the area ultimately dispersed the crowd, which had become assaultive, and apprehended several individuals.  All of the individuals were either apprehended or retreated into Mexico.  That evening, the fence was repaired.  There were no breaches along the newly constructed border wall areas.

In FY18, Congress provided $1.375B for border wall construction which equates to approximately 84 miles of border wall in multiple locations across the Southwest border, including:

- $251M for a secondary border wall in the San Diego Sector
- $445M to construct a new levee wall system in the Rio Grande Valley Sector
- $196M to construct a new steel bollard wall system in Rio Grande Valley Sector
- $445M for a primary pedestrian wall in San Diego, El Centro, Yuma and Tucson Sectors

*What's next you might ask?* When combined with the funds provided in FY 2017 and FY

2018, if funded at $5B in FY 2019 DHS expects to construct more than 330 miles of border wall in the U.S. Border Patrol's highest priority locations across the Southwest border.

DHS is positioned to construct 215 miles of Border Patrol's highest priority border wall miles including:

- ~5 miles in San Diego Sector in California
- ~14 miles in El Centro Sector in California
- ~27 miles in Yuma Sector in Arizona
- ~9 miles in El Paso Sector in New Mexico
- ~55 miles in Laredo Sector in Texas
- ~104 miles in Rio Grande Valley Sector in Texas

The Bottom Line: Walls Work. When it comes to stopping drugs and illegal aliens from crossing our borders, border walls have proven to be extremely effective. Border security relies on a combination of border infrastructure, technology, personnel and partnerships with law enforcement at the state, local, tribal, and federal level. For example, when we installed a border wall in the Yuma Sector, we have seen border apprehensions decrease by 90 percent. In San Diego, we saw on Sunday that dilapidated, decades-old barriers are not sufficient for today's threat and need to be removed so new – up to 30 foot wall sections can be completed.

Topics: Border Security (/topics/border-security) , Immigration and Customs Enforcement (/topics/immigration-enforcement)

Keywords: Border Security (/keywords/border-security) , border wall (/ntc/border-wall) , immigration enforcement (/keywords/immigration-enforcement)

Last Published Date: December 14, 2018

# Exhibit 3



FACT SHEETS

# President Donald J. Trump's Border Security Victory



—   **NATIONAL SECURITY & DEFENSE**   |   Issued on: **February 15, 2019**

★ ★ ★



> ## I will never waver from my sacred duty to defend this Nation and its people. We will get the job done.

*President Donald J. Trump*

**SECURING OUR BORDER: President Donald J. Trump is following through on his promise to secure the border with legislation and Executive action.**

- President Trump was elected partly on his promise to secure the Southern Border with a barrier and, since his first day in office, he has been following through on that promise.

- As the President has said, sections of the border wall are already being built, and legislation and Executive actions are building on that progress.

- Executive action being taken by the President makes available additional funding to secure our border that is essential to our national security.

**LEGISLATIVE WINS: President Trump secured a number of significant legislative victories in**

the Homeland Security appropriations bill that further his effort to secure the Southern Border and protect our country.

- The funding bill contains robust resources and additional provisions to secure the border and strengthen immigration enforcement.

- The bill provides $1.375 billion for approximately 55 miles of border barrier in highly dangerous and drug smuggling areas in the Rio Grande Valley, where it is desperately needed.

  - More than 40 percent of all border apprehensions occurred in the Rio Grande Valley sector in fiscal year (FY) 2018.

  - The Rio Grande Valley was the border sector with the most known deaths of illegal border crossers in FY 2018.

- $415 million will go toward addressing the humanitarian crisis at the border by providing medical care, transportation, processing centers, and consumables.

- President Trump successfully rejected efforts by some to undercut Immigration and Customs Enforcement's (ICE) ability to uphold our laws and detain illegal aliens, including criminals.

  - ICE funding supports nearly 5,000 additional beds to detain illegal aliens and keep criminals off our streets.

- Customs and Border Protection will receive funding for 600 additional officers.

- This bill will help keep deadly drugs out of our communities by increasing drug detection at ports of entry, including opioid detection staffing, labs, and equipment.

**A PROMISE TO ACT: President Trump is taking Executive action to ensure we stop the national security and humanitarian crisis at our Southern Border.**

- President Trump is using his legal authority to take Executive action to secure additional resources, just as he promised.  In part, he is declaring a national emergency that makes available additional troops and funding for military construction.

- Including funding in Homeland Security appropriations, the Administration has so far identified up to $8.1 billion that will be available to build the border wall once a national emergency is declared and additional funds have been reprogrammed, including:

  - About $601 million from the Treasury Forfeiture Fund

- Up to $2.5 billion under the Department of Defense funds transferred for Support for Counterdrug Activities (Title 10 United States Code, section 284)

- Up to $3.6 billion reallocated from Department of Defense military construction projects under the President's declaration of a national emergency (Title 10 United States Code, section 2808)

- These funding sources will be used sequentially and as needed.

- The Department of Homeland Security, Department of Defense, and the Army Corps of Engineers are working to create a prioritized list of segments and a work plan for the remainder of FY 2019 and beyond.

  - New projects could include: new levee wall, new and replacement primary pedestrian barrier, new vehicle-to-pedestrian barrier, and new secondary barrier.

**NATIONAL EMERGENCY ON OUR BORDER: The President is using his clear authority to declare a national emergency as allowed under the National Emergencies Act.**

- Since 1976, presidents have declared nearly 60 national emergencies.

  - Most of the previously declared national emergencies have been continually renewed and are still in effect, after being continually renewed.

- Multiple Governors have declared states of emergency along the border in the past.

  - Former Arizona Governor Janet Napolitano, who became President Obama's DHS Secretary, declared a state of emergency along the border in 2005.

  - Former New Mexico Governor Bill Richardson also declared a state of emergency at the border in 2005.

- Former President George W. Bush and former President Obama both directed the use of the military to assist DHS in securing and managing the Southern Border.

- Former President Bush declared a national emergency in 2001, which invoked reprogramming authority granted by Title 10 United States Code, section 2808, and both he and former President Obama used that authority a total of 18 times to fund projects between 2001 and 2014.

**ADDRESSING THE CRISIS AT HAND: President Trump is taking the necessary steps to**

**address the crisis at our Southern Border and stop crime and drugs from flooding into our Nation.**

- Cartels, traffickers, and gangs, like the vile MS-13 gang, have taken advantage of our weak borders for their own gain.

- Immigration officers have made 266,000 arrests of criminal aliens in the last two fiscal years.

  - This includes aliens charged or convicted of approximately 100,000 assaults, 30,000 sex crimes, and 4,000 killings.

- Tons of deadly drugs have flooded across the border and into our communities, taking countless American lives.

  - Methamphetamine, heroin, cocaine, and fentanyl all flow across our Southern Border and destroy our communities.

  - More than 70,000 Americans died of drug overdoses in 2017 alone.

- Human traffickers exploit our borders to traffic young girls and women into our country and sell them into prostitution and slavery.

- Massive caravans of migrants view our unsecure border as a way to gain illegal entry into our country and take advantage of our nonsensical immigration loopholes.

# Exhibit 4



# Border Security: Barriers Along the U.S. International Border

**Chad C. Haddal**
Analyst in Immigration Policy

**Yule Kim**
Legislative Attorney

**Michael John Garcia**
Legislative Attorney

March 16, 2009

**Congressional Research Service**

7-5700
www.crs.gov
RL33659

**CRS Report for Congress**
*Prepared for Members and Committees of Congress*

# Border Barrier Construction

The USBP has been constructing and maintaining barriers along the international land border since 1991. These barriers have historically been limited to selected urban areas as part of the USBP's overall strategy of rerouting illegal migration away from urban areas towards geographically isolated areas where their agents have a tactical advantage over border crossers. Two main types of border fencing have been constructed: primary fencing located directly on the border along several urban areas; and Sandia fencing, also known as secondary or triple fencing, in San Diego. Additionally, the USBP has begun installing permanent vehicle barriers in various segments of the border. Vehicle barriers are designed to impede the entry of vehicles while allowing individuals and animals to cross the border freely. As such, they have a lower environmental footprint than border fencing.

## Steps Prior to Construction

Several considerations come into play whenever the USBP contemplates construction along the border. There are a number of steps that must be taken before the construction process can begin. These steps include, but are not limited to, determining what the environmental impact of the construction will be; acquiring the land needed for the fence; acquiring the materials that will be used for the fence; and securing the assistance of the Corps of Engineers and the National Guard for the construction process. The role the Corps of Engineers plays in assisting the USBP with the entire process of constructing border fencing, including acquiring materials, will be discussed subsequently in the construction process section. This section will cover the issues associated with environmental assessments and land acquisition.

### Environmental Impact Assessments

Land along the southwest border supports a number of animals and plants and provides habitat to many protected species. The U.S. Fish and Wildlife Service, for example, reported that a total of 18 federally protected species have the potential to be found along certain sections of the California border.[54] In Arizona, at least 39 federally endangered, threatened, or candidate species can be found living along its border.[55] More than 85% of the lands directly along the Arizona border are federal lands, much of it set aside to protect wilderness and wildlife. For example, the Organ Pipe Cactus National Monument, the Cabeza Prieta National Wildlife Refuge, and the Buenos Aires National Wildlife Refuge can all be found adjacent to the border. The southwest border region is considered a fragile environment, susceptible to harm from even the slightest changes to the ecosystem.[56]

Many are concerned with the geographic footprint and subsequent environmental impacts of both illegal immigration and USBP activities. Until the early 1990s, the USBP's enforcement activities

---

[54] EIS, San Diego Border Fence.

[55] Defenders of Wildlife, *On the Line—The Impacts of Immigration Policy on Wildlife and Habitat in the Arizona Borderlands*, 2006, p. 26. (Hereinafter, Defenders of Wildlife, *On the Line*.)

[56] Eilene Zimmerman, SFGate.com, *Border protections imperil environment—Last wilderness area south of San Diego could be damaged*, February 27, 2006, at http://www.sfgate.com/cgi-bin/article.cgi?file=/c/a/2006/02/27/MNG2GHFBFL1.DTL&type=printable.

along the border were nominal and the environmental consequences of illegal crossings went largely unnoticed. As illicit trafficking escalated, however, so did the USBP's activities and enforcement footprint, including the construction of fencing and other barriers. Although the San Diego fence reportedly reduced the number of aliens attempting to drive across the open border (and consequently the enforcement footprint to stop such activities), it did little to block the flow of foot traffic.[57] Illegal aliens often damage habitat by cutting vegetation for shelter and fire, causing wildfires, increasing erosion through repeated use of trails, and discarding trash.[58] Environmentalists claim that the USBP's enforcement activities, including the pursuit of illegal aliens, use of off-road vehicles and construction of roads and fences, compound the degradation.[59] The REAL ID Act will allow the DHS Secretary to waive any legal requirements needed to expedite the construction of border fencing. Until such time that DHS waives an applicable law, however, it must follow all legal requirements normally imposed on federal agencies, including, for example, NEPA documentary requirements.

## Land Acquisition

The construction of a fence along the border necessarily requires the government to acquire some type of interest in the land. The San Diego border fence, for example, is to extend approximately 150-feet north of the international boundary.[60] Current immigration law authorizes the Secretary of DHS to contract for and buy any interest in land adjacent to or in the vicinity of the international land border when the Secretary deems the land essential to control and guard the border against any violation of immigration law.[61] It also authorizes the Secretary to accept any interest in land along the border as a gift and to commence condemnation proceedings if a reasonable purchase price can not be agreed upon. With respect to the San Diego border fence, the law requires the Secretary to promptly acquire such easements as necessary to implement the statute.[62] If DHS exercises its eminent domain powers, it must provide just compensation as required by the Constitution. In the case of the San Diego fence, construction of the final 4.5 miles continues to be held up as DHS acquires the necessary land.

DHS is authorized to acquire new interests in lands under the INA. However, the federal government may already own some land along the border pursuant to presidential proclamations made long ago. In 1907, President Roosevelt reserved from entry and set apart as a public reservation all public lands within 60-feet of the international boundary between the United States and Mexico within the State of California and the Territories of Arizona and New Mexico.[63]

---

[57] EIS, San Diego Border Fence, at 1-10.

[58] Id. at 1-11.

[59] See generally, Defenders of Wildlife, *On the Line*, p. 26.

[60] Letter from Peter C. Sornsen, Acting Field Supervisor, U.S. Dept. of the Interior, to James Caffrey, Acting Director, Facilities & Engineering Division, Immigration and Naturalization Service, Re: Endangered Species Consultation for the Proposed 14-Mile Border Infrastructure System (July 1, 2003) (on file with author).

[61] 8 U.S.C. §1103(b).

[62] 8 U.S.C. §1101 note (b)(2).

[63] 35 Stat. 2136. The reservation also extends sixty-feet from the margin of any river that forms the international boundary. This language, however, does not apply to lands that abut the Rio Grande River in Texas since there are no federal "public lands" in Texas. Title to most of the western territories was obtained by the United States from foreign powers through purchase and treaty. Generally, the terms of acquisition provided for recognition of the few existing private property rights, but granted title over the vast non-private lands to the United States. Texas was an exception; it was admitted by annexation in 1845, and retained title to all its public lands. See United States v. Denver, 656 P.2d 1, 5 n.2 (Co. 1982).

Known as the "Roosevelt Reservation," this land withdrawal was found "necessary for the public welfare ... as a protection against the smuggling of goods." The proclamation excepted from the reservation all lands, which, as of its date, were (1) embraced in any legal entry; (2) covered by any lawful filing, selection or rights of way duly recorded in the proper U.S. Land Office; (3) validly settled pursuant to law; or (4) within any withdrawal or reservation for any use or purpose inconsistent with its purposes. A similar reservation was made by President Taft in 1912, for all public lands laying within 60-feet of the boundary line between the United States and Canada.[64] This proclamation states that the customs and immigration laws of the United States could be better enforced and the public welfare thereby advanced by the retention in the federal government of complete control of the use and occupation of lands abutting the international boundary lines. The proclamation also provides exceptions similar to those described in the Roosevelt Reservation.

## Border Fence Construction Process and Funding

CBP has, in the past, constructed the majority of border fencing under a Memorandum of Agreement (MOA) with the ECSO (Engineering and Construction Support Office) of the U.S. Army Corps of Engineers (Corps). ECSO manages several components of the construction process for CBP, including planning and acquisition of real estate; drafting the environmental protection plan; designing the project and formulating the engineering costs; overseeing the construction process; and enforcing the appropriate warranties. On most of the tactical infrastructure projects, National Guard units and military units from the Department of Defense (DOD) Joint Task Force North provide the labor. DOD uses these projects as part of their training regimen, leveraging their ability to deploy tactical infrastructure and thereby providing zero labor costs to CBP.[65] The funding for land acquisition and fence materials comes out of the CBP construction account within the DHS appropriation. Specific funding for fence construction is rarely identified in the conference reports, though it typically has been identified within the DHS (and previously the former INS) Congressional Budget Justifications.[66] **Table 1** shows the overall amount appropriated for the USBP construction account, and the specific amounts identified for tactical infrastructure within that account, since FY1996. Appropriations for fencing and other border barriers has increased markedly over the past five years, from $6 million in FY2002 to $647 million in FY2007. The FY2008 appropriation, according to CBP, included $196 million for fence construction.

---

[64] 37 Stat. 1741.

[65] Department of Homeland Security, Congressional Budget Justifications for Fiscal Year 2007, pg. CBP Construction 20. Hereafter referred to as DHS FY2007 Justifications.

[66] FY2006 is an exception. Within the conference report, $35 million was identified for the Southwest Border Fence and $35 million was identified for the construction of vehicle barriers and other border infrastructure in Tucson sector. H.Rept. 109-241.

### Table 1. Border Patrol Tactical Infrastructure Appropriations

(millions of dollars)

| Fiscal Year | Construction Account (total) | Tactical Infrastructure Construction |
|---|---|---|
| 2009 | 775[a] | N/A |
| 2008 | 1,225[b] | 196[b] |
| 2007 | 1,500[c] | 647[c] |
| 2006 | 298 | 93 |
| 2005 | 92 | 15 |
| 2004 | 89 | 14 |
| 2003 | 235 | 23 |
| 2002 | 128 | 6 |
| 2001 | 133 | 3 |
| 2000 | 100 | 9 |
| 1999 | 90 | 4 |
| 1998 | 76 | 8 |
| 1997 | 10 | 4 |
| 1996 | 25 | 4 |

**Sources:** For FY2006, the amounts appropriated for construction and tactical infrastructure were identified from the FY2007 DHS Congressional Budget Justifications. For FY2004-FY2005, the amounts appropriated for construction and tactical infrastructure were identified from the FY2006 DHS Congressional Budget Justifications. FY2003 construction and tactical infrastructure funding was identified from the FY2005 DHS Congressional Budget Justifications. FY1996-FY2002 tactical infrastructure funding was identified in the FY2003 INS Congressional Budget Justifications; funding for FY1998-FY2000 includes San Diego fencing as well as fencing, light, and road projects in El Centro, Tucson, El Paso, and Marfa. FY2001 and FY2002 construction funding was identified from the FY2002 INS Congressional Budget Justifications. FY2000 construction funding was identified from the FY2001 INS Congressional Budget Justifications and H.Rept. 107-278. FY1999 construction funding was identified from P.L. 105-277. FY1998 construction funding was identified from P.L. 105-119. FY1997 funding was identified from P.L. 104-208. FY1996 construction funding identified from P.L. 104-134.

**Notes:** In FY2003 immigration inspections from the former INS, Customs inspections from the former customs service, and the USBP were merged to form the Bureau of Customs and Border Protection within DHS. As a result of this the data for years prior to FY2003 may not be comparable with the data for FY2004 and after. The USBP construction account has been used to fund a number of projects at the border, including fencing, vehicle barriers, roads, and USBP stations and checkpoints. In FY2007, the appropriations committee created a new Border Security Fencing, Infrastructure, and Technology (BSFIT) account within the CBP. This account funds the construction of fencing, other infrastructure such as roads and vehicle barriers, and border technologies such as cameras and sensors. Border fencing and infrastructure construction was transferred from the USBP Construction account to the new BSFIT account.

a.  In FY2009, Congress appropriated $775 million for BSFIT in P.L. 110-329. No breakout of tactical infrastructure construction was provided in the Act.

b.  In FY2008, Congress appropriated $1,225 million for BSFIT in the Consolidated Appropriations Act (P.L. 110-161). According to CBP, $196 million will be used for border fencing.[67]

c.  The BSFIT appropriation in the FY2007 DHS Appropriation Act was $1.2 billion (see H.Rept. 109-699). Combined with the $300 million already appropriated in the emergency supplemental, the overall BSFIT appropriation for FY2007 was $1.5 billion. The appropriators did not offer guidance on how this funding was to be allocated between these different purposes. According to CBP, $647 million will be obligated for fencing in FY2007.[68]

---

[67] From e-mail correspondence with CBP, July 27, 2007.

[68] From e-mail correspondence with CBP, July 19, 2007.

In FY2009, the Administration requested $775 million for the deployment of SBInet-related[69] technologies and infrastructures, a decrease of $450 million over the FY2008-enacted level of $1,225 million.[70] Within the FY2009 request, the Administration proposed allocating $275 million for developing and deploying additional technology and infrastructure solutions to the southwest border. An additional $410 million was requested for operations and maintenance of the cameras, sensors, and fencing that will have been constructed by the end of calendar year 2008 with prior-year funding.[71] The Administration's request did not appear to include funding for new fencing or vehicle barriers at the border. Instead, the Administration noted that this funding would cover the costs associated with operating and maintaining the technologies that have been deployed to the border as part of the SBInet program, as well as the 370 miles of fencing and 300 miles of vehicle barriers, which were scheduled to be completed by the end of calendar year 2008 with funding appropriated in FY2007 and FY2008—as of the end of calendar year 2008, DHS had constructed 306 miles of fencing and 3001 miles of vehicle barriers. Most of the fencing that was constructed during 2008 was contracted out; the Corps and the National Guard were involved mainly in the project to finish the San Diego fence.[72]

P.L. 110-329 fully funded the President's request but withheld $400 million from obligation until an expenditure plan is submitted and approved by the House and Senate Committees on Appropriations. This spending plan should include 12 specific components, among them a detailed accounting of the program's implementation to date; a description of how the expenditure plan allocates funding to the highest priority border security needs, addresses northern border security needs, and works towards obtaining operational control of the entire border; certifications by the Chief Procurement Officer and the Chief Information Officer at DHS; an analysis, for each 15 miles of fencing or tactical infrastructure, of how the selected approach compares to other alternative means of achieving operational control; and a review by the Government Accountability Office.[73]

Under the MOA, once CBP purchases the materials and acquires the land, the Corps of Engineers undertakes the engineering studies. If the Corps is involved in the construction process, it provides the manpower and machinery that are used to install the fencing. The actual manpower is typically provided by the State National Guard (the California National Guard, for example, constructed much of the San Diego fence), although occasionally the military, and sometimes the USBP, are involved in the construction.[74] As previously noted, however, DHS has been utilizing private contractors to undertake the construction of most of its new fencing in the last year. Even

---

[69] SBInet is the technological and infrastructure component of the Secure Border Initiative (SBI), a multifaceted approach to securing the border. In its FY2007 budget submission, DHS asserted that it had "developed a three-pillar approach under the SBI that will focus on controlling the border, building a robust interior enforcement program, and establishing a Temporary Worker Program." *DHS FY2007 Justification*, p. CBP S&E 4.

[70] The FY2008 total enacted appropriation of for SBInet was $1,225 million; this total included an emergency appropriation of $1,053 million. However this may be somewhat misleading because the FY2008 request for the account, which had been fully funded by both the House and Senate Committees on Appropriation, was $1,000 million. The amount of additional funding (above the request) provided in FY2008 was thus $225 million and not $1,053 million.

[71] *DHS FY2009 Justification*, p. CBP BSFIT 11.

[72] From conversations with CBP Congressional Affairs, March 13, 2008. The Corps, however, oversees the environmental assessments and engineering studies for all fence projects.

[73] H.R. 2638, as Enrolled by the House and the Senate, pp. 83-84.

[74] From interviews with CBP, November 30, 2005 and September 13, 2006, and the Corps of Engineers, November 29, 2005.

when private contractors are used to build the fencing, however, the Corps remains involved in the planning and engineering phases of the process.

The Corps of Engineers funding comes from the Department of Defense Drug Interdiction and Counter-Drug Activities Account. **Table 2** shows the funding for the "Southwest Border Fence" sub-account within this DOD Account, from FY1997 to FY2009. As previously noted, however, much of the new fence construction currently taking place is being done by private contractors.

### Table 2. DOD Funding for the Southwest Border Fence

(millions of dollars)

| Fiscal Year | DOD Funding |
|:---:|:---:|
| 2009 | 1.6 |
| 2008 | 1.2 |
| 2007 | N/A |
| 2006 | 3.5 |
| 2005 | N/A |
| 2004 | 4.0 |
| 2003 | 4.7 |
| 2002 | 5.0 |
| 2001 | 5.0 |
| 2000 | 4.0 |
| 1999 | 3.0 |
| 1998 | 4.0 |
| 1997 | 5.0 |

**Source:** FY2009, House Appropriations Committee Print accompanying P.L. 110-329, Division C; FY2008, H.Rept. 110-434; FY2007, H.Rept. 109-676; FY2006, H.Rept. 109-359; FY2005, H.Rept. 108-622; FY2004, H.Rept. 108-283; FY2004, H.Rept. 107-732; FY2002, H.Rept. 107-333; FY2002, H.Rept. 106-945; FY2000, H.Rept. 106-371, FY1999, H.Rept. 105-746; FY1998, H.Rept. 105-265; FY1997, H.Rept. 104-724.

**Notes:** N/A means not available. No funding was identified for border fencing in the FY2007 DOD Conference report, H.Rept. 109-676. The House Committee had recommended $8 million for this activity in H.Rept. 109-504, while the Senate Committee had not recommended any funding for it in S.Rept. 109-292. FY2005 funding for the "Southwest Border Fence" sub-account was also not identified in the DOD Conference Report, H.Rept. 108-622. The House Committee had recommended $7 million for this sub-account in H.Rept. 108-553; while the Senate Committee had not recommended any funding for it in S.Rept. 108-284.

## Types of Fences and Barriers

The USBP currently uses three main types of barriers along the border: primary fencing immediately on the international border, Sandia fencing behind the primary fencing, and vehicle barriers meant to stop vehicles, but not people on foot, from traversing the border. While other forms of primary fencing, such as bollard fencing[75] and picket fencing,[76] have been constructed in

---

[75] Bollard fencing is comprised of vertical installations of solid concrete, metal spheres, or large posts, embedded into the ground at small enough intervals as to be impassable. Bollard fencing is difficult to compromise but expensive to (continued...)

limited areas,[77] historically the agency has largely focused on using the landing mat fencing as a primary fence and the Sandia fence as a secondary fence.

## Landing Mat Fencing

Landing mat fencing is composed of army surplus carbon steel landing mats which were used to create landing strips during the Vietnam War. The landing mats form panels 12 feet long, 20 inches wide, and 1/4 inch thick, which are welded to steel pipes buried 8 feet deep every 6 feet along the fence. Each mile of fencing requires the use of 3,080 panels.[78] There are about 5 miles of surplus landing mat fencing remaining as of 2006.[79] According to the USBP, sites that feature landing mat fencing include the following USBP stations: Campo, CA; Yuma, AZ; Nogales, AZ; Naco, AZ; Douglas, AZ; and El Paso, TX.[80]

In a 1999 study which was commissioned by the INS and performed under a Memorandum of Understanding, the Corps of Engineers predicted that construction costs for the landing mat fencing would range from $388,005 to $431,117 per mile.[81] This estimate includes the cost of materials, despite the fact that the landing mat fencing constructed to date has been comprised of army-surplus panels acquired by CBP at no cost. As previously noted, however, only about 5 miles of surplus landing mat fencing material remains available. Maintenance costs per year could vary widely depending on the number of breaches the fence undergoes. Low levels of damage to the fence would result in low annual repair costs, while a large number of breaches could result in stretches of fencing needing to be replaced. Per mile, the Corps of Engineers estimated that yearly maintenance costs would probably range from $1,742 to $17,753.[82] The Corps of Engineers noted that the net present value[83] of the fence after 25 years of operation

---

(...continued)

install. See **Appendix C** for a depiction of bollard fencing.

[76] Picket fencing is comprised of metal stakes set sufficiently close together as to be impassable. See **Appendix C** for a depiction of picket fencing.

[77] Roughly 13 miles of these alternate forms of fencing have been constructed to date, according to an interview with CBP Congressional Affairs on September 13, 2006.

[78] U.S. Army Corps of Engineers, Construction Engineering Research Laboratories, *Engineering Life-Cycle Cost Comparison Study of Barrier Fencing Systems*, USACERL Technical Report 99/28, February 1999, p. 14. Hereafter referred to as Corps of Engineers Study.

[79] Interview with CBP Congressional Affairs, September 13, 2006.

[80] Telephone conversation with CBP, November 30, 2005.

[81] The Corps of Engineers used 1997 dollars in their study. For the purposes of this report, the numbers predicted by the Corps were adjusted to 2005 dollars using the Gross Domestic Product (GDP) deflator, available at http://www1.jsc.nasa.gov/bu2/inflateGDP.html. This website appears to be no longer operating; however, GDP deflator tables are also published by the Bureau of Economic Adjustment (BEA) at the Department of Commerce and are available at http://bea.gov/bea/dn/nipaweb/ TableView.asp?SelectedTable=13&FirstYear=1997&LastYear=2005&Freq=yr. The actual predictions made by the Corps for constructing and maintaining primary fencing, in 1997 dollars, were $341,584 to $379,538 per mile for construction costs, and $1,534 to $15,629 per mile per year in maintenance costs. The 25-year life-cycle costs for constructing and maintaining landing mat fencing were predicted to range between $4,725,572 and $7,340,098 per mile in 1997 dollars.

[82] Corps of Engineers Study, p. 21.

[83] Net present value is a term used by the Corps of Engineers in their life cycle costs analyses for construction projects. It amortizes the future costs of a project and shows what the entire costs of the project will be. In this case, these numbers represent 25 year predictions and have been adjusted from 1997 dollars to 2005 dollars using a GDP Deflator.

would range from $5.4 million and $8.3 million per mile depending on the amount of damage sustained by the fencing each year.

## Sandia Secondary Fence

The secondary fence proposed by the Sandia study has only been constructed over roughly 9.5 miles of the 14 miles in the original plan due to environmental concerns voiced by the California Coastal Commission. As previously discussed, P.L. 109-13 included language that will allow waiver of all legal requirements determined necessary by the Secretary of DHS for the expeditious construction of authorized barriers and only allows judicial review for constitutional claims. On September 14, 2005, DHS announced it is applying its new waiver authority to complete the San Diego fence.[84] DHS is currently estimating that it will cost an additional $66 million to finish the San Diego fence, bringing overall costs for this 14 mile-long project to $127 million. Additionally, DHS notes that it will use a mix of DOD resources and private contractors to finish the fence, and that the cost of using contractors is included in the request.[85]

The Sandia fence, as it has been constructed in the San Diego sector, is a secondary fence constructed behind the primary fence. Enough space is left between the two fences to accommodate an access road. The secondary fence is an angled two-piece fence. The fence is vertical up to ten feet high, and then extends out at an angle towards the climber. This prevents climbing by using gravity and the weight of the climber against them. The Corps of Engineers estimated that Sandia fencing costs per mile would range from $785,679 to $872,977 for construction and $953 to $7,628 per mile yearly for maintenance. Additionally, the Corps of Engineers study notes that the Sandia fence would possibly need to be replaced in the fifth year of operation and in every fourth year thereafter if man-made damage to the fence was "severe and ongoing." For this reason, in the study the Corps of Engineers noted that the net present value of the fence after 25 years of operation, per mile, would range from $11.1 million to $61.6 million.[86]

## Other Border Barriers: Vehicle Barriers

The USBP utilizes various different types of barriers to impede vehicles from crossing into the United States from Mexico. Some of these barriers are temporary and can be moved to different locations when needed, others are permanent barriers. The main purpose of vehicle barriers is to prevent smugglers from easily driving their vehicles across the border.

---

[84] DHS published a *Federal Register* notice on September 22, 2005, declaring the waiver of, in their entirety, (1) the National Environmental Protection Act (42 U.S.C. 4321 et seq.); (2) the Endangered Species Act (16 U.S.C. 1531 et seq.); (3) the Coastal Zone Management Act (16 U.S.C. 1451 et seq.); (4) the Federal Water Pollution Control Act (33 U.S.C. §§1251 et seq.); (5) the National Historic Preservation Act (16 U.S.C. §§470 et seq.); (6) the Migratory Bird Treaty Act (16 U.S.C. §§703 et seq.); (7) the Clean Air Act (42 U.S.C. §§7401 et seq.); and (8) the Administrative Procedure Act (5 U.S.C. §§551 et seq.).

[85] DHS FY2007 Justifications, p. CBP Construction 18.

[86] The numbers used by the Corps of Engineers were cited in 1997 dollars. They have been adjusted to 2005 dollars using the GDP deflator cited above. The actual costs per mile in the Corps of Engineers Study were: $691,680 to $768,533 for construction, and $839 to $6,715 for maintenance. Net Present Value after 25 years in 1997 dollars ranged from $9.73 million to $54.23 million. Corps of Engineer Study, pp. 3 and 23.

## Permanent Vehicle Barriers

Permanent vehicle barriers, as their name suggests, are not designed to be moved but rather are permanent installations. Permanent vehicle barriers are typically steel posts, or bollards, that are excavated 5 feet deep and inserted into a poured concrete base. The posts alternate in above-ground height in order to dissuade individuals from forming a ramp over the barrier. They are spaced so as to allow foot and animal traffic but not vehicular traffic. The USBP recently began building permanent vehicle barriers in the Yuma sector, with a substantial stretch slated to be built along the Organ Pipe Cactus National Monument. When linked with the 30 miles of vehicle barriers built by the National Park Service, a USBP spokesman reportedly noted that the total 123 mile length of the project "will form the largest continuous physical barrier along the border in the nation."[87]

In the FY2007 DHS Congressional Budget Justifications, DHS notes that the Yuma vehicle barrier project would take until at least 2010 (and possibly longer) to complete if CBP continued to use the Corps of Engineers and other military personnel to construct the barriers. Instead, CBP proposes hiring commercial contractors to build 39 miles of vehicle barriers in the Yuma sector, or almost half of the project's 93 mile total.[88] CBP is projecting that the project will be completed by FY2011, and that the overall project costs will be $116 million.[89] This means that, overall, the project will cost roughly $1.25 million per mile. The National Park Service has spent $11.1 million to construct 18 miles of permanent vehicle barriers in Organ Pipe Cactus National Monument, and has obligated, but not yet spent, an additional $6.6 million in FY2005 funding to complete the remaining 13 miles of the project.[90]

## Temporary Vehicle Barriers

Temporary vehicle barriers are typically built from welded metal, such as railroad track, but can also be constructed from telephone poles or pipe. These barriers are built so that they cannot be rolled or moved manually; they can only be moved with a forklift or a front-end loader. They are usually built at USBP stations and transported to areas of high vehicle entry, where they are placed and chained together.[91] The main advantage of the temporary vehicle barriers is their ability to be redeployed to different areas to address changes in smuggling patterns. The main disadvantage of these barriers is that they are easier to compromise than permanent vehicle barriers.

---

[87] Jonathan Athens, "Officials say OK to Border Fence," YumaSun.com (July 20, 2005) available at http://sun.yumasun.com/google/ysarchive14980.html.

[88] DHS FY2007 Justifications, pg. CBP Construction-7. CBP project length does not include the 30 miles of vehicle barriers maintained by the National Park Service.

[89] DHS FY2007 Justifications, pg. CBP Construction-18. It is unclear why the project is predicted to take less time with contractors, and yet the overall completion date for the construction is predicted to be 2011.

[90] From the National Park Service, February 9, 2006. The National Park Service notes that 30 miles of permanent vehicle barriers are being built at the Organ Pipe Cactus National Monument, and one mile is being built in the Coronado National Monument.

[91] U.S. Department of Justice, Immigration and Naturalization Service, *Final Environmental Assessment U.S. Border Patrol Temporary Vehicle Barriers Naco and Douglas, Arizona*, November 2002.

# Appendix C. Examples of USBP Border Fencing



Bollard fence

Landing mat fence

Picket or decorative fence

Sandia fence

**Source:** U.S. Department of Justice, Immigration and Naturalization Service, *Environmental Assessment for Infrastructure Within U.S. Border Patrol Naco-Douglas Corridor Cochise County, Arizona*, August, 2000, p. 1-13.

# Appendix D. The San Diego Fence



**Source:** U.S. Department of Homeland Security; *Environmental Impact Statement for the Completion of the 14-Mile Border Infrastructure System San Diego, California,* July 2003.

# Appendix E. Permanent Vehicle Barrier Schematic



**Source:** U.S. Department of the Interior, National Park Service, *Proposed Vehicle Barrier Environmental Assessment*, April, 2003.

# Appendix F. Permanent Vehicle Barriers



**Source:** CBP Congressional Affairs. Data from Figure 4.

## Author Contact Information

Chad C. Haddal
Analyst in Immigration Policy
chaddal@crs.loc.gov, 7-3701

Yule Kim
Legislative Attorney
ykim@crs.loc.gov, 7-9138

Michael John Garcia
Legislative Attorney
mgarcia@crs.loc.gov, 7-3873

## Acknowledgments

This report was originally co-authored by Blas Nuñez-Neto.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; DEFENDERS OF WILDLIFE; and ANIMAL LEGAL DEFENSE FUND, | Case No.: 1:19-cv-00408 (TNM) |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America; PATRICK M. SHANAHAN, in his official capacity as Acting Secretary of Defense; LIEUTENANT GENERAL TODD T. SEMONITE, in his official capacity as Commander and Chief of Engineers, U.S. Army Corps of Engineers; KEVIN McALEENAN, in his official capacity as Acting Homeland Security Secretary; DAVID BERNHARDT, in his official capacity as Secretary of the Interior, | |
| Defendants. | |

**DECLARATION OF KARA CLAUSER**

I, Kara Clauser, declare as follows:

    1.     I am the GIS Specalist for the Center for Biological Diversity, based in the organization's Tucson headquarters.  I work on GIS analsyes, cartography, and web mapping to assist the Center's work.  I earned a M.S. in geographic information systems technology and a B.S. in ecology and evolutionary biology from the University of Arizona.

    2.     The purpose of this Declaration is to provide an explanation of how I prepared the twelve (12) attached maps.  These maps depict eleven (11) proposed "border wall projects" as

described by U.S. Custom and Border Protection in the February 25, 2019 Request for

Assistance sent to the Department of Defense, as well as one map that shows a broader overview

of the 11 projects.

      3.     I prepared these maps using ESRI ArcGIS ArcMap version 10.7. I used Mapbox's

Cali Terrain basemap and overlaid the following layers: border wall projects locations, FWS

final critical habitats, and federal land boundaries. These layers were obtained both by

downloading spatial data from publicly available sources and from creating polyline features

using ArcMap's Editor toolset.

      4.     I created the layer showing border wall construction projects using latitude and

longitude coordinates outlined in the February 25, 2019 document "Request for Assistance

Pursuant to 10 U.S.C. § 284". This PDF describes the starting and ending coordinates for every

segment within the Project Areas. I plotted these points, and then hand digitized each segment

into a polyline feature using Editor.

      5.     The critical habitats layer was derived from the US Fish & Wildlife Service

Environmental Conservation Online System's "Threatened & Endangered Species Active

Critical Habitat Report". This report includes zip files containing polygon and polyline critical

habitat designations for all species.

      6.     The federal lands layer was created using the USGS Protected Areas Database

2.0. This geodatabase was published on September 30, 2018 and contains the nation's inventory

for protected areas, including public land and voluntarily provided private protected areas. I

queried the combined layer to only include federally managed areas, and then created different

symbology based on designation type.

I declare under penalty of perjury that the information provided is true and correct to the best of my information, knowledge, and belief.

Signed this 29th day of May, 2019 in Tucson, Arizona.

Kara Clauser

# Exhibit 1



# Exhibit 2



### El Centro Project 1

**▬▬▬** Future Wall Location

Bighorn Sheep (Peninsular Ranges DPS)
Critical Habitat

**Federal Lands**

Area of Critical Environmental Concern

BLM Public Land

Wilderness Area

# Exhibit 3



# Exhibit 4



Barry Goldwater Range

**Yuma Project 2**

▬ Future Wall Location

**Federal Lands**

🟧 BLM Public Land

🟪 Department of Defense

0    2    4 Miles

# Exhibit 5



Cabeza Prieta National Wildlife Refuge

Cabeza Prieta National Wildlife Refuge

Cabeza Prieta Wilderness

**Yuma Project 3**

━━━ Future Wall Location

**Federal Lands**

Department of Defense

NWR Wilderness Area

0   2.5   5 Miles

# Exhibit 6



# Exhibit 7



Buenos
Aires
National
Wildlife
Refuge

Coronado National Forest

**Tucson Project 5**

━━━ Future Wall Location

**Final Critical Habitats**

Chiricahua leopard frog

Jaguar

Mexican spotted owl

**Federal Lands**

FS National Forest

National Wildlife Refuge

0    1    2 Miles

# Exhibit 8



Coronado National Forest

Miller
Peak
Wilderness
Miller Peak

San Rafael Ranch
Natural Area

FR 61

Coronado
National
Memorial

SANTA CRUZ

**Tucson Project 4**

━━━ Future Wall Location

**Final Critical Habitats**

■ Huachuca water-umbel

▨ Jaguar

▢ Mexican spotted owl

**Federal Lands**

■ NPS National Monument

■ FS National Forest

■ FS Wilderness Area

0     2.5     5 Miles

# Exhibit 9



**Tucson Project 3**

▬▬▬ Future Wall Location

**Final Critical Habitats**

⬛ Huachuca water-umbel

▨ Jaguar

▢ Mexican spotted owl

⬛ San Bernardino springsnail

⬛ Yaqui catfish, Yaqui chub, & beautiful shiner

**Federal Lands**

⬛ NPS National Memorial

▢ BLM National Conservation Area

⬛ FS National Forest

⬛ National Wildlife Refuge

⬛ BLM Public Lands

▢ FS Wilderness Area

0        10        20 Miles

# Exhibit 10



Gray Peak WSA

Gray Pea...
St...

Central Peloncillo Mountains ACEC

Cowboy Spring WSA & ACEC

Big Hatchet Mountains WSA & ACEC

Whitmire Canyon WSA

Coronado National Forest

Bunk Robinson WSA

Bunk Wilderne...

Alamo Hueco Mountains WSA & ACEC

Guadalupe Canyon WSA & ACEC

**El Paso Project 2**

— Future Wall Location

**Final Critical Habitats**

Chiricahua leopard frog

Jaguar

New Mexican ridge-nosed rattlesnake

**Federal Land**

Areas of Critical Environmental Concern

FS National Forest

BLM Public Lands

FS Wilderness Study Area

0    8    16 Miles

# Exhibit 11



Florida Mountains WSA

Mohils Mountains ACEC

Organ Mountains-Desert Peaks National Monument

Aden Lava Flow WSA

West Potrillo Mountains WSA

Mount Riley WSA

**El Paso Project 1**

▬▬ Future Wall Location

**Federal Lands**

ACEC

BLM National Monument

BLM Public Lands

BLM Wilderness Study Area

0   4   8 Miles

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; DEFENDERS OF WILDLIFE; and ANIMAL LEGAL DEFENSE FUND, | Case No.: 1:19-cv-00408 (TNM) |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America; PATRICK M. SHANAHAN, in his official capacity as Acting Secretary of Defense; LIEUTENANT GENERAL TODD T. SEMONITE, in his official capacity as Commander and Chief of Engineers, U.S. Army Corps of Engineers; KEVIN McALEENAN, in his official capacity as Acting Homeland Security Secretary; DAVID BERNHARDT, in his official capacity as Secretary of the Interior, | |
| Defendants. | |

## INDEX TO STANDING DECLARATIONS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Declaration of Ileene Anderson ........................................................................................... 3

Declaration of Bryan Bird .................................................................................................. 7

Declaration of Diana Hadley .............................................................................................. 13

Declaration of Sky Jacobs .................................................................................................. 18

Declaration of Laiken Jordahl ............................................................................................ 21

Declaration of Taylor McKinnon ....................................................................................... 26

Declaration of Michael Robinson ...................................................................................... 30

Declaration of Isaac Russell ............................................................................................... 46

Declaration of Krista Schlyer ......................................................................... 48

Declaration of Robin Silver ........................................................................... 52

Declaration of Gabe Vasquez ......................................................................... 56

Declaration of Elizabeth Walsh ....................................................................... 59

I, Ileene Anderson, hereby declare as follows:

1.     I submit this declaration in support of plaintiffs' opposition to defendants' motion to dismiss in this case. I have personal knowledge of the matters stated herein and, if called as a witness, could and would competently testify thereto.

2.     I live in Los Angeles, California. I have a Masters of Science in Biology from the California State University at Northridge. I have studied and surveyed for native plants and animals in California for almost 30 years.

3.     I have been a member of the Center for Biological Diversity ("the Center") since 1998. I am currently employed as a senior scientist and Public Lands Desert Director for the Center, and have worked at the Center since late 2005.

4.     The Center is a tax-exempt, non-profit, membership organization with close to 70,000 members. The Center is based in Tucson, Arizona, with California offices in Oakland, Los Angeles, and Joshua Tree. The Center is dedicated to the preservation, protection, and restoration of biodiversity, native species, ecosystems, and public lands. The Center is one of the leading conservation groups advocating for protection of threatened and endangered species.

5.     The Center has several programs in place to address the many components of its advocacy, including an Endangered Species Program, an Oceans Program, a Climate Law Institute, an Environmental Health Program, a Public Lands Program, a Population and Sustainability Program and an International Program. At the Center, we believe that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked. Beyond their extraordinary intrinsic value, animals and plants, in their distinctness and variety, offer irreplaceable emotional, spiritual, and physical benefits to our lives and play an integral part in culture. Their loss, which parallels the loss of diversity within and among human civilizations, impoverishes us beyond repair.

6.     As part of its mission, the Center provides oversight of governmental activities that impact all species and their habitats, as well as on human health and wellbeing more generally. The Center has been at the forefront of efforts to hold the government accountable for its obligations under the Endangered Species Act, and engages in protection efforts and campaigns to ensure that our nation's environmental laws—including the National Environmental Policy Act ("NEPA")—are enforced with respect to imperiled wildlife and habitat, air and water quality, and human health, especially on our public lands.

7.     The Center also actively develops and disseminates—to its members; policymakers; local, state, federal, and international governmental officials; non-profit organizations; and interested members of the general public—a wide array of educational and informational materials concerning the status of and threats to biodiversity, air and water quality, and federal public lands, including public lands in southern California.  For example, we have numerous webpages related to U.S. Bureau of Land Management ("Bureau") activities and borderland issues, and have implemented numerous letter submission "action alerts" to our membership on various border related issues, so they can easily provide public comments to the federal agencies on issues that are open for comment.

8.      The Center's members have diverse interests including natural history, ecology, conservation, wildlife and native plant observation, nature photography, hiking, camping, backpacking, quiet and solitude in nature, dark skies, and a love of borderlands' natural landscapes. The Center's members, including myself, enjoy and use federal land along the border with Mexico in California, including the Bureau's Yuha Desert and Jacumba Wilderness area, as places to pursue these activities now and into the future. The Center's members expect and rely upon the Bureau, to protect the species, habitats, viewsheds and air and water quality of these lands.

9.      The Center regularly comments on Bureau activities in California, including the California Desert Conservation Area (CDCA) which was established under the Federal Lands Policy and Management Act (FLPMA) of 1976 under Title VI Sec. 601. [43 U.S.C. 1781], which recognized that the "California desert environment is a total ecosystem that is extremely fragile, easily scarred, and slowly healed" and that "It is the purpose of this section to provide for the immediate and future protection and administration of the public lands in the California desert within the framework of a program of multiple use and sustained yield, and the maintenance of environmental quality". On behalf of the Center and other conservation organization, I have spent decades supporting conservation in the CDCA including six years spent on the California Desert Conservation Area's Desert Advisory Committee (DAC) including one year as chairperson of the Committee.  The DAC was also established under FLPMA.

10.      I regularly recreate and observe plants and wildlife in on public lands managed by the BLM out of the El Centro field office along the border region with Mexico. Some of my favorite places to visit are the Yuha Desert, the Jacumba Wilderness area, the Algodones Dunes (also known as the Imperial Sand  Dunes) and the Cargo Muchaco Mountains.

11.      The Yuha Desert is of special interest to me because of the unique plants and animals that live there and its relatively easy access. Most of the Yuha Desert is included in BLM's Area of Critical Environmental Concern established for the conservation of the increasingly rare flat-tailed horned lizard (*Phrynosoma mcallii*), which has a very limited range in the United States in the desert regions of southern California and Arizona, although additional populations exist in Mexico. In 2016 these same lands were designated as National Conservation Lands (NCL) under the Desert Renewable Energy Conservation Plan in order to provide further protections for the Yuha Desert.

12.      I am very worried about the status of the populations of the flat-tailed horned lizard in California in particular and was on the team of scientists that petitioned the State of California to protect the flat-tailed horned lizard under the California Endangered Species Act. Unfortunately, that petition was not successful.  The Center for Biological Diversity has also litigated to advance the flat-tailed horned lizard's listing for federal Endangered Species Act, unsuccessfully to date.  With the proposal to replace vehicle barriers with a border wall, I worry that the current connectivity between the flat-tailed horned lizards in the Yuha Desert and in Mexico will be permanently severed, further endangering the flat-tailed horned lizard populations in the Yuha Desert through genetic isolation, and localized extirpations in the construction  zone.  I believe a border wall, instead of a vehicle barrier will further endanger the

flat-tailed horned lizard and will compel listing under Endangered Species Acts if wall construction advances.

13.     Another one of my favorite species that is found in the Yuha desert is a relict plant that has persisted since the Pleistocene.  One of the largest populations of the Emory's crucifixion-thorn (*Castela emoryi*) also occurs in the Yuha Desert.  This large perennial plant is interesting to me because it produces large fleshy fruits that are thought to have been dispersed by now extinct ground sloths.  The establishment of young Emory's crucifixion thorn is infrequent and I worry about the effect of border wall construction on the viability of the crucifixion-thorn's local population in the Yuha Desert.

14.     The Jacumba Wilderness is a rugged and harsh environment that I've hiked, botanized and watched for wildlife in occasionally. It was established as wilderness under the California Desert Protection Act of 1994 because it met all of the criteria for Wilderness designation.

15.     Part of the Jacumba Wilderness west of the proposed border wall is federally designated critical habitat for the federally and state endangered Peninsular bighorn sheep (*Ovis canadensis nelsonii*).  I always keep my eyes and ears open for sign of Peninsular bighorn sheep when I'm in or near the Jacumba Wilderness.  Peninsular bighorn are known to use the desert flatlands during the late winter when the vegetation greens up and starts to flower.  So, when I'm in the Yuha Desert particularly during the late winter and early spring I look for Peninsular bighorn sheep in addition to other species.

16.     I regularly visit the Yuha desert and adjacent Jacumba Wilderness with my last trip there being in 2018 to view the management of the ACEC and to enjoy the stark beauty of the landscape.  I intend to continue visiting these areas in the future, including this fall particularly if summer monsoons are ample enough to germinate wildflowers.  The Yuha Desert and adjacent areas have a whole unique group of plant species that do not bloom in the spring, but instead rely on the late summer monsoons for germination.  I go to the Yuha Desert in the fall specifically to explore these unique species, document their existence and enjoy them.

17.     I am particularly concerned about replacement of the vehicle barrier fence with an impermeable border wall.  An impermeable wall will sever connectivity for all terrestrial animals and most plants.  Creating an impermeable barrier will degrade the Yuha Desert, diminish its resources despite its protective ACEC/NCL designation and be out of compliance for the reason that the CDCA was established in 1976.

18.     My interests in protecting wildlife on public lands would be harmed if wildlife and plants suffers impacts from construction and the existence of a barrier wall.  Because a number of imperiled species live in the Yuha Desert and the Jacumba wilderness, as discussed above,  I worry greatly that protective and recovery efforts for these species, which I have worked tirelessly to implement, will be set back  by the construction  of a wall that will be impermeable to most wildlife.

19.     The relief sought by plaintiffs, including the Center, in this action – an immediate

stop to building the border wall until such construction is analyzed to meet the goals of the CDCA Plan as amended, the Wilderness Act, NEPA and ESA.  In order for the rare and common wildlife that I care so deeply about and have worked throughout my life to protect, I believe a full environmental review  and compliance with existing laws and management is necessary to adequately safeguard these species from the construction of an impermeable wall.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge.

DATED:  May 24, 2019

_____

ILEENE ANDERSON

**DECLARATION OF BRYAN BIRD**

I, Bryan Bird, declare as follows:

1.      The facts set forth in this declaration are based upon my personal knowledge and if called as a witness in this proceeding, I could and would testify competently thereto under oath.

2.      I have lived in the southwestern United States for twenty-six years, twenty-three of which I have lived in Santa Fe, New Mexico.

3.      I am the Southwest Program Director at the Defenders of Wildlife (Defenders). I have been an employee of Defenders since April 4, 2016. I am also a member of Defenders. As Southwest Director, I promote the conservation and recovery of various threatened and endangered species, including the jaguar, Mexican wolf, Sonoran pronghorn, and desert fish. I lead Defenders' Field Conservation campaign on the border wall and its impacts on endangered species and their habitats. I have over twenty years of experience protecting and preserving wilderness and biodiversity in the southwestern United States, as well as northern Mexico.

4.      Defenders is a non-profit, 501(c)(3) organization founded in 1947, with offices throughout the United States including southwestern offices in Santa Fe, New Mexico and Tucson, Arizona. Defenders has approximately 349,000 members, with approximately 3,400 members in New Mexico and approximately 7,600 members in Arizona. Defenders seeks to ensure the protection of all native animals and plants in their natural communities. Defenders is dedicated to conserving wildlife and habitat and safeguarding biodiversity.

5.      Defenders has been involved in policy and litigation associated with border wall construction along the United States-Mexico border for over a decade. Defenders has opposed the construction of the proposed border wall by the Trump administration. In August 2017,

Defenders joined wildlife advocates in Santa Ana to protest the construction of a border wall that would bisect the Santa Ana National Wildlife Refuge. DEFENDERS OF WILDLIFE, IN THE SHADOW OF THE WALL PART II: BORDERLANDS CONSERVATION HOTSPOTS ON THE LINE 34 (2018).

6.       In February 2019, Defenders, along with the Center for Biological Diversity and the Animal Legal Defense Fund, sued the Trump administration for appropriating both emergency and non-emergency funds to be used for the construction of the border walls and for waiving environmental laws to expedite the construction of the border walls. Complaint for Declaratory and Injunctive Relief, Center for Biological Diversity v. Trump, No. 1:19-cv-00408 (TNM) (D.D.C. filed Feb. 16, 2019) (amended Apr. 15, 2019).

7.       I have significant personal and professional interests in the recovery of endangered species that regularly and freely cross the United States-Mexico borders in Arizona and New Mexico. Recovery of the jaguar, Mexican gray wolf, and Sonoran pronghorn could be precluded by the construction of the border wall.

8.       My first borderlands experience was in 1993 when I attended graduate school at New Mexico State University in Las Cruces, New Mexico. Between 1993 and 1995, I traveled twice to the borderlands in southeastern Arizona to seek and observe wildlife unique to the borderlands area. I specifically visited the critical habitat of the jaguar. I also visited areas that jaguars are known to use when traversing between the Mexican State of Sonora and Cochise County, Arizona.

9.       In addition to visiting critical habitat and travel corridors of the jaguar, I also participated in birdwatching and photography. During one of my visits, I attended a conference of the Southwestern Association of Biologists in the Chiricahua Mountains in Coronado National Forest to present my graduate research.

10.     On August 25, 2016, I returned to Coronado National Forest along the United States-Mexico border to survey habitats of endangered species along the proposed pedestrian fenced areas identified as Tucson 4. I also retrieved photographs from motion-activated wildlife cameras previously placed to survey wildlife. During this trip, I hiked into Humboldt Canyon and to the top of Red Mountain to survey the border as identified as Tucson 4. I also identified cross-border movement corridors for jaguars from a preferable vantage point. In addition to retrieving photos from these wildlife cameras, I also took personal photographs and participated in birdwatching. These areas are also slated for border wall construction though not yet funded. Media Advisory, U.S. Customs and Border Protection, Comments Requested for Pima and Cochise Counties Border Infrastructure Projects (May 7, 2019) (on file with the author). I am concerned that funding will be made available for construction of pedestrian fence along this particular portion of the border because it would prohibit the cross-border movement of several animals I hope to see in the wild including the jaguar and Mexican gray wolf.

11.     My most recent trip to the border was from April 12–14, 2018. At that time, I toured Coronado National Forest where a known jaguar corridor is located. The portions of the United States-Mexico border I toured are areas of known endangered species observations. These areas are also slated for border wall construction. Media Advisory, U.S. Customs and Border Protection, Comments Requested for Pima and Cochise Counties Border Infrastructure Projects (May 7, 2019) (on file with the author).

12.     On April 12, 2018, I traveled to the Tumacacori and Pajarito Mountains in Coronado National Forest along the United States-Mexico border. I drove along "Ruby Road" that runs east-west along the border and south to the border itself along Forest Road 39A. I also hiked down Sycamore Canyon to the border in Pajarita Wilderness. During this time, I surveyed

3

sites identified as Tucson 5 where endangered species like the jaguar are known to use when traveling between Sonora, Mexico and Santa Cruz County, Arizona. Media Advisory, U.S. Customs and Border Protection, Comments Requested for Pima and Cochise Counties Border Infrastructure Projects (May 7, 2019) (on file with the author). I am concerned that construction of pedestrian fence along this particular portion of the border because it would prohibit the cross-border movement of animals I hope to see in the wild including the jaguar.  I also spent time birdwatching and taking photographs while in the area.

13.     On April 13, I traveled to Organ Pipe Cactus National Monument and Cabeza Prieta National Wildlife Refuge along the United States-Mexico border in Pima County, Arizona. I hiked to the top of Mount Ajo to survey the borderlands and the habitat of the endangered Sonoran pronghorn proposed for pedestrian fence construction identified as Tucson 1 & 2. These areas are slated for border wall construction. Media Advisory, U.S. Customs and Border Protection, Comments Requested for Pima and Cochise Counties Border Infrastructure Projects (May 7, 2019) (on file with the author). I am concerned that construction of pedestrian fence along this particular portion of the border because it would prohibit the cross-border movement of animals I hope to see in the wild including the Sonoran pronghorn.

14.     I traveled to Puerto Blanco Road, west of the port of entry at Lukeville, then to the immediate border to survey existing Normandy-style vehicle barriers. During this visit, I hiked, identified plants, and took photographs. This area is scheduled to be converted into pedestrian barriers made of vertical bollards and is identified as Yuma 3. Media Advisory, U.S. Customs and Border Protection, Comments Requested for Pima and Cochise Counties Border Infrastructure Projects (May 7, 2019) (on file with the author).

4

15.     I plan to return to the borderlands in Arizona in October 2019. I will be returning

to Coronado National Forest identified as Tucson 4 and 5 as well as Organ Pipe Cactus National

Monument and Cabeza National Wildlife Refuge along the United States-Mexico border

identified as Tucson 1 and 2 as well as Yuma 3A to document the impacts of border security

activities on threatened and endangered species that regularly cross the borderlands between the

United States and Mexico. I will be taking photographs and documenting security activities that

will inhibit or preclude recovery of endangered species like the jaguar, Mexican gray wolf, and

Sonoran pronghorn.

16.     I have significant professional interest in the construction of the border wall in the

borderlands areas, including Organ Pipe Cactus National Monument (Tucson 1-2), Cabeza Prieta

National Wildlife Refuge (Tucson 1 and Yuma 3), and Coronado National Forest (Tucson 4 and

5). As the Southwest Program Director at Defenders, I have worked and continue to work on

efforts to restore endangered species in these areas. Ensuring that endangered species like the

jaguar and Mexican wolf in the borderlands are able to rebound and thrive is a key part of my job

duties, and I am a passionate advocate for the protection of these species. As a Defenders

employee and member, I have moral, educational, and recreational interests in the conservation

of these imperiled endangered species, especially in the southwestern United States, their

habitats, and their ability to traverse to and from these areas.

17.     In addition to my professional interests, I have personal conservation, aesthetic

(including photography), and recreational interests in the public lands and plants and wildlife that

will be impacted by the specific DoD funded border wall projects.

18.     The Trump administration's emergency declaration and border wall construction

that it seeks to fund will harm the interests that Defenders and I have in wildlife and federal lands

along the border. Constructing the proposed bollard border walls in new areas will impede the ability of endangered species, like jaguars, to traverse between the United States and Mexico. Since the ability of endangered species to traverse between these areas will be impeded by the wall, I will be less likely to observe and photograph those species in the United States.

19.     Similarly, the construction and use of proposed bollard walls (Media Advisory, U.S. Customs and Border Protection, Comments Requested for Pima and Cochise Counties Border Infrastructure Projects (May 7, 2019) (on file with the author); Press Release, U.S. Department of Homeland Security, Walls Work (Dec. 12, 2018)) in areas where border walls already exist will impair the aesthetics I enjoy while hiking, birdwatching, and taking photographs in these federal lands that I travel to on a regular basis.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on May 28, 2019, in Santa Fe, New Mexico.

_____

Bryan Bird

I, Diana Hadley, declare as follows:

1. The facts set forth in this declaration are based upon my personal knowledge and if called as a witness in this proceeding, I could and would testify competently thereto under oath. As to those matters that reflect an opinion, they reflect my personal and professional opinion on the matter.

2. I am a founding board member and current co-president of the Northern Jaguar Project, a nonprofit organization that manages a 55,000-acre wildlife reserve in Sonora, Mexico.

3. I am the former owner-operator of Guadalupe Canyon Ranch, a 20,000-acre family ranch in Hidalgo County, along the New Mexico-Mexico border, with smaller portions of the ranch extending into Cochise County, Arizona. After living on the ranch in a region described as the "bootheel" of New Mexico for 15 years, running 250 head of cattle, I have now passed my shares in the ranch in trust to my daughter.

4. Subsequently, I retired from the University of Arizona, where I was director of the Arizona State Museum's Office of Ethnohistorical Research. While working at the university, I specialized in the history of land use and ecological change in the southwestern U.S. and northern Mexico. I published a number of technical studies for the Bureau of Land Management and the U.S. Forest Service.

5. I hold B.A. and M.A. degrees in archaeology and history from Washington University and the University of Arizona and have numerous certificates in education and Spanish language. I have organized conferences on grassland restoration, Native American sacred sites, deforestation of the Sierra Madres and restoration of the Santa Cruz River.

6. I have served on the board of directors of Native Seeds/SEARCH, the Audubon Research Ranch, the Arizona-Sonora Desert Museum, the Friends of Tucson's Birthplace, the Center for Desert Archaeology, Wildlands Network and am a commissioner on the Tucson-Pima County Historical Commission.

7. Because of my involvement with wildlife and ranching in the ecologically vulnerable bootheel of New Mexico, I have an acute awareness of the dangers human activities and construction have had and will have on the native plants and animals that once thrived along the border, where it is possible construction of a border wall may soon begin.

8. I urge this court to reject federal moves to authorize construction of a border wall in these circumstances and in this area. The semi-arid grasslands of Hidalgo County, NM rarely have adequate stores of water for human inhabitants and frequently reach 100 degrees Fahrenheit. Nonetheless, they have supported a regionally and globally unique mosaic of grasses and high elevation scrub that supports some of the last remaining populations of species and subspecies that have become increasingly rare on both sides of the border. Many of these species have been intensely studied with large amounts of funding devoted to their preservation, restoration and/or reintroduction. These species include rare and endangered species of mammals, as well as many other species of wildlife, whose survival would be

severely negatively impacted by both the existence of a wall and the process of construction. Construction of a border wall would adversely affect the ability of all of these species to move between critical cross-border water sources, and to seasonally translocate to a variety of mountain ranges strategically necessary for finding food sources at various times of year. Access to these water sources is clearly a matter of life or death and possibly could be a matter of species extinction.

9. For instance, the Northern Jaguar — renowned for its power, strength, beauty, and grace — was largely extirpated in the U.S. southwest as a result of federal predator control programs, poaching, uncontrolled hunting and habitat destruction on the U.S. side of the border. Jaguars are now classified as endangered and are legally protected in both the U.S. and Mexico. The northernmost breeding population of jaguar on the planet struggles to survive in the Mexican states of Sonora and Chihuahua, and during the past 15 years over 70 individual jaguars, including females and cubs, have been documented on the Northern Jaguar Reserve approximately 150 miles southwest from the New Mexico border. Since 1996, seven male jaguars have been photographed on the U.S. side of the border, and one male currently occupies territory in the area of the U.S. declared as critical jaguar habitat.

10. The Northern Jaguar Reserve, which I was instrumental in founding, consists of 86 square miles 150 miles southwest of the New Mexico-Mexico border, and only 120 miles south of Douglas, Arizona. The reserve has fostered the survival of the northern jaguar, whose range extends into Hidalgo and Luna counties in New Mexico and into Cochise County, AZ.

11. The jaguar is solitary and wanders an immense documented range of hundreds of miles, which they mark with urine and scent markings and by scratching trees, hunting and mating at any time of year. Jaguars come together only for courtship and mating and are otherwise isolated. The jaguar female is left alone to raise her cubs, which are born blind and stay in the den for several weeks, learning to hunt after six months, and remaining dependent upon and staying with their mothers for up to two years before finding their own territory. In the wild, the average lifespan of a jaguar is 12 to 16 years.

12. Our binational efforts have begun a long preservation effort to counteract dangerous human habits and hobbies and are having measured success. However, organized efforts to build a border wall may overcome our progress in conserving wildlife and border ecosystems. The Northern Jaguar is only one example of a species of threatened animal that may become extinct in the United States because of construction, vehicle traffic, noise and light associated with human construction and habitation. A border wall would disrupt the breeding grounds, habitat and migratory patterns of many species including the Northern Jaguar. Physical barriers, roads, high-powered lighting, cameras and sensors have the potential to inflict serious damage to all wildlife.

13. A fixed border wall has the obvious potential to cause irreparable harm for a jaguar isolated from a mate prior to insemination or a cub separated from its mother prior to acquiring hunting skills. Jaguars once ranged from California to Texas and as far north as Colorado. The purpose of the declaration of critical jaguar habitat within the United States (southern

New Mexico and Arizona) is to protect jaguars in this country and encourage potential reoccupation of former habitat.

14. Despite the fact that jaguars are powerful, strong climbers and rapid runners, they tire quickly and rely on proximity rather than sustained speed while hunting deer, javelina, desert bighorn sheep, birds, turtles, snakes and fish. A wall that prevents jaguars from hunting prey in their customary range could prevent access to water sources, separate mothers from young, lead to genetic isolation, and potentially starve individual jaguars.

15. The Chihuahuan pronghorn antelope (*A. americana mexicana*) also found along New Mexico's southern border, is listed as endangered in Mexico. The fastest land animal in the Western hemisphere, with a proven ability to run up to 60 miles per hour, pronghorn will be harmed by construction of a border wall of any type because pronghorn rarely jump even low fences, preferring to crawl under a fence. Pronghorn have been known to collide with barricades and to become impaled in fencing. A border wall impassable because of height or underground anchoring can separate a pronghorn from mates or litters and, if an escape route is blocked, make them vulnerable to predators. The pronghorn in the southwestern portion of Hidalgo County are the only U. S. population of native, non-introduced Chihuahuan pronghorn with pure genetics. Their numbers are increasing after three decades of study, large expenditures of funding and concerted protection efforts. Studies have shown that pronghorn mortality, especially among fawns, is greatest in areas where fences or walls have been constructed, as these structures limit the ability of pronghorn to escape from predatory coyote packs.

16. Studies of black bear *(Ursus americanus amblyceps)* have revealed through DNA testing that the populations in Chihuahua and New Mexico are genetically related and that essential bear habitat extends to both sides of the border.

17. The endangered white-sided jack rabbit *(Lepus callotis)*, found only in southwestern New Mexico, is listed as a threatened species by the State of New Mexico. Its population has plummeted in part as a result of impacts from speeding border patrol vehicles. The jackrabbit relies on pure grassland habitat, is known to mate for life and to travel in pairs. Isolation from a mate because of wall construction could kill some of the few individuals still known to inhabit the United States — individuals believed to number fewer than 100. Further, border patrol vehicles and construction equipment create threats to the survival of individuals and the species.

18. Black-tailed prairie dogs *(Cynomys ludovicianus)* inhabit both sides of the border and concerted restoration efforts have taken place in Hidalgo County. The presence of these small ground squirrels is a scientifically known benefit to many other species.

19. The Sonoran opossum has recently been viewed in near the Mexican border in Hidalgo County, as have a pair of elk, which likely migrated southward from the Gila Wilderness. Elk have not been sighted in northern Mexico for many decades and their return would be enthusiastically welcomed. Their ability to cross the border and to reoccupy former habitat in the mountains of northern Chihuahua would be eliminated by construction of a border wall.

20. A critically important feature of New Mexico's unique natural landscapes is the open expanse of native grasslands, which will be interrupted by construction of any wall, blocking the distribution of all grassland fauna larger than a kangaroo rat. In addition to supporting the habitat of the Northern Jaguar, these grasslands support innumerable additional species including many that are threatened or critically endangered.

21. During my years on the New Mexico ranch, I have grown accustomed to the quietude of the area so sparsely populated by humans. The grasslands, uninterrupted by roads and construction and accessible only on foot or horseback, support a lively community of carnivores and herbivores, in large part because this land is not suitable for commercial farming or extensive human habitation.

22. In the vast Chihuahuan Desert grassland, and in the Coronado National Forest, thousands of diverse wildlife species thrive and migrate across our shared border with Mexico for their survival. An early recognition of this unique biological diversity is the American Museum of Natural History's establishment of its Southwestern Research Station in this area. The heart of one of the largest and most ecologically diverse wildlife corridors in all of the Americas exists at the center of the wall's proposed construction site across the continental divide. The southern end of the Rocky Mountains, the northern end of the Sierra Madres, the edges of both the Sonoran and Chihuahuan Deserts, and the Apacherian Savanna all intersect on New Mexico's southern border.

23. Regionally rare native species, including desert bighorn sheep, Chihuahuan pronghorn, Coues deer, white-sided jack rabbit, Mearns quail, pygmy owl, jaguar, myriad game and songbirds and non-game mammals and reptiles depend upon the unwalled border corridor for their survival. These species migrate across the different existing international barriers in search of food, mates, sources of water, and to ensure the survival of their species. Beyond our shared responsibility to cohabitate with wildlife, these species also serve critical needs to the people of New Mexico, including economic development through hunting, wildlife watching and other passive recreation opportunities, and help ensure we keep our desert, grassland and forest ecosystems in conditions that mitigate the impact of flash flooding and forest fires. Additionally, the Mexican government has stated its opposition to the border wall on many grounds, including the negative impacts on shared ecosystems and wildlife corridors along the border that the countries mutually manage.

24. In addition, the Chiricahua leopard frog (*Lithobates chiricahuensis*) is listed under the Endangered Species Act in Hidalgo County, NM. Because of a reduction in available water, the frog has vanished from an estimated 80% of its New Mexico habitat. Using scarce water in New Mexico for wall construction constitutes a threat to this endangered species.

25. The open expanses of the New Mexico desert drew cowboys and other westerners to our county and state, as it has drawn my family and me. I have been privileged to run cattle unconstrained by artificial barriers such as the one attendant to a border wall and to engage in long-established Western traditions of cooperative, reciprocal cattle work with our neighbors across the border in Mexico. Like most border residents, my children grew up acquiring

knowledge of viable economic livelihoods while participating in time-honored border customs, speaking English and Spanish, sharing food traditions, and benefitting from the rich culture of the U.S.-Mexico borderlands. In addition to extreme ecological disruption, wall construction would diminish these multiple economic benefits and cultural wealth.

26. On a personal level, I find the construction of an unnecessary, ineffective, and horrendously expensive wall abhorrent. Over the centuries, walls have been proven ineffectual and untenable for preventing undesired entry, most famously in China, Rome, and Germany. The cruelty and wanton disregard for human and animal life and the disdain for ecological viability that result from wall construction are shameful to our nation, contradictory to common American morality, and at odds with the ethical teachings of all the world's major religions. Those of us who live on the border are keenly aware of the grim impacts wall construction: destroyed vegetation, eroded water courses, road-killed wildlife, declined or absent species, all of which is accompanied by noise, air and water pollution. This malicious destruction is for naught. The current protections provided by stationary and mobile observation towers, drones, and particularly by horseback border patrols along the actual international boundary have radically reduced undocumented entry. The success of these less harmful means of patrolling the border make the best case for the senselessness immorality of wall construction.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED: May 29, 2019

*Diana Hadley*

Diana Hadley

I, Sky Jacobs, declare as follows:

The facts set forth in this declaration are based upon my personal knowledge and if called as a witness in this proceeding, I could and would testify competently thereto, under oath. As to those matters that reflect an opinion, they reflect my personal and/or professional opinion on the matter.

I am a member of the Center for Biological Diversity and have been a donor, volunteer, and friend to the Center, off and on, since shortly after its formation.

I have spent nearly my entire life along the borderlands in southern Arizona and southern New Mexico. The borderlands are part of my heart and entwined with my future and the future of my wife and 3 ½ year-old daughter.

As a naturalist and biologist, I have worked with vegetation and wildlife on both sides of the Arizona/Sonora border extensively. Specifically, I have worked or participated in volunteer activities along both sides of the border in and/or adjacent to Cabeza Prieta NWR, Organ Pipe National Monument, the Tohono O'odham Nation, Buenos Aires NWR, the Tumacácori Mountains/Nogales Ranger District of the Coronado National Forest, Nogales, the Patagonia Mountains, San Rafael Valley, the Santa Cruz River, Coronado National Memorial, the Huachuca Mountains, Los Fresnos ranch along the upper San Pedro River, San Bernardino NWR, the Peloncillo Mountains of the bootheel of New Mexico, and San Luis Mountains of Sonora, among many other locations.

I understand the on-the-ground situation along the border of Arizona and Sonora better than most. I have spent years working within a few kilometers of the border, adjacent and amongst activities that sometimes define the border, including witnessing smuggling of drugs and humans in Sonora on hundreds of occasions, and being around literally many 10s of thousands of migrants through the height of human migration along the entire U.S. border in the mid-2000s near Sasabe, Sonora and south of the Tohono O'Odham Nation.

Being aware of the state of the borderlands over the last several decades, I can think of few things that have damaged their character more than the intensification of border enforcement, and specifically building of border wall sections. Further building of border walls and/or fences would severely erode the character of a special and unique region, which hosts some of the most beautiful landscapes and most biologically diverse locations in the United States of America.

A border wall traversing much of our border between Arizona and Sonora will cause serious problems for wildlife of all kinds, but more so for mammals including Jaguar, Ocelot, Sonoran Pronghorn, and Black Bear. Innumerable other large and medium sized mammals will be affected. My enjoyment of wildlife (mammals, birds, and reptiles) will be harmed by further border wall construction. My ability to share my appreciation of wildlife along the border with others will be impacted by border wall construction.

A bird species that I have worked with, photographed, and enjoyed extensively will likely be made extinct in the United States by border wall construction. The Cactus Ferruginous Pygmy-owl in southern Arizona exists only from near Nogales west to Cabeza Prieta NWR in Arizona in very low numbers. Any chance of survival of the species in this area depends on a connection to populations in Sonora, which will be cut off by a border wall. These owls rarely cross large open spaces and since the always fly close to the ground, will not cross over a barrier as high as current and future border walls. This fact will significantly affect my well-being and my ability to share my enjoyment of these owls with my daughter in the future.

As a photographer, the borderlands provide world-class landscapes for photography. They also host innumerable species of plants and animals, which provide me endless opportunity to photograph interesting species and produce aesthetically pleasing photos, which I share through prints, websites, and other digital media to thousands of people. Views of the landscape are severely harmed by border infrastructure and border walls, negatively impacting my ability to do photography. Loss of plants and animals to photograph from border wall construction also impacts my photography.

I am a hunter who has used the borderlands in the Tumacácori, Santa Rita, and Huachuca Mountains to hunt white-tail deer. I worry what effects a border wall may have on deer and other game animals along the border, potentially diminishing an important activity for Arizonans and a regionally important economic engine, and diminishing my enjoyment of hunting.

I am a birder and use the borderlands, along with thousands of others from across the country, to watch and enjoy birds. I think there is no better place in the United States for birds than the borderlands of southeastern Arizona. Many important bird areas have been and will be further harmed by border enforcement activities and border walls. My enjoyment of this activity will be harmed by border wall construction.

I use areas near the border extensively for camping and recreating, by myself, with friends, and with my family. My family recently spent a weekend in Sycamore Canyon in the Tumacácori Highlands, an area that is incredibly beautiful and still enjoyable because it has no border wall. Recreating along the border is very important to me and especially as I am able to share all of these places with my daughter as she grows up.

I love Mexico, both the land and the people. I travel through the border many times per year. I spend time with people from both sides of the border in Mexico. There is a shared landscape and culture between the United States and Mexico. The landscape is both literally and figuratively cut off as border walls and barriers are erected. Our shared culture is damaged. Our shared landscape is damaged. This impacts my enjoyment of the region, along with thousands of other people on both sides of the border.

On March 12, 2019 the Santa Cruz National Heritage Area was designated by Congress and signed into law by the White House. This legislation covers 3300 square mile landscape in the borderlands and was designated for its distinctive natural, multi-cultural, and cross-border heritage. A border wall goes against all that made this designation possible and the basic values it embodies, which lessens our regions economic potential, and impacting my, and our, shared future.

I have recently purchased land 14 miles from the border and plan to spend more time near the border with my family in the near, and far future. I would prefer to live in an interconnected region without border walls. Any border problems currently associated with border pale in comparison to the erection of border walls and associated infrastructure.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on May 21, 2019, at Tucson, AZ.

Sky Jacobs

5/21/19
Date

I, Laiken Jordahl, declare as follows:

1.      The facts set forth in this declaration are based upon my personal knowledge and if called as a witness in this proceeding, I could and would testify competently thereto under oath.  As to those matters that reflect an opinion, they reflect my personal and professional opinion on the matter.

2.      I reside in the city of Tucson in Pima County, Arizona.

3.      I am a staff member of the Center for Biological Diversity, where I have served as a Borderlands Campaigner in the Center's Public Lands Program since September 2017.  At the Center, I use science, policy, and advocacy to protect the borderlands from increased border walls and border militarization.  I work in collaboration with lawyers, organizers, policy experts, and scientists to achieve this goal.  At the Center, I conduct campaigns to raise awareness of the environmental and human harms of border walls and increased border militarization, and work with communities impacted by border walls to oppose the construction of additional barriers. I work with student groups, volunteers and border residents in border communities to plan and organize events that educate the public on these dangers.

4.      Prior to joining the Center, I served as a Wilderness Fellow at the National Park Service ("NPS") from May 2015 to September 2017.  As a Fellow for NPS, I studied current conditions and threats to wilderness areas in five national parks and monuments, including Organ Pipe Cactus National Monument.  My work was published in a series of reports entitled "Wilderness Character Narrative and Baseline Monitoring Assessments" for specific national parks and monuments. My report for Organ Pipe Cactus National Monument addressed how U.S. Border Patrol ("USBP") activities—including road development, infrastructure, and vehicle use—have degraded the wilderness character of the National Monument and wilderness area. My report also examined how border security activities impact natural soundscapes and interfere with both the biotic community and people's ability to enjoy solitude and sounds of nature in wilderness.  As a Fellow at NPS, I also assisted in conducting flight surveys for trespass cattle, as well as surveys for native Bighorn sheep and other wildlife. At Organ Pipe Cactus National Monument, I studied how the endangered Sonoran Pronghorn were harmed by border security activity. I was shocked to learn that pronghorn were disturbed by USBP vehicle traffic or overflights an average of once every four hours. I also compiled data showing the immense harm USBP agents incurred on the sensitive wilderness landscape by installing border security infrastructure and driving thousands of miles off-road in designated wilderness. My experience working at Organ Pipe Cactus National Monument and seeing first-hand the damage inflicted on public lands and wilderness areas was eye-opening. Witnessing the severe degradation of the sensitive Sonoran Desert landscape led me to my current role with the Center for Biological Diversity, where I advocate against the construction of border walls and militarization that harms these spectacular wildlands.

5.      Before joining the National Park Service I worked as a Legislative Fellow for Congressman Raul Grijalva. My role was focused on natural resource policy for Arizona's 3rd Congressional District, which encompasses about 300 miles of the U.S. Mexico border including Organ Pipe Cactus National Monument, Cabeza Prieta National Wildlife Refuge and other areas

1

that would be harmed by the proposed Tucson 1 Project. My work with the Congressman included developing and monitoring policies related to border security and natural resource conservation and corresponding with constituents, interest groups, and committee staff about these issues. Working on natural resource policy in a border district gave me a first-hand understanding of how border policies often run roughshod over endangered species, civil liberties, and conservation goals. This experience guided my career decision to pursue conservation work in the borderlands.

6.      Prior to working as a legislative fellow in Washington D.C., I worked at the U.S. Bureau of Land Management ("BLM") as a Recreation Management Planning Intern.  As an Intern at BLM, I studied the Bighorn sheep population in the San Juan River region of Utah, and assisted in preparing a recreation management plan for the San Juan River.

7.      In addition to my professional work in protecting threatened ecosystems and studying wildlife in the borderlands, I enjoy many recreational activities in borderlands of Arizona and New Mexico, including areas that would be harmed by the Tucson 1 and El Paso 1 Projects.  I use these lands for hiking, backpacking, birdwatching, camping, stargazing, and observing wildlife and wild landscapes.

8.      I derive recreational, spiritual, and aesthetic benefits from recreating in the landscapes in the borderlands.  Since I was a child, I have found a deep sense of peace and purpose from spending time outside.  My visits to the Sonoran Desert, beginning when I was just eight years old, have been particularly meaningful to me.

9.      The Sonoran Desert—which extends from California through much of southern Arizona and deep into Mexico—delivers a feeling of peace and a sense of scale and perspective that is difficult to duplicate. The Sonoran Desert's expansive vistas, fiery sunsets, and clear night skies provide me with an escape from modern society and a deep feeling of belonging. The Sonoran Desert is the wettest desert in North America, and as a result holds a vast array of unique desert plants.  Some of these plants like the Organ Pipe Cactus, the elephant tree, and the senita cactus, are only found at Organ Pipe Cactus National Monument and not anywhere else in the county. Seeing these hearty plants thriving in a vast desert where temperatures often top 100 degrees makes me feel intrigued and inspired. The fact that these plants do not exist anywhere else in the United States adds to the feeling of being in a truly unique area, one at the edges of two ecotones—and two countries—where tropic and montane species overlap.

10.      I particularly love to go camping and hiking in the Organ Pipe Cactus National Monument.  I have repeatedly visited and camped in many different parts of the Organ Pipe Cactus National Monument as well as portions of Bureau of Land Management land adjacent to the monument, and in the Pinacate y Gran Desierto Altar Reserve, just across the international border in Mexico.

11.      I have visited, hiked, camped, stargazed, and conducted research in the areas that would be impacted by the Tucson 1 project. During my trips, I have been consistently impressed by how remote the area feels.  In many of these locations there are few, if any, signs of modern human development. These expansive vistas of wide open spaces, rolling desert flats, and cragged distant mountains are a fundamental part of the wilderness experience. These stunning

2

views remind me of the vastness of nature, and help put into perspective the small scale of my life and my problems. I derive a deep sense of spiritual wellbeing and a sense of peace from these unobstructed vistas. Looking into the sweeping desert across the international border in Organ Pipe Cactus National Monument also reminds me that the land on both sides of the border—just like the culture and the history—is connected. I feel the wholeness of this region when I look out across the Sonoran Desert and into Mexico, and in turn I feel a deep sense of connectedness to the landscape and history of the borderlands.

12.     The proposed border wall, 18-30-feet tall with lighting and other infrastructure, would pose a clear obstruction to these vistas. The wall would rip a scar through the heart of this landscape that I have known and loved for decades. Many vistas, such as those from Senita Basin, a favorite hiking destination of mine, would be permanently marred by a massive border wall that cuts this landscape in two. The new wall, especially at its high-point on Monument Hill, would sully wilderness views from vast swaths of the Organ Pipe Cactus National Monument.

13.     I also derive recreational, aesthetic, and spiritual values from stargazing in the Organ Pipe Cactus National Monument. Remoteness from urban centers, low humidity levels and infrequent cloud cover allow for incredible stargazing opportunities in Organ Pipe Cactus National Monument and make this stretch of the Sonoran Desert one of the darkest natural night skies in the country.  As part of my work for NPS, my report on the Organ Pipe Cactus Wilderness explained how skies free from light pollution provide a sense of remoteness and contribute to the solitude and primitive aspects of wilderness character. Dark night skies are fundamental to wilderness value, providing a visible sense of remoteness, wonder and solitude. Light pollution detracts from the ability to experience the natural world free from visual reminders of developed society. In my 2017 "Wilderness Character Narrative and Baseline Assessment" for Organ Pipe Cactus Wilderness, I wrote "Future border security developments also have the potential to significantly impact dark skies. If the existing vehicle barrier is converted into a full-on border wall, permanent security lighting could potentially be installed—a development that would be catastrophic for dark night skies in the region." If allowed to proceed, the Tucson 1 project would emit severe light pollution and detract from the incredible dark night skies in Organ Pipe Cactus National Monument.

14.     I have a recreational, professional, aesthetic, and spiritual interest in wildlife watching in the Sonoran Desert borderlands.  When I am driving or hiking in the Sonoran Desert, I always am looking to spot species. Some of the species that I hope to view are the Sonoran pronghorn, cactus ferruginous pygmy owl, ocelot, jaguar, mountain lion, bobcat, coati, among many others.  I am concerned about the impacts to wildlife movement of border walls, and particularly of the Tucson 1 project.  While there is a pre-existing vehicle barrier in this portion of the borderlands, wildlife are able to move through such barriers.  In contrast, bollard fencing will prevent virtually all species of terrestrial animals from moving across the border, and even stop the movement of some species that can fly, like the cactus ferruginous pygmy owl, which rarely fly at a height of more than four meters.

15.     I intend to return to this area frequently, and have plans for a camping trip in Organ Pipe Cactus National Monument in the fall of 2019. On this trip, I hope to observe more

3

wildlife species and enjoy the gorgeous landscapes and vistas of this beautiful portion of the Sonoran Desert.

16.     In the last two years, though repeated visits, I have also grown to know and love the Chihuahuan Desert of southern New Mexico. I have visited the area along the border south of Columbus and east of Santa Teresa four times over the last two years. On each visit, I have been impressed by the serenity and undeveloped nature of the region. On my last two visits I drove the 40-mile stretch from Columbus to Santa Teresa on the dirt road paralleling the border, including the area where the El Paso 1 Project is planned.

17.     On these trips, I enjoy stopping along the way to wander among the windblown sand dunes scattered with stands of mesquite and soaptree yucca. I've seen an incredible diversity of animal tracks in these dunes including javelina, deer, coati, bobcat and others. Many of these tracks cross right under the existing vehicle barrier. The footprints tell the story of an animal migrating through the desert, from one country into another, as these species have done for millennia untold. Looking at these prints it's plainly clear that hundreds of animals migrate across the border in this area each and every day. If built, the El Paso 1 Project would completely stop these migrations. Particularly concerning is that El Paso 1 Project, when combined with the existing Santa Teresa border wall and section of wall near Columbus, would create a contiguous barrier stretching along at least 80 miles border. If built, this would be the longest contiguous stretch of border wall anywhere in the country. It would sever wildlife communities and habitats in this remote stretch of the Chihuahuan Desert with an impassable landscape-scale obstruction. I am certain that if this wall is built my ability to see wildlife in this region, admire animal tracks, and enjoy expansive unobstructed views will be greatly diminished.

18.     I intend to return to this section of the Chihuahuan Desert this September on my way to the Chihuahuan Desert Conference in El Paso. I hope to search for animal tracks and enjoy the peace and quiet of this beautiful stretch of the New Mexico borderlands.

19.     I have also spent time along the San Pedro River in Arizona both at and just downstream (to the north) of the U.S.-Mexico border. The San Pedro River is the last undammed, free-flowing river in Arizona, and is a great place to see native birds and wildlife. The San Pedro is like a natural oasis in the Sonoran Desert. It is a small ribbon of thriving plant and animal life in an otherwise harsh desert environment. The San Pedro River is also a movement corridor for a huge number of species that migrate up and down the riverbed. On my last trip to this area we saw tracks from deer, javelina, great blue herons and many other species of wildlife crossing directly under the existing vehicle barrier at the border. I recently saw my first Gila monster along the banks of the San Pedro River just north of the border, which ranks among my favorite wildlife sightings to date. Seeing the Gila monster filled me with a sense of wonder and awe for the natural world that has fed me spiritually and strengthened my resolve to fight for wild creatures and wild places ever since.

20.     Currently, there is a ¼ mile gap in the existing border wall where the San Pedro River crosses the border. This is the only gap in the border wall for almost 40 miles. If this gap at the river corridor is sealed with a solid wall, as is proposed by the Tucson 3 Project, wildlife would no longer be able to migrate up and down this corridor as they have done for millennia.

4

This would cause me personal and spiritual harm and diminish my opportunities to see the incredible wildlife present in the San Pedro River corridor.

21.     I also love to swim in the San Pedro River. Swimming in a natural desert river makes me feel spiritually renewed and invigorated each time I take a dip. Knowing that the San Pedro is the last free-flowing river in Arizona also gives the place a feeling of wildness and a sense of the pristine that is hard to come by in the increasingly developed American Southwest. If the Tucson 3 Project moves forward, a border wall would be constructed through this free-flowing river and would cause an unnatural obstruction that would likely dam the flow of water. If construction proceeds and the last-free flowing river in Arizona is dammed with a border wall, I would suffer immense grief and a severe feeling of loss. The San Pedro is an incredibly rare natural riparian zone in the Arizona Desert. A wall built through this spectacular corridor would stop wildlife migrations, alter the flow of water, and forever mar this sacred and irreplaceable site.

DATED:  May 29, 2019

_____
Laiken Jordahl

5

I, Taylor McKinnon, declare as follows:

1. The facts set forth in this declaration are based upon my personal knowledge and if called as a witness in this proceeding, I could and would testify competently thereto under oath. As to those matters that reflect an opinion, they reflect my personal and professional opinion on the matter.

2. I grew up and live in Flagstaff, Arizona.  I attended Flagstaff High School and Prescott College where I received BA in environmental studies, focusing in field ecology.

3. I am a member and employee of the Center for Biological Diversity where I began working in 2007.  My Center work focuses on public lands and endangered species conservation. Prior to my time at the Center I co-owned and operated Wild Rivers Expeditions, where I directed natural history interpretation and river programs. Prior to that I was employed by Grand Canyon Trust, focusing on public lands and wildlife conservation.

4. I'm an avid photographer and traveler. I shoot on public lands weekly, some weeks daily. I also frequently travel to observe and photograph remote North American landscapes and biodiversity. I always travel, hike and camp with a camera and wildlife lens in hopes of photographing rare, unique, or really any wildlife. My photographs have been in national publications. They're frequently in conservation campaigns. Sharing the beauty and wonder of public lands and biodiversity through photography brings joy to me and others.

5. My education, career, travel and photography all grow from a passion for natural history. For as long as I can remember, I have been captivated by the diversity of life on earth and the evolutionary histories, landforms, and natural processes that shape it.

6. That passion led me to the borderlands, one of the most biodiverse regions in the U.S.  The bird watching is tremendous; the landscapes are spectacular. In December and March I visited Oregon Pipe Cactus National Monument and Cabeza Prieta National Wildlife Refuge to hike, camp, and observe and photograph a diversity of species, ecosystems and landforms. In March I also visited Las Cienegas National Conservation Area.  I've visited the Santa Rita, Dragoon and Huachuca Mountains.  I've twice traversed borderlands by boat, through Boquillas Canyon and later the Rio Grande's Lower Canyon. I have backpacked and birdwatched to the U.S. border in Sycamore Canyon of the Pajarito Mountains as well.

7. I've traveled, camped, hiked, observed wildlife and photographed extensively throughout Cabeza Prieta National Wildlife Refuge, including near what the government refers to as the "Yuma 2" project. I have looked for both bighorn sheep and endangered Sonoran desert pronghorn in the refuge.  I have observed numerous mammals, reptiles, amphibians, birds, cacti, and wildflowers there.  I have photographed numerous birds and breathtaking unindustrialized landscapes there, including those that span both the U.S. and Mexico.

8. I've traveled, hiked, observed wildlife and photographed extensively throughout Organ Pipe Cactus National Monument, including near what the government calls the "Tucson 2" project. I have looked for both bighorn sheep and endangered Sonoran desert pronghorn in

the refuge.  I have observed numerous mammals, reptiles, amphibians, birds, cacti, and wildflowers there. I have photographed numerous birds and breathtaking unindustrialized landscapes there.

9. I've traveled, hiked, observed wildlife and photographed in Las Cienegas National Conservation Area, Patagonia Lake State Park, Madera Canyon, and the Santa Rita Mountains. I have observed numerous mammals, reptiles, amphibians, birds, cacti, and wildflowers there. Some species of wildlife that I've observed there are rare or infrequent in the U.S. A life-long hope of mine is to observe rare cats, especially Ocelot and Jaguar, for which public lands in this area are designated critical habitat. I have photographed numerous birds and breathtaking unindustrialized landscapes there.

10. I've traveled, hiked, observed wildlife and photographed in the Dragoon and Huachuca Mountains, north of what the government calls "Tucson 3" and "4" projects.  I have observed numerous mammals, reptiles, amphibians, birds, cacti, and wildflowers there. Some species of wildlife that I've observed there are rare or infrequent in the U.S. A life-long hope of mine is to observe rare cats, especially Ocelot and Jaguar, which sometimes occur there, and for which public lands there are designated critical habitat. I have photographed breathtaking unindustrialized landscapes there.

11. I've hiked, camped, and observed wildlife in Sycamore Canyon and the Pajarito Mountains. I have observed numerous mammals, reptiles, amphibians, birds, cacti, and wildflowers there. Some species of wildlife that I've observed there are rare or infrequent in the U.S. I had hoped to observe rare cats there, especially Ocelot and Jaguar, for which public lands in this area are designated critical habitat.

12. As an enthusiast of public lands, natural history and biodiversity, the construction and operation of the Yuma 2 and Tucson 2, 3 and 4 sections of the wall will harm my interest, enjoyment and use of public lands including the Cabeza National Wildlife Refuge, Organ Pipe Cactus National Monument, the Huachuca Mountains, the Dragoon Mountains, and the Pajarito Mountains.  A border wall bifurcating Arizona and Sonora would fragment habitat and harm the region's unique biodiversity, including but not limited to wide-ranging mammals like Jaguar, Ocelot, Sonoran Pronghorn, Mexican Wolf and Black Bear.  The wall would block binational movement of species. Resulting fragmentation of populations of wildlife could, in time, decrease the genetic diversity and viability of remaining populations. Construction operations will cause noise and nighttime light pollution that will be visible and audible across large reaches of the refuge. This will disturb wildlife. Depending on the wall's operations, ongoing noise and light pollution could create ongoing disturbance. Even though they can fly, the wall will harm birds. It will push Cactus Ferruginous Pygmy-owl, which occur only between Nogales and Cabeza Prieta National Wildlife Refuge, closer to extinction. Flying close to the ground, the birds are very unlikely to cross a border wall.  As with other species, a wall would spilt and further imperil its already perilous populations. Just knowing that such species exist on public lands brings me solace; their further imperilment would cause me grief. Their decline and increasing rareness as a result of a wall would harm my enjoyment and use of public lands by reducing the likelihood that I would be able to observe and photograph these species throughout any of their current or historic range on

public lands in southern Arizona. Their absence or decline would diminish my ability to experience and enjoy of region's rich public-lands ecosystems, as they occur now in some semblance of a natural, complete, and functional condition.

13. As photographer, construction and operation of the Yuma 2 and Tucson 2 sections of the wall would harm my use and enjoyment of Cabeza National Wildlife Refuge, Organ Pipe Cactus National Monument and adjacent federal public lands. Unlike vehicle barriers, which are obscured by dominant vegetation, the wall would create a massive visual obstruction across what are now unimpeded views of the desert.  By precluding me from being able to photograph contiguous cross-border, unindustrialized landscape scenes – as shown in this photograph below, looking from Cabeza Prieta National Wildlife Refuge into Mexico – construction of the wall would harm one of my favorite and most frequent uses of public lands. With construction of a wall, I would literally not photograph scenes like this one that I shot last year:



14. I have plans to return to Organ Pipe Cactus National Monument, Cabeza Prieta National Wildlife Refuge and other public lands in southern and southeast Arizona this coming fall and winter.

15. For reasons described above, I urge this court to reject federal moves to authorize construction of a border wall.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on May 23, 2019, in Flagstaff, AZ.

----------------------------------------

Taylor McKinnon

I, Michael J. Robinson, declare as follows:

1.      The facts set forth in this declaration are based upon my personal knowledge and if called as a witness in this proceeding, I could and would testify competently thereto under oath.  As to those matters that reflect an opinion, they reflect my personal and professional opinion on the matter.

2.      I live in the unincorporated village of Pinos Altos, in Grant County, New Mexico, approximately 90 miles from the Mexico/U.S. border.

3.      My affinity for the Southwest began in summer 1984 when I volunteered at the Gila Cliff Dwellings National Monument and on weekends and evenings explored the surrounding Gila Wilderness.  After that, I returned as often as possible at first to backpack in the same wilderness and later to float the Gila River.  I also began exploring other parts of New Mexico, Texas and Arizona, including the desert borderlands, through day-hiking, backpacking and floating trips – and always with keen interest in wildlife encounters.  I purchased my house and property in Pinos Altos in 1995 and after two years of renting to a friend, moved here in 1997.

4.      The village of Pinos Altos where I live adjoins Bureau of Land Management (BLM) public lands and also lies within easy walking distance of the Gila National Forest.  Most days in the week I walk on either the BLM lands or on the Gila National Forest, or both, and I also venture further afield not infrequently, including closer to and right up to the border with Mexico.  Public lands and the wildlife they harbor are inextricably bound into my quotidian existence.

5.      I am a member of the Center for Biological Diversity (the "Center"), and I have been a member of the Center and its predecessors (the "Southwest Center for Biological

Diversity" and "Greater Gila Biodiversity Project") since the early 1990s.  I have been employed by the Center (and its predecessor) since 1997, and currently work as a senior conservation advocate for the organization.

6.      The Center is a non-profit, 501(c)(3) organization based in Tucson, Arizona, dedicated to protecting and restoring imperiled species and natural ecosystems.  Since 2000, one of my responsibilities at the Center has been advocating for the protection, conservation, and recovery of the Mexican gray wolf, which is a genetically distinct subspecies of gray wolf that inhabits both sides of the international border.  The Mexican wolf is one of the most imperiled mammals in North America.

7.      To inform that responsibility I inspect Mexican wolf habitats, investigate government actions, and keep tabs on the known life-trajectories of the wolves released into the wild in an ongoing reintroduction program, and of their descendants, in order to understand the demographic, genetic and behavioral characteristics of and the management implications for the two Mexican wolf populations that were reintroduced, first, in 1998, into the United States and recently numbering 131 animals and second, in 2011, into Mexico and numbering at last count 25 animals – as well as of the 390 captive wolves in 49 captive-breeding facilities in the U.S. and Mexico.  To do so, I peruse official and open sources of information such as online maps of wolf locations in the southwestern U.S.  I also talk and correspond with scientists, wolf managers and members of the public who encounter wolves.  I read scientific studies, environmental impact statements, environmental and conservation assessments, draft and final rules, judicial motions and rulings, and records received from frequent Freedom of Information Act requests pertaining to Mexican wolves.

8.      My work at the Center entails educating the public on Mexican wolves and their plights.  I have made at least 180 presentations, written dozens of op-eds and press releases, and contributed to hundreds of news and opinion articles and broadcasts, in order to translate some of the complex information I learn about Mexican wolves and their management into succinct and comprehensible narratives.

9.      I advocate for Mexican wolves through organizing and assisting pro-wolf people to attend and speak up at germane events ranging from federal informational meetings and other informal governmental venues, to state game commission meetings and federal public hearings, as well as at protests and rallies outside government buildings and at public events.  I have written or co-written with colleagues dozens of detailed letters and (in 2004) an Administrative Procedure Act petition for rule-making to officials at government agencies seeking changes in policy toward and management of Mexican wolves, and I have attended and participated in dozens of government-convened meetings on Mexican wolves.

10.     In addition to my ongoing professional activities for Mexican wolves, I have a longstanding historical interest in the wolves and other wildlife of the United States.  I am author of *Predatory Bureaucracy: The Extermination of Wolves and the Transformation of the West* (University Press of Colorado, 2005), which recounts and explains the U.S. government's historic programs to trap, shoot, and poison wolves and other wildlife, which caused the near-extinction of the Mexican wolf.

11.     I have seen just one time in the wild an animal that I believe to have been a Mexican wolf, but in addition to that experience I have seen Mexican wolf tracks or scat on approximately a dozen occasions.  I treasure those experiences and relish future opportunities to see, hear and find sign of Mexican wolves in New Mexico and Arizona.

12.     In my view, wild Mexican wolves in the southwestern United States and those in

Mexico need to be able to travel back and forth freely across the international border in order to

be able to mate with wolves in their non-natal population and thus increase the genetic diversity

of the animals comprising both populations.  I have come to this conclusion through the

following considerations.  All Mexican wolves known in the world today stem from just seven

animals that were captured from the wild between the 1950's and 1980 and successfully bred; no

others are known to have survived in the wild in the U.S. and Mexico in the face of U.S.

government poisoning and trapping.  Yet, since the initial reintroduction program's inception in

1998, federal mismanagement of the U.S. wild population has led to diminishment of its genetic

diversity such that the population now retains the genetic legacy ("founder genome equivalents")

of just over two animals – meaning that almost every Mexican wolf in the U.S. wild today is as

related to every other wolf in the same population as if they were siblings.  The consequent

inbreeding previously reduced the average number of pups born and surviving to maturity below

the averages of other wolf populations that, like the Mexican wolf, had not yet filled the natural

carrying capacities of their ecosystems – i.e. facing few natural constraints to expansion.

Although Mexican wolf reproductive success and pup survival has recently been boosted through

artificial feeding, the increasing inbreeding further narrows the Mexican wolf's genome and can

ultimately turn into a one-way ratchet toward extinction.  Furthermore, many of the captive

wolves are too old or otherwise unable to breed, which makes all-the-more-urgent the effective

genetic management of the wild populations.  An impassable wall or fence between these

populations would impede natural migration and contribute to the ongoing and increasingly-

unsustainable loss of genetic diversity.

13.     Moreover, through a map of GPS locations and through other records obtained via the Freedom of Information Act, and from informally interviewing a colleague who found wolf tracks in Mexico just south of Arizona, I know the approximate routes through the border taken by two Mexican wolves that crossed from Mexico into the U.S..  Both crossings are now demarcated by vehicle barriers that did not impede the wolves, and both are slated for construction of wildlife-blocking walls in the planned wall-construction sectors called "El Paso 1" and "Tucson 3A."  I have also perused early-twentieth-century maps of Mexican wolf travel-routes between the two nations from when wolves were more widely distributed before they were exterminated from the wild; the border-crossing spots for these routes are also now demarcated just by (wildlife-permeable) vehicle barriers.  But two of these old routes – that could be used again as progress toward recovery increases the number of wolves -- crossed the border where wall construction in Tucson 4B is planned.  Considering these records, my own experiences in the borderlands, peer-reviewed analyses of the habitats' carrying-capacity for wolves on both sides of the border, and the wolves' genetic plight, I think that wolves will need to travel across the international border as a prerequisite for recovery of the subspecies, and that such travel would largely if not entirely be blocked by planned wall construction.

14.     Survival and recovery of the Mexican wolf is part of my life's work, what helps me get up every morning, and sometimes what I contemplate before drifting off to sleep at night. The prospect that Mexican wolf recovery might well be doomed through a wall – even if upon my natural expiration a few decades hence remnant wolves would still linger on – is inexpressibly depressing.

15.     My interest in survival and recovery of wolves and other southwestern species whose ranges span both sides of the international border is not merely an academic obsession.  I

have a longstanding experiential interest in the borderlands of New Mexico, Arizona, and Texas and in the wildlife and native plants found therein.  In my 22 years of living at the southern edge of the Mogollon Plateau perched above the Chihuahuan Desert in New Mexico, and even before my residency here, I have gone on countless day-hikes, backpack trips and river-float trips, including to remote regions in the borderlands where there are no formal trails.  During such excursions, I try to be quiet in order to observe wildlife.

16.     In exploring the borderlands, I eagerly anticipate and seek out the possibility of seeing wildlife, particularly rarer animals such as desert bighorn sheep, coatis, ringtail cats, and eagles, as well as those that have been subject to organized persecution such as prairie dogs, black-tailed jackrabbits and carnivores including gray foxes, coyotes, bobcats, cougars, wolves and jaguars.  I'm also eager to find signs of wildlife such as tracks, carcasses from predation, and scat.

17.     On February 18 of this year, while walking on a dirt road through the New Mexico desert on BLM public lands, about a quarter-mile north of the international border in "El Paso 1," I came across the scat of a cougar with telltale hairs from its prey and fecal diameters large enough to likely rule out the defecator as a bobcat.  Cougars live at low densities in such arid and sparsely-vegetated habitats and must traverse large home-ranges to find enough deer, jackrabbits and other prey, since deer in particular (a cougar's bread and butter) themselves exist at low densities in the desert.  It is likely that cougar's home range includes land in Mexico, and also likely that cougars will be greatly diminished in the borderlands of New Mexico if additional significant stretches of wall are constructed as planned to replace the vehicle barriers over which cougars can easily bound.  Such construction would diminish my chances of ever spotting a big tawny cat fleeing from me amid ochre boulders and olive-green, prickly plants.

18.     One little-known stretch of BLM public lands that I've previously hiked in comprise the Cedar Mountains in New Mexico.  A few miles directly north of the El Paso 1 wall-construction zone, the Cedar Mountains include a designated Wilderness Study Area, but nonetheless do not sport recreational trails, signage, nor developed campgrounds; the mountain range feels remote and wild.  I remember from my first trip, in fall 2009, looking down at a golden eagle soaring in front of and about 100 feet below me as I faced a north-facing cliff. Behind me to the south were a series of mountains and valleys in Mexico, and the world at that moment seemed seamless, serene, and redolent with potential for regeneration. Although eagles would not be stopped by a wall, the small herd of pig-like javelina that I encountered earlier that day would be stopped; I wonder whether their U.S. population after a long period of separation from javelinas in Mexico, would inbreed, diminish and eventually die out.  I plan to climb the Cedar Mountains again this winter, but I fear seeing the once-seamless desert ecosystem violently sundered by a wall, where today just vehicle barriers, which do not block most wildlife, mark the international border.

19.     I explore precipitous mountains and arid deserts near the border with Mexico on foot for several conjoined reasons: exercise, spiritual balm and personal perspective, questing for ecological knowledge – but no reason is greater than the opportunity to experience wildlife directly or to observe the signs of animals' passages.  And no animal draws me to the borderlands more than the jaguar, which Center for Biological Diversity advocacy caused to be placed on the endangered species list in the United States and its critical habitat to be protected. The possible presence of jaguars has drawn me repeatedly to backpack, day-hike and float rivers in remote borderland areas, starting in 1996 in the Peloncillo Mountains in New Mexico within months of the first reported jaguar sighting in the U.S. in a decade, that occurred there.  The

opportunity to spot a jaguar provides its own rewards in my heightened awareness, even though I have not yet seen one in the wild.

20.     I have returned to the Peloncillos repeatedly in the almost-23-years since that first visit.  This year, I day-hiked in the Peloncillos on January 27 and on April 29th.  I intend to return for another hike when temperatures cool down again this fall.  But the eastern foothills of the Peloncillos would be blocked off by one of the two "El Paso 2" walls, diminishing the likelihood of a jaguar crossing.

21.     Since 1999, my work for the Center includes advocating for jaguar survival and recovery through participating in meetings such as the (now-defunct) interagency Jaguar Conservation Team, writing detailed comments to federal officials on designation of jaguar critical habitat and development of a jaguar recovery plan, writing press releases and op-eds, putting on public presentations, and organizing members of the public to support jaguar recovery.

22.     To inform such advocacy, I research recent and historic jaguar reports in the Southwest and nationwide to learn and disseminate the true historic range of the jaguar in North America and the scope of its uncertain comeback.

23.     The jaguar is thought to have evolved in North America before expanding its range to Central and South America, a determination that paleontologist George Gaylord Simpson arrived at through identification of remains of jaguars in Tennessee, Florida and Nebraska and likely jaguar remains in other states as well.  Dr. Simpson's 1941 study, "Large Pleistocene Felines of North America," published by the American Museum of Natural History, has been cited by more recent scholars and, to my knowledge, has never been challenged.

24.     Archaeologists and anthropologists (including the founder and first chief of the agency that later became the U.S. Fish and Wildlife Service, C. Hart Merriam, after his retirement and during his second career as a linguist and ethnologist) have shown in four papers published in 1919 (Merriam's), 1926, 1974 and 2003 that American Indians knew of jaguars for centuries and retained that knowledge.  Moreover, pictographs and other artifacts that appear to depict jaguars have been found in Arizona, New Mexico, Texas, Washington, Ohio, Missouri, Alabama and Florida.  Eleven tribes describe apparent jaguars in oral histories or myths; these tribes' homelands stretched from the southeastern U.S. across to southern California.  A Hopi ceremony in northern Arizona, witnessed in 1998 by Steve Pavlik, author of the 2003 review, entailed use of an arrow-quiver case made from a jaguar pelt.

25.     When Europeans arrived in North America and their descendants colonized the continent, they encountered jaguars in disparate places.  A scribe for Spanish conquistador Francisco Vasquez de Coronado mentioned "tigres" in today's Gila National Forest (a few dozen miles from where I live) in 1540.  In 1700, English naturalist John Lawson encountered a "tyger" in present day South or North Carolina.  Irishman John Brickell also saw a "tyger" in North Carolina, and in 1737 described them as "large, strong and swift Beasts" and "most beautifully mottled with several kinds of spots."  In 1794, the Spanish military governor of Natchez (Mississippi), Col. Manuel Gayoso de Lemons, offered a five dollar bounty on "tygers" to protect livestock.  In 1820, a 150-pound jaguar was shot in Kentucky, its pelt "yellow with black spots curiously arranged," – according to prominent naturalist and professor C. S. Rafinesque. Jaguars were also killed in Texas (the last one killed in 1948), New Mexico, Arizona and California, and apparent jaguars reported in other states.

26.     The last confirmed jaguar in the Gila National Forest was trapped in 1900.  Two years later, another was poisoned further north in the Datil Mountains in New Mexico.  In 1903, one was killed in the Peloncillo Mountains in New Mexico near the border with Mexico.  Others were killed or reported alive in New Mexico in subsequent years and decades – and not all in forested mountains; some were in flatter and/or less-vegetated terrain.  The most recent confirmed wild jaguar in the state was photographed in 2006 after being brought to bay by cougar-hunting hounds in the grassy, open and relatively gentle San Luis Mountains near the border.

27.     The last confirmed wild female jaguar in the U.S. was shot at approximately 9,000 feet elevation in the Apache National Forest in eastern Arizona, approximately 150 miles from the international border, in September 1963 by predator hunter Terry Penrod.  In 2013, I interviewed Mr. Penrod about the event and followed up by following his directions to try to find the location of his fatal and fateful action.

28.     Since 1996, seven different (and visibly distinguishable) male jaguars – each of which almost-certainly emanated from Mexico -- have been photographed in New Mexico and Arizona.  Over the same two-plus decades, other jaguars have been reported but not confirmed.

29.     Some of the recent confirmed jaguars were only known through so-called camera traps.  The proliferation of this technology provides species-location information that in past eras could only be collected haphazardly.  Logically, therefore, increasingly common (though still far from commonplace) jaguar photos from camera traps do not necessarily represent an increase in the number of jaguars over the recent past, but perhaps just better identification and proof.

30.     It is also reasonable to hypothesize that a proportion of both the reported and the confirmed jaguars in the Southwest since 1996 may in fact reflect the success of (as-yet small

scale) jaguar conservation efforts in northern Mexico, and therefore represents an actual increase in jaguars traveling to the U.S. over the previous two-plus decades (i.e. from the early 1970's through the mid-1990's).

31.    Significantly more people believe that they have seen a jaguar in the Southwest than the number of jaguars that can be confirmed.  Of course, jaguars like most wild felids are evasive and cryptic, and they are also exquisitely camouflaged.  So it is exceedingly difficult to confirm a jaguar's presence after someone reports, for example, a big, golden, black-spotted cat bounding across the road in front of their car with no time to snap a photo.

32.    I follow up on rumors of jaguars in the U.S. to try to ascertain their validity. Because I live in a rural area where people enjoy extended social networks (the kind that existed long before the advent of computer-based social media) and sometimes learn notable aspects of others' experiences, and because I have spoken publicly and been quoted widely in regard to jaguars, there have been several occasions in the past few years in which someone calls or emails me to report a possible jaguar seen by someone else, who in some cases they themselves have not met nor communicated with but heard about through a different person.  (In a single instance, someone I already knew reached out to me directly to report her possible jaguar sighting.)  In response to each mediated report, I start with my informant and try to ultimately identify and interview the person who thinks they may have seen a jaguar.  Sometimes I'm unable to identify or speak with that person, but in several cases I have, and asked specific, detailed questions and took notes to try to assess for myself the likelihood that an actual jaguar was behind the report. Some of the reports I assess as unlikely, others as plausible, and some seem enticingly plausible to me – although none of my sleuthing and interviews have yet led to corroboration of an otherwise-unknown jaguar in the U.S..

33.     My broader research and experiences lead me to believe that the habitat for jaguars in the Southwest, and particularly in and near the Gila National Forest, has improved during the past century because of reductions in stocking of domestic livestock and big increases in the numbers of potential jaguar prey animals such as deer, javelina and elk.

34.     Six models including one that I helped to develop showed that habitat and available prey in the Gila National Forest and/or the adjoining Mogollon Plateau in Arizona could support jaguars.  One assessment, from 2014, loosely estimated that this region could support 249 jaguars.

35.     I hope that in the not-too-distant future, jaguars will once again re-inhabit the U.S. as a breeding population, including near me in the Gila National Forest.  Such a population, linked to jaguars in Mexico, would provide a critical genetic and demographic boost to the possibly declining Sonora population.  It could also enhance the functioning of southwestern ecosystems.

36.     Notwithstanding that jaguars evolved in the U.S. and are native here, after three centuries of persecution prior to passage of the Endangered Species Act in 1973, there is now no credible evidence that any females remain north of the border.  Ongoing conservation efforts of the northernmost remaining breeding population in Sonora, Mexico could lead to females eventually joining males in re-colonizing U.S. habitats and thereby enabling the expansion of the breeding range to include habitats in the U.S..  That possibility becomes increasingly bleak as the border wall continues to be extended, replacing the existing and permeable vehicle barriers, most egregiously including the planned construction of additional wall segments in El Paso 2 and Tucson 3, 4 and 5.

37. The prospect of seeing a jaguar in the wild, or even of its tracks, is the most thrilling wildlife sighting I can conceive in the Southwest and is a huge part of why I spend time in the borderlands of New Mexico.

38. The hope that jaguars can recover in the Southwest to me stands in for a broader and, frankly, diminishing hope that humanity can refrain from wiping out more wild animals and developing more wild habitats, reverse much of the damage that has already occurred, and that ultimately our species can live in some kind of balance on Earth.

39. Even beyond the issue of whether I might ever see a wild jaguar in the U.S., which desire is admittedly ambitious and perhaps unattainable given jaguars' abilities to stay hidden, the further extension of a wall in New Mexico as well as other southern border states would be a blow to my philosophy that we must restore and co-exist with wildlife, and jaguars in particular, that benefit their ecosystems and that were eliminated through human thoughtlessness.

40. I have tried to persuade federal officials that to ensure the survival of the possibly-isolated, small and possibly-declining northern Mexico population of jaguars, a population should be established in the U.S. that could be genetically linked through jaguars padding back and forth and mating with those across the border from where they would be born. I have also argued that jaguar recovery can never be complete if all of the jaguar's original evolutionary habitats in North America remain unoccupied by these big cats, and that such faux-recovery is at odds with the Endangered Species Act's first statement of purpose to conserve the ecosystems on which endangered species depend. An impermeable fence or wall on the border would preclude the connectivity that would be necessary to support a future jaguar population in the Southwest. I feel like my rights as a citizen that Congress and President Richard M. Nixon secured and sought to guarantee through enacting the Endangered Species Act into law, including the right to

conservation of ecosystems on which endangered species like the jaguar and Mexican wolf depend, would be abrogated through construction of a wall – just as surely as would my right to habeas corpus or free speech be abrogated in the event that some future declaration of emergency was to create authorities that could be used to justify my unconstitutional detention or silencing.

41.     Even in the event that no jaguar population would ever be established in the U.S., a wall would largely if not entirely prevent jaguars in northern Mexico from accessing habitat in the U.S. that could help them survive and thus enable them to return and have a chance to breed in Mexico – a benefit of U.S. habitats that was identified by the scientific advisory group of the now-defunct interagency Jaguar Conservation Team whose meetings I used to attend.

42.     Precluding the possibility of seeing a jaguar in the U.S. through construction of a fence or wall across substantial areas of habitat along the border would depress me greatly and deprive me of a tremendous reason to exert myself in day hikes and backpack trips in the borderlands.  It would also impede the Center's interests in jaguar recovery in the Southwest.

43.     American bison (informally known as buffalo) used to live throughout much of North America.  They are massive, magnificent animals that exude personal power but also display tender moments of affection with each other.  Now they are gone from almost everywhere.  In my aforementioned book of history, *Predatory Bureaucracy: The Extermination of Wolves and the Transformation of the West*, I recalled how bison transformed landscapes and benefitted other animals and vegetation.  I also recounted the uninhibited hunting of bison for entertainment, hides for commerce and industry, military advantage against unconquered Indians, and to accommodate the expansion of livestock grazing.  With wild bison in the U.S. now extraordinarily limited in distribution and numbers, the most famous population is in Yellowstone National Park.  Yet, unknown to most of the public, a wild bison herd lives on both

sides of, and on an almost daily basis crosses, the border between Chihuahua, Mexico and southwestern New Mexico, and one bison from that herd may have even traveled over a hundred miles away to be seen near Las Cruces, New Mexico.

44. Although I have only seen wild bison in Yellowstone National Park, I would love to see them closer to home in the southern borderlands, and would relish their natural expansion in numbers and geographic range into much more of the Southwest. Incongruously, this cross-border southern herd of bison currently seems to enjoy greater freedom of movement than any other wild bison herd in the U.S., since other bison are restricted through fences or through policy enforced by slaughter. But this free-ranging herd crosses the border, jumping over the current vehicle barriers, in a valley where a wall is slated to be built. From what I have read, water is more available on the Mexico side of this line; the wall could result in the herd not getting enough water to survive.

45. In sum, much of what provides me with joy on a daily basis and deep satisfaction on a long-term basis are my encounters with, comprehension of and explication of information about wildlife, as well as my ability to help conserve wildlife, and particularly creatures that are native to the Southwest where I have established my permanent home. And several of the wildlife species around which my personal, professional (through the Center for Biological Diversity) and scholarly interests revolve have to be able to cross the border to survive and/or to recover from severe depletion, endangerment and even extirpation. The wall would block those animals. It is not an exaggeration to say that continued construction of the wall would destroy entire ecosystems in the Southwest by eliminating the animals at the top of the food web, to the profound detriment of a myriad of other animals and plants and the sorrow of the people who know and cherish these animals and their habitats. Because of that widespread ecological effect

and the fact that my life is intertwined in small ways and large with the natural world around me, the wall would not just change my activities but in fact shake the basis of my existence in a way that I find difficult to express in words.

Electronically signed this 23rd day of May, 2019, in Pinos Altos, New Mexico,

Michael J. Robinson

I, Isaac Russell, declare as follows:

1.     The facts set forth in this declaration are based upon my personal knowledge and if called as a witness in this proceeding, I could and would testify competently thereto under oath.  As to those matters that reflect an opinion, they reflect my personal and professional opinion on the matter.

2.     I reside in the city of Yuma in Yuma County, Arizona and have lived here for 17 years.  My wife was born and raised in the house we live in.  After 11 years of working at the Yuma Proving Ground for the Department of Defense, I now help run two non-profits to build community and improve quality of life in Yuma.  One is an art gallery and studios which offers free classes and events for children and veterans and is also an advocacy center for arts in education.  The other is a farm which grows food for the food-insecure of Yuma via the Mission and Food Bank.

3.     I am a member and supporter of the Center for Biological Diversity.

4.     Our home is an original Homesteader's, built in 1912 just prior to Arizona becoming a State.  I have lived here for over 8 years.  My wife has lived here her entire life (with brief absences), and we are only the fifth owners of the property after purchasing it from my late father-in-law.  We live a mile from the border and only a half mile more from Morelos Dam.  Construction of the proposed border wall would result in many negative impacts on my life and the area I live in.  Wildlife would suffer from loss of habitat and curtailed mobility.  The Colorado River itself, already extremely fragile and oft-itinerant below the dam, would be irreparably harmed.  The scale and scope of the proposed project virtually guarantee horrible air pollution, light pollution, noise, trash – and more.  It would be like dumping a slice of the Rust Belt – at its worst – into my backyard.  What's worse, all of this is set to occur without me, and my community, having been consulted in any way.  I only found out about the proposed wall when the Center for Biological Diversity contacted me!  Additionally, it absolutely enrages me that a building contract was awarded a mere 24 hours into the public comment period.  That just adds insult to the injury this project would wreak.

5.     My wife and I go for walks and bike rides along the river and canals where the new border wall is proposed frequently.  It's a beautiful area, full of natural delights – from fish and birds, to coyotes and mature trees singing in the wind.  I drive the canal road home from Yuma's North End at least once a week to catch the sunset and the flat light over the landscape.  Having an 18-to-30-foot industrial monolith splitting and scarring the region would be an unqualified tragedy.  I can't imagine enjoying myself in the shadow of such a thing, nor can I imagine respite at night under the incessant gaze of the lights, which according to Border Patrol's plans, will top it.  I'll lose the sense of peace and serenity I gained by choosing to live outside the built-up city, beyond its development limits.  Sadly, instead, I'll have a daily experience reminding me of a gross miscarriage of process and total disregard for our environment.

6.     While I still intend to go for walks, bike rides, and drives in the area around my home in the future, these activities would never be free from the sadness and anger of seeing the massive, destructive and unnecessary wall.  The river bottom would be hidden behind a curtain

of steel.  The sunsets wouldn't be the same.  We wouldn't see as much wildlife.  And, all the while, we'll know that the ecosystem that is the last stretch of the Colorado River is dying just beyond a wall of dubious origin and questionable efficacy.

7.     I am also concerned about the aesthetic and environmental impacts the proposed border wall construction would have on the areas I've known, used, and treasured for years. The existing vehicle barriers in this area do not pose significant harm to wildlife migrations or impede views of the river corridor. However, the new 18-30-foot bollard walls would completely stop the migration of terrestrial wildlife species and be a massive eyesore that would scar the view of the Colorado River corridor for many miles. I may never see the wildlife I love seeing again – the bigger animals will be shut out, and many of the smaller, less-mobile ones will surely seek new home ranges which haven't been destroyed. The new border wall would stop the migrations of these species and not only damage the ecosystem, but harm the ability of me and my neighbors to enjoy seeing these species and feeling connected to nature.  The prospect of all this becoming a permanent reality is utterly unconscionable to me.  It breaks my heart.

8.     I am against the construction of the border wall in the Yuma Sector and would suffer personal harm if this project moves forward.

DATED:  May 31, 2019



_____
Isaac Russell

47

I, Krista Schlyer, declare as follows:

1. The facts set forth in this declaration are based upon my personal knowledge and if called as a witness in this proceeding, I could and would testify competently thereto under oath. As to those matters that reflect an opinion, they reflect my personal and professional opinion on the matter.

2. I am a conservation photographer, writer, and filmmaker and for the past eleven years the primary focus of my work has been on the US-Mexico border. Though my primary residence is now Prince George's County, Maryland, my primary residence was Tucson, Arizona, from 1991 to 1997; I attended the University of Arizona for my master's degree in journalism. I have been a member and supporter of the Center for Biological Diversity and Defenders of Wildlife for many years.

3. I moved to Washington D.C. in 1998 and began working as a political journalist. But in 2000, my partner died of cancer, and I left the city and my job, looking for a way to recover from a crippling depression. I spent that year in natural spaces, photographing wildlife, walking through the desert, listening to the wind moving through grasses. I can say with all honesty that this time in nature saved my life, and much of that time was spent in the Sonoran Desert. After that year, I began devoting my working life to securing a future for the wildlife and landscapes I saw disappearing all around me. I wrote and photographed for magazines and websites about creatures and lands all over the country, but always I gravitated to the Southwest, to the Sonoran and Chihuahuan Deserts, to the wildlife that eeks out an existence on these unforgiving lands. My professional, emotional, and spiritual life are closely tied to the landscape that spans the US-Mexico border.

4. In the course of my work, in 2007, I learned of a herd of bison that had been discovered roaming the border of New Mexico and Chihuahua. The news was unusual. Wild bison, those roaming freely and living as wild animals rather than domesticated for meat production, are globally rare, and this herd was completely unknown to bison researchers in the United States. It was one of 5 known free-roaming herds of plains bison left on the planet. A scientist from Mexico City had come across them while working in northern Mexico, and a team of Mexican researchers had since begun to investigate where they came from and how they had managed to survive. I proposed a story and was sent on assignment by Wildlife Conservation magazine. When I arrived at a scientific field station in Janos, Mexico, I met one of the researchers, Rurik List. List and I boarded a flight on a small Cessna airplane and went looking for the herd. We found them just as they were crossing the border line, which at the time consisted of a 3-string barbed wire fence, much of it broken down by the bison in their regular crossings back and forth. After the flight, List and I visited the landowners on both sides of the border where the bison had crossed. They were both ranchers and knew the bison well. On the US side, the rancher William Hurt said the bison came to his property regularly to access a particular type of grass that he grew, called blue grama. On the Mexico side, the rancher said the bison visited his pond nearly every day, which was one of the only year-round sources of water in the area. The herd's main water and food resources were split by the international border. Over the next few days, List and I discussed the future of the bison in the context of the Secure Fence Act, which had been

passed in 2006, and which mandated the construction of some 700 miles of enhanced border barrier. It was clear, that if the barrier was built in the bison's territory, they would be cut off from either their main food, or their main water resource, and the herd's future would be at serious risk. We also discussed the implications for every terrestrial species that lives along the border, many of whom depend on food, water, shelter and mates that straddle this invisible geopolitical line, some 100 of which are already threatened with extinction, and thousands more who will be as their habitat is cut into smaller and smaller pieces.

5.   After my experience with the bison, I spent a full year (mostly without pay) traveling the border and organizing an expedition of the International League of Conservation Photographers to document the wildlife and ecosystems of the border and help people understand the biological impacts of a border wall. In 2009, 12 photographers and a film team joined me for a month-long expedition along the border, each of us documenting the walls that were being built then, and the harm they were doing to the land and people. All through that year and those that followed I forged partnerships with environmental groups, and sought help on Capital Hill. I raised money to print a fine art exhibit of photographs from the expedition, which I called <u>Continental Divide: Borderlands Wildlife, People, and the Wall</u>. I installed the exhibit in the Rayburn House Office Building in 2009, and in the Russell Rotunda of the Senate later that year. I have worked to travel that exhibit around the country for the past decade at galleries, universities, churches, and community centers from Washington State to Mississippi.

6.   In 2012, I published a book called *Continental Divide: Wildlife, People and the Border Wall* with Texas A&M University Press. Preparation for the book included traveling the border from San Diego to Brownsville, with stops for photography and research in Yuma, Organ Pipe Cactus National Monument, the Animas and Playas valleys in the Bootheel of New Mexico, Big Bend National Park and the Lower Rio Grande Valley. I raised funds to buy 350 copies of the book and walked the halls of Congress to put them in the hands of those making the laws that were dividing the border. As wall construction slowed, I continued to spend time on the border, photographing wildlife and telling stories of transboundary wildlife, as well as giving lectures about the environmental dangers of walls and other barriers. At least once a year between the publishing of my book in 2012 and 2015, I would fly to Tucson and travel to Organ Pipe Cactus National Monument, Coronado National Memorial, the San Bernardino National Wildlife Refuge and other federally protected lands and private conservation areas along the border in order to photograph wildlife, landscapes and changes on the land due to border militarization.  But it had seemed that society was starting to sour on the idea of a border wall, until 2015 during the presidential election.

7.   In November 2017, when the election of President Donald J. Trump set the renewed construction of border wall in motion, I began a digital project with the global mapping company Esri, to provide an interactive story map of the borderlands showing the harm border walls have done and will do to wild species and human communities. That 3-month project, which I did pro-bono, was completed in March 2017, shortly before Congress approved the first funding for border wall under the Trump administration. Later that year, I began a documentary film set in the Rio Grande Valley, where wall construction was expected to begin on critical habitat within the National Wildlife Refuge System. For the past

18 months I have worked on that film full time without pay, with the hope that somehow it could contribute to the halting of border wall construction.

8. In May 2018, I traveled to New Mexico where the Trump Administration had begun construction of wall through wild lands. I was also there in February 2019 when contractors began tearing down protected forests in the Rio Grande Valley to make way for border wall.

9. I have spent much of the past eleven years trying to protect the border from border wall construction through photography, storytelling, outreach, and direct advocacy for the wildlife and human communities along the border. Over that time, my annual adjusted gross income has rarely reached $10,000. I calculate I have spent more than $500,000 in lost wages and expenses in this fight against border wall, but more than the money, my life is tied up in the future of wildlife in this region. As walls have again begun to go up, I have battled depression, anxiety, rage. The harm I experience is personally incalculable, though it doesn't even register on the scale of harm that is being visited on the ecosystems of the borderlands.

10. This harm, both personally and on a greater ecological scale, is ongoing border-wide, every creature that lives in this 2,000-mile region may ultimately have to face the fallout. But taken on a smaller scale, looking just at the bootheel region of New Mexico, there is no ledger that could hold the damages seen and unseen that will be done if the current vehicle barrier in the Playas Valley and the rest of what is known as El Paso 2, is replaced with border wall, or what is called "pedestrian fence". The current vehicle barrier, which was built with Secure Fence Act funding in 2010, presented what I suspect was an insurmountable barrier to the bison, though it was not contiguous throughout their range, so they could go around it. For other animals, (anything smaller than the bison and with the ability to jump or crawl under), the vehicle barrier presented little problem. Pronghorn, foxes, jackrabbits, reptiles, amphibians could go under, deer and perhaps jaguars, wolves and black bear could go over. But a solid wall will block *all* passage, it will cleave a chasm in this ecosystem, blocking wildlife from essential food, water and mates, and at a time when droughts are growing more and more intense.

11. The preponderance of scientific evidence points to a cascade of global biological undoing. A recent report predicted that one million species are facing extinction in the coming century. What is happening here on our border from California to the Rio Grande is a single piece of a much larger catastrophe–much of it caused by habitat destruction and fragmentation exactly like that caused by the border wall.

12. I urge this court to block the use of funds not appropriated by Congress for border wall construction. For a decade I have fought to educate the public about the destruction caused by a border wall, and have pleaded with Congress to stop funding wall. That fight will continue through the processes set forth by our legislative system. But the funding that is being used for these "emergency" walls was not governed by the democratic process. Duly elected members of Congress–the representatives of the people–did not sanction funding for these miles of wall. These projects are a result of a single official circumventing the democratic process for a project that is opposed by the majority of residents of this nation. As

one of those residents, one who has invested more than a decade of life in the protection of borderlands wildlife, the sense of powerlessness at this moment, has me questioning the future of this nation. If one person can push through a project that benefits the few rather than the many, that jeopardizes the very existence of hundreds of species along the border, that is in direct opposition to the will of a duly elected governing body, well then what power do I have as a citizen? Please act to uphold the system that checks the power of those who would most abuse it.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on May 21, 2019, in Mount Rainier, Maryland

Krista Schlyer

## DECLARATION OF ROBIN D. SILVER, M.D.

I, Robin D. Silver, M.D., declare as follows:

1. The facts set forth in this declaration are based on my personal knowledge and if called as a witness, I could and would competently testify thereto under oath.

2. I reside in Flagstaff, Arizona. I am a member, senior staff, and one of the original founders of the Center for Biological Diversity ("the Center"). In my capacity at the Center, I am familiar with all aspects of the Center's activities and organizational interests. I am also a professional photographer and retired emergency room physician.

3. The Center is a tax-exempt, non-profit, membership organization with over 1.6 million members and online activists. The Center has over 25,000 members and supporters who reside in Arizona. The Center has offices in a number of states, including Tucson, Arizona.

4. The Center works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and their habitats throughout the United States and abroad. The Center works to ensure the long-term health and viability of animal and plant communities and to protect the habitat these species need to survive. The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked.

5. As part of its mission, the Center provides oversight of governmental programs, policies, and activities that affect wildlife and endangered species. The Center has been at the forefront of efforts to hold the government accountable for its obligations under the Endangered Species Act ("ESA"), National Environmental Policy Act ("NEPA"), the Clean Water Act ("CWA"), and other laws protecting wildlife and their habitat. The Center regularly engages in protection efforts and campaigns to ensure that our nation's environmental laws are enforced with respect to wildlife and its habitat. The Center has worked to preserve and protect wildlife and endangered species along the U.S.-Mexico border for decades and has long opposed the construction of border walls.

6. Center founders and members have been actively involved in working to protect and preserve the San Pedro River and its ecosystem for more than three decades. I have played a key role in this, helping the Center research, study, observe, publicize, and seek protection for ecosystems, plants and animals in the San Pedro River watershed.

7. I am also a member of, volunteer for, and current Vice President of the Maricopa Audubon Society ("Maricopa Audubon"), where I've served on the Conservation Committee for almost 40 years. My family and I have been members of Maricopa Audubon for more than four decades.

8. Maricopa Audubon is a non-profit organization with over 3,000 members dedicated to the enjoyment of birds and other wildlife and the protection and restoration of habitat in the

Southwest. Maricopa Audubon is run by volunteers and strives to protect and restore habitat through education and community involvement. Maricopa Audubon has worked to protect the San Pedro River since 1977, when it helped stop the construction of the proposed Charleston dam. The dam would have inundated the southern half of the Upper San Pedro River into Mexico.

9. I am a land owner along the San Pedro River. In 1993, I purchased a tract of land straddling the Upper San Pedro River near Sierra Vista. I purchased this property to help save the land from impending development and to save the river. I use this property and the associated ecosystems, plants, and wildlife for observation, photography, and scientific and educational activities. More than 7,000 students tour the property each year to personally learn about and to experience the San Pedro River and its ecosystem.

10. I have aesthetic, recreational, educational, scientific, spiritual, and photographic interests in the San Pedro River, its habitats, and the species that depend on it. I have visited the area near the proposed border wall many times in my capacity as a professional photographer over the past three decades.

11. I specialize in photographing imperiled wildlife and their habitats. I have photographed the imperiled southwestern willow flycatcher, Huachuca water umbel, loach minnow, spikedace, Gila topminnow, razorback sucker, and yellow-billed cuckoo in the San Pedro River corridor near the proposed project area. I have also photographed scores of non-imperiled plants and animals associated with the San Pedro River.

12. I donate photographic images for educational purposes and for the fundraising benefit of those who endeavor to preserve imperiled wildlife and their habitats. I also sell photographic images for profit. My published contributions have appeared in many national, international, and local magazines, newspapers and books. Included among these are: Arizona Daily Star, Arizona Daily Sun, Arizona Game and Fish Department's Wildlife Views, Arizona Highways, Arizona Republic, AriZoo, American Forests, Audubon Magazine, Avvenimenti, Bear Magazine, Buzzworm Magazine, Chicago Tribune, Common Cause Magazine, Cultural Survival Quarterly, Defender Magazine, Der Spiegel, "E" Magazine, High Country News, Panorama Magazine (Italy), Phoenix Gazette, Phoenix Magazine, San Francisco Chronicle, Sierra Magazine, Spin Magazine, Stern Magazine (Germany), Tucson Citizen, and Wild Forest Review.

13. I first photographed the San Pedro River professionally in 1987 as part of my work on a book entitled "Remnant Old Growth Forests of the Southwest." That same year, I became involved in conservation efforts to save the San Pedro River.

14. Over the past thirty years, I have continued to visit the San Pedro, including the area around the proposed border wall for photography, wildlife observation, research, recreation, educational activities, aesthetic enjoyment, and spiritual and psychic renewal. My last visit there was in June 2018. My next visit to this area is scheduled for next month, June 2019.

15. The Center and I have been involved in protecting the San Pedro River, its riparian habitats,

and its dependent species for many years.  I have attended dozens of San Pedro-related hearings and meetings, filed scores of Freedom of Information Act requests and state public records requests, and have written countless letters to learn about and attempt to inform people of the consequences to the San Pedro River if the river is not protected from development and excessive groundwater extraction. I have also submitted hundreds of comments to federal agencies related to groundwater pumping and its effects on threatened and endangered species and habitats and the San Pedro River.

16. The Center has filed numerous Endangered Species Act ("ESA") "listing petitions" seeking to add imperiled species to the endangered species list and to upgrade the protected status of many species from "threatened" to "endangered."  In particular, the Center authored the listing petitions for the Huachuca water umbel and the southwestern willow flycatcher, two species that could be harmed by the proposed border wall project. The Center also engaged in litigation to force compliance by the U.S. Fish and Wildlife Service with the ESA.  These lawsuits resulted in the listing of the Huachuca water umbel and southwestern willow flycatcher and the designation of critical habitat for these species. Both of these species and their habitats will be negatively impacted by the proposed border wall project, especially if any changes to streamflow, flooding, or hydrology occur.

17. As a property owner on the San Pedro River, the proposed extension of the border barrier across the river puts my property and that of my neighbors at extreme risk.  Flow levels of the San Pedro River are highly volatile and floods are frequent.

18. The 2008 flooding that occurred in Organ Pipe Cactus National Monument as a result of border wall construction is a concerning example of what could occur on the San Pedro if the border wall project is allowed to move forward. On July 12, 2008, after only 1-2 inches of rain, a flood blew out the border wall in Organ Pipe Cactus National Monument and caused severe damage to both infrastructure and wildlife habitat.  This blowout occurred despite the fact that the wall was designed with grates across the washes that were supposed to accommodate and mitigate a flood event.

19. The San Pedro River Valley has a consistent history of much larger flood events than have ever occurred at Organ Pipe Cactus National Monument.  The nearest streamflow gage to the border on the San Pedro River is the Palominas gage, where baseflows range from 0.1 cubic feet per second ("CFS") in June to 4.1 CFS in January.[1]

20. According to a Federal Emergency Management Agency Flood Insurance Study, the 100-year peak flow of the San Pedro River just north of the border, is estimated to be 22,300 CFS.[2]  The 500-year peak flow, according to the same study, is 29,500 CFS.  The U.S. Geological Service *StreamStats* database estimates an even higher peak flow with 100-year flood levels 26,400 CFS and the 500-year peak flow at 37,500 CFS.  Because of climate change, the increasing chance of severe flood events has become much more frequent.

---

[1] Bureau of Land Management, 2011. Federal Reserved Water Right Claim, San Pedro Riparian National Conservation Area (SPRNCA).

[2] Federal Emergency Management Agency Flood Insurance Study. 2016. Cochise County and incorporated areas.

21. In an October 4, 2007, Memo, the Bureau of Land Management (BLM) evaluated Department of Homeland Security's (DHS's) prior proposal to build a "pedestrian fence" across the San Pedro River, a similar project to that which is currently proposed.[3] In this report, the BLM raised concerns regarding debris build-up against the barrier during floods. The BLM noted that DHS entirely failed to consider in their modeling debris buildup as a factor, which is almost certain to occur in any flood event. The fact that DHS failed to consider this basic and predictable factor in flood modeling suggests a level of negligence or ignorance in project planning that could seriously harm wildlife and landowners in our area as well.

22. The same BLM memo also states, "The timing and intensity of seasonal flood flows in the San Pedro River are essential for maintaining riparian function as well as recharging the alluvial aquifer. Regardless of the maintenance commitments by Border Patrol, the proposed/existing fence will inadvertently act as a flood control structure altering natural flood characteristics." If DHS proceeds with this border wall proposal, they will be creating a dam-like structure that dramatically increases the flood risk to me and my neighbors' properties, and degrades the natural riparian function of the San Pedro ecosystem. If built, the new wall will undoubtedly collapse, as happened in Organ Pipe Cactus National Monument, and cause a tidal-wave type wall of water to flood the river area. This would be devastating for the ecosystem and landowners.

23. My aesthetic, recreational, educational, scientific, spiritual, and photographic interests in the San Pedro River, its surrounding habitat, and the wildlife and plant species that depend upon it will be adversely affected by the proposed border wall. The health of the San Pedro River and this sensitive and irreplaceable desert ecosystem that I cherish will suffer irreparable harm if the project is not stopped. The proposed border wall will block wildlife migrations, inhibiting the free movement of many species and my ability to enjoy them in an undisturbed state in the wild. Many species, and the ecosystem as a whole, will suffer irreparable harm if this project moves forward. Species that depend on the San Pedro River for their survival, including the western yellow-billed cuckoo, southwestern willow fly-catcher, northern Mexican garter, and Huachuca water umbel, would suffer devastating harm.

24. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed at Flagstaff, Arizona, on May 31, 2019.

Robin D. Silver, M.D.

---

[3] Memo: 2007. BLM Hydrologic Issues and Concerns, Project: Dept. of Homeland Security ("DHS") Pedestrian Fence, Location: San Pedro River Basin, BLM

I, Gabriel Vasquez, declare as follows:

1. The facts set forth in this declaration are based upon my personal knowledge and if called as a witness in this proceeding, I could and would testify competently thereto under oath. As to those matters that reflect an opinion, they reflect my personal and professional opinion on the matter.

2. I have lived in the City of Las Cruces in Doña Ana County, New Mexico for the last seventeen years. I also have resided in this area for most of my life, including in El Paso, Texas and the City of Juarez in Mexico.

3. I am currently serving as a member of the Las Cruces City Council for District 3, and I have served in this position since November 2017.

4. I am a member and supporter of the Center for Biological Diversity.

5. It is my understanding that the Secretary of the Department of Homeland Security ("DHS") has issued contract to build 46 miles of border wall in Doña Ana and Luna counties near Columbus , New Mexico.

6. I live about fifty-five miles from the area where DHS has proposed to construct this border wall. I frequently visit this area, including the city of Columbus New Mexico. I also regularly visit the land near the border for recreational purposes, and hunt dove, quail, and javelina there, and enjoy watching birds of prey, pronghorn, mule deer, and mountain lions. Having hiked, camped, and hunted across the U.S.-Mexico border in New Mexico, I know how important the entirety of the border is for habitat connectivity and wildlife corridors. The wildlife I enjoy seeing and hunting on New Mexico's border depends on the water, food sources, habitat, and mating opportunities on both sides of the border. It is this connectivity between the states of Chihuahua and New Mexico that allows wildlife, both game and non-game species, to thrive on the New Mexico border. An impassable, physical barrier placed along most of the U.S.-Mexico border in Doña Ana, Luna, and Hidalgo counties would have irreparable, detrimental effects to the quality of wildlife that I and many others enjoy as part of my access and enjoyment of federal public lands. Species of game birds Native and unique to this area such as Mearn's quail and Gould's turkey, whose habitat mostly consists of territory in Mexico, may no longer be viable if a wall were built, decimating their genetic diversity. My grandfather Javier Bañuelos, too, hunted, hiked and camped in this same region, harvesting game animals such as Coues deer, mountain lion, quail, and javelina. However, my grandfather hunted in the Animas Valley and the Sierra Madre Occidental in Chihuahua, which provides habitat and connectivity for the same game species I hunt today in Luna and Hidalgo Counties.

7. As a staff member of the New Mexico Wildlife Federation (NMWF), I led numerous expeditions to hunt, hike, and camp throughout the area along the New Mexico-Mexico border where a border wall is likely to be built and continue to do so in my personal capacity.

8. I am also the founder and southern New Mexico coordinator of the Nuestra Tierra Conservation project, a program that offers Hispanic and underserved youth opportunities to explore New Mexico's iconic border-area landscapes through hiking, fishing, camping and hunting, among other outdoor activities.

9. The purpose of the Nuestra Tierra program is to cultivate a passionate group of young people to lead the next generation of conservation work, protecting our state's and our nation's public lands and our most treasured cultural landscapes such as the desert areas along our State's southern border. Building on the existence of multicultural, multinational and multilingual aspects common to Latino and Hispanic communities of our region, participants advocate across cultures, national boundaries and languages for preservation of public landscapes. Further, they engage in educational activities, among them most recently viewing and discussing an Outside Magazine documentary on the ecosystems and livelihoods affected by border wall construction.[1]

10. I am opposed to any construction of a border wall near Columbus New Mexico for many reasons and believe that it would have a negative impact on the City of Las Cruces. Before becoming a city councilman, I even helped draft and provided public testimony on a resolution that the Las Cruces City Council successfully passed, which stated my city's opposition to construction of a border wall.

11. The proposed border wall would have a negative impact on the area's economy, including the economy of the City of Las Cruces. Our city, county and state have spent significant resources and have made policy changes to ambitiously build the binational economy with Mexico over the last 15 years. In fact, the fastest growing export economy in New Mexico is in the Santa Teresa area. A critical component of establishing a successful binational economy is fostering a valuable partnership with Mexico, which has been our best trading partner. Building a wall will likely insult our counterparts in Mexico, which would damage our relationship and threatens to harm the export economy we have worked so hard to establish, and in turn, undermine our efforts to build our economy and create jobs in one of the poorest parts of the country.

12. In addition, a reduction of the numbers and kinds of wildlife that can be anticipated if border wall construction goes forward will also affect our Latino and Hispanic communities and our traditional relationships across cultures, nations and languages—problems now being explored through Nuestra Tierra Conservation Project.

13. If constructed, this border wall would also harm the ecological integrity of the area's Chihuahuan Desert and would have a negative impact on wildlife. There are currently accords between New Mexico, Texas, and Mexico on how to handle issues pertaining to wildlife, including genetic diversity, migratory fowl counts, and Mexican wolf reintroduction, as well as binational wildlife population studies between academic institutions in Mexico and the United States. This harm to the area's ecology and wildlife would in turn have a negative economic impact because the area currently attracts people interested in wildlife viewing, camping, and hunting.

14. It is my understanding that that the Illegal Immigration Reform and Immigrant Responsibility Act requires DHS to consult with parties who may be negatively impacted by the border wall construction. However, as a City Councilman of a municipality that would be harmed by this project I have never been contacted by DHS, U.S. Customs and Border Protection, nor any

---

[1] Outside Magazine March 14, 2019, "The River and the Wall" studied by Nuestra Tierra participants, https://www.outsideonline.com/2392023/the-river-and-the-wall-documentary

federal agency about the proposed border wall. I moreover have not heard of any such contact from the Las Cruces City Manager, the Las Cruces City Attorney, or the Las Cruces Public Information Office. I believe, had DHS properly consulted the County, I would have been made aware of such consultation because of my position. The agency has not allowed the County to give input and advice on the construction.

15. A border wall tends to be a priority because of security concerns that are considered paramount over most other considerations. Focusing on security may cause decision-makers to overlook potential impacts on wildlife, economy and outdoor recreation. However, those of us who live along the border are aware that security can be provided in many ways that do not destroy habitat. We urge the Court to direct security concerns away from policies and projects that could destroy wildlife habitat and ethnic community ties and traditions.

15. Pursuant to 28 U.S.C. § 1746 I declare, under penalty of perjury, that the foregoing is true and correct.

DATED:  May 29, 2019

_____

Gabriel Vasquez

## DECLARATION OF ELIZABETH WALSH

I, Elizabeth Walsh, declare as follows:

1.      My name is Elizabeth J. Walsh. The facts set forth in this declaration are based on my personal knowledge. If called as a witness, I could and would testify competently to these facts. Any opinions contained in this declaration reflect my personal opinion and judgment. I am making this statement as a personal choice and providing it in my capacity as a citizen and not as a representative of my employer.

2.      I reside in El Paso, Texas near Sunland Park, New Mexico that is near the United States-Mexico border.

3.      I am an active member of the Animal Legal Defense Fund and have been a member since at least 2012. I have been an animal and environmental advocate for as long as I can remember, and I appreciate that the Animal Legal Defense Fund shares my interest in protecting animals—including wildlife—through the legal system. As an Animal Legal Defense Fund member, I rely in part upon the Animal Legal Defense Fund to represent those interests on my behalf.

4.      I am familiar with the litigation filed by the Animal Legal Defense Fund and other organizations that challenges President Trump's February 15, 2019 "Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States" (the "emergency proclamation"). I'm also aware that pursuant to that emergency proclamation there are at least 10 specific projects that are being funded to build border walls or barriers in various segments in New Mexico, Arizona, and California (the "emergency proclamation project areas"). I am also familiar with the adverse impacts such construction projects will have on wildlife, having seen first-hand wild species struggling and being adversely impacted by other stretches of border

- 1 -

wall, including watching a small bird try to fly over the existing border fence at Rio Bosque
Wetlands Park, El Paso, TX during a windy day.

5.      My professional career is dedicated to environmental issues, including those
impacting wildlife. I am the Director of the Ecology and Evolutionary Biology Program and a
Professor of Biological Sciences at the University of Texas El Paso ("UTEP"). I have been a
professor at UTEP since 1994 when I moved to the area after completing my Ph.D. in
Environmental Biology at the University of Nevada, Las Vegas and two post-doctoral research
appointments.

6.      My work and advocacy on behalf of wildlife in the border region goes back more
than a decade. I was active in advocating for environmental and wildlife interests during the prior
environmental waivers issued by Secretary Chertoff under the George W. Bush administration in
the 2000s. This includes activities through my membership in the Sierra Club where I am a member
of the national Sierra Club Wildlife & Endangered Species Activist Team, the volunteer co-leader
of the national Our Wild America campaign, the Executive Committee of the El Paso Regional
Sierra Club Group, as well as working with the Borderlands Activist team. I have been involved
in various advocacy and academic discussions, protests, and meetings regarding the border region,
including being a lead presenter about the Border Wall and Wildlife at the Universidad Autonoma
de Ciudad Juarez in Oct 2008 and at an El Paso Group of the Sierra Club presentation in Sept
2008.

7.      For more than 14 years I have also co-hosted the Animal Concerns of Texas radio
show on KTEP-El Paso, the El Paso National Public Radio affiliate. The show focused on animal
interests and issues, including environmental concerns and the impact on wildlife. I have
frequently featured the impacts of the border wall on news segments of the show.

- 2 -

8.      As part of my professional and academic work I routinely visit and study the border area. This includes taking a class of approximately 100 students to the Rio Grande river area each semester to conduct water sampling studies. I also work with the Texas Clean Rivers Program of the International Boundary and Water Commission and I frequently engage in sampling and testing of the Rio Grande along the US/Mexico border.

9.      My professional and academic work in the border area broadly encompasses a number of the emergency proclamation project areas in New Mexico and Arizona.

10.     For example, part of my professional research program involves sampling at many sites in the border region, including those within the emergency proclamation project areas. I have engaged in sampling or have sampling permits at locations in and around:

- The Buenos Aires National Wildlife Refuge in Arizona (Tucson Projects 4 & 5).

- Organ Pipe Cactus National Monument and Cabeza Prieta National Wildlife Refuge in Arizona (Yuma Project 3, Tucson Projects 1 & 2).

- The regions surrounding Coronado National Forest and Monument, south of Tucson, Arizona (Tucson Projects 3, 4, & 5).

- The regions surrounding Columbus, New Mexico, including border regions south of New Mexico Highway 9 (El Paso Project 1).

- Lordsburg playas and Antelope Wells regions in New Mexico (El Paso Project 2)

- The Animas Mountains region in New Mexico (El Paso Project 2)

11.     The result of my work in these areas and other border regions has been the subject of academic publications, including some of those cited below.

12.     More broadly, much of my work involves the study of species and micro-organisms that live in the border regions, including the emergency proclamation project areas. A small sampling of my published work regarding these species includes the following papers:

- 3 -

- Kordbacheh, Azar ; Shapiro, Ashanti ; Walsh, Elizabeth J  -  (2019). "*Reproductive isolation, morphological, and ecological differentiation among cryptic species of Euchlanis dilatata, with the description of four new species*." Hydrobiologia https://doi.org/10.1007/s10750-019-3892-0.

- Rios Arana, Judith V ; Agüero Reyes, Luz del Carmen ; Wallace, Robert L ; Walsh, Elizabeth J  -  (2019). "*Limnological Characteristics and Rotifer Community Composition of Northern Mexico Chihuahuan Desert Springs*." Journal of Arid Environments. Volume 160. Page(s) 32-41.

- Brown, Patrick ; Walsh, Elizabeth J  -  (2019). "*Genome size and lifestyle in gnesiotrochan rotifers*." Hydrobiologia, https://doi.org/ 10.1007/s10750-018-3873-8.

- Rico Martinez, Roberto ; Walsh, Elizabeth J  -  (2013). "*Sexual Reproductive Biology of a Colonial Rotifer* Sinantherina socialis *(Rotifera: Monogononta).*" Marine and Freshwater Behaviour and Physiology. Volume 46. Issue 6. Page(s) 419-430.

- Suarez- Morales,  Eduardo ; Walsh, Elizabeth J  -  (2009). "*Two new species of Eucyclops Claus (Copepoda Cyclopoida) from the Chihuahuan Desert with a redescriptionof E. pseudoensifer Dussart*." Zootaxa. Volume 2206. Page(s) 1-22.

- Schroder, Thomas ; Wallace, Robert L. ; Walsh, Elizabeth J  -  (2009). "*Cryptic speciation in Chihuahuan Desert zooplankton? I.* Lecane bulla *( Monogononta: Rotifera)*." Verh. Internat Verein. Limnol. . Volume 30. Page(s) 1046-1050.

- Wallace, , Robert L., ; Schröder, Thomas ; Rico-Martínez, Roberto ; Ríos-Arana, Judith V. ; Walsh, Elizabeth J  -  (2008). "*Species composition and distribution of rotifers in Chihuahuan Desert waters of Mexico: is everything everywhere?*" Verh. Internat. Verein. Limnol . Volume 30. Page(s) 73-76.

- Walsh, Elizabeth J., Schröder, Thomas, Wallace, Robert L.,  Ríos Arana, Judith V.;Rico-Martínez, Robert -  (2008). "*Rotifers from selected inland saline waters in the Chihuahuan Desert of México*." Saline Systems 4: 7.

- Walsh, Elizabeth J., Schröder, Thomas, Arroyo, Maria Luisa, Wallace, Robert  L. – (2007). "*How well do single samples reflect rotifer species diversity? A test based on interannual variation of rotifer communities in Big Bend National Park (Texas, USA).*" Hydrobiologia (2007) 593:39–47.

- Wallace, Robert L. ; Arroyo, Maria Luisa ; Starkweather , Peter L.; Walsh, Elizabeth J  -  (2005). "*Life on the edge: rotifers from springs and ephemeral waters in the Chihuahuan Desert, Big Bend National Park (Texas, U.S.A.)*." Hydrobiologia 546: 147- 157.

13.     The proposed construction projects will irreparably harm my future academic

work and studies in this area by impacting on the species within the emergency proclamation

project areas and more generally the cascading impacts those projects will cause to the ecosystems and wildlife in the border region.

14.     My work also extends to additional border regions that—although not currently the subject of any emergency proclamation project areas—likely will be absent an order from this Court that enjoins future work. This includes the sampling in the Big Bend National Park in Texas, the Rio Grande National Wildlife Refuge, and many other ecological important and sensitive regions in the border areas.

15.     In addition to my substantial occupational and academic interest and connection to the border region, I also frequently visit the border area—including specifically the emergency proclamation project areas in New Mexico—for recreational and non-professional purposes, primarily bird watching and hiking. This includes observing a wide range of species that call the border area their home, including scaled quail, Southwestern willow flycatcher, and other species. I visit the border region routinely as part of my bird watching activities and have done so since I moved to El Paso in the early 1990s.

16.     As noted above, I have personally observed the adverse impacts caused to wildlife by border wall projects. I am also aware of scientific studies and other information demonstrating such adverse impacts, as well as the cascading negative ramifications to areas adjacent to barriers. These areas tend to have high levels of human disturbance, including roads, lighting, and removal of vegetation, which further expand negative impacts of barriers on wildlife populations. Thus, the adverse impact of the proposed emergency proclamation project areas will not just adversely impact my personal interests and ability to enjoy the wildlife in the emergency proclamation project areas, but also my interest in enjoying and recreating in a large geographic zone in the

- 5 -

border area that I also routinely visit and intend to continue to visit in the future, including for scientific research as well as for wildlife watching and hiking.

17.     I am also aware that barriers to wildlife movement exacerbate the current extinction threats posed by human-altered landscapes and human activities. Scientists warn that animals whose ranges will be halved by the border wall will be impeded in their ability to reproduce with other members of their species, thereby creating a shallower gene pool and heightening the chance of inbreeding.

18.     I am personally offended and object to the federal government's plans to engage in construction in the emergency proclamation project areas without engaging in a thorough review of the impacts such construction would have on the local environment and on vulnerable species that live here. I am afraid the environmental devastation and loss of biodiversity will negatively impact my aesthetic enjoyment of borderlands wildlife. I am especially concerned about what will happen when so many species' habitats are fully and permanently bisected by an impermeable wall. The likely result—ecological devastation and likely regional extirpation of species—has made me worried and upset. This concern will be magnified if the wall extension proceeds as currently planned. The legal proceedings concerning only the specific emergency proclamation project areas also fails to fully consider the cumulative impacts that the construction of hundreds of miles of border wall will have on wildlife.  My professional, aesthetic, and recreational interest in observing all wildlife as well as threatened and endangered species is also severely at risk.

19.     Moreover, that various agencies and officials within the government are facilitating construction of these emergency proclamation project areas without compliance with federal laws, they are also violating my procedural rights and causing me procedural harm. As a U.S. citizen, I

have a statutory right to participate in these decision-making processes, but that right is being denied to me.

20.     If the projects within the emergency proclamation project areas are completed, I will be injured professionally, aesthetically, recreationally, morally, and procedurally, as set forth in the previous paragraphs of this declaration. The only way to redress these injuries is to invalidate the emergency proclamation and related funding processes and to enjoin construction within the emergency proclamation project areas.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 30, 2019

Elizabeth J. Walsh, Ph.D.