# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY;
DEFENDERS OF WILDLIFE; ANIMAL LEGAL
DEFENSE FUND,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America; PATRICK
M. SHANAHAN, in his official capacity as Acting
Secretary of Defense; LIEUTENANT GENERAL
TODD T. SEMONITE, in his official capacity as
Commander and Chief of Engineers, U.S. Army
Corps of Engineers; KEVIN McALEENAN, in his
official capacity as Acting Homeland Security
Secretary; DAVID BERNHARDT, in his official
capacity as Secretary of the Interior,

Defendants.

Civil Action No. 1:19-cv-00408 (TNM)

## REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.   Plaintiffs' Challenge to the President's Declaration of a National Emergency
(Count One) Should Be Dismissed. ....................................................................... 2

     A.   The Text, Structure, and History of the NEA Evidence Congress's Intent
to Preclude Judicial Review. ...................................................................... 2

     B.   The President's National Emergency Declaration Presents a
Nonjusticiable Political Question and Plaintiffs' NEA Claim Lacks Merit. .......... 5

     C.   The President Should Be Dismissed as a Party to this Lawsuit. ............................ 8

II.   Plaintiffs' Challenges to the Use of § 8005 of the DoD Act (Counts Four and
Five) Should Be Dismissed. ................................................................................ 10

     A.   Plaintiffs Lack Standing to Challenge DoD's Use of § 8005 Authority.............. 10

     B.   Plaintiffs' § 8005 Claims Fail the Zone-of-Interests Test. ................................. 12

     C.   Plaintiffs Fail to State a Claim Under § 8005. .................................................. 15

III.   Plaintiffs' Challenges to the Use of 10 U.S.C. § 2808 (Counts Two and Three)
Fail at the Threshold of APA Review and Do Not State a Claim.................................. 17

     A.   No "Final Agency Action" Exists With Respect to § 2808. ................................ 18

     B.   Plaintiffs Fail To State A Claim Under § 2808.................................................. 18

     C.   The President's Invocation of § 2808 Is Not Actionable..................................... 21

IV.   Plaintiffs Have Not Alleged Any Violation of the Consolidated Appropriations
Act (Counts Two, Three, Four, and Five). ......................................................... 22

V.   The Court Lacks Jurisdiction To Hear Plaintiffs' NEPA Claim (Count Six)
Because NEPA Has Been Waived. ...................................................................... 23

VI.   Plaintiffs' Constitutional Claims (Counts Seven and Eight) Must Be Dismissed. .......... 25

CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ...................................................................................... 3

*Alaska v. Kerry*,
  972 F. Supp. 2d 1111 (D. Alaska 2013) ....................................................... 8

*Ali Jaber v. United States*,
  155 F. Supp. 3d 70 (D.D.C. 2016) ................................................................ 8

*AFL-CIO v. Kahn*,
  618 F.2d 784 (D.C. Cir. 1979) ...................................................................... 4

*\*Armstrong v. Bush*,
  924 F.2d 282 (D.C. Cir. 1991) ............................................................... 3, 4, 5

*Armstrong v. Exceptional Child Ctr., Inc.*,
  135 S. Ct. 1378 (2015) ................................................................................. 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................... 21

*Baker v. Carr*,
  369 U.S. 186 (1962) ....................................................................................... 6

*Bengzon v. Sec'y of Justice of the Philippine Islands*,
  299 U.S. 410 (1937) ..................................................................................... 17

*Bennett v. Spear*,
  520 U.S. 154 (1997) ......................................................................... 11, 13, 18

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) .................................................................................. 3, 5

*Building & Const. Trades Dept., AFL-CIO v. Martin*,
  961 F.2d 269 (D.C. Cir. 1992) .................................................................... 23

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ....................................................................................... 8

*Clarke v. Secs. Indus. Ass'n*,
  479 U.S. 388 (1987) ............................................................................... 13, 14

*Clinton v. City of New York*,
    524 U.S. 417 (1998) .................................................................................. 17

*Cmty. Nutrition Inst. v. Block*,
    698 F.2d 1239 (D.C. Cir. 1983) ............................................................... 13

*Comm. on Judiciary of U.S. House of Representatives v. Miers*,
    542 F.3d 909 (D.C. Cir. 2008) ................................................................... 9

*Connecticut v. U.S. Dep't of the Interior*,
    344 F. Supp. 3d 279 (D.D.C. 2018) .......................................................... 18

*\*Dalton v. Specter*,
    511 U.S. 462 (1994) ............................................................................ 2, 25

*Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.*,
    215 F.3d 37 (D.C. Cir. 2000) ................................................................... 19

*Doe 2 v. Trump*,
    319 F. Supp. 3d 539 (D.D.C. 2018) ........................................................... 9

*Donovan v. Carolina Stalite Co.*,
    734 F.2d 1547 (D.C. Cir. 1984) ............................................................... 23

*Dunlop v. Bachowski*,
    421 U.S. 560 (1975) .................................................................................. 3

*El-Shifa Pharm. Indus. Co. v. United States*,
    607 F.3d 836 (D.C. Cir. 2010) ................................................................... 8

*FCC v. Nextwave Personal Commc'ns Inc.*,
    537 U.S. 293 (2003) ................................................................................ 21

*\*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ........................................................................ 3, 9, 10

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) ................................................................................ 13

*Haitian Refugee Ctr. v. Gracey*,
    809 F.2d 794 (D.C. Cir. 1987) ................................................................. 15

*Hawaii v. Trump*,
    859 F.3d 741 (9th Cir. 2017) ................................................................... 10

*Heckler v. Chaney*,
  470 U.S. 821 (1985) .................................................................................................. 19

*Int'l Refugee Assistance Project v. Trump*,
  857 F.3d 554 (4th Cir. 2017) ................................................................................... 10

*J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
  534 U.S. 124 (2001) .................................................................................................. 21

*Jubelirer v. Rendell*,
  598 Pa. 16 (2008) ...................................................................................................... 17

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*,
  104 F.3d 1349 (D.C. Cir. 1997) ............................................................................... 19

*\*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ...................................................................................... 13, 14, 18

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) .................................................................................................. 12

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) .................................................................................................. 14

*Miccosukee Tribe of Indians of Fla. v. United States*,
  2009 WL 10668917 (S.D. Fla. Sept. 30, 2009) ....................................................... 15

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
  453 U.S. 1 (1981) ........................................................................................................ 5

*Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel*,
  792 F.2d 1172 (D.C. Cir. 1986) .......................................................................... 12, 22

*\*Mississippi v. Johnson*,
  71 U.S. (4 Wall) 475 (1866) ....................................................................................... 9

*Mitchell v. Harmony*,
  54 U.S. 115 (1851) ...................................................................................................... 6

*Mobarez v. Kerry*,
  187 F. Supp. 3d 85 (D.D.C. 2016) ............................................................................. 8

*Nat'l Ass'n of Gov't Emps., Inc. v. Fed. Labor Relations Auth.*,
  179 F.3d 946 (D.C. Cir. 1999) ................................................................................. 22

*Newdow v. Bush*,
   355 F. Supp. 2d 265 (D.D.C. 2005) ....................................................................... 9

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ..................................................................... 9, 10

*NFFE v. United States*,
   905 F.2d 400 (D.C. Cir. 1990) ............................................................................ 19

*Nyunt v. Chairman, Broad. Bd. of, Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ............................................................................ 21

*OPM v. Richmond*,
   496 U.S. 414 (1990) ............................................................................................. 15

*Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n*,
   324 F.3d 726 (D.C. Cir. 2003) ............................................................................ 18

*Samuels v. Mackell*,
   401 U.S. 66 (1971) ................................................................................................. 9

*Sanchez-Espinoza v. Reagan*,
   770 F.2d 202 (D.C. Cir. 1985) .............................................................................. 9

*Sierra Club v. EPA*,
   292 F.3d 895 (D.C. Cir. 2002) ............................................................................ 12

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) ....................................................................... 9, 10

*Teton Historic Aviation Found. v. U.S. Dep't of Defense*,
   785 F.3d 719 (D.C. Cir. 2015) ............................................................................ 11

*Thompson v. N. Am. Stainless, LP*,
   562 U.S. 170 (2011) ............................................................................................. 13

*Touche Ross & Co. v. Redington*,
   442 U.S. 560 (1979) ............................................................................................... 4

*Trudeau v. FTC*,
   456 F.3d 178 (D.C. Cir. 2006) ............................................................................ 21

*United States v. Amirnazmi*,
   645 F.3d 564 (3d Cir. 2011) .................................................................................. 8

*United States v. Brignoni-Ponce*,
  422 U.S. 873 (1975) ........................................................................ 7

*Woytowicz v. George Washington Univ.*,
  327 F. Supp. 3d 105 (D.D.C. 2018) ................................................. 11

**STATUTES**

10 U.S.C. § 284 ............................................................................ *passim*

10 U.S.C. § 2801 .................................................................................. 20

10 U.S.C. § 2808 .......................................................................... *passim*

50 U.S.C. § 1622 ................................................................................... 5

50 U.S.C. § 1631 ................................................................................... 6

50 U.S.C. § 1641 ................................................................................... 6

50 U.S.C. §§ 1701–02 ........................................................................... 8

Trading with the Enemy Act,
  Pub. L. No. 65–91, § 5, 40 Stat. 411 (1917) ..................................... 8

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
  Pub. L. No. 104-208, div. C, § 102, 110 Stat. 3009 (1996) ........... 23, 24

Department of Homeland Security Appropriations Act, 2007,
  Pub. L. No. 109-295, 120 Stat. 1355 (2006) ................................... 24

Consolidated Appropriations Act, 2008,
  Pub. L. No. 110-161, § 564(b), 121 Stat. 1844 (2007) ..................... 24

Consolidated Appropriations Act, 2018,
  Pub. L. No. 115-141, § 230, 132 Stat. 348 (2018) ........................... 24

Department of Defense Appropriations Act, 2019,
  Pub. L. No. 115-245, 132 Stat. 2981 (2018) ............................. *passim*

Consolidated Appropriations Act, 2019,
  Pub. L. No. 116-6, 132 Stat. 2981 (2019) ................................ *passim*

H.R. 2500, 116th Cong. (June 10, 2019),
  https://docs.house.gov/meetings/AS/AS00/20190612/109540/BILLS-116HR2500ih.pdf ...... 14

## ADMINISTRATIVE AND EXECUTIVE MATERIALS

Exec. Order No. 12735,
   55 Fed. Reg. 48587 (Nov. 16, 1990) .......................................................................... 7

Exec. Order No. 12978,
   60 Fed. Reg. 54579 (Oct. 21, 1995) ........................................................................... 7

## OTHER AUTHORITIES

Cong. Research Serv., Military Construction: Process and Outcomes (Dec. 16, 2016),
   https://apps.dtic.mil/dtic/tr/fulltext/u2/1024167.pdf ................................................... 7

## INTRODUCTION

Defendants demonstrated in their motion to dismiss that Plaintiffs' Amended Complaint should be dismissed for lack of jurisdiction and for failure to state a claim.  *See generally* Defs.' Mot. (ECF No. 22).  Plaintiffs offer no meaningful response, instead knocking down straw men, responding to arguments Defendants did not make, and effectively conceding that many of their claims are subject to dismissal.  *See generally* Opp. (ECF No. 31).  In light of Plaintiffs' concessions, and in the face of significant jurisdictional and pleading deficiencies, Plaintiffs' Amended Complaint should be dismissed.

Foremost, Plaintiffs' National Emergencies Act (NEA) claim is nonjusticiable.  They point to no authority suggesting that Congress intended private litigants to enforce the statute, nor do they dispute that every court to have considered challenges to national emergency declarations has held them to be nonjusticiable political questions.  Neither can Plaintiffs show that the extraordinary step of issuing declaratory relief against the President is warranted here, particularly when complete relief could be provided by agency defendants.

Plaintiffs' statutory challenges fail for numerous reasons.  Significantly, Plaintiffs do not meaningfully contest that they fall outside the zone of interests of § 8005 of the Department of Defense (DoD) Appropriations Act 2019, Pub. L. No. 115-245, 132 Stat. 2981 (2018) (DoD Act), which governs internal transfers within DoD.  And they effectively concede that DoD has taken no final agency action with respect to 10 U.S.C. § 2808 and that any eventual decision by the Acting Secretary of Defense to undertake or authorize border construction pursuant to § 2808 might, in fact, comply with the statutory terms.  Plaintiffs also cannot reconcile the plain text of § 230(a) of the Consolidated Appropriations Act 2019, Pub. L. No. 116-6, 132 Stat. 2981 (2019) (CAA)—which imposes limitations on the use of funds appropriated to the Department of Homeland Security (DHS) for border construction—with their claim that DoD is prohibited from

engaging in border barrier construction authorized by other statutory authorities. Further, Plaintiffs cannot escape the fact that the Court lacks jurisdiction to consider their National Environmental Protection Act (NEPA) claims because that law has been waived.

Finally, because Plaintiffs concede that their constitutional claims "share the same underlying factual basis" as their statutory claims, Opp. 54, they cannot dispute that those allegations contravene the principle that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462 (1994).

For these reasons, as explained more fully below and in Defendants' motion to dismiss, Plaintiffs' Amended Complaint should be dismissed.

## ARGUMENT

I. <u>Plaintiffs' Challenge to the President's Declaration of a National Emergency (Count One) Should Be Dismissed.</u>

The Court lacks subject matter jurisdiction over Plaintiffs' claim alleging that the President violated the NEA. Plaintiffs' NEA claim fails because the NEA impliedly precludes judicial review and challenges to Presidential declarations of a national emergency raise nonjusticiable political questions. Additionally, the President must be dismissed as a party because there is no cause of action against the President, and Plaintiffs cannot obtain injunctive or declaratory relief against the President.

A. <u>The Text, Structure, and History of the NEA Evidence Congress's Intent to Preclude Judicial Review.</u>

The NEA's text, structure, and legislative history decidedly point in favor of the conclusion that Congress has impliedly precluded judicial review of Presidential national emergency declarations. *See* Defs.' Mot. 23–26. Plaintiffs' contrary arguments lack merit.

As a threshold matter, Plaintiffs incorrectly contend that Defendants have a "heavy burden" and must present "clear and convincing evidence" that Congress intended to preclude review of

the President's national emergency declaration. *See* Opp. 26. The cases Plaintiffs cite address the standard for judicial review of agency action under the Administrative Procedure Act (APA). *See Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975) (review of "final agency action"); *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967) (APA review of agency rulemaking). But Presidential action is not subject to APA review. *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) (plurality opinion). "Out of respect for the separation of powers and the unique constitutional position of the President," the official actions of the President are not subject to the typical presumptions favoring judicial review of federal agency action. *See id.* Thus, whether the NEA impliedly precludes judicial review turns on the statute's "express language" as well as the "structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)). Unlike the cases cited by Plaintiffs, *Armstrong* involved a challenge to the President's compliance with a statute that the Court of Appeals concluded "does impliedly preclude judicial review." *Id.* That same analysis applies here and warrants the same conclusion with respect to the NEA. *See Block*, 467 U.S. at 349, 351 (recognizing implied preclusion where it is "fairly discernible in the statutory scheme" even absent "clear and convincing evidence").

With respect to the text of the NEA, Plaintiffs contend that the lack of a definition for the term "national emergency" does not preclude judicial review because courts routinely interpret undefined terms in statutes. *See* Opp. 28–29. But this argument ignores the unique context of the NEA and Congress's intentional decision to leave to the President the determination about when and under what circumstances to declare a national emergency. *See* Defs.' Mot. 12–17. There is nothing in the text, structure, or history of the NEA to suggest that Congress intended the judiciary

to place limits (that Congress was unwilling to impose) on when the President may declare a national emergency.  Further, there is no basis for this Court to overrule Congress's considered decision, based upon a multi-year study of the President's emergency powers, and impose Plaintiffs' suggested restriction on the President's authority based on the dictionary definition of the term "emergency."  *See* Opp. 30.  Accordingly, Plaintiffs' reliance on a case where the Court of Appeals interpreted "open-ended" statutory terms relating to Presidential authority is beside the point.  *See AFL-CIO v. Kahn,* 618 F.2d 784, 788 (D.C. Cir. 1979) (en banc).  Indeed, Plaintiffs identify nothing in the text or history of the statute at issue in that case—the Federal Property and Administrative Services Act—remotely analogous to the NEA or the President's national emergency declaration at issue here.  *See id.* at 785.

Plaintiffs assert that the "legislative history also provides no indication, express or implied, that Congress intended to foreclose judicial review of NEA actions."  *See* Opp. 28.  But the absence of legislative history that Congress intended to prevent judicial review of national emergency decisions is not a basis to infer that such a remedy exists.  *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 571 (1979) ("[I]mplying a private right of action on the basis of congressional silence is a hazardous enterprise, at best . . . .").  Moreover, Plaintiffs cite no evidence in the extensive legislative history leading to the passage of the NEA that would suggest Congress intended for private parties to sue the President over the circumstances in which he can declare a national emergency.  *See Armstrong*, 924 F.2d at 290.  Nor could they, as the legislative history supports the position that Congress would be the sole branch of Government to check the President's use of national emergency authority, not private lawsuits.  *See* Defs.' Mot. 24–26.

The structural provisions of the NEA also support implied preclusion of judicial review because the NEA does not contain a private right of action or any other structural mechanism that

would suggest courts could review national emergency declarations.  The NEA's remedial scheme grants Congress the exclusive ability to challenge the President's national emergency determination through the legislative process.  *See* 50 U.S.C. § 1622.  The Court should "not second-guess that decision" or "upset Congress' carefully crafted" oversight scheme by "[a]llowing judicial review of the President's [national emergency declarations] at the behest of private litigants."  *Armstrong*, 924 F.2d at 291.  Plaintiffs contend that the structural mechanisms Congress created for its review of national emergency declarations have "no relevance to the role of judicial review."  *See* Opp. 31.  But that is not the law, as the "structure of the statutory scheme" must be considered in the Court's analysis.  *See Armstrong*, 924 F.2d at 290; *Block*, 467 U.S. at 345.  Indeed, in cases where the Supreme Court declined to imply judicial remedies, it emphasized the importance of the statutory enforcement scheme that Congress had enacted.  *See Block*, 467 U.S. at 347; *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 18 (1981).  Where, as here, Congress has made an express legislative judgment in favor of political and legislative remedies, the Court should not imply a new judicial remedy that would raise both separation-of-powers concerns and conflict with the structure of the NEA.  *See* Defs.' Mot. 26.

In sum, the NEA's text, structure, and legislative history support dismissal of Count One on implied preclusion grounds.  *See Armstrong*, 924 F.2d at 289–91; *Block*, 467 U.S. at 349 (citing *Morris v. Gressette*, 432 U.S. 491, 499 (1977)).

**B.      The President's National Emergency Declaration Presents a Nonjusticiable Political Question and Plaintiffs' NEA Claim Lacks Merit.**

Courts that have considered the issue have uniformly concluded that a Presidential declaration of a national emergency is a nonjusticiable political question.  *See* Defs.' Mot. 26–27 & n.6.  Plaintiffs do not address this extensive authority in their opposition brief.  *See* Opp. 32–35.  Indeed, Plaintiffs now concede that their "NEA claim does not ask this Court to second guess

whether the conditions at the southern border are truly an 'emergency' or not." *Id.* at 34; *see also id.* ("Plaintiffs do not ask this Court to weigh the wisdom of the President's Proclamation[.]"). Neither do Plaintiffs contend that the President has violated any of the notification or reporting requirements of the NEA. *See* 50 U.S.C. §§ 1631, 1641. For these reasons, Plaintiffs have no basis on which to assert a violation of the NEA. Nor could they challenge the President's determination that a national emergency exists at the southern border, as there are no judicially manageable standards for the judiciary to review whether or when to declare a national emergency. Further, the Court could not review the President's decision to declare a national emergency without second guessing various policy determinations about immigration enforcement, border security, and public safety that are hallmarks of a political question. *See Baker v. Carr*, 369 U.S. 186, 217 (1962). Such judgments are left to the political branches of government, not the judiciary. *See id.*; *see also* Defs.' Mot. 28–31.

Because the political question doctrine forecloses review of the President's proclamation, Plaintiffs have recast their NEA claim and ask this Court to impose restrictions on the President's authority to declare a national emergency that are both unprecedented and lack any legal basis. Plaintiffs now argue that "the President has violated the NEA by abusing its authorities to circumvent congressional appropriations enactments" and by "delaying the declaration of the initial emergency Proclamation as well as the subsequent emergency action." *See* Opp. 34. These arguments are meritless, and Plaintiffs provide no support for the proposition that courts can graft new limitations on the President's ability to declare a national emergency without statutory basis.[1]

With respect to Plaintiffs' appropriations argument, the President's national emergency

---

[1] Plaintiffs' only support for their position is a citation to a case from 1851 involving the seizure of property in the context of the Mexican-American War. That opinion has no application to the issues in this case. *See* Opp. 34 (quoting *Mitchell v. Harmony*, 54 U.S. 115 (1851)).

declaration standing alone does not provide any authority to spend money or appropriate funds. Rather, the President's proclamation invoked 10 U.S.C. § 2808 and made that construction authority available to the Secretary of Defense.  *See* Proclamation.  The entire point of § 2808 is to provide DoD with the flexibility to use funds for military construction projects during a national emergency outside of the normal, time-consuming appropriations process.  *See* Defs.' Mot. 19–20; *see also* Cong. Research Serv., Military Construction: Process and Outcomes (Dec. 16, 2016), https://apps.dtic.mil/dtic/tr/fulltext/u2/1024167.pdf.  Accordingly, there is no basis for the Court to conclude that the President has violated the NEA or abused his authority to declare a national emergency when he invoked § 2808 for the very purpose that Congress intended.  *See* Defs.' Mot. 20 (explaining DoD's prior use of § 2808).

Nor is there any basis for the Court to conclude that the President violated the NEA because he waited too long to declare a national emergency.  *See* Opp. 34.  Plaintiffs offer no support for their position that the Court can create a restriction on the time period within which the President may declare a national emergency, and there would be no judicially manageable standards for doing so.  Presidents have historically declared national emergencies to address longstanding problems, such as when President George H.W. Bush declared a national emergency to address the "proliferation of chemical and biological weapons," *see* Exec. Order No. 12735, 55 Fed. Reg. 48587 (Nov. 16, 1990), or when President Clinton declared a national emergency arising from narcotics trafficking, Exec. Order No. 12978, 60 Fed. Reg. 54579 (Oct. 21, 1995).  Consequently, neither the NEA nor historical practice supports a conclusion that the President may not declare a national emergency simply because immigration enforcement and border security have been long-standing policy challenges.  *See United States v. Brignoni-Ponce,* 422 U.S. 873, 878 (1975).

Plaintiffs also contend that the political question doctrine is inapplicable because they are

alleging statutory violations of the NEA and § 2808. *See* Opp. 33–35. But the cases in which courts have concluded that national emergency declarations are nonjusticiable political questions arose in the context of alleged statutory violations. As Plaintiffs recognize, *see id.* at 30, these cases arose within the context of challenges to the President's statutory authority under the Trading with the Enemy Act (TWEA), Pub. L. No. 65–91, § 5, 40 Stat. 411, 415 (1917), which granted the President authority to regulate international trade during a declared national emergency, and the International Emergency Economic Powers Act (IEEPA), which empowers the President to deploy economic sanctions and other measures upon the declaration of a national emergency, 50 U.S.C. §§ 1701–02. *See United States v. Amirnazmi*, 645 F.3d 564, 572 (3d Cir. 2011); *see also* Defs.' Mot. 26–27 & n.6. Accordingly, the President's determination that a national emergency exists along the southern border does not become justiciable simply because the NEA and § 2808, like TWEA and IEEPA, are premised on a national emergency declaration.

As the Court of Appeals has recognized, even "a statute providing for judicial review does not override Article III's requirement that federal courts refrain from deciding political questions." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 843 (D.C. Cir. 2010) (en banc). Thus, statutory challenges to Executive conduct can present nonjusticiable political questions, as here. *See Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948); *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 90–97 (D.D.C. 2016); *Ali Jaber v. United States*, 155 F. Supp. 3d 70, 80 (D.D.C. 2016), *aff'd sub nom Jaber v. United States* 861 F.3d 241 (D.C. Cir. 2017); *Alaska v. Kerry*, 972 F. Supp. 2d 1111, 1127–231 (D. Alaska 2013).

## C.   <u>The President Should Be Dismissed as a Party to this Lawsuit.</u>

Plaintiffs also contend that the President should remain a party to this action, *see* Opp. 35–37, notwithstanding lack of a cause of action to sue the President and the Supreme Court's recognition over 150 years ago that federal courts have "no jurisdiction of a bill to enjoin the

President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall) 475, 501 (1866); *see also Franklin*, 505 U.S. at 802 (entry of injunctive relief against President was "extraordinary" and "should have raised judicial eyebrows").   In accordance with this well-established authority, courts of this Circuit have declined to impose declaratory or injunctive relief against the President for his official conduct.  *See, e.g.*, *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010); *Swan v. Clinton*, 100 F.3d 973, 976–78 (D.C. Cir. 1996); *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018); *Newdow v. Bush*, 355 F. Supp. 2d 265, 280 (D.D.C. 2005).

Plaintiffs' opposition notably does not request that the Court enjoin the actions of the President.  *See* Opp. 35–37.   Instead, Plaintiffs assert that relief "can be provided through a declaratory order that the Proclamation is unlawful, accompanied by injunctive relief prohibiting agency implementation." *Id.* at 35.   But the same separation-of-powers considerations that prohibit an injunction against the President also prohibit declaratory relief against him.  With respect to Executive Branch officials, a "declaratory judgment is the functional equivalent of an injunction," *Comm. on the Judiciary of the U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (citing *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985)), because "it must be presumed that federal officers will adhere to the law as declared by the court," *Sanchez-Espinoza*, 770 F.2d at 208 n.8.   Therefore, "similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [a] request for a declaratory judgment."  *Swan*, 100 F.3d at 976 n.1; *see also Sanchez-Espinoza*, 770 F.2d at 208 n.8 (The "equivalence of [the] effect" of injunctive and declaratory relief directed at Executive branch officials "dictates an equivalence of criteria for issuance." (citing *Samuels v. Mackell*, 401 U.S. 66, 73 (1971)).   As Justice Scalia explained in *Franklin*, "a declaratory judgment against the President" is "incompatible with his constitutional position" and "the separation of powers."

505 U.S. at 827–28 (Scalia, J., concurring).  Following *Franklin*, the D.C. Circuit determined that "declaratory relief" against the President for his non-ministerial conduct "is unavailable." *Newdow*, 603 F.3d at 1012–13.  Accordingly, the Court should conclude that a declaratory judgment is unavailable against the President for his official conduct and dismiss him as a party.

To do so would not deprive Plaintiffs of the ability to remedy their alleged harms.  To the contrary, if Plaintiffs ultimately prevail, the Court could issue an injunction or a declaratory judgment against the agency defendants.  That approach would comply with the D.C. Circuit's directive to "avoid confronting the elected head of a coequal branch of government" while also providing complete relief to Plaintiffs.  *Swan*, 100 F.3d at 978; *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir.), *vacated as moot and remanded*, 138 S. Ct. 377 (2017); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir.), *vacated and remanded*, 138 S. Ct. 353 (2017).

## II.     Plaintiffs' Challenges to the Use of § 8005 of the DoD Act (Counts Four and Five) Should Be Dismissed.

Plaintiffs cannot establish standing to challenge DoD's use of § 8005 to effectuate an internal transfer of funds between DoD appropriations; and even if they could, the zone-of-interests test forecloses their challenge.  In any event, they have not stated a claim that Defendants have violated § 8005.  Counts Four and Five should therefore be dismissed.

### A.     Plaintiffs Lack Standing to Challenge DoD's Use of § 8005 Authority.

Plaintiffs acknowledge that the source of their alleged harm is the construction of border barriers and that the Acting Secretary of Defense's decision to transfer funds under § 8005 to support DoD's § 284 activities does not directly result in that construction.  *See* Opp. 14.  Plaintiffs do not dispute that they have no interest in or entitlement to the transferred funds, *id.* at 13, nor have they identified any cases in which a private party had standing to challenge an agency's internal transfer of funds.  The absence of such authority is unsurprising because Plaintiffs simply

have not suffered Article III injury as a result of DoD's internal transfers. *See* Defs.' Mot. 34–36.

Plaintiffs claim they have standing to challenge DoD's transfer of funds under § 8005 because of the alleged "interrelated" nature of the Acting Secretary's subsequent decisions to approve construction under § 284.[2] *See* Opp. 16. Plaintiffs' argument improperly conflates legally distinct agency actions that have distinct significance for purposes of Article III. Contrary to Plaintiffs' contention, DoD is not using its counterdrug support authority under § 284 "as a mere pass-through account" for the Acting Secretary's prior reprogramming decision under § 8005. *Id.* Rather, the Acting Secretary made separate decisions—on (i) whether to approve DHS's request for assistance under § 284 and (ii) how to fund the assistance he approved—under separate authorities, as memorialized in separate memoranda. *See* First Declaration of Kenneth P. Rapuano, Exs. B, C, D, F (ECF No. 22-1). And unlike in Plaintiffs' cited cases, DoD could permissibly use funds transferred to the counterdrug appropriation that funds § 284 on other projects that Plaintiffs would have no basis to challenge. *See* Opp. 14 (citing *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) (holding that injury was fairly traceable to agency's challenged opinion because it had "determinative or coercive effect upon the action" of the third-party decisionmaker)); *see id.* at 16 (citing *Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 725, 727–28 (D.C. Cir. 2015) (finding for standing purposes that DoD's use of a third-party to sell property constituted a "pass-through" because the third-party was "not an independent operator that might do anything it wishes with [DoD] property it acquires")). That the Acting Secretary's decisions to exercise his authority under § 8005 and § 284 were made close in time or that he was the decisionmaker in

---

[2] Plaintiffs purport to challenge DoD's transfers of funds on May 9 and May 10, 2019. Opp. 17 & n.14. But these actions post-date the filing of the Amended Complaint, and the May 9 transfer was premised on a provision of the DoD Appropriations Act (§ 9002) not challenged therein. "[A] plaintiff cannot amend its [claims] by the briefs in opposition to a motion to dismiss." *Woytowicz v. George Washington Univ.*, 327 F. Supp. 3d 105, 121 (D.D.C. 2018) (citation omitted).

both instances is legally irrelevant. *See* Opp. 14. The key inquiry is whether Plaintiffs have alleged an injury "fairly traceable" to the challenged government action. *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002). The only action to which Plaintiffs' alleged injuries are "fairly traceable" is DoD's construction of border barriers under § 284, which the Amended Complaint does not challenge.

Plaintiffs claim that § 8005 is the "crux moment for the interrelated agency actions" to fund barrier construction, asserting that the record does not document any decision to expend counterdrug funds for barrier construction. *See* Opp. 16. Plaintiffs have it entirely backwards. Any expenditures for § 284 construction flow directly from the Acting Secretary's exercise of his § 284 authority, which is documented in memoranda submitted by Defendants to this Court. *See* First Rapuano Decl. Exs. B, F. The intervening § 284 decision is necessary to connect DoD's use of § 8005 to the border barrier construction that allegedly injures Plaintiffs. *Cf. Mideast Sys. & China Civil Const. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1178 (D.C. Cir. 1986) ("[T]he presence of an independent variable between . . . the harm and the conduct makes causation sufficiently tenuous that standing should be denied.").

Plaintiffs cannot challenge DoD's use of § 8005 by pleading alleged harms caused by the Acting Secretary's distinct decision to utilize § 284 to undertake barrier construction. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891–94 (1990). Courts "intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect." *Id.* at 894 (citation omitted). Contrary to Plaintiffs' claim, *see* Opp. 17, DoD's internal transfer of funds under § 8005 has no such effect on Plaintiffs.

### B.   Plaintiffs' § 8005 Claims Fail the Zone-of-Interests Test.

Plaintiffs' § 8005 claims fail for the separate reason that Plaintiffs are not within the zone of interests of § 8005 and thus cannot sue to enforce it. Although Plaintiffs properly concede that

they must satisfy the zone-of-interests test to bring their § 8005 claim under the APA (Count Four), they argue incorrectly that their § 8005 ultra vires claim (Count Five) is not subject to the same analysis. *See* Opp. 23–24. To the contrary, the zone-of-interests test "is a 'requirement of general application,'" reflecting a presumption about Congress's intended limits on the scope of *all* causes of action. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Bennett*, 520 U.S. at 163). *Lexmark*'s reference to the requirement applying to all "statutory" or "statutorily created" causes of action, *see id.*, encompasses equitable causes of action, which are inferred from Congress's statutory grant of equity jurisdiction and which enforce statutes enacted against the backdrop of the zone-of-interests limitation, *see Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999). There is no basis to conclude that Congress intended to allow courts not only to infer an equitable cause of action but to do so for individuals outside the zone of interests of the statute being enforced. Such a rule would lead to "absurd consequences." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176–77 (2011); *see also Armstrong*, 135 S. Ct. at 1385 ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory [and constitutional] limitations.").

Indeed, although the zone-of-interests test under the APA's "generous review provisions" bars suit only where a plaintiff's interests are "marginally related to or inconsistent with" the statute it seeks to enforce, *id.* at 130, the D.C. Circuit has suggested that a heightened standard likely applies in non-APA cases, *Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1256 (D.C. Cir. 1983), *rev'd on other grounds*, 467 U.S. 340 (1984). The Supreme Court has likewise suggested that, where a plaintiff seeks to bring an implied cause of action in equity to enforce a statutory provision, the provision must be intended for the "*especial* benefit" of protecting that plaintiff. *See*

*Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 396, 400 & n.16 (1987).

Here, under any standard, Plaintiffs are not within the zone of interests of § 8005.  That statute regulates the relationship between Congress and the Executive by limiting when DoD may transfer appropriated funds between internal accounts.  Nothing in § 8005 suggests that Congress arguably intended to allow persons alleging conservational, aesthetic, or recreational harms to sue to enforce § 8005's terms, let alone that it specifically intended to protect such persons.  Even Plaintiffs concede that the DoD Act "primarily focuses on the funding of DoD needs and operations with little direct relation to Plaintiffs' interests."[3]  Opp. 25.

In fact, there is no indication that Congress intended to authorize judicial enforcement of § 8005.  Congress required DoD to provide notice to Congress when it exercises its transfer authority, *see* Pub. L. No. 115-245, § 8005, 132 Stat. at 2999, and Congress intended § 8005 to "tighten congressional control of the re-programming process," DoD Appropriations Act, 1974, H. Rep. No. 93-662, at 16–17 (1973).  To the extent Congress disagrees with DoD's transfer decisions, it has the tools necessary to address the problem.  And indeed, it is doing so—the current version of the fiscal year 2020 National Defense Authorization Bill includes a variety of restrictions on using past appropriations to engage in border barrier construction, *see* H.R. 2500, 116th Cong. §§ 1046, 2801, 2802 (June 10, 2019), https://docs.house.gov/meetings/AS/AS00/20190612/109540/BILLS-116HR2500ih.pdf, confirming that Congress may act to protect its prerogatives within the legislative process.

---

[3] Instead, Plaintiffs argue that their interests are "not . . . inconsistent" with § 8005's purpose and that *other* sections of the 788-page DoD Act "include environmental provisions."  Opp. 25.  That Plaintiffs rely on such a slender reed illustrates that their alleged interest in reprogramming is "'so marginally related to . . . the purposes implicit in'" § 8005 "that it cannot reasonably be assumed that Congress authorized" suit under the statute.  *Lexmark*, 572 U.S. at 130 (quoting *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)).

Plaintiffs fare no better by arguing that the Court's zone-of-interests inquiry should encompass the CAA, which they allege their interests fall "comfortably" within.  Opp. 24.  As an appropriations act, the CAA is a directive from Congress to Executive agencies setting forth the specific amounts and purposes for which appropriations may be spent.  *See OPM v. Richmond*, 496 U.S. 414, 424 (1990).  It was in no way intended to protect the public's generalized interest in the expenditure of appropriations, let alone DoD's use of reprogramming authority under a separate statute.  *See Miccosukee Tribe of Indians of Fla. v. United States*, 2009 WL 10668917, at *4 (S.D. Fla. Sept. 30, 2009) (holding that an appropriations act, at most, protected federal agency's interest in appropriated funds, not the interests asserted by plaintiffs).

Indeed, on its face, the provisions of the CAA that appropriate fiscal year 2019 funds to DHS for barrier construction do not purport to regulate or protect Plaintiffs' interests in the environmental, aesthetic, or recreational impacts of border walls.  *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 812 (D.C. Cir. 1987).  Plaintiffs cannot merely allege a "generalized grievance" about the Government's action; they must show that "the interest asserted . . . *in the particular instance* is one intended by Congress to be protected or regulated by *the statute under which suit is brought*."  *Id.* at 813–14 (citations omitted).  In this instance, the purpose of the CAA is to *permit* DHS to expend funds on border barriers (up to $1.375 billion), subject to certain limitations.  Pub. L. No. 116-6, §§ 230–32.  Contrary to Plaintiffs' contention, *see* Opp. 24, the plain terms of the act do not prohibit border barrier construction through funding provided by DoD pursuant to separate statutory authorities, *see infra* pp. 22–23.  At bottom, Plaintiffs' general interest in the alleged effects of barrier construction is insufficient to bring their § 8005 claims within the zone of interests of the CAA or § 8005.  *See Haitian Refugee Ctr.*, 809 F.2d at 387.

C.      **Plaintiffs Fail to State a Claim Under § 8005.**

Even if Plaintiffs could sue to enforce § 8005, they have failed to state a claim for any

violation of that provision based on the use of this reprogramming authority to support § 284 construction.   Plaintiffs allege that the transfer of funds was unlawful because "the items for which funds [were] requested [have] been denied by Congress."   Opp. 47 (citation omitted).   They contend that the "item" is "the border wall" and, through the CAA's funding limitations on border barrier construction, Congress "rejected" all other such construction "in excess of [the] appropriation, or in areas contrary to its limitations."   *Id.* at 48.   But that reasoning considers the appropriations process at far too high a level of generality.   Section 8005 is a provision in the *DoD* appropriations act, which grants DoD limited authorization to make internal transfers to fund *particular items* even after the appropriations bill is enacted.   The relevant question is whether Congress ever "denied" DoD funds to provide counterdrug support.   The answer is plainly "no."

Under § 8005, an "item for which funds are requested" is a particular budget item requiring additional funding beyond the amount in the Defense appropriation for the fiscal year.   Congress first imposed the restriction on DoD's transfer authority for "denied" items in 1974, to ensure that DoD would not transfer funds for budget items that "ha[d] been *specifically deleted* in the legislative process."   H.R. Rep. No. 93-662, at 16 (emphasis added).   DoD makes funding requests to Congress during the budgeting process for budget line items, and Congress approves or disapproves these requests.   *See, e.g.*, H. Rep. No. 115-952, at 452 (Sept. 13, 2018).   At no point in the budgeting process at issue here did Congress deny a DoD funding request for appropriations for drug interdiction or counterdrug activities, which is the appropriation that funds § 284 requests. Congress's decision with respect to DHS's request for border barrier funding is irrelevant.[4]

---

[4] Plaintiffs' minimization of DoD's role in border barrier construction under § 284 is both inaccurate and unavailing.   Opp. 48 n.26.   As recently as fiscal year 2019, Congress appropriated $700 million to DoD for counternarcotics support, a portion of which supports § 284 projects.   *See* Pub. L. No. 115-245, title VI, title XI.   And contrary to Plaintiffs' claim, appropriations for § 284 are provided through the counternarcotics support subdivision of the "Drug Interdiction and

Plaintiffs fail to identify any authority that supports their expansive interpretation of the term "item."  Neither of the cases they cite concerned the federal government's appropriation process.  *See* Opp. 48 (citing *Bengzon v. Sec'y of Justice of Philippine Islands*, 299 U.S. 410, 414–15 (1937) (reviewing decision of the Phillipine Supreme Court related to the application of a Phillipine statute) and *Jubelirer v. Rendell*, 598 Pa. 16 (2008) (decision of Pennsylvania's Supreme Court related to a state appropriations bill)).  Rather, each of these cases addressed the lawfulness or effect of the relevant official's line-item veto powers—a procedure the Supreme Court has found irreconcilable with the Framers' design for our federal system.  *See Clinton v. City of New York*, 524 U.S. 417, 440 (1998).  Regardless, the definitions of "item" discussed in these cases is consistent with Defendants' interpretation—*i.e.*, Congress's "specific appropriation of money" to DoD's counterdrug activities is the "item" the Court must analyze with respect to Plaintiffs' § 8005 claims.  Opp. 48 (quoting *Bengzon*, 299 U.S. at 414–15).

Accordingly, Plaintiffs' § 8005 claims should be dismissed.

### III.     Plaintiffs' Challenges to the Use of 10 U.S.C. § 2808 (Counts Two and Three) Fail at the Threshold of APA Review and Do Not State a Claim.

Plaintiffs' challenges to the use of § 2808 likewise should be dismissed.  Plaintiffs tacitly admit their APA claim fails because no final agency action has occurred with respect to that statute.  Nor do Plaintiffs point to any concrete allegation sufficient to state a plausible claim for violation of § 2808.  And Plaintiffs cannot save their § 2808 challenges by claiming that they are challenging Presidential invocation of the statute because the Acting Secretary of Defense, not the President, has statutory authority to authorize military construction projects pursuant to § 2808.  For these reasons, Counts Two and Three should be dismissed.

---

Counter-Drug Activities, Defense" appropriation, not any "subaccount."  Regardless, Plaintiffs identify no instance in which Congress denied DoD funds to provide counterdrug support to DHS through barrier construction, which is the only relevant inquiry under § 8005.

### A.      No "Final Agency Action" Exists With Respect to § 2808.

At the outset, Plaintiffs implicitly concede that no final agency action exists with respect to § 2808.  It is uncontested that "final agency action" is a threshold requirement to bring a claim under the APA.  *See, e.g.*, *Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003).  Yet nowhere in their opposition do Plaintiffs contend that DoD has reached "the consummation of [its] decisionmaking process" regarding whether to undertake or authorize any barrier construction projects pursuant to § 2808.  *See Bennett*, 520 U.S. at 177–78.  Nor do they argue that "rights or obligations have been determined," or that a decision has been made "from which legal consequences will flow."  *See id.* at 178.  Instead, Plaintiffs pivot to alternative arguments, pointing out that the President is not subject to the APA, and that they have pleaded, in the alternative, a nonstatutory ultra vires claim.  Opp. 39–40.  These arguments conspicuously omit any contention that DoD's actions pursuant to § 2808 are final and subject to review.  *See id.* at 40 ("DoD's final implementing actions (*when taken*) are reviewable." (emphasis added)).  Because Plaintiffs all but admit that DoD has not taken final action under § 2808, their APA claim should be dismissed.  *See Reliable Automatic Sprinkler Co.*, 324 F.3d at 731–32.[5]

### B.      Plaintiffs Fail To State A Claim Under § 2808.

Even if this Court were to reach the merits of Plaintiffs' § 2808 claim, Plaintiffs have failed plausibly to plead any statutory violation.  As a threshold matter, Plaintiffs' environmental interests fall well outside any zone of interests conceivably protected by § 2808, a statute that protects DoD's ability to engage in military construction projects during a declared national emergency.  *See supra* pp. 12–15; *Lexmark*, 527 U.S. at 131.

---

[5] Plaintiffs invoke Local Rule 7(n) to require the submission of an administrative record, but there is no such record for § 2808 because no decisions have been made.  At the motion to dismiss stage, courts in this District have not required record filing because it "is not necessary for the court's decision."  *Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279, 294 (D.D.C. 2018).

Moreover, Plaintiffs do not contest that the President's decision that the national emergency "requires use of the armed forces" or any decision by the Acting Secretary of Defense that military construction projects authorized or undertaken pursuant to § 2808 are "necessary to support such use of the armed forces" are not proper subjects for judicial review.  *See* 10 U.S.C. § 2808(a).   These statutory requirements provide significant discretion to, respectively, the President as Commander-in-Chief and the Acting Secretary of Defense as the head of the military branches, and offer the Court "no judicially manageable standards" to evaluate the exercise of such discretion.  *See, e.g.*, *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).   Plaintiffs make no attempt to argue otherwise.  *See* Opp. 40–41.   Instead, they contend that "military construction" is a defined term.  *See id.* at 41.   This nonsequitur serves only to highlight that Congress chose not to impose any standards governing the determination whether a national emergency "requires use of the armed forces" or that military construction is "necessary to support such use of the armed forces."  *See* 10 U.S.C. § 2808(a).   It instead left such decisions to the sound discretion of the Nation's military leaders.  *See*, *e.g.*, *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 41–42 (D.C. Cir. 2000) (holding that "determinations regarding [] military value" were committed to agency discretion by law); *NFFE v. United States*, 905 F.2d 400, 406 (D.C. Cir. 1990).   Plaintiffs' conclusory allegations that "border wall funding hardly qualifies as an emergency requiring use of the armed forces, and in no way supports the armed forces," should be set aside.  *See* Am. Compl. ¶ 159 (ECF No. 16).

Plaintiffs' arguments that any decision by the Acting Secretary of Defense to authorize or undertake border construction pursuant to § 2808 would otherwise violate the statute also fail. Plaintiffs have not plausibly alleged in the abstract—as they must without a decision by the Acting

Secretary—that any border construction under § 2808 would not constitute "military construction." Although Plaintiffs contend that the Amended Complaint includes sufficient detail to state a claim for violation of this term, they do not address the breadth of the definition of "military construction," which permits a wide range of activities to fall within the scope of that term. *See* Defs.' Mot. 47–48. Nor do they proffer any explanation *why* any future barrier construction authorized or undertaken pursuant to § 2808 would not constitute military construction—which Congress has defined to "include[] any construction . . . of any kind," 10 U.S.C. § 2801(a), carried out with respect to "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department," *id.* § 2801(c)(4). To the contrary, the Amended Complaint's allegations acknowledge that at least portions of such yet-to-be-determined construction may fall within the broad definition of military construction. *See* Am. Compl. ¶ 158 ("The vast majority, if not all, of the border wall construction that the proclamation would fund occurs on lands that do not constitute a military installation . . . ." (emphasis omitted)). Without concrete allegations as to why border construction undertaken pursuant to § 2808 falls outside the definition of "military construction," Plaintiffs have not stated a claim.

Plaintiffs' contention that other provisions of Title 10, or the immigration code, demonstrate that § 2808 cannot be used for border construction is simply off base. *See* Opp. 41, 46–47. Plaintiffs specifically assert that Chapter 15 of Title 10 limits the situations in which the military can provide emergency support to civilian law enforcement agencies. *See id.* This argument fails for two reasons. First, Plaintiffs ignore the fact that any use of § 2808 will be pursuant to a determination that such construction is "necessary to support [the] use of the armed forces," not to provide support to civilian law-enforcement agencies. 10 U.S.C. § 2808(a). That DoD is separately acting pursuant to 10 U.S.C. § 284—a different statute with a different purpose

and different requirements—to provide support for DHS's counterdrug activities (at that agency's request) alters neither this fact nor the availability of § 2808.  Second, Plaintiffs' argument overlooks the well-established principle that "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."  *FCC v. Nextwave Personal Commc'ns Inc.*, 537 U.S. 293, 304 (2003) (quoting *J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143–44 (2001)).  Congress did not limit the use of § 2808 to exclude border construction, or activities that might incidentally support law-enforcement activities, within the text of that statute; within the text of Chapter 15; within the text of Chapter 169 of Title 10 (which contains § 2808); or within any provision of the immigration code.  Without such direction from Congress, there is no basis for the Court to read the limitations into § 2808 that Plaintiffs urge.

At bottom, Plaintiffs fail to state a claim for a violation of § 2808 because their allegations are "nothing more than conclusions" without factual support, and their complaint lacks "sufficient factual matter" to state a plausible claim for violation of § 2808.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  And Plaintiffs' ultra vires claim alleging § 2808 violations fail for the same reasons, because the standard to state a nonstatutory ultra vires claim is higher than that that under the APA, and such claims "rarely succeed."  *See Nyunt v. Chairman, Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009); *see also Trudeau v. FTC*, 456 F.3d 178, 189–90 (D.C. Cir. 2006).

C.      **The President's Invocation of § 2808 Is Not Actionable.**

Finally, to the extent Plaintiffs allege that the President's invocation of § 2808 was unlawful, *see* Opp. 39–40, such a claim also fails.  Even if a suit for equitable relief could be maintained against the President—which it cannot—Plaintiffs have not stated a claim for violation of § 2808 against the President.  The statute gives the Secretary of Defense, not the President, authority to act.  *See* 10 U.S.C. § 2808(a).  The President's invocation of § 2808 did nothing more

than make available to the Acting Secretary of Defense the construction authority § 2808 provides. *Cf. Nat'l Ass'n of Gov't Emps., Inc. v. Fed. Labor Relations Auth.*, 179 F.3d 946, 950 (D.C. Cir. 1999) ("[I]f the President orders the Secretary of State to terminate an employee, the order does not effect the termination—only the Secretary of State can terminate an employee whom the Secretary was statutorily authorized to appoint.").  The President's invocation of the statute has no independent effect on Plaintiffs, and Plaintiffs are not injured by such action.  *See Mideast Sys. & China Civil Const. Saipan Joint Venture*, 792 F.2d at 1178.  For this reason, it is not actionable, and any claim of "unlawful Presidential action" in violation of § 2808 should be dismissed.

## IV.   Plaintiffs Have Not Alleged Any Violation of the Consolidated Appropriations Act (Counts Two, Three, Four, and Five).

Plaintiffs assert that the use of either § 284 (funded by appropriations transferred pursuant to § 8005) or § 2808 would violate the CAA.  This argument impermissibly ignores the plain text of § 230(a) of the Department of Homeland Security Appropriations Act, 2019 (a component of the CAA).  Plaintiffs insist that § 230(a) created "specific monetary and geographic limitations . . . on border wall construction" writ large.  Opp. 50.  But the text says otherwise.  Section 230 provides that "[o]f the total amount made available under 'U.S. Customs and Border Protection—Procurement, Construction, and Improvements,'" $1.375 billion "shall be available only," as relevant here, for "the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector."  Pub. L. No. 116-6, div. A, § 230(a).  This provision means exactly what it says: that the $1.375 billion appropriation to DHS for border barrier construction in 2019 may only be used for the construction of pedestrian fencing in the Rio Grande Valley Sector.  The Government recognizes and is abiding by this limitation.

What the provision does *not* say is that any other border barrier construction—particularly

that permitted under other statutory authority—is prohibited.[6]  Plaintiffs would have the Court read such a limitation into the appropriations measure, insisting that "Congress cannot be expected to specifically legislate or prohibit for every possible contingency, but instead must affirmatively provide an appropriation."  Opp. 49.  Congressional appropriations are, of course, a necessary prerequisite to executive spending.  But a court cannot assume that, where Congress has enacted permanent statutes permitting expenditures of appropriated funds, Congress intended a later appropriations measure to take away that statutory authority without a clear statement of intent. *See Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1558 (D.C. Cir. 1984); *see also Building & Const. Trades Dept., AFL-CIO v. Martin*, 961 F.2d 269, 273 (D.C. Cir. 1992) ("While appropriation acts are 'Acts of Congress' which can substantively change existing law, there is a very strong presumption that they do not . . . .").  Because the plain text of § 230(a) does not prevent the planned expenditure of funds on border barrier construction pursuant to § 284 or future construction pursuant to § 2808, and for the reasons further explained in Defendants' motion to dismiss, *see* Defs.' Mot. 49–52, Plaintiffs have not stated a claim for violation of the CAA.

## V.   **The Court Lacks Jurisdiction To Hear Plaintiffs' NEPA Claim (Count Six) Because NEPA Has Been Waived.**

The Acting Secretary of Homeland Security's waiver of NEPA's requirements for the barrier construction projects authorized by 10 U.S.C. § 284 deprives the Court of jurisdiction over Plaintiffs' NEPA claims.  Under the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Congress sought to ensure expeditious construction of border barriers the Secretary determines necessary by granting authority to "waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers

---

[6] Plaintiffs have not alleged that DoD has undertaken or will undertake border barrier construction in any specific "protected areas," Opp. 24, where the CAA either prohibits such construction or requires additional consultation prior to construction. *See* Pub. L. No. 116-6, §§ 231–32.

and roads under this section."  Pub. L. No. 104-208, div. C, § 102(c)(1), 110 Stat. 3009 (1996).

Plaintiffs concede, at least for purposes of this motion, that the phrase "'under this section' in § 102(c)(1) refers to DHS border construction authorized under any provision of section 102." Opp. 44 (emphasis omitted).   But Plaintiffs wrongly conclude that "projects funded and implemented by DoD" cannot be authorized by § 102 at all.  Rather, § 102(a) directs the Secretary to take "such actions as may be necessary" to install additional border barriers in any "areas of high illegal entry into the United States," and § 102(b)(1)(A) directs the Secretary to "provide for the installation of additional [border infrastructure] to gain operational control of the southwest border."  Here, the Acting Secretary properly took "such action[s] as may be necessary to install" and "provide[d] for the installation of" border barriers by requesting assistance from DoD.  *See* Defs.' Mot. 38 (demonstrating that upheld waivers have involved construction by DoD).

That Congress specifically authorized appropriations for the construction contemplated by § 102(b)(1)(A) and (B) has no bearing on which lawfully appropriated funds may be used to assist the Secretary in carrying out his broader mandate under § 102(a).  *See* § 102(b)(4) ("There are authorized to be appropriated such sums as may be necessary to carry out this subsection."). Indeed, funds for border construction have been provided under a variety of appropriations and are not limited to one appropriation specifically tied to § 102(b).  *See*, *e.g.*, Pub. L. No. 115-141, § 230, 132 Stat. 348 (2018) (Procurement, Construction, and Improvements); Pub. L. No. 109-295, 120 Stat. 1355, 1359 (2006) (Border Security Fencing, Infrastructure, and Technology).  Similarly, the fact that Congress has used conditions in appropriations to enforce § 102(b)(1)(C)'s consultation requirement, *see, e.g.*, Pub. L. No. 110-161, div. E, § 564(b), 121 Stat. 1844, 2091 (2007), does not mean that funds from other appropriations may not be used to support § 102 projects.

The Acting Secretary's use of his waiver authority in furtherance of his statutory mandate

to construct border barriers thus deprives the Court of jurisdiction over Plaintiffs' NEPA claims, and those claims should be dismissed.  *See* Defs.' Mot. 6 (citing cases).

## VI. <u>Plaintiffs' Constitutional Claims (Counts Seven and Eight) Must Be Dismissed.</u>

Plaintiffs' purported constitutional claims are no different from Plaintiffs' statutory claims, and thus, under *Dalton*, these claims must be dismissed.  511 U.S. at 473; *see* Defs.' Mot. 53–55. As a threshold matter, Plaintiffs' opposition is based on an incorrect reading of *Dalton*. Plaintiffs characterize *Dalton*'s holding as standing only for the proposition that "statutory-based claims against the President are not automatically or even presumptively also constitutional claims," accusing the Government of using *Dalton* as a "prohibition" on the connection between statutory and constitutional claims.  But *Dalton* applies to all "constitutional" claims that the "President has exceeded his statutory authority."  511 U.S. at 473–74, 477.  Where, as here, the "constitutional" claim is indistinguishable from the statutory claim, *Dalton* prohibits the constitutional claim.

Indeed, Plaintiffs admit "the statutory violations alleged here share the same underlying factual basis as the constitutional violations" and their constitutional claims "will inherently concern the executive's failure to undertake, or a violation of, a statutory duty."  Opp. 54. Plaintiffs' only attempt to distinguish their constitutional claims is to say that "[t]his case presents a rare (perhaps unprecedented) set of circumstances that may never be replicated," failing entirely to identify these "rare" circumstances or explain why they would be sufficient to ignore *Dalton*'s well-settled precedent.  *Id.*  Plaintiffs' constitutional claims should be dismissed.

## CONCLUSION

For these reasons, and those explained in Defendants' motion to dismiss, Plaintiffs' Amended Complaint should be dismissed pursuant to Rules 12(b)(1) and 12(b)(6).[7]

---

[7] As previously stated, upon the completion of briefing, Defendants stand ready to appear for argument at the Court's earliest convenience.

Dated:  June 17, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

*/s/ Andrew I. Warden*
ANDREW I. WARDEN (IN Bar No. 23840-49)
Senior Trial Counsel, Federal Programs Branch

*/s/ Leslie Cooper Vigen*
LESLIE COOPER VIGEN (D.C. Bar No. 1019782)
KATHRYN C. DAVIS
MICHAEL J. GIRARDI
RACHAEL L. WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 305-0727
Fax: (202) 616-8470
Email: Leslie.Vigen@usdoj.gov

*Counsel for Defendants*