# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; DEFENDERS OF WILDLIFE; ANIMAL LEGAL DEFENSE FUND,<br><br>Plaintiffs,<br><br>v.<br><br>MARK ESPER, in his official capacity as Secretary of Defense, *et al*.,<br>Defendants. | Civil Action No. 1:19-cv-00408 (TNM) |
| RIO GRANDE INTERNATIONAL STUDY CENTER, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MARK ESPER, in his official capacity as Secretary of Defense, *et al*.,<br><br>Defendants. | Civil Action No. 1:19-cv-00720 (TNM) |

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 4

     A.     10 U.S.C. § 284 ..............................................................................................4

     B.     10 U.S.C. § 2808 .............................................................................................7

     C.     The Court's Order Granting In Part Defendants' Motions to Dismiss ................10

LEGAL STANDARD........................................................................................................ 12

ARGUMENT .................................................................................................................. 13

  I.    Plaintiffs Lack Standing to Challenge Certain § 284 and § 2808 Projects .........................13

     A.     CBD Plaintiffs...............................................................................................13

     B.     RGISC Plaintiffs. ......................................................................................... 16

           1.     RGISC Has Standing With Respect to Only Three
                 Barrier Projects. .........................................................................16

           2.     Claims Related to "El Centro A" Are Not Properly Before the Court. .....17

           3.     RGISC Lacks Standing to Challenge Barrier Projects in the
                 Rio Grande Valley. .....................................................................19

  II.    The CAA Does Not Preclude DoD From Using its Appropriated Funds Pursuant to Its
     Own Statutory Grants of Authority...................................................................................24

     A.     Section 230 of the CAA Does Not Prohibit DoD's Use of § 284 and § 2808...... 24

     B.     Plaintiffs Do Not Fall Within the Zone of Interests of § 739 of the CAA............ 25

     C.     Border Barrier Construction Pursuant to § 284 and § 2808 Does Not Violate
          § 739 of the CAA .........................................................................................29

  III.  Plaintiffs Cannot Evade The Zone-Of-Interest Requirement By Asserting an Implied
     Equitable Cause of Action ................................................................................................32

  IV.  Plaintiffs' Implied Equitable *Ultra Vires* Claims Fail on the Merits .................................38

     A.     *Ultra Vires* Review is Narrow and Limited.......................................................... 38

B.       DoD's Transfer of Funds Pursuant to § 8005 is Lawful........................................ 41

C.       DoD's Border Barrier Construction Pursuant to § 284 is Lawful ....................... 46

D.       DoD's Border Barrier Construction Pursuant to § 2808 is Lawful. ..................... 50

    1.       Section 2808's Requirement that the President Declare a National
        Emergency that Requires Use of the Armed Forces is Non-Justiciable ....50

    2.       The § 2808 Border Barriers Are Military Construction Projects...............51

    3.       The § 2808 Border Barriers Support the Use of the Armed Forces...........56

CONCLUSION.................................................................................................................... 60

## TABLE OF AUTHORITIES

**Cases:**

*Aid Ass'n for Lutherans v. U.S. Postal Service*,
321 F.3d 1166 (D.C. Cir. 2003) ............................................. 38

*Air Courier Conference of Am. v. American Postal Workers Union*,
498 U.S. 517 (1991) ........................................... 26, 27, 28

*Am. Fed'n of Gov't Emps., Local 3295 v. Fed. Labor Relations Auth.*,
46 F.3d 73 (D.C. Cir. 1995) ............................................. 52

*Am. Rd. & Transp. Builders Ass'n v. EPA.*,
2013 WL 599474 (D.C. Cir. Jan. 28, 2013) ........................... 36

*Armstrong v. Exceptional Child Ctr., Inc.*,
135 S. Ct. 1378 (2015) .................................................. 34

*Bivens v. Six Unknown Fed. Narcotics Agents*,
403 U.S. 388 (1971) .................................................... 34

*Block v. North Dakota*,
461 U.S. 273 (1983) .................................................... 35

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964) .................................................... 39

*Bush v. Lucas*,
462 U.S. 367 (1983) .................................................... 35

*California Sportfishing Prot. All. v. United States Bureau of Reclamation*,
2015 WL 6167521 (E.D. Cal. Oct. 20, 2015) ........................ 37-38

*Cameron Development Company v. United States*
145 F.2d 209 (5th Cir. 1944) ........................................... 53

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .................................................... 13

*Chamber of Commerce v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .......................................... 38

*Chappell v. Wallace*,
462 U.S. 296 (1983) .................................................... 57

*Cigar Ass'n of Am. v. FDA*,
315 F. Supp. 3d 143 (D.D.C. 2018) ..................................... 18

*Citizens Bank of Maryland v. Strumpf*,
516 U.S. 16 (1995) ..................................................... 48

*Clarke v. Securities Indus. Ass'n,*
  479 U.S. 388 (1987) ........................................................................ 26, 27, 28

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ........................................................................ 20

*Delta Data Sys. Corp. v. Webster,*
  744 F.2d 197 (D.C. Cir. 1984) ...................................................... 43

*Dart v. United States,*
  848 F.2d 217 (D.C. Cir. 1988) ...................................................... 38, 41

*Dalton v. Specter,*
  511 U.S. 462 (1994) ........................................................................ 12

*El Paso Cty. v. Trump,*
  408 F. Supp. 3d 840 (W.D. Tex. 2019) ........................................ 32

*Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Human Servs.,*
  830 F.3d 515 (D.C. Cir. 2016) ...................................................... 41

*Fla. Audubon Soc'y v. Bentsen,*
  94 F.3d 658 (D.C. Cir. 1996) ........................................................ 21

*Trudeau v. FTC,*
  456 F.3d 178 (D.C. Cir 2006) ...................................................... 40, 41

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*
  93 F.3d 897 (D.C. Cir. 1996) ........................................................ 27, 29

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ........................................................................ 29-30, 49

*FCC v. ITT World Commc'ns, Inc.,*
  466 U.S. 463 (1984) ........................................................................ 35

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
  528 U.S. 167 (2000) ........................................................................ 13, 19

*Gilligan v. Morgan,*
  413 U.S. 1 (1973) ............................................................................ 57, 58, 60

*Goldman v. Weinberger,*
  475 U.S. 503 (1986) ........................................................................ 57, 58

*Griffith v. Fed. Labor Relations Auth.,*
  842 F.2d 487 (D.C. Cir. 1988) ...................................................... 39, 40

*Grocery Mfrs. Ass'n v. E.P.A.,*
  693 F.3d 169 (D.C. Cir. 2012) ...................................................... 28-29

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999) ......................................................................................... 36

*Haitian Refugee Center v. Gracey*,
809 F.2d 794 (D.C. Cir. 1987) ................................................................... 12, 36-37

*Hernandez v. Mesa*,
140 S. Ct. 335 (2020) ......................................................................... 2, 34, 35, 37

*Home Depot U.S.A. v. Jackson*,
139 S. Ct. 1743 (2019) ..................................................................................... 44

*Indian River Cty. v. U.S. DOT*,
945 F.3d 515 (D.C. Cir. 2019) ...................................................................... 26, 28

*Jafarzadeh v. Duke*,
270 F. Supp. 3d 296 (D.D.C. 2017) ................................................................... 38

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..................................................................................... 13, 15

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........................................................................ 15, 16, 18, 26

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ......................................................................................... 25

*McDermott Int'l, Inc. v. Wilander*,
498 U.S. 337 (1991) ......................................................................................... 30

*Miles v. Apex Marine Corp.*,
498 U.S. 19 (1990) ........................................................................................... 35

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*,
437 F.3d 1256, 1263 (D.C. Cir. 2006) ............................................................... 39

*Nat'l Petrochemical & Refiners Ass'n v. E.P.A.*,
287 F.3d 1130 (D.C. Cir. 2002) ........................................................................ 28

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers*,
170 F. Supp. 3d 6 (D.D.C. 2016) ...................................................................... 16

*Neb. Legislative Bd. v. Slater*,
245 F.3d 656 (8th Cir. 2001) ............................................................................ 37

*Nevada v. Department of Energy*,
400 F.3d 9 (D.C. Cir. 2005) .............................................................................. 49

*North Dakota v. United States*,
495 U.S. 423 (1990) ......................................................................................... 57

v

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ........................................................ 38

*Orloff v. Willoughby*,
    345 U.S. 83 (1953) ........................................................................ 57

*Puerto Rico v. United States*,
    490 F.3d 50 (1st Cir. 2007) .......................................................... 37

*Quick v. Dep't of Commerce*,
    775 F. Supp. 2d 174 (D.D.C. 2011) ............................................. 18

*Qwest Corp. v. FCC*,
    482 F.3d 471 (D.C. Cir. 2007) ...................................................... 41

*R.I. Dep't of Envtl. Mgmt. v. United States*,
    304 F.3d 31 (1st Cir. 2002) .......................................................... 38

*Rostker v. Goldberg*,
    453 U.S. 57 (1981) ................................................................... 57, 58

*Russello v. United States*,
    464 U.S. 16 (1983) ........................................................................ 47

*Ry. Labor Execs.' Ass'n v. United States*,
    987 F.2d 806 (D.C. Cir. 1993) ................................................ 14, 17

*Schroer v. Billington*,
    525 F. Supp. 2d 58 (D.D.C. 2007) ................................................ 38

*Second, in Am. Clinical Lab. Ass'n v. Azar*,
    931 F.3d 1195 (D.C. Cir. 2019) .............................................. 40, 41

*Sierra Club v. Jewell*,
    764 F.3d 1 (D.C. Cir. 2014) .................................................... 13, 14

*Sierra Club v. Trump*,
    929 F.3d 670 (9th Cir. 2019) .................................... 7, 33, 35, 36

*Sierra Club v. Trump*,
    379 F. Supp. 3d 883 (N.D. Cal. 2019) ......................................... 55

*State of Washington v. Trump*,
    2020 WL 949934 (W.D. Wash. Feb. 27, 2020) ....................... 32, 55

*Summers v. Earth Island Inst*,
    555 U.S. 488 (2009) ................................................................ 13, 55

*Thompson v. N. Am. Stainless, LP*,
    562 U.S. 170–78 (2011) .......................................................... 35, 36

*Trump v. Sierra Club*
      140 S. Ct. 1 (2019) ........................................................................... 33

*United States v. 32.42 Acres of Land, More or Less, Located in San Diego Cty., Cal.*,
      683 F.3d 1030 (9th Cir. 2012) ......................................................... 53

*United States v. Apel*,
      571 U.S. 359 (2014) ......................................................................... 55

*United States v. Burgess*,
      1987 WL 39092 (N.D. Ill. Dec. 1, 1987) ......................................... 30

*Winpisinger v. Watson*,
      628 F.2d 133 (D.C. Cir. 1980) ......................................................... 23

*Winter v. Nat. Res. Def. Council, Inc.*,
      555 U.S. 7 (2008) ....................................................................... 56, 57

*Younger v. Harris*,
      401 U.S. 37 (1971) ........................................................................... 36

**Statutes:**

2 U.S.C. § 906 ........................................................................................ 30

5 U.S.C. § 706 ........................................................................................ 40

10 U.S.C. § 277 ................................................................................ 49, 50

10 U.S.C. § 284 ............................................................................... passim

10 U.S.C. § 2801 ............................................................................. passim

10 U.S.C. § 2808 ............................................................................. passim

12 U.S.C. § 36 ................................................................................. 26, 27

12 U.S.C. § 81 ................................................................................. 26, 27

23 U.S.C. § 210 ...................................................................................... 52

26 U.S.C. § 142 ...................................................................................... 28

31 U.S.C. § 1112 .............................................................................. 29, 30

31 U.S.C. § 9705 ....................................................................... 11, 12, 20

40 U.S.C. § 101 ................................................................................... 9, 53

40 U.S.C. § 521 ...................................................................................... 53

42 U.S.C. § 1983 ............................................................................................... 34

43 U.S.C. § 1701 ............................................................................................ 9, 10

43 U.S.C. § 1702 ............................................................................................... 53

43 U.S.C. § 1714 ............................................................................................... 53

50 U.S.C. § 1601 ............................................................................................... 50

National Defense Authorization Act, 1991
  Pub L. No. 101-510, § 1004 ............................................................................ 47

Consolidated Appropriations Act, 2014
  Pub L. No. 113-76, div. E, § 743 ..................................................................... 25

Federal Assets Sale and Transfer Act of 2016
  Pub L. No. 114-287, § 3 ............................................................................. 55, 56

Department of Defense Appropriations Act, 2019
  Pub L. No. 115-245, div. A, § 8005 ........................................................... passim
  Pub L. No. 115-245, div. A, § 9002 ................................................................ 6, 7

Consolidated Appropriations Act, 2019
  Pub L. No. 116-6, § 3 ..................................................................................... 27
  Pub L. No. 116-6, div. A, § 101 ...................................................................... 31
  Pub L. No. 116-6, div. A, § 230 .............................................................. passim
  Pub L. No. 116-6, div. A, § 231 ....................................................... 26, 27, 28
  Pub L. No. 116-6, div. A, § 232 ....................................................... 26, 27, 28
  Pub L. No. 116-6, div. D, § 739 .............................................................. passim

National Defense Authorization Act, 2019
  Pub L. No. 115-232, Title X, § 1001 ............................................................ 6, 7
  Pub L. No. 115-232, Title XV, § 1512 .......................................................... 6, 7

Department of Defense Appropriations Act, 2020
  Pub L. No. 116-93, div. A, § 8005 ................................................................. 17
  Pub L. No. 116-93, div. A, § 9002 ................................................................. 17

National Defense Authorization Act, 2020
  Pub L. No. 116-92, Title X, § 1001 ............................................................... 17
  Pub L. No. 116-92, Title XV, § 1520A ......................................................... 17

**Legislative Materials:**

H.R. Rep. No. 93-662 (1973)........................................................................................... 44

H.R. Rep. No. 97-44 (1981) ................................................................................... 52, 56

H.R. Rep. No. 103-200 (1993) .................................................................................... 47

H.R. Rep. No. 109-452 (2006)............................................................................... 47, 48

H.R. Rep. No. 110-146 (2007)..................................................................................... 48

H.R. Rep. No. 110-652 (2008)..................................................................................... 48

H.R. Rep. No. 115-952 (2018)..................................................................................... 44

H.R. Rep. No. 116-9 (2019)......................................................................................... 31

**Rules:**

Federal Rules of Civil Procedure 56 ..................................................................... 12, 13

**Regulations:**

84 Fed. Reg. 4949 (Feb. 15, 2019) ............................................................................... 7

84 Fed. Reg. 50063–65 (Sept. 24, 2019) ................................................................... 10

32 C.F.R. § 552.31 .................................................................................................54, 55

**Other Authorities:**

GAO Opinion B-330862,
    2019 WL 4200949 (Sept. 5, 2019) ......................................................... 42, 43, 45


Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure.................................20, 36


Kenneth Culp Davis, Administrative Law.......................................................................57

## INTRODUCTION

The Department of Defense's (DoD) construction of barriers along the southern border of the United States pursuant to 10 U.S.C. § 284 and 10 U.S.C. § 2808 is lawful.  The Secretary of Defense's decision in fiscal year 2019 to authorize six border barrier projects pursuant to § 284 and 11 projects pursuant to § 2808 was consistent with the requirements of those statutes, as confirmed by the detailed administrative record supporting the Secretary's decisions.  In funding the § 284 projects, the Secretary also complied with the requirements of § 8005 of the DoD Appropriations Act, Pub. L. No. 115-245, governing the internal transfer of DoD funds.  Further, the Secretary's decision to authorize § 284 and § 2808 construction did not violate § 739 of the Consolidated Appropriations Act, 2019, Pub. L. No. 116-6 (CAA).

Plaintiffs (RGISC and CBD)[1] contend that DoD acted in excess of the statutory authority provided by these four statutes.  Plaintiffs' motions for summary judgment assert a cause of action under the Administrative Procedure Act (APA) for a violation of § 739 and an implied equitable *ultra vires* cause of action for violations of § 284, § 2808, and § 8005.  Plaintiffs, however, lack standing to challenge the construction of several border barrier projects at issue.  CBD purports to challenge ten § 2808 projects, but has not submitted evidence to support that assertion.  CBD's declarations assert cognizable injuries traceable to only two § 2808 projects and are otherwise silent about the remaining § 2808 projects.  RGISC challenges construction of border barriers located in the Rio Grande Valley Sector of Texas, but DoD is not using § 284 or § 2808 funds for those projects and RGISC thus cannot establish either a traceable or redressable injury.  Additionally, RGISC cannot challenge construction of a § 284 project authorized by

---

[1] The remaining plaintiffs in *RGISC* and the plaintiffs in *CBD* will be referred to herein as "RGISC" and "CBD," respectively, or collectively in both cases as "Plaintiffs."

DoD in fiscal year 2020 that was not raised in their complaint and is the subject of a completely separate agency action that is not at issue in this case.

As to the merits, Plaintiffs lack a cause of action under the APA to assert a violation of § 739 because they do not fall within the statute's zone of interests and § 739 does not have an integral relationship with other provisions of the CAA that would arguably protect Plaintiffs' environmental interests.  In any event, Plaintiffs' claim fails because § 739 does not prohibit DoD from utilizing its own appropriated funds and statutory authority for border barrier construction.  Plaintiffs misinterpret § 739, which prohibits increasing funds for a "program, project, or activity" in an agency budget account, by ignoring the appropriations context where that term of art appears.  Contrary to Plaintiffs' argument, DoD's use of its own appropriated funds for § 284 and § 2808 projects is not adding funds to a budget account within the Department of Homeland Security (DHS).

Plaintiffs' implied equitable *ultra vires* claims also fail at the outset because they cannot satisfy the zone-of-interests requirement for § 284, § 2808, and § 8005.  The Court previously concluded that Plaintiffs did not fall within the zone of interests of these statues for purposes of their APA claims, and Plaintiffs should not be permitted to evade that limitation simply by pleading a redundant equitable cause of action.  As the Supreme Court recently emphasized, "[i]t would be anomalous to impute a judicially implied cause of action beyond the bounds Congress has delineated for a comparable express cause of action."  *Hernandez v. Mesa*, 140 S. Ct. 335, 747 (2020) (internal quotation omitted).

Even if Plaintiffs could bring an equitable *ultra vires* cause of action, they have not established that DoD violated the statutes at issue, let alone act acted patently in excess of its statutory authority, a higher standard that is required for such implied claims.  RGISC does not

dispute that DoD satisfied the requirements for § 284 border barrier construction, and there is no textual or historical basis for its argument that § 284 contains an implied limit on the scope or scale of the support DoD may provide under the statute.  For its part, CBD does not challenge the use of § 284, but instead contests DoD's internal transfer of funds pursuant to § 8005 for the § 284 projects.  Section 8005 authorizes the Secretary to transfer funds between internal DoD accounts for higher priority military requirements that are unforeseen and have not been denied by Congress.  DoD correctly determined that these elements were satisfied, and Congress's later decision to appropriate funds to DHS for that agency's border barrier funding account did not alter DoD's authority to transfer appropriated funds for the specific counter-drug projects at issue here.  Indeed, when asked by Members of Congress whether the transfers complied with § 8005, the Government Accountability Office (GAO) agreed with DoD.

The Court should also reject Plaintiffs' various challenges to DoD's § 2808 border barrier military construction.  The Court previously held that Plaintiffs cannot challenge the President's decision to declare a national emergency along the southern border because it is a nonjusticiable political question.  Contrary to RGISC's argument, that conclusion was not limited to Plaintiffs' claims under the National Emergencies Act and applies equally to RGISC's § 2808 claim. Further, all of the § 2808 projects constitute "military construction" undertaken "with respect to a military installation."  *See* 10 U.S.C. § 2801.  Congress defined these terms broadly and the border barrier projects here fall squarely within those statutory definitions.  As to the final element of § 2808, the Court has previously decided that it will limit its review to whether the projects support the use of the armed forces, as opposed to whether the projects are "necessary." The Secretary's military judgment with respect to the allocation of resources to support the armed forces is subject to review under a highly deferential standard given the long line of

authority requiring judicial deference to military judgments.  Here, the Secretary of Defense properly determined that the projects support the use of the armed forces in connection with the national emergency because the projects will, among other things, enhance the ability of military forces to support DHS more effectively and efficiently.

For these reasons, as explained below, the Court should deny Plaintiffs' motions for summary judgment, grant Defendants' motion for summary judgment, and enter final judgment for Defendants on all claims related to the funding and construction of the § 284 and § 2808 border barrier projects.

## BACKGROUND

The Court previously summarized the factual background of these cases in its consolidated memorandum opinion granting in part Defendants' motions to dismiss.  *See* Memorandum Opinion at 3–10 (*RGISC* ECF No. 76; *CBD* ECF No. 54).  Defendants' motions to dismiss also set forth the history of DoD's support for DHS's efforts to secure the southern border, the President's February 15, 2019 national emergency proclamation, and the various statutory authorities that Defendants' reply upon for border barrier construction.  *See RGISC*, ECF No. 34 at 4–18; *CBD*, ECF No. 22 at 4–20.  Defendants refer the Court to those prior background sections for a more detailed history and focus here on the factual issues relevant to the claims remaining in these cases.

### A.    10 U.S.C. § 284

Section 284 authorizes DoD to "provide support for the counterdrug activities . . . of any other department or agency," if "such support is requested."  10 U.S.C. § 284(a).  This support explicitly includes the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States."  *Id.* § 284(b)(7).

On February 25, 2019, in accordance with the requirements of § 284, DHS requested

4

DoD's assistance to construct 11 border barrier projects located on Federal land in drug-smuggling corridors along the southern border.  *See* Administrative Record (AR) at 15–24.  DHS's request sought the replacement of existing vehicle barricades or dilapidated pedestrian fencing with new pedestrian fencing, the construction and improvement of existing patrol roads, and the installation of lighting.  *See id.*

The then-Acting Secretary of Defense approved seven projects, in two phases, pursuant to § 284.  First, in March 2019, the Acting Secretary authorized DoD to support three projects: Yuma 1 & 2 in Arizona and El Paso 1 in New Mexico.  *See* AR at 1–8.[2]  Second, in May 2019, the Acting Secretary approved four projects in California (El Centro 1) and Arizona (Tucson 1, 2, 3).  *See* AR 137–44.  A summary of each fiscal year 2019 § 284 project is below:

| Name | Location | Total Miles | Type of Project |
|---|---|---|---|
| El Paso 1 | Luna and Doña Ana Counties, NM | 46 | Replace vehicle barrier |
| Yuma 1 | Yuma County, AZ | 5 | Replace pedestrian fencing |
| El Centro 1 | Imperial County, CA | 15 | Replace vehicle barrier |
| Tucson 1 | Pima County, AZ | 38 | Replace vehicle barrier |
| Tucson 2 | Cochise County, AZ | 5 | Replace pedestrian fencing |
| Tucson 3 | Cochise County, AZ | 20 | Replace vehicle barrier |

CBD challenges all six projects, *see* CBD Mot. at 10–13, whereas RGISC challenges only El Centro 1, *see* RGISC Mot. at 19.[3]

---

[2] The Army Corps of Engineers subsequently decided not to fund or construct Yuma 2 pursuant to § 284.  *See* Second Declaration of Kenneth Rapuano ¶ 4 (*RGISC*, ECF No. 34-4; *CBD*, ECF No. 25-1).  That project was subsequently funded pursuant to 10 U.S.C. § 2808, as explained below.

[3] RGISC also challenges a project authorized by the Secretary of Defense in fiscal year 2020 (El Centro A), but as explained below that claim is not properly before the Court in this case.

The Acting Secretary concluded that DHS identified each project location as a drug-smuggling corridor in accordance with § 284(b)(7).  *See* AR at 7, 143.  The United States Border Patrol collectively had more than 4,000 separate drug-related events between border crossings in the El Paso, El Centro, Tucson, and Yuma Sectors in fiscal year 2018, through which it seized over 155,000 pounds of marijuana, over 640 pounds of cocaine, over 285 pounds of heroin, over 4,300 pounds of methamphetamine, and over 17 pounds of fentanyl.  *See id.* at 15–24.

The replacement of existing pedestrian fencing and vehicle barriers in these areas is necessary because the older designs are easily breached and have been damaged to such an extent that they are ineffective.  *See id.*  Further, transnational criminal organizations and drug cartels have adapted their tactics to evade the existing barriers.  *See id.*  DHS thus requires new barrier infrastructure to impede and deny illegal narcotics smuggling.  *See id.*

To fund the § 284 projects, the Acting Secretary authorized the transfer of $2.5 billion to the Drug Interdiction and Counter-Drug Activities, Defense, appropriation, pursuant to DoD's general transfer authority under § 8005 of the DoD Appropriations Act, 2019, Pub. L. No. 115-245, div. A, 132 Stat. 2981, 2999 (Sept. 28, 2018), and § 1001 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (NDAA), Pub. L. No. 115-232, § 1001, 132 Stat. 1636, 1945 (Aug. 13, 2018), and DoD's special transfer authority under § 9002 of the FY19 DoD Appropriations Act and § 1512 of the FY19 NDAA.  *See* AR at 1–5, 10–11, 34–37, 137–141, 146–56.[4]  These provisions collectively authorized DoD to transfer up to $6 billion between DoD appropriations in fiscal year 2019 provided "[t]hat such authority to transfer may not be

---

[4] The transferred funds were drawn from military personnel accounts and other DoD program funds that were "excess or early to current programmatic needs" due to certain factors, including contract savings, unexpected strength reduction, elimination of mission requirements, and lower-than-expected funding requirements for a new DoD retirement program.  *See* AR at 5, 10, 35–37, 140, 146–56.

used unless for higher priority items, based on unforeseen military requirements than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress."  Pub. L. 115-245, div. A, § 8005.[5]  The Acting Secretary concluded the transfers met these statutory requirements.  *See* AR at 5, 10–11, 138–41, 146–47.

### B.    10 U.S.C. § 2808

The President's National Emergency Proclamation made available to the Secretary of Defense the military construction authority provided by 10 U.S.C. § 2808.  *See* Presidential Proclamation on Declaring a Nat'l Emergency Concerning the S. Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019).  Section 2808(a) provides:

> In the event of a declaration of war or the declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 *et seq.*) that requires use of the armed forces, the Secretary of Defense, without regard to any other provision of law, may undertake military construction projects, and may authorize the Secretaries of the military departments to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces. Such projects may be undertaken only within the total amount of funds that have been appropriated for military construction, including funds appropriated for family housing, that have not been obligated.

The term "military construction" as used in § 2808 "includes any construction, development, conversion, or extension of any kind carried out with respect to a military installation, whether to satisfy temporary or permanent requirements, or any acquisition of land . . . ." 10 U.S.C. § 2801(a).  Congress defined the term "military installation" to mean "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the Secretary of a military department or the Secretary of Defense, without regard to the duration of

---

[5] Because § 1001, § 1512, and § 9002 incorporate § 8005 by reference or are subject to the same substantive requirements as § 8005, this motion refers to these requirements collectively by reference to § 8005.  *See Sierra Club v. Trump*, 929 F.3d 670, 682 n.7 (9th Cir. 2019).

operational control."  *Id.* § 2801(c)(4).

On September 3, 2019, pursuant to § 2808, the Secretary of Defense determined that 11 border barrier projects along the international border with Mexico are military construction projects necessary to support the use of the armed forces in connection with the President's declaration of a national emergency.  *See* AR at 185–217; *see also id.* at 195 (list and locations of projects).  A summary of the § 2808 projects is below:

| Name | Location | Total Miles | Type of Project |
|------|----------|-------------|-----------------|
| Yuma 2 | Barry M. Goldwater Range (AZ) | 2 | Replace primary pedestrian fencing |
| Yuma 10/27 | Barry M. Goldwater Range (AZ) | 31 | New secondary pedestrian fencing |
| Yuma 3 | Yuma County, AZ | 31 | Replace vehicle barriers with new pedestrian fencing |
| San Diego 4 | San Diego County, CA | 3.5 | New primary and secondary pedestrian fencing |
| Yuma 6 | Imperial County, CA and Yuma County, AZ | 3 | New primary and secondary pedestrian fencing |
| El Paso 2 | Hidalgo and Luna Counties, NM | 23 | Replace vehicle barriers with new pedestrian fencing |
| El  Paso 8 | Hidalgo County, NM | 12 | Replace vehicle barriers with new primary pedestrian fencing, and new secondary pedestrian fencing |
| San Diego 11 | San Diego County, CA | 3 | New secondary pedestrian fencing |
| El Centro 9 | Imperial County, CA | 12 | New secondary pedestrian fencing |
| Laredo 7 | Webb and Maverick Counties, TX | 52 | New primary pedestrian fencing |
| El Centro 5 | Imperial County, CA | 1 | New secondary pedestrian fencing |

CBD challenges 10 of the 11 projects, *see* CBD MSJ at 10–13, and RGISC challenge only Laredo 7 and San Diego 4, *see* RGISC MSJ at 9.

Based on analysis from the Chairman of the Joint Chiefs of Staff, among others, the Secretary concluded the projects will deter illegal entry, increase the vanishing time of those illegally crossing the border (*i.e.*, the time that passes before a subject who illegally crosses the border can no longer be identified), and channel migrants to ports of entry.  AR at 193.  Further, the projects will support the use of the armed forces by reducing demand for DoD personnel and assets at the locations where the barriers are to be constructed, allowing for redeployment of DoD personnel and assets to other high-traffic areas on the border without barriers.  *Id.*  Consequently, the barriers serve as force multipliers enhancing military capabilities and allowing DoD to provide support to DHS more efficiently and effectively.  *See id.*

To fund these projects, the Secretary approved the use of up to $3.6 billion in unobligated military construction funds.  *See id.* at 266–273.  This funding was divided evenly between deferred military construction located outside and inside the United States.  *See id.* at 266; *see also id.* at 271–73 (list of all deferred projects).[6]

The Secretary identified four different types of land on which the barrier projects would be built and, as necessary, authorized the Secretary of the Army to take steps to acquire and add that land to the Army's real property inventory, either as a new military installation or as part of an existing military installation.  *See id.* at 187, 190, 193–94, 214–15.  First, two projects will be built on the Barry M. Goldwater Range, an existing military installation in Arizona.  *See id.* at 187.  Second, several projects will be located in whole or in part on Federal land not subject to the Federal Property and Administrative Services Act (Property Act), 40 U.S.C. § 101 *et. seq.*, and that can be transferred under the Federal Land Policy and Management Act (FLPMA), 43

---

[6] On April 27, 2020, the Secretary of Defense authorized adjustments to the funding sources for the § 2808 projects.  *See* Notice of Changes in Funding for Border Barrier Projects Undertaken Pursuant to 10 U.S.C. § 2808 in Fiscal Year 2019 (*RGISC* ECF No. 83; *CBD* ECF No. 62).

U.S.C. §§ 1701 *et seq*.  *See* Declaration of Brigadier General Glenn Goddard ¶ 10 (*RGISC* ECF

No. 49-3; *CBD* ECF No. 37-3).  The Secretary authorized and directed the Secretary of the Army

to request that the Department of the Interior (DoI) transfer to the Army Federal lands subject to

the FLPMA required for the projects.  *See* AR at 193–94, 214–15.  On September 18, 2019, DoI

announced transfers of the public lands for five projects in this category.  *See* Public Land Order

Nos. 7883–87, 84 Fed. Reg. 50063–65 (Sept. 24, 2019).[7]  Third, for Federal land governed by

the Property Act, the Secretary of Defense directed the Secretary of Army to request that the

relevant Federal land holding agency, through the General Services Administration (GSA),

transfer administrative jurisdiction over lands in the project areas to the Army expeditiously and

without charge.  *See* AR at 187, 189, 193–94, 214–15.  Fourth, with respect to any non-Federal

land, the United States intends to acquire that land through negotiated purchases or

condemnation.  *See id.* at 187; Goddard Decl. ¶¶ 9, 10.c.  On October 8, 2019, the Secretary of

the Army assigned all land necessary for the § 2808 projects to the U.S. Army Garrison Fort

Bliss, Texas, making those lands part of the Fort Bliss military installation, upon transfer of

administrative jurisdiction to the Army.  *See* General Order No. 2019-36, Assignment of

Southwest Border Sites (Exhibit 2); *see also* Second Declaration of Alex Beehler ¶ 11 (Exhibit

3) (explaining decision to designate project locations as part of Fort Bliss).

### C.     The Court's Order Granting in Part Defendants' Motions to Dismiss

On April 2, 2020, the Court issued a consolidated Memorandum Opinion granting in part

and denying in part Defendants' motions to dismiss.  In *RGISC*, the Court dismissed two

Plaintiffs for lack of organizational standing (Labor Council for Latin American Advancement

and GreenLatinos), but concluded six Plaintiffs plausibly alleged standing to survive the low bar

---

[7] On June 24, 2019, DoI transferred additional land to the Army for the San Diego 4 project.  *See*
Public Land Order 7895 (Exhibit 1).

at the motion to dismiss stage. *See id.* at 12–15. The remaining Plaintiffs are Dr. Ramiro R.

Ramirez, Mr. Joseph Hein, and Ms. Elsa Hull, landowners in southern Texas; the

Carrizo/Comecrudo Nation of Texas (Carrizo/Comecrudo), an association of indigenous people;

and two nonprofit advocacy groups: Rio Grande International Study Center (RGISC) and

California Wilderness Coalition (CalWild). Defendants did not challenge standing for any

Plaintiffs in *CBD* in the motion to dismiss.

On the merits, the Court concluded that Plaintiffs' challenge to the President's national

emergency declaration presented a nonjusticiable political question and dismissed the President

from the case. *See* Mem. Op. at 17–25. The Court also dismissed Plaintiffs' claims under the

National Environmental Policy Act on the basis of waivers issued by the Secretary of Homeland

Security. *See id.* at 26–28.

The Court dismissed most of Plaintiffs' claims brought pursuant to the APA, concluding

that Plaintiffs' environmental, recreational, and property interests fell outside the zone of

interests protected by § 284, § 2808, § 8005 and 31 U.S.C. § 9705 (the Treasury Forfeiture Fund

statute). *See id.* at 32–38, 40–45. The Court, however, held that Plaintiffs had stated a claim

under the APA's cause of action for a violation of § 739 of the CAA (but not § 230) and

arguably fell within the zone of interests of certain provisions of the CAA that were integrally

related to § 739. *See id.* at 38–40.

The Court also concluded that Plaintiffs could assert *ultra vires* claims based on a non-

statutory implied equitable cause of action. *See id.* at 45–48. The Court expressed "doubt[] that

Plaintiffs can bring an equitable claim when a statutory cause of action is available[,]" but

concluded that Plaintiffs had presented "colorable" equitable claims to survive a motion to

dismiss. *Id.* at 48. Further, the Court held that plaintiffs asserting equitable *ultra vires* claims do

not need to comply with the zone-of-interests test, relying on dicta in *Haitian Refugee Center v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987). *See id.* at 48–49. Addressing the merits of Plaintiffs' *ultra vires* allegations, the Court concluded that Plaintiffs had stated claims that Defendants exceeded the statutory authority provided by § 284, § 2808, and § 8005, but dismissed RGISC's claim alleging a violation of § 9705. *See id.* at 49–54.

Lastly, the Court dismissed Plaintiffs' constitutional claims on the basis of *Dalton v. Specter*, 511 U.S. 462 (1994), concluding that Plaintiffs raise only statutory claims. *See id.* at 54–58.

In sum, the only remaining claims in this case are (1) an APA cause of action asserting a violation of § 739 of the CAA; and (2) an equitable *ultra vires* cause of action alleging violations of § 284, § 8005, and § 2808. As explained further below, the Court should grant summary judgment to Defendants on all remaining claims.[8]

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that a party may move for summary judgment on some or all of the claims or defenses presented in a case. Summary judgment is

---

[8] On June 26, 2020, the same day this motion was due, a divided panel of Ninth Circuit issued two lengthy opinions in related cases addressing the Government's merits appeal regarding the § 284 projects. *See Sierra Club v. Trump*, No. 19-16102 (9th Cir.) (Exhibit 4); *California v. Trump*, No. 19-16299 (9th Cir.) (Exhibit 5). The panel majority concluded that the plaintiffs have a constitutional cause of action under the Appropriations Clause and an equitable *ultra vires* cause of action to challenge the § 8005 transfers. With respect to the zone-of-interests test, the majority concluded it did not apply to *ultra vires* claims and if the test applied at all, the Appropriations Clause defines the relevant zone of interests. For the APA claims brought by the States, the majority held the States fell within § 8005's zone of interests. On the merits, the majority concluded § 8005 did not authorize the transfer of funds. Judge Collins dissented. He concluded the plaintiffs lack a cause of action to challenge § 8005 because they fall outside the statute's zone of interests. Further, Judge Collins concluded that the § 8005 transfers were lawful. In light of the length of the opinions (nearly 200 pages) and the limited time to review them before submitting this filing, Defendants reserve the right to address the Ninth Circuit's decision more fulling in Defendants' reply, as appropriate.

appropriate when, viewing the evidence and drawing all reasonable inferences in favor of the

nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S.

317, 321 (1986).

## ARGUMENT

**I.      Plaintiffs Lack Standing to Challenge Certain § 284 and § 2808 Projects.**

**A.      CBD Plaintiffs**

"An association has standing to sue under Article III of the Constitution of the United

States only if (1) at least one of its members would have standing to sue in his own right; (2) the

interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the

relief requested requires the member to participate in the lawsuit." *Am. Trucking Ass'ns, Inc. v.*

*Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013) (internal quotation marks

omitted).  To establish standing for an individual member, "a plaintiff must show (1) it has

suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167,

180-81 (2000).  At the summary judgment stage, the plaintiff bears the burden of establishing

standing as "set forth by affidavit or other evidence [of] specific facts." *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks omitted).

In cases involving allegations of environmental harm, the Supreme Court has recognized

that injuries to the "recreational or the mere esthetic interests of the plaintiff . . . will suffice" for

standing. *Summers v. Earth Island Inst.,* 555 U.S. 488, 494 (2009); *see Sierra Club v. Jewell*,

764 F.3d 1, 5 (D.C. Cir. 2014) ("This court has similarly understood that injury in fact can be found when a defendant adversely affects a plaintiff's enjoyment of flora or fauna."). CBD challenges the construction of all six § 284 projects, *see* CBD Mot. at 10–13, and it has submitted sworn declarations from its members stating that they recreate near the § 284 projects and explaining how construction of each § 284 project will harm their recreational and aesthetic interests. *See* First Declaration of Laiken Jordahl ¶¶ 7, 16–18 (El Paso 1); Declaration of Isaac Russell ¶¶ 5–7 (Yuma 1); Declaration of Ileene Anderson ¶¶ 10–17 (El Centro 1); First Jordhal Decl. ¶¶ 7, 11–14, 20–21 (Tucson 1, 3); Declaration of Taylor McKinnon ¶¶ 8–12 (Tucson 2). These declarations establish the requisite injury for recreational and aesthetic standing under the law of this Circuit, and Defendants do not contest that CBD has satisfied the other elements for associational standing. Accordingly, Defendants concede that CBD has standing to challenge the § 284 projects.[9]

By contrast, CBD has not presented sufficient evidence to establish standing for all of the § 2808 projects they purportedly challenge. CBD's motion states that it challenges construction of 10 of the 11 § 2808 projects and cites 14 declarations in support of that assertion. *See* CBD Mot. at 10–13.[10] But only two of these declarations discuss the § 2808 projects. *See* Declaration of Jill Holslin; Second Declaration of Laiken Jordahl. Further, these two declarations are limited to alleging injuries traceable to only two § 2808 projects. *See* Holsin Decl. (San Diego 4); Second Jordahl Decl. (Yuma 10/27). Defendants concede that CBD has standing to challenge

---

[9] Because CBD itself has standing to challenge construction of the § 284 projects, there is no need for the Court to separately address the standing allegations by the other plaintiffs in the case, Animal Legal Defense Fund (*see* Declaration of Elizabeth Walsh) and Defenders of Wildlife (*see* Declaration of Bryan Bird), who challenge a subset of the § 284 projects. *See Ry. Labor Execs.' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993).

[10] There is no indication in CBD's motion that they challenge construction of Yuma 2, which is one of the projects located on the Goldwater Range.

these two projects, but CBD's remaining declarations do not contain any allegations about the other § 2808 projects.  Nor could they, because the declarations were executed in May 2019, more than three months *before* the Secretary of Defense made his decision to authorize the § 2808 projects in September 2019.  *See* AR at 185–90.  CBD has known the locations and parameters of the § 2808 projects for nine months, *see* CBD ECF No. 37, and could have developed declarations explaining how each § 2808 project harms their members' interests in the project areas.  *Lujan*, 504 U.S. at 565–66 ("a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly in the vicinity of it").  However, CBD has simply re-submitted the same declarations it filed with its opposition to Defendants' motion to dismiss, none of which even mention the § 2808 projects, let alone explain how those projects harm CBD's members' recreational and aesthetic interests. This approach is plainly insufficient to carry CBD's burden to establish standing at this stage for the § 2808 projects other than San Diego 4 and Yuma 10/27.  *See Lujan*, 504 U.S. at 564 (evidence that a plaintiff " 'had visited' the areas of the projects before the projects commenced proves nothing"); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990) (evidence that a member "uses unspecified portions of an immense tract of territory, on some portions of which [an] activity has occurred or probably will occur" is insufficient under Article III); *Summers*, 555 U.S. at 495 (holding that an affidavit stating that a plaintiff had "visited many national forests and plans to visit several unnamed national forests in the future" is insufficient to establish standing absent an allegation that "*any* particular timber sale or other project" alleged to be unlawful will impede a "specific and concrete plan of [plaintiff's] to enjoy the national forests").

The Supreme Court has emphasized that "standing is not dispensed in gross," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and the fact CBD has standing to challenge two § 2808

projects does not mean that it has standing to challenge the remaining projects located elsewhere along the border.  Although a project-by-project requirement for standing may be "understandably frustrating to an organization such as [CBD], which has as its objective across-the-board protection of [the] Nation's wildlife . . . ," such an approach "is the traditional, and remains the normal, mode of operation of the courts."  *Nat'l Wildlife Fed'n*, 497 U.S. at 894; *see Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers*, 170 F. Supp. 3d 6, 13–14 (D.D.C. 2016) (finding no standing where plaintiffs' members presented no evidence that their "river activities take place along a portion of the shoreline about to be altered by an erosion prevention structure").

### B.    RGISC Plaintiffs

The remaining plaintiffs in the *RGISC* case challenge only a small subset of the § 284 and § 2808 projects.  Plaintiffs RGISC, Hull, Hein, and Carrizo/Comercrudo challenge the construction of Laredo 7, a § 2808 project.  *See* RGISC Mot. at 15–18, 20-22, 24.  CalWild challenges three projects:  El Centro 1, a fiscal year 2019 § 284 project; El Cento A, a fiscal year 2020 § 284 project; and San Diego 4, a § 2808 project.  *See id.* at 18-20.  Plaintiffs Ramirez and Carrizo/Comercrudo generally challenge a project they describe as "95-miles of border wall construction" in Texas's Rio Grande Valley, and specifically a barrier project planned near the Jackson Ranch Church and Cemetery and Eli Jackson Cemetery.  *See id.* at 22-26.

### 1.    RGISC Has Standing With Respect to Only Three Barrier Projects.

RGISC and CalWild have submitted sworn declarations from a member of each organization stating that they recreate near Laredo 7, El Centro 1, and San Diego 4 and explaining how construction of each of these projects will harm their recreational and aesthetic interests.  *See* Declaration of Virginia Palacios ¶¶ 4, 10, 14-15, 18 (Laredo 7); Declaration of

David Hogan ¶¶ 3, 7-9 (El Centro 10), 10-12 (San Diego 4).  Defendants do not dispute that these declarations demonstrate injury for recreational and aesthetic standing, and they do not contest that RGISC and CalWild have satisfied the other elements to establish associational standing.  Accordingly, Defendants concede that RGISC and CalWild have standing to challenge Laredo 7, El Centro 1, and San Diego 4.[11]

### 2.      Claims Related to "El Centro A" Are Not Properly Before the Court.

CalWild also seeks to challenge the construction of El Centro A, but this claim—raised for the first time in RGISC's summary judgment motion—is not properly before the Court. Unlike the fiscal year 2019 projects at issue in this case, El Centro A is one of 31 project segments being constructed and funded *in fiscal year 2020* pursuant to § 284.  The project was approved by the Secretary of Defense on February 7, 2020, and is being paid for with funds transferred pursuant to DoD's general transfer authority under § 8005 of the DoD Appropriations Act, 2020 (a component of the FY20 CAA), *see* Pub. L. No. 116-93, 133 Stat 2317, div. A; § 1001 of the National Defense Authorization Act for Fiscal Year 2020 (FY20 NDAA), *see* Pub. L. No. 116-92, 133 Stat. 1198, Title X; and DoD's special transfer authority under § 9002 of the FY20 DoD Appropriations Act and § 1520A of the FY20 NDAA.  *See RGISC* ECF No. 73. DoD's decision to undertake border barrier projects in fiscal year 2020 is beyond the scope of RGISC's First Amended Complaint, which consists of allegations related solely to actions taken by Defendants in fiscal year 2019 that RGISC claims, among other things, violate the fiscal year 2019 CAA.  *See* Am. Compl. ¶¶ 88-96, *RGISC* ECF No. 28 (detailing agency actions taken from

---

[11] Because RGISC itself has standing to challenge the construction of Laredo 7, the Court does not need to separately analyze the standing claims of Plaintiffs Hull (*see* Declaration of Elsa Hull), Hein (*see* Declaration of Joseph Hein), and Carrizo/Comecrudo (*see* Declaration of Juan Mancias), who also challenge the construction of this project.  *See Ry. Labor Execs.' Ass'n*, 987 F.2d at 810.

February to May 2019 related to border barrier projects); *see id.* ¶ 137 ("The statutes the

President relies on, 10 U.S.C. §§ 284, 2808 . . . , do not authorize wall construction outside of the

limits set by Congress in the Consolidated Appropriations Act of 2019.").  And because they

were not challenged in the Amended Complaint, DoD's fiscal year 2020 decisions are likewise

not part of the administrative record that Defendants certified in this case.  *See generally* Cert.

Index of Admin. Rec., *RGISC* ECF No. 82.

　　　"It is well established that a party may not amend its complaint or broaden its claims

through summary judgment briefing."  *Cigar Ass'n of Am. v. FDA*, 315 F. Supp. 3d 143, 174

(D.D.C. 2018) (citation omitted); *see, e.g.*, *Quick v. Dep't of Commerce*, 775 F. Supp. 2d 174,

183 (D.D.C. 2011) ("[I]t is axiomatic that a party cannot amend its complaint merely by injecting

new claims in the course of briefing a dispositive motion.").  But that is exactly what RGISC

seeks to do here, because the Amended Complaint unquestionably does not contain a challenge

to any fiscal year 2020 border barrier projects and RGISC never sought to further amend its

complaint.  Nor can RGISC frame its claims as a broader challenge to Defendants' use of certain

authorities to build border barriers.  The Supreme Court has rejected attempts to bring

programmatic-type challenges "for wholesale correction under the APA, simply because one

[agency action] that is ripe for review adversely affects one of [plaintiff's] members."  *National

Wildlife Fed'n*, 497 U.S. at 894.  As explained above, a project-by-project "approach . . . is the

traditional, and . . . normal, mode of operation" for the Court to resolve RGISC's claims.[12]  *Id.*

---

[12] By way of example, CBD filed a new lawsuit raising challenges to DoD's fiscal year 2020
border barrier funding decisions.  *See Center for Biological Diversity v. Esper*, Case No. 20-cv-
1230-TNM (D.D.C.).  Similarly, in related litigation pending in the Northern District of
California, the plaintiffs raised claims challenging fiscal year 2020 border barrier projects by
initiating new, separate actions.  *See Sierra Club v. Trump*, 20-cv-1494-HSG (N.D. Cal.);
*California v. Trump*, 20-cv-1563-HSG (N.D. Cal.).

This Court should thus deny RGISC's motion as to El Centro A because it seeks relief beyond the scope of the Amended Complaint.

### 3. RGISC Lacks Standing to Challenge Barrier Projects in the Rio Grande Valley.

RGISC has failed to demonstrate standing for its claims related to border barrier construction in the Rio Grande Valley Sector of Texas. The alleged injury caused by these projects is neither traceable to the agency actions challenged in this case, nor redressable by the relief that RGISC requests. *See Friends of the Earth, Inc.*, 528 U.S. at 180-81 (Article III standing requires injury that is, *inter alia*, "fairly traceable to the challenged action of the defendant" and "likely, as opposed to merely speculative, [to] be redressed by a favorable decision.").

As explained by Loren Flossman, the Acquisition Program Manager for the U.S. Customs and Border Protection's (CBP) Wall Program Management Office, the barrier project planned near the Jackson Ranch Church and Cemetery and Eli Jackson Cemetery in Hidalgo County, Texas, "will be constructed using only CBP's Fiscal Year 2019 appropriation (Public Law No. 116-6, § 230) and the [Treasury Forfeiture Fund (TFF)]." Declaration of Loren Flossman (June 24, 2020) ¶ 6 (Exhibit 6). Indeed, Mr. Flossman confirms that the *entire* "border wall system that CBP will construct in the Rio Grande Valley" is being "funded *exclusively* by three sources: (1) CBP's Fiscal Year 2018 appropriation (Public Law No. 115-141, § 230); (2) CBP's Fiscal Year 2019 appropriation (Public Law No. 116-6, § 230); and [(3)] the [TFF]."[13] *Id.*

---

[13] RGISC incorrectly asserts that CBP is constructing 95 miles of border barrier in the Rio Grande Valley. *See* RGISC Mot. at 23. RGISC's assertion is based on a June 27, 2019 letter that sought public input on the construction of barriers in this sector. *See id.* (citing Ex. 15). The mileage totals in CBP's consultation letters, however, do not represent the final number of miles that will actually be built. *See* Declaration of Loren Flossman (Aug. 27, 2019) ¶ 5, *RGISC* ECF No. 47-2 (noting that the consultation letter describes "approximate, estimated mileage" for planned projects and that actual mileage would depend on available funding). After considering

¶ 5 (emphasis added).  "No other sources of funding or authority, including those authorities challenged in this action (10 U.S.C. § 284 and 10 U.S.C. § 2808), will be used to construct border wall system in the Rio Grande Valley," *id.*, including the planned project at the cemeteries, *id.* ¶ 6.[14]  Indeed, the administrative record shows that DHS never requested or recommended that DoD undertake border barrier construction in the Rio Grande Valley pursuant to 10 U.S.C. § 284 or 10 U.S.C. § 2808, and that the Secretary of Defense has not approved any such construction under these authorities.  *See* AR 7–8, 15–24, 143–44, 193–195, 234–241; *see also* Flossman Decl. ¶ 7 (6/24/20).

Because Defendants are not acting pursuant to the statutory authorities in dispute, RGISC has not established the traceability prong of Article III's standing requirement.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (holding the plaintiffs failed to establish traceability where they could not show the government acted under the specific statutory authority being challenged); Wright, Miller & Cooper, Fed. Practice & Procedure, § 3531.4 (2d ed. 1984) ("The very notion of injury implies a causal connection to the challenged activity; an injury caused by other events is irrelevant" to standing).  For the same reason, RGISC also has not demonstrated that the requested relief—an injunction preventing Defendants from using funds under § 284 and § 2808 to build border barriers—will redress the alleged harms caused by

---

all potential barrier projects and assessing all of the available funding, CBP will execute 110 miles of barrier construction in the Rio Grande Valley.  *See* Flossman Decl. (6/24/20) ¶ 9 (describing construction of approximately 25 miles of levee and pedestrian barrier in Hidalgo and Starr Counties using funding from the 2018 CAA); *see id.* ¶ 10 (describing construction of approximately 85 miles of levee and pedestrian barrier in Hidalgo, Starr, and Cameron Counties using funding from both the 2019 CAA and the TFF).

[14] As noted above, RGISC's Amended Complaint challenged Defendants' use of TFF funds (31 U.S.C. § 9705) to undertake border barrier construction; however, the Court dismissed this claim for failure to state a claim.  *See* Mem. Op. at 54.

barrier construction in the Rio Grande Valley.  Even if this Court were to enter such relief, it would have no effect on CBP moving forward with Rio Grande Valley barrier projects because those projects are not being funded by the sources of authority that are at issue in this case.  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996) ("Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff.").

Even though Defendants have consistently and repeatedly affirmed that none of the on-going or planned barrier projects in the Rio Grande Valley will be undertaken pursuant to § 284 or § 2808,[15] RGISC speculates that CBP cannot complete construction of the barrier system, including the project near the cemeteries, without use of these challenged authorities.  RGISC Mot. at 24-26.  The crux of its argument is that construction costs will significantly exceed the amount of money currently available to CBP to fund the Rio Grande Valley border system due to alleged cost overruns and additional costs incurred to paint the barriers.  *Id.*  RGISC's claim, however, is premised on irrelevant, unfounded, and mischaracterized facts.

To support its claim, RGISC erroneously relies on an October 15, 2019 letter to the Secretary of Defense from several United States Senators, which references that the U.S. Army Corps of Engineers is preparing for a potential 10% cost overrun for barrier construction.  *Id.* at 25.  The reference in this letter "has nothing to do the CBP-funded barrier projects in Rio Grande Valley," but rather "concerns border barrier construction by [DoD] pursuant to 10 U.S.C. § 284 and 10 U.S.C. § 2808."  Flossman Decl. (6/24/20) ¶ 8.  That much is clear from the text of the

---

[15] *See* Second Declaration of Loren Flossman (Apr. 1, 2019) ¶ 8, *RGISC* ECF No. 34-1; Declaration of Loren Flossman (May 31, 2019), ¶ 8, *RGISC* ECF No. 34-6; Flossman Decl. (8/27/19) ¶ 6; Flossman Decl. (6/24/20) ¶¶ 5-6.

letter itself, which discusses DoD's transfer of certain funds to support DoD's border barrier construction.  *See* RGISC Mot., Ex. 18.[16]  The alleged overrun estimate thus has no bearing on the cost of construction in the Rio Grande Valley—all of which is being funded by CBP appropriations and the TFF.

　　　　Equally unconvincing is RGISC's reliance on unsourced allegations in media reports related to the costs of painting border barriers.  *Id.* at 24.  According to RGISC, CBP intends to paint border barriers in the Rio Grande Valley at a cost of several hundred-million dollars, for which CBP's current funding does not account, thus requiring CBP to use disputed authorities to cover the increased costs.  *Id.* at 24, 25.  This series of logical leaps is baseless.  Mr. Flossman confirms that "CBP will not rely on . . . [§ 284 or § 2808] to cover the cost of painting or epoxy coating the planned border barriers in the Rio Grande Valley."  Flossman Decl. (6/24/20) ¶ 8.  In fact, the funds available to CBP that have currently been obligated include "the cost to apply an epoxy coating to approximately 65 miles of barrier to extend its lifecycle."  *Id.* ¶ 10.  CBP will epoxy coat additional miles of barrier "only if" funding is available from CBP's Fiscal Year 2018 and 2019 appropriations or the TFF "once the construction is complete."  *Id.*; *see id.* ¶ 9.

　　　　RGISC also mischaracterizes a prior declaration submitted by Mr. Flossman in January 2020 to support the proposition that Defendants are experiencing unexpected cost overruns with Rio Grande Valley projects.  *See* RGISC Mot. at 24-25.  Not only did Mr. Flossman not make such a statement, but the proper quotation of his declaration actually undermines RGISC's

---

[16] The focus of the letter is on DoD's decision to use $129 million in excess counter-narcotics funds for § 284 construction.  Defendants notified the Court and parties about that development in September 2019, explaining that DoD is making available $129 million of expiring fiscal year 2019 funds from the counter-narcotics account to address any unanticipated, within-scope contract costs associated with DoD's fiscal year 2019 counter-narcotics projects.  *See* Notice Regarding Funding of Border Barrier Projects Pursuant to 10 U.S.C. § 284 in Fiscal Year 2020, *RGISC* ECF No. 59.  Nothing in the letter or Defendants' notice relates to CBP-funded projects.

speculative claim that CBP has insufficient funding.  What Mr. Flossman explained was that

CBP had allocated $216 million of TFF funds to use for, among other things, "change

management, i.e., covering increased project costs due to unforeseen site conditions and other

contingencies."  Declaration of Loren Flossman (Jan. 8, 2020) ¶ 7(b), *RGISC* ECF No. 68-1.  In

other words, CBP has prepared for and already set aside money to cover cost overruns from the

funds available to it.

Although the Court found that similar allegations met the low bar for demonstrating

standing at the motion-to-dismiss stage, "that finding does not obviate the court's responsibility

to ensure that the plaintiff can actually *prove* those allegations when one or both parties seek

summary judgment."  Mem. Op. at 14 (citations omitted) (emphasis in original).  Far from the

proof required by Article III, RGISC's conjecture and speculation that § 284 and § 2808 funds

will be used for construction in the Rio Grande Valley is wholly insufficient at this stage.

*Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980) (no standing exists where the court

"would have to accept a number of very speculative inferences and assumptions in any endeavor

to connect [the] alleged injury with [the challenged conduct]").

In fact, Defendants have demonstrated that, "[c]ontrary to plaintiffs' assertion, the 110

miles of border wall system that CBP will construct in the Rio Grande Valley *is fully funded.*"

Flossman Decl. (6/24/20) ¶ 8 (emphasis added).  As Mr. Flossman explains, from the sources of

funding available to CBP (fiscal years 2018 and 2019 appropriations and the TFF), CBP has

$2.356 billion to construct a border wall system in the Rio Grande Valley.  *See id.* ¶¶ 9–10.  All

110 miles of barrier are currently under contract, and approximately $2 billion has been

obligated.  *See id.*  The remaining $350 million will be used for "risk mitigation (including

increased costs due to unforeseen site conditions or real estate), border wall system elements,

real estate and environmental support and project management." *Id.* ¶ 9, *see id.* ¶ 10.  Thus, CBP has not only fully funded the planned barrier projects in the Rio Grande Valley, it still has approximately $350 million in reserve should unexpected costs arise.  And even "if actual construction of project costs exceed CBP's available funding for [these] projects," the agency official responsible for overseeing barrier construction has affirmed—for the fourth time in this litigation—that "[i]n no event will CBP rely on [§ 284 or § 2808] to fund construction" in the Rio Grande Valley.  *Id.* ¶ 11.

II. **The CAA Does Not Preclude DoD From Using its Appropriated Funds Pursuant to Its Own Statutory Grants of Authority.**

A. **Section 230 of the CAA Does Not Prohibit DoD's Use of § 284 and § 2808.**

The Court should reject Plaintiffs' argument that the CAA prevents DoD from funding border barrier construction pursuant to § 284 and § 2808.  *See* RGISC Mot. at 26–30; CBD Mot. at 13–20.  As an initial matter, RGISC continues to assert that Congress's appropriation of $1.375 billion to DHS in § 230 of the CAA for border barrier construction in the Rio Grande Valley Sector implicitly precludes DoD from relying on its own separate statutory authority and appropriations for border barrier construction in other areas.  *See* RGISC Mot. at 27.  The Court previously held that Plaintiffs' failed to state a claim for a violation of § 230 and RGISC does not offer any new arguments to alter that conclusion.  *See* Mem. Op. at 41–45.  Congress's appropriation of funds to an account within DHS's budget does not explicitly or impliedly override DoD's existing statutory authority under § 2808 and § 284 to construct barriers using its

24

own appropriated funds.[17]  *See* Defs.'Mot. to Dismiss at 59–61 (*RGISC* ECF No. 34); Defs'

Reply in Support of Mot. to Dismiss at 28–30 (*RGISC* ECF No. 47).

### B.   Plaintiffs Do Not Fall Within the Zone of Interests of § 739 of the CAA.

Plaintiffs' reliance on § 739 of the Financial Services and General Government

Appropriations Act, 2019 (a component of the CAA), fares no better.  That provision states:

> None of the funds made available in this or any other appropriations Act
> may be used to increase, eliminate, or reduce funding for a program,
> project, or activity as proposed in the President's budget request for a fiscal
> year until such proposed change is subsequently enacted in an appropriation
> Act, or unless such change is made pursuant to the reprogramming or
> transfer provisions of this or any other appropriations Act.

Pub. L. No. 116-6, div. D, § 739, 133 Stat. at 197.

Because Plaintiffs assert their § 739 claim as an APA cause of action, Plaintiffs must fall

within "the zone of interests to be protected or regulated" by § 739.  *Match-E-Be-Nash-She-Wish*

*Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).  Plaintiffs cannot satisfy this

standard.  There is no question that § 739, standing alone, does not protect or regulate Plaintiffs'

environmental, recreational, and aesthetic interests in the land where § 284 and § 2808 barrier

construction will occur.  Section 739 is intended to regulate the back-and-forth relationship

between agencies and Congress regarding federal spending.  That provision's boilerplate

language, which has been included in appropriations statutes since 2014, *see e.g.*, Consolidated

Appropriations Act, 2014, Pub. L. No. 113-76, div. E, § 743, in no way suggests that Congress

intended to allow suits to enforce the attenuated interests these particular Plaintiffs assert here.

---

[17] RGISC also briefly argues that DoD's use of § 284 and § 2808 violates the Appropriations
Clause.  *See* RGISC Mot. at 26.  As noted above, the Court dismissed Plaintiffs' constitutional
claims.  *See* Mem. Op. at 54–58.

At the motion to dismiss stage, the Court concluded that Plaintiffs fell within the zone of interests of § 739 because it "bears an integral relationship" to §§ 231 and 232 of the DHS Appropriations Act (a separate component of the CAA) and these provisions arguably align with Plaintiffs' conservational interests.  *See* Mem. Op. at 38–40 (quoting *Indian River Cty. v. U.S. DOT*, 945 F.3d 515, 530 (D.C. Cir. 2019)).  Sections 231 and 232 place limitations on the use of funds for barrier construction in five specified areas of the border and require DHS to consult with local officials before beginning construction funded by DHS's fiscal year 2019 appropriations in certain locations.  *See* Pub. L. No. 116-6, div. A, §§ 231–32.

Defendants respectfully request that the Court reconsider at the summary judgment stage its prior conclusion that § 739 is integrally related to §§ 231 and 232, such that Plaintiffs fall within the zone of interests of § 739.  The "[t]he relevant statute" for zone-of-interests purposes "is the statute whose violation is the gravamen of the complaint."  *National Wildlife Fed'n*, 497 U.S. at 886.  Here, that statute is § 739, not § 231 or § 232.  The Supreme Court has recognized a narrow exception to the "relevant statute" requirement where the statute forming the basis of the plaintiff's claim bears an "integral relationship" with a closely-related provision.  *Air Courier Conference of Am. v. American Postal Workers Union,* 498 U.S. 517, 528–30 (1991).  But that narrow exception, which the Supreme Court has recognized only once, has no application here.

In *Clarke v. Securities Industry Association*, 479 U.S. 388, 401 (1987), the Supreme Court examined the National Bank Act and concluded that the provision of law that plaintiffs "claimed had been misinterpreted" by the agency (12 U.S.C. § 36) was "a limited exception" to an otherwise general statutory requirement in that same act (12 U.S.C. § 81).  *Id.*  Consequently, the Supreme Court held that the "zone-of-interests test was to be applied not merely in light of the" statute that formed the basis of the plaintiffs' claim (§ 36), but also on the basis of the

provision that established the general rule (§ 81), "to which § 36 was an exception." *Air Courier Conference*, 498 U.S. at 529.

The relationship between § 739 and §§ 231 and 232 is far more attenuated than the situation in *Clarke*. The statutes here do not create the type of interrelated general rule and exception relationship that the Supreme Court found critical in *Clarke*. Further, it is not enough that § 739 and §§ 231 and 232 are both within the CAA, an omnibus legislative vehicle that totals over 400 pages and consists of seven separate appropriations acts. *See* Pub. L. No. 116-6, § 3 (defining "act" to refer to each separate appropriations act). The Supreme Court rejected a similar argument in *Air Courier Conference*, 498 U.S. at 529–30, concluding that the inclusion of separate provisions in a lengthy statute (the Postal Reorganization Act) is not enough to satisfy the integral relationship test, even where the statutes addressed the same subject matter. "[T]o accept this level of generality in defining the 'relevant statute' could deprive the zone-of-interests test of virtually all meaning." *Id.* at 530; *see Fed'n for Am. Immigration Reform, Inc. v. Reno,* 93 F.3d 897, 903 (D.C. Cir. 1996).

Indeed, this case involves an even weaker relationship than *Air Courier Conference*, where the Supreme Court held that postal employees could not bring suit for violations of a postal statute regulating the delivery of international mail by reference to the zone of interests protected by the "labor-management provisions" for postal workers in the same statute. *See* 498 U.S. at 529–30. Here, there is no unifying substantive or procedural relationship between § 739 and §§ 231 and 232. Moreover, nothing in the text or structure of § 739 suggests that it has any connection to the consultation and conservational interests protected by §§ 231 and 232. Although the Court stated that § 739 "bears an integral relationship" to §§ 231 and 232 because "it preserves the integrity of each appropriation in the CAA[,]" Mem. Op. at 40, that approach

defines the inquiry at a level of generality that is inconsistent with the narrow way the Supreme

Court analyzed whether the statues were interrelated in *Clarke* and *Air Courier Conference*.  Just

as in *Air Courier Conference*, Plaintiffs cannot "leapfrog from their asserted protection" for

environmental interests under §§ 231 and 232 to assert a cause of action for a violation of the

funding limitations in § 739.  *Id.* at 530.

This conclusion is consistent with the D.C. Circuit's decisions applying the integral

relationship exception.  In the cases where the D.C Circuit has recognized an integral

relationship the statutory provisions at issue were far more directly related and intertwined than

the provisions at issue here.  *See Nat'l Petrochemical & Refiners Ass'n v. E.P.A.*, 287 F.3d 1130,

1146–48 (D.C. Cir. 2002) (holding that a truck manufacturer fell within the zone of interests to

challenge EPA's emissions credit program established pursuant to the Clean Air Act's general

authority to regulate pollutants because of the "integral relationship" between that provision and

the Clean Air Act's penalty provisions); *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362,

1366 (D.C. Cir. 1990) (concluding that an employees' union could challenge a regulation

requiring drug testing for certain local transit employees issued under the Urban Mass

Transportation Act because of the integral relationship between the authority for the regulation

and the "congressional solicitude throughout the statutory scheme for preserving employees'

collective bargaining rights at the local level").[18]  By contrast, this case is far more analogous to

the cases in which the D.C. Circuit concluded that no such integral relationship exists.  *See, e.g.,*

---

[18] *Indian River County* did not apply the "integral relationship" test because the Court of Appeals
concluded that the plaintiffs fell within the zone of interests of the statute they asserted was
violated (26 U.S.C. § 142).  *See* 945 F.3d at 528–30 (explaining that although the district court
analyzed "whether § 147(f) bears an integral relationship with § 142, the provision upon which
Indian River County sues," there was no need "to tarry further over the District Court's decision
because we hold that Appellant is within the zone-of-interests of 26 U.S.C. § 142(m)").

*Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 179 (D.C. Cir. 2012) (concluding that plaintiffs asserting a violation of the Clean Air Act could not satisfy the zone of interests requirement by reference to the interests protected by the Energy Independence and Security Act (EISA) because the statutes were not "integrally related" even though both statutes "have fuel as their subject matter" and the EISA "may have incentivized" a party to apply for a Clean Air Act waiver); *Reno,* 93 F.3d at 903 (D.C. Cir. 1996) (holding that distinct provisions of the INA did not have the "integral relationship" required to be considered together for the purpose of zone-of-interests analysis).

### C.    Border Barrier Construction Pursuant to § 284 and § 2808 Does Not Violate § 739 of the CAA.

Even assuming Plaintiffs could assert a claim under § 739 on the merits, Plaintiffs argument rests on a faulty premise:  that barrier construction undertaken pursuant to separate funding and statutory authority under § 284 and § 2808 is somehow adding funds to DHS's appropriation in the CAA.  *See* RGISC Mot. at 26–30; CBD Mot. at 13–20.  It is not.  Any funds utilized for border barrier construction pursuant to § 284 and § 2808 will be used for the purpose for which they were appropriated—counter-drug support and military construction—not to increase funding of DHS's appropriation in the CAA.  As discussed above, similar boilerplate language has been included in appropriations statutes since 2014 and there is nothing in § 739 to suggest that it could be read to implicitly repeal the longstanding and specific authority provided in § 284 or § 2808.

There is no violation of § 739 because DoD is not adding additional money to a "program, project, or activity" within one of DHS's budget accounts, as that term of art is understood in the appropriations context.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a

statute must be read in their context.") (internal quotations omitted).  The GAO has defined "program, project, or activity" as an "element within a budget account."  U.S. Gov't Accountability Off., GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* 80 (2005); *see* 31 U.S.C. § 1112 (requiring GAO to publish standard budget terms).[19]  Contrary to Plaintiffs' argument, s*ee* RGISC Mot. at 28–29; CBD Mot. at 15–16, the term "program, project, or activity" as used in § 739 refers to a particular item funded in an agency's budget account as set forth in an appropriations act, not the "border wall" generally.  *See McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991) (explaining that when Congress uses a "term of art," Congress is assumed to have "intended [the term] to have its established meaning" in that context).

In appropriating funds, Congress specifies appropriations to particular budget accounts within an agency.  *See, e.g.*, CAA, div. A, tit. II.  An agency's total budget is divided into several different appropriations accounts—*i.e.*, DHS's budget includes its "U.S. Customs and Border Protection–Procurement, Construction and Improvements" account, or "U.S. Immigration and Nationality Service–Operations and Support."  *See id.*  Under those accounts, an agency may fund numerous programs, projects, and activities.  *See generally* U.S. Customs and Border Prot., DHS, *Budget Overview, Fiscal Year 2019, Congressional Justification*, https://go.usa.gov/xd7Hj; *see id.* at 338 (describing the "Border Security Assets and Infrastructure" program, projects, and activities within DHS's U.S. Customs and Border Protection's Procurement, Construction, and Improvements account).

---

[19] *See also* 2 U.S.C. § 906(k)(2) (defining "programs, projects, and activities" for purposes of budget sequestration by reference to "a budget account . . . as delineated in the appropriation Act or accompanying report for the relevant fiscal year covering that account"); *United States v. Burgess*, 1987 WL 39092, at *17 n.16 (N.D. Ill. Dec. 1, 1987) (defining the term by reference to the "most specific level of budget items" listed in an appropriations act and committee reports).

The CAA, like other appropriations statutes, uses the term "programs, projects, and activities" in this specific manner:  to refer to elements within an agency's budget accounts.  *See, e.g.*, CAA, div. A, § 101, (directing DHS Chief Financial Officer to submit to the appropriations committees reports "that include[] total obligations of the Department for that month . . . at the appropriation and program, project, and activity levels"); *see also* H.R. Rep. No. 116-9, at 503 (2019) ("remind[ing]" DHS, in the Conference Report accompanying the CAA, that DHS should "follow GAO's definition of 'program, project, or activity' as detailed in the GAO's A Glossary of Terms Used in the Federal Budget Process").  CBD even concedes that Defendants' definition of "program, project, or activity" is "the meaning that Congress routinely applies to the phrase." CBD Mot. at 16.

None of the § 284 or § 2808 projects that DoD is undertaking increases funding for an element within any budget account that belongs to DHS (or any other agency).  Rather, DoD is using funds previously appropriated by Congress to DoD pursuant to longstanding statutory authority.  *See* AR at 35–37, 148–56, 271–73.  The fact that appropriations to different agencies can be used for similar purposes does not transform a valid use of one source of appropriated funds into an improper expenditure.  *See* Mem. Op. at 44 (stating that "no one alleges that the Government is using general appropriations to inflate the specific appropriation to Rio Grande Valley Sector barrier construction" and concluding that "the Government is using general appropriations to fund a *different*, though similar, subject") (emphasis in original).  Under Plaintiffs' reading, the term "program, project, or activity" would entirely eliminate the possibility that two agencies could spend their own respective appropriated funds on similar, but entirely separate, activities that each was statutorily authorized to undertake.  Without a clear statement from Congress, § 739 cannot be read so broadly.  The fact that § 284 and § 2808

provide DoD with independent authority to construct border barriers does not somehow transform DoD's use of those authorities into an excess infusion of money to an entirely separate DHS appropriation account.  Accordingly, the use of funds at issue here complies with § 739, and Plaintiffs have not established a violation of the CAA.[20]

In the alternative, CBD argues that it prevails even if the term "program, project, or activity" is understood to refer to a specific element within an agency's budget account.  *See* CBD Mot. at 16–17.  CBD contends that under this definition the specific budget account for purposes of the § 739 analysis is the "U.S. Customs and Border Protection–Procurement, Construction and Improvements" account that appropriates funds "for the construction of fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector."  *See* Pub. L. No. 116-6, div. A, § 230.  But even accepting that framing, DoD's use of § 284 and § 2808 funds is not adding additional funds to this account.  None of the challenged § 284 and § 2808 projects at issue are in the Rio Grande Valley Sector, and DoD is not transferring its own appropriated funds to DHS to increase the funding levels in its account.

### III.    Plaintiffs Cannot Evade The Zone-Of-Interest Requirement By Asserting an Implied Equitable Cause of Action.

The Court should dismiss Plaintiffs' implied equitable cause of action alleging violations of § 284, § 8005, and § 2808 because Plaintiffs do not fall within the zone of interests protected by these statutes.  Defendants acknowledge the Court previously concluded that Plaintiffs need not satisfy the zone-of-interests test to assert equitable *ultra vires* claims, *see* Mem. Op. at 48–

---

[20] For these reasons, the Court should not follow the analysis of § 739 in *State of Washington v. Trump*, 2020 WL 949934 at *9 (W.D. Wash. Feb. 27, 2020), and *El Paso Cty. v. Trump*, 408 F. Supp. 3d 840, 859–60 (W.D. Tex. 2019).  Those courts erred in concluding that the "border wall" generally is a "program, project, or activity" and did not address Defendants' arguments that the term has a specific meaning within the budget context.

49, but Defendants respectfully request the Court reconsider this decision at the summary judgment stage.  *See* Defs.' Supp. Briefs Addressing Zone of Interests (*CBD* ECF Nos. 46, 51; *RGISC* ECF Nos. 67, 71)

In granting in part Defendants' motion to dismiss, the Court concluded that Plaintiffs' APA claims asserting violations of § 284, § 8005, and § 2808 failed because Plaintiffs' could not satisfy the zone-of-interests requirement.  *See* Mem. Op. at 32–41.  The fact that Plaintiffs cannot satisfy the APA's zone-of-interests requirement forecloses any attempt to invoke an equitable cause of action to evade the limits Congress has imposed in the APA.  *See Sierra Club v. Trump*, 929 F.3d 670, 712 (9th Cir. 2019) (N.R. Smith, J., dissenting) (plaintiffs cannot assert "an equitable claim to bypass the APA's limitations").

The argument that an implied equitable *ultra vires* cause of action need not comply with the zone-of-interest test was presented and rejected by the Supreme Court in *Trump v. Sierra Club*, 140 S. Ct. 1 (2019).  The Supreme Court granted the government's motion for a stay pending appeal, concluding the government had made a sufficient showing that the plaintiffs fell outside the zone-of-interests of the statute they sought to enforce through an implied equitable action.  *Id.* at 1.  ("Among the reasons [for the stay] is that the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005.").  In reaching this conclusion, the Supreme Court logically had to reject the plaintiffs' argument that the zone of interests test does not apply to such equitable claims.  *See Trump v. Sierra Club*, No. 19A60 (S. Ct.), Respondents' Opposition to Application for Stay at 27–31 (arguing that "Plaintiffs have an ultra vires cause of action, and therefore need not satisfy a zone-of-interests test").

The "judge-made remedy" of equitable relief to enjoin executive action does not permit Plaintiffs to sidestep "express and implied statutory limitations" on judicial review of nonconstitutional claims, such as under the APA. *Armstrong* v. *Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384-1385 (2015). "Courts of equity can no more disregard those limitations than may "courts of law." *Id.* (citation and internal quotations omitted). Indeed, *Armstrong* itself held that a federal statute "implicitly preclude[d] private enforcement" actions "in equity" based on the text and structure of the statute. *Id.* at 1384–85 (an implied cause of action in equity is available only in "some circumstances" that present "a proper case"). Likewise here, Plaintiffs cannot invoke an equitable cause of action to assert a broader claim that would not be available under the express cause of action in the APA. *See* Mem Op. at 48 ("The Court doubts that Plaintiffs can bring an equitable claim when a statutory cause of action is available to it.").

This conclusion is reinforced by the Supreme Court's recent decision in *Hernandez v. Mesa*, 140 S. Ct. 735 (2020), which declined to extend the implied cause of action in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), to create a constitutional damages remedy for a cross-border shooting. In reaching that conclusion, the Supreme Court stated that it "frequently look[s] to analogous statutes for guidance on the appropriate boundaries of judge-made causes of action." *Hernandez*, 140 S. Ct. at 747. To determine the scope of *Bivens*, the Supreme Court relied on the limitations in 42 U.S.C. § 1983, the statute providing for a damages remedy for constitutional violations under the color of state law, that restricted the remedy only to citizens or persons subject to United States jurisdiction. *Id.* (finding § 1983's statutory limitation "especially significant"). The Supreme Court concluded that "[i]t would be 'anomalous to impute a judicially implied cause of action beyond the bounds Congress has

34

delineated for a comparable express cause of action.'" *Id.* (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 736 (1975)).

That same rationale applies equally to this case, as it would defy both law and logic to conclude that Plaintiffs who are not within the zone of interests to enforce the limitations in § 284, § 8005, and § 2808 under the *express* APA cause of action can nonetheless sue to enforce those same limitations under an *implied* cause of action. The Supreme Court has consistently rejected similar attempts to expand the scope of implied equitable actions beyond the limits of related statutory cause of actions. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("It would be inconsistent with our place in the constitutional scheme were we to sanction more expansive remedies in a judicially created cause of action . . . than Congress has allowed"); *FCC v. ITT World Commc'ns, Inc.,* 466 U.S. 463, 468 (1984) (holding that "[l]itigants may not evade" a provision that vests the courts of appeals with exclusive jurisdiction by requesting a district court to enjoin agency "action as ultra vires"); *Block v. North Dakota*, 461 U.S. 273, 284–85 (1983) (holding that plaintiffs could not "avoid the [Quiet Title Act's] statute of limitations and other restrictions by the device of an officer's suit); *Bush v. Lucas*, 462 U.S. 367, 388 (1983) (declining to create an implied cause of action where Congress had created a comprehensive remedial system for civil service employees even though that system did not "provide complete relief for the plaintiff").

Allowing Plaintiffs' equitable claim to proceed in these circumstances would eviscerate the APA's limits on judicial review. As Judge Smith explained, the "failure to channel Plaintiffs' claims through the APA's framework for challenging agency action will inevitably lead to peculiar results." *Sierra Club*, 929 F.3d at 717 (N.R. Smith, J., dissenting); *see Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176–78 (2011) (warning of "absurd

consequences" if persons with Article III injuries that are "unrelated" to the interests protected by the statute could bring suit).  There would be no reason for any plaintiff to rely on the APA to challenge agency action if an implied equitable action is always available without having to comply with limitations Congress has imposed through the APA.  *Sierra Club*, 929 F.3d at 717 (N.R. Smith, J., dissenting).  Such a regime would "distort decades of administrative law practice."  *Id.*

A leading treatise supports this view, noting that the availability of an implied equitable action "raises the question of why anyone would bother to use more limited causes of action created by special statutory review proceedings and the APA."  33 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 8307 (3d ed. April 2020 Update).  For that reason, "an equitable remedy via nonstatutory review ought not be available" where, as here, Plaintiffs seek to expand the Court's equitable jurisdiction beyond the bounds of the APA.  *Id.*  This conclusion is consistent with the longstanding "doctrine of equity jurisprudence that courts of equity should not act  . . . when the moving party has an adequate remedy at law."  *Younger v. Harris*, 401 U.S. 37, 43 (1971); *see Am. Rd. & Transp. Builders Ass'n v. EPA.*, No. 12-5244, 2013 WL 599474, at *1 (D.C. Cir. Jan. 28, 2013) (relying on this principle to summarily affirm a district court order "declining to exercise its general equity jurisdiction" where a statutory cause of action existed under the Clean Air Act); *see also Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999) (equity jurisdiction is limited by "traditional equitable relief").

In declining to dismiss Plaintiffs' equitable cause of action at the motion to dismiss stage, the Court relied principally on dicta from *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987).  *See* Mem. Op. at 48–49.  Defendants have previously explained why the

footnote in that decision does not provide Plaintiffs with an exemption from the zone-of-interest

requirement when asserting a non-statutory equitable cause of action. *See RGISC* ECF No. 67 at

5–6, ECF No. 71 at 5; *CBD* ECF No. 46 at 5–6, ECF No. 51 at 5. Further, the non-binding dicta

in *Haitian Refugee Center* is in tension with the far more recent decisions from the Supreme

Court, including *Sierra Club*, *Armstrong* and *Hernandez*, limiting the scope of implied equitable

claims, if not outright rejecting them. There is no dispute that the zone-of-interests test applies to

APA claims, independent statutory cause of actions (*e.g.*, Lanham Act), and equitable

constitutional claims. *See RGISC* ECF No. 67 at 2–3 (citing cases); *CBD* ECF No. 46 at 2–3.

Because the zone of interests' "roots lie in the common-law[,]" there is no principled basis on

which to create an exception for the type of equitable statutory claims that Plaintiffs assert here.

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 & n.5 (2014).

        Further, the Court should not imply an equitable cause of action to give Plaintiffs a

second bite at the apple to re-assert their failed APA claims without having to comply with the

zone-of-interests requirement. Other courts confronted with the same type of overlapping claims

asserting identical statutory violations under both equitable and express statutory causes of action

have dismissed the equitable claims, and this Court should do the same here. *See Puerto Rico v.

United States*, 490 F.3d 50, 59–60 (1st Cir. 2007) (holding that Puerto Rico must assert claims

under the APA even though "nonstatutory review might have allowed Puerto Rico to obtain a

more favorable standard of review and to circumvent certain of the APA's procedural

requirements"); *Neb. Legislative Bd. v. Slater*, 245 F.3d 656, 659 (8th Cir. 2001) (holding

nonstatutory review unavailable where the plaintiff could have sought judicial review under a

statutory grant of jurisdiction to the court of appeals "but failed to do so in a timely fashion");

*California Sportfishing Prot. All. v. United States Bureau of Reclamation*, 2015 WL 6167521, at

*10–11 (E.D. Cal. Oct. 20, 2015) (declining to review a federal agency's compliance with water quality standards under non-statutory ultra vires cause of action where plaintiffs' APA claim failed for lack of final agency action); *Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 312 (D.D.C. 2017) (holding that "because plaintiffs are able to assert the same claim through the APA, they cannot obtain relief under the Mandamus Act or through the Court's inherent power to review ultra vires agency action").

### IV.   Plaintiffs' Implied Equitable *Ultra Vires* Claims Fail on the Merits.

#### A.   *Ultra Vires* Review is Narrow and Limited.

Even assuming Plaintiffs could proceed with an implied equitable *ultra vires* claim, the scope of the Court's review is limited.  "The basic premise behind nonstatutory review is that, even after the passage of the APA, some residuum of power remains with the district court to review agency action that is ultra vires."  *R.I. Dep't of Envtl. Mgmt. v. United States*, 304 F.3d 31, 41 (1st Cir. 2002).  However, it is "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), and the equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).[21]

---

[21] Plaintiffs focus their argument on the line of cases in the D.C. Circuit allowing equitable *ultra vires* review to proceed notwithstanding the potential availability of an alternative statutory cause of action.  *See* CBD Mot. at 20–22; RGISC Mot. at 12–13 (citing *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996); *Aid Ass'n for Lutherans v. U.S. Postal Service*, 321 F.3d 1166 (D.C. Cir. 2003)).  But the question in this case is not whether the APA, standing alone, implicitly repealed equitable *ultra vires* review that existed before passage of the APA— Defendants acknowledge the D.C. Circuit has concluded otherwise.  *See, e.g., Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988).  Rather, the issue the Court must address is what is the scope and contour of Plaintiffs' implied equitable claims.  As explained herein, Plaintiffs' equitable claims must satisfy the zone-of-interests requirement and are subject to a heightened standard of review.

*Ultra vires* review of agency action is available when an agency's error is "patently a misconstruction of the Act," or "when the agency has disregarded a specific and unambiguous statutory directive," or "when the agency has violated some specific command of a statute." *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) (internal citations and quotations omitted).  "Garden-variety errors of law or fact are not enough."  *Id.*

This standard derives from the limited equitable review that the Supreme Court recognized in *Leedom v. Kyne,* 358 U.S. 184 (1958).  As the Supreme Court has explained, *Kyne* was "characterized by extraordinary circumstances" because it involved action by the National Labor Relations Board that was "'in excess of its delegated powers and contrary to a specific [statutory] prohibition.'" *Boire v. Greyhound Corp.*, 376 U.S. 473, 480 (1964) (quoting *Kyne*, 358 U.S. at 188).  Indeed, the NLRB in *Kyne* conceded that it had acted in excess of its authority and caused injury to the plaintiffs' statutory collective bargaining rights.  *Id.* at 480 (citing *Kyne,* 358 U.S. at 187).  The Supreme Court has since emphasized that *Kyne* should be confined to the "narrow limits" and "painstakingly delineated procedural boundaries" of that particular case.  *Id.* at 481.  The Court of Appeals has similarly stated that the "invocation of *Leedom* jurisdiction" is "extraordinary" and "extremely limited in scope."  *Ass'n of Civilian Technicians v. FLRA,* 283 F.3d 339, 344 (D.C. Cir. 2002); *see Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006) ("This point cannot be overstated").

In addressing Defendants' motions to dismiss, the Court concluded that Defendants had not carried their burden to establish that this "heightened scrutiny" applies to Plaintiffs' *ultra vires* claims in light of Plaintiffs' argument that the standard applies only "[w]hen plaintiffs bring *ultra vires* claims where Congress has precluded review."  *See* Mem. Op. at 46–47.  But two D.C. Circuit cases outside of the preclusion context illustrate that the heightened standard of

review applies to equitable *ultra vires* claims even where Congress has not precluded other forms of statutory review.

First, in *Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir 2006), the Court of Appeals confronted the same type of overlapping APA and implied equitable *ultra vires* claims that Plaintiffs present in this case.  *Id.* at 188 (asserting separate causes of action that the FTC exceeded its statutory authority in issuing a press release critical of the plaintiff).  Like the Court here, the Court of Appeals concluded that the plaintiff's APA claim for agency action in excess of statutory authority should be dismissed on threshold grounds, finding that the press release at issue was not "final agency action."  *See id.* at 189.  The Court of Appeals next addressed the plaintiffs' implied *ultra vires* claim and the FTC's argument that the heightened standard of review should apply.  *See id.* at 189–90.  Importantly, the Court of Appeals stated:  "There certainly is no question that nonstatutory review 'is intended to be extremely limited in scope,' *Griffith*, 842 F.2d at 493, and hence represents a more difficult path for Trudeau than would review under the APA (assuming final agency action) for acts 'in excess of statutory . . . authority," 5 U.S.C. § 706(2)(C)."  *Id.* at 190.  The Court of Appeals reiterated this distinction between APA and *ultra vires* review standards later in the opinion:  "the cause of action provided by the APA offers Trudeau the more inclusive (covering both his [statutory] and constitutional claims) and more expansive (as compared to the narrow scope of nonstatutory review) vehicle for asserting his claims."  *Id.*

Second, in *American Clinical Lab. Association v. Azar*, 931 F.3d 1195 (D.C. Cir. 2019), the Court of Appeals favorably cited *Trudeau*'s standard for *ultra vires* review in a non-preclusion context.  *Id.* at 1208.  Although the Government argued that judicial review of the plaintiff's claim was precluded, the Court of Appeals concluded otherwise, holding that the

statute at issue "does not bar judicial review of the Secretary's rule" and instructed the district

court to consider the plaintiff's APA challenge. *Id.* Even though APA review was not

precluded, the Court of Appeals nonetheless proceeded to consider the plaintiff's implied *ultra*

*vires* claim under the heightened standard of review. *Id.* at 1208–09. The Court of Appeals

stated that *ultra vires* review has an "extremely limited scope" and the plaintiff "must show a

patent violation of agency authority." *Id.* at 1208 (quoting *Trudeau* and *Indep. Cosmetic Mfrs. &*

*Distribs., Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 574 F.2d 553, 555 (D.C. Cir. 1978)).

Applying that standard, the Court of Appeals found that the agency "did not clearly step so far

outside the scope of" its statutory authority "as to have acted *ultra vires*." *Id.* ("Appellant's

objection to the Secretary's efforts, even if meritorious, does not establish that the Secretary

acted *ultra vires*.").

　　*Trudeau* and *Azar* thus establish that the heightened standard for equitable *ultra vires*

review applies in this case.[22] As explained below, Plaintiffs have not established an "obvious" or

"apparent" violation of § 8005, § 284, or § 2808, *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health &*

*Human Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016), as opposed to a mere "dispute over statutory

interpretation." *Dart,* 848 F.2d at 231.[23]

### B.　　DoD's Transfer of Funds Pursuant to § 8005 is Lawful.

　　Section 8005 authorizes the Secretary of Defense to transfer funds among DoD's internal

budget accounts to accommodate higher priorities that were unforeseen and not specifically

---

[22] CBD appears to concede this point and states that it "must show that the challenged action is 'patently in excess of the agency's authority.'" CBD Mot. at 8 (quoting *Qwest Corp. v. FCC*, 482 F.3d 471, 476 (D.C. Cir. 2007) ("we can't say that the Commission's action here falls into the outer darkness of a "patent" violation")).

[23] Even if the Court were to review Plaintiffs' *ultra vires* claims under a *de novo* non-deferential standard of review, Defendants' would still prevail for the reasons set forth below.

denied during the budgeting process.  *See* Pub. L. 115-245, div. A, § 8005.  The Secretary of

Defense correctly concluded that the requirements of § 8005 were satisfied in directing the

transfer of funds at issue here.  The Secretary concluded that the transfers to provide DHS

counter-drug support in constructing border barriers were for a "higher priority item" than the

purposes for which the funds were originally appropriated, because the transferred funds were

"excess or early to current programmatic needs."  *See* AR at 2, 3, 5, 10–11, 35–37, 140, 146–56;

*see supra* note 4.  The Secretary further found that § 284 projects were "unforeseen" because

DoD's need to provide support for the projects was not known at the time of DoD's fiscal year

2019 budget request.  *Id.* at 2, 5, 10–11, 138–40, 146–47.  DoD's budget was finalized in

September 2018, *see* DoD Appropriations Act, Pub. L. No. 115-245, but DHS did not submit its

request for DoD's assistance under § 284 until February 2019, *see* AR at 15, five months later.

The Secretary also concluded that the item for which the funds were transferred—barrier

construction under § 284 in the specific project areas requested by DHS—had not "been denied

by Congress."  *Id.* at 2, 5, 11, 139–40, 146–47.

  The Secretary's decision is consistent with the views of the GAO, the independent

legislative agency charged with overseeing Executive Branch spending on behalf of Congress.

In response to a request from several Members of Congress, the GAO concluded that DoD acted

consistently with § 8005 in transferring and using its "fiscal year 2019 appropriations for the

purpose of constructing fences at the southern border of the United States" to support DHS's

drug-interdiction efforts.  *See* GAO Opinion B-330862, 2019 WL 4200949 (Sept. 5, 2019).  The

GAO found that DoD's transfer was for an "unforeseen military requirement" under § 8005

because DHS's § 284 request "was unforeseen at the time of [DoD's] budget request and

appropriations," and DoD's "authority to support DHS by constructing fences at the southern

border under section 284 only materialized when DHS requested DOD's assistance on February 15, 2019, and DoD accepted that request." *Id.* at *6. The GAO also concluded that the item had not been "denied by Congress" because DoD had not requested funds to support DHS, "so there was nothing for Congress to deny with respect to DOD." *Id.* at *8–9 (noting that GAO had "reached similar conclusions in prior opinions"). The GAO's conclusion reflects the "expert" view of an independent arm of Congress on fiscal issues that the Court should "prudently consider." *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 (D.C. Cir. 1984) (Scalia, J.).

CBD's contrary arguments are incorrect. *See* CBD Mot. at 2, 23–26. CBD argues that DoD violated § 8005 because the "item" to be funded by the transfer is "Congress's specific border wall appropriation" to DHS in the CAA and that appropriation "denied" funding for any additional border barriers. *See id.* at 2, 23–24. But CBD ignores the fact that Court previously concluded that the appropriation to DHS in the § 230 of the CAA does not prohibit DoD from relying on its own separate statutory authority and appropriated funds. *See supra* at 24–25. The GAO reached the same conclusion, finding that Congress's appropriations to DHS for border barrier funding do not constitute a "denial" of appropriations to DoD for its counter-drug activities under § 284. *See* GAO Opinion B-330862, 2019 WL 4200949 at *8–9. Accordingly, there is no basis to conclude that in passing the CAA Congress "denied" DoD the authority to utilize § 8005 to transfer funds for the § 284 border barrier projects at issue here.

Indeed, the phrase "item for which funds are requested" most naturally refers to an item within DoD's own budget, as § 8005 does not permit anyone other than DoD to "request" that funds be transferred. That is confirmed by the first clause of § 8005, which disallows transfers "unless *for* higher priority items." *Id.* (emphasis added). To the extent DoD is using § 8005 to transfer money "*for*" a "higher priority item," the referenced "item" must be a specific project or

program *of DoD*'s—after all, § 8005 permits DoD to transfer funds only between internal DoD accounts.

Further, § 8005's reference to an "item for which funds are requested" cannot be understood at the level of generality used by CBD to refer to border wall construction generally *See* CBD Mot. at 23–24. Section 8005 is a provision in DoD's annual appropriations statute, and must be understood in that context. *Home Depot U.S.A. v. Jackson*, 139 S. Ct. 1743, 1748 (2019) (explaining that the "words of the statute must be read in their context and with a view to their place in the overall statutory scheme.") (citation omitted). During the budgeting process, DoD requests funding from Congress for particular items, which may be as varied as personnel expenses, weapons systems, activities, or other programs, and Congress appropriates funds in light of those requests. *See, e.g.*, H.R. Rep. No. 115-952, at 452 (noting the House-, Senate-, and conference-committee determinations regarding DoD's requests for items to be funded by the appropriation for "Drug Interdiction and Counter-Drug Activities, Defense"). Section 8005 reflects Congress's understanding that, after this process between Congress and DoD is complete, DoD must nevertheless have "financial flexibility during a given year" to respond to changing circumstances after its budget has been finalized. *See* H.R. Rep. No. 93-662, at 17.

Congress first imposed limitations on DoD's transfer authority for "denied" "items" in 1974, to ensure that DoD would not transfer funds for items in its budget that "ha[d] been *specifically deleted* in the legislative process" between DoD and Congress, or "for projects or items which are of a lower priority from programs of higher priority which have been funded." H.R. Rep. No. 93-662, at 16 (emphasis added). Understood in this context, the term "item for which funds are requested" in § 8005 means a particular item for which DoD may request

funding during a given fiscal year because it requires additional funding beyond the amount (if any) Congress appropriated to DoD for the fiscal year for that item.

Thus, contrary to CBD's argument, the "item" § 8005 refers to cannot be DHS's border barrier appropriation or a generic "border wall," untethered to any particular DoD authority or spending program.  It can only be an "item" for which DoD could request funding during the process of negotiating the defense budget.  Here, the relevant "item for which funds are requested" is DoD's counter-narcotics support to DHS under § 284 pursuant to DHS's fiscal year 2019 request for support.  That "item" was not "denied by the Congress."  At no point in the budgeting process did Congress deny a DoD funding request for border-barrier construction under DoD's counter-narcotics support line.

CBD points to the fact that Congress specifically appropriated funds to DoD for border fencing between 1997 and 2009, and could have appropriated such funds again in 2019.  *See* CBD Mot. at 25–26.  But the mere fact that Congress took no action to add funding in 2019 for an item that DoD never requested in its budget submissions is not a denial of that item.  As explained above, the key inquiry for § 8005 is whether DoD specifically requested funds to support the § 284 projects at issue and whether Congress denied that request.  Here, "the President's Budget for Fiscal Year 2019 did not request any amounts for DOD with respect to construction of fences at the southern border, so there was nothing for Congress to deny with respect to DOD."  *See* GAO Opinion B-330862, 2019 WL 4200949 at *8.  The GAO has also recognized that Congress's decision to reduce the amount of funding specifically requested by an agency "is not tantamount to a denial of the item by Congress."  *See id.* at 8–9 (citing prior GAO opinions).  Thus, *a fortiori*, the mere absence of appropriated funds for a specific item is not a

denial where the agency did not request funds for that item and it was not "specifically deleted" during the budgeting process.  H.R. Rep. No. 93-662, at 16.[24]

### C.    DoD's Border Barrier Construction Pursuant to § 284 is Lawful.

DoD's construction of the six fiscal year 2019 border barrier projects falls squarely within its counter-drug support authority under § 284.  RGISC does not dispute that the projects at issue were approved in accordance with § 284's procedural requirements, *id.* § 284(a), (a)(1)(A), and encompass the type of fences, roads, and lighting permitted by the statute, *id.* § 284(b)(7).  RGISC likewise does not dispute that the projects at issue are being constructed in "drug smuggling corridors" along the U.S.-Mexico border.  *Id.*

Instead, RGISC contends that DoD has exceeded the level of support that it may provide under § 284.  *See* RGISC Mot. at 37–39.  But the text and history of § 284 contradict RGISC's claim that Congress impliedly limited DoD's support authority under the statute.  No monetary restriction appears in the types of support permitted under § 284(b).  *See* 10 U.S.C. § 284(b).  To the contrary, the statute broadly approves "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States" without regard to the size, scale, or budget of the project.  *Id.* § 284(b)(7).  It would be entirely arbitrary for the Court to create an unspecified monetary limit on DoD's § 284(b)(7) authority out of whole cloth, as nothing in the statute even arguably defines any upper limit.

RGISC points to the requirement under Section 284(h) that the Secretary must give

---

[24] CBD contends that the GAO opinion is flawed because it described the "item" at issue as "fences at four sectors at the southern border."  *See* CBD Mot. at 24.  But that reference in the GAO opinion is simply a more detailed description of the § 284 projects, which are located in the El Paso, El Centro, Tucson, and Yuma border patrol sectors.  The GAO correctly recognized that the "item" for § 8005 purposes is the specific § 284 projects requested by DHS and not, as CBD contends, border barrier funding generally.

Congress 15 days' written notice before engaging in "small scale construction," which the statute defines as construction "not to exceed $750,000." *Id.* § 284(h)(1)(B), (i)(3). That notice requirement does not expressly prohibit larger construction, and it also provides no basis to infer that Congress intended to limit the support authorized under § 284(b)(7) to "small scale construction."[25]  Contrary to RGISC's suggestion, there is nothing inherently implausible about Congress choosing to require notice for some, but not all, projects that DoD could construct under § 284.  Congress could reasonably have concluded, for example, that it would be unlikely to be made independently aware of small-scale construction projects, rendering a notice requirement uniquely necessary in that context.  If Congress wanted to limit all § 284 construction to "small scale construction," it could have and "presumably would have done so expressly." *Russello v. United States*, 464 U.S. 16, 23 (1983). "The short answer is that Congress did not write the statute that way." *Id.*

RGISC's argument also cannot be reconciled with § 284's history.  Since Congress first provided § 284's support authority, DoD has repeatedly used that authority, with Congress's explicit approval, to complete large-scale fencing projects along the southern border in support of DHS's counter-drug activities.  For example, under authority of the first counter-drug activities support appropriation, DoD built a 14-mile fence in a drug smuggling corridor along the San Diego-Tijuana border—a project Congress described as "precisely the kind of federal-local cooperative effort the Congress had in mind" in enacting such authority.  H.R. Rep. No. 103-200, at 330-31 (1993).  As of 2006, Congress reported with approval that, since 1990, DoD's use of its authority to support counterdrug activities through "construction and

---

[25] The predecessor statute to § 284 also did not contain any limitation on the level of support DoD could provide for border barrier construction.  *See* National Defense Authorization Act for Fiscal Year 1991, Pub. L. No. 101-510, § 1004, 104 Stat. 1485 (1991).

rehabilitation" along the southern border "resulted in 7.6 miles of double-layer fencing, 59 miles of single fencing, and 169.5 miles of road." H.R. Rep. No. 109-452, at 368 (2006). And in determining appropriations for these construction activities, Congress recommended that DoD spend millions of dollars on specific border projects with regular annual increases. *See, e.g.*, *id.* at 369 (recommending a $10 million increase in DoD's budget for fence and road construction on the southern border); *see also* H.R. Rep. 110-652 at 420 (2008) (recommending $5 million increase); H.R. Rep. 110-146 at 385–86 (2007) (recommending $8 million increase). Far from being an elephant hidden in a mouse hole, *see* RGISC Mot. at 39, Congress has approved of DoD's prior barrier construction under § 284 in amounts substantially greater than the $750,000 limit RGISC seeks to infer from the congressional notification requirement. *See* 10 U.S.C. § 284(h)(1)(B), (i)(3).

Nor is there any merit to RGISC's argument that DoD's use of § 284 overrides Congress's decisions about border barrier funding. *See* RGISC Mot. at 38. The entire purpose of § 284 is to permit DoD to use its own appropriated funds to support DHS through the construction of barriers to block drug-smuggling corridors. RGISC's interpretation of § 284 would render the entire provision a nullity, as DoD would be prohibited from providing such authorized support under § 284 in any year in which Congress appropriates funds to DHS specifically for border fence construction. *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 20 (1995) (avoiding construction that rendered statute meaningless). There is no evidence Congress intended that result, and the long history of Congress's support for § 284 construction refutes RGISC's position.

For similar reasons, the Court should reject RGISC's argument that DoD's § 284 support is constrained by Congress's appropriations to DHS in the CAA. *See* RGISC Mot. at 39. This

argument is simply a re-packaged version of the same § 230 claim that the Court previously rejected. *See* Mem. Op. at 41–45. There is no basis to conclude that the CAA, a statute appropriating funds to *DHS*, impliedly prohibits *DoD* from relying on its own previous appropriations and independent counter-narcotics support authority under § 284. RGISC relies on the Supreme Court's statement in *Food & Drug Administration v. Brown & Williamson Tobacco Corporation*, 529 U.S. 120, 133, (2000), that "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *See* RGISC Mot. at 39. But that canon of statutory construction for evaluating *Chevron* deference challenges has no application here because Congress has not directly spoken to whether the funding to DHS in the CAA precludes use of § 284 authority. The CAA does not address § 284 support at all, let alone "specifically address the topic at hand." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 143.

RGISC also continues to rely on *Nevada v. Department of Energy*, 400 F.3d 9 (D.C. Cir. 2005), but the Court previously explained that the general-specific appropriation principle discussed in that case does not apply here where separate appropriations are being used "to finance similar, but distinct, projects" authorized by separate statutory authorities. *See* Mem. Op. at 42–44. RGISC suggests CBP's website showing a map of ongoing construction of various projects under the heading "border wall system" warrants a different conclusion, *see* RGISC Mot. at 40, but a website cannot change the fact that each of the projects is funded by legally distinct appropriations and authorities, thus the "general-specific" canon has no application here.

The Court should also reject RGISC's claim that support under § 284 is subject to the reimbursement requirement provided in 10 U.S.C. § 277. *See id.* at 41. Section 277 provides, with certain exceptions, that the Secretary of Defense shall "require a civilian law enforcement

agency to which support is provided under this chapter to reimburse [DoD] for that support" "to the extent otherwise required by section 1535 of title 31 (popularly known as the 'Economy Act')." 10 U.S.C. § 277(a).  Section 284(g), however, expressly exempts support for counter-drug activities from this reimbursement requirement by providing that counter-drug support is "not subject to the other requirements of this chapter."  *See* 10 U.S.C. § 284(g)(1).  Section 284 and § 277 are both part of 10 U.S.C., Chapter 15.  Accordingly, § 277 has no application here.

### C.    DoD's Border Barrier Construction Pursuant to § 2808 is Lawful.

#### 1.    Section 2808's Requirement that the President Declare a National Emergency that Requires Use of the Armed Forces is Non-Justiciable.

Section 2808's military construction authority is made available to DoD upon "a declaration by the President of a national emergency in accordance with the National Emergencies Act (50 U.S.C. 1601 et seq.) that requires use of the armed forces[.]"  10 U.S.C. § 2808(a).  The Court previously concluded that the President's decision to declare a national emergency at the southern border is a nonjusticiable political question.  *See* Mem. Op.  17–24. RGISC contends, however, that the Court's decision did not "dispose of the question whether the situation at the border 'requires the use of the armed forces.'"  *See* RGISC Mot. at 31.  To the contrary, the Court's decision made clear that the statutory requirement in § 2808 that the President determine that the national emergency "require[s] use of the armed forces" is—like the declaration of a national emergency itself—a nonjusticiable political question.  *See* Mem. Op. at 22 n.10 ("The Court will therefore not review any portion of the President's emergency declaration, including his determination that the emergency 'requires the use of the armed forces.'").  Defendants previously explained at length why the "use of the armed forces" requirement in § 2808 is nonjusticiable (*see RGISC* ECF No. 34 at 50–53; ECF No. 47 at 26–28),

and RGISC's motion merely repeats the same arguments that the Court previously rejected at the motion to dismiss stage.  *Compare* RGISC Mot. at 31–33 *with RGISC* ECF No. 39 at 58–60.

### 2.      The § 2808 Border Barriers Are Military Construction Projects.

Section 2808(a) authorizes the Secretary of Defense to "undertake military construction projects," and there is no dispute here that the planned border barriers constitute "construction" being undertaken by DoD.  Accordingly, the projects fall within the definition of "military construction" so long as they are undertaken "with respect to a military installation."  10 U.S.C. § 2801(a).

The locations of the planned border barrier projects fall within the broad definition of "military installation," which includes "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department[.]"  *Id.* § 2801(c)(4).  Two of the projects will be built on the Goldwater Range, which is an Air Force and Marine Corps bombing range,[26] and the other nine will be built on land assigned to Fort Bliss, an Army base.  *See supra* at 9.  Neither CBD nor RGISC disputes that the projects on the Goldwater Range are with respect to a military installation.  Instead, Plaintiffs focus on the remaining projects, but each of their arguments lacks merit.  *See* RGISC Mot. at 33–35; CBD Mot. at 26–30.

There is no requirement that § 2808 projects must be built on pre-existing military installations.  *See* CBD Mot. at 27–28.  DoD has authority to obtain administrative jurisdiction over the requisite project land and add it to an existing military installation in accordance with DoD's regulations governing property acquisition.  *See* DoD Instruction 4165.14, Real Property Inventory and Forecasting; DoD Instruction 4165.71, Real Property Acquisition.  DoD may acquire land necessary for § 2808 projects, given that § 2808 expressly authorizes "military

---

[26] *See* National Defense Authorization Act for Fiscal Year 2000, Pub. L. 106-65, Title XXX, § 3031, 113 Stat. 512 (explaining purpose of the land withdrawal for the Goldwater Range).

construction," including "*any acquisition of land . . . .*" 10 U.S.C. § 2801(a) (emphasis added).

Section 2808 further authorizes the Secretary of Defense to undertake military construction

projects (including land acquisitions) "without regard to any other provision of law." This broad

language—a variant of a *non obstante* or "notwithstanding" clause—sweeps aside all statutory

and regulatory provisions that might otherwise constrain the authority provided by § 2808,

including with respect to land acquisition. *See Am. Fed'n of Gov't Emps., Local 3295 v. Fed.*

*Labor Relations Auth.*, 46 F.3d 73, 76 (D.C. Cir. 1995) (similar clause provides "a sweeping

dispensation from all legal constraints," and "indicate[s] that Congress intended agencies to

enjoy unfettered discretion.") (internal quotation omitted).

     There is no evidence to suggest that, during a time of war or national emergency,

Congress intended § 2808 construction to be limited only within the four corners of pre-existing

installations. Such an interpretation would conflict with the plain text of the statue and defeat the

entire purpose of § 2808, which is to provide DoD with flexibility to engage in military

construction during emergency situations. *See* H.R. Rep. No. 97-44, at 72 (1981). Moreover, §

2808 requires that DoD notify Congress when § 2808 projects are authorized and the notice must

"includ[e] the cost of any real estate action pertaining to those construction projects." 10 U.S.C.

§ 2808(b). That notification requirement thus reflects Congress's expectation that DoD would be

expending funds on land acquisition for § 2808 projects, as the statute plainly provides.

     CBD relies on 23 U.S.C. § 210 as support for its position, *see* CBD Mot. at 27–28, but

that statute is a provision of the federal highway code that authorizes the Secretary of Defense to

acquire land and construct "defense access roads" to enable entry and exit from various military

facilities. Section 210 says nothing about § 2808 at all and cannot be read to implicitly limit

§ 2808 emergency military construction solely to existing facilities.

CBD also argues that because DoD has not completed the land acquisition process for certain § 2808 projects, DoD may not expend § 2808 funds on projects that are not within DoD's jurisdiction at this time. *See* CBD Mot. at 29. But that argument is contrary to the text of § 2801, which authorizes DoD to undertake "all military construction work" that is "necessary to produce a complete and useable facility or a complete and usable improvement to an existing facility." 10 U.S.C. § 2801(b); *see also* § 2801(c) ("'facility' means a building, structure, or other improvement to real property."). Pre-construction activities such as land acquisition and project planning easily fall within the scope of this provision as activities that are necessary to build a complete facility.

In addition to the land acquisition authority in § 2808, for land currently controlled by other federal agencies, Congress has authorized land transfers between federal agencies. The FLPMA authorizes the Secretary of the Interior to make "withdrawals" of land, 43 U.S.C. § 1714(a), including the "transfer[ of] jurisdiction over an area of Federal land . . . from one department, bureau or agency to another department, bureau or agency," *id.* § 1702(j). Further, the Property Act, 40 U.S.C. §§ 101 *et seq.*, authorizes GSA to transfer excess real property between agencies. *See id.* § 521. For any non-federal land, the federal government's power of eminent domain has long been used to acquire property for military installations. *See, e.g.*, *United States v. 32.42 Acres of Land, More or Less, Located in San Diego Cty., Cal.*, 683 F.3d 1030, 1038 (9th Cir. 2012); *Cameron Development Company v. United States* 145 F.2d 209, 209–10 (5th Cir. 1944).

As explained above, the Secretary of Defense has directed the Secretary of the Army to acquire administrative jurisdiction of real property from other Federal agencies and acquire the non-Federal real property necessary to undertake the § 2808 projects. *See supra* at 9–10. And the

Secretary of the Army has determined that the sites designated for the § 2808 border barrier military construction projects will be part of the Fort Bliss military installation upon transfer of administrative jurisdiction of those sites to the Department of the Army.  *See id.* at 10.  There is thus no merit to Plaintiffs' argument that the projects are not "military construction."  RGISC Mot. at 33; CBD Mot. at 28.  All of the challenged projects will be undertaken "with respect to" Fort Bliss, which is unquestionably a military installation, *i.e.*, a "base, camp, post, station, yard, center[.]"  *See* 10 U.S.C. § 2801(c)(4).

Section 2808 does not limit the type of base or other installation that qualifies for military construction purposes.  Nor does it require that any base or land assigned to a base have been under military jurisdiction for any length of time.  And longstanding military practice confirms that many military installations include noncontiguous property, including geographically distant sites, that DoD has determined to subject to centralized administrative control and jurisdiction.  *See* Second Beehler Decl. ¶¶ 8–10 (listing examples).  Further, Army regulations specifically contemplate the assignment of lands "under the control of the Department of the Army, at which functions of the Department of the Army are carried on" as "subinstallation[s]," which are "attached to installations for command and administrative purposes, *although they are located separately.*" 32 C.F.R. § 552.31(c) (emphasis added).

In addition, the project locations satisfy the definition of a military installation because they are an "other activity under the jurisdiction of the Secretary of a military department."  10 U.S.C. § 2801(c)(4).  This broad residual category covers the wide range of locations and types of property that the military might need to use to conduct operations.  Its meaning likewise includes any land under military jurisdiction and subject to the military's operational control.  *See* 32 C.F.R. 552.31(b) ("[T]he term 'installation' will include installations, subinstallations, and *separate*

*locations housing an activity*." (emphasis added)).  This conclusion is underscored by the Supreme Court's recognition that federal law treats the term "military installation" as "synonymous with the exercise of *military jurisdiction*."  *United States v. Apel*, 571 U.S. 359, 368 (2014) (citing § 2801(c)(4)) (emphasis in original).

Plaintiffs rely primarily on the decisions by two other district courts in related cases challenging § 2808 construction.  *See* CBD Mot. at 28–29; RGISC Mot. at 33–34  (citing *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 920–21 (N.D. Cal. 2019); *State of Washington v. Trump*, 2020 WL 949934, at *11–12 (W.D. Wash. Feb. 27, 2020)).  But those courts erred in concluding that the term "other activity" in § 2801 should be construed as referring to "discrete and traditional military locations" similar to "a base, camp, post, station, yard, [and] center."  *Sierra Club*, 379 F. Supp. at 921; *see Washington*, 2020 WL 949934 at 12.  There is no basis in the statute to conclude that a project is "with respect to a military installation" only if it occurs at a place where the military has already been conducting unspecified activities for a lengthy (but unspecified) period of time or that the project have a connection to the military mission of a prior installation.  These tacked-on conditions find no support in the statutory text.

Moreover, the word "activity" is a fundamentally different term than the other places listed in the statute (*e.g.*, base, camp, post).  It refers to the actions under the jurisdiction of DoD rather than specific types of facilities.  Accordingly, it makes little sense to confine the meaning of "activity" by reference to those other terms in the statute.  If Congress had wished to limit the "other activity" residual category solely to facilities similar to those listed in the statute, it could have done so, as it has in another statute that defines the term more narrowly in a different context. *See* Pub. L. No. 114-287, § 3, 130 Stat. 1463 (2016) (defining military installation as "any fort, camp, post, naval training station, airfield proving ground, military supply depot, military school,

or any similar facility of the Department of Defense.").

Contrary to Plaintiffs' argument, *see* RGISC Mot. at 34; CBD Mot. at 28, it does not provide DoD with unlimited authority to conclude that the nine projects at issue here fall within the definition of military construction. To be sure, the point of § 2808 is to provide DoD with appropriate flexibility to engage in emergency military construction and Congress did not limit the type of projects that could be built, recognizing "it is impossible to provide in advance for all conceivable emergency situations," H.R. Rep. No. 97-44, at 72. But the record here also demonstrates that DoD complies with a host of statutory and regulatory requirements to acquire land and bring it under the jurisdiction of a military installation. *See* AR at 187–90, 193–94, 214–15; Second Beehler Decl. ¶¶ 3–7. And DoD can undertake military construction under § 2808 only in the event of a declaration of war or national emergency that requires use of the armed forces, and even then only if the Secretary concludes that such construction is necessary to support the use of the armed forces. Further, DoD must notify "the appropriate committees of Congress of the decision and of the estimated cost" of any such project before beginning military construction. 10 U.S.C. § 2808(b). These requirements impose meaningful restraints, and § 2808 does not provide DoD with boundless domestic construction authority.

### 3. The § 2808 Border Barriers Support the Use of the Armed Forces.

Section 2808 also requires that the military construction projects must be "necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). The Court previously concluded that there are no judicially manageable standard for reviewing whether the border barrier construction projects are "necessary" to support the armed forces. *See* Mem. Op. at 30–31. Consequently, the Court stated that it "will not review whether the Secretary erred in determining, under § 2808, that the border barrier construction was 'necessary.'" *Id.* at 31. The Court further held that this ruling

applied to both review of Plaintiffs' APA and *ultra vires* causes of action.  *See id.* at 50 n.17.[27]  In light of the Court's prior decision, the only remaining question is whether "construction supports the use of the armed forces."  *Id.* at 31.  That requirement is satisfied here and RGISC's contrary arguments lack merit.  *See* RGISC Mot. at 35–37.

        As a threshold matter, the Secretary of Defense's determination that the border barrier projects support the use of the armed forces is entitled to substantial deference from this Court.  *See, e.g., Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (military officials are owed "great deference" by courts faced with requests to enjoin military action); *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) (courts must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest."); *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981) (Courts must give "a healthy deference to legislative and executive judgments in the area of military affairs.").  Indeed, the Supreme Court has traditionally been reluctant to intervene in the conduct of military affairs.  *See, e.g., Winter*, 555 U.S. at 24–27; *North Dakota v. United States*, 495 U.S. 423, 443 (1990); *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988); *Chappell v. Wallace*, 462 U.S. 296, 300 (1983); *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953).  This reluctance rests on separation-of-powers concerns as well as the principle that judges "are not given the task of running the Army," *Orloff,* 345 U.S. at 93, and are "ill-equipped" to determine the impact of judicial intrusion on military decision making, *Chappell*, 462 U.S. at 305.  For these reasons, the Supreme Court has instructed courts to defer to "[t]he complex, subtle, and professional decisions as to the

---

[27] RGISC contends that the "committed to agency discretion" doctrine does not apply to equitable *ultra vires* claims, *see* RGISC Mot. at 35 n.26, but that doctrine has a long common law history and courts applied it even before it was statutorily codified in the APA.  *See* Kenneth Culp Davis, Administrative Law §§ 28:1, 5, 15 (1984) (summarizing pre-APA law on unreviewable agency action).

composition, training, equipping, and control of a military force." *Gilligan*, 413 U.S. at 10; *see* Mem. Op. at 30 ("the Defense Secretary undoubtedly has significant discretion under this statute").

Applying this highly deferential standard of review, the administrative record supports the Secretary's military judgment that the projects support the use of the armed forces in connection with the national emergency at the southern border. *See* AR at 185–94; 226–54; 281–321. In reaching this decision, the Secretary undertook a thorough and deliberate process of study and review that are the hallmark of judicial deference to military decisions. *See, e.g., Goldman*, 475 U.S. at 508–09; *Rostker*, 453 U.S. at 71–72. The Secretary requested and received information from DHS concerning which border barrier projects DHS considers to be most effective in improving the effectiveness and efficiency of DoD personnel supporting CBP at the southern border. *See* AR at 234–41, 275. DHS explained that the proposed border barrier construction would fundamentally change the dynamic at the border, would give a distinct and enduring advantage to the Border Patrol as a force multiplier, and would provide agents with capabilities to respond more quickly to illicit activities. *Id.* at 240–41. As such, the projects would improve the effectiveness and efficiency of DoD personnel by allowing them to shift away from providing support to frequent, low risk border incursions and instead concentrate on monitoring, tracking, and responding to a smaller, more focused set of higher risk activities at the border. *Id.* By serving as a force multiplier for DHS, the projects will reduce reliance by DHS on DoD for force protection, surveillance support, engineering support, and air support, and thus allow DoD to concentrate its efforts on a smaller, more focused area. *Id.*

In addition, the Secretary received two separate reports from the Chairman of the Joint Chiefs of Staff providing his views on whether and how border barrier projects would support the use of the armed forces deployed to the border to support DHS. The Chairman provided a

preliminary assessment in February 2019.  *See* AR at 303–08.  That assessment concluded, among other things, that constructing physical barriers in areas where military personnel are deployed could allow those forces to be re-prioritized to other missions in support of DHS, thereby enabling a more efficient use of DoD personnel.  *See id.* at 306–08.  After receiving the DHS recommendation, the Secretary requested that the Chairman provide an updated and expanded report assessing a variety of factors analyzing how border barriers could support the use of the armed forces.  *See id.* at 281–82.

The Chairman's final report, based on consultations with multiple DoD and DHS components, identified four key factors upon which to assess whether the projects were necessary to support the use of the armed forces at the southern border:  1) prioritization by DHS of the projects; 2) current migrant flows measured by apprehensions per month; 3) current troop dispositions and support missions by CBP sector; and 4) the type of land upon which the proposed projects were to be undertaken.  *See id.* at 245–46.  The Chairman then conducted a detailed analysis of these factors for each border patrol sector where proposed construction would take place.  *See id.* at 247–54.  The Chairman analyzed, among other things, the type of proposed border barrier construction; the location and mileage of each project; the number of DoD personnel deployed to each sector and the support activities they provide to DHS; and the impact the barriers are expected to have on denying illegal entry, channeling migrants to ports of entry, and increasing vanishing times along the southern border.  *See id.*  For example, the Chairman concluded that barriers will reduce the areas where migrants can cross easily, thereby reducing the need for DoD personnel to operate mobile surveillance cameras as well as conduct monitoring and detection operations between ports of entry.  *See id.* at 252–54.  In the end, the Chairman developed a prioritized list of border barrier projects and concluded that the projects are necessary to support

the use of the armed forces because they support those forces by enabling more efficient use of DoD personnel, and may ultimately reduce the demand for military support over time. *Id.* at 248.

Relying on the Chairman's analysis and advice, as well as input from the U.S. Army Corps of Engineers, DHS, and DoI, the Secretary of Defense determined that the border barrier projects discussed above are necessary to support the use of the armed forces in connection with the national emergency. *See* AR at 185–94; 226–32. The Secretary concluded that the border barrier projects will deter illegal entry, increase the vanishing time of those illegally crossing the border, and channel migrants to ports of entry. *See* AR at 193–94. Thus, he determined, the projects will reduce the demand for DoD personnel and assets at the locations where the barriers are constructed and allow the redeployment of DoD personnel and assets to other high-traffic areas on the border without barriers. *See id.* Given the extensive record supporting the Secretary's decision, the Court should defer to his military judgment that the barriers support the use of military forces at the border. *See, e.g., Gilligan*, 413 U.S. at 10.

Contrary to RGISC's argument, *see* RGISC Mot. at 36–27, the record explains in detail how the projects support military personnel, separate and apart from any benefit the projects also provide to DHS. Nothing in the text, structure, or history of § 2808 supports RGISC's argument that, even when the Secretary has concluded that that the projects support the use of the armed forces, the projects cannot be built because they also benefit a civilian agency.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment and deny Plaintiffs' motions for summary judgment. A proposed order is attached.

DATE:  June 26, 2020                    Respectfully submitted,


                                        JOSEPH H. HUNT
                                        Assistant Attorney General

                                        DAVID M. MORRELL
                                        Deputy Assistant Attorney General

                                        ALEXANDER K. HAAS
                                        Director, Federal Programs Branch

                                        ANTHONY J. COPPOLINO
                                        Deputy Director, Federal Programs Branch

                                        /s/ Andrew I. Warden
                                        ANDREW I. WARDEN (IN #23840-49)
                                        Senior Trial Counsel

                                        /s/ Kathryn C. Davis
                                        KATHRYN C. DAVIS (D.C. Bar No. 985055)
                                        MICHAEL J. GERARDI
                                        LESLIE COOPER VIGEN
                                        RACHAEL WESTMORELAND
                                        Trial Attorneys
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street, NW
                                        Washington, D.C. 20530
                                        Tel.:   (202) 616-5084
                                        Fax:    (202) 616-8470
                                        Email:  Andrew.Warden@usdoj.gov

                                        *Attorneys for Defendants*

# EXHIBIT 1

3720-58

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

**Public Land Order No.   7895**          ; San Diego Project 4: Project

**Modification, San Diego County, CA**

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Public Land Order.

**SUMMARY:** This Order withdraws, subject to valid existing rights, approximately 37 acres of Federal lands from settlement, sale, location, and entry under the general land laws, including the United States mining laws, mineral leasing laws, and geothermal leasing laws, for a period ending September 18, 2022, for use by the Department of the Army for border security purposes. This withdrawal also transfers administrative jurisdiction of the lands to the Department of the Army.

**DATES:** This Public Land Order takes effect on June 24, 2020. This withdrawal will expire on September 18, 2022.

**FOR FURTHER INFORMATION CONTACT:** Karen E. Mouritsen, State Director California, telephone: 916-978-4600, email: kmourits@blm.gov. Persons who use a telecommunications device for the deaf (TDD) may call the Federal Relay Service (FRS) at 1-800-877-8339 to contact Ms. Mouritsen. The FRS is available 24 hours a day, 7 days a week, to leave a message or question. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:**

1

## ORDER

By virtue of the authority vested in the Secretary of the Interior by Section 204 of the Federal Land Policy and Management Act of 1976, 43 U.S.C. 1714, and in accordance with subsection 204(e) of that Act, it is determined that an emergency situation exists and that extraordinary measures must be taken to preserve values that would otherwise be lost.  It is therefore ordered as follows:

1.  Subject to valid existing rights, the following described Federal lands are hereby withdrawn from settlement, sale, location, and entry under the general land laws, including the United States mining laws, mineral leasing laws, and geothermal leasing laws, and jurisdiction over such lands is hereby transferred to the Department of the Army for border security purposes:

> A strip of land of the uniform width of 300 feet lying contiguous to and parallel with the 200-foot withdrawn strip parallel with the international border between the United States and Mexico, located in the County of San Diego, State of California and situate in the following described locations:
>
> San Bernardino Meridian, California
>
> T.18 S., R. 1 E.,
>
> sec. 34.

The areas described above aggregate approximately 37 acres of Federal lands in San Diego County.

2

2.  This withdrawal will expire on September 18, 2022, unless it is extended in accordance with subsections (c)(1) or (d), whichever is applicable, and (b)(1) of Section 204 of the Federal Land Policy and Management Act of 1976, 43 U.S.C. 1714.


David L. Bernhardt
Secretary of the Interior


6/24/2020
Date

# EXHIBIT 2

*GO 2019–36

GENERAL ORDERS }
NO. 2019–36

HEADQUARTERS
DEPARTMENT OF THE ARMY
WASHINGTON, DC, *8 October 2019*

## ASSIGNMENT OF SOUTHWEST BORDER SITES

1. Effective 8 October 2019, upon transfer of administrative jurisdiction to the Department of the Army, the Southwest Border sites as designated by the Secretary of Defense for the border barrier military construction projects pursuant to Title 10, United States Code, Section 2808 are assigned to U.S. Army Garrison Fort Bliss, Texas (Installation Code 48125). Exercise of all necessary authority, direction, and command and control over the Southwest Border sites assigned to Fort Bliss will be in accordance with Army Regulation 600-20.

2. U.S. Army Materiel Command is designated the Real Property Accountable Organization for the Southwest Border sites and shall promptly register the sites, as they are acquired, in the Army Accountable Property System of Record as required by Department of Defense Instruction 4165.14.

[DAMO-FMI]

Ryan D. McCarthy
*Secretary of the Army*

DISTRIBUTION: This publication is available in electronic media only and is intended for the Regular Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

# EXHIBIT 3

SECOND DECLARATION OF ALEX A. BEEHLER

I, Alex A. Beehler, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Assistant Secretary of the Army (Installations, Energy and Environment). Among other duties, which are generally reflected in General Orders No. 2019-01, "Assignment of Functions and Responsibilities Within Headquarters, Department of the Army," I am responsible for developing and overseeing policies and programs that include military construction, management of real property and installations, real estate contracting, environmental compliance and conservation, and oversight of all execution functions performed by the U.S. Army Corps of Engineers related to the Army's military construction, real property, real estate, and environmental programs.

2. This declaration is based on my own personal knowledge and information made available to me in the course of my official duties.

*Process for Designating Real Property as a Military Installation*

3. A military installation is defined at 10 U.S.C. § 2801(c)(4) as "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the Secretary of a military department or the Secretary of Defense, without regard to the duration of operational control."

4. The process of real property becoming part of a military installation begins with identifying the military requirement for real property, followed by the legal and administrative actions necessary to bring that real property "under the jurisdiction of the Secretary of a military department," in accordance with 10 U.S.C. § 2801.

   a. For property already owned by the United States, the steps and mechanisms for bringing real property under the jurisdiction of the Secretary of a Military Department depend on whether the property is subject to the Federal Land Policy Management Act of 1976 (FLPMA), 43 U.S.C. § 1714, or subject to the Federal Property and Administrative Services Act of 1949 (Property Act), 40 U.S.C. §§ 101 *et seq*.

      i. For land available for transfer under the FLPMA, the Military Department submits a withdrawal application to the Department of the Interior in accordance with 43 U.S.C. § 157 or 43 C.F.R. Subpart 2310. The Department of the Interior then acts on this application by withdrawing the land from other forms of use under the public land laws and transfers administrative jurisdiction to the requesting Military Department by publication of a Public Land Order in the Federal Register.

1

ii. For land governed by the Property Act, the transfer of custody and accountability among agencies occurs by the General Services Administration (GSA) executing a letter effectuating transfer pursuant to 40 U.S.C. § 521 and in accordance with the Federal Management Regulation, 41 C.F.R. Subchapter C.

b. For property not already owned by the United States, the process for bringing real property under the jurisdiction of the Secretary of a Military Department begins by obtaining ownership over the real property in the name of the United States.

i. Because "[n]o military department may acquire real property not owned by the United States unless the acquisition is expressly authorized by law," the Military Department must first identify the land acquisition authority. 10 U.S.C. § 2664; *see* 10 U.S.C. § 2802(a) ("The Secretary of Defense and the Secretaries of the military departments may carry out such military construction projects, land acquisitions, and defense access road projects . . . as are authorized by law."). In this case, 10 U.S.C. § 2808 provides the requisite legal authorization because it authorizes military construction, and the definition of "military construction" in § 2808 includes "any acquisition of land." 10 U.S.C. § 2801(a).

ii. Real property not owned by the United States may be acquired by a Military Department in the name of the United States through purchase, donation, exchange, or condemnation.

iii. Once the Military Department acquires the real property, the Military Department has administrative jurisdiction and real property accountability on behalf of the U.S. Government.

5. In order to manage and account for real property under its jurisdiction consistent with Chapter 159 of Title 10 U.S. Code and DoD Directive 4165.06, *Real Property*, the Military Department may either designate the property as a new military installation or assign the property to an existing military installation.

6. Under Army procedures established by General Orders No. 2019-01, *Assignment of Functions and Responsibilities Within Headquarters, Department of the Army*, such organizational designations relating to installations are directed by General Orders signed by the Secretary of the Army and registered in the DoD official real property database of record as required by DoD policy.

7. In this instance, the Army assigned the real property brought under the jurisdiction of the Secretary for these military construction projects to Fort Bliss, Texas, through General Orders 2019-36, October 8, 2019, signed by the Secretary of the Army.

*Geographically Separate Sites of a Military Installation*

8. There is no legal, regulatory, or policy requirement for geographically separate sites to be assigned to a "nearby" military installation. Nor is there any legal, regulatory, or policy requirement for all the sites or lands that comprise a given military installation to be located in the same State or within a certain distance of other sites associated with the military installation. In the Secretary of Defense's September 3, 2019, memorandum to the Secretary of the Army, the Secretary of Defense directed the Department of the Army to "add such land to the Department of the Army's real property inventory, either as a new installation or as part of an existing military installation," without conditions on the location of the existing installation to which the land could be added.

9. The Department of the Army, on behalf of the United States, owns and uses many parcels of land that are not contiguous to other portions of a military installation and that are not considered separate military installations. The same is true for other Military Departments. Such locations are referred to as "sites." DoD Instruction 4165.14, *Real Property Inventory (RPI) and Forecasting*, defines a site as a "physical (geographic) location that is, or was owned by, leased to, or otherwise possessed by a DoD Component on behalf of the United States. Each site (except for leased) is assigned to a single installation." A site may exist as "land only, where there are no facilities present," "facility or facilities only, where the underlying land is neither owned nor controlled by the government," or "land and the facilities thereon."

10. Each such site is assigned to a military installation for real property accountability purposes and is considered part of that installation, even if located remotely from the Army Garrison. The Garrison is the Army organizational unit that is responsible for installation management across the installation sites. *See* Army Regulation 405-70, *Utilization of Real Property*. Sites can be in States other than the one in which the Army Garrison unit is located, and the distance between various sites can vary significantly. For example, Fort Campbell is located in both Kentucky and Tennessee; the Green River Test Complex site in Utah is part of White Sands Missile Range in New Mexico; the Special Forces site in Key West, Florida, is part of Fort Bragg, North Carolina; six different Navy Outlying Landing Field sites in Alabama are part of Naval Air Station Whiting Field, Florida; a new National Geospatial Intelligence Agency West Campus being constructed in Missouri is part of Scott Air Force Base, Illinois; the Pentagon Reservation includes the Pentagon building and Mark Center in Virginia as well as the Raven Rock Complex in Maryland and Pennsylvania; and among other Army examples, Fort Carson, Fort Belvoir, Fort Bliss, Joint Base Lewis McChord, Fort Benning, Fort Greely, and Fort Detrick all include various geographically separate sites.

*Decision to Designate Section 2808 Project Locations as Part of Fort Bliss*

11. Fort Bliss is the largest, most capable Active Army installation in the vicinity of the southern border. Fort Bliss has a sizable existing installation management office with

3

experience addressing various land management issues and experience working with the U.S. Army Corps of Engineers on military construction projects. The Department of the Army also determined that it is more efficient for command of all the real property associated with the projects undertaken pursuant to Section 2808 to be vested in one Army installation, given the similar nature and scope of all such Section 2808 projects. In addition, Fort Bliss has an existing support relationship with the U.S. Border Patrol, which maintains a regional office on the installation.

***

I hereby declare under penalty of perjury that the foregoing is true and correct.


Alex A. Beehler

Executed on November 25, 2019

4

# EXHIBIT 4

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SIERRA CLUB; SOUTHERN BORDER COMMUNITIES COALITION, *Plaintiffs-Appellees*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; MARK T. ESPER, in his official capacity as Secretary of the Defense; CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security; STEVEN TERNER MNUCHIN, in his official capacity as Secretary of the Department of the Treasury, *Defendants-Appellants*. | Nos. 19-16102 <br> 19-16300 <br><br> D.C. No. <br> 4:19-cv-00892-HSG <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted November 12, 2019
San Francisco, California

Filed June 26, 2020

2                    SIERRA CLUB V. TRUMP

Before:  Sidney R. Thomas, Chief Judge, and Kim McLane
Wardlaw and Daniel P. Collins, Circuit Judges.

Opinion by Chief Judge Thomas;
Dissent by Judge Collins

## SUMMARY[*]

### Appropriations

The panel affirmed the district court's judgment in an action brought by the Sierra Club and the Southern Border Communities Coalition (collectively the "Sierra Club") challenging the Department of Defense's budgetary transfers to fund construction of a wall on the southern border of the United States in California, New Mexico, and Arizona.

At issue is whether Section 8005 and Section 9002 of the Department of Defense Appropriations Act of 2019 ("Section 8005") authorized the budgetary transfers to fund construction of the wall.

The panel held that the Sierra Club had Article III standing to pursue its claims. Specifically, the panel held that Sierra Club's thousands of members live near and frequently visit areas along the U.S.-Mexico border for hiking, birdwatching, photography, and other professional, scientific, recreational, and aesthetic activities; and construction of a border wall and related infrastructure will acutely injure these

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

interests because the Department of Homeland Security is proceeding with border wall construction without ensuring compliance with any federal or state environmental regulations designed to protect these interests. Additionally, the interests of Sierra Club's members in the lawsuit are germane to the organization's purpose. Similarly, the panel held that the Southern Border Communities Coalition alleged facts that support that it had standing to sue on behalf of itself and its member organizations. The panel further held that Sierra Club's injuries were fairly traceable to the Section 8005 transfers. In addition, the panel held that the injury to Sierra Club members and Southern Border Communities Coalition was likely to be redressed by a favorable judicial decision.

In companion appeal *State of California v. Trump*, Nos. 19-16299 and 19-16336, slip op. (9th Cir. June 26, 2020) (published concurrently), the panel held that Section 8005 did not authorize the transfers of funds at issue here. The panel reaffirmed this holding here.

The panel held that the Executive Branch lacked independent constitutional authority to authorize the transfer of funds. The panel noted that the Appropriations Clause of the U.S. Constitution exclusively grants the power of the purse to Congress. The panel held that the transfer of funds violated the Appropriations Clause, and, therefore, was unlawful.

The panel held that the Sierra Club was a proper party to challenge the Section 8005 transfers, and concluded that Sierra Club had both a constitutional and an *ultra vires* cause of action. First, the panel held that where plaintiffs, like Sierra Club, establish that they satisfy the requirements of

4                          SIERRA CLUB V. TRUMP

Article III standing, they may invoke separation of powers constraints, like the Appropriations Clause, to challenge agency spending in excess of its delegated authority. Because the federal defendants not only exceeded their delegated authority, but also violated an express constitutional prohibition designed to protect individual liberties, the panel held that Sierra Club had a constitutional cause of action. Second, the panel held that the Sierra Club had an equitable *ultra vires* cause of action to challenge the Department of Defense's transfer of funds. Where it is alleged that the Department of Defense has exceeded the statutory authority delegated by Section 8005, plaintiffs like Sierra Club can challenge this agency action.

The panel rejected the federal defendants' additional arguments. First, the federal defendants asserted that Sierra Club's challenge must be construed as an Administrative Procedure Act ("APA") claim, rather than as a constitutional or *ultra vivres* cause of action. The panel held that the APA is not to be construed as an exclusive remedy, and the APA does not displace all constitutional and equitable causes of action. Second, the federal defendants asserted that the zone of interests test must apply to any challenge brought by Sierra Club, and that Section 8005 prescribes the relevant zone of interests. The panel held that Sierra Club fell within the Appropriations Clause's zone of interests. The unconstitutional transfer of funds here infringed upon Sierra Club's members' liberty interests, harming their environmental, aesthetic, and recreational interests. The panel concluded that the Sierra Club had a cause of action to challenge the transfers.

Finally, the panel held that the district court did not abuse its discretion in granting Sierra Club a permanent injunction

enjoining the federal defendants from spending the funds at issue. First, the panel agreed with the district court that Sierra Club would suffer irreparable harm to its recreational and aesthetic interests absent injunction. Second, the panel agreed with the district court that the balance of equities and the public interest favored injunctive relief. The panel held that the Supreme Court's decision in *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008), did not require the panel to vacate the injunction.

Judge Collins dissented. He agreed that at least the Sierra Club established Article III standing, but in his view the organizations lacked any cause of action to challenge the transfers. Even assuming that they had a cause of action Judge Collins would conclude that the transfers were lawful. Accordingly, he would reverse the district court's partial summary judgment for the organizations and remand for an entry of partial summary judgment in favor of the defendants.

6                    SIERRA CLUB V. TRUMP

## COUNSEL

H. Thomas Byron III (argued), Anne Murphy, and Courtney L. Dixon, Appellate Staff; Hashim M. Mooppan and James M. Burnham, Deputy Assistant Attorneys General; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Dror Ladin (argued), Noor Zafar, Jonathan Hafetz, Hina Shamsi, and Omar C. Jadwat, American Civil Liberties Union Foundation, New York, New York; Cecillia D. Wang, American Civil Liberties Union Foundation, San Francisco, California; Mollie M. Lee and Christine P. Sun, American Civil Liberties Union Foundation of Northern California Inc., San Francisco, California; David Donatti and Andre I. Segura, American Civil Liberties Union Foundation of Texas, Houston, Texas; Sanjay Narayan and Gloria D. Smith, Sierra Club Environmental Law Program, Oakland, California; for Plaintiffs-Appellees.

Douglas N. Letter (argued), Todd B. Tatelman, Megan Barbero, Josephine Morse, and Kristin A. Shapiro, United States House of Representatives, Washington, D.C.; Carter G. Phillips, Virginia A. Seitz, Joseph R. Guerra, and Christopher A. Eiswerth, Sidley Austin LLP, Washington, D.C.; for Amicus Curiae United States House of Representatives.

James F. Zahradka II (argued), Brian J. Bilford, Sparsh S. Khandeshi, Heather C. Leslie, Lee I. Sherman, and Janelle M. Smith, Deputy Attorneys General; Michael P. Cayaban, Christine Chuang, and Edward H. Ochoa, Supervising Deputy Attorneys General; Robert W. Byrne, Sally Magnani, and Michael L. Newman, Senior Assistant Attorneys General;

Xavier Becerra, Attorney General; Attorney General's Office, Oakland, California; Jennie Lusk, Civil Rights Bureau Chief; Nicholas M. Sydow, Civil Appellate Chief; Tania Maestas, Chief Deputy Attorney General; Hector Balderas, Attorney General; Office of the Attorney General, Santa Fe, New Mexico; for Amici Curiae States of California and New Mexico.

Christopher J. Hajec, Immigration Reform Law Institute, Washington, D.C.; Lawrence J. Joseph, Washington, D.C.; for Amicus Curiae United States Representative Andy Barr.

John W. Howard, George R. Wentz Jr., Richard Seamon, and D. Colton Boyles, Davillier Law Group LLC, Sandpoint, Idaho, for Amicus Curiae State of Arizona House of Representatives Federal Relations Committee.

Richard P. Hutchison, Landmark Legal Foundation, Kansas City, Missouri; Michael J. O'Neill and Matthew C. Forys, Landmark Legal Foundation, Leesburg, Virginia; for Amici Curiae Angel Families, Sabine Durden, Don Rosenberg, Brian McAnn, Judy Zeito, Maureen Mulroney, Maureen Laquerre, Dennis Bixby, and Advocates for Victims of Illegal Alien Crimes.

Douglas A. Winthrop, Arnold & Porter Kaye Scholer LLP, San Francisco, California; Irvin B. Nathan, Robert N. Weiner, Andrew T. Tutt, Kaitlin Konkel, and Samuel F. Callahan, Arnold & Porter Kaye Scholer LLP, Washington, D.C.; for Amici Curiae Former Members of Congress.

Elizabeth B. Wydra, Brianne J. Gorod, Brian R. Frazelle, and Ashwin P. Phatak, Constitutional Accountability Center, Washington, D.C., for Amici Curiae Federal Courts Scholars.

8                    SIERRA CLUB V. TRUMP

Steven A. Zalesin, Adeel A. Mangi, and Amir Badat, Patterson Belknap Webb & Tyler LLP, New York, New York, for Amici Curiae 75 Religious Organizations.

Harold Hongju Koh, Peter Gruber Rule of Law Clinic, Yale Law School, New Haven, Connecticut; Kathleen R. Hartnett, Boies Schiller Flexner LLP, San Francisco, California; Phillip Spector, Messing & Spector LLP, Baltimore, Maryland; for Amici Curiae Former United States Government Officials.

Samuel F. Daughety and Suzanne R. Schaeffer, Dentons US LLP, Washington, D.C.; Joshua O. Rees, Acting Attorney General, Tohono O'Odham Nation, Sells, Arizona; for Amicus Brief Tohono O'Odham Nation.

## OPINION

THOMAS, Chief Judge:

We consider in this appeal challenges by the Sierra Club and the Southern Border Communities Coalition ("SBCC")[1] to the Department of Defense's budgetary transfers to fund construction of the wall on the southern border of the United States in California, New Mexico, and Arizona. Specifically, we consider whether Section 8005 and Section 9002 of the Department of Defense Appropriations Act of 2019, Pub. L. No. 115-245, 132 Stat. 2981 (2018) ("Section 8005")[2] authorized the budgetary transfers. In a companion appeal, *State of California, et al. v. Trump et al.*, Nos. 19-16299 and 19-16336, we considered similar challenges filed by a collective group of States. However, because Sierra Club asserts different legal theories, and this case, when presented, was in a different procedural posture, we treat this appeal separately. We conclude that the transfers were not authorized, and that plaintiffs have a cause of action. We affirm the judgment of the district court.

---

[1] We refer throughout this opinion to Sierra Club and SBCC together as "Sierra Club," unless otherwise noted.

[2] For simplicity, because the transfer authorities are both subject to Section 8005's substantive requirements, this opinion refers to these authorities collectively as Section 8005, as did the district court and the motions panel. Our holding in this case therefore extends to both the transfer of funds pursuant to Section 8005 and Section 9002.

10          SIERRA CLUB V. TRUMP

I

We recounted the essential underlying facts in the companion case. However, we briefly outline them here for convenience of reference.

The President has long supported the construction of a border wall on the southern border between the United States and Mexico. Since the President took office in 2017, however, Congress has repeatedly declined to provide the amount of funding requested by the President.

The debate over border wall funding came to a head in December of 2018. During negotiations to pass an appropriations bill for the remainder of the fiscal year, the President announced that he would not sign any legislation that did not allocate substantial funds to border wall construction. On January 6, 2019, the White House requested $5.7 billion to fund the construction of approximately 234 miles of new physical barrier.[3] Budget negotiations concerning border wall funding reached an impasse, triggering the longest partial government shutdown in United States history.

After 35 days, the government shutdown ended without an agreement to provide increased border wall funding in the amount requested by the President. On February 14, 2019, Congress passed the Consolidated Appropriations Act of 2019 ("CAA"), which included the Department of Homeland Security Appropriations Act for Fiscal Year 2019, Pub. L.

---

[3] Some form of a physical barrier already exists at the site of some of the construction projects. In those places, construction would reinforce or rebuild the existing portions.

No. 116-6, div. A, 133 Stat. 13 (2019).  The CAA appropriated only $1.375 billion for border wall construction, specifying that the funding was for "the construction of primary pedestrian fencing . . . in the Rio Grande Valley Sector."  *Id.* § 230(a)(1).  The President signed the CAA into law the following day.

The President concurrently issued a proclamation under the National Emergencies Act, 50 U.S.C. §§ 1601–1651, "declar[ing] that a national emergency exists at the southern border of the United States."  Proclamation No. 9,844, 84 Fed. Reg. 4949 (Feb. 15, 2019).[4]  An accompanying White House Fact Sheet explained that the President was "using his legal authority to take Executive action to secure additional resources" to build a border wall, and it specified that "the Administration [had] so far identified up to $8.1 billion that [would] be available to build the border wall once a national emergency [was] declared and additional funds [were] reprogrammed."  The Fact Sheet identified several funding sources, including $2.5 billion of Department of Defense ("DoD") funds that could be transferred to provide support for counterdrug activities of other federal government agencies under 10 U.S.C. § 284 ("Section 284").[5]  Executive

---

[4] Subsequently, Congress adopted two joint resolutions terminating the President's emergency declaration pursuant to its authority under 50 U.S.C. § 1622(a)(1).  The President vetoed each resolution, and Congress failed to override these vetoes.

[5] Section 284 authorizes the Secretary of Defense to "provide support for the counterdrug activities . . . of any other department or agency of the Federal Government" if it receives a request from "the official who has responsibility for the counterdrug activities."  10 U.S.C. §§ 284(a), 284(a)(1)(A).  The statute permits, among other things, support for "[c]onstruction of roads and fences and installation of lighting to block

12                     SIERRA CLUB V. TRUMP

Branch agencies began using the funds identified by the Fact
Sheet to fund border wall construction.  On February 25, the
Department of Homeland Security ("DHS") submitted to
DoD a request for Section 284 assistance to block drug
smuggling corridors.  In particular, it requested that DoD
fund "approximately 218 miles" of wall using this authority,
comprised of numerous projects.  On March 25, Acting
Secretary of Defense Patrick Shanahan approved three border
wall construction projects: Yuma Sector Projects 1 and 2 in
Arizona and El Paso Sector Project 1 in New Mexico.  On
May 9, Shanahan approved four more border wall
construction projects: El Centro Sector Project 1 in California
and Tucson Sector Projects 1–3 in Arizona.

At the time Shanahan authorized Section 284 support for
these border wall construction projects, the counter-narcotics
support account contained only $238,306,000 in unobligated
funds, or less than one tenth of the $2.5 billion needed to
complete those projects.  To provide the support requested,
Shanahan invoked the budgetary transfer authority found in
Section 8005 of the 2019 DoD Appropriations Act to transfer
funds from other DoD appropriations accounts into the
Section 284 Drug Interdiction and Counter-Drug Activities-
Defense appropriations account.

For the first set of projects, Shanahan transferred
$1 billion from Army personnel funds.  For the second set of
projects, Shanahan transferred $1.5 billion from "various
excess appropriations," which contained funds originally

---

drug smuggling corridors across international boundaries of the United
States." *Id.* § 284(b)(7).  DoD's provision of support for other agencies
pursuant to Section 284 does not require the declaration of a national
emergency.

appropriated for purposes such as modification of in-service missiles and support for U.S. allies in Afghanistan.

As authority for the transfers, DoD invoked Section 8005, which provides, in relevant part that:

> Upon determination by the Secretary of Defense that such action is necessary in the national interest, he may, with the approval of the Office of Management and Budget, transfer not to exceed $4,000,000,000 of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction) between such appropriations or funds or any subdivision thereof, to be merged with and to be available for the same purposes, and for the same time period, as the appropriation or fund to which transferred.[6]

Section 8005 also explicitly limits when its authority can be invoked: "*Provided*, That such authority to transfer may

---

[6] The other authority invoked by the Federal Defendants, Section 9002 provides that: "Upon the determination of the Secretary of Defense that such action is necessary in the national interest, the Secretary may, with the approval of the Office of Management and Budget, transfer up to $2,000,000,000 between the appropriations or funds made available to the Department of Defense in this title: *Provided*, That the Secretary shall notify the Congress promptly of each transfer made pursuant to the authority in this section: *Provided further*, That the authority provided in this section is in addition to any other transfer authority available to the Department of Defense and is subject to the same terms and conditions as the authority provided in section 8005 of this Act."

not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress."

Although Section 8005 does not require formal congressional approval of transfers, historically DoD had adhered to a "gentleman's agreement," by which it sought approval from the relevant congressional committees before transferring the funds. DoD deviated from this practice here—it did not request congressional approval before authorizing the transfer. Further, the House Committee on Armed Services and the House Committee on Appropriations both wrote letters to DoD formally disapproving of the reprogramming action after the fact. Moreover, with respect to the second transfer, Shanahan expressly directed that the transfer of funds was to occur "without regard to comity-based policies that require prior approval from congressional committees."

In the end, Section 8005 was invoked to transfer $2.5 billion of DoD funds appropriated for other purposes to fund border wall construction.

## II

On February 19, 2019, Sierra Club filed a lawsuit challenging the Executive Branch's funding of the border wall.[7] Sierra Club pled theories of violation of the 2019

---

[7] California, New Mexico, and fourteen other states had filed a lawsuit the previous day challenging the same border wall funding. Both lawsuits named as defendants Donald J. Trump, President of the United States, Patrick M. Shanahan, former Acting Secretary of Defense, Kirstjen

CAA, violation of the constitutional separation of powers, violation of the Appropriations Clause, violation of the Presentment Clause, violation of the National Environmental Policy Act ("NEPA"), and *ultra vires* action.

Sierra Club subsequently filed a motion requesting a preliminary injunction to enjoin the transfer of funds pursuant to Section 8005 to construct a border wall in Arizona's Yuma Sector and New Mexico's El Paso Sector. The district court held that Sierra Club had standing to assert its Section 8005 claims, and granted the preliminary injunction motion. The Federal Defendants timely appealed the preliminary injunction order. Sierra Club subsequently sought a supplemental preliminary injunction to block additional construction planned in California's El Centro Sector and Arizona's Tucson Sector.

Sierra Club also filed a motion requesting partial summary judgment, a declaratory judgment, and a permanent injunction to enjoin the transfer of funds pursuant to Section 8005 to construct a border wall in Arizona's Yuma and Tucson Sectors, California's El Centro Sector, and New Mexico's El Paso Sector. The Federal Defendants cross-moved for summary judgment and opposed Sierra Club's motion. The district court granted Sierra Club's motion for partial summary judgment and granted its request for a declaratory judgment and a permanent injunction. The Federal Defendants requested that the district court certify the judgment for appeal under Fed. R. Civ. P. 54(b). The district

M. Nielsen, former Secretary of Homeland Security, and Steven Mnuchin, Acting Secretary of the Treasury in their official capacities, along with numerous other Executive Branch officials (collectively referenced as "the Federal Defendants").

16                    SIERRA CLUB V. TRUMP

court considered the appropriate factors, made appropriate findings, and certified the order as final pursuant to Rule 54(b). *See Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 574–75 (9th Cir. 2018) (explaining when certification is appropriate under Rule 54). The Federal Defendants timely appealed the district court decision.

The Federal Defendants initially filed a motion to stay the district court's preliminary injunction, and in their later briefing on summary judgment, they requested that the district court stay any permanent injunction granted pending appeal. The district court denied both requests. The Federal Defendants filed an emergency motion for stay of the preliminary injunction pending appeal in this Court and subsequently sought a stay of the permanent injunction, relying on the same arguments. *Sierra Club v. Trump*, 929 F.3d 670, 685 (9th Cir. 2019). An emergency motions panel of this Court considered whether to stay the injunction pending appeal, and held that a stay was not warranted. *Id.* at 677. The Federal Defendants then filed an application for a stay pending appeal with the Supreme Court. The Supreme Court granted the application, noting that "[a]mong the reasons is that the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (mem.).

We now consider the merits of the Federal Defendants' appeal of the district court's grant of partial summary judgment, grant of a declaratory judgment, and grant of a

permanent injunction to Sierra Club.**[8]**    We review the existence of Article III standing *de novo*.  *See California v. U.S. Dep't of Health & Human Servs.*, 941 F.3d 410, 420 (9th Cir. 2019).    We review questions of statutory interpretation *de novo*.  *See United States v. Kelly*, 874 F.3d 1037, 1046 (9th Cir. 2017).

III

Sierra Club has Article III standing to pursue its claims. To establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).**[9]**  An organization has standing to sue on behalf of its members when "its members would otherwise have standing to sue in their own right," and when "the interests it seeks to protect are germane to the organization's purpose."  *United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert.*

---

**[8]** We dismiss the Federal Defendants' appeal of the district court's grant of the preliminary injunction as moot.  *See Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 963 (9th Cir. 2013) ("The district court's entry of final judgment and a permanent injunction moots Arizona's appeal of the preliminary injunction."); *see also Planned Parenthood of Cent. & N. Ariz. v. Arizona*, 718 F.2d 938, 949–50 (9th Cir. 1983); *SEC v. Mount Vernon Mem'l Park*, 664 F.2d 1358, 1361–62 (9th Cir. 1982).

**[9]** The Federal Defendants do not challenge Sierra Club's Article III standing in these appeals.  However, "the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

*Comm'n*, 434 U.S. 333, 343 (1977)).[10]  An organization has standing to sue on its own behalf when it suffers "both a diversion of its resources and a frustration of its mission." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (quoting *Fair Housing of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)).  It must "show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.*  At summary judgment, a plaintiff cannot rest on mere allegations, but "must set forth by affidavit or other evidence specific facts." *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 412 (2013) (quotations and citation omitted).  However, these specific facts "for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561.

Here, Sierra Club and SBCC have alleged facts that support their standing to sue on behalf of their members.  Sierra Club has alleged that the actions of the Federal Defendants will cause particularized and concrete injuries to its members, and SBCC has shown that it has suffered a concrete injury itself.

Sierra Club has more than 400,000 members in California, over 9,700 of whom belong to its San Diego Chapter.  Sierra Club's Grand Canyon Chapter, which covers

---

[10] *United Food and Commercial Workers* held that those two requirements were based on constitutional demands, but held that the third prong of *Hunt*'s test for organizational standing, whether the claim or relief requested requires the participation of individual members in the lawsuit, was prudential only.  *Id.* at 555.  In any case, because the claim and relief requested here do not require the participation of Sierra Club or SBCC members, even this prudential consideration supports plaintiffs' standing here.

the State of Arizona, has more than 16,000 members. Sierra Club's Rio Grande Chapter includes over 10,000 members in New Mexico and West Texas. These members visit border areas such as the Tijuana Estuary (California), the Otay Mountain Wilderness (California), the Jacumba Wilderness Area (California), the Sonoran Desert (Arizona), Cabeza Prieta National Wildlife Refuge (Arizona), and the Chihuahan Desert (New Mexico).

Sierra Club's thousands of members live near and frequently visit these areas along the U.S.-Mexico border for hiking, birdwatching, photography, and other professional, scientific, recreational, and aesthetic activities. They obtain recreational, professional, scientific, educational, and aesthetic benefits from their activities in these areas, and from the wildlife dependent upon the habitat in these areas. The construction of a border wall and related infrastructure will acutely injure these interests because DHS is proceeding with border wall construction without ensuring compliance with any federal or state environmental regulations designed to protect these interests.

Sierra Club has adequately set forth facts and other evidence by declaration, which taken as true, support these allegations for the purpose of Article III standing.

Sierra Club members Orson Bevins and Albert Del Val have alleged that they will be injured by construction of Yuma Project 1. Bevins avers that he visits the area several times per year and is concerned that the wall "would disrupt the desert views and inhibit [him] from fully appreciating [the] area," and that the additional presence of U.S. Customs and Border Protection agents "would further diminish[] [his] enjoyment of these areas" and "deter[] [him] from further

exploring certain areas." Del Val worries that "construction and maintenance of the border wall will limit or entirely cut off [his] access to [] fishing spots" along the border, where he has fished for more than 50 years.

Sierra Club member Elizabeth Walsh has alleged that construction of El Paso Sector Project 1 would injure her because "[a]s part of [her] professional and academic work [she] routinely visit[s] and stud[ies]" the area where the project would be built to "supervise several ongoing and long-term biology studies in this area with graduate students on the aquatic diversity of ephemeral wetlands known locally as playas." Among other things, she is worried that border wall construction would "negatively impact the scientific playa studies . . . because a wall could impede vital natural drainage patterns for the playas."

Sierra Club member Carmina Ramirez has alleged that she "will be harmed culturally and aesthetically" if El Centro Sector Project 1 is built because she has spent her entire life in the area surrounding the U.S.-Mexico Border, including the El Centro Sector, and she believes that border wall construction would "drastically impact [her] ability to enjoy the local natural environment," because she would "see a high border wall instead of [the] beautiful landscape," and "drastically impact [her] cultural identity by fragmenting [her] community." Construction will make her "less likely to hike Mount Signal and enjoy outdoor recreational activities; and when [she does] undertake those activities, [her] enjoyment of them will be irreparably diminished."

Sierra Club member Ralph Hudson "recreat[es] in the wilderness areas along the U.S.-Mexico border" in the area referred to as the Tucson Sector and has done so for 20 years.

He uses the land "to hike, take photos, and explore the natural history." He is "extremely concerned that Tucson Projects 1 and 2 will greatly detract from [his] ability to enjoy hiking, camping, and photographing these landscapes."

Sierra Club member Margaret Case lives a few miles from the border, and she asserts that she will be injured by the construction of Tucson Sector Project 3. "With each increase and escalation in enforcement along the border, [her] and other border residents' quality of life decreases" and "[t]he proposed wall will . . . extend an already unwanted eyesore in the middle of a landscape whose beauty [she] treasure[s], irrevocably harming [her] enjoyment of that landscape."

Additionally, the interests of Sierra Club's members in this lawsuit are germane to the organization's purpose. Sierra Club is a national organization "dedicated to exploring, enjoying, and protecting the wild places of the earth; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives." Sierra Club's organizational purpose is at the heart of this lawsuit, and it easily satisfies this secondary requirement.

SBCC has also alleged facts that support that it has standing to sue on behalf of itself and its member organizations. SBCC alleged that since the Federal Defendants proposed border wall construction, it has had to "mobilize[] its staff and its affiliates to monitor and respond to the diversion of funds and the construction caused by and accompanying the national emergency declaration." These "activities have consumed the majority of SBCC staff's time, thereby interfering with SBCC's core advocacy regarding border militarization, Border Patrol law-enforcement

activities, and immigration reform," but it has had no choice because it "must take these actions in furtherance of its mission to protect and improve the quality of life in border communities."

SBCC Director Vicki Gaubeca confirms these allegations. She has stated that a "border wall, as a physical structure and symbol, is contrary to the goals of SBCC and the needs of border communities." She avers that the "emergency declaration and the threat and reality of construction have caused [SBCC] to reduce the time [it] spend[s] on [its] core projects, including public education about border policies, community engagement on local issues, and affirmative advocacy for Border Patrol accountability and immigration reform." SBCC and its member organizations have instead "been forced to devote substantial time to analyze and respond to the declaration and the promise to build border walls across the southern border" "at a substantial monetary and opportunity cost."

These allegations are sufficient to establish that, if funds are transferred to the border wall construction projects, Sierra Club members and SBCC will each suffer injuries in fact.

Sierra Club and SBCC have also shown that such injuries are "fairly traceable to the challenged action of the [Federal Defendants], and [are] not the result of the independent action of some third party not before the court." *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). It makes no difference that the border wall construction is the product of other statutory provisions, such as Section 284, in addition to Section 8005. "Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the

plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain." *Id.* The Federal Defendants could not build the border wall projects challenged by Sierra Club without invoking Section 8005's transfer authority—without this authority, there was no money to build these portions of the border wall; therefore, construction is fairly traceable to the Section 8005 transfers.

The injury to Sierra Club members and SBCC is likely to be redressed by a favorable judicial decision. A judicial order prohibiting the Federal Defendants from spending the money transferred pursuant to Section 8005 would stop construction, thereby preventing the harm alleged by Plaintiffs. Thus, Sierra Club and SBCC have established that their members satisfy the demands of Article III standing to challenge the Federal Defendants' actions.

IV

First, we consider whether Section 8005 or any constitutional provision authorized DoD to transfer the funds at issue. We hold they did not.

A

Section 8005 provides DoD with limited authority to transfer funds between different appropriations accounts, but it provides no such authority "unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." In the opinion filed today in the companion case, *State of California, et al. v. Trump, et al.*, Nos. 19-16299 and

24          SIERRA CLUB V. TRUMP

19-16336, slip op. at 37 (9th Cir. filed June 26, 2020), we hold that Section 8005 did not authorize the transfer of funds at issue here because "the border wall was not an unforeseen military requirement," and "funding for the wall had been denied by Congress." We reaffirm this holding here and conclude that Section 8005 did not authorize the transfer of funds.

## B

The "straightforward and explicit command" of the Appropriations Clause[11] "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quotation and citation omitted). The Clause is "a bulwark of the Constitution's separation of powers." *U.S. Dep't. Of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012); *see also United States v. McIntosh*, 833 F.3d 1163, 1174–75 (9th Cir. 2016). It "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Office of Pers. Mgmt.*, 496 U.S. at 427–28. Without it, "the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure." *Id*. at 427 (quoting Joseph Story, 2 Commentaries on the Constitution of the United States § 1348 (3d ed. 1858)).

Accordingly, "[t]he United States Constitution exclusively grants the power of the purse to Congress, not the

---

[11] "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." U.S. Const. art. I, § 9, cl. 7.

President." *City and Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing U.S. Const. art. I, § 9, cl. 7). "[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." *Id.* at 1233–34 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

Here, the Executive Branch lacked independent constitutional authority to authorize the transfer of funds. These funds were appropriated for other purposes, and the transfer amounted to "drawing funds from the Treasury without authorization by statute and thus violating the Appropriations Clause." *McIntosh*, 833 F.3d at 1175.

Therefore, the transfer of funds here was unlawful.

## V

All that is left for us to decide, then, is whether Sierra Club is a proper party to challenge the Section 8005 transfers. Sierra Club asserts that it has a number of viable causes of action—including a constitutional cause of action and an *ultra vires* cause of action—while the Federal Defendants assert that Sierra Club has none.

The Supreme Court stay order suggests that Sierra Club may not be a proper challenger here. *See Sierra Club*, 140 S. Ct. at 1. We heed the words of the Court, and carefully analyze Sierra Club's arguments. Having done so, we conclude that Sierra Club has both a constitutional and an *ultra vires* cause of action.

In reaching this result, we realize that this is a rare case in which the "judiciary may . . . have to intervene in determining

26          SIERRA CLUB V. TRUMP

where the authority lies as between the democratic forces in our scheme of government." *Youngstown*, 343 U.S. at 597 (1952) (Frankfurter, J. concurring).  In doing so, we remain "wary and humble," *id.*, for "[i]t is not a pleasant judicial duty to find that the President has exceeded his powers," *id.* at 614. But where, as here, "Congress could not more clearly and emphatically have withheld [the] authority," *id.* at 602, exercised by DoD, "with full consciousness of what it was doing and in the light of much recent history," *id.*, and Sierra Club satisfies the rigors of Article III standing, our "obligation to hear and decide [this] case is virtually unflagging," *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quotations and citation omitted).  "All we can do is, to exercise our best judgment, and conscientiously to perform our duty." *Cohens v. State of Virginia*, 19 U.S. 264, 404 (1821).

A

First, we consider whether Sierra Club has a constitutional cause of action to challenge the Federal Defendants' transfer.  We hold that it does.

Certain provisions of the Constitution give rise to equitable causes of action.  Such causes of action are most plainly available with respect to provisions conferring individual rights, such as the Establishment Clause or the Free Exercise Clause.  *See Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018); *Flast v. Cohen*, 392 U.S. 83 (1968).  But certain structural provisions give rise to causes of action as well.  *See Nat. Labor Relations. Bd. v. Noel Canning*, 573 U.S. 513, 556–57 (2014) (cause of action based on the Recess Appointments Clause); *Bond v. United States*, 564 U.S. 211, 225–26 (2011) (cause of action based on structural principles

of federalism); *Clinton v. City of New York*, 524 U.S. 417, 434–36 (1998) (cause of action based on the Presentment Clause); *INS v. Chadha*, 462 U.S. 919, 943–44 (1983) (cause of action based on the constitutional requirement of bicameralism and presentment); *McIntosh*, 833 F.3d at 1174–75 (cause of action based on the Appropriations Clause).

In *Bond*, the Supreme Court articulated why certain structural constitutional provisions give rise to causes of action. The Court considered "whether a person indicted for violating a federal statute has standing to challenge its validity on the grounds that, by enacting it, Congress exceeded its powers under the Constitution, thus intruding upon the sovereignty and authority of the States." 564 U.S. at 214. The Court held that "[j]ust as it is appropriate for an individual, in a proper case, to invoke separation-of-powers or checks-and-balances constraints, so too may a litigant, in a proper case, challenge a law as enacted in contravention of constitutional principles of federalism." *Id.* at 223–24. It reasoned that the challenge was permissible because "structural principles secured by the separation of powers protect the individual as well," and "[a]n individual has a direct interest in objecting to laws that upset the constitutional balance . . . when the enforcement of those laws causes injury that is concrete, particular, and redressable." *Id.* at 222. In other words, an individual who otherwise meets the requirements of Article III standing may challenge government action that violates structural constitutional provisions intended to protect individual liberties.

We have held that the Appropriations Clause contains such a cause of action. *See McIntosh*, 833 F.3d at 1173–74. In *McIntosh*, defendants moved to enjoin their prosecutions

for federal marijuana offenses on the grounds that a congressional appropriations rider prohibited the Department of Justice from spending federal funds on such prosecutions. *Id.* at 1168. We held that "[the Appropriations Clause] constitutes a separation-of-powers limitation that Appellants can invoke to challenge their prosecutions." *Id.* at 1175. The opinion reasoned that so long as a litigant satisfies the Article III standing requirements, he or she can challenge Appropriations Clause violations because "[o]nce Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for . . . the courts to enforce them when enforcement is sought." *Id.* at 1172 (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978)). In *McIntosh*, we also reaffirmed the Supreme Court's statement in *Bond* that "both federalism and separation-of-powers constraints in the Constitution serve to protect individual liberty, and a litigant in a proper case can invoke such constraints '[w]hen government acts in excess of its lawful powers.'" *Id.* at 1174 (quoting *Bond*, 564 U.S. at 222).[12]

The cause of action available to the plaintiffs in *McIntosh* is available to Sierra Club here. Congress decided the order of priorities for border security. In doing so, it chose to allocate $1.375 billion to fund the construction of pedestrian

---

[12] The Federal Defendants incorrectly characterize *McIntosh*'s constitutional holding as dicta. The *McIntosh* Court discussed the availability of a constitutional cause of action, analogizing to *Bond* and *Canning*, and stating that "Appellants have standing to invoke separation-of-powers provisions of the Constitution to challenge their criminal convictions." 833 F.3d at 1174. Because the Court "confront[ed] an issue germane to the eventual resolution of the case," and "resolve[d] it after reasoned consideration in a published opinion," *McIntosh*'s constitutional holding is "the law of the circuit." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004) (quotations and citation omitted).

fencing in Texas. *See* 2019 CAA § 230(a)(1). It declined to provide additional funding for projects in other areas, and it declined to provide the full $5.7 billion sought by the President: it is for the courts to enforce Congress's priorities, and we do so here. Where plaintiffs, like Sierra Club, establish that they satisfy the requirements of Article III standing, they may invoke separation-of-powers constraints, like the Appropriations Clause, to challenge agency spending in excess of its delegated authority.

The Federal Defendants argue that *Dalton v. Specter*, 511 U.S. 462 (1994) forecloses this result. They assert that *Dalton*'s proposition that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution," means that when there is a claim that an Executive Branch official acted in excess of his statutory authority, there is no constitutional violation. *Id.* at 472. But *Dalton* does not hold that *every* action in excess of statutory authority is *not* a constitutional violation.[13] Rather, *Dalton* suggests that some

---

[13] Notably, the plaintiffs in *Dalton* never alleged that the President violated the Constitution and sought review "exclusively under the [Administrative Procedure Act ("APA")]." *Id.* at 471. Only the Court of Appeals "sought to determine whether non-APA review, based on either common law or constitutional principles, was available." *Id.* The Supreme Court did not consider whether the President had violated a specific constitutional prohibition; instead, it took issue only with the Court of Appeals' contention that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* The Supreme Court's objection to this conclusion is unsurprising in the context of the Defense Base Closure and Realignment Act of 1990 at issue in *Dalton*. The Constitution divides authority with respect to the military between Congress and the President. Here, in contrast, the Constitution delegates exclusively to Congress the power of the purse.

30          SIERRA CLUB V. TRUMP

actions in excess of statutory authority may be constitutional violations, while others may not. Specifically, *Dalton* suggests that a constitutional violation may occur when an officer violates an express prohibition of the Constitution. *Id.* (citing *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 396–97 (1971) for the distinction between "actions contrary to [a] constitutional prohibition," and those "merely said to be in excess of the authority delegated . . . by the Congress"). The Appropriations Clause contains such a constitutional prohibition, declaring that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." U.S. Const. art.1, § 9, cl. 7. Under *Dalton*, then, violations of the Appropriations Clause may give rise to viable causes of action.

*Dalton*'s discussion of *Youngstown* only underscores this point. The Court determined that *Youngstown* could not stand for the proposition "that an action taken by the President in excess of his statutory authority *necessarily* violates the Constitution" because in *Youngstown* "no statutory authority was claimed." *Dalton*, 511 U.S. at 473 (emphasis added). The Court concluded only that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review." *Id.* Thus, *Dalton* and its discussion of *Youngstown* do not address situations in which the President exceeds his or her statutory authority, and in doing so, *also* violates a specific constitutional prohibition, as is the case here.

Neither does *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), require an opposite result here. In *Armstrong*, the Supreme Court rejected the argument that the Supremacy Clause created a private right of action. *Id.* at 325–27. But the Supremacy Clause is not the

Appropriations Clause: while the Supremacy Clause "only declares a truth, which flows immediately and necessarily from the institution of a Federal Government," *id.* at 325 (citing The Federalist No. 33, p. 207 (J. Cooke ed. 1961)), the Appropriations Clause contains an explicit prohibition, which protects individual liberty, because "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury," *McIntosh*, 833 F.3d at 1175. "The individual loses liberty in a real sense if [the appropriations power] is not subject to traditional constitutional constraints." *Clinton v. City of New York*, 524 U.S. at 451 (Kennedy, J., concurring). Thus, while it might be "strange" "to give a clause that makes federal law supreme a reading that *limits* Congress's power to enforce that law," *Armstrong*, 575 U.S. at 326, it is entirely sensible to give a clause that restricts the power of the federal government as a whole a reading that safeguards individual liberty.

Therefore, because the Federal Defendants not only exceeded their delegated authority, but also violated an express constitutional prohibition designed to protect individual liberties, we hold that Sierra Club has a constitutional cause of action here.

## B

Second, we consider whether Sierra Club has an equitable *ultra vires* cause of action to challenge the Federal Defendants' transfer. We hold that it does.

Whether Sierra Club can assert an equitable *ultra vires* cause of action turns on "whether the relief [it] request[s] . . .

was traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). Equitable actions to enjoin *ultra vires* official conduct do not depend upon the availability of a statutory cause of action; instead, they seek a "judge-made remedy" for injuries stemming from unauthorized government conduct, and they rest on the historic availability of equitable review. *Armstrong*, 575 U.S. at 327. "The substantive prerequisites for obtaining an equitable remedy . . . depend on traditional principles of equity jurisdiction." *Grupo Mexicano*, 527 U.S. at 318–19 (quotations and citation omitted).

The relief Sierra Club requests has been traditionally available. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 575 U.S. at 327 (citing Jaffe & Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956)); *see also Harmon v. Brucker*, 355 U.S. 579, 581–82 (1958) ("Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers."). Such causes of action have been traditionally available in American courts: "[w]hen Congress limits its delegation of power, courts infer (unless the statute clearly directs otherwise) that Congress expects this limitation to be judicially enforced." *Dart v. United States*, 848 F.2d 217, 223 (D.C. Cir. 1988).

The passage of the APA has not altered this presumption. "Prior to the APA's enactment . . . courts had recognized the right of judicial review of agency actions that exceeded

authority," and "[n]othing in the subsequent enactment of the APA altered [that] doctrine of review," to "repeal the review of *ultra vires* actions." *Id.* at 224. "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Id.*

That Sierra Club has a cause of action to enjoin the unconstitutional actions at issue here is best illustrated by *Youngstown*. There, Congress passed numerous statutes authorizing the President to take personal and real property under specific conditions. 343 U.S. at 585–86. During the Korean War, however, President Truman signed an executive order seizing most of the nation's steel mills, even though the conditions of the statutes had not been satisfied as a matter of fact. *Id.* at 582, 586. It fell to the Supreme Court to determine whether the President had constitutional authority to seize the steel mills—it held he did not and affirmed the district court injunction. *Id.* at 588–589. The Court never questioned that it had the authority to provide the requested relief.

Such is the case here. Section 8005 authorizes DoD to transfer funds under certain conditions; however, as explained previously, DoD failed to satisfy those conditions. Likewise, as explained previously, the Executive Branch lacks independent constitutional authority to fund border wall construction. If an equitable *ultra vires* action was available to the plaintiffs in *Youngstown*, it surely must be available to Sierra Club here.

A number of D.C. Circuit cases reaffirm that review is ordinarily available when an agency exceeds its delegation of authority. In *Chamber of Commerce of the United States v. Reich*, the D.C. Circuit considered whether the Chamber of

34          SIERRA CLUB V. TRUMP

Commerce had a cause of action to challenge an executive order barring the federal government from contracting with employers who hire permanent replacements during a lawful strike.  74 F.3d 1322, 1325–26 (D.C. Cir. 1996).  The government argued that the Chamber of Commerce lacked a statutory cause of action and that APA review was not available because the challenge was directed at the President's statutory authority to issue the executive order, and the President is not an agency within the meaning of the APA.  *See id.*  The court agreed that APA review was not available, but it held that non-statutory review remained available.  *See id.* at 1327.  The court held that "[i]f a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action."  *Id.*  The court reasoned in part that "[t]he responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction."  *Id.* (quoting *Stark v. Wickard*, 321 U.S. 288, 310 (1944)).

Likewise, in *Dart v. United States*, the D.C. Circuit considered whether the plaintiff could challenge the Secretary of Commerce's decision to impose civil sanctions for a violation of the Export Administration Act ("EAA").  *See* 848 F.2d at 219.  The court held that even though the EAA expressly limited judicial review, the court retained the ability to review whether the Secretary exceeded the authority delegated by the statute.  *See id.* at 223–34.  It explained that "the presumption of judicial review is particularly strong where an agency is alleged to have acted beyond its authority."  *Id.* at 223.  It ultimately concluded that the Secretary had done just that and invalidated the sanctions he imposed.

These cases support our holding here that Sierra Club has an equitable *ultra vires* cause of action to challenge DoD's transfer of funds. Where it is alleged that DoD has exceeded the statutory authority delegated by Section 8005, plaintiffs like Sierra Club can challenge this agency action.

The Federal Defendants contend that an equitable cause of action is not available to Sierra Club here because equitable remedies are available only when they have been "traditionally available in the *specific circumstances presented*," and that the remedies sought here have not been traditionally available in the specific circumstances presented by this case.

The Federal Defendants cite *Grupo Mexicano* in support of this argument, but that case provides little support for their position. In *Grupo Mexicano*, the Court considered whether a district court had the power to issue a preliminary injunction to prevent the transfer of assets in which no lien or equitable interest was claimed. *See* 527 U.S. at 318. The Court concluded it did not. *See id.* at 333. It held that a district court cannot grant relief that "has never been available before—and especially (as here) a type of relief that has been specifically disclaimed by longstanding judicial precedent," particularly when "there is absolutely nothing new about debtors' trying to avoid paying their debts, or seeking to favor some creditors over others." *Id.* at 322; *see id.* at 333.

Here, however, the plaintiffs request a type of relief that is consistent with our longstanding precedent. Indeed, as explained above, the Supreme Court has actually granted injunctive relief in circumstances very similar to these. *See*, *e.g.*, *Youngstown*, 343 U.S. at 589. Further, unlike attempts

to avoid paying debts, instances of Executive Branch *ultra vires* action are, fortunately, relatively rare, and unlikely to occur in contexts likely to repeat themselves precisely. Thus, the justifications for limiting equitable relief in *Grupo Mexicano* are not present here, and courts are able to grant the relief sought by Sierra Club.

We therefore hold that Sierra Club may assert an equitable *ultra vires* cause of action to challenge DoD's transfer of funds.

C

The Federal Defendants raise a number of additional arguments. We address them here.

First, the Federal Defendants assert that Sierra Club's challenge must be construed as an APA claim, rather than as a constitutional or *ultra vires* cause of action. But neither of the two cases cited by the Federal Defendants compel this conclusion. The Federal Defendants cite *Hoefler v. Babbitt*, 139 F.3d 726, 728 (9th Cir. 1998) for the proposition that "[t]he APA is the sole means for challenging the legality of federal agency action," but there, we did not consider whether plaintiffs had a constitutional or *ultra vires* cause of action; rather, we considered whether the action was properly considered under the APA or the Quiet Title Act. *See id.* at 728–29. We ultimately held that the former was appropriate. *See id.* at 729. To extrapolate from a general statement made in this context, as the Federal Defendants do here, goes too far.

Likewise, in *Bennett v. Spear*, 520 U.S. 154, 175 (1997), the Court did not consider whether plaintiffs had a

constitutional cause of action; rather, the Court considered whether the citizen-suit provision of the Endangered Species Act ("ESA") provided an exclusive statutory remedy, or whether a cause of action was also available under the APA. The Court ultimately determined that "[n]othing in the ESA's citizen-suit provision expressly precludes review under the APA, nor do we detect anything in the statutory scheme suggesting a purpose to do so." *Id.* If anything, this case underscores that the APA is not to be construed as an exclusive remedy. Thus, the APA does not displace all constitutional and equitable causes of action.

Second, the Federal Defendants assert that the zone of interests test must apply to any challenge brought by Sierra Club, and that Section 8005 prescribes the relevant zone of interests. We reject this argument.

The zone of interests test limits which plaintiffs can invoke statutorily created causes of action. Although earlier cases, such as *Association of Data Processing Services Organizations, Inc. v. Camp*, 397 U.S. 150 (1970), suggested that the test applied to constitutional causes of action, the Supreme Court's most recent zone of interests case, *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), clarifies that the test applies only to statutory causes of action and causes of action under the APA. *See id.* at 129 ("[T]he modern 'zone of interests' formulation originated . . . as a limitation on the cause of action for judicial review conferred by the [APA]," but "[w]e have since made clear, however, that it applies to *all statutorily created causes of action*." (emphasis added)).

Common sense supports this approach. As Judge Bork explained in *Haitian Refugee Center v. Gracey*,

38                    SIERRA CLUB V. TRUMP

Appellants need not, however, show that their interests fall within the zones of interests of the constitutional and statutory powers invoked by the President in order to establish their standing to challenge the interdiction program as *ultra vires*. Otherwise, a meritorious litigant, injured by *ultra vires* action, would seldom have standing to sue *since the litigant's interest normally will not fall within the zone of interests of the very statutory or constitutional provision that he claims does not authorize action concerning that interest.* For example, were a case like *Youngstown*, to arise today, the steel mill owners would not be required to show that their interests fell within the zone of interests of the President's war powers in order to establish their standing to challenge the seizure of their mills as beyond the scope of those powers.

809 F.2d 794, 811 n.14 (D.C. Cir. 1987) (emphasis added). We agree with Judge Bork.[14]  It would make little sense to

---

[14] While the dissent asserts that we rely on the wrong portion of Judge Bork's opinion, we disagree.  Section 8005 cannot merely be read as a statutory provision limiting the authority conferred when it is simultaneously a statutory power invoked by the President.  In any case, as explained below, the relevant limitation here is not the inapplicable statutory power invoked by the Executive—Section 8005—but instead the restriction on unlawful action—the Appropriations Clause.  *See also Ctr. for Biodiversity v. Trump*, No. 1:19-cv-00408, 2020 WL 1643657 at *25 (D.D.C. Apr. 2, 2020) (quoting the same language from *Haitian Refugee Center* and holding that plaintiffs "thus need not satisfy the zone of interests test for their *ultra vires* claims.").

require Sierra Club to demonstrate that it falls within the zone of interests of Section 8005. Congress may not have contemplated the environmental advocacy group when it included Section 8005 in the defense budget, but nevertheless, Sierra Club has asserted a legally cognizable injury. The fact Congress did not have Sierra Club as a particular plaintiff in mind when it authorized Section 8005's transfer authority does not make its injury less real, nor DoD's action more lawful.

If the zone of interests test applies at all, the Appropriations Clause of the Constitution defines the zone of interests because it is the "particular provision of law upon which [Sierra Club] relies" in seeking relief. *Bennett*, 520 U.S. at 175–76. Section 8005 is relevant only because, to the extent it applies, it authorizes executive action that otherwise would be unconstitutional or *ultra vires*. That a statute is relevant does not transform a constitutional claim into a statutory one. Sierra Club's cause of action stems from the Federal Defendants' violation of the Appropriations Clause because it seeks to enforce the limits mandated by the clause.

To the extent the zone of interests test ever applies to constitutional causes of action, it asks only whether a plaintiff is "arguably within the zone of interests to be protected . . . by the . . . constitutional guarantee in question." *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320 n.3 (1977) (quoting *Data Processing*, 397 U.S. at 153). This renders the test nearly superfluous: so long as a litigant is asserting an injury in fact to his or her constitutional rights, he has a cause of action. *See* ERWIN CHEMERINKSY, FEDERAL JURISDICTION 112 (7th ed. 2016) (citing LAURENCE TRIBE, AMERICAN CONSTITUTIONAL LAW 446 (3d ed. 2000)).

Applying that generous formulation of the test here, Sierra Club falls within the Appropriations Clause's zone of interests. Here, Sierra Club is an organization within the United States that is protected by the Constitution. The Appropriations Clause is a "bulwark of the Constitution's separation of powers," *U.S. Dep't. of Navy v. Fed. Labor Relations Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012), and the "separation of powers can serve to safeguard individual liberty," *McIntosh*, 833 F.3d at 1174 (quoting *Noel Canning*, 573 U.S. at 525). The unconstitutional transfer of funds here infringed upon Sierra Club's members' liberty interests, harming their environmental, aesthetic, and recreational interests. Thus, Sierra Club falls within the Clause's zone of interests, and Sierra Club has a cause of action to challenge the transfers.

## VI

Finally, we consider whether the district court abused its discretion in granting Sierra Club a permanent injunction enjoining the Federal Defendants from spending the funds at issue. We hold it did not, and we affirm the district court injunction.

A permanent injunction is appropriate when: (1) a plaintiff will suffer an irreparable injury absent injunction, (2) remedies available at law are inadequate,[15] (3) the balance of hardships between the parties supports an equitable remedy, and (4) the public interest would not be disserved. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). When the government is a party to the case, the court should consider the balance of hardships and public interests factors

---

[15] The parties do not contest this factor and so we do not address it.

together. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Although injunctive relief "does not follow from success on the merits as a matter of course," *Winter v. NRDC, Inc.*, 555 U.S. 7, 32 (2008), we review a district court's decision to grant a permanent injunction for abuse of discretion, *see eBay*, 547 U.S. at 391.

The district court did not abuse its discretion in weighing these factors and determining that injunctive relief was warranted. First, we agree with the district court that Sierra Club would suffer irreparable harm to its recreational and aesthetic interests absent injunction. An organization can demonstrate irreparable harm by showing that the challenged action will injure its members' enjoyment of public lands. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (finding irreparable harm when the Forest Service's proposed project would harm the Alliance's members' ability to "view, experience, and utilize" national forest areas in an undisturbed state). We conclude that Sierra Club sufficiently demonstrated that the Federal Defendants' proposed use of funds would harm its members ability to recreate and enjoy public lands along the border such that it will suffer irreparable harm absent injunction.

The Federal Defendants' arguments to the contrary are unpersuasive. The Federal Defendants submit that Sierra Club will not be irreparably harmed because its members have plenty of other space to enjoy. We have already rejected the essence of the Federal Defendants' argument. *See All. for the Wild Rockies*, 632 F.3d at 1135 (concluding that the Forest Service's argument that plaintiffs can "view, experience, and utilize other areas of the forest" "proves too much," because its logical extension is that a "plaintiff can never suffer irreparable injury resulting from environmental

42          SIERRA CLUB V. TRUMP

harm in a forest as long as there are other areas of the forest that are not harmed" (internal citations omitted)).

Moreover, we agree with the district court that the balance of equities and the public interest favor injunctive relief here. The public has an important interest in "ensuring that statutes enacted by their representatives are not imperiled by executive fiat." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (quotations and citation omitted). By passing the CAA, Congress made a calculated choice to fund only one segment of border barrier. The public interest favors enforcing this decision. In contrast, the Federal Defendants cannot suffer harm "from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (citing *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983) ("[T]he INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations.")). We agree with the district court that the Federal Defendants' position essentially "boils down to an argument that the Court should not enjoin conduct found to be unlawful because the ends justify the means." No matter how great the collateral benefits of building a border wall may be, the transfer of funds for construction remains unlawful. The equitable maxim "he who comes in equity must come with clean hands" would be turned on its head if unlawful conduct by one party precluded a court from granting equitable relief to the opposing party. The district court properly concluded that the balance of equities and the public interest favor injunctive relief.

The Federal Defendants' additional arguments do not compel a different result. First, the Supreme Court's decision in *Winter* does not require us to vacate the injunction. In

*Winter*, the Supreme Court reversed a preliminary injunction enjoining the Navy from using a particular type of sonar that was essential to its training exercises because it violated NEPA and a number of federal environmental laws. 555 U.S. at 16–17. Key distinctions between this case and *Winter* render it inapposite. There, plaintiffs' "ultimate legal claim [was] that the Navy must prepare an [environmental impact statement], not that it must cease sonar training" because the use of the sonar had otherwise been sanctioned by law. *Id.* at 32. Having determined that the "continuation of the exercises . . . was 'essential to national security,'" *id.* at 18, the President had used his statutory authority to "exempt from compliance those elements of the Federal agency activity that [were] found by the Federal court to be inconsistent with an approved State program," 16 U.S.C. § 1456(c)(1)(B). In addition, the Council on Environmental Quality ("CEQ") had authorized the Navy to implement alternative arrangements to NEPA compliance that would allow the Navy to conduct its training exercises under mitigation procedures, but it imposed additional notice, research, and reporting requirements. *Winter*, 555 U.S. at 18–19.

By contrast, here, Sierra Club's ultimate legal claim is that DoD cannot legally use Section 8005 to fund construction of the border wall, and moreover, that no such exemption applies. If anything, Section 8005 itself is a defense against the Executive Branch's unconstitutional transfer of funds; however, as discussed previously, it offers no such legal cover here. Therefore, while the use of the sonar was not unlawful at the time the Supreme Court vacated the injunction in *Winter*, DoD's transfer of funds here is. While the injunction here "merely ends an unlawful practice," *Rodriguez*, 715 F.3d at 1145, the injunction in *Winter*

44                    SIERRA CLUB V. TRUMP

enjoined conduct that had been sanctioned by law, *see
Winter*, 555 U.S. at 32.

Moreover, the public interest at issue in *Winter* more
clearly favored vacating the injunction. "Antisubmarine
warfare [was] [] the Pacific Fleet's top war-fighting priority."
*Winter*, 555 U.S. at 12. Accordingly, the use of MFA sonar
during training missions was deemed "mission-critical," *id.*
at 14, because it is not only the "most effective technology,"
*id.* at 13, but "the only proven method of identifying
submerged diesel-electric submarines operating on battery
power," *id.* at 14. On the other side of the equation, "the
most serious possible injury [to plaintiffs] would be harm to
an unknown number of marine mammals." *Id.* at 26. The
Court reasonably concluded that the "balance of equities and
consideration of the overall public interest . . . tip strongly in
favor of the Navy." *Id.*

The balance of interests does not so starkly favor the
Federal Defendants here. Although they allege that the
injunction "frustrates the government's ability to stop the
flow of drugs across the border," unlike the government in
*Winter*, the Federal Defendants have failed to demonstrate
that construction of the border wall would serve this purpose,
or alternatively, that an injunction would inhibit this purpose.
The Federal Defendants cite drug trafficking statistics, but
fail to address how the construction of additional physical
barriers would further the interdiction of drugs. The
Executive Branch's failure to show, in concrete terms, that
the public interest favors a border wall is particularly
significant given that Congress determined fencing to be a
lower budgetary priority and the Department of Justice's own

data points to a contrary conclusion.[16]   The district court properly accorded this interest little weight.[17]   Therefore, we hold that the district court did not abuse its discretion, and we affirm the grant of the permanent injunction.

## VII

In sum, we affirm the district court.   We conclude that Sierra Club and SBCC have Article III standing to file their

---

[16] According to the U.S. Department of Justice's Drug Enforcement Administration's 2018 National Drug Threat Assessment Report, the "most common method employed by [Mexican Transnational Criminal Organizations] involves transporting illicit drugs through U.S. [ports of entry] in passenger vehicles with concealed compartments or commingled with legitimate goods on tractor trailers." *2018 National Drug Threat Assessment*, U.S. Dep't of Just. Drug Enforcement Admin. at 99 (2018). Opioids like heroin and fentanyl are most commonly smuggled across the southwest border into the U.S. through legal ports of entry. *Id.* at 19–20, 33; *see also* Joe Ward & Anjali Singhvi, *Trump Claims There is a Crisis at the Border.  What's the Reality?*, NEW YORK TIMES (Jan. 11, 2019) (analyzing U.S. Customs and Border Patrol data and finding that "[m]ost drugs are seized at ports of entry, not along the open border").

[17] We are likewise unconvinced by Defendants argument, citing *Maryland v. King*, 567 U.S. 1301 (2012), that "there is 'irreparable harm' whenever a government cannot enforce its own laws."  The Ninth Circuit has recognized that there is "some authority" for the idea that "a state may suffer an abstract form of harm whenever one of its acts is enjoined," but, "to the extent that is true . . . it is not dispositive of the balance of harms analysis."  *Latta v. Otter*, 771 F.3d 496, 500 (9th Cir. 2014) (quoting *Indep. Living Ctr. of So. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 658 (9th Cir. 2009), *vacated and remanded on other grounds*, 132 S. Ct. 1204 (2012) (alterations adopted)); *see also id.* at 500 n.1 (noting that "[i]ndividual justices, in orders issued from chambers, have expressed the view that a state suffers irreparable injury when one of its laws is enjoined, [but] [n]o opinion for the Court adopts this view" (citations omitted)).

46 SIERRA CLUB V. TRUMP

claims, that the Federal Defendants violated Section 8005 in transferring DoD appropriations to fund the El Paso, Yuma, El Centro, and Tucson Sectors of the proposed border wall, and that Sierra Club and SBCC have a constitutional cause of action under the Appropriations Clause and an *ultra vires* cause of action to challenge the Section 8005 transfers. We also decline to reverse the district court's decision to impose a permanent injunction. Given our resolution of this case founded upon the violations of Section 8005, we need not—and do not—reach the merits of any other theory asserted by Sierra Club, nor reach any other issues presented by the parties.

**AFFIRMED.**

COLLINS, Circuit Judge, dissenting:

This case involves similar claims to those presented in *California v. Trump*, Nos. 19-16299 & 19-16336, ___ F.3d ___ (9th Cir. 2020). In each case, a distinct group of plaintiffs brought suit challenging the Acting Secretary of Defense's invocation of § 8005 and § 9002 of the Department of Defense Appropriations Act, 2019 ("DoD Appropriations Act"), Pub. L. No. 115-245, Div. A, 132 Stat. 2981, 2999, 3042 (2018), to transfer $2.5 billion in funds that Congress had appropriated for other purposes into a different Department of Defense ("DoD") appropriation that could then be used by DoD for construction of border fencing and accompanying roads and lighting. In *California v. Trump*, the relevant plaintiffs are the States of California and New Mexico, who challenged two such construction projects, and here the plaintiffs are the Sierra Club and the Southern Border

SIERRA CLUB V. TRUMP                    47

Communities Coalition ("SBCC") (collectively, the "Organizations"), who challenge six projects. The district court granted declaratory relief to both sets of plaintiffs invalidating the transfers, but it granted permanent injunctive relief only to the Organizations. The majority concludes that the Organizations have Article III standing; that they have a cause of action to challenge the transfers under the Appropriations Clause of the Constitution as well as a cause of action under an equitable ultra vires theory; that the transfers were unlawful; and that the district court properly determined that the Organizations are entitled to declaratory and injunctive relief. I agree that at least the Sierra Club has established Article III standing, but in my view the Organizations lack any cause of action to challenge the transfers. And even assuming that they had a cause of action, I conclude that the transfers were lawful. Accordingly, I would reverse the district court's partial judgment for the Organizations and remand for entry of partial summary judgment in favor of the Defendants. I respectfully dissent.[1]

---

[1] There is considerable overlap between the substantive issues presented in this case and in *California v. Trump*, and my disagreements with the majority in this case largely parallel my disagreements in the other case. But rather than simply cross-reference all of the discussion in my dissent in *California v. Trump*, I will follow the majority and will rely on cross-reference only when it does. The result is a fair amount of verbatim repetition between this dissent and my dissent in *California v. Trump*, but proceeding in this way avoids the awkwardness of directing the reader to a separate published opinion when that reader wants to see what my response is to a particular point made by the majority in its opinion in this case.

## I

The parties' dispute over DoD's funding transfers comes to us against the backdrop of a complex statutory framework and an equally complicated procedural history. Before turning to the merits, I will briefly review both that framework and that history.

## A

Upon request from another federal department, the Secretary of Defense is authorized to "provide support for the counterdrug activities" of that department by undertaking the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284(a), (b)(7). On February 25, 2019, the Department of Homeland Security ("DHS") made a formal request to DoD for such assistance. Noting that its counterdrug activities included the construction of border infrastructure, *see* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Div. C, § 102(a), 110 Stat. 3009-546, 3009-554 (1996) (codified as amended as a note to 8 U.S.C. § 1103), DHS requested that "DoD, pursuant to its authority under 10 U.S.C. § 284(b)(7), assist with the construction of fences[,] roads, and lighting" in several specified "Project Areas" in order "to block drug-smuggling corridors across the international boundary between the United States and Mexico."

On March 25, 2019, the Acting Defense Secretary invoked § 284 and approved the provision of support for DHS's "El Paso Sector Project 1" (which would involve DoD construction of border fencing, roads, and lighting in Luna

and Doña Ana Counties in New Mexico), as well as for, *inter alia*, DHS's "Yuma Sector Project 1" (which would involve DoD construction of similar border infrastructure in Yuma County, Arizona). Thereafter, the Secretary of Homeland Security invoked his authority under § 102(c) of IIRIRA to waive a variety of federal environmental statutes with respect to the planned construction of border infrastructure in the relevant portions of the El Paso Sector and the Yuma Sector, as well as "all . . . state . . . laws, regulations, and legal requirements of, deriving from, or related to the subject of," those federal laws. *See* 84 Fed. Reg. 17185, 17187 (Apr. 24, 2019); 84 Fed. Reg. 17187, 17188 (Apr. 24, 2019).

Subsequently, on May 9, 2019, the Acting Defense Secretary again invoked § 284, this time to approve DoD's construction of similar border infrastructure to support DHS's "El Centro Sector Project 1" in Imperial County, California, and DHS's "Tucson Sector Projects 1, 2, and 3" in Pima and Cochise Counties in Arizona. Less than a week later, the Secretary of Homeland Security again invoked his authority under IIRIRA § 102(c) to waive federal and state environmental laws, this time with respect to the construction in the relevant sections of the El Centro Sector and the Tucson Sector. *See* 84 Fed. Reg. 21800, 21801 (May 15, 2019); 84 Fed. Reg. 21798, 21799 (May 15, 2019).

Although § 284 authorized the Acting Defense Secretary to provide this support, there were insufficient funds in the relevant DoD appropriation to do so. Specifically, for Fiscal Year 2019, Congress had appropriated for "Drug Interdiction and Counter-Drug Activities, Defense" a total of only $670,271,000 that could be used for counter-drug support. *See* DoD Appropriations Act, Title VI, 132 Stat. at 2997 (appropriating, under Title governing "Other Department of

50            SIERRA CLUB V. TRUMP

Defense Programs," a total of "$881,525,000, of which $517,171,000 shall be for counter-narcotics support"); *id.*, Title IX, 132 Stat. at 3042 (appropriating $153,100,000 under the Title governing "Overseas Contingency Operations"). Accordingly, to support the El Paso Sector Project 1 and Yuma Sector Project 1, the Acting Secretary on March 25, 2019 invoked his authority to transfer appropriations under § 8005 of the DoD Appropriations Act and ordered the transfer of $1 billion from "excess Army military personnel funds" into the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation. That transfer was accomplished by moving $993,627,000 from the "Military Personnel, Army" appropriation and $6,373,000 from the "Reserve Personnel, Army" appropriation.

To support the El Centro Sector Project 1 and Tucson Sector Projects 1, 2, and 3, the Acting Secretary on May 9, 2019 again invoked his transfer authority to move an additional $1.5 billion into the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation. Pursuant to § 8005 of the DoD Appropriations Act, DoD transferred a total of $818,465,000 from 12 different DoD appropriations into the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation. Invoking the Secretary's distinct but comparable authority under § 9002 to transfer funds appropriated under the separate Title governing "Overseas Contingency Operations," DoD transferred $604,000,000 from the "Afghanistan Security Forces Fund" appropriation and $77,535,000 from the "Operation and Maintenance, Defense-Wide" appropriation into the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation.

**B**

The complex procedural context of this case involves two parallel lawsuits and four appeals to this court, and it has already produced one published Ninth Circuit opinion that was promptly displaced by the Supreme Court.

**1**

The Organizations filed this action in the district court against the Acting Defense Secretary, DoD, and a variety of other federal officers and agencies. In their March 18, 2019 First Amended Complaint, they sought to challenge, *inter alia*, any transfer of funds by the Acting Secretary under § 8005 or § 9002. California and New Mexico, joined by several other States, filed a similar action, and their March 13, 2019 First Amended Complaint also sought to challenge any such transfers. Both sets of plaintiffs moved for preliminary injunctions in early April 2019. The portion of the States' motion that was directed at the § 8005 transfers was asserted only on behalf of New Mexico and only with respect to the construction on New Mexico's border (*i.e.*, El Paso Sector Project 1). The Organizations' motion was likewise directed at El Paso Sector Project 1, but it also challenged Yuma Sector Projects 1 and one other project ("Yuma Sector Project 2").

After concluding that the Organizations were likely to prevail on their claims that the transfers under § 8005 were unlawful and that these organizational plaintiffs had demonstrated a "likelihood of irreparable harm to their members' aesthetic and recreational interests," the district court on May 24, 2019 granted a preliminary injunction enjoining Defendants from using transferred funds for "Yuma

Sector Project 1 and El Paso Sector Project 1."[2]   In a companion order, however, the district court denied preliminary injunctive relief to the States.  Although the court held that New Mexico was likely to succeed on its claim that the transfers under § 8005 were unlawful, the court concluded that, in light of the grant of a preliminary injunction against El Paso Sector Project 1 to the Organizations, New Mexico would not suffer irreparable harm from the denial of its duplicative request for such relief.   On May 29, 2019, Defendants appealed the preliminary injunction in favor of the Organizations, and after the district court refused to stay that injunction, Defendants moved in this court for an emergency stay on June 3, 2019.  New Mexico did not appeal the district court's denial of its duplicative request for a preliminary injunction.

**2**

While the Defendants' emergency stay request was being briefed and considered in this court, the Organizations moved for partial summary judgment on June 12, 2019.  The motion was limited to the issue of whether the transfers under § 8005 and § 9002 were lawful, and it requested corresponding declaratory relief, as well as a permanent injunction against the use of transferred funds for all six projects (El Paso Sector Project 1, El Centro Sector Project 1, Yuma Sector Project 1, and Tucson Sector Projects 1, 2, and 3).  California and New Mexico (but not the other States) filed a comparable summary judgment motion that same day, directed only at El Paso

---

[2] By the time the district court ruled, DoD had decided not to use funds transferred under § 8005 for any construction in Yuma Sector Project 2, and so the request for a preliminary injunction as to that project was moot.

Sector Project 1 and El Centro Sector Project 1.  Defendants filed cross-motions for summary judgment on the legality of the transfers under § 8005 and § 9002 with respect to the corresponding projects at issue in each case.

On June 28, 2019, the district court granted partial summary judgment and declaratory relief to both sets of plaintiffs, concluding that the transfers under § 8005 and § 9002 were unlawful.  The court granted permanent injunctive relief to the Organizations against all six projects, but it denied any such relief to California and New Mexico. The district court concluded that California and New Mexico had failed to prove a threat of future demonstrable environmental harm.  The court expressed doubts about the States' alternative theory that they had demonstrated injury to their sovereign interests, but the court ultimately concluded that it did not need to resolve that issue.  As before, the district court instead held that California and New Mexico would not suffer any irreparable harm in light of the duplicative relief granted to the Organizations.  The district court denied Defendants' cross-motions for summary judgment in both cases.  Invoking its authority under Federal Rule of Civil Procedure 54(b), the district court entered partial judgments in favor of, respectively, the Sierra Club and SBCC, and California and New Mexico.  The district court denied Defendants' request to stay the permanent injunction pending appeal.

**3**

On June 29, 2019, Defendants timely appealed in both cases and asked this court to stay the permanent injunction based on the same briefing and argument that had been presented in the preliminary injunction appeal.  California

54                    SIERRA CLUB V. TRUMP

and New Mexico timely cross-appealed nine days later. On July 3, 2019, this court consolidated Defendants' appeal of the judgment and permanent injunction with Defendants' pending appeal of the preliminary injunction.[3] That same day, a motions panel of this court issued a 2–1 published decision denying Defendants' motion for a stay of the permanent injunction (which had overtaken the preliminary injunction). *See Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019).

Defendants then applied to the Supreme Court for a stay of the permanent injunction pending appeal, which the Court granted on July 26, 2019. *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019). That stay remains in effect "pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the Government's petition for a writ of certiorari, if such writ is timely sought." *Id.* at 1. In granting the stay, the Court concluded that "the Government has made a sufficient showing at this stage that [the Sierra Club and SBCC] have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Id.*

## II

Defendants have not contested the Article III standing of the Sierra Club and SBCC on appeal, but as the majority notes, "'the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties.'" *See* Maj. Opin. at 17 n.9 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). As "an

---

[3] This court later consolidated the appeal and cross-appeal in the States' case with the already-consolidated appeals in this case.

indispensable part of the plaintiff's case, each element" of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife* (*Lujan v. Defenders*), 504 U.S. 555, 561 (1992). Thus, although well-pleaded allegations are enough at the motion-to-dismiss stage, they are insufficient to establish standing at the summary-judgment stage. *Id.* "In response to a summary judgment motion, . . . the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (simplified).

In reviewing standing *sua sponte* in the context of cross-motions for summary judgment, it is appropriate to apply the more lenient standard that takes the *plaintiffs'* evidence as true and then asks whether a reasonable trier of fact could find Article III standing. *Lujan v. Defenders*, 504 U.S. at 563 (applying this standard in evaluating whether Government's cross-motion for summary judgment should have been granted). In their briefs below concerning the parties' cross-motions, the Sierra Club and SBCC each asserted that Defendants' allegedly unlawful conduct caused harm to their members' recreational, aesthetic, and environmental interests. Accepting the Organizations' evidence as true, and drawing all reasonable inferences in their favor, a reasonable trier of fact could conclude that at least the Sierra Club has associational standing under *Hunt v. Washington State Apple*

*Advert. Comm'n*, 432 U.S. 333 (1977).[4]  Under the *Hunt* test, an association has standing if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Id*. at 343.  The Sierra Club has presented sufficient evidence as to each of these three requirements.

To establish that its members would suffer irreparable harm absent a permanent injunction, the Sierra Club presented declarations from members who regularly visit the respective project areas.  These members described how the construction and the resulting border barriers would interfere with their enjoyment of the surrounding landscape and would impede their ability to fish, to hunt, to monitor and document wildlife and vegetation for educational purposes, and to participate in other activities near the project sites.  These injuries to the members' recreational, aesthetic, and environmental interests are sufficient to constitute an injury-in-fact for Article III purposes.  *See Lujan v. Defenders*, 504 U.S. at 562–63 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing.").  Moreover, these injuries are fairly traceable to the construction, and an injunction blocking the transfers would redress those injuries by effectively stopping that

---

[4] The district court explicitly addressed Article III standing only in connection with the preliminary injunction motion.  Although Article III standing was not revisited when the Organizations subsequently moved for summary judgment and a permanent injunction, the Organizations' showing of injury in support of a permanent injunction provides a sufficient basis for evaluating their Article III standing.

SIERRA CLUB V. TRUMP                    57

construction. *See id*. at 560–61. This evidence is therefore sufficient to establish that these members would have Article III standing to sue in their own right.

The other *Hunt* requirements are also satisfied. These members' interests are clearly germane to the Sierra Club's mission to protect the natural environment and local wildlife and plant life. And in seeking declaratory and injunctive relief, the lawsuit does not require the participation of individual members. *See Hunt*, 432 U.S. at 343.

Because the Sierra Club satisfies the applicable standing requirements as to all of the challenged projects, we may proceed to the merits without having to address SBCC's standing. *See Secretary of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) ("Since the State of California clearly does have standing, we need not address the standing of the other [plaintiffs], whose position here is identical to the State's."). And given my view that the Organizations' legal challenges fail, I perceive no obstacle to entering judgment against *both* the Sierra Club and SBCC without determining whether the latter has standing. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 98 (1998).

### III

After examining the Article III standing of the Organizations, the majority then proceeds straight to the merits of whether the transfers were unlawful. *See* Maj. Opin. at 23. But we ought not address that issue unless we have first determined that the Organizations have asserted a viable cause of action that properly brings that issue before us. *See Air Courier Conf. v. American Postal Workers Union AFL-CIO*, 498 U.S. 517, 530–31 (1991). The majority

belatedly gets to that question in Section V of its opinion, holding that the Organizations have two viable causes of action: an equitable cause of action under the Constitution and an ultra vires cause of action. *See* Maj. Opin. at 25. I disagree with that conclusion, and I also disagree with the Organizations' alternative argument that they have a valid cause of action under the Administrative Procedure Act ("APA"). *See Trump v. Sierra Club*, 140 S. Ct. at 1 ("[T]he Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005.").[5]

---

[5] In its merits analysis, the majority scarcely cites the motions panel's published decision, which addressed the Organizations' likelihood of success on the merits of many of the same issues before us. I agree with the majority's implicit rejection of the Organizations' contention that the motions panel's opinion bars this merits panel from examining these issues afresh. Although the motions panel decision is a precedent, it remains subject to reconsideration by this court until we issue our mandate. *See United States v. Houser*, 804 F.2d 565, 567–68 (9th Cir. 1986) (distinguishing, on this point, between reconsideration of a prior panel's decision "during the course of a single appeal" and a decision "on a prior appeal"); *cf. Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc) (three-judge panel lacks authority to overrule a decision in a prior appeal in the same case). To the extent that *Lair v. Bullock*, 798 F.3d 736, 747 (9th Cir. 2015), suggests otherwise, that suggestion is dicta and directly contrary to our decision in *Houser*. *See East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1261–65 (9th Cir. 2020). In all events, the precedential force of the motions panel's opinion was largely, if not entirely, vitiated by the Supreme Court's subsequent decision to grant the very stay that the motions panel's opinion denied. I do not agree, however, with the majority's disregard of the Supreme Court's order in this case—a disregard that hardly befits the "wary and humble" attitude the majority professes. *See* Maj. Opin. at 25–26.

## A

Although the Organizations invoke the APA only as a fallback to their preferred non-statutory claims, I think it is appropriate to first consider whether they have a *statutory* cause of action under the APA. *Cf. Chamber of Commerce v. Reich*, 74 F.3d 1322, 1326–27 (D.C. Cir. 1996) (suggesting that, if a plaintiff relies on both the APA and non-statutory-review claims, the APA claim should be considered first). Even assuming *arguendo* that the APA does not displace reliance upon alternative non-statutory causes of action, *see infra* at 69, the contours of any express cause of action under the APA certainly provide appropriate context for the consideration of any non-statutory claim.

In authorizing suit by any person "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, the APA incorporates the familiar zone-of-interests test, which reflects a background principle of law that always "applies unless it is expressly negated," *Bennett v. Spear*, 520 U.S. 154, 163 (1997); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).[6] That test requires a plaintiff to "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. NWF*, 497 U.S. at

---

[6] The Supreme Court has not squarely addressed whether the zone-of-interests test applies to a plaintiff who claims to have "suffer[ed] legal wrong because of agency action," which is the other class of persons authorized to sue under the APA, 5 U.S.C. § 702. *See Lujan v. National Wildlife Fed.* (*Lujan v. NWF*), 497 U.S. 871, 882–83 (1990). The Organizations have not invoked any such theory here, so I have no occasion to address it.

883 (quoting *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 396–97 (1987)).  This test "is not meant to be especially demanding."  *Clarke*, 479 U.S. at 399.  Because the APA was intended to confer "generous review" of agency action, the zone-of-interests test is more flexibly applied under that statute than elsewhere, and it requires only a showing that the plaintiff is "*arguably* within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs., Inc. v. Camp* (*Data Processing*), 397 U.S. 150, 153, 156 (1970) (emphasis added); *see also Bennett*, 520 U.S. at 163 ("what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not do so for other purposes") (simplified).  Because an APA plaintiff need only show that its interests are "arguably" within the relevant zone of interests, "the benefit of any doubt goes to the plaintiff."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).  Although these standards are generous, the Organizations have failed to satisfy them.

**1**

In applying the zone-of-interests test, we must first identify the "statutory provision whose violation forms the legal basis for [the] complaint" or the "gravamen of the complaint." *Lujan v. NWF*, 497 U.S. at 883, 886; *see also Air Courier Conf.*, 498 U.S. at 529.  That question is easy here.  The Organizations' complaint alleges that the challenged transfers are not authorized by § 8005 and § 9002 because "[t]he diversion of funding to build a border wall or fence is not based on unforeseen military requirements"; "the building of a permanent border wall is not a 'military requirement'";

and "Congress has denied funding for Defendants' planned wall construction, thus barring the Department of Defense from using transfers to fund it."[7]  The Organizations allege that, because Congress thus "has not authorized the Department of Defense to transfer additional Defense funds into the Drug Interdiction and Counter-Narcotics Activities account for the purpose of supporting another agency, rather than for military requirements," the Appropriations Clause bars the transfers and "Defendants are acting ultra vires in seeking to transfer funds into the Drug Interdiction and Counter-Narcotics Activities account for the purpose of building a permanent border wall."  Given that the case turns on whether the transfers met the criteria in § 8005, that statute is plainly the "gravamen of the complaint," and it therefore defines the applicable zone of interests.  *Lujan v. NWF*, 497 U.S. at 886.

Although the Organizations invoke the Appropriations Clause and the constitutional separation of powers in contending that Defendants' actions are unlawful, any such constitutional violations here can be said to have occurred *only if* the transfers violated the limitations set forth in § 8005: if Congress authorized DoD to transfer the appropriated funds from one account to another, and to spend them accordingly, then the money has been spent "in Consequence of Appropriations made by Law," U.S. CONST. art. I, § 9, cl. 7, and the Executive has not otherwise

---

[7] Because the limitations on transfers set forth in § 8005 also apply to transfers under § 9002, *see* 132 Stat. at 3042, the parties use "§ 8005" to refer to both provisions, and I will generally do so as well.

transgressed the separation of powers.[8]    *All* of the
Organizations' theories for challenging the transfers—
whether styled as constitutional claims or as statutory
claims—thus rise or fall based on whether DoD has
transgressed the limitations on transfers set forth in § 8005.
As a result, § 8005 is obviously the "statute whose violation
is the gravamen of the complaint." *Lujan v. NWF*, 497 U.S.
at 886.  To maintain a claim under the APA, therefore, the
Organizations must establish that they are within the zone of
interests of § 8005.[9]

---

[8] The only possible exception is the Organizations' argument that
§ 8005 *itself* violates the Presentment Clause.  As explained below, that
contention is frivolous. *See infra* at 71–72.

[9] The Organizations briefly contend that DoD has exceeded its
authority under § 284 and has violated the National Environmental Policy
Act ("NEPA"), but even assuming *arguendo* that the Organizations have
a cause of action to raise any such challenges, they are patently without
merit.  The Organizations note that § 284 contains a special reporting
requirement for "small scale construction" projects, which are defined as
projects costing $750,000 or less, 10 U.S.C. § 284(h)(1)(B), (i)(3), and
they argue that this shows that Congress did not authorize projects on the
scale at issue here.  The inference is a non sequitur: the fact that Congress
requires special reporting of these smaller projects does not mean that they
are the *only* projects authorized.  Congress may have imposed such a
unique reporting requirement in order to capture the sort of smaller-scale
activities that might otherwise have escaped its notice.  And the fact that
past expenditures under § 284 have happened to be for more modest
projects is irrelevant, because nothing in the text of § 284 imposes any
such size limits on the projects authorized by that statute.    The
Organizations' reliance on NEPA is likewise meritless.  We have upheld
DHS's waiver of NEPA under § 102(c) of IIRIRA, *see In re Border
Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1225 (9th Cir. 2019), and the
district court correctly concluded that the waiver applies to construction
that DoD undertakes under § 284 to "provide support" to DHS at DHS's
"request[]," 10 U.S.C. § 284.  *See Sierra Club v. Trump*, 379 F. Supp. 3d
883, 922–23 (N.D. Cal. 2019).

**2**

Having identified the relevant statute, our next task is to "discern the interests arguably to be protected by the statutory provision at issue" and then to "inquire whether the plaintiff's interests affected by the agency action in question are among them." *National Credit Union Admin. v. First Nat'l Bank & Trust Co.* (*NCUA*), 522 U.S. 479, 492 (1998) (simplified). Identifying the interests protected by § 8005 is not difficult, and here the Organizations' asserted interests are not among them.

Section 8005 is a grant of general transfer authority that allows the Secretary of Defense, if he determines "that such action is necessary in the national interest" and if the Office of Management and Budget approves, to transfer from one DoD "appropriation" into another up to $4 billion of the funds that have been appropriated under the DoD Appropriations Act "for military functions (except military construction)." *See* 132 Stat. at 2999. Section 8005 contains five provisos that further regulate this transfer authority, and the only limitations on the Secretary's authority that the Organizations claim were violated here are all contained in the first such proviso. That proviso states that "such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." *Id.*[10] The remaining provisos require prompt notice to Congress "of all transfers made pursuant to this

---

[10] Similar language has been codified into permanent law. *See* 10 U.S.C. § 2214(b). No party contends that § 2214(b) alters the relevant analysis under the comparably worded provision in § 8005.

64 SIERRA CLUB V. TRUMP

authority or any other authority in this Act"; proscribe the use
of funds to make requests to the Committees on
Appropriations for reprogrammings that are inconsistent with
the restrictions described in the first proviso; set a time limit
for making requests for multiple reprogrammings; and
exempt "transfers among military personnel appropriations"
from counting towards the $4 billion limit. *Id*.

Focusing on "the particular provision of law upon which
the plaintiff relies," *Bennett*, 520 U.S. at 175–76, makes clear
that § 8005 as a whole, and its first proviso in particular,
are aimed at tightening congressional control over the
appropriations process. The first proviso's general
prohibition on transferring funds for any item that "has been
denied by the Congress" is, on its face, a prohibition on using
the transfer authority to effectively reverse Congress's
specific decision to deny funds to DoD for that item.
132 Stat. at 2999. The second major limitation imposed by
the first proviso states that the transfer authority is not to be
used unless, considering the items "for which [the funds
were] originally appropriated," there are "higher priority
items" for which the funds should now be used in light of
"military requirements" that were "unforeseen" in DoD's
request for Fiscal Year 2019 appropriations. *Id*. The obvious
focus of this restriction is likewise to protect congressional
judgments about appropriations by (1) restricting DoD's
ability to *reprioritize* the use of funds differently from how
Congress decided to do so and (2) precluding DoD from
transferring funds appropriated by Congress for "military
functions" for purposes that do not reflect "military
requirements." The remaining provisos, including the
congressional reporting requirement, all similarly aim to
maintain congressional control over appropriations. And all
of the operative restrictions in § 8005 that the Organizations

invoke here are focused *solely* on limiting DoD's ability to use the transfer authority to reverse the congressional judgments reflected in *DoD's* appropriations.

In addition to preserving congressional control over DoD's appropriations, § 8005 also aims to give DoD some measure of flexibility to make necessary changes. Notably, in authorizing the Secretary to make transfers among appropriations, § 8005's first proviso specifies only *one* criterion that he must consider in exercising that discretion: he must determine whether the item for which the funds will be used is a "*higher priority* item[]" in light of "unforeseen *military* requirements." 132 Stat. at 2999 (emphasis added). Under the statute, he need not consider any other factor concerning either the original use for which the funds were appropriated or the new use to which they will now be put.

In light of these features of § 8005, the "interests" that the Organizations claim are "affected by the agency action in question" are not "among" the "interests arguably to be protected" by § 8005. *NCUA*, 522 U.S. at 492 (simplified). In particular, the Organizations' asserted recreational, aesthetic, and environmental interests clearly lie outside the zone of interests protected by § 8005. The statute does not mention recreational, aesthetic, and environmental interests, nor does it require the Secretary to consider such interests. On the contrary, the statute requires him only to consider whether an item is a "higher priority" in light of "military requirements," and it is otherwise entirely neutral as to the uses to which the funds will be put. Indeed, that neutrality is reflected on the face of the statute, which says that, once the transfer is made, the funds are "merged with and . . . available *for the same purposes*, and for the same time period, *as the appropriation or fund to which transferred*." 132 Stat.

at 2999 (emphasis added). Because the alleged recreational, aesthetic, and environmental harms that the Organizations assert here play no role in the analysis that § 8005 requires the Secretary to conduct, and are not among the harms that § 8005's limitations seek to address or protect, the Organizations' interests in avoiding these harms are not within § 8005's zone of interests.

Moreover, focusing on the specific interests for which the Organizations have presented sufficient evidentiary support at the summary-judgment stage, *see Lujan v. NWF*, 497 U.S. at 884–85, further confirms that, in deciding whether to redirect excess military personnel funds under § 8005 to assist DHS by building fencing to stop international drug smuggling, the Acting Secretary of Defense did not have to give even the slightest consideration to whether that reprogramming of funds would disrupt views of the desert landscape or affect local flora and fauna. Put simply, the Organizations' recreational, aesthetic, and environmental interests are "'so marginally related to . . . the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Patchak*, 567 U.S. at 225 (quoting *Clarke*, 479 U.S. at 399).

**3**

The Organizations nonetheless claim that they fall within § 8005's zone of interests because § 8005 was "aimed at tightening congressional control over executive spending," and the Organizations' interests do not "meaningfully diverge from Congress's interests in enacting the statute." This contention fails. As the Supreme Court made clear in *Lujan v. NWF*, the zone-of-interests test requires the plaintiff to make a factual showing that the plaintiff itself, or someone

else whose interests the plaintiff may properly assert, has a cognizable interest that falls within the relevant statute's zone of interests. 497 U.S. at 885–99 (addressing whether the interests of NWF—or of any of its members, whose interests NWF could validly assert under *Hunt*'s associational standing doctrine—had been shown to be within the relevant zone of interests). I am aware of no precedent that would support the view that these Organizations can *represent* the interests of Congress (akin to NWF's representation of the interests of its members), much less that they can do so merely because they are sympathetic to Congress's perceived policy objectives.[11] But the Organizations do not actually rely on such a novel theory. Instead, the Organizations suggest that, merely because their overall litigation objectives here do not diverge from those of Congress, they have thereby satisfied the zone-of-interests test with respect to their *own* interests. This theory is clearly wrong.

The critical flaw in the Organizations' analysis is that it rests, not on the *interests* they are asserting (preservation of landscape, flora, fauna, etc.), but on the *legal theory* that the Organizations invoke to protect those interests here. But the zone-of-interests test focuses on the former and not the latter. *See Lujan v. NWF*, 497 U.S. at 885–89. Indeed, if the Organizations were correct, that would effectively eliminate

---

[11] Even if the Organizations could assert Congress's interests in some representational capacity, they could do so only if the injury to Congress's interests satisfied the requirements of Article III standing. *See Air Courier Conf.*, 498 U.S. at 523–24 (zone-of-interests test is applied to those injuries-in-fact that meet Article III requirements). I express no view on that question. *Cf. U.S. House of Reps. v. Mnuchin*, 379 F. Supp. 3d 8 (D.D.C. 2019) (holding that House lacks Article III standing to challenge the transfers at issue here), *appeal ordered heard en banc*, 2020 WL 1228477 (D.C. Cir. 2020).

68              SIERRA CLUB V. TRUMP

the zone-of-interests test. By definition, *anyone* who alleges
a violation of a particular statute has thereby invoked a legal
theory that does not "meaningfully diverge" from the
interests of those *other* persons or entities who *are* within that
statute's zone-of-interests. Such a tautological congruence
between the Organizations' legal theory and Congress's
institutional interests is not sufficient to satisfy the zone-of-
interests test here.

The Organizations suggest that their approach is
supported by the D.C. Circuit's decision in *Scheduled
Airlines Traffic Offices, Inc. v. Department of Defense*,
87 F.3d 1356 (D.C. Cir. 1996), but that is wrong. As the
opinion in that case makes clear, the D.C. Circuit was relying
on the same traditional zone-of-interests test, under which a
plaintiff's interests are "outside the statute's 'zone of
interests' only 'if the plaintiff's interests are so marginally
related to or inconsistent with the purposes implicit in the
statute that it cannot reasonably be assumed that Congress
intended to permit the suit.'" 87 F.3d at 1360 (quoting
*Clarke*, 479 U.S. at 399). The court mentioned "congruence"
in the course of explaining why the plaintiff's interests in that
case were "not more likely to frustrate than to further
statutory objectives," *i.e.*, why those interests were not
*inconsistent* with the purposes implicit in the statute. *Id.*
(simplified). It did not thereby suggest—and could not
properly have suggested—that the mere lack of any such
inconsistency is alone sufficient under the zone-of-interests
test. Here, the problem is not that the Organizations' interests
are inconsistent with the purposes of § 8005, but rather that
they are too "marginally related" to those purposes. *See
supra* at 66.

The Organizations also suggest that we must apply the zone-of-interests test broadly here, because—given Congress's inability to enforce the limitations of § 8005 directly—the agency's transfers would otherwise be effectively "unreviewable." The assumption that no one will ever be able to sue for any violation of § 8005 seems doubtful, *cf. Sierra Club v. Trump*, 929 F.3d at 715 (N.R. Smith, J., dissenting) (suggesting that "those who would have been entitled to the funds as originally appropriated" may be within the zone of interests of § 8005), but in any event, we are not entitled to bend the otherwise applicable—and already lenient—standards to ensure that someone will be able to sue in this case or others like it.

**B**

As noted earlier, the Organizations only invoke the APA as a fallback option, and they instead insist that they may assert claims under the Constitution, as well as an equitable cause of action to enjoin "ultra vires" conduct. The Organizations do not have a cause of action under either of these theories.

**1**

The Organizations contend that they are not required to satisfy any zone-of-interests test to the extent that they assert non-APA causes of action to enjoin Executive officials from taking *unconstitutional* action.[12] Even assuming that an

---

[12] It is not entirely clear that the Organizations are alternatively contending that *APA claims* to enjoin *unconstitutional* conduct, *see* 5 U.S.C. § 706(2)(B), are exempt from the zone-of-interests test. To the extent that they are so contending, the point seems doubtful. *See Data*

equitable cause of action to enjoin unconstitutional conduct exists alongside the APA's cause of action, *see Juliana v. United States*, 947 F.3d 1159, 1167–68 (9th Cir. 2020); *Navajo Nation v. Department of the Interior*, 876 F.3d 1144, 1172 (9th Cir. 2017); *but see Sierra Club v. Trump*, 929 F.3d at 715–17 (N.R. Smith, J., dissenting), it avails the Organizations nothing here. The Organizations have failed to allege the sort of constitutional claim that might give rise to such an equitable action, because their "constitutional" claim is effectively the very same § 8005-based claim dressed up in constitutional garb. And even if this claim counted as a "constitutional" one, it would still be governed by the same zone of interests defined by the relevant limitations in § 8005.

### a

The Organizations assert three constitutional claims in their operative complaint: (1) that Defendants have violated the constitutional separation of powers by "usurp[ing] Congress's legislative authority"; (2) that Defendants have violated the Presentment Clause by "modify[ing] or repeal[ing] Congress's appropriations legislation by executive proclamation, rather than by law"; and (3) that Defendants have violated the Appropriations Clause by "allocat[ing] money from the Department of the Treasury by executive proclamation, rather than by law, and in contravention of restrictions contained in Congress's appropriations' laws."

*Processing*, 397 U.S. at 153 (zone-of-interests test requires APA claimant to show that its interest "is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question"). But in all events, any such APA-based claim to enjoin unconstitutional conduct would fail for the same reasons as the Organizations' purported free-standing equitable claim to enjoin such conduct.

As clarified in their subsequent briefing, the Organizations assert both what I will call a "strong" form of these constitutional arguments and a more "limited" form. In its strong form, the Organizations' argument is that, *even if § 8005 authorized the transfers in question here*, those transfers nonetheless violated the Presentment Clause. In its more limited form, the Organizations' argument is that the transfers violated the separation of powers, the Presentment Clause, and the Appropriations Clause *because* the transfers were not authorized by § 8005.

I need not address whether the Organizations have an equitable cause of action to assert the strong form of their constitutional argument, because in my view that argument on the merits is so "wholly insubstantial and frivolous" that it would not even give rise to federal jurisdiction. *Bell v. Hood*, 327 U.S. 678, 682–83 (1946); *see also Steel Co.*, 523 U.S. at 89. If § 8005 *allowed* the transfers here, then that necessarily means that the Executive has properly spent funds that Congress, by statute, has *appropriated* and allowed to be spent for *that* purpose. *Cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion"). By transferring funds after finding that the statutory conditions for doing so are met, an agency thereby "execut[es] the policy that Congress had embodied in the statute" and does not unilaterally alter or repeal any law in violation of the Presentment Clause or the separation of powers. *See Clinton v. City of New York*, 524 U.S. 417, 444 (1998). If anything, it is the Organizations' theory—that the federal courts must give effect to an alleged broader congressional judgment against border funding *regardless* of whether that judgment

72                    SIERRA CLUB V. TRUMP

is embodied in binding statutory language—that would
offend separation-of-powers principles.

That leaves only the more limited form of the
Organizations' argument, which is that, *if* § 8005 did not
authorize the transfers, *then* the expenditures violated the
Appropriations Clause, the Presentment Clause, and the
separation of powers.  Under *Dalton v. Specter*, 511 U.S. 462
(1994), this theory—despite its constitutional garb—is
properly classified as "a statutory one," *id*. at 474.  It
therefore does not fall within the scope of the asserted non-
APA equitable cause of action to enjoin *unconstitutional*
conduct.[13]

In *Dalton*, the Court addressed a non-APA claim to enjoin
Executive officials from implementing an allegedly
unconstitutional Presidential decision to close certain military
bases under the Defense Base Closure and Realignment Act
of 1990.  511 U.S. at 471.[14]  But the claim in *Dalton* was not
that the President had directly transgressed an applicable
constitutional limitation; rather, the claim was that, *because*
Executive officials "violated the procedural requirements" of
the statute on which the President's decision ultimately
rested, the President thereby "act[ed] in excess of his
statutory authority" and therefore "violate[d] the

---

[13] There remains the Organizations' claim that *statutory* violations
may be enjoined under a non-APA ultra vires cause of action for equitable
relief, but that also fails for the reasons discussed below.  *See infra* at
79–80.

[14] The plaintiffs in *Dalton* also asserted a claim under the APA itself,
but that claim failed for the separate reason that the challenged final action
was taken by the President personally, and the President is not an
"agency" for purposes of the APA.  *See* 511 U.S. at 469.

constitutional separation-of-powers doctrine." *Id*. at 471–72. The Supreme Court rejected this effort to "eviscerat[e]" the well-established "distinction between claims that an official exceeded his *statutory* authority, on the one hand, and claims that he acted in violation of the *Constitution*, on the other." *Id*. at 474 (emphasis added). As the Court explained, its "cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. The Court distinguished *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), on the ground that there "the Government disclaimed any statutory authority for the President's seizure of steel mills," and as a result the Constitution itself supplied the rule of decision for determining the legality of the President's actions. *Dalton*, 511 U.S. at 473. Because the "only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces," *Youngstown* thus "necessarily turned on *whether the Constitution authorized* the President's actions." *Id*. (emphasis added). By contrast, given that the claim in *Dalton* was that the President had violated the Constitution *because* Executive officials had "violated the terms of the 1990 Act," the terms of that statute provided the applicable rule of decision and the claim was therefore "a statutory one." *Id*. at 474. And because those claims sought to enjoin conduct on the grounds that it violated *statutory* requirements, it was subject to the "longstanding" limitation that non-APA "review is not available when the statute in question commits the decision to the discretion of the President." *Id*.

Under *Dalton*, the Organizations' purported "constitutional" claims—at least in their more limited

version—are properly classified as *statutory* claims that do *not* fall within any non-APA cause of action to enjoin unconstitutional conduct. 511 U.S. at 474. Here, as in *Dalton*, Defendants have "claimed" the "statutory authority" of § 8005, and any asserted violation of the Constitution would occur *only if, and only because,* Defendants' conduct is assertedly not authorized by § 8005. *Id*. at 473. The rule of decision for *this* dispute is thus not supplied, as in *Youngstown*, by the Constitution; rather, it is supplied only by § 8005. *Id*. at 473–74. Because these claims by the Organizations are thus "statutory" under *Dalton*, they may only proceed, if at all, under an equitable cause of action to enjoin ultra vires conduct, and they would be subject to any limitations applicable to such claims. *Id*. at 474. The Organizations do assert such a fallback claim here, but it fails for the reasons I explain below. *See infra* at 79–80.

**b**

But even if the Organizations' claims may properly be classified as *constitutional* ones for purposes of the particular equitable cause of action they invoke here, those claims would still fail.

To the extent that the Organizations argue that the Constitution *itself* grants a cause of action allowing *any plaintiff with an Article III injury* to sue to enjoin an alleged violation of the Appropriations Clause, the Presentment Clause, or the separation of powers, there is no support for such a theory. None of the cases cited by the Organizations involved putative plaintiffs, such as the Organizations here, who are near the outer perimeter of Article III standing. On the contrary, these cases involved either allegedly unconstitutional agency actions *directly targeting* the

claimants, *see Bond v. United States*, 564 U.S. 211, 225–26 (2011) (criminal defendant challenged statute under which she was convicted on federalism and separation-of-powers grounds); *United States v. McIntosh*, 833 F.3d 1163, 1174–75 (9th Cir. 2016) (criminal defendants sought to enjoin, based on an appropriations rider and the Appropriations Clause, the Justice Department's expenditure of funds to prosecute them), or they involved a suit based on an express *statutory* cause of action, *see Clinton v. City of New York*, 524 U.S. at 428 (noting that right of action was expressly conferred by 2 U.S.C. § 692(a)(1) (1996 ed.)).

Moreover, the majority's novel contention that the Constitution *requires* recognizing, in this context, an equitable cause of action that extends to the outer limits of Article III cannot be squared with the Supreme Court's decision in *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015). There, the Court rejected the view that the Supremacy Clause itself created a private right of action for equitable relief against preempted statutes, and instead held that any such equitable claim rested on "judge-made" remedies that are subject to "express and implied statutory limitations." *Id*. at 325–27. The Supremacy Clause provides a particularly apt analogy here, because (like the Appropriations Clause) the asserted "unconstitutionality" of the challenged action generally depends upon whether it falls *within or outside the terms of a federal statute*: a state statute is "unconstitutional under the Supremacy Clause" only if it is "contrary to federal law," *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1361–62 (9th Cir. 1998), and here, the transfers violated the Appropriations Clause only if they were barred by the limitations in § 8005. And just as the Supremacy Clause protects Congress's "broad discretion with regard to the

enactment of laws," *Armstrong*, 575 U.S. at 325–26, so too the Appropriations Clause protects "congressional control over funds in the Treasury," *McIntosh*, 833 F.3d at 1175. It is "unlikely that the Constitution gave Congress such broad discretion" to enact appropriations laws only to simultaneously "*require[]* Congress to permit the enforcement of its laws" by *any* "private actor[]" with even minimal Article III standing, thereby "*limit[ing]* Congress's power" to decide how "to enforce" the spending limitations it enacts. *Armstrong*, 575 U.S. at 325–26.**[15]**

The Appropriations Clause thus does not itself create a constitutionally required cause of action that extends to the limits of Article III. On the contrary, any equitable cause of action to enforce that clause would rest on a "judge-made" remedy: as *Armstrong* observed, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." 575 U.S. at 327. At least where, as here, the contours of the applicable constitutional line (under the

---

**[15]** The majority asserts that *Armstrong* is distinguishable on the grounds that the Appropriations Clause is supposedly more protective of individual liberty than the Supremacy Clause. *See* Maj. Opin. at 30–31. Nothing is cited to support this comparative assertion, which seems highly doubtful: there is no reason to think that Congress's ability, in the exercise of its enumerated powers, to preempt potentially oppressive state laws is any *less* protective of individual liberty than is Congress's ability to insert riders in appropriations bills. Moreover, to the extent that these clauses protect individual liberty, they both do so only as a consequence of protecting congressional authority within our overall constitutional structure. *Armstrong*'s core point—that it would be "strange indeed" to construe a clause that protects congressional power as simultaneously saddling Congress with a particular enforcement method—remains equally applicable to both. 575 U.S. at 326.

Appropriations Clause) are defined by and parallel a statutory line (under § 8005), any such judge-made equitable cause of action would be subject to "express and implied statutory limitations," as well as traditional limitations governing such equitable claims. *Id.*

One long-established "'judicially self-imposed limit[] on the exercise of federal jurisdiction'"—including federal equitable jurisdiction—is the requirement "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett*, 520 U.S. at 162 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). This limitation is *not* confined to the APA, but rather reflects a "prudential standing requirement[] of general application" that always "applies unless it is expressly negated" by Congress. *Id.* at 163.[16] Because Congress has not expressly negated that test in any relevant respect, the Organizations' equitable cause of action to enforce the Appropriations Clause here remains subject to the zone-of-interests test. *Cf. Thompson v. North American Stainless, LP*,

---

[16] The majority wrongly contends that, by quoting this language from *Bennett*, and stating that the zone-of-interests test therefore "applies to all *statutorily* created causes of action," *Lexmark*, 572 U.S. at 129 (emphasis added), the Court in *Lexmark* thereby intended to signal that the test *only* applies to statutory claims and not to non-statutory equitable claims. *See* Maj. Opin. at 36–37. Nothing in *Lexmark* actually suggests any such negative pregnant; instead, the Court's reference to "statutorily created causes of action" reflects nothing more than the fact that only statutory claims were before the Court in that case. *See* 572 U.S. at 129. Moreover, *Lexmark* notes that the zone-of-interests test's roots lie in the common law, *id*. at 130 n.5, and *Bennett* (upon which *Lexmark* relied) states that the test reflects a "prudential standing requirement[] of general application" that applies to any "exercise of federal jurisdiction," 520 U.S. at 162–63.

562 U.S. 170, 176–77 (2011) (construing a cause of action as extending to "any person injured in the Article III sense" would often produce "absurd consequences" and is for that reason rarely done). And given the unique nature of an Appropriations Clause claim, as just discussed, *the line between constitutional and unconstitutional conduct* here is defined entirely by the limitations in § 8005, and therefore the relevant zone of interests for the Organizations' Appropriations-Clause-based equitable claim remains defined by *those* limitations. Thus, contrary to the majority's conclusion, *see* Maj. Opin. at 39–40, the Organizations are outside the applicable zone of interests for this claim as well.

In arguing for a contrary view, the Organizations rely heavily on *United States v. McIntosh*, asserting that there we granted non-APA injunctive relief based on the Appropriations Clause without inquiring whether the claimants were within the zone of interests of the underlying appropriations statute. *McIntosh* cannot bear the considerable weight that the Organizations place on it.

In *McIntosh*, we asserted interlocutory jurisdiction over the district courts' refusal to enjoin the expenditure of funds to prosecute the defendants—an expenditure that allegedly violated an appropriations rider barring the Justice Department from spending funds to prevent certain States from "'implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana.'" 833 F.3d at 1175; *see also id*. at 1172–73. We held that the defendants had Article III standing and that, if the Department was in fact "spending money in violation" of that rider in prosecuting the defendants, that would produce a violation of the Appropriations Clause that could be raised by the defendants in challenging their prosecutions. *Id*.

at 1175. After construing the meaning of the rider, we then remanded the matter for a determination whether the rider was being violated. *Id.* at 1179. Contrary to the Organizations' dog-that-didn't-bark theory, nothing can be gleaned from the fact that the zone-of-interests test was never discussed in *McIntosh*. *See Cooper Indus., Inc. v. Aviall Servs, Inc.*, 543 U.S. 157, 170 (2004) ("'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.'") (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). Moreover, any such silence seems more likely to have been due to the fact that it was so overwhelmingly obvious that the defendants *were* within the rider's zone of interests that the point was incontestable and uncontested. An asserted interest in not going to prison for *complying* with state medical-marijuana laws seems well within the zone of interests of a statute prohibiting interference with the implementation of such state laws.

**2**

The only remaining question is whether the Organizations may evade the APA's zone-of-interests test by asserting a non-APA claim for ultra vires conduct in excess of *statutory* authority. Even assuming that such a cause of action exists alongside the APA, *cf. Trudeau v. Federal Trade Comm'n*, 456 F.3d 178, 189–90 (D.C. Cir. 2006), I conclude that it would be subject to the same zone-of-interests limitations as the Organizations' APA claims and therefore likewise fails.

For the same reasons discussed above, any such equitable cause of action rests on a judge-made remedy that is subject to the zone-of-interests test. *See supra* at 74–79. The

Organizations identify no case from the Supreme Court or this court affirmatively holding that the zone-of-interests test does *not* apply to a non-APA equitable cause of action to enjoin conduct allegedly in excess of express statutory limitations on *statutory* authority, and I am aware of none. Indeed, it makes little sense, when evaluating a claim that Executive officials exceeded the *limitations* in a federal statute, not to ask whether the plaintiff is within the zone of interests protected by those statutory limitations. *Cf. Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987) (although plaintiff asserting ultra vires claim may not need to show that its interests "fall within the zones of interests of the constitutional and statutory *powers* invoked" by Executive officials, when "a particular constitutional or statutory provision was intended to protect persons like the litigant by *limiting* the authority conferred," then "the litigant's interest may be said to fall within the zone protected by the *limitation*") (emphasis added).[17]  Here, those limitations are supplied by § 8005, and the Organizations are not within the zone of interests of that statute.[18]

---

[17] The majority thus relies on the wrong portion of Judge Bork's opinion in *Haitian Refugee Center*.  *See* Maj. Opin. at 37–39.  This case turns on a "statutory provision" that "limit[s] the authority conferred." 809 F.2d at 811 n.14.  If the Executive had contended that it had power to transfer the funds regardless of § 8005, then this case would look more like *Youngstown*, but no such extravagant claim has been pressed in this case.  On the contrary, Defendants concede that, if the requirements of § 8005 were not met, then the transfers were unlawful.

[18] Even if the Organizations were correct that the zone-of-interests test does not apply to a non-APA equitable cause of action, that would not necessarily mean that such equitable jurisdiction extends, as the Organizations suggest, to the outer limits of Article III.  Declining to apply the APA's generous zone-of-interests test might arguably render applicable the sort of narrower review of agency action that preceded the

\*   \*   \*

Given that each of the Organizations' asserted theories fail, the Organizations lack any cause of action to challenge the DoD's transfer of funds under § 8005.

## IV

Alternatively, even if the Organizations had a cause of action, their claims would fail on the merits, because the challenged transfers did not violate § 8005 or § 9002. In the companion appeal, *California v. Trump*, the majority concluded that § 8005 and § 9002 did not authorize the transfers at issue, and I concluded that these provisions did authorize the transfers. Just as the majority "reaffirm[s] this holding here and conclude[s] that Section 8005 did not authorize the transfer of funds," Maj. Opin. at 24, I reaffirm my previous conclusion that § 8005 and § 9002 authorized the transfers.

## V

Based on the foregoing, I conclude that at least the Sierra Club has Article III standing, but that the Organizations lack any cause of action to challenge these § 8005 and § 9002 transfers. Alternatively, if the Organizations did have a cause of action, their claims fail on the merits as a matter of law because the transfers complied with the limitations in § 8005 and § 9002. I therefore would reverse the district court's partial grant of summary judgment to the Organizations and would remand the matter with instructions to grant

---

APA standards articulated in *Data Processing*, 397 U.S. at 153. *See also Clarke*, 479 U.S. at 400 n.16.

82                    SIERRA CLUB V. TRUMP

Defendants' motion for summary judgment on this set of
claims.    Because the majority concludes otherwise, I
respectfully dissent.

# United States Court of Appeals for the Ninth Circuit

## Office of the Clerk
95 Seventh Street
San Francisco, CA 94103

## Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise. To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)   A.   Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ► A material point of fact or law was overlooked in the decision;
  - ► A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ► An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.   Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

> ► Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
>
> ► The proceeding involves a question of exceptional importance; or
>
> ► The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)   Deadlines for Filing:**

- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)   Statement of Counsel**

- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)   Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**

- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

## Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

## Attorneys Fees
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

## Petition for a Writ of Certiorari
- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

## Counsel Listing in Published Opinions
- Please check counsel listing on the attached decision.
- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  - ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  - ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 10. Bill of Costs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form10instructions.pdf

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**            **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | | $ |
| TOTAL: | | | | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 10**                                           *Rev. 12/01/2018*

# EXHIBIT 5

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; STATE OF HAWAII; STATE OF MAINE; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEVADA; STATE OF NEW YORK; STATE OF OREGON; COMMONWEALTH OF VIRGINIA; STATE OF ILLINOIS; STATE OF MARYLAND; DANA NESSEL, ATTORNEY GENERAL, ON BEHALF OF THE PEOPLE OF MICHIGAN; STATE OF WISCONSIN; STATE OF MASSACHUSETTS; STATE OF VERMONT; STATE OF RHODE ISLAND, *Plaintiffs-Appellees*, | No. 19-16299 <br><br> D.C. No. 4:19-cv-00872-HSG |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America; UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF DEFENSE; MARK T. ESPER, in his official capacity as Acting Secretary of Defense; RYAN D. MCCARTHY, senior official | |

2                    STATE OF CALIFORNIA V. TRUMP

performing the duties of the
Secretary of the Army; RICHARD V.
SPENCER, in his official capacity as
Secretary of the Navy; HEATHER
WILSON, in her official capacity as
Secretary of the Air Force; UNITED
STATES DEPARTMENT OF THE
TREASURY; STEVEN TERNER
MNUCHIN, in his official capacity as
Secretary of the Department of the
Treasury; U.S. DEPARTMENT OF THE
INTERIOR; DAVID BERNHARDT, in his
official capacity as Secretary of the
Interior; U.S. DEPARTMENT OF
HOMELAND SECURITY; CHAD F.
WOLF, in his official capacity as
Acting Secretary of Homeland
Security,

                    *Defendants-Appellants.*

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF NEW MEXICO, | No. 19-16336 |
| *Plaintiffs-Appellants*, | D.C. No. 4:19-cv-00872-HSG |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America; UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF DEFENSE; MARK T. ESPER, in his official capacity as Acting Secretary of Defense; RYAN D. MCCARTHY, senior official performing the duties of the Secretary of the Army; RICHARD V. SPENCER, in his official capacity as Secretary of the Navy; HEATHER WILSON, in her official capacity as Secretary of the Air Force; UNITED STATES DEPARTMENT OF THE TREASURY; STEVEN TERNER MNUCHIN, in his official capacity as Secretary of the Department of the Treasury; U.S. DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as Secretary of the Interior; U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security, | OPINION |
| *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted November 12, 2019
San Francisco, California

Filed June 26, 2020

Before:  Sidney R. Thomas, Chief Judge, and Kim McLane
Wardlaw and Daniel P. Collins, Circuit Judges.

Opinion by Chief Judge Sidney R. Thomas;
Dissent by Judge Collins

## SUMMARY[*]

### Appropriations

The panel affirmed the district court's judgment holding that budgetary transfers of funds for the construction of a wall on the southern border of the United States in California and New Mexico were not authorized under the Department of Defense Appropriations Act of 2019.

Section 8005 and Section 9002 of the Act (collectively "Section 8005") was invoked to transfer $2.5 billion of Department of Defense funds appropriated for other purposes to fund border wall construction. Sixteen states, including California and New Mexico, filed suit challenging the Executive Branch's funding of the border wall. The district court granted California and New Mexico's motion for partial summary judgment, and issued declaratory relief, holding the Section 8005 transfer of funds as to the El Centro and El Paso sectors unlawful.

The panel held that California and New Mexico established the requisite Article III standing to challenge the federal defendants' actions.

Concerning the injury in fact element of standing, the panel held that California and New Mexico alleged that the actions of the federal defendants will cause particularized and concrete injuries in fact to the environment and wildlife of their respective states as well as to their sovereign interests in

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

enforcing their environmental laws.  First, the panel held that
California and New Mexico each provided sufficient
evidence, if taken as true, that would allow a reasonable fact-
finder to conclude that both states would suffer injuries in
fact to their environmental interests, and in particular, to
protect endangered species within their borders.  Second, the
panel also held that California and New Mexico demonstrated
that border wall construction injured their quasi-sovereign
interests by preventing them from enforcing their
environmental laws.

Concerning the causation element for standing, the panel
held that California alleged environmental and sovereign
injuries that were fairly traceable to the federal defendants'
conduct.  The panel held that with respect to most of the
environmental injuries, causation was apparent.  The panel
also concluded that the causation requirement was likewise
satisfied for the injuries to California's and New Mexico's
quasi-sovereign interests.

Concerning the redressability element of standing, the
panel held that a ruling in California and New Mexico's favor
would redress their harms.  Without the Section 8005 funds,
the Department of Defense would have inadequate funding to
finance construction of the projects, and this would prevent
both the alleged and environmental and sovereign injuries.

The panel held that California and New Mexico had the
right to challenge the transfer of funds under the
Administrative Procedure Act ("APA").  Specifically, the
panel held that Section 8005 imposed certain obligations
upon the Department of Defense, which it did not satisfy.
The panel further held that California and New Mexico, as
aggrieved parties, could pursue a remedy under the APA, as

long as they fell within Section 8005's zone of interests. The panel held that California and New Mexico were suitable challengers because their interests were congruent with those of Congress and were not inconsistent with the purposes implicit in the statute. The panel concluded that California and New Mexico easily fell within the zone of interests of Section 8005.

The panel held that Section 8005 did not authorize the Department of Defense's budgetary transfer to fund construction of the El Paso and El Centro Sectors. Specifically, the panel concluded that the district court correctly determined that the border wall was not an unforeseen military requirement, and that funding for the wall had been denied by Congress. Absent such statutory authority, the Executive Branch lacked independent constitutional authority to transfer the funds at issue here. The panel concluded that the transfer of funds was unlawful, and affirmed the district court's declaratory judgment to California and New Mexico.

Finally, the panel declined to reverse the district court's denial of California and New Mexico's request for permanent injunctive relief, without prejudice to renewal.

Judge Collins dissented. He agreed that at least California established Article III standing, but would hold that the States lacked any cause of action to challenge the transfer of funds under the APA or otherwise. Even assuming that they had a cause of action, Judge Collins would conclude that the transfers were lawful and reverse the district court's partial judgment for the States and remand for entry of partial summary judgment in favor of the defendants.

**COUNSEL**

H. Thomas Byron III (argued), Anne Murphy, and Courtney L. Dixon, Appellate Staff; Hashim M. Mooppan and James M. Burnham, Deputy Assistant Attorneys General; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants/Cross-Appellees.

Dror Ladin (argued), Noor Zafar, Jonathan Hafetz, Hina Shamsi, and Omar C. Jadwat, American Civil Liberties Union Foundation, New York, New York; Cecillia D. Wang, American Civil Liberties Union Foundation, San Francisco, California; Mollie M. Lee and Christine P. Sun, American Civil Liberties Union Foundation of Northern California Inc., San Francisco, California; David Donatti and Andre I. Segura, American Civil Liberties Union Foundation of Texas, Houston, Texas; Sanjay Narayan and Gloria D. Smith, Sierra Club Environmental Law Program, Oakland, California; for Plaintiffs-Appellees.

Douglas N. Letter (argued), Todd B. Tatelman, Megan Barbero, Josephine Morse, and Kristin A. Shapiro, United States House of Representatives, Washington, D.C.; Carter G. Phillips, Virginia A. Seitz, Joseph R. Guerra, and Christopher A. Eiswerth, Sidley Austin LLP, Washington, D.C.; for Amicus Curiae United States House of Representatives.

James F. Zahradka II (argued), Brian J. Bilford, Sparsh S. Khandeshi, Heather C. Leslie, Lee I. Sherman, and Janelle M. Smith, Deputy Attorneys General; Michael P. Cayaban, Christine Chuang, and Edward H. Ochoa, Supervising Deputy Attorneys General; Robert W. Byrne, Sally Magnani, and Michael L. Newman, Senior Assistant Attorneys General;

Xavier Becerra, Attorney General; Attorney General's Office, Oakland, California; Jennie Lusk, Civil Rights Bureau Chief; Nicholas M. Sydow, Civil Appellate Chief; Tania Maestas, Chief Deputy Attorney General; Hector Balderas, Attorney General; Office of the Attorney General, Santa Fe, New Mexico; for Amici Curiae States of California and New Mexico.

Christopher J. Hajec, Immigration Reform Law Institute, Washington, D.C.; Lawrence J. Joseph, Washington, D.C.; for Amicus Curiae United States Representative Andy Barr.

John W. Howard, George R. Wentz Jr., Richard Seamon, and D. Colton Boyles, Davillier Law Group LLC, Sandpoint, Idaho, for Amicus Curiae State of Arizona House of Representatives Federal Relations Committee.

Richard P. Hutchison, Landmark Legal Foundation, Kansas City, Missouri; Michael J. O'Neill and Matthew C. Forys, Landmark Legal Foundation, Leesburg, Virginia; for Amici Curiae Angel Families, Sabine Durden, Don Rosenberg, Brian McAnn, Judy Zeito, Maureen Mulroney, Maureen Laquerre, Dennis Bixby, and Advocates for Victims of Illegal Alien Crimes.

Douglas A. Winthrop, Arnold & Porter Kaye Scholer LLP, San Francisco, California; Irvin B. Nathan, Robert N. Weiner, Andrew T. Tutt, Kaitlin Konkel, and Samuel F. Callahan, Arnold & Porter Kaye Scholer LLP, Washington, D.C.; for Amici Curiae Former Members of Congress.

Elizabeth B. Wydra, Brianne J. Gorod, Brian R. Frazelle, and Ashwin P. Phatak, Constitutional Accountability Center, Washington, D.C., for Amici Curiae Federal Courts Scholars.

10             STATE OF CALIFORNIA V. TRUMP

Steven A. Zalesin, Adeel A. Mangi, and Amir Badat, Patterson Belknap Webb & Tyler LLP, New York, New York, for Amici Curiae 75 Religious Organizations.

Harold Hongju Koh, Peter Gruber Rule of Law Clinic, Yale Law School, New Haven, Connecticut; Kathleen R. Hartnett, Boies Schiller Flexner LLP, San Francisco, California; Phillip Spector, Messing & Spector LLP, Baltimore, Maryland; for Amici Curiae Former United States Government Officials.

Samuel F. Daughety and Suzanne R. Schaeffer, Dentons US LLP, Washington, D.C.; Joshua O. Rees, Acting Attorney General, Tohono O'Odham Nation, Sells, Arizona; for Amicus Brief Tohono O'Odham Nation.

## OPINION

THOMAS, Chief Judge:

This appeal presents the question of whether the Department of Defense Appropriations Act of 2019 authorized the Department of Defense ("DoD") to make budgetary transfers from funds appropriated by Congress to it for other purposes in order to fund the construction of a wall on the southern border of the United States in California and New Mexico. We conclude that the transfers were not authorized by the terms of the Act, and we affirm the judgment of the district court.[1]

I

The President has long supported the construction of a border wall on the southern border between the United States and Mexico. Since the President took office in 2017, however, Congress has repeatedly declined to provide the amount of funding requested by the President.

The debate over border wall funding came to a head in December of 2018. During negotiations to pass an appropriations bill for the remainder of the fiscal year, the President announced that he would not sign any legislation that did not allocate substantial funds to border wall construction. On January 6, 2019, the White House requested $5.7 billion to fund the construction of approximately

---

[1] There are companion appeals concerning some of the same issues in *Sierra Club, et. al. v. Trump et. al.*, Nos. 19-16102 and 19-16300. Those appeals will be the subject of a separate opinion.

234 miles of new physical barrier.[2]  Budget negotiations concerning border wall funding reached an impasse, triggering the longest partial government shutdown in United States history.

After 35 days, the government shutdown ended without an agreement to provide increased border wall funding in the amount requested by the President.  On February 14, 2019, Congress passed the Consolidated Appropriations Act of 2019 ("CAA"), which included the Department of Homeland Security Appropriations Act for Fiscal Year 2019, Pub. L. No. 116-6, div. A, 133 Stat. 13 (2019).  The CAA appropriated only $1.375 billion for border wall construction, specifying that the funding was for "the construction of primary pedestrian fencing . . . in the Rio Grande Valley Sector." *Id.* § 230(a)(1).  The President signed the CAA into law the following day.

The President concurrently issued a proclamation under the National Emergencies Act, 50 U.S.C. §§ 1601–1651, "declar[ing] that a national emergency exists at the southern border of the United States."  Proclamation No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019).[3]  An accompanying White House Fact Sheet explained that the President was "using his legal authority to take Executive action to secure additional resources" to build a border wall, and it specified that "the

---

[2] Some form of a physical barrier already exists at the site of some of the construction projects.  In those places, construction would reinforce or rebuild the existing portions.

[3] Subsequently, Congress adopted two joint resolutions terminating the President's emergency declaration pursuant to its authority under 50 U.S.C. § 1622(a)(1).  The President vetoed each resolution, and Congress failed to override these vetoes.

Administration [had] so far identified up to $8.1 billion that [would] be available to build the border wall once a national emergency [was] declared and additional funds [were] reprogrammed." The Fact Sheet identified several funding sources, including $2.5 billion of Department of Defense ("DoD") funds that could be transferred to provide support for counterdrug activities of other federal government agencies under 10 U.S.C. § 284 ("Section 284").[4] Executive Branch agencies began using the funds identified by the Fact Sheet to fund border wall construction. On February 25, the Department of Homeland Security ("DHS") submitted to DoD a request for Section 284 assistance to block drug smuggling corridors. In particular, it requested that DoD fund "approximately 218 miles" of wall using this authority, comprised of numerous projects, including the El Centro Sector Project 1 in California and the El Paso Sector Project 1 in New Mexico, as relevant to this case. On March 25, Acting Secretary of Defense Patrick Shanahan approved three border wall construction projects: Yuma Sector Projects 1 and 2 in Arizona and El Paso Sector Project 1 in New Mexico. On May 9, Shanahan approved four more border wall construction projects: El Centro Sector Project 1 in California and Tucson Sector Projects 1–3 in Arizona.

---

[4] Section 284 authorizes the Secretary of Defense to "provide support for the counterdrug activities . . . of any other department or agency of the Federal Government" if it receives a request from "the official who has responsibility for the counterdrug activities." 10 U.S.C. §§ 284(a), 284(a)(1)(A). The statute permits, among other things, support for "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." *Id.* § 284(b)(7). DoD's provision of support for other agencies pursuant to Section 284 does not require the declaration of a national emergency.

Because these projects were undertaken to construct barriers and roads in furtherance of border security, Acting Secretary of Homeland Security Kevin McAleenan invoked the authority granted to him by Section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Div. C, § 102(c), 110 Stat. 3009-546, 3009-554 (1996) (codified as amended as a note to 8 U.S.C. § 1103), to "waive all legal requirements" that would otherwise apply to the border wall construction projects "to ensure . . . expeditious construction." 84 Fed. Reg. 17185-01 (April 24, 2019). On April 24, with respect to the El Paso Sector, he "waive[d] in their entirety, with respect to the construction of physical barriers and roads" a long list of statutes, "including all federal, state, or other laws, regulations, and legal requirements of, deriving from, or related to the subject of" "[t]he National Environmental Policy Act" "(42 U.S.C. 4321 et seq.)," "the Endangered Species Act" "(16 U.S.C. 1531 et seq.)," "the Federal Water Pollution Control Act (commonly referred to as the Clean Water Act (33 U.S.C. 1251 et seq.))," and "the Clean Air Act (42 U.S.C. 7401 et seq.)." *Id.* He executed a similar Section 102(c) waiver with respect to the El Centro Sector on May 15. 84 Fed. Reg. 21800-01 (May 15, 2019).

At the time Shanahan authorized these border wall construction projects, the counter-narcotics support account contained only $238,306,000 in unobligated funds, or less than one tenth of the $2.5 billion needed to complete those projects. To provide the support requested, Shanahan invoked the budgetary transfer authority found in Section 8005 of the 2019 DoD Appropriations Act to transfer funds from other DoD appropriations accounts into the Section 284 Drug Interdiction and Counter-Drug Activities-Defense appropriations account.

For the first set of projects, Shanahan transferred $1 billion from Army personnel funds.  For the second set of projects, Shanahan transferred $1.5 billion from "various excess appropriations," which contained funds originally appropriated for purposes such as modification of in-service missiles and support for U.S. allies in Afghanistan.

As authority for the transfers, DoD specifically relied on Section 8005 and Section 9002 of the Department of Defense Appropriations Act of 2019, Pub. L. No. 115-245, 132 Stat. 2981 (2018) ("Section 8005").[5]

Section 8005 provides, in relevant part, that:

> Upon determination by the Secretary of Defense that such action is necessary in the national interest, he may, with the approval of the Office of Management and Budget, transfer not to exceed $4,000,000,000 of working capital funds of the Department of Defense or funds made available in this Act to the Department of Defense for military functions (except military construction) between such appropriations or funds or any subdivision thereof, to be merged with and to be available for the same purposes, and for the

---

[5] For simplicity, because the transfer authorities are both subject to Section 8005's substantive requirements, this opinion refers to these authorities collectively as Section 8005, as did the district court and the motions panel.  Our holding in this case therefore extends to both the transfer of funds pursuant to Section 8005 and Section 9002.

same time period, as the appropriation or fund
to which transferred.[6]

Section 8005 also explicitly limits when its authority can
be invoked: "*Provided*, That such authority to transfer may
not be used unless for higher priority items, based on
unforeseen military requirements, than those for which
originally appropriated and in no case where the item for
which funds are requested has been denied by the Congress."

Although Section 8005 does not require formal
congressional approval of transfers, historically DoD had
adhered to a "gentleman's agreement," by which it sought
approval from the relevant congressional committees before
transferring the funds. DoD deviated from this practice
here—it did not request congressional approval before
authorizing the transfer. Further, the House Committee on
Armed Services and the House Committee on Appropriations
both wrote letters to DoD formally disapproving of the
reprogramming action after the fact. Moreover, with respect
to the second transfer, Shanahan expressly directed that the
transfer of funds was to occur "without regard to comity-

---

[6] Section 9002 provides that: "Upon the determination of the
Secretary of Defense that such action is necessary in the national interest,
the Secretary may, with the approval of the Office of Management and
Budget, transfer up to $2,000,000,000 between the appropriations or funds
made available to the Department of Defense in this title: *Provided*, That
the Secretary shall notify the Congress promptly of each transfer made
pursuant to the authority in this section: *Provided further*, That the
authority provided in this section is in addition to any other transfer
authority available to the Department of Defense and is subject to the
same terms and conditions as the authority provided in section 8005 of
this Act."

based policies that require prior approval from congressional committees."

In the end, Section 8005 was invoked to transfer $2.5 billion of DoD funds appropriated for other purposes to fund border wall construction.

## II

On February 18, 2019, sixteen states,[7] including California and New Mexico, filed a lawsuit challenging the Executive Branch's funding of the border wall. The States pled theories of violation of the constitutional separation of powers, violation of the Appropriations Clause, *ultra vires* action, violations of the Administrative Procedure Act ("APA"), and violations of the National Environmental Policy Act ("NEPA"). The next day, Sierra Club and the Southern Border Communities Coalition filed a separate action challenging the same border wall funding.[8]

---

[7] Specifically, the action was filed by the following states: California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, the Commonwealth of Virginia, and Attorney General Dana Nessel on behalf of the People of Michigan. The complaint was later amended to add the following states: Rhode Island, Vermont, Wisconsin, and the Commonwealth of Massachusetts. State parties are collectively referenced as "the States."

[8] Both lawsuits named as defendants Donald J. Trump, President of the United States, Patrick M. Shanahan, former Acting Secretary of Defense, Kirstjen M. Nielsen, former Secretary of Homeland Security, and Steven Mnuchin, Secretary of the Treasury in their official capacities, along with numerous other Executive Branch officials (collectively referenced as "the Federal Defendants").

The States subsequently filed a motion requesting a preliminary injunction to enjoin the transfer of funds to construct a border wall in New Mexico's El Paso Sector. The district court held that New Mexico had standing, but it denied without prejudice the preliminary injunction motion. The court based part of its reasoning on the fact that it had already imposed a preliminary injunction in the *Sierra Club* action such that the grant of a preliminary injunction in favor of the States would be duplicative. California subsequently filed another motion requesting a preliminary injunction to enjoin the transfer of funds to construct a border wall in California's El Centro Sector.

California and New Mexico then moved for partial summary judgment on their declaratory judgment action as to the El Centro and El Paso Sectors, and additionally moved for a permanent injunction to enjoin funding the construction of these sectors. The Federal Defendants filed a cross-motion for summary judgment on all claims. The district court granted California and New Mexico's motion for partial summary judgment, and issued declaratory relief, holding the Section 8005 transfer of funds as to the El Centro and El Paso sectors unlawful. The district court denied the Federal Defendants' motion for summary judgment.

The court also denied California and New Mexico's motion for a permanent injunction, this time basing its reasoning, in part, on the permanent injunction ordered by the district court in the companion *Sierra Club* case.[9]

---

[9] The Supreme Court subsequently granted a stay of the district court's permanent injunction in the separate companion case, *Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (mem.).

The Federal Defendants requested that the district court certify its order as a final judgment for immediate appeal pursuant to Fed. R. Civ. P. 54(b). In response, the district court considered the appropriate factors, made appropriate findings, and certified the order as final pursuant to Rule 54(b). *See Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 574 (9th Cir. 2018) (listing factors). The Federal Defendants timely appealed the district court's judgment, and the States timely cross-appealed the district court's denial of injunctive relief. The district court's Rule 54(b) certification was proper; therefore, we have jurisdiction under 28 U.S.C. § 1291. *See Durfey v. E.I. DuPont De Nemours & Co.*, 59 F.3d 121, 124 (9th Cir. 1995) (appeal is proper upon certification as a final judgment pursuant to Rule 54(b)).

We review the existence of Article III standing *de novo*. *See California v. U.S. Dep't of Health & Human Servs.*, 941 F.3d 410, 420 (9th Cir. 2019). We review questions of statutory interpretation *de novo*. *See United States v. Kelly*, 874 F.3d 1037, 1046 (9th Cir. 2017).

III

California and New Mexico have Article III standing to pursue their claims. In order to establish Article III standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).[10] At summary judgment, a plaintiff cannot rest on

---

[10] The Federal Defendants do not challenge California's and New Mexico's Article III standing in these appeals. However, "the court has an independent obligation to assure that standing exists, regardless of

mere allegations, but "must set forth by affidavit or other evidence specific facts." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (internal quotations and citations omitted). These specific facts, set forth "for purposes of the summary judgment motion[,] will be taken to be true." *Lujan*, 504 U.S. at 561.

States are "entitled to special solicitude in our standing analysis." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). As a quasi-sovereign, a state "has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain." *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907). Thus, a state may sue to assert its "quasi-sovereign interests in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). In addition, "[d]istinct from but related to the general well-being of its residents, the State has an interest in securing observance of the terms under which it participates in the federal system." *Id*. at 607–08.

## A

Here, California and New Mexico have alleged that the actions of the Federal Defendants will cause particularized and concrete injuries in fact to the environment and wildlife

---

whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

The Federal Defendants challenged New Mexico's standing before the district court, but conflated its challenge with the APA "zone of interest" requirement, which we will discuss later. The district court held that New Mexico had established Article III standing.

of their respective states as well as to their sovereign interests in enforcing their environmental laws.

1

The El Centro Sector Project 1 involves the Jacumba Wilderness area. California contends that this area is home to a large number of sensitive plant and animal species that are listed as "endangered," "threatened," or "rare" under the federal Endangered Species Act of 1973, 16 U.S.C. § 1531 *et seq.*, or the California Endangered Species Act, Cal. Fish & Game Code § 2050 *et seq.* California alleges that "[t]he construction of border barriers within or near the Jacumba Wilderness Area . . . will have significant adverse effects on environmental resources, including direct and indirect impacts to endangered or threatened wildlife." One such species is the federally and state-endangered peninsular desert bighorn sheep. Another is the flat-tailed horned lizard, a California species of special concern.[11]

---

[11] A species of special concern is "a species, subspecies, or distinct population of an animal native to California that currently satisfies one or more of the following (but not necessarily mutually exclusive) criteria: is extirpated from the State . . .; is listed as Federally-, but not State-, threatened or endangered; meets the State definition of threatened or endangered but has not formally been listed; is experiencing, or formerly experienced, serious (noncyclical) population declines or range retractions (not reversed) that, if continued or resumed, could qualify it for State threatened or endangered status; has naturally small populations exhibiting high susceptibility of to risk from any factor(s), that if realized, could lead to declines that would qualify it for State threatened or endangered status." CAL. DEPT. OF FISH AND WILDLIFE, SPECIES OF SPECIES CONCERN, https://wildlife.ca.gov/Conservation/SSC#394871324-what-is-the-relationship-between-sscs-and-the-california-wildlife-action-plan.

California has adequately set forth facts and other evidence, which taken as true, support these allegations for the purpose of Article III standing. According to the California Department of Fish and Wildlife 2018 annual report addressing sheep monitoring in the Jacumba Wilderness area, "[t]he Jacumba ewe group is dependent on resources both within the US and Mexico. A fence along the US-Mexico border would prohibit movement to, and use of, prelambing and lamb-rearing habitat and summer water sources," and the development of energy projects adjacent to the Jacumba Mountains "combined with disturbance by border security activities" "will have significant adverse impacts on this ewe group." California contends that road construction; grading and construction of equipment storage and parking areas; and off road movement of vehicle and equipment involved in construction will alter the normal behavior of peninsular bighorn sheep, with the most significant effect on the endangered peninsular bighorn sheep being the permanent reduction of its north-south movement across the U.S.-Mexico border. California further avers that the effects of a border wall will place additional pressure on the survival and recovery of the bighorn sheep because the unimpeded movement of the peninsular bighorn sheep between the United States and Mexico is important for increasing and maintaining their genetic diversity. It contends that as the number of animals that move between these two countries declines or ceases, the species will begin to suffer the deleterious effects of inbreeding and reduced genetic diversity.

Likewise, California asserts that the flat-tailed horned lizard lives within the project footprint and surrounding area, and that the extensive trenching, construction of roads, and staging of materials proposed in the area will harm or kill

lizards that are either active or in underground burrows within the project footprint. It claims that the construction of the border wall will also greatly increase the predation rate of lizards adjacent to the wall by providing a perch for birds of prey and will effectively sever the linkage that currently exists between populations on both sides of the border.

New Mexico alleges that "[t]he construction of a border wall in the El Paso Sector along New Mexico's southern border will have adverse effects on the State's environmental resources, including direct and indirect impacts to endangered or threatened wildlife." Such harm "would include the blocking of wildlife migration, flooding, and habitat loss." It notes that the Chihuahuan desert is bisected by the New Mexico-Mexico border, and this "bootheel" region is the most biologically diverse desert in the Western Hemisphere, containing numerous endangered or threatened species. Such species include the Mexican gray wolf and the jaguar, both of which coexist in this region along the U.S.-Mexico border.

New Mexico has adequately set forth facts and other evidence, which taken as true, support these allegations for the purpose of Article III standing. It contends that the construction of El Paso Sector Project 1 may have a number of adverse effects on the Mexican wolf, including injury, death, harm, and harassment due to construction and related activities, as well as abandonment of the area for essential behaviors such as feeding, resting, and mating due to night lighting and the elimination of food sources and habitat in the area. Moreover, New Mexico avers that the construction of El Paso Sector Project 1 would interrupt the movement of the Mexican wolf across the U.S.-Mexico border, putting additional pressure on the species' survival and recovery in the wild because the unimpeded movement of Mexican

wolves between the United States and Mexico is important for increasing and maintaining their genetic diversity. New Mexico notes that the documented movement of a radio-collared Mexican wolf across the border in the areas where border wall construction is planned demonstrates that construction will indeed cause such an interruption.

Additionally, the jaguar is considered endangered by the U.S. Fish and Wildlife Service ("USFWS"). New Mexico avers that jaguars were formerly widespread in the southwest United States, but were extirpated by hunting. It claims that, in recent decades, small numbers of individuals have dispersed north from breeding populations in northern Mexico, with some reaching the mountains in southwestern New Mexico west of Luna County. New Mexico contends that, if further long-term recolonization of jaguars continues, areas in Doña Ana and Luna counties include suitable habitat, but construction of El Paso Sector Project 1 would stop jaguar movement through the region, potentially limiting recolonization.

For these reasons, we conclude that California and New Mexico have each provided sufficient evidence which, if taken as true, would allow a reasonable fact-finder to conclude that both states will suffer injuries in fact to their environmental interests, and in particular, to protected species within their borders.

2

In addition, California and New Mexico have alleged that the Federal Defendants' actions have interfered with their respective abilities to enforce their environmental laws, thus interfering with the terms under which they participate in the

federal system. They alleged that they have suffered, and will continue to suffer, injuries to their concrete, quasi-sovereign interests relating to the preservation of wildlife resources within their boundaries, including but not limited to wildlife on state properties.

California and New Mexico have adequately set forth facts and other evidence, which taken as true, support these allegations for the purpose of Article III standing. They have demonstrated that border wall construction injures their quasi-sovereign interests by preventing them from enforcing their environmental laws.

Under California law, the California Water Resources Control Board and nine regional boards establish water quality objectives and standards, and for construction projects like El Centro Sector Project 1, where dredge and fill activities are expected to occur, a regional board must ordinarily certify compliance with water quality standards. The record indicates that, absent the Secretary of Homeland Security's Section 102(c) IIRIRA waiver of the Clean Water Act requirements for the project, El Centro Project 1 could not proceed without completing certification issued by a regional water board because the El Centro Project 1 will occur within or near the Pinto Wash and will traverse at least six ephemeral washes that have been identified as waters of the United States. The record further indicates that, due to the nature and location of construction, El Centro Project 1 would also require enrollment in the State Water Board's statewide National Pollutant Discharge Elimination General Permit for Storm Water Discharges Associated with Construction and Land Disturbance Activities.

Likewise, the Section 102(c) waiver of the Clean Air Act's requirements undermines California's enforcement of its air quality standards for complying with the Clean Air Act as set forth in California's State Implementation Plan ("SIP"). In particular, but for the waiver, in order to move forward with El Centro Project 1, the Federal Defendants "would be obligated to comply with Rule 801 [of the SIP], which requires the development and implementation of a dust-control plan for construction projects to prevent, reduce, and mitigate [fine particulate matter] emissions."

Moreover, the Section 102(c) waiver exempts the Federal Defendants from complying with laws designed to protect endangered or threatened species. For instance, it exempts the Federal Defendants from consulting with the USFWS to ensure that El Centro Sector Project 1 "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species" that are identified as endangered under California and federal law. 16 U.S.C. § 1536(a)(2). As we have noted, California contends that the El Centro Sector Project 1 is likely to harm federal and California endangered species such as the peninsular bighorn sheep and the flat-tailed horned lizard. The presence of these species led the USFWS, Bureau of Land Management ("BLM"), California Department of Fish and Wildlife, and California State Parks to develop and implement the "Flat-Tailed Horned Lizard Rangewide Management Strategy," which imposes restrictions on projects resulting in large-scale soil disturbances in the project area and prohibits activities that restrict the lizards' interchange with lizard populations across the border. Without the Section 102(c) waiver, this management strategy would impose certain restrictions and mitigation measures on the border wall construction projects.

Under New Mexico law, the Federal Defendants, absent the Section 102(c) waiver of the Clean Air Act's requirements, would normally be required to comply with New Mexico's fugitive dust control rule and High Wind Fugitive Dust Mitigation Plan that New Mexico adopted under the Clean Air Act. *See* N.M. Admin. Code §§ 20.2.23.109–.112 (mandating that "[n]o person . . . shall cause or allow visible emissions from fugitive dust sources that: pose a threat to public health; interfere with public welfare, including animal or plant injury or damage, visibility or the reasonable use of property" and "[e]very person subject to this part shall utilize one or more control measures . . . as necessary to meet the requirements of [this section]"). The waiver, however, prevents New Mexico from enforcing these air quality rules.

New Mexico further contends that, absent the Section 102(c) waiver, the Federal Defendants would also normally be required to consult with the USFWS to protect species such as the Mexican wolf that are endangered under both federal and New Mexico Law. Moreover, the USFWS's management plan for the species—the "Mexican Wolf Recovery Plan-First Revision"—which is designed to "facilitate the wolf's revival," "calls for a minimum of 320 wolves in the United States and 200 in Mexico to meet recovery goals." The "binational recovery strategy" of this plan was developed by the USFWS "in coordination with federal agencies in Mexico and state, federal, and Tribal agencies in the United States," and "[e]ffective recovery requires participation by multiple parties within Federal, state, and local governments." USFWS, MEXICAN WOLF RECOVERY PLAN-FIRST REVISION at 10, 16 (2017). Construction undermines this plan because it inhibits the

"utilization of habitat" and does not promote "meta-population connectivity."

The Section 102(c) waiver likewise prevents New Mexico from enforcing its Wildlife Corridors Act. Portions of El Paso Project 1 cross New Mexico State Trust Lands, and New Mexico contends that the planned pedestrian fencing disrupts habitat corridors in New Mexico—contravening to the Wildlife Corridors Act. The Act "requires New Mexico state agencies to create a 'wildlife corridors action plan' to protect species' habitat." New Mexico further avers that New Mexico's State Trust Lands in and around the El Paso Project 1 site form an important wildlife corridor for numerous species such as mule deer, javelina, pronghorn, bighorn sheep, mountain lion, bobcat, coyote, bats, quail, and other small game like rabbits.

In sum, we conclude that California and New Mexico have each provided sufficient evidence which, if taken as true, would allow a reasonable fact-finder to conclude that they have both suffered injuries in fact to their sovereign interests.

## B

Turning to the causation requirement, we conclude that California has alleged environmental and sovereign injuries "fairly traceable" to the Federal Defendants' conduct. To satisfy this requirement, California and New Mexico "need not show that [Section 8005 is] 'the very last step in the chain of causation.'" *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 953 (9th Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). "A causal chain does not fail simply because it has several

'links,' provided those links are 'not hypothetical or tenuous' and remain 'plausib[le].'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (quoting *Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)).

With respect to most of the environmental injuries, causation is apparent—for instance, as explained above, the construction and presence of the border wall will separate the peninsular bighorn sheep and Mexican wolf populations, decreasing biodiversity, and harming these species.

Although slightly more attenuated, we also conclude that the causation requirement is likewise satisfied for the injuries to California's and New Mexico's quasi-sovereign interests. It makes no difference that the Section 102(c) waiver is most directly responsible for these injuries because without Section 8005, there is no waiver. That is, without the Section 8005 funding to construct El Centro Sector Project 1 and El Paso Sector Project 1, there would be no basis to invoke Section 102(c), and therefore, no resulting harm to California's and New Mexico's sovereign interests. Thus, we conclude that these injuries too are fairly traceable to the Section 8005 transfers of funds.

## C

A ruling in California and New Mexico's favor would redress their harms. Without the Section 8005 funds, DoD had inadequate funding to finance construction of these projects; presumably, without this funding, construction of El Centro Sector Project 1 and El Paso Sector Project 1 would cease. This would prevent both the environmental injuries and the sovereign injuries alleged.

Thus, these facts would allow a reasonable fact-finder to conclude that, if funds are diverted to construct border wall projects in the El Centro and El Paso Sectors, California and New Mexico will each suffer environmental and quasi-sovereign injuries in fact that are fairly traceable to the challenged conduct of the Federal Defendants and likely to be redressed by a favorable judicial decision. California and New Mexico have established the requisite Article III standing to challenge the Federal Defendants' actions.

## IV

The Federal Defendants argue that California and New Mexico lack the right to challenge the transfer of funds under the APA. We disagree.[12]

The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Where a statute imposes obligations on a federal agency but the obligations do not "give rise to a 'private' right of action against the federal government[,] [a]n aggrieved party may pursue its remedy under the APA." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005). California and New Mexico must, however, establish that they fall within the zone of interests of the relevant statute to bring an APA claim. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

---

[12] The States argue that they have both an equitable *ultra vires* cause of action and a cause of action under the APA. Although each of the claims can proceed separately, *see Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1170 (9th Cir. 2017), we do not need to address the *ultra vires* claims here. The States seek the same scope of relief under both causes of action and they prevail under the APA.

567 U.S. 209, 224 (2012) ("This Court has long held that a person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." (quoting *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970))).

Section 8005 does not confer a private right of action. Instead, it delegates a narrow slice of Congress's appropriation power to DoD to allow the agency to respond flexibly to unforeseen circumstances implicating the national interest. In doing so, the statute imposes certain obligations upon DoD—*i.e.*, DoD cannot invoke Section 8005 unless there is an unforeseen military requirement and unless Congress did not previously deny the item requested. California and New Mexico argue that DoD did not satisfy these obligations. We agree. Therefore, as aggrieved parties, California and New Mexico may pursue a remedy under the APA, so long as they fall within Section 8005's zone of interests.

As a threshold matter, Section 8005 is the relevant statute for the zone of interests test. "Whether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of the zone-of-interests test is to be determined *not by reference to the overall purpose of the Act* in question . . . but by reference to the *particular provision of law* upon which the plaintiff relies." *Bennett*, 520 U.S. at 175–76 (emphasis added). Here, for purposes of their APA claim, California and New Mexico rely on Section 8005's limitations. Thus, Section 8005 is the relevant statute for the zone of interests test.

The Supreme Court has clarified that, in the APA context, the zone of interests test does "not require any 'indication of congressional purpose to benefit the would-be plaintiff.'" *Patchak*, 567 U.S. at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987)). It has repeatedly emphasized that the zone of interests test is "not 'especially demanding'" in the APA context. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quoting *Patchak*, 567 U.S. at 225). Instead, for APA challenges, a plaintiff can satisfy the test in either one of two ways: (1) "if it is among those [who] Congress expressly or directly indicated were the intended beneficiaries of a statute," or (2) "if it is a suitable challenger to enforce the statute—that is, if its interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further . . . statutory objectives." *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1359 (D.C. Cir. 1996) (alterations in original) (quotations and citations omitted). "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Patchak*, 567 U.S. at 225 (quoting *Clarke*, 479 U.S. at 399). "We apply the test in keeping with Congress's 'evident intent' . . . 'to make agency action presumptively reviewable[,]'" and note that "the benefit of any doubt goes to the plaintiff." *Id.* (quoting *Clarke*, 479 U.S. at 399).

In enacting Section 8005, Congress primarily intended to benefit itself and its constitutional power to manage appropriations. The obligations imposed by the section limit the scope of the authority delegated to DoD, reserving to Congress in most instances the power to appropriate funds to

particular DoD accounts for specific purposes. This conclusion is reinforced by the legislative history. Congress first imposed limits on DoD's transfer authority in order to "tighten congressional control of the reprogramming process." H.R. Rep. No. 93-662, at 16 (1973).

The field of suitable challengers must be construed broadly in this context because, although Section 8005's obligations were intended to protect Congress, restrictions on congressional standing make it difficult for Congress to enforce these obligations itself. *See Goldwater v. Carter*, 617 F.2d 697, 702 (D.C. Cir. 1979), *vacated and remanded on other grounds*, 44 U.S. 996 (1979) (explaining that a member of Congress has standing only if "the alleged diminution in congressional influence . . . amount[s] to a disenfranchisement, a complete nullification or withdrawal of a voting opportunity"). Indeed, the House of Representatives filed its own lawsuit in the U.S. District Court for the District of Columbia challenging this same transfer of funds, but the court held that the House lacked standing to sue. *See U.S. House of Reps. v. Mnuchin*, 379 F. Supp. 3d 8, 11 (D.D.C. 2019) ("And while the Constitution bestows upon Members of the House many powers, it does not grant them standing to hale the Executive Branch into court claiming a dilution of Congress's legislative authority.").

California and New Mexico are suitable challengers because their interests are congruent with those of Congress and are not "inconsistent with the purposes implicit in the statute." *Patchak*, 567 U.S. at 225. First, this challenge actively furthers Congress's intent to "tighten congressional control of the reprogramming process." H.R. Rep. No. 93-662, at 16 (1973). In particular, this challenge furthers this intent because, even though Section 8005 does not require

formal congressional approval to reprogram funds, the congressional committees expressly disapproved of DoD's use of the authority here.

Second, California and New Mexico's challenge strives to reinforce the same structural constitutional principle Congress sought to protect through Section 8005: congressional power over appropriations. *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."); *see also Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (explaining that this "straightforward and explicit command" "'means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress'" (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937))). California and New Mexico's interest in reinforcing these structural separation of powers principles is unique but aligned with that of Congress because just as those principles are intended "to protect each branch of [the federal] government from incursion by the others," the "allocation of powers in our federal system [also] preserves the integrity, dignity, and residual sovereignty of the States," because "[f]ederalism has more than one dynamic." *Bond v. United States*, 564 U.S. 211, 221–22 (2011). This interest applies with particular force here because the use of Section 8005 here impacts California's and New Mexico's ability to enforce their state environmental laws. *See Massachusetts v. EPA*, 549 U.S. at 518–19 ("'[T]he State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air.'" (quoting *Tenn. Copper Co.*, 206 U.S. at 237)); *see also Maine v. Taylor*, 477 U.S. 131, 151 (1986) ("[A state] retains broad regulatory authority

to protect the health and safety of its citizens and the integrity of its natural resources."). Here, the use of Section 8005 allows the government to invoke Section 102(c) of IIRIRA to waive state environmental law requirements for purposes of building the border wall.[13] Thus, Section 8005's limitations protect California's and New Mexico's sovereign interests, just as they protect Congress's constitutional interests, because they ensure that, ordinarily, Executive action cannot override these interests without congressional approval and funding. Therefore, just as Section 8005's limitations serve Congress to preserve the "equilibrium the Constitution sought to establish—so that 'a gradual concentration of the several powers in the same department,' can effectively be resisted," they likewise serve California and New Mexico as well. *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting) (quoting Federalist No. 51, p. 321 (J. Madison)).

Moreover, that the states regularly benefit from DoD's use of Section 8005 reinforces that California and New Mexico's interests are *not* "so marginally related" that "it can[] reasonably be assumed that Congress intended to permit suit." *Patchak*, 567 U.S. at 225. For instance, in 2004 DoD invoked Section 8005 to transfer funds to pay for storm damages incurred by airforce bases across Florida during Hurricane Charley. Office of the Under Sec'y of Def. (Comptroller), FY 04-37 PA, Reprogramming Action (2004). Likewise, in 2008 DoD invoked Section 8005 to finance costs incurred by the National Guard in responding to Hurricane

---

[13] As we explained with respect to Article III standing, California and New Mexico have provided sufficient evidence by declaration to establish that they have suffered cognizable injuries to their sovereign interests and that this injury is fairly traceable to the Federal Defendants' use of Section 8005.

Gustav in Louisiana, Texas, Mississippi, and Alabama, as well as operations related to Hurricane Ike in Texas and Louisiana. Office of the Under Sec'y of Def. (Comptroller), FY 08-43 PA, Reprogramming Action (2008). The historical use of Section 8005 supports that states are "reasonable" and "predictable" challengers to its use, and this instance is no anomaly. *Patchak*, 567 U.S. at 227.

For these reasons, California and New Mexico easily fall within the zone of interests of Section 8005 and are suitable challengers to enforce its obligations. We therefore affirm the grant of summary judgment to the States. To conclude otherwise would effectively hold that no entity could fall within Section 8005's zone of interests, and that no agency action taken pursuant to Section 8005 could ever be challenged under the APA. Such a conclusion is not tenable, and a result Congress surely did not intend.

V

The district court correctly held that Section 8005 did not authorize DoD's budgetary transfer to fund construction of the El Paso and El Centro Sectors.

In construing a statute, we begin, as always, with the language of the statute. *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1026 (9th Cir. 2013). "When terms are not defined within a statute, they are accorded their plain and ordinary meaning, which can be deduced through reference sources such as general usage dictionaries." *Id.* Of course, "[s]tatutory language must always be read in its proper context," *id.* (quotations and citation omitted), as courts must look to the "design of the statute as a whole and to its object and policy," *id.* (quotations

and citation omitted), and "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019) (quotations and citation omitted).

Section 8005's transfer authority cannot be invoked "unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." Two limitations are important to our analysis: (1) that the transfer must be "based on unforeseen military requirements," and (2) that the transfer authority cannot be invoked if the "item for which funds are requested ha[d] been denied by the Congress." We conclude that the district court correctly determined that the border wall was not an unforeseen military requirement, that funding for the wall had been denied by Congress, and therefore, that the transfer authority granted by Section 8005 was not permissibly invoked.

A

Section 8005 authorizes the transfer of funds only in response to an "unforeseen military requirement." The district court properly concluded that the need for a border wall was not unforeseen. We also conclude that the need was unrelated to a military requirement.

1

Section 8005 does not define "unforeseen." Therefore, we start by considering the ordinary meaning of the word. Something is unforeseen when it is "not anticipated or

expected." *Unforeseen*, MERRIAM-WEBSTER ONLINE DICTIONARY (2020). By contrast, to foresee is "to see (something, such as a development) *beforehand*." *Foresee*, MERRIAM-WEBSTER ONLINE DICTIONARY (2020) (emphasis added). Prior use of this authority confirms this meaning. Previously, DoD has invoked its Section 8005 authority to transfer funds to repair hurricane and typhoon damage to military bases—natural disasters that inflict damage that may not be anticipated or expected ahead of time. We conclude that an unforeseen requirement is one that DoD did not anticipate or expect.

Neither the problem, nor the President's purported solution, was unanticipated or unexpected here. The smuggling of drugs into the United States at the southern border is a longstanding problem. U.S. CUSTOMS AND BORDER PATROL, BORDER PATROL HISTORY, https://www.cbp.gov/border-security/along-us-borders/history (last visited June 16, 2020) ("By [the early 1960's] the business of alien smuggling began to involve drug smuggling also. The Border Patrol assisted other agencies in intercepting illegal drugs from Mexico."); *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) ("That interest in protecting the borders is illustrated in this case by the evidence that smugglers frequently attempt to penetrate our borders with contraband secreted in their automobiles' fuel tank. Over the past 5 1/2 fiscal years, there have been 18,788 vehicle drug seizures at the southern California ports of entry."). Indeed, the federal Drug Enforcement Administration was created over four decades ago in 1974 in large part to address the smuggling of illegal drugs into the United States. *See* Reorganization Plan No. 2 of 1973, 87 Stat. 1091, as amended Pub. L. 93-253, §1, 88 Stat. 50 (1974).

Congress's joint resolution terminating the President's declaration of a national emergency only reinforces this point: there was no unanticipated crisis at the border. Nothing prevented Congress from funding solutions to this problem through the ordinary appropriations process—Congress simply chose not to fund this particular solution.

The long, well-documented history of the President's efforts to build a border wall demonstrates that he considered the wall to be a priority from the earliest days of his campaign in 2015. *See, e.g.*, *Here's Donald Trump's Presidential Announcement Speech*, TIME (June 16, 2015) ("I would build a great wall . . . I will build a great, great wall on our southern border."); *Transcript of Donald Trump's Immigration Speech*, NEW YORK TIMES (Sept. 1, 2016) ("On day one, we will begin working on an impenetrable, physical, tall, power, beautiful southern border wall."). Moreover, his repeated pronouncements on the subject made clear that federal agencies like DoD might be tasked with the wall's funding and construction. Congress's repeated denials of funding only drew national attention to the issue and put agencies on notice that they might be asked to finance construction. *See* Securing America's Future Act of 2018, H.R. 4760, 115th Cong. § 1111 (2018); Border Security and Immigration Reform Act of 2018, H.R. 6136, 115th Cong. § 5101 (2018); American Border Act, H.R. 6415, 115th Cong. § 4101 (2018); Fund and Complete the Border Wall Act, H.R. 6657, 115th Cong. § 2 (2018); Build the Wall, Enforce the Law Act of 2018, H.R. 7059, 115th Cong. § 9 (2018); 50 Votes for the Wall Act, H.R. 7073, 115th Cong. § 2 (2018); WALL Act of 2018, S. 3713, 115th Cong. § 2 (2018). In short, neither the conditions at the border nor the President's position that a wall was needed to address those conditions was unanticipated or unexpected by DoD.

The Federal Defendants' arguments to the contrary are unpersuasive. They assert that "an agency's *request*" "will be foreseen" only "when *it is received* by DoD in time to include in the submission to Congress [for the yearly budget]," and that therefore, the transfer at issue here complied with the text of the statute. (emphasis added). There are two problems with the Federal Defendants' position.

First, Section 8005 permits transfers based only on unforeseen military *requirements*—not unforeseen budgetary *requests*. A requirement that gives rise to a funding request is distinct from the request itself. Here, the requirement that gave rise to the Section 284 requests is a border wall. Thus, to invoke the statute, the need for a border wall must have been unforeseen. To hold otherwise—*i.e.*, to conclude that transfers are permitted under Section 8005 if they are based on unforeseen budgetary requests—would undermine the narrowness of the statute and potentially encourage DoD and other agencies to submit budgetary requests after DoD has submitted its final budget to Congress in order to skirt the congressional appropriations process. This result is inconsistent with the purpose of Section 8005: to "tighten congressional control of the reprogramming process." H.R. Rep. No. 93-662, at 16 (1973). If this interpretation prevailed, the exception would swallow the rule and undermine Congress's constitutional appropriations power.

Second, even if we were to accept the government's definition of "requirement" as equivalent to "request," DHS's specific Section 284 requests were both anticipated and expected, even within the confines of the appropriations context. Nearly six months before the enactment of the 2019 DoD Appropriations Act, the President wrote the following in a memorandum to the Secretary of Defense, the Attorney

General, and the Secretary of Homeland Security: "The Secretary of Defense shall support the Department of Homeland Security in securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband . . . into this country." Further, in a response to a request for information from the House Armed Services Committee, DoD wrote that the "DoD Comptroller with[held] over 84% ($947 million) of [counter-drug] appropriated funds for distribution until the 4th Quarter for possible use in supporting Southwest Border construction last fiscal year." As explained by the Staff Director of the House Armed Services Committee, this "suggests that DoD was considering using its counter-drug authority under 10 U.S.C. § 284 for southern border construction in early 2018." Further still, because Section 284 only allows DoD to provide support that is *requested* by other agencies, DoD's retention of funds suggests it likely anticipated such a request. *See* 10 U.S.C. § 284(a)(1) ("The Secretary of Defense may provide support . . . if . . . such support is requested.").

The Federal Defendants also unpersuasively equate "foreseen" with "known." "[T]o know" means "to perceive directly: have direct cognition of." *Know*, MERRIAM-WEBSTER ONLINE DICTIONARY (2020). This interpretation effectively eliminates any element of anticipation or expectation. "'Congress' choice of words is presumed to be deliberate' and deserving of judicial respect." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013)). Thus, we must presume that Congress's use of the word "unforeseen" is deliberate. Congress could have easily specified that a transfer is permitted only when based on "unknown" requirements, but it did not. Instead, Congress specified that Section 8005 permits a transfer only where a

requirement was unforeseen—*i.e.*, unanticipated or unexpected. We decline to read into the text a lower standard based on actual knowledge.[14]

In sum, both the requirement to build a wall on the southern border as well as the DHS request to DoD to build that wall were anticipated and expected. Thus, neither was "unforeseen" within the meaning of Section 8005.

### 2

Section 8005 not only mandates that the requirement be unforeseen, but also that it be a *military requirement*. Under relevant definitions, the construction of El Centro and El Paso projects does not satisfy any definition of a "military requirement."

The 2019 Appropriations Act does not define "military." Therefore, we start by considering its ordinary meaning: "of or relating to soldiers, arms, or war." *Military*, MERRIAM-WEBSTER ONLINE DICTIONARY (2020). The border wall construction projects here plainly fail to satisfy this definition because the Federal Defendants have argued neither that the border wall construction projects are related to the use of soldiers or arms, nor that there is a war on the southern border.

---

[14] Indeed, in DoD parlance, the possibility that border funding from the DoD budget might be requested was a "known unknown," as opposed to "unforeseeable," which would be an "unknown unknown," a category which former Secretary of Defense Rumsfeld described as including a "genuine surprise." DONALD RUMSFELD, KNOWN AND UNKNOWN: A MEMOIR, p. xiv. (2011).

The administrative record underscores this point, and supports that the border wall construction projects are not military ones. The record demonstrates that the diverted funding is primarily intended to support DHS—a civilian agency entirely separate from any branch of the armed forces. The Assistant Secretary of Defense stated that the funds were transferred "to provide assistance to DHS to construct fencing to block drug-smuggling corridors in three project areas along the southern border of the United States." He also explained that the purpose of the transfer was to "support DHS's efforts to secure the southern border." By contrast, the transfer of funds for border wall construction does little to assist DoD with any of its operations. Even to the extent it might, it does so only insofar as it helps DoD assist DHS: as summarized by the Chairman of the Joint Chiefs of Staff and DHS, border wall projects "allow DoD *to provide support to DHS* more efficiently and effectively." (emphasis added). In short, the fact that construction is intended to support a civilian agency, as opposed to DoD itself or any branch of the armed forces, emphasizes that the transfer fails to meet the plain meaning of "military."

The border wall construction projects do not even satisfy a statutory definition specifically invoked by the Federal Defendants. *See also* WILLIAM N. ESKRIDGE ET AL., LEGISLATION AND STATUTORY INTERPRETATION 273 (2d ed. 2006) ("A word or clause that is ambiguous at first glance might be clarified if 'the same terminology is used elsewhere in a context that makes its meaning clear'" and such coherence arguments may be invoked "across as well as within statutes" (quoting *United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988))).

The Federal Defendants have also invoked 10 U.S.C. § 2808 ("Section 2808") to fund other border wall construction projects on the southern border. Section 2808 incorporates the definition of "military construction" provided by 10 U.S.C. § 2801(a): it defines "military construction" as construction associated with a "military installation" or "defense access road." Section 2801(c)(4) further defines "military installation" as "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department."[15]

The border wall construction projects at issue in this appeal are not carried out with respect to a "military installation." The projects themselves are not a base, camp, station, yard, or center, and unlike the projects considered by the Federal Defendants' related Section 2808 appeal, the

---

[15] To be sure, Section 8005 states that it applies only to transfers between appropriations for "military functions," as opposed to the phrase "military construction" used in Section 2808. However, the statutes address similar subject matter, and it is of some significance that the Federal Defendants have invoked Section 2808 for functionally identical projects, claiming that such projects constitute "military construction" within the meaning of that statute, while also asserting that such projects satisfy the term "military" within the meaning of Section 8005. And, as we know, "'statutes addressing the same subject matter' should be construed *in pari materia*." *Fed. Trade Comm'n v. AMG Capital Mgmt., LLC*, 910 F.3d 417, 433 n.2 (9th Cir. 2018) (O'Scannlain, J., concurring) (quoting *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315 (2006)). Under that doctrine, related statutes should "be construed as if they were one law." *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) (quotations and citation omitted). Further, even apart from *in pari materia* considerations, the Supreme Court "has previously compared nonanalogous statutes to aid its interpretation of them." *Nat'l Fed'n of Fed. Emps., Local 1309 v. Dep't of Interior*, 526 U.S. 86, 105 (1999) (O'Connor, J., dissenting) (citing *Overstreet v. North Shore Corp.*, 318 U.S. 125, 131–32 (1943)).

projects at issue in this appeal have not been brought under military jurisdiction.  Moreover, there are no military installations in the El Centro or El Paso project areas, nor any claim of a requirement for a defense access road; instead, as we have noted, the projects affect open wilderness areas—the El Centro Sector project involves the Jacumba Wilderness areas, and the El Paso Sector project involves the Chihuahuan desert.  The fact that the construction projects fail to meet Section 2808's definition of military construction supports that these projects fail to satisfy any meaningful definition of "military."

Even if we were to afford some consideration to the subchapter title for Section 284 authorizing "Military Support for Civilian Law Enforcement Agencies," there is a distinction to be drawn between "military support," and what the statute requires: a "military requirement."  Requirement ordinarily means "something wanted or needed," or "something essential to the existence or occurrence of something else."  *Requirement*, MERRIAM-WEBSTER ONLINE DICTIONARY (2020).  The border wall construction projects are not something needed or essential to the armed forces, soldiers, arms, or any sort of war effort.  Rather, as explained above, they are designed to "provide assistance" and "support" to DHS, a civilian agency.  While providing such support may be appropriate under Section 284, a request for this support without connection to any military function fails to rise to the level of a military requirement for purposes of Section 8005.  Simply because a civilian agency requests support in furtherance of a particular objective, even when such support is authorized by statute, does not mean that the military itself *requires* that objective.

To conclude that supporting projects unconnected to any military purpose or installation satisfies the meaning of "military requirement" would effectively write the term out of Section 8005. Therefore, we conclude that the transfers at issue here do not satisfy Section 8005's military purpose requirement.

## B

In addition, Section 8005 authorizes the transfer of funds only when "the item for which funds are requested has [not] been denied by the Congress." The question here is whether by declining to provide sufficient funding for the border wall, Congress denied the item for which funds were requested within the meaning of the statute.

As we have explained, Congress declined to fund the border wall numerous times in a variety of ways. Congress failed to pass seven different bills, *see supra at* 37–38, that were proposed specifically to fund the wall. Congress also refused to appropriate the $5.7 billion requested by the White House in the CAA; instead, Congress appropriated $1.375 billion, less than a quarter of the funds requested, for "the construction of primary pedestrian fencing . . . in the Rio Grande Valley Sector." CAA at § 230(a)(1).

The Federal Defendants assert that the Section 8005 transfer would be invalid only if Congress had denied a Section 284 budgetary line item request to fund the border wall. But "[i]n common usage, a general denial of something requested can, and in this case does, encompass more specific or narrower forms of that request." *Sierra Club v. Trump*, 929 F.3d 670, 691 (9th Cir. 2019). Here, Congress refused to provide the funding requested by the President for border

wall construction: a general denial. This general denial necessarily encompasses narrower forms of denial—such as the denial of a Section 284 budgetary line item request. We decline to impose upon Congress an obligation to deny every possible source of funding when it refuses to fund a particular project—surely when Congress withheld additional funding for the border wall, it intended to withhold additional funding for the wall, regardless of its source. "No" means no.

To hold that Congress did not previously deny the Executive Branch's request for funding to construct a border wall would be to "find secreted in the interstices of legislation the very grant of power which Congress consciously withheld." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring). Regardless of how specific a denial may be in some circumstances, Congress's broad and resounding denial resulting in a 35-day partial government shutdown must constitute a previous denial for purposes of Section 8005. This history precludes the use of Section 8005's transfer authority.

## C

In sum, Section 8005 did not authorize the transfer of funds challenged by California and New Mexico. Absent such statutory authority, the Executive Branch lacked independent constitutional authority to transfer the funds at issue here. *See City and Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1233–34 (9th Cir. 2018) ("[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring))). Therefore, the transfer of

funds at issue here was unlawful. We affirm the district court's declaratory judgment to California and New Mexico.

## VI

Finally, we consider the district court's denial of California and New Mexico's request for injunctive relief, a decision we review for an abuse of discretion. *See Midgett v. Tri-Cty. Metro. Transp. Dist. of Or.*, 254 F.3d 846, 849 (9th Cir. 2001). The district court denied the States' request for a permanent injunction primarily because the relief sought was duplicative of the relief the district court had already granted in the *Sierra Club* matter. That decision, which is the only one before us in this appeal, was certainly not an abuse of discretion. As we have noted, however, subsequent to the district court's decision, the Supreme Court stayed the *Sierra Club* permanent injunction. *See Sierra Club*, 140 S. Ct. at 1.

Nevertheless, given the totality of the considerations at issue in this case, we continue to see no abuse of discretion in the district court's order, even though at this moment, the injunction in *Sierra Club* no longer affords the States protection. We emphasize, however, that depending on further developments in these cases, the States are free to seek further remedies in the district court or this Court.

## VII

In sum, we affirm the district court. We conclude that California and New Mexico have Article III standing to file their claims, that California and New Mexico are sufficiently within Section 8005's zone of interests to assert an APA claim, and that the Federal Defendants violated Section 8005 in transferring DoD appropriations to fund the El Centro and

El Paso Sectors of the proposed border wall. We also decline to reverse the district court's decision against imposing a permanent injunction, without prejudice to renewal. Given our resolution of this case founded upon the violations of Section 8005, we need not—and do not—reach the merits of any other theory asserted by the States, nor reach any other issues presented by the parties.

**AFFIRMED.**

COLLINS, Circuit Judge, dissenting:

In the judgment under review, the district court granted summary judgment and declaratory relief to California and New Mexico on their claims challenging the Acting Secretary of Defense's invocation of § 8005 and § 9002 of the Department of Defense Appropriations Act, 2019 ("DoD Appropriations Act"), Pub. L. No. 115-245, Div. A, 132 Stat. 2981, 2999, 3042 (2018), to transfer $2.5 billion in funds that Congress had appropriated for other purposes into a different Department of Defense ("DoD") appropriation that could then be used by DoD for construction of border fencing and accompanying roads and lighting. The States allege that the transfers were not authorized under § 8005 and § 9002 and that, as a result of the construction activities made possible by the unlawful transfers, the States have suffered injuries to their sovereign and environmental interests. The majority concludes that the States have Article III standing; that they have a cause of action to challenge the transfers under the Administrative Procedure Act ("APA"); that the transfers were unlawful; and that the district court properly determined that the States are not entitled to any relief beyond a

declaratory judgment. I agree that at least California has established Article III standing, but in my view the States lack any cause of action to challenge the transfers, under the APA or otherwise. And even assuming that they had a cause of action, I conclude that the transfers were lawful. Accordingly, I would reverse the district court's partial judgment for the States and remand for entry of partial summary judgment in favor of the Defendants. I respectfully dissent.

## I

The parties' dispute over DoD's funding transfers comes to us against the backdrop of a complex statutory framework and an equally complicated procedural history. Before turning to the merits, I will briefly review both that framework and that history.

## A

Upon request from another federal department, the Secretary of Defense is authorized to "provide support for the counterdrug activities" of that department by undertaking the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284(a), (b)(7). On February 25, 2019, the Department of Homeland Security ("DHS") made a formal request to DoD for such assistance. Noting that its counterdrug activities included the construction of border infrastructure, *see* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Div. C, § 102(a), 110 Stat. 3009-546, 3009-554 (1996) (codified as amended as a note to 8 U.S.C. § 1103), DHS requested that "DoD,

pursuant to its authority under 10 U.S.C. § 284(b)(7), assist with the construction of fences[,] roads, and lighting" in several specified "Project Areas" in order "to block drug-smuggling corridors across the international boundary between the United States and Mexico."

On March 25, 2019, the Acting Defense Secretary invoked § 284 and approved the provision of support for, *inter alia*, DHS's "El Paso Sector Project 1," which would involve DoD construction of border fencing, roads, and lighting in Luna and Doña Ana Counties in New Mexico. Thereafter, the Secretary of Homeland Security invoked his authority under § 102(c) of IIRIRA to waive a variety of federal environmental statutes with respect to the planned construction of border infrastructure in the El Paso Sector, as well as "all . . . state . . . laws, regulations, and legal requirements of, deriving from, or related to the subject of," those federal laws. *See* 84 Fed. Reg. 17185, 17187 (Apr. 24, 2019).

Subsequently, on May 9, 2019, the Acting Defense Secretary again invoked § 284, this time to approve DoD's construction of similar border infrastructure to support, *inter alia*, DHS's "El Centro Sector Project 1" in Imperial County, California. Less than a week later, the Secretary of Homeland Security again invoked his authority under IIRIRA § 102(c) to waive federal and state environmental laws, this time with respect to the construction in the relevant section of the El Centro Sector. *See* 84 Fed. Reg. 21800, 21801 (May 15, 2019).

Although § 284 authorized the Acting Defense Secretary to provide this support, there were insufficient funds in the relevant DoD appropriation to do so. Specifically, for Fiscal

Year 2019, Congress had appropriated for "Drug Interdiction and Counter-Drug Activities, Defense" a total of only $670,271,000 that could be used for counter-drug support. *See* DoD Appropriations Act, Title VI, 132 Stat. at 2997 (appropriating, under Title governing "Other Department of Defense Programs," a total of "$881,525,000, of which $517,171,000 shall be for counter-narcotics support"); *id.*, Title IX, 132 Stat. at 3042 (appropriating $153,100,000 under the Title governing "Overseas Contingency Operations"). Accordingly, to support the El Paso Sector Project 1, the Acting Secretary on March 25, 2019 invoked his authority to transfer appropriations under § 8005 of the DoD Appropriations Act and ordered the transfer of $1 billion from "excess Army military personnel funds" into the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation. That transfer was accomplished by moving $993,627,000 from the "Military Personnel, Army" appropriation and $6,373,000 from the "Reserve Personnel, Army" appropriation.

To support the El Centro Sector Project 1, the Acting Secretary on May 9, 2019 again invoked his transfer authority to move an additional $1.5 billion into the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation. Pursuant to § 8005 of the DoD Appropriations Act, DoD transferred a total of $818,465,000 from 12 different DoD appropriations into the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation. Invoking the Secretary's distinct but comparable authority under § 9002 to transfer funds appropriated under the separate Title governing "Overseas Contingency Operations," DoD transferred $604,000,000 from the "Afghanistan Security Forces Fund" appropriation and $77,535,000 from the "Operation and Maintenance, Defense-Wide" appropriation into the "Drug

Interdiction and Counter-Drug Activities, Defense" appropriation.

## B

The complex procedural context of this case involves two parallel lawsuits and four appeals to this court, and it has already produced one published Ninth Circuit opinion that was promptly displaced by the Supreme Court.

## 1

California and New Mexico, joined by several other States, filed this action in the district court against the Acting Defense Secretary, DoD, and a variety of other federal officers and agencies. In their March 13, 2019 First Amended Complaint, they sought to challenge, *inter alia*, any transfer of funds by the Acting Secretary under § 8005 or § 9002. The Sierra Club and the Southern Border Communities Coalition ("SBCC") filed a similar action, and their March 18, 2019 First Amended Complaint also sought to challenge any such transfers. Both sets of plaintiffs moved for preliminary injunctions in early April 2019. The portion of the States' motion that was directed at the § 8005 transfers was asserted only on behalf of New Mexico and only with respect to the construction on New Mexico's border (*i.e.*, El Paso Sector Project 1). The Sierra Club motion was likewise directed at El Paso Sector Project 1, but it also challenged two other projects in Arizona ("Yuma Sector Projects 1 and 2").

After concluding that the Sierra Club and SBCC were likely to prevail on their claims that the transfers under § 8005 were unlawful and that these organizational plaintiffs had demonstrated a "likelihood of irreparable harm to their

members' aesthetic and recreational interests," the district court on May 24, 2019 granted a preliminary injunction enjoining Defendants from using transferred funds for "Yuma Sector Project 1 and El Paso Sector Project 1."[1]  In a companion order, however, the district court denied preliminary injunctive relief to the States.  Although the court held that New Mexico was likely to succeed on its claim that the transfers under § 8005 were unlawful, the court concluded that, in light of the grant of a preliminary injunction against El Paso Sector Project 1 to the Sierra Club and SBCC, New Mexico would not suffer irreparable harm from the denial of its duplicative request for such relief.  On May 29, 2019, Defendants appealed the preliminary injunction in favor of the Sierra Club and SBCC, and after the district court refused to stay that injunction, Defendants moved in this court for an emergency stay on June 3, 2019.  New Mexico did not appeal the district court's denial of its duplicative request for a preliminary injunction.

**2**

While the Defendants' emergency stay request was being briefed and considered in this court, California and New Mexico (but not the other States) moved for partial summary judgment on June 12, 2019.  The motion was limited to the issue of whether the transfers under § 8005 and § 9002 were lawful, and it requested corresponding declaratory relief, as well as a permanent injunction against the use of transferred funds for El Paso Sector Project 1 and El Centro Sector

---

[1] By the time the district court ruled, DoD had decided not to use funds transferred under § 8005 for any construction in Yuma Sector Project 2, and so the request for a preliminary injunction as to that project was moot.

Project 1.  The Sierra Club and SBCC filed a comparable summary judgment motion that same day, directed at those two projects, as well as at Yuma Sector Project 1 and three other Arizona projects ("Tucson Projects 1, 2, and 3"). Defendants filed cross-motions for summary judgment on the legality of the transfers under § 8005 and § 9002 with respect to the corresponding projects at issue in each case.

On June 28, 2019, the district court granted partial summary judgment and declaratory relief to both sets of plaintiffs, concluding that the transfers under § 8005 and § 9002 were unlawful.  The court granted permanent injunctive relief to the Sierra Club and SBCC against all six projects, but it denied any such relief to California and New Mexico.  The district court concluded that California and New Mexico had failed to prove a threat of future demonstrable environmental harm.  The court expressed doubts about the States' alternative theory that they had demonstrated injury to their sovereign interests, but the court ultimately concluded that it did not need to resolve that issue.  As before, the district court instead held that California and New Mexico would not suffer any irreparable harm in light of the duplicative relief granted to the Sierra Club and SBCC.  The district court denied Defendants' cross-motions for summary judgment in both cases.  Invoking its authority under Federal Rule of Civil Procedure 54(b), the district court entered partial judgments in favor of, respectively, the Sierra Club and SBCC, and California and New Mexico.  The district court denied Defendants' request to stay the permanent injunction pending appeal.

**3**

On June 29, 2019, Defendants timely appealed in both cases and asked this court to stay the permanent injunction in the *Sierra Club* case based on the same briefing and argument that had been presented in the preliminary injunction appeal in that case. California and New Mexico timely cross-appealed nine days later. On July 3, 2019, this court consolidated Defendants' appeal of the judgment and permanent injunction in the *Sierra Club* case with Defendants' pending appeal of the preliminary injunction.[2] That same day, a motions panel of this court issued a 2–1 published decision denying Defendants' motion for a stay of the permanent injunction (which had overtaken the preliminary injunction). *See Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019).

Defendants then applied to the Supreme Court for a stay of the permanent injunction pending appeal, which the Court granted on July 26, 2019. *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019). That stay remains in effect "pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the Government's petition for a writ of certiorari, if such writ is timely sought." *Id.* at 1. In granting the stay, the Court concluded that "the Government has made a sufficient showing at this stage that [the Sierra Club and SBCC] have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Id.*

---

[2] This court later consolidated the appeal and cross-appeal in the States' case with the already-consolidated appeals in the *Sierra Club* case.

## II

The Government has not contested the Article III standing of California and New Mexico on appeal, but as the majority notes, "'the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties.'" *See* Maj. Opin. at 19 n.10 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). As "an indispensable part of the plaintiff's case, each element" of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife* (*Lujan v. Defenders*), 504 U.S. 555, 561 (1992). Thus, although well-pleaded allegations are enough at the motion-to-dismiss stage, they are insufficient to establish standing at the summary-judgment stage. *Id.* "In response to a summary judgment motion, . . . the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (simplified).**[3]**

In reviewing standing *sua sponte* in the context of cross-motions for summary judgment, it is appropriate to apply the

---

**[3]** I favor the general practice of reciting the language of the quoted source as if that source were stating those exact words for the first time, thereby disregarding any indicia of quotations within quotations (such as brackets, ellipses, and multiple layers of quotation marks). Going forward, I will use the word "simplified" rather than "cleaned up," because it seems less colloquial and it avoids suggesting that the more precise quotation format needed "cleaning." Of course, if I make any changes to the simplified quotation, then those would be shown with brackets or ellipses.

more lenient standard that takes the *plaintiffs'* evidence as true and then asks whether a reasonable trier of fact could find Article III standing. *Lujan v. Defenders*, 504 U.S. at 563 (applying this standard in evaluating whether Government's cross-motion for summary judgment should have been granted). In their briefs below concerning the parties' cross-motions, California and New Mexico asserted that Defendants' allegedly unlawful conduct caused both harm to the States' sovereign interests in enforcing their environmental laws as well as actual environmental harm to animals and plants within the States. I agree that at least the second of these two asserted injuries—the threatened occurrence of actual environmental harm—is sufficient to establish Article III standing in this case, at least as to California.[4] Although the district court correctly recognized that the States' evidence of injury was very thin, *see infra* note 6, California's evidence is sufficient to establish standing at the summary-judgment stage.

Even assuming *arguendo* that the States must show a threat of injury to a protected *species* within their borders, rather than merely injury to individual animals or plants

---

[4] As the majority notes, *see* Maj. Opin. at 19 n.10, the district court explicitly addressed Article III standing to challenge the transfers only in the context of New Mexico's request for a preliminary injunction. Although Article III standing was not revisited when both California and New Mexico subsequently moved for summary judgment and a permanent injunction, the States' showing of injury in support of a permanent injunction provides a sufficient basis for evaluating their Article III standing.

belonging to such a species,[5] I think that California has made a sufficient showing. Accepting the States' evidence as true, and drawing all reasonable inferences in their favor, a reasonable trier of fact could conclude that the construction activities associated with El Centro Sector Project 1 in California could materially adversely affect the local population of flat-tailed horned lizards, which California has classified as a "Species of Special Concern." Specifically, California presented declarations from two biologists explaining how DoD's construction activities, and the resulting border barrier, would materially harm the lizard population by increasing opportunities for natural predators to catch lizards, by creating a "genetic break" between the populations within the species' small range area on either side of the barrier, and by accidentally killing a potentially significant number of lizards during the construction itself. This evidence is sufficient to establish an injury-in-fact to California's environmental interests. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 521 (2007) (significant harm to ecosystem is an injury to the State for Article III standing purposes).[6]

---

[5] There are aspects to the States' arguments below—and of the majority opinion here—that seem implicitly to rest on the expansive view that the States would suffer cognizable injury-in-fact if there is harm to a *single* protected animal or to *any* of the plants in the construction area. Such theories push the outermost limits of plausible injury-in-fact, *cf. Lujan v. Defenders*, 504 U.S. at 566–67, but it is unnecessary to rely on them here.

[6] At the permanent-injunction stage, the district court found unpersuasive California's evidence of potential harm to this lizard species, especially when weighed against the Government's countervailing evidence of mitigation efforts. I do not necessarily disagree with that weighing of the competing evidence, but it addresses the injury issue in a different posture under different standards. The district court's denial of

California's showing of a material risk to a "Species of Special Concern" is fairly traceable to the challenged funding transfers and would be redressed by a favorable decision. *Lujan v. Defenders*, 504 U.S. at 560–61. It therefore suffices to give us Article III jurisdiction to address the merits of the States' causes of action. We thus may proceed to do so without having to address New Mexico's standing. *See Secretary of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) ("Since the State of California clearly does have standing, we need not address the standing of the other [plaintiffs], whose position here is identical to the State's."). And given my view that the States' legal challenges fail, I perceive no obstacle to entering judgment against *both* California and New Mexico without determining whether the latter has standing. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 98 (1998).[7]

---

permanent injunctive relief reflected an exercise of *remedial discretion* after the court had found the transfers invalid as a matter of law. Accordingly, in weighing the States' evidence of injury in deciding how to exercise that discretion, the district court was not required to, and did not, evaluate the States' evidence of injury in the light most favorable to them (as we must do as to the standing issue here). *See Continental Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1102 (9th Cir. 1994) (where district court granted summary judgment and permanent injunction, power to issue injunction was reviewed de novo, but "the district court's exercise of that power" was reviewed "for abuse of discretion").

[7] By contrast, New Mexico's standing is relevant to the scope of relief that can be afforded if, as the majority concludes, the § 8005 and § 9002 transfers are *invalid*. California suffers no injury from the construction activities concerning the El Paso Sector Project 1, and so California lacks standing to request or obtain relief that extends to that separate project. *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). Accordingly, before affirming the district

## III

Our first task is to determine whether the States have asserted a viable cause of action that properly brings the lawfulness of the transfers before us. *See Air Courier Conf. v. American Postal Workers Union AFL-CIO*, 498 U.S. 517, 530–31 (1991). The majority holds that California and New Mexico have a valid cause of action under the APA. *See* Maj. Opin. at 30. I disagree with that conclusion, and I also disagree with the States' alternative arguments that they may assert either an equitable cause of action under the Constitution or an "ultra vires" cause of action.[8]

---

court's declaratory judgment that the use of funds transferred under § 8005 and § 9002 "for El Paso Sector Project 1 . . . is unlawful," the majority properly examines New Mexico's standing. I express no view as to whether the majority is correct in concluding that New Mexico's evidence of environmental harm was sufficient, notwithstanding the district court's conclusion that this evidence rested largely on unsupported speculation. *See* Maj. Opin. at 23–24; *cf. California v. Trump*, 2019 WL 2715421, at *4 (N.D. Cal. June 28, 2019) ("New Mexico's speculation that a border barrier *might* prevent interbreeding, which *might* hamper genetic diversity, which *might* render Mexican wolves *more susceptible* to diseases falls far short of the necessary demonstrable evidence of harm to a protected species"). However, for the reasons expressed below, I disagree with the majority's conclusion that New Mexico and California have standing based on their inability to enforce their environmental laws. Maj. Opin. at 24–28. Given that this asserted injury is due to the Secretary of Homeland Security's waiver under § 102 of IIRIRA, and not to the funding transfers, it would not be redressed by an injunction aimed only at the transfers. *See infra* at 68–70.

[8] In its merits analysis, the majority scarcely cites the motions panel's published decision, which addressed the Sierra Club's and SBCC's likelihood of success on the merits of many of the same issues before us. I agree with the majority's implicit conclusion that the motions panel's opinion does not prevent this merits panel from examining these issues afresh. Although the motions panel decision is a precedent, it remains

**A**

In authorizing suit by any person "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, the APA incorporates the familiar zone-of-interests test, which reflects a background principle of law that always "applies unless it is expressly negated," *Bennett v. Spear*, 520 U.S. 154, 163 (1997); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).[9] That test requires a plaintiff to "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. NWF*, 497 U.S. at 883 (quoting *Clarke v. Securities Indus. Ass'n*, 479 U.S.

---

subject to reconsideration by this court until we issue our mandate. *See United States v. Houser*, 804 F.2d 565, 567–68 (9th Cir. 1986) (distinguishing, on this point, between reconsideration of a prior panel's decision "during the course of a single appeal" and a decision "on a prior appeal"); *cf. Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc) (three-judge panel lacks authority to overrule a decision in a prior appeal in the same case). To the extent that *Lair v. Bullock*, 798 F.3d 736, 747 (9th Cir. 2015), suggests otherwise, that suggestion is dicta and directly contrary to our decision in *Houser*. *See East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1261–65 (9th Cir. 2020). In all events, the precedential force of the motions panel's opinion was largely, if not entirely, vitiated by the Supreme Court's subsequent decision to grant the very stay that the motions panel's opinion denied.

[9] The Supreme Court has not squarely addressed whether the zone-of-interests test applies to a plaintiff who claims to have "suffer[ed] legal wrong because of agency action," which is the other class of persons authorized to sue under the APA, 5 U.S.C. § 702. *See Lujan v. National Wildlife Fed. (Lujan v. NWF)*, 497 U.S. 871, 882–83 (1990). The States have not invoked any such theory here, so I have no occasion to address it.

388, 396–97 (1987)).  This test "is not meant to be especially demanding."  *Clarke*, 479 U.S. at 399.  Because the APA was intended to confer "generous review" of agency action, the zone-of-interests test is more flexibly applied under that statute than elsewhere, and it requires only a showing that the plaintiff is "*arguably* within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs., Inc. v. Camp* (*Data Processing*), 397 U.S. 150, 153, 156 (1970) (emphasis added); *see also Bennett*, 520 U.S. at 163 ("what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not do so for other purposes") (simplified).  Because an APA plaintiff need only show that its interests are "arguably" within the relevant zone of interests, "the benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). Although these standards are generous, the States have failed to satisfy them.

**1**

In applying the zone-of-interests test, we must first identify the "statutory provision whose violation forms the legal basis for [the] complaint" or the "gravamen of the complaint." *Lujan v. NWF*, 497 U.S. at 883, 886; *see also Air Courier Conf.*, 498 U.S. at 529.  That question is easy here. The States' complaint alleges that the transfers made by DoD "do not satisfy the criteria under section 8005"; that Defendants therefore "have acted ultra vires in seeking to transfer funding pursuant to section 8005"; that DoD consequently "acted unconstitutionally and in excess of [its] statutory authority in diverting federal funds" pursuant to

§ 8005; and that therefore "these actions are unlawful and should be set aside under 5 U.S.C. section 706."[10]  Section 8005 is plainly the "gravamen of the complaint," and it therefore defines the applicable zone of interests.  *Lujan v. NWF*, 497 U.S. at 886.

Although the States invoke the Appropriations Clause and the constitutional separation of powers in contending that Defendants' actions are "unlawful" within the meaning of the APA, any such constitutional violations here can be said to have occurred *only if* the transfers violated the limitations set forth in § 8005: if Congress authorized DoD to transfer the appropriated funds from one account to another, and to spend them accordingly, then the money has been spent "in Consequence of Appropriations made by Law," U.S. CONST. art. I, § 9, cl. 7, and the Executive has not otherwise transgressed the separation of powers.[11]  *All* of California's theories for challenging the transfers under the APA— whether styled as constitutional claims or as statutory claims—thus rise or fall based on whether DoD has transgressed the limitations on transfers set forth in § 8005. As a result, § 8005 is obviously the "statute whose violation is the gravamen of the complaint."  *Lujan v. NWF*, 497 U.S. at 886.  To maintain a claim under the APA, therefore, California must establish that it is within the zone of interests

---

[10] Because the limitations on transfers set forth in § 8005 also apply to transfers under § 9002, *see* 132 Stat. at 3042, the parties use "§ 8005" to refer to both provisions, and I will generally do so as well.

[11] The only possible exception is the States' argument that § 8005 *itself* violates the Appropriations Clause and the constitutional separation of powers.  As explained below, that contention is frivolous.  *See infra* at 76–77.

of § 8005.  On this point, the majority and I are in apparent agreement.  *See* Maj. Opin. at 30–31.[12]

### 2

Having identified the relevant statute, our next task is to "discern the interests arguably to be protected by the statutory provision at issue" and then to "inquire whether the plaintiff's interests affected by the agency action in question are among them."  *National Credit Union Admin. v. First Nat'l Bank & Trust Co.* (*NCUA*), 522 U.S. 479, 492 (1998) (simplified).  Identifying the interests protected by § 8005 is not difficult, and here the States' asserted interests are not among them.

Section 8005 is a grant of general transfer authority that allows the Secretary of Defense, if he determines "that such action is necessary in the national interest" and if the Office of Management and Budget approves, to transfer from one DoD "appropriation" into another up to $4 billion of the funds that have been appropriated under the DoD Appropriations Act "for military functions (except military construction)."  *See* 132 Stat. at 2999.  Section 8005 contains

---

[12] The States briefly contend that DoD has exceeded its authority under § 284, but even assuming *arguendo* that the States have a cause of action to raise such a challenge, it is patently without merit.  The States note that § 284 contains a special reporting requirement for "small scale construction" projects, which are defined as projects costing $750,000 or less, 10 U.S.C. § 284(h)(1)(B), (i)(3), and they argue that this shows that Congress did not authorize projects on the scale at issue here.  The inference is a non sequitur: the fact that Congress requires special reporting of these smaller projects does not mean that they are the *only* projects authorized.  Congress may have imposed such a unique reporting requirement in order to capture the sort of smaller-scale activities that might otherwise have escaped its notice.

five provisos that further regulate this transfer authority, and the only limitations on the Secretary's authority that the States claim were violated here are all contained in the first such proviso. That proviso states that "such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." *Id*.[13] The remaining provisos require prompt notice to Congress "of all transfers made pursuant to this authority or any other authority in this Act"; proscribe the use of funds to make requests to the Committees on Appropriations for reprogrammings that are inconsistent with the restrictions described in the first proviso; set a time limit for making requests for multiple reprogrammings; and exempt "transfers among military personnel appropriations" from counting towards the $4 billion limit. *Id*.

Focusing on "the particular provision of law upon which the plaintiff relies," *Bennett*, 520 U.S. at 175–76, makes clear that § 8005 as a whole, and its first proviso in particular, are aimed at tightening congressional control over the appropriations process. The first proviso's general prohibition on transferring funds for any item that "has been denied by the Congress" is, on its face, a prohibition on using the transfer authority to effectively reverse Congress's specific decision to deny funds to DoD for that item. 132 Stat. at 2999. The second major limitation imposed by the first proviso states that the transfer authority is not to be used unless, considering the items "for which [the funds

---

[13] Similar language has been codified into permanent law. *See* 10 U.S.C. § 2214(b). No party contends that § 2214(b) alters the relevant analysis under the comparably worded provision in § 8005.

were] originally appropriated," there are "higher priority items" for which the funds should now be used in light of "military requirements" that were "unforeseen" in DoD's request for Fiscal Year 2019 appropriations. *Id.* The obvious focus of this restriction is likewise to protect congressional judgments about appropriations by (1) restricting DoD's ability to *reprioritize* the use of funds differently from how Congress decided to do so and (2) precluding DoD from transferring funds appropriated by Congress for "military functions" for purposes that do not reflect "military requirements." The remaining provisos, including the congressional reporting requirement, all similarly aim to maintain congressional control over appropriations. And all of the operative restrictions in § 8005 that the States invoke here are focused *solely* on limiting DoD's ability to use the transfer authority to reverse the congressional judgments reflected in *DoD's* appropriations.

In addition to preserving congressional control over DoD's appropriations, § 8005 also aims to give DoD some measure of flexibility to make necessary changes. Notably, in authorizing the Secretary to make transfers among appropriations, § 8005's first proviso specifies only *one* criterion that he must consider in exercising that discretion: he must determine whether the item for which the funds will be used is a "*higher priority* item[]" in light of "unforeseen *military* requirements." 132 Stat. at 2999 (emphasis added). Under the statute, he need not consider any other factor concerning either the original use for which the funds were appropriated or the new use to which they will now be put.

In light of these features of § 8005, the "interests" that the States claim are "affected by the agency action in question" are not "among" the "interests arguably to be protected" by

§ 8005. *NCUA*, 522 U.S. at 492 (simplified). In particular, the States' asserted environmental interests clearly lie outside the zone of interests protected by § 8005. The statute does not mention environmental interests, nor does it require the Secretary to consider such interests. On the contrary, the statute requires him only to consider whether an item is a "higher priority" in light of "military requirements," and it is otherwise entirely neutral as to the uses to which the funds will be put. Indeed, that neutrality is reflected on the face of the statute, which says that, once the transfer is made, the funds are "merged with and . . . available *for the same purposes*, and for the same time period, *as the appropriation or fund to which transferred*." 132 Stat. at 2999 (emphasis added). Because the alleged environmental harms that the States assert here play no role in the analysis that § 8005 requires the Secretary to conduct, and are not among the harms that § 8005's limitations seek to address or protect, the States' interests in avoiding these harms are not within § 8005's zone of interests.

Moreover, focusing on the specific interests for which the States have presented sufficient evidentiary support at the summary-judgment stage, *see Lujan v. NWF*, 497 U.S. at 884–85, further confirms that, in deciding whether to redirect excess military personnel funds under § 8005 to assist DHS by building fencing to stop international drug smuggling, the Acting Secretary of Defense did not have to give even the slightest consideration to whether that reprogramming of funds would result in the death of more flat-tailed horned lizards.[14]     Put simply, the States'

---

[14] It is unnecessary to exhaustively review whether California or New Mexico has provided the requisite factual support with respect to their claims of potential harms to *other* species of animals or plants, *see supra*

environmental interests are "'so marginally related to . . . the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Patchak*, 567 U.S. at 225 (quoting *Clarke*, 479 U.S. at 399).

For similar reasons, the States' invocation of their *sovereign* interests is also insufficient. The majority finds that these interests "app[ly] with particular force" because the Secretary's transfer of funds *ultimately* had an effect on "California's and New Mexico's ability to enforce their state environmental laws," *see* Maj. Opin. at 34, but that consideration plays no role—not even indirectly—in the analysis that § 8005 requires. Section 8005 authorizes the Secretary to move funds from one appropriation to another if (1) that transfer is consistent with the appropriations-process-based constraints discussed earlier; and (2) the transfer is for items that the Secretary deems to be "higher priority" in light of "military requirements." 132 Stat. at 2999. The statute does not itself mention or contemplate the displacement of state laws as a result of the transfer, nor does it require that any such derogation from state sovereignty be considered in evaluating the proposed transfer. Moreover, here the ultimate preemption of state law occurred, not as a result of § 8005, but rather as a result of DHS's separate determination, under a completely separate statute (*viz.*, IIRIRA § 102(c)), that state (and federal) environmental laws would be waived. The States might perhaps be within the zone of interests with respect to *that* statute, but they do not challenge the validity of that waiver under § 102(c) in this case, and in any event, California has already brought (and lost) a challenge to an earlier § 102(c) waiver with respect to a similar border

---

note 7, because there is no basis in law or logic for concluding that it would make any difference to the zone-of-interests analysis under § 8005.

fencing project.  *See In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213 (9th Cir. 2019).

The States nonetheless insist that they are within § 8005's zone of interests because the actual *activities* that are taking place under the valid waiver, in derogation of their sovereignty, are only occurring because the § 8005 transfer was approved.  This argument fails.  Once a valid § 102(c) waiver has been issued, the States' laws have been definitively set aside as a *de jure* matter under the Supremacy Clause, and halting construction will *not* bring those laws back into force or redress that injury to the States' sovereignty.  The residual interest on which the States rely, therefore, is not an injury to their sovereignty, but merely the interest in ensuring that activities that the States consider undesirable do not occur.  But the Supreme Court has consistently held that "assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning," *Lujan v. Defenders*, 504 U.S. at 576 (simplified), and an interest that is not cognizable for Article III purposes is irrelevant for zone-of-interests purposes as well, *Sierra Club v. Morton*, 405 U.S. 727, 733 (1972).  Similarly, to the extent that the States rely on an interest in "hav[ing] the Government act in accordance with law" such as § 8005, *see Lujan v. Defenders*, 504 U.S. at 575, such an interest is not cognizable under Article III and cannot satisfy the zone-of-interests test here.

**3**

The majority makes two main arguments as to why the States nonetheless fall within § 8005's zone of interests, but neither has merit.

First, the majority contends that "the states regularly benefit from DoD's use of Section 8005," and it cites several past examples in which the statute was used to transfer funds that allowed the military to assist in addressing storm damage from hurricanes that occurred in various States. *See* Maj. Opin. at 35–36. This argument is foreclosed by the Supreme Court's decision in *Lujan v. NWF*. The Court in that case held that, because satisfaction of the zone-of-interests test is an element of the cause of action that the plaintiff seeks to invoke, the plaintiff at the summary-judgment stage has the burden "to set forth specific facts (even though they may be controverted by the Government) showing that he has satisfied its terms," *i.e.*, that "the injury he complains of (*his* aggrievement, or the adverse effect *upon him*)" falls within the relevant statute's zone of interests. 497 U.S. at 883–84. Here, in opposing summary judgment, California and New Mexico made no showing whatsoever that, in the absence of these transfers to the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation, the funds in question would otherwise have been transferred for the direct benefit of either State. Absent such an evidentiary showing, the States have failed to show that they satisfy the zone-of-interests test under such a theory. *Id*. at 882–99 (exhaustively analyzing the evidence presented at summary judgment and concluding that the plaintiffs had failed to carry their burden under the zone-of-interests test).

Second, the majority asserts that California and New Mexico fall within § 8005's zone of interests because § 8005 was "primarily intended to benefit [Congress] and its constitutional power to manage appropriations," and the States' "interests are *congruent* with those of Congress." *See* Maj. Opin. at 32–33 (emphasis added). This theory also fails. As the Supreme Court made clear in *Lujan v. NWF*, the zone-of-interests test requires the plaintiff to make a factual showing that the plaintiff itself, or someone else whose interests the plaintiff may properly assert, has a cognizable interest that falls within the relevant statute's zone of interests. 497 U.S. at 885–99 (addressing whether the interests of NWF—or of any of its members, whose interests NWF could validly assert under the associational standing doctrine of *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977)—had been shown to be within the relevant zone of interests). I am aware of no precedent that would support the view that California and New Mexico can *represent* the interests of Congress (akin to NWF's representation of the interests of its members), much less that the States can do so merely because they are sympathetic to Congress's perceived policy objectives.[15] But I do not read the majority opinion as actually relying on such a novel theory. Instead, the majority suggests that, merely because the States' overall litigation objectives here are sufficiently

---

[15] Even if the States could assert Congress's interests in some representational capacity, they could do so only if the injury to Congress's interests satisfied the requirements of Article III standing. *See Air Courier Conf.*, 498 U.S. at 523–24 (zone-of-interests test is applied to those injuries-in-fact that meet Article III requirements). I express no view on that question. *Cf. U.S. House of Reps. v. Mnuchin*, 379 F. Supp. 3d 8 (D.D.C. 2019) (holding that House lacks Article III standing to challenge the transfers at issue here), *appeal ordered heard en banc*, 2020 WL 1228477 (D.C. Cir. 2020).

congruent with those of Congress, the States have thereby satisfied the zone-of-interests test with respect to the States' *own* interests. This contention is clearly wrong.

The critical flaw in the majority's analysis is that it rests, not on the *interests* asserted by the States (preservation of the flat-tailed horned lizard, etc.), but on the *legal theory* that the States invoke to protect those interests here. But the zone-of-interests test focuses on the former and not the latter. *See Lujan v. NWF*, 497 U.S. at 885–89. Indeed, if the majority were correct, that would effectively eliminate the zone-of-interests test. By definition, *anyone* who alleges a violation of a particular statute has thereby invoked a legal theory that is "congruent" with the interests of those *other* persons or entities who *are* within that statute's zone-of-interests. Such a tautological congruence between the States' legal theory and Congress's institutional interests is not sufficient to satisfy the zone-of-interests test here.

The majority suggests that its approach is supported by the D.C. Circuit's decision in *Scheduled Airlines Traffic Offices, Inc. v. Department of Defense*, 87 F.3d 1356 (D.C. Cir. 1996), *see* Maj. Opin. at 32, but that is wrong. As the opinion in that case makes clear, the D.C. Circuit was relying on the same traditional zone-of-interests test, under which a plaintiff's interests are "outside the statute's 'zone of interests' only 'if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" 87 F.3d at 1360 (quoting *Clarke*, 479 U.S. at 399). The court mentioned "congruence" in the course of explaining why the plaintiff's interests in that case were "not more likely to frustrate than to further statutory objectives," *i.e.*, why those interests were not

*inconsistent* with the purposes implicit in the statute. *Id.* (simplified). It did not thereby suggest—and could not properly have suggested—that the mere lack of any such inconsistency is alone sufficient under the zone-of-interests test. Here, the problem is not that the States' interests are inconsistent with the purposes of § 8005, but rather that they are too "marginally related" to those purposes. *See supra* at 68–69.

Lastly, the majority suggests that we must apply the zone-of-interests test "broadly in this context," because—given the difficulties that congressional plaintiffs have in establishing Article III standing—otherwise "no agency action taken pursuant to Section 8005 could ever be challenged under the APA." *See* Maj. Opin. at 33, 36. The assumption that no one will ever be able to sue for any violation of § 8005 seems doubtful, *cf. Sierra Club v. Trump*, 929 F.3d at 715 (N.R. Smith, J., dissenting) (suggesting that "those who would have been entitled to the funds as originally appropriated" may be within the zone of interests of § 8005), but in any event, we are not entitled to bend the otherwise applicable—and already lenient—standards to ensure that someone will be able to sue in this case or others like it.

## B

In addition to asserting claims under the APA, California and New Mexico also purport to assert claims under the Constitution, as well as an equitable cause of action to enjoin "ultra vires" conduct. The States do not have a cause of action under either of these theories.

**1**

The States contend that they are not required to satisfy any zone-of-interests test to the extent that they assert non-APA causes of action to enjoin Executive officials from taking *unconstitutional* action.[16]   Even assuming that an equitable cause of action to enjoin unconstitutional conduct exists alongside the APA's cause of action, *see Juliana v. United States*, 947 F.3d 1159, 1167–68 (9th Cir. 2020); *Navajo Nation v. Department of the Interior*, 876 F.3d 1144, 1172 (9th Cir. 2017); *but see Sierra Club v. Trump*, 929 F.3d at 715–17 (N.R. Smith, J., dissenting), it avails the States nothing here.  The States have failed to allege the sort of constitutional claim that might give rise to such an equitable action, because their "constitutional" claim is effectively the very same § 8005-based claim dressed up in constitutional garb.  And even if this claim counted as a "constitutional" one, it would still be governed by the same zone of interests defined by the relevant limitations in § 8005.

**a**

The States assert two constitutional claims in their operative complaint: (1) that Defendants have violated the

---

[16] It is not entirely clear that the States are contending that their *APA claims* to enjoin *unconstitutional* conduct, *see* 5 U.S.C. § 706(2)(B), are exempt from the zone-of-interests test.  To the extent that they are so contending, the point seems doubtful.  *See Data Processing*, 397 U.S. at 153 (zone-of-interests test requires APA claimant to show that its interest "is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question").  But in all events, any such APA-based claim to enjoin unconstitutional conduct would fail for the same reasons as the States' purported free-standing equitable claim to enjoin such conduct.

Presentment Clause, and the constitutional separation of powers more generally, by "unilaterally diverting funding that Congress already appropriated for other purposes to fund a border wall for which Congress has provided no appropriations"; and (2) that Defendants have violated the Appropriations Clause "by funding construction of the border wall with funds that were not appropriated for that purpose." As clarified in their subsequent briefing, the States assert both what I will call a "strong" form of these constitutional arguments and a more "limited" form. In its strong form, the States' argument is that, *even if § 8005 authorized the transfers in question here*, those transfers nonetheless violated the separation of powers, the Presentment Clause, and the Appropriations Clause. In its more limited form, the States' argument is that the transfers violated the separation of powers, the Presentment Clause, and the Appropriations Clause *because* the transfers were not authorized by § 8005.

I need not address whether the States have an equitable cause of action to assert the strong form of their constitutional argument, because in my view that argument on the merits is so "wholly insubstantial and frivolous" that it would not even give rise to federal jurisdiction. *Bell v. Hood*, 327 U.S. 678, 682–83 (1946); *see also Steel Co.*, 523 U.S. at 89. If § 8005 *allowed* the transfers here, then that necessarily means that the Executive has properly spent funds that Congress, by statute, has *appropriated* and allowed to be spent for *that* purpose. The States cite no authority for the extraordinary proposition that the Appropriations Clause itself constrains *Congress's* ability to give agencies latitude in how to spend appropriated funds, and I am aware of no such authority. *Cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed

to agency discretion"). And by transferring funds after finding that the statutory conditions for doing so are met, an agency thereby "execut[es] the policy that Congress had embodied in the statute" and does not unilaterally alter or repeal any law in violation of the Presentment Clause or the separation of powers. *See Clinton v. City of New York*, 524 U.S. 417, 444 (1998). If anything, it is the States' theory—that the federal courts must give effect to an alleged broader congressional judgment against border funding *regardless* of whether that judgment is embodied in binding statutory language—that would offend separation-of-powers principles.

That leaves only the more limited form of the States' argument, which is that, *if* § 8005 did not authorize the transfers, *then* the expenditures violated the Appropriations Clause, the Presentment Clause, and the separation of powers. Under *Dalton v. Specter*, 511 U.S. 462 (1994), this theory—despite its constitutional garb—is properly classified as "a statutory one," *id*. at 474. It therefore does not fall within the scope of the asserted non-APA equitable cause of action to enjoin *unconstitutional* conduct.[17]

In *Dalton*, the Court addressed a non-APA claim to enjoin Executive officials from implementing an allegedly unconstitutional Presidential decision to close certain military bases under the Defense Base Closure and Realignment Act

---

[17] There remains the States' claim that *statutory* violations may be enjoined under a non-APA ultra vires cause of action for equitable relief, but that also fails for the reasons discussed below. *See infra* at 84–85.

of 1990. 511 U.S. at 471.[18] But the claim in *Dalton* was not that the President had directly transgressed an applicable constitutional limitation; rather, the claim was that, *because* Executive officials "violated the procedural requirements" of the statute on which the President's decision ultimately rested, the President thereby "act[ed] in excess of his statutory authority" and therefore "violate[d] the constitutional separation-of-powers doctrine." *Id*. at 471–72. The Supreme Court rejected this effort to "eviscerat[e]" the well-established "distinction between claims that an official exceeded his *statutory* authority, on the one hand, and claims that he acted in violation of the *Constitution*, on the other." *Id*. at 474 (emphasis added). As the Court explained, its "cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id*. at 472. The Court distinguished *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), on the ground that there "the Government disclaimed any statutory authority for the President's seizure of steel mills," and as a result the Constitution itself supplied the rule of decision for determining the legality of the President's actions. *Dalton*, 511 U.S. at 473. Because the "only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces," *Youngstown* thus "necessarily turned on *whether the Constitution authorized* the President's actions." *Id*. (emphasis added). By contrast, given that the claim in *Dalton* was that the President had violated the Constitution

---

[18] The plaintiffs in *Dalton* also asserted a claim under the APA itself, but that claim failed for the separate reason that the challenged final action was taken by the President personally, and the President is not an "agency" for purposes of the APA. *See* 511 U.S. at 469.

*because* Executive officials had "violated the terms of the 1990 Act," the terms of that statute provided the applicable rule of decision and the claim was therefore "a statutory one." *Id*. at 474. And because those claims sought to enjoin conduct on the grounds that it violated *statutory* requirements, it was subject to the "longstanding" limitation that non-APA "review is not available when the statute in question commits the decision to the discretion of the President." *Id*.

Under *Dalton*, the States' purported "constitutional" claims—at least in their more limited version—are properly classified as *statutory* claims that do *not* fall within any non-APA cause of action to enjoin unconstitutional conduct. 511 U.S. at 474. Here, as in *Dalton*, Defendants have "claimed" the "statutory authority" of § 8005, and any asserted violation of the Constitution would occur *only if, and only because,* Defendants' conduct is assertedly not authorized by § 8005. *Id*. at 473. The rule of decision for *this* dispute is thus not supplied, as in *Youngstown*, by the Constitution; rather, it is supplied only by § 8005. *Id*. at 473–74. Because these claims by the States are thus "statutory" under *Dalton*, they may only proceed, if at all, under an equitable cause of action to enjoin ultra vires conduct, and they would be subject to any limitations applicable to such claims. *Id*. at 474. The States do assert such a fallback claim here, but it fails for the reasons I explain below. *See infra* at 84–85.

**b**

But even if the States' claims may properly be classified as *constitutional* ones for purposes of the particular equitable cause of action they invoke here, those claims would still fail.

To the extent that the States argue that the Constitution *itself* grants a cause of action allowing *any plaintiff with an Article III injury* to sue to enjoin an alleged violation of the Appropriations Clause, the Presentment Clause, or the separation of powers, there is no support for such a theory. None of the cases cited by the States involved putative plaintiffs, such as the States here, who are near the outer perimeter of Article III standing. On the contrary, these cases involved either allegedly unconstitutional agency actions *directly targeting* the claimants, *see Bond v. United States*, 564 U.S. 211, 225–26 (2011) (criminal defendant challenged statute under which she was convicted on federalism and separation-of-powers grounds); *United States v. McIntosh*, 833 F.3d 1163, 1174–75 (9th Cir. 2016) (criminal defendants sought to enjoin, based on an appropriations rider and the Appropriations Clause, the Justice Department's expenditure of funds to prosecute them), or they involved a suit based on an express *statutory* cause of action, *see Clinton v. City of New York*, 524 U.S. at 428 (noting that right of action was expressly conferred by 2 U.S.C. § 692(a)(1) (1996 ed.)).

Moreover, any claim that the Constitution *requires* recognizing, in this context, an equitable cause of action that extends to the outer limits of Article III seems difficult to square with the Supreme Court's decision in *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015). There, the Court rejected the view that the Supremacy Clause itself created a private right of action for equitable relief against preempted statutes, and instead held that any such equitable claim rested on "judge-made" remedies that are subject to "express and implied statutory limitations." *Id*. at 325–27. The Supremacy Clause provides a particularly apt analogy here, because (like the Appropriations Clause) the asserted "unconstitutionality" of the challenged action generally

depends upon whether it falls *within or outside the terms of a federal statute*: a state statute is "unconstitutional under the Supremacy Clause" only if it is "contrary to federal law," *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1361–62 (9th Cir. 1998), and here, the transfers violated the Appropriations Clause only if they were barred by the limitations in § 8005. And just as the Supremacy Clause protects Congress's "broad discretion with regard to the enactment of laws," *Armstrong*, 575 U.S. at 325–26, so too the Appropriations Clause protects "congressional control over funds in the Treasury," *McIntosh*, 833 F.3d at 1175. It is "unlikely that the Constitution gave Congress such broad discretion" to enact appropriations laws only to simultaneously "*require[]* Congress to permit the enforcement of its laws" by *any* "private actor[]" with even minimal Article III standing, thereby "*limit[ing]* Congress's power" to decide how "to enforce" the spending limitations it enacts. *Armstrong*, 575 U.S. at 325–26.

The Appropriations Clause thus does not itself create a constitutionally required cause of action that extends to the limits of Article III. On the contrary, any equitable cause of action to enforce that clause would rest on a "judge-made" remedy: as *Armstrong* observed, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." 575 U.S. at 327. At least where, as here, the contours of the applicable constitutional line (under the Appropriations Clause) are defined by and parallel a statutory line (under § 8005), any such judge-made equitable cause of action would be subject to "express and implied statutory limitations," as well as traditional limitations governing such equitable claims. *Id*.

One long-established "'judicially self-imposed limit[] on the exercise of federal jurisdiction'"—including federal equitable jurisdiction—is the requirement "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett*, 520 U.S. at 162 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). This limitation is *not* confined to the APA, but rather reflects a "prudential standing requirement[] of general application" that always "applies unless it is expressly negated" by Congress. *Id*. at 163.[19] Because Congress has not expressly negated that test in any relevant respect, the States' equitable cause of action to enforce the Appropriations Clause here remains subject to the zone-of-interests test. *Cf. Thompson v. North American Stainless, LP*, 562 U.S. 170, 176–77 (2011) (construing a cause of action as extending to "any person injured in the Article III sense" would often produce "absurd consequences" and is for that reason rarely done). And given the unique nature of an Appropriations Clause claim, as just discussed, *the line between constitutional and unconstitutional conduct* here is defined entirely by the limitations in § 8005, and therefore the

---

[19] The States wrongly contend that, by quoting this language from *Bennett*, and stating that the zone-of-interests test therefore "applies to all *statutorily* created causes of action," *Lexmark*, 572 U.S. at 129 (emphasis added), the Court in *Lexmark* thereby intended to signal that the test *only* applies to statutory claims and not to non-statutory equitable claims. Nothing in *Lexmark* actually suggests any such negative pregnant; instead, the Court's reference to "statutorily created causes of action" reflects nothing more than the fact that only statutory claims were before the Court in that case. *See id*. at 129. Moreover, *Lexmark* notes that the zone-of-interests test's roots lie in the common law, *id*. at 130 n.5, and *Bennett* (upon which *Lexmark* relied) states that the test reflects a "prudential standing requirement[] of general application" that applies to any "exercise of federal jurisdiction," 520 U.S. at 162–63.

relevant zone of interests for the States' Appropriations-Clause-based equitable claim remains defined by *those* limitations.  The States are thus outside the applicable zone of interests for this claim as well.

In arguing for a contrary view, the States rely heavily on *United States v. McIntosh*, asserting that there we granted non-APA injunctive relief based on the Appropriations Clause without inquiring whether the claimants were within the zone of interests of the underlying appropriations statute. *McIntosh* cannot bear the considerable weight that the States place on it.

In *McIntosh*, we asserted interlocutory jurisdiction over the district courts' refusal to enjoin the expenditure of funds to prosecute the defendants—an expenditure that allegedly violated an appropriations rider barring the Justice Department from spending funds to prevent certain States from "'implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana.'" 833 F.3d at 1175; *see also id*. at 1172–73.  We held that the defendants had Article III standing and that, if the Department was in fact "spending money in violation" of that rider in prosecuting the defendants, that would produce a violation of the Appropriations Clause that could be raised by the defendants in challenging their prosecutions. *Id*. at 1175.  After construing the meaning of the rider, we then remanded the matter for a determination whether the rider was being violated. *Id*. at 1179.  Contrary to the States' dog-that-didn't-bark theory, nothing can be gleaned from the fact that the zone-of-interests test was never discussed in *McIntosh*. *See Cooper Indus., Inc. v. Aviall Servs, Inc.*, 543 U.S. 157, 170 (2004) ("'Questions which merely lurk in the record, neither brought to the attention of the court nor

ruled upon, are not to be considered as having been so decided as to constitute precedents.'") (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). Moreover, any such silence seems more likely to have been due to the fact that it was so overwhelmingly obvious that the defendants *were* within the rider's zone of interests that the point was incontestable and uncontested. An asserted interest in not going to prison for *complying* with state medical-marijuana laws seems well within the zone of interests of a statute prohibiting interference with the implementation of such state laws.

## 2

The only remaining question is whether the States may evade the APA's zone-of-interests test by asserting a non-APA claim for ultra vires conduct in excess of *statutory* authority. Even assuming that such a cause of action exists alongside the APA, *cf. Trudeau v. Federal Trade Comm'n*, 456 F.3d 178, 189–90 (D.C. Cir. 2006), I conclude that it would be subject to the same zone-of-interests limitations as the States' APA claims and therefore likewise fails.

For the same reasons discussed above, any such equitable cause of action rests on a judge-made remedy that is subject to the zone-of-interests test. *See supra* at 79–84. The States identify no case from this court affirmatively holding that the zone-of-interests test does *not* apply to a non-APA equitable cause of action to enjoin conduct allegedly in excess of *statutory* authority, and I am aware of none. Indeed, it makes little sense, when evaluating a claim that Executive officials exceeded the *limitations* in a federal statute, not to ask whether the plaintiff is within the zone of interests protected by those statutory limitations. *Cf. Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987) (although

plaintiff asserting ultra vires claim may not need to show that its interests "fall within the zones of interests of the constitutional and statutory *powers* invoked" by Executive officials, when "a particular constitutional or statutory provision was intended to protect persons like the litigant by *limiting* the authority conferred," then "the litigant's interest may be said to fall within the zone protected by the *limitation*") (emphasis added).[20]

*          *          *

Given that each of the States' asserted theories fail, the States lack any cause of action to challenge the DoD's transfer of funds under § 8005.

## IV

Alternatively, even if the States had a cause of action, their claims would fail on the merits, because the challenged transfers did not violate § 8005 or § 9002. The States argue that the transfers violated the first proviso of § 8005, which states that the transfer authority granted by that section "may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress."

---

[20] Even if the States were correct that the zone-of-interests test does not apply to a non-APA equitable cause of action, that would not necessarily mean that such equitable jurisdiction extends, as the States suggest, to the outer limits of Article III. Declining to apply the APA's generous zone-of-interests test might arguably render applicable the sort of narrower review of agency action that preceded the APA standards articulated in *Data Processing*, 397 U.S. at 153. *See also Clarke*, 479 U.S. at 400 n.16.

132 Stat. at 2999.  The requirements of this proviso likewise limit the transfer authority under § 9002.  *See id.* at 3042 (stating that the transfer authority in § 9002 is in addition to that specified in § 8005, but "is subject to the same terms and conditions as the authority provided in section 8005 of this Act").  The States argue, and the majority agrees, that two of the requirements in this proviso are not met, because (1) the transfers were for an item for which Congress has denied funding; and (2) they were not for "unforeseen military requirements."  *See* Maj. Opin. at 37–47.  I disagree.

### A

The proviso states that the Secretary may not transfer funds for an admittedly "higher priority item[] . . . than those for which originally appropriated" if "the item for which funds are requested has been denied by the Congress." 132 Stat. at 2999.  In my view, the Secretary's transfers did not violate this condition.

Determining whether Congress "denied" the relevant "item" at issue here turns on the meaning of the phrase "the item for which funds are requested."  According to the States, the relevant "item" should be broadly defined to include any "border barrier construction," and Congress should be held to have "denied" that item except to the extent that it appropriated funds for "primary pedestrian fencing" in § 230(a)(1) of the Department of Homeland Security Appropriations Act, 2019, *see* Pub. L. No. 116-6, Div. A, § 230(a)(1), 133 Stat. 13, 28 (2019).  The States' reading is implausible, because it ignores the context of the appropriations process that § 8005 addresses.

As a provision designed to preserve Congress's authority over the appropriations process, § 8005's restriction on transfers can only be understood against the backdrop of that process and of the role of transfers and reprogrammings in it. *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (simplified). That process is usefully set forth in Chapter 2 of the GAO's authoritative *Principles of Federal Appropriations Law*, otherwise known as the "Red Book," and I borrow heavily from that treatise in setting forth that relevant context. *See Lincoln*, 508 U.S. at 192 (citing Red Book in addressing suit challenging reallocation of funds).

While Congress ordinarily appropriates funds annually for agencies to use in specified amounts for enumerated purposes, Congress has also recognized that "a certain amount of flexibility" is sometimes warranted. *See* 2 U.S. GOV'T ACCOUNTABILITY OFF. ("GAO"), PRINCIPLES OF FEDERAL APPROPRIATIONS LAW (4th ed. 2016 rev.) ("RED BOOK"), pt. B, § 7, 2016 WL 1275442, at *1. Two ways in which such flexibility may be achieved are through "transfer and reprogramming." *Id.* A "transfer"—which is the specific subject of § 8005—refers to "the shifting of funds between appropriations," and it is generally prohibited in the absence of specific statutory authority. *Id.*; *see also* 31 U.S.C. § 1532. By contrast, a "reprogramming shifts funds *within* a single appropriation," and in the absence of specific statutory limitations on reprogramming, agencies have broad discretion to do so "as long as the resulting obligations and expenditures are consistent with the purpose restrictions applicable to the appropriation." *See* RED BOOK, 2016 WL 1275442, at *6 (emphasis added) (citing *Lincoln*, 508 U.S. at 192). In

contrast to a transfer—which is easy to identify, because it shifts funds between separate appropriations that are "well-defined and delineated with specific language in an appropriations act"—it is more difficult to identify what counts as a reprogramming within an appropriation, because the appropriations act itself "does not set forth the subdivisions that are relevant to determine whether an agency has reprogrammed funds." *See id.* at *6. There is only a need to identify a "reprogramming" when Congress has sought to place limits on an agency's ability to do so. *See, e.g.*, Pub. L. No. 111-80, § 712, 123 Stat. 2090, 2120–21 (2009) (requiring 15-days advance notice to Congress before certain "reprogramming[s] of funds" may be made by various agriculture-related agencies). In such cases, whether a shift of funds within an appropriation counts as a reprogramming is ordinarily determined by considering how the reallocation of funds compares to the allocation of funds that was contemplated during the appropriations process: "Typically, *the itemizations and categorizations in the agency's budget documents* as well as statements in committee reports and the President's budget submission, contain the subdivisions within an agency's appropriation that are relevant to determine whether an agency has reprogrammed funds." RED BOOK, 2016 WL 1275442, at *7 (emphasis added). GAO's Red Book illustrates the point with an example, drawn from a prior opinion letter:

> For instance, for FY 2012, the Commodity Futures Trading Commission (CFTC) received a single lump-sum appropriation. *Id.* CFTC's FY 2012 *budget request* included an *item* within that lump sum to fund an Office of Proceedings. A reprogramming would occur if CFTC shifted amounts that it had

> previously designated to carry out the
> functions of the Office of Proceedings to carry
> out *different* functions.

*Id*. (citing GAO, B-323792, *Commodity Futures Trading Commission—Reprogramming Notification* (Jan. 23, 2013)) (emphasis added).

Against this backdrop, the import of § 8005's first proviso is clear. In evaluating a transfer from one appropriation to another, the Secretary must justify the transfer, not at the broad level of each overall appropriation itself (*i.e.*, not by comparing the statutory appropriation category for "Drug Interdiction and Counter-Drug Activities, Defense" versus that for "Military Personnel, Army"), but rather at the same "*item*" level at which the Secretary would have to justify a reprogramming within an appropriation. *See* Pub. L. No. 115-245, Div. A, § 8005, 132 Stat. at 2999 (requiring Secretary to compare whether the item to which the transferred funds will be directed is a "higher priority" than the items "for which originally appropriated"). The point of reference for determining whether the destination "item" justifies the transfer is therefore, as with a reprogramming, "the itemizations and categorizations in the agency's budget documents as well as statements in committee reports and the President's budget submission." RED BOOK, 2016 WL 1275442, at *7.

Several features of the language of § 8005 confirm this reading. The statutory reference to "those [items] for which *originally* appropriated," 132 Stat. at 2999 (emphasis added), is unmistakably a reference to the familiar concept of the itemizations contained *within* the current appropriation, as set forth in the already existing budgetary documents exchanged

and generated during the appropriations process for DoD. *Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014) ("It is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken.") (simplified). And because those "original[]" items are to be compared with the new "items" for which the transfer authority is to "be used," 132 Stat. at 2999, these latter "items" must likewise be understood as a reference to the destination items *within* the transferee DoD appropriation. *Law v. Siegel*, 571 U.S. 415, 422 (2014) ("[W]ords repeated in different parts of the same statute generally have the same meaning").

The destination item is also referred to in the statute as "the item for which funds are *requested*," which is an unusual way to refer to a transfer that an agency approves on its own. 132 Stat. at 2999 (emphasis added). But the use of that term makes perfect sense when the language is again construed against the background of the appropriations process, because it is a common practice for agencies—despite the decision in *INS v. Chadha*, 462 U.S. 919 (1983)—to "request" the appropriations committees' approval for transfers and reprogrammings as a matter of comity. *See Lincoln*, 508 U.S. at 193 ("[W]e hardly need to note that an agency's decision to ignore congressional expectations [concerning the use of appropriations] may expose it to grave political consequences"). That reading is confirmed by § 8005's third proviso, which enforces the exclusivity of the first proviso by barring DoD from using any appropriated funds to "prepare or present a *request* to the Committees on Appropriations for reprogramming of funds," unless it meets the requirements of the first proviso. 132 Stat. at 2999 (emphasis added). This

language also confirms what is already otherwise apparent, which is that any transfer under § 8005 is to be analyzed, and papered, as a request for "*reprogramming* of funds." *Id*. (emphasis added). Indeed, although DoD made a conscious decision to depart from the comity-based practice of making a request in this case, the House Committee on Appropriations nonetheless proceeded to construe DoD's notification of the transfer as a "requested reprogramming action" and "denie[d] the request." *See* House Comm. on Appropriations, *Press Release: Visclosky Denies Request to Use Defense Funds for Unauthorized Border Wall* (Mar. 27, 2019), https://appropriations.house.gov/news/press-releases/visclosky-denies-request-to-use-defense-funds-for-unauthorized-border-wall.

For all of these reasons, the "items" at issue under § 8005 must be understood against the backdrop of the sort of familiar item-level analysis required in a budgetary reprogramming, and the benchmark for evaluating the proposed destination item is therefore, as with any reprogramming, the *original* allocation among items that is reflected in the records of the DoD appropriations process. Accordingly, when § 8005 requires a consideration of whether "the item for which funds are requested has been denied by the Congress," it is referring to whether Congress, *during DoD's appropriations process*, denied an "item" that corresponds to the "item for which funds are requested." Under that standard, this case is easy. The States do not contend (and could not contend) that Congress ever "denied" such an item to DoD during DoD's appropriations process.

Instead, the States argue that a grant of funds to *another* agency (DHS) in its appropriations, in an amount less than that agency requested, should be construed as a *denial* of an

analogous item to DoD under its entirely separate authorities and appropriations. This disregards the appropriations-law context against which § 8005 must be construed, which makes clear that the relevant clause refers only to denials that are applicable to DoD within the context of *its* appropriations process. Taking into account the broader context of the political struggle between the President and the Congress over DHS's requests for border-barrier funding, the majority concludes that Congress thereby issued a "general denial" of "border wall" funding, which should be construed as "necessarily encompass[ing] narrower forms of denial—such as the denial of a Section 284 budgetary line item request." *See* Maj. Opin. at 46–47. But § 8005's proviso only applies if, during the DoD appropriations process, such an item "has been denied by the Congress," 132 Stat. at 2999, and that manifestly did not occur here, given that (1) no such request was presented and denied during that process; and (2) indeed, that process *ended* several months *before* the ultimate "denial" that the majority claims we should now retroactively apply to DoD's transfer authority.

More fundamentally, the majority is quite wrong in positing that § 8005 assigns to us the task of discerning the contours of the larger political struggle between the President and the Congress over border-barrier funding (including by reviewing campaign speeches and the like), *see* Maj. Opin. at 39, and then giving legal effect to what we think, based on that review, is "Congress's broad and resounding denial resulting in a 35-day partial government shutdown," *id*. at 47. Our job under § 8005 is the more modest one of determining whether a proposed item of DoD spending was presented to Congress, and "denied" by it, during DoD's appropriations process, and all agree that that did not occur here. Any action that Congress took in the separate appropriations process

concerning DHS would create a "denial" as to DoD only if there is some language in the DHS Appropriations Act that somehow extends that Act's denial vis-à-vis DHS to *other* agencies.[21]  But the only relevant limitation in that Act that even arguably extends beyond DHS is a prohibition on the construction of "pedestrian fencing" in five designated parks and refuge areas, *see* Pub. L. No. 116-6, Div. A, § 231, 133 Stat. at 28 ("None of the funds made available by this Act *or prior Acts* are available" for such construction) (emphasis added), but no one contends that this limitation is being violated here.  Beyond that, it is not our role under § 8005 to give effect to a perceived big-picture "denial" that we think is implicit in the "real-world events in the months and years leading up to the 2019 appropriations bills." *Sierra Club v. Trump*, 929 F.3d at 691.

## B

The majority alternatively holds that, even if Congress did not deny the "item" in question, the transfers were still unlawful because the requirements invoked by the Secretary here to justify the transfers were neither "military" in nature nor "unforeseen."  *See* Maj. Opin. at 37–46.  The majority is wrong on both counts.

---

[21] Nor is this a situation in which DoD is invoking the transfer authority to move funds *into DHS's appropriations*.  The destination item here involves the authority under § 284 for *DoD* to undertake "[c]onstruction of roads and fences" along the border.  10 U.S.C. § 284(b)(7).  Indeed, § 8045(a) of the DoD Appropriations Act specifically forbids DoD from "transferr[ing] to any other department" any funds available to it for "counter-drug activities," except "as specifically provided in an appropriations law."  132 Stat. at 3012.

**1**

The DoD's provision of support for counterdrug activities under § 284 is plainly a "military" requirement within the meaning of § 8005. As the majority notes, § 8005 does not define the term "military," *see* Maj. Opin. at 42, and so the word should be given its ordinary meaning. *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). In common parlance, the word "military" simply means "[o]f, relating to, or involving the armed forces." *Military*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Military*, AMERICAN HERITAGE DICTIONARY (5th ed. 2018) ("Of, relating to, or characteristic of members of the armed forces"; "Performed or supported by the armed forces"); *Military*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1961) ("WEBSTER'S THIRD") ("of or relating to soldiers, arms, or war"; "performed or made by armed forces"). Because Congress, by statute, has formally assigned to DoD the task of providing "support for the counterdrug activities" of other departments through the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States," 10 U.S.C. § 284(a), (b)(7), that task "relat[es] to" and "involv[es] the armed forces," and is "[p]erformed or supported by the armed forces." As such, it is a "military" task.[22]

---

[22] The majority is wrong in suggesting that the Government has never argued that the construction projects "are related to the use of soldiers." *See* Maj. Opin. at 42. The Government affirmatively argues in its brief that "the *military* may be, and here is, required to assist in combatting" drug trafficking under § 284 (emphasis added). Moreover, the evidence submitted to the district court showed that the construction was to be carried out by the U.S. Army Corps of Engineers. Even granting that most of that agency's employees are civilians, the agency remains within the

Two other textual clues support this conclusion. First, the chapter heading for the chapter of Title 10 that includes § 284 is entitled, "*Military Support* for Civilian Law Enforcement Agencies," thereby further confirming that the support authorized to be provided under § 284 counts as *military* support. *See Henderson v. Shinseki*, 562 U.S. 428, 439 (2011) (title of subchapter aided in resolving ambiguity concerning provision in that subchapter). Second, the DoD Appropriations Act *itself* classifies the activities carried out under § 284 as "military" activities. The Act recognizes, on its face, that funds appropriated for "Drug Interdiction and Counter-Drug Activities, Defense," may be transferred *out* of that appropriation under § 8005. *See* DoD Appropriations Act, § 8007(b)(6), 132 Stat. at 3000 (exempting transfers of funds out of this appropriation from an otherwise applicable prohibition on transferring funds under § 8005). Given that the transfer authority granted by § 8005 applies *only* to "funds made available in this Act to the Department of Defense for *military* functions (except military construction)," 132 Stat. at 2999 (emphasis added), the Act necessarily deems funds in the "Drug Interdiction and Counter-Drug Activities, Defense" appropriation to be for "military functions." The majority's insistence that such counter-drug functions are not "military" activities thus flatly contradicts the statute itself.

The majority is also wrong in relying on the distinctive definition given in 10 U.S.C. § 2801 for the phrase "military construction." *See* Maj. Opin. at 44–45. At the outset, this makes little sense, because § 8005 states on its face that it applies only to transfers between appropriations for "military *functions*" and *not* for "military construction." 132 Stat.

---

Department of the Army and is led by a military officer. *See* 10 U.S.C. §§ 7011, 7036, 7063.

at 2999 (emphasis added). Indeed, Congress has long handled appropriations for "military construction" separately from those for military functions, and it did so again for Fiscal Year 2019: appropriations for "military construction" were made in a *separate* appropriations statute enacted one week before the DoD Appropriations Act. *See* Pub. L. No. 115-244, Div. C, Title I, 132 Stat. 2897, 2946 (2018). Of all the terms to consider in construing "military" for purposes of the DoD Appropriations Act, "military construction" may be the least appropriate.

Moreover, the majority fails to recognize that "military construction" is a term of art, with its own unique definition, and it therefore provides an inapt guide for trying to discern the meaning of "military" in a different phrase in a different context. Absent a special definition, one would have thought that the phrase "military construction" embraces any "construction" that is performed by or for the "military." *See supra* at 94 (quoting definitions of "military"). But § 2801 more narrowly defines "military construction" as generally referring only to "construction . . . carried out with respect to a military installation . . . or any acquisition of land or construction of a defense access road," and it defines a "military installation" as a "base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department." 10 U.S.C. § 2801(a), (c)(4). Nothing about this distinctive definition of "military construction" creates or reflects a general gloss on the word "*military*," much less does it suggest that the ordinary meaning of "military" in other contexts carries all of this baggage with it. The majority's effort to import the specific features of this term of art ("military construction") into one of the *component* words of that phrase makes neither linguistic nor logical sense, and it is therefore irrelevant

whether or not the § 284 activities at issue here meet that definition.[23]

The majority also contends that, even if the activities involved here are "military" ones, they still did not involve "military *requirements*." *See* Maj. Opin. at 45–45 (emphasis added). That is wrong. The term "requirement" is not limited to those tasks that DoD is *compelled* to undertake, nor is it limited to those actions that DoD undertakes *for itself*. The term also includes "something that is wanted or needed" or "something called for or demanded," *see Requirement*, WEBSTER'S THIRD; *see also Requirement*, BLACK'S LAW DICTIONARY (11th ed. 2019) (listing, as an alternative definition, "[s]omething that someone needs or asks for"), and that readily applies to the request for assistance that was made to DoD in this case under § 284. We should be

---

[23] The majority notes that the phrase "military construction" is used in 10 U.S.C. § 2808, which "[t]he Federal Defendants have also invoked . . . to fund other border wall construction projects on the southern border." Maj. Opin. at 44. But that statute was invoked only with respect to a *different* set of funds to be used for activities that Defendants contend *do* qualify as "military construction" for purposes of DoD's additional construction authority after a declaration of a national emergency. *See* 10 U.S.C. § 2808(a). The States also challenged the use of that separate set of funds in their suit below, but these challenges form no part of the Rule 54(b) partial judgment now before us, and any issue concerning them has no bearing on the distinct questions presented here. Relatedly, the President's proclamation declaring such an emergency is relevant only to that other set of funds and has no legal bearing on the Secretary's transfers here. *Cf.* Maj. Opin. at 12–13, 39 (discussing the declaration). And Congress's joint resolutions attempting to terminate the emergency declaration, *see id.* at 39, are irrelevant for the further reason that they were vetoed and never became law. *See id.* at 12 n.3; *see also* 50 U.S.C. § 1622(a)(1) (congressional termination requires "enact[ing] into law a joint resolution terminating the emergency"); *Chadha*, 462 U.S. at 946–48.

cautious before adopting an unduly crabbed reading of what constitutes a military "requirement," especially when Congress has explicitly assigned a task to the military, as it did in § 284. *Cf. Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008) ("great deference" is generally given to the military's judgment of the importance of a military interest).

Accordingly, DoD's provision of support to DHS under § 284 involves a "military requirement[]" within the meaning of § 8005. The majority errs in concluding otherwise.

**2**

The majority is likewise wrong in contending that DoD's need to provide assistance to DHS for these projects under § 284 was not "unforeseen" within the meaning of § 8005. *See* Maj. Opin. at 37–42.

Once again, the majority fails to construe § 8005 against the backdrop of the appropriations process. In ordinary usage, "foresee" means "to see (as a future occurrence or development) as *certain or unavoidable*: look forward to *with assurance*." *Foresee*, WEBSTER'S THIRD (emphasis added). In the context of the appropriations process, an "item" has been *seen as certain or unavoidable* only if it is reflected in DoD's budgetary submissions or in Congress's review and revision of those submissions. Conversely, it is "unforeseen" if it is *not* reflected as an item in any of those materials. The Red Book confirms this understanding. In explaining the need for reprogramming, it quotes the Deputy Defense Secretary's statement that reprogramming allows agencies to respond to "unforeseen changes" that *are not reflected in the*

*"budget estimates" on which the final appropriations are based*:

> "The defense budget does not exist in a vacuum. There are forces at work to play havoc with even the best of budget estimates. The economy may vary in terms of inflation; political realities may bring external forces to bear; fact-of-life or programmatic changes may occur. The very nature of the lengthy and overlapping cycles of the budget process poses continual threats to the integrity of budget estimates. Reprogramming procedures permit us to respond to these unforeseen changes and still meet our defense requirements."

RED BOOK, 2016 WL 1275442, at *5 (citation omitted). As the GAO has explained, the question is not whether a particular item "was unforeseen *in general*"; "[r]ather, the question under section 8005 is whether it was unforeseen at the time of the budget request and enactment of appropriations." U.S. GAO, B-330862, *Department of Defense—Availability of Appropriations for Border Fence Construction* at 7–8 (Sept. 5, 2019) (emphasis added), https://www.gao.gov/assets/710/701176.pdf. Under this standard, the items at issue here were "unforeseen"; indeed, the States do not contend that funding for the DoD assistance at issue here was ever requested, proposed, or considered during DoD's appropriations process.

In reaching a contrary conclusion, the majority makes two legal errors. First, it makes precisely the mistake the GAO identified, namely, it examines whether the "problem" (drug

smuggling) and the "solution" (a border barrier) were foreseen *in general*, rather than whether they were foreseen *within the appropriations process*. *See* Maj. Opin. at 40–41. Thus, in concluding that DoD's need to provide assistance under § 284 was not "unforeseen," the majority relies on the general premises that "the conditions at the border" have been known to be a problem since at least the 1960s and that "the President's position that a wall was needed to address those conditions" was publicly known well before he took office. *Id*. at 35, 37. Second, by rejecting the view that "foreseen" is equivalent to "known" or that it requires "actual knowledge," *id*. at 39–40, the majority effectively rewrites the statute as if it said "*foreseeable*" rather than "foreseen." Contrary to the majority's view that requiring foreknowledge would "effectively eliminate[] any element of anticipation or expectation," *see id*. at 39, "foreseen" is commonly understood to be interchangeable with "foreknown." *See*, *e.g.*, *Foresee*, WEBSTER'S THIRD (listing "foreknow" as a synonym). By wrongly shifting the focus away from whether a current need matches up with the assumptions on which the budget and appropriations were based, the majority's errors would preclude DoD from making transfers based on *any* factors that were anticipated within the larger society and, as a result, would essentially reduce the transfer power in § 8005 to a nullity.

**3**

DoD's transfers here were thus based on "military" "requirements" that were "unforeseen" within the meaning of § 8005. The States do not otherwise contest the Secretary's determination that the items in question were "higher priority" items than "those for which originally

appropriated." This element of § 8005's first proviso was therefore also satisfied here.

## C

The States contend that, even if the transfers complied with the conditions in § 8005, the particular transfer that was made under § 9002, *see supra* at 52–53, did not satisfy that section's additional requirement that transfers under that section be made only "between the appropriations or funds made available to the Department of Defense *in this title*." 132 Stat. at 3042 (emphasis added). According to the States, the appropriations under that title are only for "Overseas Contingency Operations," and the transferee appropriation does not count. This argument is plainly incorrect. The separate title in the DoD Appropriations Act that is entitled "Overseas Contingency Operations" contains within it a specific appropriation for "Drug Interdiction and Counter-Drug Activities, Defense," 132 Stat. at 3042, which is the appropriation to which the funds were transferred. The fact that the amounts in that fund are designated as funds for "Overseas Contingency Operations/Global War on Terrorism" *for purposes of calculating budgetary caps* under § 251(b)(2)(A)(ii) of the Balanced Budget and Emergency Deficit Control Act of 1985, 2 U.S.C. § 901(b)(2)(A)(ii), does not thereby impose an additional limitation on the purposes for which such funds may be expended.

## V

Based on the foregoing, I conclude that at least California has Article III standing, but that the States lack any cause of action to challenge these § 8005 and § 9002 transfers. Alternatively, if the States did have a cause of action, their

102        STATE OF CALIFORNIA V. TRUMP

claims fail on the merits as a matter of law because the transfers complied with the limitations in § 8005 and § 9002. I therefore would reverse the district court's partial grant of summary judgment to the States and would remand the matter with instructions to grant the Government's motion for summary judgment on this set of claims. Because the majority concludes otherwise, I respectfully dissent.



Home : Conservation : SSC

# Species of Special Concern

▼  **What is a "Species of Special Concern"?**

A Species of Special Concern (SSC) is a species, subspecies, or distinct population of an animal* native to California that currently satisfies one or more of the following (not necessarily mutually exclusive) criteria**:

- is extirpated from the State or, in the case of birds, is extirpated in its primary season or breeding role;
- is listed as Federally-, but not State-, threatened or endangered; meets the State definition of threatened or endangered but has not formally been listed;
- is experiencing, or formerly experienced, serious (noncyclical) population declines or range retractions (not reversed) that, if continued or resumed, could qualify it for State threatened or endangered status;
- has naturally small populations exhibiting high susceptibility to risk from any factor(s), that if realized, could lead to declines that would qualify it for State threatened or endangered status.

*for the purposes of this discussion, "animal" means fish, amphibian, reptile, bird and mammal

**criteria for fishes are similar except that Federally listed taxa are not defined as SSCs

▸  **What important factors contribute to a species being designated as an SSC?**

▸  **How does the Department use the SSC designation?**

▸  **How are SSCs addressed under the California Environmental Quality Act?**

▸  **Who is responsible for developing and maintaining SSC documents and lists?**

▸  **What procedures are used to designate SSCs?**

▸  **What elements are found in an SSC document?**

Cited in State of California v. Trump
No: 19cv162-5 archived on June 22, 2020

> ▶ **How does the Department add or remove animals from the SSC lists?**

> ▶ **What is the relationship between SSCs and the California Wildlife Action Plan?**

## Species Lists and Accounts

 **Mammals**

 **Birds**

 **Amphibians & Reptiles**

 **Fishes**

*cited in State of California v. Trump No. 19-16299 archived on June 22, 2020*

### Related Information

- Special Animals List (PDF)
- California Natural Diversity Database

---

### About CDFW

- ▶ Budget
- ▶ Organizational Structure
- ▶ Strategic Vision
- ▶ Tribal Affairs

### Opportunities

- ▶ Employment
- ▶ Grants
- ▶ Public Meetings and Notices
- ▶ Vendors/Contractors
- ▶ Volunteer

### Get in Touch

- ▶ Contact CDFW
- ▶ Law Enforcement
- ▶ News Room
- ▶ Public Records Act Requests
- ▶ Regions

### Related Agencies

- ▶ Fish and Game Commission
- ▶ Wildlife Conservation Board
- ▶ More related organizations

cited in State of California v. Trump
No. 19-16299 archived on June 22, 2020

📖 Register to Vote        Accessibility        Conditions of Use

Privacy Policy        Site Map        Contact Us

© 2020 State of California



Get Email Updates | Contact Us | Comunicarse con Nosotros

     

Search

| About CBP | Newsroom | Travel | Trade | Border Security | Careers |

HOME >> BORDER SECURITY >> ALONG US BORDERS

**Border Security**

At Ports of Entry

Along U.S. Borders

Border Patrol History

Border Patrol Overview

Special Operations

Border Patrol Sectors

Strategy

Border Wall System

From the Air and Sea

International Initiatives

Canine

# Border Patrol History

Since its inception in 1924, the U.S. Border Patrol has had a proud history of service to our nation. Although enormous changes have affected nearly every aspect of its operations from its earliest days, the basic values that helped shape the Patrol in the early years; professionalism, honor, integrity, respect for human life and a shared effort, have remained.

## The Origins of the Border Patrol

Mounted watchmen of the U.S. Immigration Service patrolled the border in an effort to prevent illegal crossings as early as 1904, but their efforts were irregular and undertaken only when resources permitted. The inspectors, usually called Mounted Guards, operated out of El Paso, Texas. Though they never totaled more than seventy-five, they patrolled as far west as California trying to restrict the flow of illegal Chinese immigration.

In March 1915, Congress authorized a separate group of Mounted Guards, often referred to as Mounted Inspectors. Most rode on horseback, but a few operated cars and even boats. Although these inspectors had broader arrest authority, they still largely pursued Chinese immigrants trying to avoid the Chinese exclusion laws. These patrolmen were Immigrant Inspectors, assigned to inspection stations, and could not watch the border at all

**RELATED CONTENT:**

**The U.S. Border Patrol's Early Rank and Time-in-Service Insignia**

**The Father of the U.S. Border Patrol**

## Chiefs

Chiefs of the U.S. Border Patrol - Document is currently being updated. New Version available soon.

**Newton-Azrak**

Cited in State of California v. Trump No. 19-16299 archived on June 22, 2020

cited in State of California v. Trump
No. 19-16299 archived on June 22, 2020

Program

Human Trafficking

times. Military troops along the southwest border performed intermittent border patrolling, but this was secondary to "the more serious work of military training." Aliens encountered illegally in the U.S. by the military were directed to the immigration inspection stations. Texas Rangers were also sporadically assigned to patrol duties by the state, and their efforts were noted as "singularly effective."



Always referred to as "the first Immigration Border Patrolman", Jeff Milton (left) poses outside the Birdcage Theatre in Tombstone, Arizona. Milton became a Texas Ranger in 1879 and later joined the U.S. Immigration Service, retiring in 1932. Milton died at his home in 1947 and according to his wishes, his ashes were scattered in the Arizona desert.

Customs violations and intercepting communications to "the enemy" seem to be of a greater concern than enforcing immigration regulations in the early years of the twentieth century. Agencies charged with inspecting people and goods entering and leaving the U.S. noticed that their efforts were totally ineffective without border enforcement between inspection stations. After 1917, a higher head tax and literacy requirement imposed for entry prompted more people to try to enter illegally.

In 1918, Supervising Inspector Frank W. Berkshire wrote to the Commissioner-General of Immigration expressing his concerns about the lack of a coordinated, adequate effort to enforce immigration and customs laws along the border with Mexico.

## Prohibition and Border Control

The Eighteenth Amendment to the United States Constitution, prohibiting the importation, transport,

The Story of Theodore L. Newton, Jr. and George F. Azrak

About the Newton-Azrak Award

Newton-Azrak 50th Anniversary



manufacture or sale of alcoholic beverages went into effect at midnight on January 16, 1920. With the passage of this constitutional amendment and the numerical limits placed on immigration to the United States by the Immigration Acts of 1921 and 1924, border enforcement received renewed attention from the government. The numerical limitations resulted in people from around the world to try illegal entry if attempts to enter legally failed. Therefore, the mission of the Border Patrol became more important to the U.S. Government.

These events set the wheels of change into motion. On May 28, 1924, Congress passed the Labor Appropriation Act of 1924, officially establishing the U.S. Border Patrol for the purpose of securing the borders between inspection stations. In 1925 its duties were expanded to patrol the seacoast.

## The Early Years

 

Officers were quickly recruited for the new positions. The Border Patrol expanded to 450 officers. Many of the early agents were recruited from organizations such as the Texas Rangers, local sheriffs and deputies, and appointees from the Civil Service Register of Railroad Mail Clerks.

The government initially provided the agents a badge and revolver. Recruits furnished their own horse and saddle, but Washington supplied oats and hay for the horses and a $1,680 annual salary for the agents. The agents did not have uniforms until 1928.

cited in State of California v. Trump No. 19-16299 archived on June 22, 2020



In 1932 the Border Patrol was placed under the authority of two directors, one in charge of the Mexican border office in El Paso, the other in charge of the Canadian border office in Detroit. Liquor smuggling was a major concern because it too often accompanied alien smuggling. The majority of the Border Patrol was assigned to the Canadian border. Smuggling was commonplace along the Mexican border also. Whiskey bootleggers avoided the bridges and slipped their forbidden cargo across the Rio Grande by way of pack mules along the Southern border.



President Franklin D. Roosevelt combined the Bureau of Immigration and the Bureau of Naturalization into the Immigration and Naturalization Service in 1933. The first Border Patrol Academy opened as a training school at Camp Chigas, El Paso, in December 1934. Thirty-four trainees attended classes in marksmanship and horsemanship.

Although horses remained the transportation of choice for many years, by 1935, the Border Patrol began using motorized vehicles with radios. Rugged terrain and the need for quick, quiet transportation guaranteed that horses would remain essential transportation to the Patrol even to the present day.

## The War Years

The workload and accomplishments of the Patrol remained fairly

cited in State of California v. Trump
No. 19-16299 archived on June 22, 2020



constant until 1940, when the Immigration Service was moved from the Department of Labor to the Department of Justice. An additional 712 agents and 57 auxiliary personnel brought the force to 1,531 officers. Over 1,400 people were employed by the Border Patrol in law enforcement and civilian positions by the end of WWII. During the war, the Patrol provided tighter control of the border, manned alien detention camps, guarded diplomats, and assisted the U.S. Coast Guard in searching for Axis saboteurs. Aircraft proved extremely effective and became an integral part of operations.

## Border Patrol Role Expands

Legislation in 1952 codified and carried forward the essential elements of the 1917 and 1924 acts. The same year, Border Patrol agents were first permitted to board and search a conveyance for illegal immigrants anywhere in the United States. For the first time, illegal entrants traveling within the country were subject to arrest.

As illegal immigration continued along the Mexican border, sixty-two Canadian border units were transferred south for a large-scale repatriation effort. In 1952, the government airlifted 52,000 illegal immigrants back to the Mexican interior. The program was terminated after it ran out of funds during its first year. The Mexican government offered train rides into the Mexican interior for nationals being returned from the San Antonio and Los Angeles districts, but this program was halted after only five months. Throughout the early 1950s, a special taskforce of 800 Border Patrol agents was assigned by the United States Attorney General to round up and ship home thousands of illegal immigrants in southern California. The task force moved to the lower Rio Grande valley, then to Chicago and other interior cities. The Border Patrol began expelling adult Mexican males by boatlift from Port Isabel, Texas, to

cited in State of California v. Trump
No. 19-16299 archived on June 22, 2020

Vera Cruz in September 1954. The project was discontinued two years later after nearly 50,000 illegal aliens had been returned home. Various other flights, train trips, and bus trips originated along the border and terminated in the Mexican interior. In spite of the major successes in repatriation, many deportees simply turned around and recrossed the seriously undermanned border. Repatriation programs proved extremely expensive and were phased out primarily because of cost.



Significant numbers of illegal aliens began entering the U.S. on private aircraft in the late 1950s. In cooperation with other federal services, the Border Patrol began tracking suspect flights. During the Cuban missile crisis of the early 1960s, Cuban defectors living in Florida flew aircraft out over the ocean in an effort to harass their former homeland. The American government made this harassment illegal, and assigned the Border Patrol to prevent unauthorized flights. The Patrol added 155 officers, but discharged 122 of them when the crisis ended in 1963.

The early 1960s also witnessed aircraft-hijacking attempts and President John F. Kennedy ordered Border Patrol agents to accompany domestic flights to prevent takeovers. The Miami Sector of the Border Patrol coordinated the effort. By that time the business of alien smuggling began to involve drug smuggling also. The Border Patrol assisted other agencies in intercepting illegal drugs from Mexico.

## Today's Border Patrol

The 1980s and 1990s saw a tremendous increase of illegal migration to America. The Border Patrol responded with increases in manpower and the implementation of modern technology. Infrared night-vision scopes, seismic sensors, and a modern computer processing system helped the

cited in State of California v. Trump No. 19-16299 archived on June 22, 2020

Patrol locate, apprehend, and process those crossing into the U.S. illegally.

In an effort to bring a level of control to the border, Operation "Hold the Line" was established in 1993 in El Paso, and proved an immediate success. Agents and technology were concentrated in specific areas, providing a "show of force" to potential illegal border crossers. The drastic reduction in apprehensions prompted the Border Patrol to undertake a full-scale effort in San Diego, California, which accounted for more than half of illegal entries. Operation "Gatekeeper" was implemented in 1994, and reduced illegal entries in San Diego by more than 75% over the next few years. A defined national strategic plan was introduced alongside Operation Gatekeeper and set out a plan of action for the Border Patrol into the future. With illegal entries at a more manageable level, the Patrol was able to concentrate on other areas, such as establishing anti-smuggling units and search and rescue teams such as BORSTAR. The Border Safety Initiative (BSI) was created in 1998 with a commitment by the Border Patrol and the promised cooperation of the Mexican government.

Homeland security became a primary concern of the nation after the terrorist attacks of September 11, 2001. Border security became a topic of increased interest in Washington. Funding requests and enforcement proposals were reconsidered as lawmakers began reassessing how our nation's borders must be monitored and protected. On March 1, 2003, the Department of Homeland Security (DHS) was established, and the U.S. Border Patrol became part of U.S. Customs and Border Protection, a component of DHS.

The U.S. Border Patrol continues its efforts to control our nation's borders. The 21st century promises to provide enormous leaps in technology that can be applied to border enforcement. The modernization of the Patrol advances at a dizzying rate as new generations of agents develop innovative ways to integrate the contemporary technology into field operations. New and specialized

technology is being created within the Border Patrol that holds increasing potential to assist agents in fulfilling the mission of the Patrol. Additionally, cooperation with neighboring countries increases border safety and law enforcement efforts. The future of the U.S. Border Patrol promises to be as exciting and interesting as its past, and will continue to echo the motto that agents have lived by since 1924.

Honor First.

Last modified: October 5, 2018

Tags:  **U.S. Border Patrol,**  **History**

 Share This Page.

About CBP        Newsroom        Travel

cited in State of California v. Trump
No. 19-16299 archived on June 22, 2020

Trade        Border Security        Careers

Accessibility        Accountability        DHS Components        FOIA        Forms        Inspector General

No FEAR Act        Privacy        Site Policies        The White House        USA.gov        Plug-ins



# Visclosky Denies Request to Use Defense Funds for Unauthorized Border Wall

March 27, 2019 | Press Release

WASHINGTON – House Defense Appropriations Subcommittee Chairman Pete Visclosky (D-IN) today denied the Department of Defense's request to use Defense funds for an unauthorized wall on the southern border of the United States.

The U.S. Constitution gives Congress the power to appropriate funds for designated and authorized purposes, and the reprogramming process has been historically utilized to allow Congress to maintain this Constitutional responsibility and oversight of Executive Branch requests to adjust funds to meet operational needs.

However, the Department of Defense has indicated that – for the first time ever – it intends to move forward with the reprogramming action despite the Appropriations Committee opposing the reprogramming.

**"This unprecedented action will clearly be a consideration as the Committee discusses the entirety of the Department's budget request, including its current transfer authority,"** Visclosky said.

The full text of the letter to Under Secretary of Defense David L. Norquist is available below. A PDF is available here.

Dear Mr. Secretary:

The Committee has received and reviewed the requested reprogramming action, FY 19-01RA, submitted to the Committee on March 25, 2019, which proposes the transfer of $1 billion from fiscal year 2019 Military Personnel, Army and Army Reserve accounts to the Drug Interdiction and Counter Drug Activities account for the purposes of erecting a wall on the U.S. southern border.

The Committee denies the request.

The Defense Appropriations Act of 2019 was enacted on September 28, 2018, and inherent in the enactment is the specific allocation of appropriations and the execution of funds as called for under the Constitution between the Congress and the Executive Branch. Article 1 states, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law". The reprogramming transmitted by the Department denies the Congress and the Committee on Appropriations those stated Constitutional prerogatives; these funds were neither requested nor appropriated for the activities described in the reprogramming. With this unilateral action, the historic and unprecedented comity that has existed between the Committee and the Department has been breached.

Sincerely,

/s/

Peter J. Visclosky

cited in State of California v. Trump No. 19-16299 archived on June 22, 2020

Chairman

Defense Subcommittee

### ###

**Subcommittees:**
Defense (116th Congress)
116th Congress

cited in State of California v. Trump
No. 19-16299 archived on June 22, 2020



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

B-330862

September 5, 2019

Congressional Requesters

Subject:  *Department of Defense—Availability of Appropriations for Border Fence*
*Construction*

This responds to your request for our legal opinion on whether the Department of
Defense (DOD) may transfer and use its fiscal year 2019 appropriations for the
purpose of constructing fences at the southern border of the United States.[1]
Specifically, you asked (1) whether DOD's transfer of amounts to its Drug
Interdiction and Counter-Drug Activities, Defense, account for border fence
construction was consistent with DOD's transfer authority; (2) whether DOD's use of
its Drug Interdiction and Counter-Drug Activities, Defense, account for border fence
construction was consistent with appropriations law principles in light of amounts
previously appropriated to DOD's Operation and Maintenance, Defense-Wide,
account for installing fences; and (3) whether DOD's reliance on the Department of
Homeland Security (DHS) to exercise its authority to waive certain laws requiring
environmental studies to facilitate DOD border fence construction was consistent
with a certain prohibition on the use of DOD's fiscal year 2019 appropriations.

As discussed below, we conclude that DOD's transfer of amounts into its Drug
Interdiction and Counter-Drug Activities, Defense, account for border fence
construction was consistent with DOD's statutorily enacted transfer authority, and
that use of these amounts for the purpose of border fence construction was
permissible under various statutory provisions.  We also conclude that DHS waivers
of legal requirements did not violate a prohibition on use of DOD's appropriations.
Our opinion applies the legal provisions to the facts before us and does not address
or draw conclusions regarding border fencing as a policy matter.

---

[1] Letter from Patrick Leahy, Vice Chairman, Committee on Appropriations, United
States Senate; Richard J. Durbin, Vice Chairman, Subcommittee on Defense,
Committee on Appropriations, United States Senate; and Brian Schatz, Ranking
Member, Subcommittee on Military Construction, Veterans Affairs, and Related
Agencies, Committee on Appropriations, United States Senate, to the Comptroller
General (March 11, 2019).

Consistent with our practice for legal opinions, we requested and received from DOD pertinent factual information and its legal views on this matter. GAO, *Procedures and Practices for Legal Decisions and Opinions*, GAO-06-1064SP (Washington, D.C.: Sept. 2006), *available at* www.gao.gov/products/GAO-06-1064SP; Letter from Managing Associate General Counsel, GAO, to General Counsel, DOD (June 10, 2019); Letter from Deputy General Counsel, Fiscal, DOD, to Managing Associate General Counsel, GAO (July 3, 2019) (Response Letter).[2]

BACKGROUND

Statutory authority for border fence construction

DHS has statutory authority to control and guard the borders of the United States. 8 U.S.C. § 1103(a)(5). Specifically, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), as amended, requires DHS to take necessary actions to install physical barriers and roads in the vicinity of the border of the United States to deter illegal crossings in areas of high illegal entry. Pub. L. No. 104-208, div. C, title I, § 102(a), 110 Stat. 3009, 3009-546, 3009-554 (Sept. 30, 1996), *as amended by* Department of Homeland Security Appropriations Act, 2008, Pub. L. No. 110-161, div. E, title V, § 564, 121 Stat. 1844, 2042, 2090 (Dec. 26, 2007). The REAL ID Act of 2005 amended IIRIRA by expanding the authority of the Secretary of DHS to waive all legal requirements determined necessary to ensure expeditious construction of barriers and roads along the border. Pub. L. No. 109-13, div. B, title I, § 102, 119 Stat. 231, 302, 306 (May 11, 2005).

DHS has delegated authority to secure the borders to the Customs and Border Protection's (CBP) Border Patrol. 6 U.S.C. § 211(e)(3). Border Patrol divides responsibility for border security geographically among nine sectors along the southern border as follows: San Diego; El Centro; Yuma; Tucson; El Paso; Big Bend; Del Rio; Laredo; and Rio Grande Valley. GAO, *CBP Is Evaluating Designs and Locations for Border Barriers But Is Proceeding Without Key Information*, GAO-18-614 (Washington, D.C.: July 2018), at 8. CBP receives an annual appropriation for its construction activities, among other purposes, in its Procurement, Construction, and Improvements account. *See, e.g.*, Department of Homeland

---

[2] Of the three questions addressed herein, one of the questions—that is, whether DOD's transfer of amounts to its Drug Interdiction and Counter-Drug Activities, Defense, account for border fence construction was consistent with DOD's transfer authority—is the subject of ongoing litigation in federal courts. *See, e.g.*, *Donald J. Trump, et al. v. Sierra Club, et al.*, 588 U.S. ___(2019) (granting application to stay a permanent injunction ordered by the District Court). In response to our request to DOD for factual information and its legal views on the three questions asked of the Comptroller General, DOD stated that the government's pleadings in *Sierra Club* reflect DOD's legal views, and provided us with copies of the government's pleadings, administrative records, and declarations filed in *Sierra Club*.

Security Appropriations Act, 2019, Pub. L. No. 116-6, div. A, title II, 133 Stat. 13, 15, 18 (Feb. 15, 2019).

DOD has statutory authority to provide support to civilian law enforcement agencies, such as DHS. *See* subtitle A, part I, chapter 15 of title 10 of the United States Code (Military Support for Civilian Law Enforcement Agencies). For example, DOD may train federal civilian law enforcement officials and make military equipment available to them. 10 U.S.C. §§ 272, 273.

DOD also has authority under section 284 of title 10 of the United States Code (section 284) to provide support for the counter-drug activities of another department of the federal government if that support is requested by the official who has responsibility for the counter-drug activities. 10 U.S.C. § 284(a)(1)(A). One of the "purposes for which [DOD] may provide support" includes "[c]onstruction of . . . fences . . . to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284(b)(7).

DOD receives an annual appropriation for its counter-drug activities in its Drug Interdiction and Counter-Drug Activities, Defense, account. *See, e.g.*, Department of Defense Appropriations Act, 2019, Pub. L. No. 115-245, div. A, title VI, 132 Stat. 2981, 2982, 2997 (Sept. 28, 2018). In fiscal years 2006 and 2008, DOD received line-item appropriations in its Operation and Maintenance, Defense-Wide, account for support to DHS, including "installing fences." Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006, Pub. L. No. 109-234, title V, 120 Stat. 418, 480 (June 15, 2006); Department of Defense Appropriations Act, 2008, Pub. L. No. 110-116, div. A, title II, 121 Stat. 1295, 1299 (Nov. 13, 2007).

<u>Executive Order, Appropriations for Fiscal Year 2019, and National Emergency</u>

On January 25, 2017, the President ordered executive departments and agencies "to deploy all lawful means to secure the Nation's southern border." Exec. Order No. 13767, *Border Security and Immigration Enforcement Improvements*, 82 Fed. Reg. 8793 (Jan. 25, 2017). The President also declared it the policy of the executive branch to secure the southern border through "immediate construction of a physical wall," and defined "wall" as "a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier." *Id.* at 8793–8794.

Consistent with the executive order, the President's Budget for Fiscal Year 2019, transmitted in February 2018, requested $1.8 billion in appropriations for CBP Procurement, Construction, and Improvements, with $1.6 billion of that budgeted for border security assets and infrastructure. *Appendix, Budget of the United States Government for Fiscal Year 2019*, (Feb. 2018), at 496–497, *available at* https://www.whitehouse.gov/wp-content/uploads/2018/02/appendix-fy2019.pdf (last visited Aug. 5, 2019). On January 6, 2019, the Office of Management and Budget notified members of the House and Senate Appropriations Committees that the

President was requesting a total of $5.7 billion in fiscal year 2019 amounts for CBP to construct a steel barrier for the southwest border.  *See, e.g.*, Letter from Acting Director, Office of Management and Budget, to the Chairman of the Committee on Appropriations, United States Senate (Jan. 6, 2019) (OMB Letter), at 1.  CBP was ultimately appropriated $2.5 billion for Procurement, Construction, and Improvements.  Pub. L. No. 116-6, 133 Stat. at 18.  Of the total amount available for CBP Procurement, Construction, and Improvements, $1.375 billion was "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector."  *Id.* § 230(a)(1).

With respect to DOD activities, the President's Budget did not specifically request anything for construction of fences at the border, but requested $787.5 million for Drug Interdiction and Counter-Drug Activities, Defense.  *Appendix*, *Budget for Fiscal Year 2019*, at 236.  In September 2018, Congress appropriated to DOD for fiscal year 2019 $881.5 million for Drug Interdiction and Counter-Drug Activities, Defense. Pub. L. No. 115-245, 132 Stat. at 2997.  In the same appropriations act, Congress in section 8005 granted DOD authority to transfer up to $4 billion between its appropriations, on the condition that " . . . such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item . . . has been denied by the Congress . . . ."  *Id.* § 8005 (section 8005).

After appropriations were enacted, on February 15, 2019 the President officially declared that a national emergency exists at the southern border of the United States.  Proclamation No. 9844, *Declaring a National Emergency Concerning the Southern Border of the United States*, 84 Fed. Reg. 4949 (Feb. 15, 2019).  A fact sheet published by the White House announced plans for DOD to provide support to DHS by constructing fences to block drug smuggling corridors pursuant to DOD's authority under section 284.[3]  White House, Fact Sheets: *The Funds Available to Address the National Emergency at Our Border* (Feb. 26, 2019), *available at* https://www.whitehouse.gov/briefings-statements/funds-available-address-national-emergency-border/ (last visited Aug. 5, 2019).  To fund DOD's efforts, the announcement stated that DOD would transfer up to $2.5 billion to DOD's Drug Interdiction and Counter-Drug Activities, Defense, account from other DOD accounts using DOD's transfer authority under section 8005.  *Id.*

Fiscal Year 2019 activities with respect to DOD border fence construction

On February 25, 2019, DHS requested that DOD provide assistance to secure the southern border by, among other things, constructing fences to block drug-

---

[3] As noted above, section 284 authorizes DOD to provide support for the counter-drug activities of another department including "[c]onstruction of . . . fences . . . to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284(b)(7).

smuggling corridors across the international boundary between the United States and Mexico pursuant to DOD's authority under section 284.  Response Letter, Encl. 1.  DHS requested DOD's assistance in four particular sectors:  Yuma, El Paso, El Centro, and Tucson.  *Id.*

DOD agreed to provide support to DHS, and in March and May transferred $1.8 billion into its Drug Interdiction and Counter-Drug Activities, Defense, account using its authority under section 8005.[4]  Response Letter, Encl. 1.  DOD awarded contracts for border fence construction for locations in the Yuma, El Paso, El Centro, and Tucson sectors. *See, e.g.,* DOD, *Contracts for April 9, 2019*, Release No. CR-066-19, *available at* https://dod.defense.gov/News/Contracts/Contract-View/Article/1809986/ (last visited Aug. 5, 2019) (April Contracts); DOD, *Contracts for May 15, 2019*, Release No. CR-092-19, *available at* https://dod.defense.gov/News/Contracts/Contract-View/Article/1848882/ (last visited Aug. 5, 2019) (May Contracts).

DHS published notices under IIRIRA, as amended, that it was installing physical barriers in the Yuma, El Paso, El Centro, and Tucson sectors, and that DOD was providing support by constructing fences, among other things, in those sectors. 84 Fed. Reg. 17185 (Apr. 24, 2019); 84 Fed. Reg. 17187 (Apr. 24, 2019); 84 Fed. Reg. 21798 (May 15, 2019); 84 Fed. Reg. 21800 (May 15, 2019).  In the notices,

---

[4] As noted above, section 8005 provides authority for DOD to transfer up to $4 billion between appropriations on the condition that ". . . such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item . . . has been denied by the Congress . . ."  Pub. L. No. 115-245, § 8005.  On March 25, 2019, DOD transferred a total of $1 billion using authority under section 8005 from the Military Personnel, Army, and Reserve Personnel, Army accounts, made available in the DOD Appropriations Act, 2019.  Response Letter, Encl. 1.  On May 9, 2019, DOD transferred a total of  $818.5 million using authority under section 8005 from the following accounts, made available in the DOD Appropriations Act, 2019:  Reserve Personnel, Army; National Guard Personnel, Army; Military Personnel, Navy; Military Personnel, Marine Corps; Reserve Personnel, Navy; Military Personnel, Air Force; Reserve Personnel, Air Force; National Guard Personnel, Air Force; Aircraft Procurement, Air Force; Missile Procurement, Air Force; Space Procurement, Air Force; and Chemical Agent and Munitions Destruction, Defense.  *Id.*  DOD also transferred $681.5 million on May 9, 2019 into its Drug Interdiction and Counter-Drug Activities, Defense, account to fund activities in support of DHS using authority under section 9002 of the DOD Appropriations Act, 2019.  *Id.*  That transfer authority is not the subject of our opinion.  We are aware that DOD announced plans this week to use unobligated military construction funds for projects along the southern border.  Letter from Secretary, DOD, to the Chairman of the Committee on Armed Services, House of Representatives (Sept. 3, 2019).  Use of military construction funds is not the subject of this opinion either.

Cited State of California v. Trump
Not for cite or precedent — June 23, 2020

DHS also stated that it was waiving several laws in their entirety, including the National Environmental Policy Act (NEPA), to ensure expeditious construction of barriers in these sectors.  Pub. L. No. 109-13, § 102; *see*, *e.g.*, 84 Fed. Reg. at 17187.

DISCUSSION

At issue here is whether DOD's transfer of amounts to its Drug Interdiction and Counter-Drug Activities, Defense, account for border fence construction was consistent with DOD's transfer authority under section 8005, and whether DOD's use of its Drug Interdiction and Counter-Drug Activities, Defense, account for the purpose of border fence construction was a permissible use of this appropriation account.  We also address whether DHS's waivers of legal requirements in order to expedite border fence construction was consistent with a certain prohibition on the use of DOD's appropriations.  We will address each of the three issues in turn.

Transfer of DOD appropriations for border fence construction

Agencies may transfer[5] funds only when expressly authorized by law.  31 U.S.C. § 1532.  In that regard, section 8005 authorizes DOD to transfer funds between appropriations as follows:

> "Upon determination by the Secretary of Defense that such action is necessary in the national interest, he may . . . transfer not to exceed $4,000,000,000 of . . . funds made available in this Act . . . between such appropriations or funds or any subdivision thereof, to be merged with and to be available for the same purposes, and for the same time period, as the appropriation or fund to which transferred:  *Provided*, That such authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item . . . has been denied by the Congress . . . ."  Pub. L. No. 115-245, § 8005.

In March and May of 2019, DOD transferred amounts made available in the DOD Appropriations Act, 2019, into its Drug Interdiction and Counter-Drug Activities, Defense, account in order to construct fences in four particular sectors at the southern border in support of DHS pursuant to DHS's request and DOD's authority under section 284.[6]  Response Letter, Encl. 1.  DOD relied on its authority under

---

[5] A transfer is the shifting of budget authority between appropriations.  GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: Sept. 2005), at 95.

[6] DOD referred to this as a "reprogramming action."  Response Letter, Encl. 1.  DOD uses the phrase "reprogramming action" generally to include both transfers (the shifting of funds from one appropriation account to another) and reprogrammings

(continued...)

Sierra Club v. Trump
No. 19-16102 archived on June 22, 2020

section 8005 for these transfers.  *Id.*  The issue is whether DOD's transfers were consistent with DOD's transfer authority under section 8005.  Specifically at issue here are two of the conditions under section 8005 that must be satisfied.  First, the item to which funds are transferred must be of "higher priority . . . based on unforeseen military requirements, than those for which originally appropriated."  Pub. L. No. 115-245, § 8005.  Second, the item to which funds are transferred must not be one "denied by the Congress."  *Id.*  We consider each of these statutory conditions in turn.

### (1) Higher priority based on unforeseen military requirements

DOD asserts that the transferred funds were in support of higher priority items, based on unforeseen military requirements.  Response Letter, Encl. 1.  The first issue is whether DOD border fence construction in support of DHS under section 284 was an unforeseen military requirement.  The answer is determined by reference to section 284 and DOD's internal guidance.

DOD states that "unforeseen" under section 8005 means that DOD was not aware of the need at the time of the budget request and when Congress passed DOD's appropriations.  Response Letter, Encl. 8.  We do not disagree with DOD's interpretation of "unforeseen" under section 8005.  For purposes of section 8005, the question is not whether border fencing was unforeseen in general.  Indeed, the President campaigned for border fencing and explicitly requested amounts for border fencing as part of DHS's budget.  *See, Donald Trump's Presidential Announcement Speech,* (June 16, 2015), *available at* https://time.com/3923128/donald-trump-announcement-speech/ (last visited Aug. 28, 2019); OMB Letter at 1.  Rather, the question under section 8005 is whether it was unforeseen at the time of the budget request and enactment of appropriations that DOD would fund and construct border fencing pursuant to DOD's authority under section 284.

Section 284 makes clear that DOD's authority to construct fences in support of other departments is available only upon the request of another department and DOD's acceptance of the request.  10 U.S.C. § 284(a)(1)(A) (DOD "*may* provide support . . . *if* . . . requested" by the official with responsibility for the counter-drug activities) (emphasis added).  Here, the President's Budget for Fiscal Year 2019 was submitted in February 2018, and while the President requested funds for border fencing as part of DHS's budget, DOD had not yet been requested by an appropriate official to provide support to DHS by constructing fences under section 284, and DOD's budget did not include amounts to provide support under section 284.

---

(...continued)
(the shifting of funds within an account).  *See* DOD Financial Management Regulation 7000.14-R, vol. 3, ch. 6, *Reprogramming of DOD Appropriated Funds* (Sept. 2015); *Glossary*, at 85, 95.

Similarly, when DOD received its appropriations for fiscal year 2019 through its annual appropriations act enacted on September 28, 2018, there was not yet a request from DHS or an acceptance by DOD regarding support at the southern border pursuant to section 284.

Rather, DOD's authority to support DHS by constructing fences at the southern border under section 284 only materialized when DHS requested DOD's assistance on February 25, 2019, and DOD accepted the request. (DOD accepted part of the work in March 2019 and the remainder of the work in May 2019). Response Letter, Encl. 1 (providing copies of DHS's February 25, 2019 request letter and DOD's March 2019 and May 2019 acceptance letters). Until the requisite request and acceptance for support took place, which was well into the second quarter of fiscal year 2019, DOD had no requirement to construct fences under section 284. Thus it was unforeseen at the time of DOD's budget request and appropriations that DOD would fund and construct such border fences.

DOD defines "military requirement" as "[a]n established need justifying the timely allocation of resources to achieve a capability to accomplish approved military objects, missions, or tasks." CJCS Guide 3401D, *CJCS Guide to the Chairman's Readiness System*, Appendix A, Glossary (Nov. 15, 2010, current as of Nov. 25, 2013). Once DOD accepted DHS's request, the provision of support constituted a military requirement as defined in DOD's internal guidance.

The legislative history of section 8005 indicates that one of the reasons Congress enacted this transfer authority was to provide DOD with flexibility when changing conditions occur. H.R. Rep. No. 93-662, at 16 (1973). While border fencing in general was foreseen, it was not foreseen that DOD would fund and construct border fencing pursuant to DOD's authority in section 284. The realization of a military requirement during the course of the fiscal year, as was the case here, is such a condition that the transfer authority permits DOD to address. DOD's authority to construct fences in support of civilian agencies is dependent upon a request from such agency under section 284. That authority, and a corresponding military requirement for construction, did not materialize until after submission of the President's Budget and enactment of DOD's appropriations and thus was not forecast in DOD's budget submission. We conclude that DOD's fence construction projects constitute an unforeseen military requirement under section 8005.

The next issue is whether construction of fences at the southern border in support of DHS constituted a "higher priority" military requirement than the activities from which funds were transferred. In light of the President's order to executive departments and agencies to "deploy all lawful means to secure the Nation's southern border . . . through the immediate construction of a physical wall,"[7] and declaration of national

---

[7] 82 Fed. Reg. at 8793.

emergency at the southern border, [8] DOD asserts that the transferred funds were in support of higher priority military requirements. We are in no position to disagree with DOD's prioritization of military requirements. DOD asserts that funds were available from other accounts to transfer into its Drug Interdiction and Counter-Drug Activities, Defense, account for various reasons. Lower than expected agency contributions to the new Blended Retirement System due to fewer than planned opt-ins, a reduction to Army's overall end strength target, and reduced projected costs gained by shortening schedules at chemical agent destruction plants meant that some funds were no longer needed for these purposes and could be transferred into the Drug Interdiction and Counter-Drug Activities, Defense, account. Response Letter, Encl. 1. We do not find legally objectionable DOD's determination that construction of fences at the southern border in support of DHS was a higher priority than these activities from which funds were transferred.

Based on the foregoing, we conclude that DOD satisfied the first condition of section 8005 when it transferred funds into its Drug Interdiction and Counter-Drug Activities, Defense, account in order to construct fences at the southern border in support of DHS pursuant to DHS's request and DOD's authority under section 284. We now consider the second condition of section 8005.

    (2) <u>Not denied by Congress</u>

DOD asserts that "none of the items [to which funds are being transferred] has previously been denied by the Congress." Response Letter, Encl. 1. The "items" here are fences at four sectors at the southern border, and we consider whether such fences were denied by Congress for fiscal year 2019.

Neither section 8005 nor the DOD Appropriations Act, 2019, defines "denied by Congress." So, we turn to the ordinary meaning of the term "deny" which is "to refuse to grant" or "to give a negative answer to." Merriam-Webster Dictionary Online, *Definition of deny*, *available at* www.merriam-webster.com/dictionary/deny (last visited Aug. 5, 2019). GAO has recognized that when "Congress . . . intends to impose a legally binding restriction on an agency's use of funds, it does so by means of explicit statutory language." 55 Comp. Gen. 307, 318, Oct. 1, 1975. This principle, along with the ordinary definitions, suggest that to deny is to actively refuse.

Here, the President's Budget for Fiscal Year 2019 did not request any amounts for DOD with respect to construction of fences at the southern border, so there was nothing for Congress to deny with respect to DOD. Further, Congress did not include any restrictive language with regard to border fences in either the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (NDAA, 2019),

---

[8] 84 Fed. Reg. at 4949.

cited in State of California v. Trump
No. 19-16299 archived on June 22, 2020

Pub. L. No. 115-232, 132 Stat. 1636 (Aug. 13, 2018), or the DOD Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat. 2982.

The appropriation to CBP for $1.375 billion for the construction of primary pedestrian fencing in the Rio Grande Valley sector does not constitute a "denial" of appropriations to DOD for its counter-drug activities in furtherance of DOD's mission under section 284 to support other agencies' activities. Additionally, although Congress ultimately appropriated less to CBP in its Procurement, Construction, and Improvements account than what the President requested, a reduction from the amount requested is not tantamount to a denial of the item by Congress, nor does a reduction from the amount requested negate the otherwise proper exercise of statutory transfer authority. DOD came to the same conclusion. Response Letter, Encl. 2.

We have reached similar conclusions in prior opinions. For example, where Congress did not appropriate amounts requested for fiscal year 1979 for the President's new Urban Crime Prevention Program, the agency put the program into effect anyway by using amounts budgeted for other related programs. B-195269, Oct. 15, 1979. We did not take issue with the agency's actions since the agency's appropriations were otherwise available for this purpose. *Id.* The fact that Congress did not appropriate the additional amount for the program did not mean that Congress intended to curtail, or deny, the initiative, and Congress did not enact legislation imposing restrictions on the use of money for this purpose. *See id.* As another example, where Congress made $6 million available for fiscal year 1963 for a certain National Aeronautics and Space Administration (NASA) activity, as opposed to the request for $10 million, we did not object to NASA's transfer of $4.4 million to increase amounts for the activity, on the grounds that the reduction by Congress did not render inoperative the exercise of NASA's statutory transfer authority. B-151157, June 27, 1963.

Here, there was no denial of fences at the southern border and, in fact, Congress provided affirmative authority for the same. Specifically, Congress provided DOD authority under section 284 to support the counter-drug activities of civilian law enforcement agencies (including the construction of fences), an appropriation for counter-drug activities, and authority to transfer amounts between its appropriations. 10 U.S.C. § 284; Pub. L. No. 115-245, 132 Stat. at 2997; Pub. L. No. 115-245, § 8005. Congress provided DHS with direction to install physical barriers at the border, a lump-sum appropriation for CBP's construction activities, and a line-item[9] appropriation to be used for fencing in the Rio Grande Valley sector, one of the nine sectors at the southern border. Pub. L. No. 104-208, § 102(a), *as amended by* Pub.

---

[9] A lump-sum appropriation is one that is made to cover a number of programs, projects, or items. In contrast, a line-item appropriation is available only for the specific object described. GAO, *Principles of Federal Appropriations Law*, Vol. 2, 3rd ed., ch. 6, § B.1, GAO-06-382SP (Washington, D.C.: Feb. 2006).

L. No. 110-161, § 564; Pub. L. No. 116-6, 133 Stat. at 18; Pub. L. No. 116-6, § 230(a)(1).

We do note that certain congressional committees expressed objection to the transfers and use of DOD amounts for this purpose.  *See* Letter from Senate Committee on Appropriations, to the Acting Secretary of Defense (Mar. 25, 2019); Letter from House of Representatives Committee on Appropriations, to the Under Secretary of Defense, Comptroller (Mar. 26, 2019); Letter from House of Representatives Committee on Armed Services, to the Under Secretary of Defense Comptroller and Chief Financial Officer (Mar. 26, 2019).  However, the Supreme Court has made clear that congressional exercise of legislative power requires bicameralism and presentment.[10]

Although prior committee approval is not binding as a matter of law, and the objection of the congressional committees in this case does not constitute a "denial by Congress" within the meaning of section 8005, we have cautioned that agencies "ignore such expressions of intent at the peril of strained relations with the Congress."  55 Comp. Gen. 307, 325, Oct. 1, 1975.  Indeed, the DOD Financial Management Regulation sets forth a process for DOD to obtain the prior approval of the Appropriations and Armed Services Committees of the House of Representatives and United States Senate prior to transferring amounts between appropriations under section 8005.  DOD-FMR-7000.14-R, vol. 3, ch. 6.  In this case, there is no evidence that DOD obtained prior approval of the committees before the March or May transfers.

Having found that DOD's March and May transfers of funds into its Drug Interdiction and Counter-Drug Activities, Defense, account for border fence construction was consistent with the conditions under section 8005 for a higher priority item based on unforeseen military requirements, and not denied by Congress, we conclude that the transfers were a permissible use of DOD's transfer authority.  We now turn to consideration of whether the use of DOD appropriations for the purpose of border fence construction was permissible.

Use of DOD appropriations for border fence construction

The purpose statute, 31 U.S.C. § 1301(a), provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made . . . ."  Given the size and breadth of the federal government, Congress may appropriate amounts for

---

[10] *See Immigration & Naturalization Service v. Chadha*, 462 U.S. 919 (1983) (holding that a one-house veto provision is unconstitutional because it was an exercise of legislative power that circumvented the procedures of bicameralism and presentment); *see also* B-330330.1, Dec. 10, 2018; GAO, *Principles of Federal Appropriations Law*, 4th ed., 2016 rev., ch. 2, § B.7.a(4), GAO-16-464SP (Washington, D.C.: Mar. 2016).

a broad purpose and not enumerate each permissible expenditure. As such, application of the purpose statute requires an analysis of whether the expenditure in question is a "necessary expense" of the appropriation. This application involves a three-step analysis, known as the necessary expense rule: (1) the expenditure must bear a logical relationship to the appropriation; (2) the expenditure must not be prohibited by law; and (3) the expenditure must not be otherwise provided for. *See*, *e.g.*, B-303170, Apr. 22, 2005; GAO, *Principles of Federal Appropriations Law*, 4th ed., 2017 rev., ch. 3, § B, GAO-17-787SP (Washington, D.C.: Mar. 2016). We address DOD's use of its appropriations for the purpose of border fence construction in the context of this three-step analysis.

### (1) Step 1: logical relationship between the expenditure and the appropriation

With regard to step one, the expenditure must contribute to accomplishing the purposes of the corresponding appropriation. In this regard, the language of the appropriation act is of paramount importance. *See, e.g.*, B-303927, June 7, 2005. Other statutes, such as authorizing legislation, and the agency's interpretation of its appropriations are also relevant considerations. B-323365, Aug. 6, 2014; B-223608, Dec. 19, 1988.

In this case, following DOD's transfer of amounts into its Drug Interdiction and Counter-Drug Activities, Defense, appropriation, DOD obligated those amounts by awarding contracts for construction of fences in the Yuma, El Paso, El Centro, and Tucson sectors, in accordance with DHS's request. Response Letter, Encl. 6, 7; April Contracts; May Contracts. The question is whether DOD border fence construction undertaken pursuant to section 284 contributes to accomplishing the purposes of the Drug Interdiction and Counter-Drug Activities, Defense, appropriation.

We begin with the language of the appropriation and the provision permitting DOD to support the counter-drug activities of other agencies (section 284). The Drug Interdiction and Counter-Drug Activities, Defense, appropriation provides that it is available for, among other things, "counter-narcotics support." Pub. L. No. 115-245, 132 Stat. at 2997. Border fence construction with no connection to countering narcotics does not fall within the plain meaning of the appropriation. Here, DOD's border fence construction was undertaken pursuant to section 284, which specifically authorizes "construction of . . . fences . . . to block drug smuggling corridors across international boundaries of the United States." 10 U.S.C. § 284(b)(7).

Based on the information before us, the fence construction requested by DHS meets the conditions of section 284. In its request to DOD for support, DHS asserted that the Yuma, El Paso, El Centro, and Tucson sectors are experiencing "large numbers of individuals and narcotics being smuggled into the country illegally" and are used "as drug smuggling corridors." Response Letter, Encl. 1. DHS also asserted that "[t]he construction of border infrastructure within the [p]roject [a]reas will support

DHS's ability to impede and deny illegal entry and drug smuggling activities within the [p]roject [a]reas." *Id.* Construction of fences in order to block drug smuggling corridors is logically related to hindering, or countering, the movement of narcotics. Thus, DOD's construction of fences in this case bears a logical relationship to the stated purpose of the Drug Interdiction and Counter-Drug Activities, Defense, appropriation, that is, for "counter-narcotics support."

Because border fence construction under the circumstances presented here has a logical relationship to the Drug Interdiction and Counter-Drug Activities, Defense, appropriation, we conclude that step one of the necessary expense rule is satisfied.

### (2) Step 2: expenditure not prohibited by law

We now consider, under the second step of the necessary expense rule, whether there is a specific statutory prohibition on the use of appropriations for border fence construction undertaken pursuant to section 284. When a law specifies that an agency's appropriation is not available for a designated purpose, obligations or expenditures for that purpose may violate the Antideficiency Act, 31 U.S.C. § 1341(a)(1), which provides that an agency may not obligate or expend in excess or in advance of an appropriation. For example, where an expenditure violated the prohibition on publicity or propaganda of the relevant appropriations act, and the agency had no appropriations available for this purpose, the agency violated the Antideficiency Act. B-302710, May 19, 2004. Here, neither the NDAA, 2019, nor the DOD Appropriations Act, 2019, contains any prohibitive language regarding construction of fences at the southern border. We are not aware of any other law that prohibits use of DOD's appropriations for border fence construction. We conclude that step two of the necessary expense rule is satisfied.

### (3) Step 3: expenditure not otherwise provided for

Having concluded that DOD's obligation of funds for construction of fences at the southern border bears a logical relationship to the Drug Interdiction and Counter-Drug Activities, Defense, appropriation and that use of DOD's appropriations for this purpose was not prohibited by law, we now turn to the final step: determining whether another appropriation other than the Drug Interdiction and Counter-Drug Activities, Defense, account provides for DOD border fence construction pursuant to section 284 in the Yuma, El Paso, El Centro, and Tucson sectors. If another appropriation provides for this activity, then use of the Drug Interdiction and Counter-Drug Activities, Defense, account for this activity would be impermissible under the purpose statute, 31 U.S.C. § 1301(a).

With regard to step three, a more specific appropriation prevails over a general appropriation, including where another agency has the more specific appropriation. *Compare* B-139510, May 13, 1959 (concluding that the Navy's Shipbuilding and Conversion, Navy, appropriation was not available to dredge a deeper channel for naval vessel transit because the Army Corps of Engineers had more specific

appropriations for this purpose) *with* B-184595, Mar. 10, 1976 (concluding that the Immigration and Naturalization Service's (a precursor to Border Patrol) appropriations could be used to repair border fencing installed by other agencies because there was no other appropriation more specific in this regard that prevailed).

Applying our case law to the issues here, we first consider whether DHS, the agency with statutory authority for controlling and guarding the borders, has an appropriation that specifically provides for the activity in question—border fence construction undertaken by DOD pursuant to section 284.  DHS is required to install physical barriers at the border to deter illegal crossings in areas of high illegal entry.  Pub. L. No. 104-208, § 102(a), *as amended by* Pub. L. No. 110-161, § 564.  DHS was appropriated a lump-sum amount for CBP's Procurement, Construction, and Improvements, which, based on the information before us, is available to fund DHS's mandate to install physical barriers in the sectors located at the southern border.  Pub. L. No. 116-6, 133 Stat. at 18.  Of the lump sum, CBP was also appropriated a line-item amount available only for the construction of fencing in one particular sector—the Rio Grande Valley.  *Id.* § 230(a)(1).  Thus, DHS has amounts available for CBP's fence construction activities, including an amount available only for fencing in the Rio Grande Valley sector.

However, Congress has also long vested DOD with authority to construct fences as part of its counter-drug support activities upon the request of another agency, and has provided DOD with appropriations to cover this activity.  Specifically, in the National Defense Authorization Act for Fiscal Year 1991, Congress permitted DOD to provide support for the counter-drug activities of other agencies, including construction of fences to block drug smuggling corridors, under what is now section 284.  Pub. L. No. 101-510, div. A, title X, § 1004, 104 Stat. 1485, 1629-1630 (Nov. 5, 1990).  DOD's provision of support for the counter-drug activities of other agencies is not subject to reimbursement under section 284.  While section 277(a) of title 10 of the United States Code provides that DOD shall require a law enforcement agency to which support is provided to reimburse DOD for that support, section 284(g)(1) provides that support provided under section 284 is not subject to other requirements of the chapter, which would include section 277(a).  Congress established the Drug Interdiction, Defense (now the Drug Interdiction and Counter-Drug Activities, Defense), appropriation in the DOD Appropriations Act, 1989, to cover DOD's costs under section 284.  *See* Pub. L. No. 100-463, title VII, 102 Stat. 2270, 2270-16 (Oct. 1, 1988).

The fact that Congress appropriated line items in fiscal years 2006 and 2008 for "installing fences" has no legal consequence at this point in time.  Specifically, Congress in 2006 appropriated $708 million as an additional amount for DOD Operation and Maintenance, Defense-Wide, for emergency support to DHS, including "installing fences and vehicle barriers."  Pub. L. No. 109-234, 120 Stat. at 480.  Then, in fiscal year 2008 Congress provided that $247 million of amounts provided for DOD Operation and Maintenance, Defense-Wide, shall be available for

support to DHS, including "installing fences and vehicle barriers." Pub. L. No. 110-116, 121 Stat. at 1299. The 2006 and 2008 line-item appropriations expired on September 30, 2007 and September 30, 2008, respectively, which means they are no longer available to cover new obligations. GAO, *Principles of Federal Appropriations Law*, Vol. I, 3rd ed., ch. 5, § D.1, GAO-04-264SP (Washington, D.C.: Jan. 2004).

Here, DOD's authority to construct fences in support of the counter-drug activities of other agencies has been in place since fiscal year 1991, and DOD has received a lump sum appropriation for its counter-drug activities for each fiscal year starting with 1989.[11] Pub. L. No. 101-510, § 1004; Pub. L. No. 100-463, 102 Stat. at 2270-16. Thus, DOD's authorities and appropriations for counter-drug support activities existed before and continue to exist after the line-item appropriations for 2006 and 2008. With no currently available line-item appropriation for this purpose, and without a statutory means of reimbursement from DHS, DOD's Drug Interdiction and Counter-Drug Activities, Defense, appropriation is the appropriate source of funds to cover DOD's costs under section 284.

In sum, DOD border fence construction pursuant to section 284 bears a logical relationship to the Drug Interdiction and Counter-Drug Activities, Defense, appropriation; there are no legal prohibitions on the use of DOD's appropriations for border fence construction undertaken pursuant to section 284; and the Drug Interdiction and Counter-Drug Activities, Defense, appropriation was the appropriate account to use for DOD border fence construction here, as no other account otherwise provides for this activity. We conclude that DOD border fence construction under the terms of section 284 is a proper use of DOD's Drug Interdiction and Counter-Drug Activities, Defense, appropriation and therefore amounts were used for a permissible purpose, consistent with the purpose statute.

<u>DHS waivers and section 8113 of the DOD Appropriations Act, 2019</u>

You also asked whether the Secretary of DHS's waivers of legal requirements in order to expedite construction of barriers at the southern border by DHS and DOD was consistent with section 8113 of the DOD Appropriations Act, 2019.

In carrying out DHS's border control mission, the Secretary of DHS exercised authority to waive legal requirements, such as NEPA,[12] to ensure expeditious

---

[11] DOD has also received authority, like section 8005, annually since fiscal year 1974 to transfer its appropriations. DOD Appropriations Act, 1974, Pub. L. No. 93-238, title VII, § 735, 87 Stat. 1026, 1044 (Jan. 2, 1974).

[12] NEPA requires federal agencies to evaluate the likely environmental effects of projects they are proposing, generally by preparing either an environmental assessment or a more detailed environmental impact statement. 42 U.S.C. §§ 4321–4347.

construction of barriers along the southern border, including barriers constructed by DHS and barriers constructed by DOD in support of DHS under section 284. Pub. L. No. 109-13, § 102; 84 Fed. Reg. 17185 (Apr. 24, 2019); 84 Fed. Reg. 17187 (Apr. 24, 2019); 84 Fed. Reg. 21798 (May 15, 2019); 84 Fed. Reg. 21800 (May 15, 2019).

Section 8113 of the DOD Appropriations Act, 2019, prohibits use of DOD funds

> "to pay the salary of any officer or employee of any agency funded by this Act who approves or implements the transfer of administrative responsibilities . . . to the jurisdiction of another Federal agency not financed by this Act without the express authorization of Congress . . . ." Pub. L. No. 115-245, § 8113 (section 8113).

Here, while the Secretary of DHS exercised authority to waive legal requirements in order to expedite barrier construction by DHS and DOD, this does not constitute a transfer of DOD's administrative responsibilities under section 8113 because DHS exercised its waiver authority with regard to projects for which DHS maintains overall responsibility. With regard to border fences constructed by DOD in support of DHS within the scope of DHS's February 2019 request, DHS defined the requirements, will take custody of completed fences and operate them going forward, retained responsibility for securing any real estate interest required for project execution, and remained responsible for applicable environmental planning and compliance. Response Letter, Encl. 1. We conclude that waivers of legal requirements by the Secretary of DHS to expedite DHS and DOD barrier construction at the southern border was not a violation of section 8113.

CONCLUSION

Based on application of the relevant legal provisions to the facts before us, we conclude that DOD's transfer of amounts into its Drug Interdiction and Counter-Drug Activities, Defense, appropriation to construct fences at the southern border of the United States pursuant to section 284 was consistent with DOD's transfer authority under section 8005. We are in no position to disagree with DOD's determination that construction of fences at the southern border pursuant to section 284 was a higher priority, and we conclude that this activity was based on unforeseen military requirements, as the requirement for DOD's support did not materialize until well into the second quarter of fiscal year 2019. Congress has not explicitly denied either DHS or DOD from constructing border fences and, by contrast, has provided specific authorities for each agency to undertake this activity.

Further, we conclude that DOD's use of its appropriations for the purpose of border fence construction was consistent with the purpose statute, 31 U.S.C. § 1301(a). There is a logical relationship between construction of fences to block drug smuggling corridors and the counter-narcotics purpose of the Drug Interdiction and Counter-Drug Activities, Defense, appropriation; there are no legal prohibitions on the use of DOD appropriations for border fence construction under section 284; and

the Drug Interdiction and Counter-Drug Activities, Defense, appropriation is the proper account to charge for this activity, as CBP's appropriations for construction, to include an amount for fence construction in the Rio Grande Valley sector, do not specifically provide for DOD's construction of fences under section 284.

In addition, we conclude that DHS's waivers of legal requirements to expedite construction of fences at the southern border was not a violation of section 8113. DHS exercised its statutory waiver authority with respect to projects for which DHS is ultimately responsible and in furtherance of DHS's border control mission, and those projects include fence construction undertaken by DOD at DHS's request.

Congress enacted authority for DOD to construct fences in support of other departments starting in fiscal year 1991 and Congress has enacted authority annually since fiscal year 1974 for DOD to transfer is appropriations. It is these authorities that enabled DOD to accept DHS's request for support and fund construction of fences at the southern border. Although there was no statutory requirement to do so, DOD did not obtain the prior approval of congressional committees before transferring funds, contrary to provisions in its Financial Management Regulation. Nevertheless, DOD's activities were affirmatively permitted by law under the various statutory provisions discussed herein. We express no opinion on the merits of a fence to impede drug smuggling.

If you have any questions, please contact Shirley A. Jones, Managing Associate General Counsel, at (202) 512-8156, or Omari Norman, Assistant General Counsel for Appropriations Law, at (202) 512-8272.

Thomas H. Armstrong
General Counsel

*List of Requesters*

The Honorable Patrick Leahy
Vice Chairman
Committee on Appropriations
United States Senate

The Honorable Richard J. Durbin
Vice Chairman
Subcommittee on Defense
Committee on Appropriations
United States Senate

The Honorable Brian Schatz
Ranking Member
Subcommittee on Military Construction, Veterans Affairs,
 and Related Agencies
Committee on Appropriations
United States Senate

cited in State of California v. Trump
No. 19-16299 archived on June 22, 2020

B-330862

## United States Court of Appeals for the Ninth Circuit

### Office of the Clerk
95 Seventh Street
San Francisco, CA 94103

### Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36.  Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise.  To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)    A.    Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ▶ A material point of fact or law was overlooked in the decision;
  - ▶ A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ▶ An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.    Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

> ► Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
>
> ► The proceeding involves a question of exceptional importance; or
>
> ► The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)  Deadlines for Filing:**
- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)  Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)  Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

## Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

## Attorneys Fees
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

## Petition for a Writ of Certiorari
- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

## Counsel Listing in Published Opinions
- Please check counsel listing on the attached decision.
- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  - ► Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  - ► and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 10. Bill of Costs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form10instructions.pdf

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                              **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | | $ |
| TOTAL: | | | | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; DEFENDERS OF WILDLIFE; ANIMAL LEGAL DEFENSE FUND,<br><br>                          Plaintiffs,<br><br>        v.<br><br>MARK ESPER, in his official capacity as Secretary of Defense, *et al.*,<br><br>                          Defendants. | Civil Action No. 1:19-cv-00408 (TNM) |
| RIO GRANDE INTERNATIONAL STUDY CENTER, *et al.*,<br><br>                          Plaintiffs,<br><br>        v.<br><br>MARK ESPER, in his official capacity as Secretary of Defense, *et al.*,<br><br>                          Defendants. | Civil Action No. 1:19-cv-00720 (TNM) |

## <u>DECLARATION OF LOREN FLOSSMAN</u>

I, Loren Flossman, declare as follows:

1. I am the Acquisition Program Manager for the Wall Program Management Office (Wall PMO), U.S. Border Patrol Program Management Directorate, U.S. Customs and Border Protection (CBP), an agency of the Department of Homeland Security (DHS).  The Wall PMO is responsible for border barrier projects.

2. The statements in this declaration are based on my personal knowledge and information that I have received in my official capacity.

3.  CBP has previously executed declarations dated April 1, 2019 (ECF No. 34-1), May 31, 2019 (ECF No. 34-6), July 11, 2019 (ECF Nos. 34-2, 34-7), August 27, 2019 (ECF No. 47-2), and January 8, 2020 (ECF No. 68-1) in *RGISC v. Trump*, Case No. 19-CV-720-TNM, that explained CBP's planned projects and funding for barrier construction along the southern border.  This declaration addresses the funding that will be used by CBP for construction of border barriers in the Rio Grande Valley, Texas.

4.  Between planned and on-going projects, CBP will construct approximately 110 miles of border wall system in the Rio Grande Valley in Cameron, Hidalgo, and Starr Counties, Texas.

5.  The approximately 110 miles of border wall system that CBP will construct in the Rio Grande Valley, Texas, is funded exclusively by three sources: (1) CBP's Fiscal Year 2018 appropriation (Public Law No. 115-141, § 230); (2) CBP's Fiscal Year 2019 appropriation (Public Law No. 116-6, § 230); and the Treasury Forfeiture Fund (TFF).  No other sources of funding or authority, including those authorities challenged in this action (10 U.S.C. § 284 and 10 U.S.C. § 2808), will be used to construct border wall system in the Rio Grande Valley, Texas.

6.  The barrier project planned near the Jackson Ranch Church and Cemetery and Eli Jackson Cemetery will be constructed using only CBP's Fiscal Year 2019 appropriation (Public Law No. 116-6, § 230) and the TFF.  No other sources of funding or authority, including those authorities challenged in this action (10 U.S.C. § 284 and 10 U.S.C. § 2808), will be used to construct this planned project.

7.  DHS/CBP has never requested or recommended that the Department of Defense construct border barrier in the Rio Grande Valley pursuant to 10 U.S.C. § 284 or 10

U.S.C. § 2808.  Further, the Secretary of Defense has not approved the construction of border barrier in the Rio Grande Valley pursuant 10 U.S.C. § 284 or 10 U.S.C. § 2808.

8.   Plaintiffs make the erroneous assertion that CBP does not have sufficient funding to complete its planned border barrier projects in the Rio Grande Valley and thus CBP will have to utilize funding made available to the Department of Defense for construction under 10 U.S.C. § 284 and 10 U.S.C. § 2808 to complete such projects (Pl. MSJ at pg. 23-26).  This assertion is incorrect.  It is principally based on two unfounded allegations by plaintiffs.  Plaintiffs allege that due to the cost of painting the barriers and because the "U.S. Army Corps of Engineers is anticipating a 10% cost overrun" on contracts, CBP cannot complete all of its planned barrier projects in the Rio Grande Valley using only funding from CBP's Fiscal Year 2018 and 2019 appropriations and the TFF.  To support their claim of an anticipated 10% cost overrun, however, plaintiffs cite to an October 15, 2019, letter to the Secretary of Defense from members of the United States Senate.  (Id. at pg. 25 citing Pl. Ex. 18.)  The October 15, 2019, letter cited by plaintiffs has nothing to do with the CBP-funded barrier projects in Rio Grande Valley.  Rather, it concerns border barrier construction by the Department of Defense pursuant to 10 U.S.C. § 284 and 10 U.S.C. § 2808.  Further, as explained below, CBP will not rely on the challenged sources of funding or authority (10 U.S.C. § 284 and 10 U.S.C. § 2808) to cover the cost of painting or epoxy coating the planned border barriers in the Rio Grande Valley.  Contrary to plaintiffs' assertion, the 110 miles of border wall system that CBP will construct in the Rio Grande Valley is fully funded.

9. As a part of CBP's Fiscal Year 2018 appropriation, Congress appropriated $445 million for the construction of primary pedestrian levee fencing in the Rio Grande Valley and

$196 million for the construction of primary pedestrian fencing in the Rio Grande Valley. Public Law No. 115-141, § 230(a)(1)&(2). With the $641 million in funding made available by Congress in fiscal year 2018, CBP will construct approximately 13 miles of levee barrier in Hidalgo County, Texas, and approximately 12 miles of primary pedestrian barrier in Starr County, Texas. All of the planned miles are under contract, and approximately $622 million of the $641 million made available in CBP's Fiscal Year 2018 appropriation for barrier construction has been obligated. The remaining $19 million will be used for risk mitigation (including increased costs due to unforeseen site conditions or real estate), border wall system elements, real estate and environmental support and project management. CBP may apply an epoxy coating to the border barrier to extend its lifecycle. However, CBP will only add epoxy coating to the border barrier if funding is available from CBP's Fiscal Year 2018 appropriation or the TFF once the construction is complete. In no event will CBP rely on the challenged sources of funding or authority (10 U.S.C. § 284 and 10 U.S.C. § 2808) to cover the cost of painting or epoxy coating the planned border barriers in the Rio Grande Valley.

10. As a part of CBP's Fiscal Year 2019 appropriation, Congress appropriated $1.375 billion for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley. Public Law No. 116-6, § 230(a)(1). In addition, as stated in my January 8, 2020, declaration, CBP will utilize up to $340 million in TFF funds for border barrier construction in the Rio Grande Valley. With the $1.715 billion in available funding, CBP will construct approximately 11 miles of levee barrier in Hidalgo County, Texas, and approximately 74 miles of pedestrian barrier in Hidalgo, Starr, and Cameron Counties, Texas. All of the planned barrier miles are under contract,

and approximately $1.384 billion of the $1.715 billion in available funding has been obligated.  The remaining $331 million will be used for risk mitigation (including potential cost increases due to unforeseen site conditions or real estate), border wall system elements, real estate and environmental support and project management.  The approximately $1.384 billion that has been obligated to date includes the cost to apply an epoxy coating to approximately 65 miles of barrier to extend its lifecycle.  CBP will epoxy coat additional miles of barrier only if funding is available from CBP's Fiscal Year 2019 appropriation or the TFF once the construction is complete.  In no event will CBP rely on the challenged sources of funding or authority (10 U.S.C. § 284 and 10 U.S.C. § 2808) to cover the cost of painting or epoxy coating the planned border barriers in the Rio Grande Valley.

11.  In sum, CBP has sufficient funding available from its Fiscal Year 2018 and 2019 appropriations and the TFF to construct the 110 miles of border wall system that CBP has planned for Rio Grande Valley.  CBP also has approximately $350 million currently available to address potential cost increases.  If actual construction or project costs were to exceed available funding from CBP's Fiscal Year 2018 and 2019 appropriations and the TFF, CBP will make adjustments to the planned border barrier projects to ensure they can be executed with the funding that is available from those three funding sources, which could include, among other things, foregoing the construction of certain miles of border barrier or reducing or eliminating certain system elements of the border wall system.  In no event will CBP rely on the challenged sources of funding or authority (10 U.S.C. § 284 and 10 U.S.C. § 2808) to fund construction if actual construction of project costs exceed CBP's available funding for Rio Grande Valley barrier projects.

This declaration is made pursuant to 28 U.S.C. § 1746.  I declare under penalty of perjury that

the foregoing is true and correct to the best of my current knowledge.

Executed on this __ day of June, 2020.

Loren
Flossman

Digitally signed by Loren
Flossman
Date: 2020.06.24 18:18:00
-04'00'

Loren Flossman
Acquisition Program Manager
U.S. Customs and Border Protection

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY;
DEFENDERS OF WILDLIFE; ANIMAL LEGAL
DEFENSE FUND,

                          Plaintiffs,

        v.

MARK ESPER, in his official capacity as Secretary
of Defense, *et al.*,

                          Defendants.

Civil Action No. 1:19-cv-00408 (TNM)

RIO GRANDE INTERNATIONAL STUDY
CENTER, *et al.*,

                          Plaintiffs,

        v.

MARK ESPER, in his official capacity as Secretary
of Defense, *et al.*,

                          Defendants.

Civil Action No. 1:19-cv-00720 (TNM)

**[Proposed] ORDER**

      Before this Court are the parties' respective Motions for Summary Judgment addressing

the border barrier projects undertaken pursuant to 10 U.S.C. § 284 and 10 U.S.C. § 2808.  For

the reasons set forth in Defendants' Motion for Summary Judgment, and the entire record herein,

it is hereby ORDERED that:

      1.      Plaintiffs' Motions for Summary Judgment are DENIED; and

      2.      Defendant's Motions for Summary Judgment are GRANTED.

Accordingly, the Clerk is directed to enter FINAL JUDGMENT for Defendants with respect to all claims related to the funding and construction of the border barrier projects pursuant to 10 U.S.C. § 284 and U.S.C. § 2808.

IT IS SO ORDERED

DATED:  _____, 2020          _____
                                          TREVOR N. McFADDEN, U.S.D.J.