**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; DEFENDERS OF WILDLIFE; ANIMAL LEGAL DEFENSE FUND,<br><br>    Plaintiffs,<br><br>    v.<br><br>MARK ESPER, in his official capacity as Secretary of Defense, *et al.*,<br><br>    Defendants. | Civil Action No. 1:19-cv-00408 (TNM) |
| RIO GRANDE INTERNATIONAL STUDY CENTER, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>MARK ESPER, in his official capacity as Secretary of Defense, *et al.*,<br><br>    Defendants. | Civil Action No. 1:19-cv-00720 (TNM) |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 3

I.   Plaintiffs Lack Standing to Challenge Certain Border Barrier Projects.............................3

     A.   CBD Lacks Standing to Challenge Most § 2808 Projects .......................................3

     B.   RGISC Has Not Demonstrated Standing to Challenge All Barrier Projects .......... 5

          1.   RGISC Must Demonstrate Article III Standing With Respect to Each
               Project It Challenges .................................................................................5

          2.   RGISC Has Not Established Standing to Challenge the Construction of
               Barrier Projects in the Rio Grande Valley. ...............................................7

               a.   RGISC's Claims Based on the Use of the TFF in RGV. ....................7

               b.   RGISC's Speculation about the Use of § 284 and § 2808 in RGV ...11

          3.   RGISC Does Not Dispute that Claims Related to "El Centro A" Are Not
               Properly Before the Court ........................................................................ 13

II.  Plaintiffs' APA Claim Asserting a Violation of § 739 of the CAA Lacks Merit................14

     A.   Plaintiffs Do Not Fall Within the Zone of Interests of § 739 .............................. 14

     B.   Defendants' Border Barrier Construction Does Not Violate § 739 of the CAA. . 17

III. The Zone-Of-Interest Requirement Applies to Implied Equitable Causes of Action .........19

IV.  Plaintiffs' *Ultra Vires* Claims Fail on the Merits. ..............................................................24

     A.   Plaintiffs' *Ultra Vires* Claims are Subject to a Heightened Standard of Review. 24

     B.   DoD Fully Complied with the Requirement of § 8005......................................... 26

     C.   DoD's Border Barrier Construction Pursuant to § 284 is Lawful ....................... 29

     D.   DoD's § 2808 Military Construction is Lawful................................................... 31

          1.   The § 2808 Border Barriers are Military Construction Projects...............31

i

      2.      The § 2808 Border Barriers Support the Use of the Armed Forces...........36

V.   The Court Should Reject Plaintiffs' Various Requests for Relief.......................................39

      A.      Plaintiffs Have Not Met the Requirements for a Permanent Injunction ............... 39

              1.      An Injunction Will Impose Substantial and Irreparable Harm on
                      Defendants ...............................................................................................41

              2.      Defendants' Interests Decisively Outweigh Plaintiffs' Environmental
                      Interests ...................................................................................................43

              3.      The Public Interest Weighs Against Injunctive Relief ............................52

              4.      The Court Should Reject Plaintiffs' Overbroad Injunction ......................54

      B.      Vacatur of Secretary of Defense's Decisions is Not an Appropriate Remedy ..... 58

      C.      The Court Should Stay Any Relief Pending Appeal ..............................................60

CONCLUSION....................................................................................................................... 60

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Air Courier Conference v. Am. Postal Workers Union*,
    498 U.S. 517 (1991) ................................................................................ 15, 16, 17

*American Clinical Lab. Association v. Azar*,
    931 F.3d 1195 (D.C. Cir. 2019) ...................................................................... 25, 26

*Amoco Prod. Co. v. Village of Gambell*,
    480 U.S. 531 (1987) ...................................................................................... 48, 53

*Arbaugh v. Y&H Corp.*,
    546 U.S. 500 (2006) ............................................................................................ 23

*Armstrong v. Exceptional Child Ctr., Inc.*,
    135 S. Ct. 1378 (2015) ...................................................................................... 21

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................ 22

*Blum v. Yaretsky*,
    457 U.S. 991 (1982) ............................................................................................ 59

*Bush v. Lucas*,
    462 U.S. 367 (1983) ............................................................................................ 22

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ............................................................................................ 54

*California v. Trump*,
    407 F. Supp. 3d 869 (N.D. Cal. 2019) ................................................................ 60

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ............................................................................ 23

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ...................................................................... 44, 52

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .............................................................................................. 9

*Clarke v. Securities Industry Association*,
    479 U.S. 388 (1987) ...................................................................................... 15, 16, 23

*Commonwealth of the N. Mariana Islands v. United States*,
    670 F. Supp. 2d 65 (D.D.C. 2009) ...................................................................... 43

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*,
    901 F.2d 107 (D.C. Cir. 1990) .............................................................................. 9

*Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*,
  75 F. Supp. 3d 387 (D.D.C. 2014) ........................................................... 4

*Dart v. United States*,
  848 F.2d 217 (D.C. Cir. 1988) ............................................................... 23

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008) ........................................................................ 6, 7

*Doe 2 v. Shanahan*,
  917 F.3d 694 (D.C. Cir. 2019) ............................................................... 37

*Doe v. Trump*,
  284 F. Supp. 3d 1182 (W.D. Wash. 2018) ................................................ 20-21

*Duke Power Co. v. Carolina Environmental Study Group, Inc.*,
  438 U.S. 59 (1978) ............................................................................ 7

*E.g., Hercules, Inc. v. EPA*,
  598 F.2d 91 (D.C. Cir. 1978) ................................................................ 13

*Eco Tour Adventures, Inc. v. Zinke*,
  249 F. Supp. 3d 360 (D.D.C. 2017) ........................................................ 39

*El Paso Cty., Texas v. Trump*,
  407 F. Supp. 3d 655 (W.D. Tex. 2019) ..................................................... 60

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
  93 F.3d 897 (D.C. Cir. 1996) ................................................................ 17

*Fenwick v. City of Burlington*,
  167 Vt. 425 (1997) ........................................................................ 56-57

*Finca Santa Elena, Inc. v. U.S. Army Corps of Engineers*,
  62 F. Supp. 3d 1 (D.D.C. 2014) ............................................................. 56

*Fla. Health Scis. Ctr., Inc. v. Sec'y of HHS*,
  830 F.3d 515 (D.C. Cir. 2016) ......................................................... 24-25, 25

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
  528 U.S. 167 (2000) ................................................................. 5, 8, 9, 55

*Food & Drug Administration v. Brown & Williamson Tobacco Corporation*,
  529 U.S. 120 (2000) ..................................................................... 30, 31

*Fund for Animals v. Frizzell*,
  530 F.2d 982 (D.C. Cir. 1975) .......................................................... 44, 52

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) .............................................................. 5, 6, 7, 54

*Gilligan v. Morgan*,
   413 U.S. 1 (1973) ................................................................. 33-34, 37

*Goldman v. Weinberger*,
   475 U.S. 503 (1986) ................................................................. 42

*Griffith v. Fed. Labor Relations Auth.*,
   842 F.2d 487 (D.C. Cir. 1988) ................................................ 25

*Grocery Mfrs. Ass'n v. Epa*,
   693 F.3d 169 (D.C. Cir. 2012) ................................................ 16

*Guedes v. Bur. of Alcohol, Tobacco, Firearms & Explosives*,
   920 F.3d 1, 10 (D.C. Cir.) ..................................................... 52-53

*Haitian Refugee Center v. Gracey*,
   809 F.2d 794 (D.C. Cir. 1987) ................................................ 23, 24

*Hargreaves v. Skrbina*,
   662 P.2d 1078 (Colo. 1983) ................................................... 57

*Hecht Co. v. Bowles*,
   321 U.S. 321 (1944) ............................................................... 59

*Hernandez v. Mesa*,
   140 S. Ct. 735 (2020) ............................................................ 21, 22

*In re Metroplex on the Atl., LLC*,
   545 B.R. 786 (Bankr. E.D.N.Y. 2016) ................................... 56

*Inc. v. MercExchange, LLC.*,
   547 U.S. 388 (2006) ............................................................... 39

*Landon v. Plasencia*,
   459 U.S. 21 (1982) ................................................................ 42-43

*Lane v. Dist. of Columbia*,
   72 F. Supp. 3d 215 (D.D.C. 2014) ......................................... 13-14

*Lewis v. Casey*,
   518 U.S. 343 (1996) ............................................................... 59

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) .............................................................. 20, 22

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .............................................................. 3, 12, 45

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) .............................................................. 5, 12, 16

*McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of Judicial
Conference of U.S.,*
   264 F.3d 52 (D.C. Cir. 2001) ........................................................................... 26

*Mitchell v. Donovan,*
   398 U.S. 427 (1970) ...................................................................................... 54

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ........................................................................ 39, 48, 54

*Nat'l Petrochemical & Refiners Ass'n v. EPA,*
   287 F.3d 1130, (D.C. Cir. 2002) ............................................................. 16, 17

*Nat'l Treasury Employees Union v. Von Raab,*
   489 U.S. 656 (1989) ...................................................................................... 41

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers,*
   170 F. Supp. 3d 6–14 (D.D.C. 2016) ........................................................... 4

*National Wildlife Federation v. Hodel,*
   839 F.2d 694 (D.C. Cir. 1988) ...................................................................... 7

*Nken v. Holder,*
   556 U.S. 418 (2009) ........................................................... 40, 52-53, 60

*Office of Pers. Mgmt. v. Richmond,*
   496 U.S. 414 (1990) ...................................................................................... 57

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
   489 F.3d 1279 (D.C. Cir. 2007) ............................................................. 10, 11

*Reed v. Salazar,*
   744 F. Supp. 2d 98 (D.D.C. 2010) ............................................................... 7

*Rodriguez v. Robbins,*
   715 F.3d 1127 (9th Cir. 2013) ...................................................................... 53

*San Juan Audubon Soc'y v. Wildlife Servs., Animal & Plant Inspection Serv.,*
   257 F. Supp. 2d 133 (D.D.C. 2003) ............................................................. 11

*Saunders v. Wash. Metro. Area Transit Auth.,*
   359 F. Supp. 457 (D.D.C. 1973) ............................................................. 46, 48

*Scenic Am., Inc. v. U.S. Dep't of Transportation,*
   836 F.3d 42 (D.C. Cir. 2016) ................................................................. 10, 11

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
   140 S. Ct. 2183 (2020) .................................................................................. 18

*California v. Trump,*
   963 F.3d 926 (9th Cir. 2020) ................................................... 24, 27, 29, 30

*Sierra Club v. Johnson*,
374 F. Supp. 2d 30 (D.D.C. 2005) ....................................................... 57

*Sierra Club v. Trump*,
2019 WL 2715422 (N.D. Cal. June 28, 2019) ....................................... 55

*Sierra Club v. Trump*,
963 F.3d 874 (9th Cir. 2020) .................................................... 23-24, 24

*Sierra Club v. U. S. Army Corps of Eng'rs*,
990 F. Supp. 2d 9 (D.D.C. 2013) ............................................... 49-50, 50

*Singh v. Carter*,
185 F. Supp. 3d 11 (D.D.C. 2016) ...................................................... 55

*State of Washington v. Trump*,
441 F. Supp. 3d 1101 (W.D. Wash. 2020) ............................................ 55

*Steffel v. Thompson*,
415 U.S. 452 (1974) ........................................................................ 54

*Bowser v. Synar*
478 U.S. 714 (1986) ........................................................................ 29

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir 2006) ...................................................... 25, 26

*Trump v. Sierra Club*,
2020 WL 4381616 (U.S. July 31, 2020) ......................................... 40, 60

*Trump v. Sierra Club*,
140 S. Ct. 1 (2019) ........................................................ 20, 21, 40, 60

*United States v. Apel*,
571 U.S. 359 (2014) ........................................................................ 35

*United States v. Guzman-Padilla*,
573 F.3d 865 (9th Cir. 2009) ........................................................... 43

*United Steel v. MSHA*,
925 F.3d 1279 (D.C. Cir. 2019) ........................................................ 58

*Water Keeper Alliance v. Department of Defense*,
271 F.3d 21 (1st Cir. 2001) ............................................................. 44

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ...................................................................... passim

*Wis. Gas Co. v. F.E.R.C.*,
758 F.2d 669 (D.C. Cir. 1985) ..................................................... 45, 46

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ........................................................................ 38

*Zelios v. City of Dallas*,
    568 S.W.2d 173 (Tex. Civ. App. 1978) ......................................... 57

*Ziglar v. Abbasi*,
    137 S. Ct. 1843–58 (2017) ............................................................ 23

**Statutes:**

5 U.S.C. § 702 ...................................................................................... 59

5 U.S.C. § 706 ...................................................................................... 58

10 U.S.C. § 251–284 ............................................................................ 38

10 U.S.C. § 284 ............................................................................. passim

10 U.S.C. § 2801 .......................................................................... passim

10 U.S.C. § 2808 .......................................................................... passim

18 U.S.C. § 1382 .................................................................................. 35

22 U.S.C. § 277d-34 ............................................................................ 49

31 U.S.C. § 9705 .................................................................................. 17

42 U.S.C. § 1983 .................................................................................. 22

Department of Defense Appropriations Act, 2019
    Pub L. No. 115-245, div. A, § 8005 ........................................ passim

Consolidated Appropriations Act, 2019
    Pub L. No. 116-6, div. A, § 230 .............................................. passim
    Pub L. No. 116-6, div. A, § 231 .............................................. passim
    Pub L. No. 116-6, div. A, § 232 .............................................. passim
    Pub L. No. 116-6, div. D, § 739 .............................................. passim

**Legislative Materials:**

H.R. Rep. No. 93-662 (1973) ............................................................... 29

H.R. Rep. No. 110-652 (2008) ............................................................. 41

H.R. Rep. No. 114-840 (2016) ............................................................. 19

H.R. Rep. No. 115-92 (2018) ............................................................................................. 28

H.R. Rep. No. 116-9 (2019) ............................................................................................... 19

**Rules:**

Federal Rules of Civil Procedure 54 ................................................................................. 15

**Regulations:**

84 Fed. Reg. 4949 (Feb. 15, 2019) ................................................................................... 38

**Treaties:**

*Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande and Colorado River as the International Boundary*, U.S.- Mex., Art. IV, Nov. 23, 1970, T.I.A.S. 7313 ...................................................................................................................49, 50

**Other Authorities:**

GAO Opinion B-330862,
     2019 WL 4200949 (Sept. 5, 2019) ........................................................................... 29

Veto Message for H.R.J. Res. 46,
     2019 WL 1219481 (Mar. 15, 2019) .......................................................................... 41

Veto Message for S.J. Res. 54,
     2019 WL 5206087 (Oct. 15, 2019) ........................................................................... 41

**<u>INTRODUCTION</u>**

Defendants' cross-motion for summary judgment explained why Plaintiffs' (RGISC and

CBD)[1] summary judgment motions lack merit, and why these cases should be resolved in

Defendants' favor.  *See generally* Defs.' Mot. (*RGISC* ECF No. 92; *CBD* ECF No. 68).

Plaintiffs' reply memoranda do nothing to alter that conclusion.  *See generally* CBD Reply (ECF

No. 73); RGISC Reply (ECF No. 97).

At the outset, CBD has failed to cure the standing deficiencies highlighted in Defendants'

motion.  Although CBD purports to challenge nine of the 11 border barrier projects that the

Department of Defense (DoD) is building pursuant to 10 U.S.C. § 2808, CBD lacks standing to

challenge seven of those projects.  CBD has submitted generalized declarations that its members

recreate in vast expanses in the southern United States, none of which even mention the disputed

§ 2808 projects, let alone explain how construction at those specific project locations will harm

CBD's members' recreational and aesthetic interests.  Similarly, RGISC has not submitted

sufficient evidence to establish standing to challenge projects in the Rio Grande Valley Sector of

Texas (RGV), let alone every border barrier project undertaken pursuant to a statutory authority

challenged in this case.

On the merits, Plaintiffs' lone remaining claim under the Administrative Procedure Act

(APA) fails because Plaintiffs do not fall within the zone of interests of § 739 of the

Consolidated Appropriations Act, 2019, Pub. L. No. 116-6 (CAA).  Further, Defendants' use of

§ 284, § 2808, and the Treasury Forfeiture Fund (TFF) for border barrier construction is entirely

consistent with § 739, which neither applies to the TFF nor prohibits DoD from using its own

appropriations and longstanding statutory authority under § 284 and § 2808.

---

[1] The remaining plaintiffs in *RGISC* and the plaintiffs in *CBD* will be referred to herein as
"RGISC" and "CBD," respectively, or collectively in both cases as "Plaintiffs."

Plaintiffs' implied equitable *ultra vires* causes of action alleging violations of § 284, § 2808, and § 8005 of the fiscal year 2019 DoD Appropriations Act, Pub. L. No. 115-245, suffer from similar flaws.  Plaintiffs fall outside of the zone of interests protected by these provisions, as the Court previously held, and Plaintiffs cannot evade that requirement simply by pleading an implied equitable claim outside of the APA.  Moreover, Defendants have complied with the statutory requirements in § 284, § 2808, and § 8005.  Indeed, Plaintiffs have not established a patent or obvious violation of these statutes, a higher threshold required for such implied claims.

The Court also should reject Plaintiffs' proposed remedies.  Plaintiffs have not satisfied the requirements for a permanent injunction because Defendants' compelling interests in border security, drug interdiction, and supporting the armed forces far outweigh Plaintiffs' speculative environmental concerns, as confirmed by the Supreme Court's stay order in the related *Sierra Club* litigation in the Ninth Circuit that resolved this same balance of equities in Defendants' favor.  Additionally, the APA's statutory "set aside" remedy does not apply beyond Plaintiffs' § 739 APA claim and cannot be used to vacate the Secretary of Defense's decisions authorizing the border barrier construction projects in their entirety.

Finally, the Court should stay any relief awarded to Plaintiffs pending appeal.  The Supreme Court's stay order was a clear directive that funding and construction of border barrier projects should be permitted to proceed until final resolution of the appeal process.  The Supreme Court recently denied a motion to lift that stay and last week the Government filed a petition for certiorari seeking review of the Ninth Circuit's decisions, which address several of same issues presented here.  In light of the current posture, there is no basis for the Court to grant immediate relief to Plaintiffs that would conflict with the Supreme Court's order or alter the status quo.

## ARGUMENT

**I.    Plaintiffs Lack Standing to Challenge Certain Border Barrier Projects.**

**A.    CBD Lacks Standing to Challenge Most § 2808 Projects.**

Defendants' motion explained that CBD has not presented sufficient evidence to establish standing to challenge most of the § 2808 projects.  *See* Defs.' Mot. at 13–16.  Although Defendants agreed that CBD has standing to challenge two § 2808 projects (Yuma 10/27 and San Diego 4), Defendants contested CBD's standing to challenge the remaining nine projects.  *See id.*  CBD concedes that it is no longer challenging two projects (Yuma 2 and Laredo 7), *see* CBD Reply at 4 n.1, thus the only remaining standing issue before the Court with respect to CBD is whether it has standing to challenge the following seven § 2808 projects:  Yuma 3, Yuma 6, El Paso 2, El Paso 8, San Diego 11, El Centro 5, and El Centro 9.  *See* Defs.' Mot. at 8.

CBD lacks standing to challenge these projects because it has not submitted evidence explaining how border barrier construction in these specific locations will harm its members' interests.  In contrast to the evidence it submitted for the § 284 projects,[2] CBD concedes that it has not submitted declarations from its members stating that they have recently recreated near the § 2808 project locations and explaining how construction in those specific locations will harm their interests.  *See* CBD Reply at 4–5.  As the Supreme Court has made clear, "a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly in the vicinity of it."  *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 565–566 (1992).  Evidence of project-specific harm is a necessary element for standing in the environmental context because the Court must "assure itself that some of these members plan to

---

[2] Defendants conceded that CBD has presented sufficient evidence to challenge the six fiscal year 2019 § 284 projects.  *See* Defs.' Mot. at 14.

make use of the specific sites upon which projects may take place." *Summers v. Earth Island Inst.,* 555 U.S. 488, 494 (2009).  Judges of this Court have applied this well-established principle to reject standing in cases like this one where plaintiffs have not presented sufficient evidence that construction on a specific site harmed their interests.  *See Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*, 75 F. Supp. 3d 387, 415–17 (D.D.C. 2014); *Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers*, 170 F. Supp. 3d 6, 13–14 (D.D.C. 2016).

CBD contends that it has standing to challenge the § 2808 projects because it has submitted declarations "addressing harm in the specific areas" of the projects that the Department of Homeland Security (DHS) identified as "priority areas" along the border.  *See* CBD Reply at 4–5.  To support that position, CBD refers back to its opposition to Defendants' motion to dismiss and specifically to a DHS document from December 2018 entitled "Walls Work," which stated that DHS intended to construct 215 miles of border barriers in unspecified locations in various border patrol sectors along the border.  *See* CBD Reply at 4 (citing CBD Opp'n Br. at 7).  But speculative allegations of harm resulting from generalized references to future construction in border patrol sectors, unconnected to any specific location within that large swath of territory, cannot satisfy the specificity requirement set forth in *Lujan* and *Summers*. [3]

Nor is it enough for CBD to assert that its members recreate in unspecified "federal lands administered by the Bureau of Land Management;" the "western portion of the Cabeza Prieta National Wildlife Refuge," which consists of over 800,000 acres, *see* Decl. of Paul Enriquez (Enriquez Decl.) ¶ 62 (Exhibit 2); or "in the vicinity of Yuma, Arizona."  CBD Reply at 5.  CBD's declarations are far too general and suffer from the same flaw that the Supreme Court

---

[3] For example, the El Paso Sector stretches 264 miles along the border with Mexico.  *See* www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/el-paso-sector-texas.

identified in *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990).  The Supreme Court dismissed

that case for lack of standing based on similar facts, holding that a plaintiff "assuredly" does not

provide enough "specific facts" when it only states "that one of respondent's members uses

unspecified portions of an immense tract of territory."  *Id.* at 889.  The challenged agency action

in *Nat'l Wildlife Fed'n* opened up approximately 4,500 acres to mining within a two million acre

area, but the plaintiff failed to establish that her recreational activities actually extended to the

particular 4,500 acres in dispute.  The declarations that CBD has submitted are similarly devoid

of specific facts establishing that construction of the contested § 2808 projects, all of which are

located in discrete locations along a narrow strip of land directly adjacent to the international

border, have injured CBD's members' recreational and aesthetic interests.  *Friends of the Earth,*

*Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 182–83 (2000) (concluding

that environmental plaintiff had standing to challenge alleged river pollution based on detailed

evidence that plaintiffs lived a half-mile from the facility causing the pollution and would have

recreated at a specific location along the river but for the pollution).

      **B.**     **RGISC Has Not Demonstrated Standing to Challenge All Barrier Projects.**

          **1.**     **RGISC Must Demonstrate Article III Standing With Respect to Each**
                **Project It Challenges.**

      RGISC incorrectly argues that it has standing to challenge Defendants' entire "funding

scheme" "to build a wall across the [southern] border," irrespective of whether it has

demonstrated standing as to each of the barrier projects it seeks to enjoin.  RGISC Reply at 3, 4.

That argument misunderstands Article III standing.  "A federal court is not 'a forum for

generalized grievances.'"  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018).  "[A] plaintiff may not

invoke federal-court jurisdiction unless he can show 'a personal stake in the outcome of the

controversy.'"  *Id.*  The courts "enforce that requirement by insisting that a plaintiff satisfy the

familiar three-part test for Article III standing," *id.*, "'for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("standing is not dispensed in gross").

The Supreme Court employed this particularized analysis of standing in *Gill*. In that case, the Court held that a group of Wisconsin Democratic voters had failed to establish standing to challenge on a statewide basis alleged partisan gerrymandering in the state legislative redistricting plan. *Gill*, 138 S. Ct. at 1930-31. The Court held that the only cognizable injury allegedly suffered by the plaintiffs resulted from the voter composition of their own districts and thus their claims had to proceed on a district-by-district basis. *Id.* at 1930, 1931 ("This fits the rule that a 'remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.'") (quoting *Lewis v. Casey,* 518 U.S. 343, 357 (1996)).

The injuries complained of by RGISC are similarly particularized: RGISC raises multiple *ultra vires* or APA claims based on harms allegedly caused by a handful of barrier projects, which are being funded by different statutory authorities (§ 284, § 2808, and the TFF). *See* Defs.' Mot. at 16. To determine RGISC's standing to press each of its claims, this Court must examine whether RGISC has demonstrated Article III standing requirements for Defendants' use of each of the authorities RGISC challenges. This analysis cannot be performed on a macro-level, because it is not Defendants' abstract use of a "funding scheme" that allegedly injures RGISC, but rather the construction of specific border barrier projects using specific sources of funding. *See Gill*, 138 S. Ct. at 1930 ("To the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific."). And assuming RGISC is successful, any order enjoining construction of barrier projects will be limited to projects for which RGISC establishes an injury-in-fact, traceable to Defendants' use of a disputed authority, and redressable by such

order.  *Id.* at 1931 (quoting *Lewis,* 518 U.S. at 357).

To the extent RGISC objects to Defendants' use of § 284, § 2808, or the TFF to undertake construction of the well over a dozen other barrier projects in areas along the border that undisputedly *do not impact* RGISC Plaintiffs, it "assert[s] only a generalized grievance against governmental conduct" that does not confer Article III standing.  *Id.* at 1930.

RGISC claims that standing to challenge an action is not defeated where "a plaintiff's injury may be caused by only one aspect or application of the challenged action."  RGISC Reply at 3.  Defendants do not disagree, but this argument misses the mark.  RGISC bases its contention on the false premise that Defendants' use of the contested authorities to undertake barrier construction is a single agency action—*i.e.*, a "funding scheme"—which RGISC seeks to set aside on the same legal grounds.  Unlike the cases RGISC cites,[4] this suit involves claims challenging decisions by multiple federal agencies relating to the construction of distinct barrier projects funded using different statutory authorities.  RGISC's claim that standing to challenge *three* of those barrier projects confers standing to challenge *all* barrier projects defies Article III principles.  *See Davis*, 554 U.S. at 734.

## 2.    RGISC Has Not Established Standing to Challenge the Construction of Barrier Projects in the Rio Grande Valley.

### a.   *RGISC's Claims Based on the Use of the TFF in RGV*

Although far from clear in its opening brief, RGISC now clarifies that it bases its

---

[4] *See* RGISC Reply at 3-4 (citing, *e.g.*, *Duke Power Co. v. Carolina Envt'l Study Group, Inc.*, 438 U.S. 59 (1978) (constitutional challenge to a federal statute); *Reed v. Salazar*, 744 F. Supp. 2d 98 (D.D.C. 2010) (action to set aside land management agreement between federal agency and a Native American tribe); *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694 (D.C. Cir. 1988) (challenge to federal agency's revised regulations).  Notably, as the Court should in this case, the D.C. Circuit in *National Wildlife Federation* scrupulously evaluated and affirmed "the plaintiff's standing to challenge each of the regulations in question."  839 F.2d at 703.

standing to challenge RGV barrier construction on Defendants' use of the TFF for certain barrier projects, which it alleges (without any supporting argument) violates § 739 of the CAA.  RGISC Reply at 5.  This late-breaking clarification does not salvage RGISC's standing claims.

First, any alleged injury caused by the barrier project planned near the Jackson Ranch and Eli Jackson cemeteries is neither traceable to Defendants' use of the TFF, nor redressable by the relief that RGISC requests.  *See Friends of the Earth*, 528 U.S. at 180-81 (Article III standing requires injury that is, *inter alia*, "fairly traceable to the challenged action of the defendant" and "likely, as opposed to merely speculative, [to] be redressed by a favorable decision.").  Contrary to RGISC's contention, Defendants have not conceded that U.S. Customs and Border Protection (CBP) is using the TFF to fund construction of this project.

Defendants have submitted several declarations of Loren Flossman, the Acquisition Program Manager for CBP's Wall Program Management Office (Wall PMO), addressing CBP's planned funding for construction of border barriers in RGV, including for the project near the cemeteries at issue, also known as "RGV 04."  *See* Decl. of Loren Flossman (Aug. 13, 2020) (Flossman Decl. (8/13/20)), ¶¶ 3-4 (Exhibit 1).  As Mr. Flossman has explained, "only two sources of funding are currently available to CBP for the construction of RGV 04: CBP's Fiscal Year 2019 appropriation (Public Law No. 116-6, § 230) and [the TFF]."  *Id.* ¶ 5.  The *availability* of the TFF, however, does not equate to the *actual use* of the TFF to fund the project's construction.  Mr. Flossman further explains that, "[c]urrently, RGV 04 is under contract and *fully-funded* with funds from CBP's Fiscal Year 2019 appropriation.  To date, *no TFF funds* have been obligated or used for the construction of RGV 04."  *Id.* ¶ 6 (emphasis added).  Indeed, after obligating the full contract and other costs of construction, "CBP has approximately $45 million in fiscal year 2019 funds available for potential cost overruns or risk

8

mitigation" for RGV 04.  *Id.* ¶ 7.  Although the TFF remains an available source of funding, Mr. Flossman confirms that the TFF would be used only "if there are unexpected cost overruns that exceed the [$45 million of] remaining fiscal year 2019 funds" and only after exhausting all of these remaining funds.  *Id.* ¶ 8.  Importantly, at this time, "CBP does not anticipate or expect that it will require the use of TFF funds to complete the construction of RGV 04."  *Id.*

Accordingly, RGISC has failed to sufficiently demonstrate the "cause-and-effect" relationship" between Defendants' use of the TFF for barrier construction and the injury allegedly caused by the barrier project near the cemeteries, as there is not a "substantial likelihood" that the project will be funded by the TFF.  *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 114 (D.C. Cir. 1990); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (holding that traceability was not established by speculation as to whether the government acted under the specific statutory authority being challenged).  For the same reason, RGISC has not established that the relief it seeks is "likely" to redress its injuries. *See Friends of the Earth*,  528 U.S. at 181.  If the Court were to enjoin Defendants' use of the TFF, it would have no effect on CBP moving forward with RGV 04 because the project is fully funded by fiscal year 2019 appropriations that are not disputed in this case.

Second, RGISC fails to establish Article III standing with respect to other barrier projects in RGV that CBP is in fact constructing with the TFF.  RGISC claims that it has standing because RGV 09 and RGV 10 will allegedly "increase[] flooding risks" to the Jackson Ranch and Eli Jackson cemeteries and will purportedly "deny the Carrizo/Comecrudo access to cultural and religious sites along the Rio Grande."  RGISC Reply at 5.  At the summary judgment stage, however, RGISC "can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts establishing standing."  *Scenic Am., Inc. v. U.S. Dep't of*

*Transportation*, 836 F.3d 42, 48-49 (D.C. Cir. 2016).  RGISC's evidence falls short.

RGISC offers declarations generally alleging that "the approximately 100 miles of new border walls and additions to existing border walls" planned in RGV pose a risk of flooding to the Jackson Ranch and Eli Jackson cemeteries, Tompkins Decl. ¶ 7, and that RGV 09 and RGV 10 risk harm to Carrizo/Comecrudo's ancestral sites and cultural/religious practices "along the [Rio Grande] riverbank," *see* Suppl. Mancias Decl. ¶ 11 (generally alleging that RGV 09 and RGV 10, "if built, would impede Carrizo/Comecrudo's access to the Rio Grande to engage in the cultural and religious practices detailed in my prior declaration").  RGISC ignores, however, that the vast majority of the 110-mile border wall system planned in RGV (including the majority of RGV 09 and RGV 10) will be constructed using CBP's fiscal year 2018 and 2019 appropriations that are not challenged in this case.  Indeed, CBP is using the TFF in RGV only to (a) cover the costs of increasing the height from 18 feet to 30 feet of an 11-mile barrier segment being constructed in RGV 09 using CBP's fiscal year 2019 appropriations, and (b) add 10 barrier miles (in four distinct segments) to existing pedestrian fencing in RGV 10.  *See* Decl. of Loren Flossman (Jan. 8, 2020) ¶ 7, *RGISC* ECF No. 68-1.  RGISC fails to present specific facts connecting the construction of these barrier segments using the TFF to the alleged harms posed by purported "flooding risks" or to the disturbance of the Carrizo/Comecrudo's cultural or religious interests at any particular ancestral site.  Such unspecific and generalized claims do not establish Article III standing.  *See Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1294 (D.C. Cir. 2007).

In any event, as described in the Declaration of Paul Enriquez, the Acquisitions, Real Estate and Environmental Director for the Wall PMO, Defendants dispute RGISC's allegations.  *See* Enriquez Decl. ¶¶ 98, 100 (explaining that RGISC's declarant's hydrological "findings are

10

at odds with both the floodplain analysis commissioned by CBP" and concurred with by the U.S.
Section of the International Boundary and Water Commission (USIBWC)); *see id.* ¶ 102
(explaining that CBP has surveyed all RGV project areas for "historic and cultural resources"
and instituted practices to ensure such resources are handled appropriately, if issues arise, and
that CBP "works with landowners and other stakeholders" regarding barrier gates "to ensure
continued access to the [Rio Grande] River" and the land adjacent to it); *see also infra* at 49-50.

> b.  *RGISC's Speculation about the Use of § 284 and § 2808 in RGV*

RGISC's claim that Defendants "are likely to invoke § 284 or § 2808 to complete
construction" of RGV barrier projects is likewise insufficient to establish standing.  RGISC
Reply at 6.  The facts RGISC presents in support of its claim—including an inapplicable 10%
cost overrun estimate and unsourced media reports about barrier painting costs—utterly fail to
prove that "it is substantially probable" Defendants will undertake construction in RGV using
these authorities.  *San Juan Audubon Soc'y v. Wildlife Servs., Animal & Plant Inspection Serv.*,
257 F. Supp. 2d 133, 142 (D.D.C. 2003) (quoting *Florida Audubon Soc'y v. Bentsen,* 94 F.3d
658, 664 (D.C. Cir. 1996)); *see Scenic Am., Inc.*, 836 F.3d at 48 (plaintiff must "actually prove"
its allegations of standing with "specific facts" to support its claim).  Rather, at best, RGISC has
"presented a series of speculative assumptions" "pasted together with inferential glue" that fall
well short of its heightened burden to establish standing at the summary judgment stage.  *San
Juan Audubon Soc'y*, 257 F. Supp. 2d at 142.

RGISC incorrectly contends that Defendants have not controverted its claim because they
did not provide CBP's cost estimates for RGV barrier projects.  RGISC Reply at 6.  The
summary judgment standard does not require Defendants to "negate" RGISC's standing claim.
*Cf. Lujan*, 497 U.S. at 884–85 (emphasis omitted).  Rather, as plaintiffs, RGISC must

demonstrate all three elements of standing by a preponderance of the evidence and, if it does not meet its burden, the Court should grant judgment for Defendants. *Lujan*, 504 U.S. at 561.

Nonetheless, Defendants submitted a sworn declaration from the CBP official responsible for border barrier construction, including projects planned in RGV, confirming that "the 110 miles of border wall system that CBP will construct in the Rio Grande Valley is fully funded," Decl. of Loren Flossman (Jun. 24, 2020) (Flossman Decl. (6/24/20)) ¶ 8, *RGISC* ECF No. 93-6, by CBP's fiscal year 2018 and fiscal year 2019 appropriations and the TFF, *id.* ¶ 5.  Mr. Flossman further explained that CBP has approximately $350 million currently available [from those sources] to address potential cost increases." *Id.* ¶ 11.  If unforeseen costs exceed that amount, "CBP will make adjustments to the planned border barrier projects to ensure they can be executed with the funding that is available from appropriations and the TFF," including "foregoing the construction of certain miles of border barrier or reducing or eliminating certain system elements." *Id.*  It will not, contrary to RGISC's claim, request or seek to have DoD use its authority under § 284 and § 2808 to complete these projects. *Id.*  Mr. Flossman also explained *ad seriatim* that RGISC's speculation about the use of § 284 and § 2808 for RGV barrier projects is premised on irrelevant and unfounded facts.  *See* Defs.' Mot. at 21-23.

RGISC's remarkable suggestion that the sworn statements of Mr. Flossman—an official from the agency component responsible for barrier projects—should not be taken at face value is factually baseless and inconsistent with the "presumption of regularity" that applies here. *E.g.*,[5]

---

[5] RGISC attempts to impugn the credibility of Defendants' statements by creating inconsistency where none exists.  *See* RGISC Reply at 8.  Specifically, RGISC cites Defendants' opposition to its request for jurisdictional discovery, based on the allegation that CBP could not build the 127-mile border system it plans for the Laredo Sector without resorting to § 2808 authority.  *See id.* Defendants' opposition denied that claim, and that denial is still true today.  Although the Secretary of Defense issued a decision shortly thereafter authorizing construction of Laredo 7

*Hercules, Inc. v. EPA*, 598 F.2d 91, 123 (D.C. Cir. 1978). Defendants have consistently asserted that construction of border barriers in RGV will not be undertaken pursuant to § 284 and § 2808. *See, e.g.*, Flossman Decl. (6/24/20) ¶ 5. Indeed, "DHS/CBP has never requested or recommended that [DoD] construct border barrier in [RGV]," nor has the Secretary of Defense "approved the construction of border barrier in [RGV]," pursuant to these authorities. *Id.* ¶ 7; *see generally* Cert. Index of Admin. Rec., *RGISC* ECF No. 82.

   3.   **RGISC Does Not Dispute that Claims Related to "El Centro A" Are Not Properly Before the Court.**

   RGISC does not dispute that its challenge to the construction of El Centro A—a project being constructed and funded *in fiscal year 2020* pursuant to § 284—is not properly before this Court, as the scope of RGISC's Amended Complaint relates solely to actions taken by Defendants in fiscal year 2019. *See* Defs.' Mot. at 17-18; *see also Cigar Ass'n of Am. v. FDA*, 315 F. Supp. 3d 143, 174 (D.D.C. 2018) (a party cannot "amend its complaint or broaden its claims" by raising this challenge for the first time in its summary judgment briefing citation omitted).

   The Court should consider RGISC's failure to respond as a concession and grant summary judgment to Defendants as to El Centro A. *See Lane v. Dist. of Columbia*, 72 F. Supp. 3d 215, 219 (D.D.C. 2014) (treating defendants' argument in summary judgment motion as conceded where plaintiff failed to address it in her response) (citing *Antoine v. U.S. Bank Nat'l Ass'n,* 821 F. Supp. 2d 1, 6 (D.D.C. 2010) (deeming an argument conceded when plaintiff did not respond to it in opposition to a summary judgment motion)); *see also* Standing Order for Cases Before Judge Trevor N. McFadden ¶ 12(B), *RGISC* ECF No. 11.

---

pursuant to § 2808, Laredo 7 is entirely separate from the 127-mile CBP project that was the subject of RGISC's discovery request and which was addressed in Defendants' opposition.

II.     **Plaintiffs' APA Claim Asserting a Violation of § 739 of the CAA Lacks Merit.**

A.      **Plaintiffs Do Not Fall Within the Zone of Interests of § 739.**

Plaintiffs assert a cause of action under the APA arguing that Defendants acted in violation of § 739 of the CAA, but Plaintiffs make no attempt to argue that they fall within § 739's zone of interests.  Instead, Plaintiffs argue that they satisfy the zone-of-interests test for § 739 because their environmental interests are protected by §§ 230, 231 and 232 of the DHS Appropriations Act for fiscal year 2019 (a separate component of the CAA), *see* Pub. L. No. 116-6, div. A, §§ 230–32, and these provisions are integrally related to § 739.  *See* CBD Reply at 6–9; RGISC Reply at 15–21.  The Court should reject that argument.  *See* Defs.' Mot. at 25–29.

Section 230 of the CAA appropriated $1.375 billion to DHS for the construction of barriers in the Rio Grande Valley and Plaintiffs are not within the zone of interests of that provision, which says nothing about protecting environmental interests.  Plaintiffs' argument thus rests on §§ 231 and 232, which place limitations on the use of funds in § 230 by prohibiting construction along certain areas of the border and requiring DHS to consult with local officials before beginning construction in certain locations.  *See* Pub. L. No. 116-6, div. A, §§ 231–32.  But these provisions do not have an integral relationship to § 739.  The purpose of § 739 is to regulate the spending relationship between federal agencies and Congress.  There is no relationship, let alone an integral one, between the restrictions in § 739 and the requirements in § 231 and § 232 addressing the protection of certain lands and local communities along the border.  These provisions function completely independently of each other and Plaintiffs cannot "leapfrog from their asserted protection" for environmental interests under §§ 231 and 232 to assert a cause of action for a violation of the congressional funding limitations in § 739.  *Air*

*Courier Conference v. Am. Postal Workers Union,* 498 U.S. 517, 530, (1991).[6]

Plaintiffs' arguments to the contrary lack merit.  CBD contends that the provisions are integrally related because they appear in the same statute, *see* CBD Reply at 7–8, but the Supreme Court rejected that argument in *Air Courier Conference*, 498 U.S. at 529–30.  It is not enough that two provisions appear in the same omnibus piece of legislation, such as the CAA, that address numerous subjects.  If that were the law, the zone-of-interests test would be deprived of "virtually all meaning."  *Id.* at 530.  RGISC similarly argues that the Court should not "parse out and isolate certain sections" of statutes in performing the zone-of-interests analysis, *see* RGISC Reply at 16, but that is exactly the way the Supreme Court has analyzed the issue in its decisions.  *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987) (focusing on relationship between 12 U.S.C. §§ 36, 81); *Air Courier Conference*, 498 U.S. at 529–30 (analyzing relationship between 39 U.S.C. § 601(b) and the Postal Reorganization Act).

Plaintiffs also are not helped by arguing that they fall within the zone of interests protected by §§ 230 and 231.  *See* CBD Reply at 8–9; RGISC Reply at 16–17.  Plaintiffs are seeking to enforce § 739, not the limitations in §§ 230 and 231.  Accordingly, the fact that Plaintiffs' interests arguably align with §§ 231 and 232 is beside the point.  To establish an APA cause of action to enforce § 739, Plaintiffs must either fall within the zone of interests of § 739, as it is "the relevant statute . . . whose violation is the gravamen of the complaint," *Lujan*, 497 U.S. at 886, or establish that § 739 is "integrally related" to §§ 231 and 232.  *Grocery Mfrs.*

---

[6] CBD argues that because the Court addressed the § 739 zone-of-interests issue at the motion to dismiss stage, the standard for reconsideration of a non-final order should govern the Court's review at summary judgment.  *See* CBD Reply at 6–7.  This argument lacks merit because Defendants are not moving for reconsideration under Rule 54(b).  In any event, the Court has broad discretion to reconsider its own rulings "as justice requires."  *Jones v. Castro*, 200 F. Supp. 3d 183, 185 (D.D.C. 2016) (alteration in original) (citation omitted).

Case 1:19-cv-00408-TNM   Document 74   Filed 08/14/20   Page 26 of 71

*Ass'n v. EPA*, 693 F.3d 169, 179 (D.C. Cir. 2012).  Plaintiffs have not satisfied either requirement.

The Supreme Court's cases applying the "integral relationship" exception to the "relevant statute" requirement support this conclusion.  *See* Defs.' Mot. at 26–29.  Plaintiffs' attempt to distinguish these cases is unavailing.  *See* CBD Reply at 7–8; RGISC Reply at 17–21.  RGISC points to language in *Clarke* that courts are "not limited to considering the statute under which [the plaintiffs] sued, but may consider any provision that helps . . . to understand Congress' overall purposes."  In *Clarke*, the Supreme Court looked to the statute setting forth a general rule regarding the location of national banks in order to understand the scope of the statute's "limited exception" for branch locations, which was the statute plaintiff claimed had been violated.  *See* 479 U.S. at 401–02.  In this case, the purpose of § 739 is not informed or illuminated by reference to the text or purpose of §§ 231 and 232.  *See Air Courier Conference*, 498 U.S. at 530.

The D.C. Circuit has similarly found an "integral relationship" between statutes only in narrow circumstances where the statutes at issue were closely intertwined.  *See* Defs.' Mot. at 28–29.  RGISC contends that this case is analogous to *National Petrochemical & Refiners Association v. EPA*, 287 F.3d 1130 (D.C. Cir. 2002), *see* RGISC Reply at 20–21, but the statutes at issues there were far more connected and interrelated than § 739 and §§ 231 and 232.  The Court of Appeals concluded in that case that an engine manufacturer alleging anticompetitive injury fell within the zone of interests to challenge EPA's emissions credit program established pursuant to the Clean Air Act's general authority to regulate pollutants, because of the close relationship between that authority and the Clean Air Act's penalty provisions that were intended to remedy anticompetitive harms.  *Nat'l Petrochemical*, 287 F.3d at 1147.  That type of relationship between a general grant of regulatory authority and related statutory penalties for

non-compliance is far more integral than the attenuated connection between § 739 and §§ 231 and 232.  This case thus falls into the same category of cases as *Air Courier Conference, Federation for American Immigration Reform, Inc. v. Reno,* 93 F.3d 897 (D.C. Cir. 1996), and *Grocery Manufacturers Association*, where there was no basis to extend the zone-of-interests requirement beyond the specific statute that formed the basis of the plaintiff's complaint.

### B.    Defendants' Border Barrier Construction Does Not Violate § 739 of the CAA.

Plaintiffs' § 739 claim also fails on the merits.  Defendants' motion explained that DoD's use of § 284 and § 2808 funds did not violate the restrictions in § 739.  *See* Defs.' Mot. 29–32. RGISC clarifies in its opposition brief that its § 739 challenge also extends to DHS's use of the TFF to provide additional money to border barrier projects in the Rio Grande Valley.  *See* RGISC Mot. at 5, 45.  That argument is baseless, however, because the TFF is not subject to § 739's funding limitations.  Section 739 restricts only the use of "funds made available in this or any other appropriations Act."  Pub. L. No. 116-6, div. D, § 739.  The TFF, however, does not receive annual appropriations from Congress.  *See* Decl. of John M. Farley ¶ 7 (Exhibit 3). Rather, it receives funding through "seizures and forfeitures made pursuant to any law . . . enforced or administered by the Department of the Treasury or the United States Coast Guard." 31 U.S.C. § 9705(a).  Accordingly, § 739 places no restriction on the use of the TFF.

DoD's use of § 284 and § 2808 for border barrier construction also does not violate § 739.  Plaintiffs misinterpret § 739, insisting that the phrase "program, project, or activity" must be given what they contend is its "plain language" meaning, but ignoring the appropriations context where that term of art appears. CBD Reply at 9; *see* RGISC Reply at 26.  The phrase "program, project, or activity" in the context of an appropriations statute refers to a particular item funded in an appropriations act for a particular agency.  *See* Defs.' Mot. at 29–31.  Here,

none of the § 284 and § 2808 projects that DoD is undertaking pursuant to its own statutory authority increases funding for an item within any budget account that belongs to DHS.

Plaintiffs do not meaningfully respond to the extensive authority cited in Defendants' motion, that the term "program, project, or activity" has this unique meaning in the context of appropriating funds between the Executive Branch and Congress. *See* Defs.' Mot. at 29–32. In response to the fact that § 739 has been regularly included in annual appropriations acts since 2014, CBD relies on the Supreme Court's recent statement in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2209 (2020), that "boilerplate is boilerplate for a reason—because it offers tried-and-true language to ensure a precise and predictable result." That truism supports Defendants' position and applies with particular force in this case because the term "program, project, or activity" should be given the meaning that both Congress and the Executive Branch have understood for years.

CBD argues that it prevails even if the term "program, project, or activity" is understood to refer to a specific element within an agency's budget account because the relevant item for purposes of the § 739 analysis is "the border fencing appropriation item in CAA § 230(a)(1)." CBD Reply at 11. That framing, however, underscores why there is no violation of § 739. Neither DoD's use of § 284 nor § 2808 is adding additional money to the DHS border fencing appropriation in the CAA. DoD's counter-narcotics support and military construction are entirely separate "programs, projects, and activities" from the border fencing construction undertaken pursuant to the "U.S. Customs and Border Protection—Procurement, Construction, and Improvements" appropriation. Pub. L. No. 116-6, div. A, § 230.

Defendants' position is not, as RGISC contends, "creative accounting" for litigation purposes. RGISC Reply at 26. The CAA, like other appropriations statutes, uses "programs,

18

projects, and activities" in a specific manner to refer to elements within an agency's budget

accounts. *See* H.R. Rep. No. 116-9, at 503 (2019) (directing DHS to "follow GAO's definition

of 'program, project, or activity' as detailed in the GAO's A Glossary of Terms Used in the

Federal Budget Process"). This interpretation is consistent with the well-established process by

which federal agencies request and receive funding from Congress based on agency-specific

requests for particular items and programs. *See* Defs.' Mot. at 30–31. RGISC thus ignores both

the context and unique meaning of "program, project, or activity" when it incorrectly contends

that all funding for border barrier construction, regardless of the agency or appropriation, is

going to the same project or activity for "the border wall." RGISC Reply at 26.

Contrary to Plaintiffs' arguments, § 739 does not prevent DoD from expending

appropriated funds pursuant to its statutory authority simply because DHS is also expending

appropriated funds on border fencing. *See* RGISC Reply at 26–27; CBD Reply at 11–12. The

Court recognized as much in its prior opinion in these cases. *See* Mem. Op. (April 2, 2020) at 44

(stating that "no one alleges that the Government is using general appropriations to inflate the

specific appropriation to Rio Grande Valley Sector barrier construction" and concluding that "the

Government is using general appropriations to fund a *different*, though similar, subject")

(emphasis in original). Accepting Plaintiffs' argument would result in a radical transformation

of appropriations law and there is no legal or historical support for such an extreme step. The

Court should therefore conclude that DoD's use of § 284 and § 2808 is consistent with § 739.

## III.   The Zone-Of-Interest Requirement Applies to Implied Equitable Causes of Action.

Plaintiffs also contend that DoD exceeded its statutory authority to fund and construct

border barriers pursuant to § 284, § 8005, and § 2808. The Court previously concluded that

Plaintiffs lack a cause of action to assert those claims under the APA because Plaintiffs fall

outside of the zone of interests protected by these statutes.  *See* Mem. Op. at 32–41.  Plaintiffs

should not be permitted to circumvent that conclusion by asserting the very same claims through

an implied equitable *ultra vires* cause of action.  The zone-of-interests test applies equally to

both APA claims and implied equitable claims.  *See* Defs.' Mot. at 32–38.

       Plaintiffs also try to downplay the impact of the Supreme Court's stay order in the related

*Sierra Club* litigation, but an order of the Supreme Court cannot be so easily cast aside.  *See*

RGISC Reply at 15; CBD Reply at 13.  The Supreme Court was confronted with the same

argument that Plaintiffs assert in this case regarding the inapplicability of the zone-of-interests

test to an implied *ultra vires* cause of action, and the Supreme Court concluded that the plaintiffs

in *Sierra Club* lacked a cause of action.  *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019)  ("Among

the reasons [for the stay] is that the Government has made a sufficient showing at this stage that

the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with

Section 8005.").  Contrary to CBD's argument, the fact that the Supreme Court did not use the

term "zone-of-interests" does not diminish the force of the order because the Supreme Court has

made clear a "cause of action extends only to plaintiffs whose interests fall within the zone of

interests protected by the law invoked."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*,

572 U.S. 118, 129 (2014).  Similarly, RGISC's critique that the order contained "no analysis" is

undermined by the fact that the Supreme Court gave a rationale for its decision, which is often

not the case in that particular posture.  *See Doe v. Trump*, 284 F. Supp. 3d 1182, 1185 (W.D.

Wash. 2018).  Here, the Supreme Court's order, although issued during a preliminary stage of

proceedings, undermines Plaintiffs' position that an implied equitable ultra vires claim is exempt

from the zone-of-interests requirement.  *See CASA de Md., Inc. v. Trump*, 2020 LEXIS 24672, at

*7 (4th Cir. Aug. 5, 2020) ("[E]very maxim of prudence suggests that we should decline to take

the aggressive step of ruling that the plaintiffs here are in fact likely to succeed on the merits right upon the heels of the Supreme Court's stay order necessarily concluding that they were unlikely to do so.").

This conclusion is supported by the Supreme Court's decisions in *Armstrong* v. *Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015) and *Hernandez v. Mesa*, 140 S. Ct. 735 (2020).  *See* Defs.' Mot. at 34–35.  Both of these decisions reinforce the principle that a judicially-created cause of action should not be extended "beyond the bounds Congress has delineated for a comparable express cause of action."  *Hernandez*, 140 S. Ct. at 747; *Armstrong*, 135 S. Ct. at 1384–85 ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations.").

CBD's argument that *Armstrong* has limited force in this context because of the unique facets of the Medicaid statute ignores the broader principle set forth in that case.  *See* CBD Reply at 14–15.  Just as the plaintiffs in *Armstrong* could not "by invoking [the court's] equitable powers, circumvent Congress's exclusion of private enforcement," *Armstrong*, 140 S. Ct. at 1385, Plaintiffs here cannot circumvent the well-established zone-of-interests requirement that applies to both APA and implied constitutional claims.

Additionally, there is no merit to RGISC's argument that *Hernadez* is distinguishable because it involved a *Bivens* claim.  *See* RGISC Reply 11–12.  *Bivens* is a judge-made implied cause of action similar to the type of implied equitable claim Plaintiffs assert here.  "[I]mplied causes of action are disfavored," *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009), and the Supreme Court in *Hernandez* looked to a comparable express cause of action (42 U.S.C. § 198) to delineate the boundaries of the implied *Bivens* claim.  *See Hernandez*, 140 S. Ct. at 747.  Here, that same reasoning leads to the conclusion that Plaintiffs cannot evade the zone-of-interests

requirement simply by pleading an implied equitable *ultra vires* claim.  It would turn the

Constitution's separation of powers on its head for courts to allow a larger class of plaintiffs to

sue an agency under an implied cause of action in equity than the class of plaintiffs Congress

intended to allow to sue under the APA's express cause of action that it created for such

challenges.  Accordingly, judicial authority to infer equitable claims cannot extend beyond the

traditional presumption that Congress does not intend to allow plaintiffs outside the zone of

interests of a statute to sue to enforce it.  *See Lexmark*, 527 U.S. at 129.

This same principle animates the line of Supreme Court cases rejecting arguments to

create judicially-implied remedies that exceed the limits of related statutes.  *See, e.g.*, *Bush v.

Lucas*, 462 U.S. 367, 369 (1983); *see also* Defs.' Mot. at 35.  CBD and RGISC argue that these

cases are distinguishable because the plaintiffs in those cases were seeking additional remedies

beyond established statutory schemes.  *See* CBD Reply at 15; RGISC 12–14.  But there is no

principled reason why the same analysis disfavoring courts from creating new remedies would

not apply here.  Plaintiffs similarly ask the Court to use its equity power to expand a cause of

action beyond the limits of the APA for litigants who do not fall within the zone of interests of

the statutes they seek to enforce.  The consistent line of Supreme Court authority rejecting

judicially-created expansions of equitable claims and remedies points in favor of rejecting

Plaintiffs' argument in these cases.

Plaintiffs also rely on the line of cases in the D.C. Circuit permitting plaintiffs to assert

equitable *ultra vires* claims even though express statutory causes of action were also available.

*See* CBD Reply at 15; RGISC Reply at 9, 23 (citing *Chamber of Commerce v. Reich*, 74 F.3d

1322 (D.C. Cir. 1996); *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).  But those

cases say nothing about the applicability of the zone-of-interests test to implied *ultra vires* claims

22

and such "drive by" rulings that do not discuss the issue have no precedential effect.  *See, e.g., Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006).  Moreover, Plaintiffs do not contend that the plaintiffs in the cited cases fell outside the zone of interests.  For example, in *Reich*, there is no question that the labor unions and employment associations fell within the zone of interests of the National Labor Relations Act to challenge an Executive Order about striking workers.  *See Reich*, 74 F.3d at 1325–25.  The Court should therefore reject the "absurd consequence[]" of an implied equitable suit brought by "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated" to those protected by the statutory provision on which the suit rests.  *Thompson v. North Am. Stainless, LP,* 562 U.S. 170,177-78 (2011).  If anything, the Supreme Court has indicated that, in light of the heightened separation-of-powers concerns with judicially implied causes of action, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855–58 (2017), it would be appropriate to apply a more rigorous zone-of-interests standard requiring that the provision at issue be intended for the "especial benefit" of the plaintiff seeking to enforce it.  *Clarke*, 479 at  400 n.16.

Defendants recognize that this Court reached the opposite conclusion in addressing Defendants' motion to dismiss, citing dicta in *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 811 n.14 (D.C. Cir. 1987).  *See* Mem. Op. at 48–49.  Since that decision, a divided panel of the Ninth Circuit similarly relied on the footnote in *Haitian Refugee Center* to conclude that the zone-of-interest test does not apply to implied *ultra vires* claims.  *See Sierra Club v. Trump*, 963 F.3d 874, 893 (9th Cir. 2020).  In dissent, Judge Collins rejected that position and concluded that plaintiffs may not "evade the APA's zone-of-interests test by asserting a non-APA claim for ultra vires conduct in excess of statutory authority."  *Id.* at 914 (Collins, J., dissenting).  The Court should adopt Judge Collins's position, not the Ninth Circuit panel majority.  As Judge Collins

explained, "it makes little sense, when evaluating a claim that Executive officials exceeded the limitations in a federal statute, not to ask whether the plaintiff is within the zone of interests protected by those statutory limitations." *Id.* Further, this Court and the Ninth Circuit panel majority relied on the wrong portion of the *Haitian Refugee Center* and neglected the critical second paragraph of the footnote. *Id.* at 914 n.17. That paragraph explains that in cases where the plaintiff challenges Executive action as exceeding statutory authority, the relevant question is whether the plaintiff's "interest may be said to fall within the zone protected by the limitation[s]" on the "statutory powers invoked by the [defendant]." *Haitian Refugee Center*, 809 F.2d at 811 n.14; *see Sierra Club* 963 F.3d at 914 & n.17. Here, the relevant limitations are supplied by § 284, § 2808, and § 8005, and Plaintiffs are not within the zone of interests of those provisions.[7]

## IV. Plaintiffs' *Ultra Vires* Claims Fail on the Merits.

### A. Plaintiffs' *Ultra Vires* Claims are Subject to a Heightened Standard of Review.

Defendants' motion also explained that Plaintiffs' *ultra vires* claims are reviewed under a heightened standard. *See* Defs.' Mot. at 38–40. "To challenge agency action on the ground that it is *ultra vires*, [a plaintiff] must show a 'patent violation of agency authority.'" *Fla. Health Sci. Ctr., Inc. v. Sec'y of HHS*, 830 F.3d 515, 522 (D.C. Cir. 2016) (quoting *Indep. Cosmetic Mfrs. & Distribs., Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 574 F.2d 553, 555 (D.C. Cir. 1978)). "A violation is 'patent' if it is 'obvious' or 'apparent.'" *Id.* "Garden-variety errors of law or fact are not enough." *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988).

---

[7] On August 7, 2020, Defendants filed a petition for certiorari in the Supreme Court seeking review of the Ninth Circuit's decisions in *Sierra Club* and *California v. Trump*, 963 F.3d 926 (9th Cir. 2020). *See Trump v. Sierra Club*, Case No. 20-138 (S. Ct.). The petition presents two questions, both of which are at issue in these cases: 1) whether plaintiffs have a cause of action to obtain review of § 8005; and 2) whether DoD exceeded the statutory limits of § 8005 in transferring funds for § 284 border barrier construction.

CBD concedes this point and "do[es] not dispute that ultra vires claims are subject to a heightened standard."  CBD Reply at 16.  Although CBD takes minor issue with the precise way in which Defendants framed the standard, *see* CBD Reply at 16, Defendants agree with CBD that that Plaintiffs must establish an "obvious," "patent," or "apparent" violation of statutory authority and "garden-variety" legal errors are not enough.  CBD Reply at 16–17.

RGISC objects to the application of a heightened standard and contends it is only applicable where Congress has precluded judicial review.  *See* RGISC at 21–23.  But the D.C. Circuit has stated that the heightened standard applies in cases like this one outside of the preclusion context.  *See Am. Clinical Lab. Assoc'n v. Azar*, 931 F.3d 1195 (D.C. Cir. 2019); *Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir 2006); *see also* Defs.' Mot. at 39–41.  RGISC then argues that *Trudeau* is distinguishable because it cited to *Griffith*, a preclusion case, in setting forth the narrow standard for *ultra vires* review.  *See* RGISC Reply at 22–23.  That citation, however, only reinforces that the heightened standard should apply in the non-preclusion context.  In *Trudeau*, the plaintiff made the same argument that RGISC makes here:  after dismissal of his APA claim on threshold grounds (lack of final agency action), the plaintiff asserted an implied *ultra vires* claim that the agency acted without statutory authority.  *Trudeau*, 456 F.3d at 189–90.  In response, the Court of Appeals expressly agreed with the Government's argument that the higher standard applied in that context, cited *Griffith*, and stated that "there certainly is no question that nonstatutory review 'is intended to be extremely limited in scope.'" *Id.* at 190 (quoting *Griffith*, 842 F.2d at 493).

RGISC also claims "the weight of this Circuit's case law" applies the heightened standard only where Congress intended to foreclose review.  *See* RGISC Reply at 23.  RGISC supports this argument by citing solely to preclusion cases, all of which pre-date *Trudeau* and

none of which say anything about whether the heightened standard applies in the non-preclusion context.  *See, e.g., McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of Judicial Conference of U.S.,* 264 F.3d 52, 63 (D.C. Cir. 2001).  Further, *American Clinical* relied on *Trudeau* to apply the heightened standard in a more recent non-preclusion case.  *See Am. Clinical Lab. Ass'n*, 931 F.3d at 1208 ("Although we hold that the statute itself does not bar review, we nonetheless consider [plaintiff's] *ultra vires* argument" under a standard where the plaintiff "must show a patent violation of agency authority").

*Trudeau* and *American Clinical* therefore establish that the heightened standard of review applies to Plaintiffs' *ultra vires* claims.  Applying that standard, Plaintiffs have not established an "obvious" or "patent" violation of § 8005, § 284, or § 2808.[8]

**B.    DoD Fully Complied with the Requirement of § 8005.**

Section 8005 authorizes the Secretary of Defense to transfer, "[u]pon determination . . . that such action is necessary in the national interest," up to $4 billion from certain appropriations made available in the DoD Appropriations Act.  CBD contends that DoD violated a proviso in § 8005 that states transfers are not authorized "where the item for which funds are requested has been denied by the Congress."  Pub. L. 115-245, div. A, § 8005; *see* CBD Reply at 17–20.  That conclusion—which the Government Accountability Office (GAO) rejected—is inconsistent with the statutory text, history, and purpose of § 8005.  *See* Defs.' Mot. at 41–46.

CBD relies on the Ninth Circuit's recent decision in *California v. Trump*, 963 F.3d 926 (9th Cir. 2020), but the Ninth Circuit panel majority erred by interpreting the term "item" to refer to additional funding for a "border wall" writ large, which the majority understood Congress to have "denied" when it appropriated only $1.375 billion to DHS for border barrier construction in

_____

[8] Even if the Court were to review Plaintiffs' *ultra vires* claims under a *de novo* non-deferential standard of review, Defendants would still prevail for the reasons set forth below.

the Rio Grande Valley.  *Id.* at 948–49.  That interpretation is inconsistent with the statutory

context.  As Judge Collins explained in his dissenting opinion, the position advanced by

California (and CBD here) is "implausible, because it ignores the context of the appropriations

process that § 8005 addresses."  *Id.* at 968 (Collins, J., dissenting).  When properly considered

within the context of the back and forth between Congress and DoD over appropriations, §

8005's phrase "'the item for which funds are requested has been denied by the Congress' is

referring to whether Congress, *during DoD's appropriations process*, denied an 'item' that

corresponds to the 'item for which funds are requested.'"  *Id.* at 971 (emphasis in original).

Applying that standard, "this case is easy" because, during the budgeting process, DoD never

proposed and Congress never denied any item of expenditure for DoD to provide assistance to

DHS for border barrier construction.  *Id.*

Even if the phrase "item for which funds are requested" is interpreted to mean an item

within DoD's own budget, CBD argues that it should prevail because Congress did deny funding

for border barrier construction in DoD's fiscal year 2019 budget.  *See* CBD Reply at 18–19.

Congress did no such thing, and CBD misunderstands the congressional budget documents that it

relies upon.  The gist of CBD's argument is that Congress appropriated funds to a so-called

"Southwest Border Fence subaccount" in prior years, thus the absence of funding in fiscal year

2019 means that Congress "denied" it for purposes of § 8005.  *Id.* at 19.  As threshold matter,

there is no such thing as a "Southwest Border Fence subaccount" within DoD's budget.  The

various conference reports from the 1990s and early 2000s that CBD relies upon (ECF No. 63-3)

simply list the border fence as a specific item to be funded and note the difference between the

amounts requested by DoD and those provided by Congress.  Contrary to CBD's argument, there

is no freestanding border fence subaccount that permanently exists in the annual DoD budget

such that CBD can draw a negative inference that Congress's failure to fund that sub-account in 2019 is a denial for purposes of § 8005.

Congress can and does deny funding requests in several different ways, but Congress did not take any of those actions to deny DoD's counter-narcotics support to DHS under § 284 in fiscal year 2019.  First, Congress can expressly deny DoD the ability to spend funds on particular items by including a statutory restriction in an appropriations act.  Section 231 of the CAA is an example of this type of restriction, but there is no similar statutory restriction preventing DoD from providing § 284 support to DHS's border barrier construction efforts.

Second, Congress can express its denial of particular items in the Joint Explanatory Statement of the Conference Report accompanying the DoD Appropriations Act each fiscal year. *See* H.R. 115-92 (Sept. 13, 2018), Conference Report Accompanying DoD Appropriation Act for Fiscal Year 2019.  Congress can state in the report that it is denying funds for a particular item or activity requested by DoD.  Additionally, the reports include detailed tables entitled "Explanation of Project Level Adjustments" that list the funding levels requested by DoD and the final funding appropriated by Congress.  Congress can deny funding by appropriating no funding to a particular item requested by DoD.  *See, e.g.,* H.R. Rep 115-92 at 261 (listing DoD's funding request for certain small arms weapons and listing no appropriated funds).  None of these objective, verifiable denials for § 284 border barrier funding appear in the conference report for the fiscal year 2019 DoD Appropriations Act.

This understanding of the way denials work in the appropriations context is reinforced by the history leading to the passage of § 8005.  Congress first imposed limitations on DoD's transfer authority for "denied" "items" in 1974, to ensure that DoD would not transfer funds for items in its budget that "ha[d] been *specifically deleted* in the legislative process."  H.R. Rep.

No. 93-662, at 16 (emphasis added).  Section 8005 thus functions to protect the choices Congress

makes in "delet[ing]" items requested by DoD during the appropriations process.  But Congress

never considered, let alone deleted, any request by DoD to use counterdrug appropriations to

assist DHS for border barrier construction.

The GAO—"an agent of the Congress," *Bowser* v. *Synar*, 478 U.S. 714, 731 (1986)

(citation omitted)—agrees with this interpretation of § 8005.  *See* GAO Opinion B-330862, 2019

WL 4200949 (Sept. 5, 2019).  CBD argues that the GAO's decision is flawed because it did not

take into account the fact that Congress appropriated funds to DoD for border barrier support in

prior years but not in 2019.  *See* CBD Reply at 19.  There was no reason for the GAO to consider

Congress's border barrier funding decisions 20 years ago in order to evaluate whether there was

a denial of that item in 2019.  The important point is that DoD did not request funds to support

DHS in 2019, "so there was nothing for Congress to deny with respect to DOD."  *Id.* at *8–9

(noting that GAO had "reached similar conclusions in prior opinions").

CBD also argues that § 8005 refers to "items" denied by Congress, not funding requests.

CBD Reply at 19.  But the "item for which funds are requested" in § 8005, a statute governing

internal transfers of funds within DoD, can only be an "item" for which DoD could request

funding during the process of negotiating its budget.  Here, that "item" is DoD's counter-

narcotics support to DHS under § 284 and there is no basis to conclude "that Congress ever

'denied' such an item to DoD during DoD's appropriations process."  *California*, 963 F.3d at

971 (Collins, J., dissenting).

### C.    DoD's Border Barrier Construction Pursuant to § 284 is Lawful.

RGISC's claim that DoD violated § 284 likewise misses the mark.  *See* RGISC Reply at

28–30.  Section 284 authorizes DoD to "provide support for the counterdrug activities . . . of any

other department or agency," if "such support is requested."  10 U.S.C. § 284(a).  This support

explicitly includes the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." *Id.* § 284(b)(7). RGISC does not argue that the six counter-narcotics support projects DoD is undertaking pursuant to § 284 violate any requirement in the statute itself. *See California*, 963 F.3d at 957 n.12 (Collins, J., dissenting) (rejecting California's argument that "DoD has exceeded its authority under § 284" as "patently without merit").

Instead, RGISC contends that DoD has exceeded the level of support it can provide under § 284 as contrary to "Congress's specific decisions about funding of the border wall." RGISC Reply at 28. This objection focuses on the amount of funding DoD is spending to support DHS, but the "support" authorized by § 284 is limited only by the *types* of assistance permitted, not by the *degree* of such assistance. Indeed, no monetary restrictions appear in the list of support-activities permitted under § 284. *See* 10 U.S.C. § 284(b)–(c). The statute broadly approves numerous forms of support, including fencing, without regard to a project's scale or budget. *Id.* § 284(b)(7); *see* Defs.' Mot. at 46–50. There is no basis for the Court to re-write the statute to impose an arbitrary limit on the amount of money that DoD can provide in § 284 support.

RGISC's argument that this case is analogous to *Food & Drug Administration v. Brown & Williamson Tobacco Corporation*, 529 U.S. 120 (2000), is meritless. *See* Defs.' Mot. at 49. The Supreme Court's decision that the FDA could not exercise jurisdiction over tobacco was based on "the intent that Congress has expressed" in the "overall regulatory scheme" as well as in the "tobacco-specific legislation" that it had enacted. *Brown & Williamson*, 529 U.S. at 126; *see id.* at 144. Unlike in *Brown & Williamson*, Congress has neither "directly spoke to the issue" before the Court nor enacted a complex web of laws over a 35 year period that would suggest Congress has precluded DoD from providing § 284 support to DHS. *Id.* at 133. To the contrary,

Congress's longstanding support for DoD's § 284 authority undermines RGISC's argument. *See* Defs.' Mot. at 47–48. Moreover, the only law RGISC points to as possibly precluding § 284 support is § 230 of the CAA, but Congress's appropriations to DHS say nothing about whether DoD is prohibited from using its own statutory authorities and appropriations to support DHS's counterdrug activities.

Defendants' straightforward reading of § 284 does not displace the "judgment of Congress embodied in the CAA." RGISC Reply at 29. Whether and how much Congress chooses to appropriate to DoD or DHS in a given fiscal year, and whether and under what circumstances Congress authorizes DoD to transfer funds between internal appropriation accounts, does not change the scope of DoD's underlying statutory authority set forth in the text of § 284. There is no dispute that DoD has complied with the statutory requirements of § 284 and the Court should reject RGISC's argument that Congress implicitly limited DoD's § 284 funding authority merely by appropriating funds to DHS.

### D.      DoD's § 2808 Military Construction is Lawful.

The Court should reject Plaintiffs' unduly narrow reading of § 2808 that the military construction projects at issue are neither construction with respect to a military installation nor necessary to support the use of the armed forces. *See* RGISC Reply at 30–37; CBD Reply at 20–24. The 11 projects fall well within the plain text, purpose, and historical context of those statutory requirements. *See* Defs.' Mot. at 50–60.

#### 1.      The § 2808 Border Barriers are Military Construction Projects.

Section 2808 authorizes "military construction projects . . . that are necessary to support [the] use of the armed forces" in a national emergency. 10 U.S.C. § 2808(a). Military construction is defined as "any construction . . . of any kind carried out with respect to a military

installation." *Id.* § 2801(a).  The term "military installation" in turn is defined as "a base, camp, post, station, yard, center, or other activity under the jurisdiction of the Secretary of a military department." *Id.* § 2801(c)(4).  Nine projects will take place on land assigned to Fort Bliss, an Army Base under the jurisdiction of the Secretary of the Army that is indisputably a "military installation;" the other two will occur at the Barry M. Goldwater Range, which Plaintiffs do not dispute is a military installation.  In addition, the projects satisfy the definition of a military installation because they are an "other activity under the jurisdiction of the Secretary of a military department."  10 U.S.C. § 2801(c)(4); *see* Defs.' Mot. at 51–56.

Plaintiffs' arguments to the contrary lack merit.  CBD and RGISC incorrectly contend that Defendants' interpretation of § 2808 "would allow *any* land to be the subject of military construction funds."  CBD Reply at 21; *see* RGISC at 31–32.  Section 2808, however, imposes meaningful restraints on DoD's authority to engage in emergency military construction.  Before DoD can acquire any land, there must be a declaration of a national emergency by the President that requires use of the armed forces and the Secretary of Defense must conclude that each project is necessary to support such use of the armed forces in the context of that emergency. These are not trivial constraints.  Upholding DoD's exercise of § 2808 authority for these projects would not provide DoD with boundless authority to acquire any land it wants using military construction funds.  Each of the disputed military construction projects at issue here is taking place on a specific tract of land along the southern border that has been (or will be) acquired by the military and placed under the jurisdiction of the Secretary of the Army and assigned to Fort Bliss.  The projects thus satisfy the definition of military construction because they entail construction with respect to a particular piece of land that qualifies as a military installation.

RGISC argues that the § 2808 projects do not satisfy the definition of military installation because they are not "connected to Fort Bliss in terms of its functions, purpose, or even geography."  RGISC Reply at 32.  These purported limits appear nowhere in the statutory text, and they make little sense in this context.  Section 2808 allows DoD to acquire land for military use in the event of a national emergency, and to build military construction projects on that land that the Secretary deems necessary to support the use of the armed forces in connection with that emergency.  Its purpose is to expand the military's ability to support DoD personnel in times of emergency, not to contract it.  The Court should therefore decline RGISC's invitation to impose vague and arbitrary constraints on DoD.

RGISC also argues that the examples of noncontiguous military installations listed in Defendants' motion are irrelevant because, in those examples, there is a substantive connection between the remote locations and the main hub.  *See* RGISC Reply at 32.  Even assuming the statute imposed such a requirement, which it does not, the Assistant Secretary of the Army for Installations, Energy and Environment explained the operational reasons why the § 2808 project sites were assigned to Fort Bliss.  *See* Decl. of Alex A. Beehler ¶ 11 (Nov. 25, 2019) (Exhibit 4).  These reasons include Fort Bliss's proximity to the southern border and its experience addressing various land management issues and working with the U.S. Army Corps of Engineers (USACE) on military construction projects.  *Id.*  The internal assignment of military property to a particular installation is a decision for DoD, and Plaintiffs provide no basis for the Court to second-guess that determination.  *See*, *e.g.*, *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (courts should defer to the "[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force").

RGISC next argues that DoD's decision to assign the projects to Fort Bliss "does not

make sense on its own terms" because the exercise of jurisdiction over the contested areas "would result in the military's abandonment" of them.  RGISC Reply at 32–33.  But RGISC cites no record evidence supporting their assertion that, once the projects are completed, no military personnel or purpose will remain.  Moreover, RGISC's argument merely restates their disagreement with the Secretary of Defense's military judgment that the projects are necessary to support DoD personnel because they create a force-multiplier effect, allowing military personnel to redeploy to other areas of the border.  No one would doubt the permissibility of constructing a fence or installing barbed wire around the perimeter of a military installation to prevent enemy forces from entering the base, even though such barriers allow troops guarding the perimeter to be redeployed elsewhere.  Thus, RGISC's disagreement is not about the presence or absence of military personnel but about the type of military construction project.  Nothing in the statute, however, supports the limitations RGISC seeks to impose.

The broad reach of the definition of a military installation is further confirmed by the expansive catch-all phrase "or other activity under the jurisdiction of the Secretary of a military department."  10 U.S.C. § 2801(c)(4).  RGISC takes issue with Defendants' position that the projects fall within the scope of this provision, *see* RGISC Reply at 33, but this residual category confirms that the statutory list of places in § 2801(c)(4), such as "base" or "camp," was not intended to be restrictive, and Congress instead sought to ensure that all activity under military jurisdiction is defined as a "military installation."  The general canons of statutory interpretation that RGISC invokes, *see* RGISC Reply at 33–34, cannot alter the plain meaning of the text.  And RGISC's interpretation would have untenable consequences if adopted.  For example, DoD would no longer be able to undertake even routine military construction projects—such as the construction of a radio tower to facilitate troop communication—on small, distant parcels of land

where the military exercises jurisdiction.

Defendants' interpretation of the "other activity" clause is reinforced by the Supreme Court's recognition that the term "military installation" is generally "synonymous with the exercise of *military jurisdiction*." *United States v. Apel*, 571 U.S. 359, 368 (2014) (emphasis in original).  RGISC's effort to distinguish *Apel* on its facts is unavailing.  *See* RGISC Reply at 34. Although *Apel* focused on a different federal statue (18 U.S.C. § 1382), which criminalized trespassing on a military installation, the Supreme Court considered the attributes of a military installation and surveyed both the history and the way Congress has defined the term in various statutes, including § 2801.  *Apel*, 571 U.S. at 367–70.  The Supreme Court ultimately concluded that "[w]here a place with a defined boundary is under the administration of a military department, the limits of the 'military installation' for purposes of § 1382 are coterminous with the commanding officer's area of responsibility."  *Id.* at 373.  That interpretation supports Defendants' position here that § 2801's definition of military installation should be coextensive with the location where DoD conducts an activity under its jurisdiction.

Section 2808 also authorizes land acquisition, permitting DoD to acquire the land needed for construction, rather than limiting its construction to pre-existing military installations.  CBD contends otherwise, *see* CBD Reply at 21–23, but the definition of military construction expressly includes "any acquisition of land," 10 U.S.C. § 2801(a), and Congress plainly expected DoD to acquire new land for § 2808 construction by including a notification requirement that DoD must inform Congress of "the cost of any real estate action pertaining to th[e] construction projects."  10 U.S.C. § 2808(b).  That notice provision would be meaningless if § 2808 construction were limited solely to parcels of real estate already under DoD's control.  CBD argues that DoD's internal directives for acquiring new property do not specifically address

§ 2808, *see* CBD Reply at 21, but that criticism lacks force because the policies are generally applicable "with regard to the acquisition of real property" regardless of the statutory authority for the acquisition. *See* DoD Instruction 4165.71, Real Property Acquisition.

CBD's position also conflicts with the text of § 2801, which authorizes DoD to undertake actions that are "necessary to produce a complete and useable facility or a complete and usable improvement to an existing facility." 10 U.S.C. § 2801(b). Land acquisition is undoubtedly a necessary action to complete the projects. CBD asserts that this position "strains credulity" because it would enable DoD to spend military construction funds anywhere eminent domain might be conceivable. *See* CBD Reply at 23. But the entire point of § 2808 is to provide DoD with a broad and flexible authority to engage in military construction in emergency situations, regardless of whether the land must first be acquired before undertaking that construction. Indeed, § 2808 authorizes military construction (including the acquisition of the land needed for the construction) worldwide in both foreign and domestic locations. *See* 10 U.S.C. § 2801(c)(4). The limitations in § 2808 are not based on geography, but rather the factual circumstances in which the authority may be utilized. Those statutory criteria are satisfied here and the Court should reject CBD's effort to limit § 2808's land acquisition authority.

### 2. The § 2808 Border Barriers Support the Use of the Armed Forces.

As set forth in Defendants' motion, the administrative record explains at length why the 11 military construction projects support the armed forces in connection with the national emergency at the southern border. *See* Defs.' Mot. at 56–60.[9] The projects will deter illegal

---

[9] The Court previously concluded that there are no judicially manageable standards for reviewing whether the border barrier construction projects are "necessary" to support the armed forces. *See* Mem. Op. at 30–31. Therefore, the question at this stage is whether "construction supports the use of the armed forces." *Id.* at 31.

entry, increase the vanishing time of those illegally crossing the border, and channel migrants to ports of entry.  Military troops have been deployed to these areas to support efforts by DHS to address those specific concerns.  Consequently, the construction of new or upgraded barriers in those locations will allow the military to support those efforts more efficiently and effectively.  *See* Administrative Record (AR) at 185–94; 226–54; 281–321.  The projects thus serve as a "force multiplier":  they will help secure certain locations while allowing military forces to help DHS secure others, thus maximizing the use of those forces overall.  *See* AR at 193.

The Court should defer to the Secretary of Defense's judgment based on longstanding principles of judicial deference to military decisions.  *See* Defs.' Mot. 57–58; *Gilligan*, 413 U.S. at 10; *see also Doe 2 v. Shanahan*, 917 F.3d 694, 702 (D.C. Cir. 2019) (instructing that "courts defer to the reasoned, professional analysis of Congress and the Executive on matters strictly within the realm of military expertise").  RGISC contends that no deference should apply to the Secretary's decision because this case is about statutory interpretation challenging DoD's decision to reallocate military construction funds.  *See* RGSIC Reply at 26.  RGISC's argument lacks merit because it does not engage with the specific statutory element of the statute at issue here, namely whether the § 2808 projects support the armed forces.  That question is a fact-laden issue that cannot be resolved simply by reading the text of the statute in isolation or applying canons of statutory construction.  Rather, the determination as to what actions and resources will support the armed forces during an ongoing deployment is a fact-based judgment within the unique expertise of the military.  *See, e.g.*, *Kreis v. Sec'y of Air Force*, 406 F.3d 684, 686 (D.C. Cir. 2005) (stating that a "military judgment requiring military expertise" is reviewed under an "unusually deferential" standard).  The Secretary of Defense undertook a robust internal deliberative process, seeking analysis and advice from the Chairman of the Joint Chiefs of Staff,

and input from others, regarding the benefits the § 2808 projects would have on the military personnel currently deployed to the border.  The Secretary's decision that the projects support the armed forces by improving their effectiveness and efficiency is well supported by the record and the Court should defer to it.[10]

RGISC also contends that the projects are not authorized under § 2808 because, in addition to supporting the armed forces, the projects assist DHS in its border security mission.  *See* RGISC Reply at 35.  But that shared mission merely reflects the nature of the national emergency, which was declared precisely because DHS could not manage the southern border alone.  *See* Presidential Proclamation on Declaring a Nat'l Emergency Concerning the S. Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019).  Nothing about that mission is untoward and Congress has repeatedly authorized DoD to provide a wide range of support to DHS at the southern border.  *See, e.g.*, 10 U.S.C. §§ 251-252, 271-284.  Further, military personnel have long supported civilian law-enforcement agency activities to secure the border, counter the spread of illegal drugs, and respond to transnational threats.  *See* Defs.' Mot. to Dismiss at 6 (*RGISC* ECF No. 34).  Nothing in § 2808 remotely suggests that a military construction project ceases to support the military simply because its benefits are shared with another agency.  The fact that the projects both support the armed forces and assist DHS in its efforts to secure the border do not render them unlawful under § 2808.

---

[10] RGISC's reliance on *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), is misplaced because that decision said nothing about the deference principles to be applied when Congress has delegated statutory authority to the Secretary of Defense to make particular factual findings in furtherance of supporting the armed forces.  *Youngstown* was a case about the exercise of the President's Article II power as Commander in Chief  to domestic manufacturing, *id.* at 587,  and did not involve any question of deference to military judgment in carrying out statutory authority, similar to the issue here.

V.      **The Court Should Reject Plaintiffs' Various Requests for Relief.**

For the reasons explained above and in Defendants' motion, DoD's funding and

construction of the § 284 and § 2808 projects is lawful.  Accordingly, the Court should enter

summary judgment in favor of Defendants without examining whether Plaintiffs are entitled to

the remedies they seek.  In the event, however, the Court determines otherwise, the Court should

nevertheless reject Plaintiffs' requests for overbroad relief.

A.      **Plaintiffs Have Not Met the Requirements For a Permanent Injunction.**

The Court should deny Plaintiffs' request for a permanent injunction.  *See* RGSIC Reply

at 39–44; CBD Reply at 27–38.  A plaintiff seeking a permanent injunction must satisfy a four-

factor test before a court may grant such relief.  A plaintiff must demonstrate: "(1) that it has

suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

inadequate to compensate for that injury; (3) that, considering the balance of hardships between

the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC.*, 547 U.S.

388, 391 (2006).

Even if Plaintiffs were to prevail on the merits of their claims, permanent injunctive relief

is not automatic.  *See Weinberger v. Romero–Barcelo,* 456 U.S. 305, 313 (1982) ("The grant of

jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under

any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated

to grant an injunction for every violation of law."); *Eco Tour Adventures, Inc. v. Zinke*, 249 F.

Supp. 3d 360, 385 (D.D.C. 2017).  As the Supreme Court has emphasized, a permanent

"injunction is a matter of equitable discretion; it does not follow from success on the merits as a

matter of course."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008); *see Monsanto*

*Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010) ("the traditional four-factor test" for

injunctive relief "applies in [National Environmental Policy Act (NEPA)] cases).

Here, the Court should deny Plaintiffs' request for a permanent injunction because the balance of equities tips decisively in favor of Defendants.  Indeed, in staying an injunction prohibiting construction of the § 284 projects, the Supreme Court already determined that the harm to the Government from an injunction prohibiting border barrier construction outweighs the aesthetic, recreational, and environmental interests advanced by Plaintiffs.  *See Trump*, 140 S. Ct. at 1.  Such stays may issue only if the applicant satisfies all four stay factors, including that the balance of the harms and the public interest favors a stay.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009).  The environmental interests that Plaintiffs assert in these cases are similar to those advanced by the plaintiffs in the *Sierra Club* litigation, and the balance of equities favors Defendants, as the Supreme Court necessarily recognized.  *See Trump*, 140 S. Ct. at 1 ("*Among the reasons* [for the stay] is that the Government has made a sufficient showing . . . that the plaintiffs have no cause of action.") (emphasis added); *see also Trump v. Sierra Club*, No. 19A60, 2020 WL 4381616, at *1 (U.S. July 31, 2020) (denying Sierra Club's motion to lift stay).

The Supreme Court applied a similar balancing analysis in *Winter*, reversing a preliminary injunction prohibiting the Navy from using sonar technology in training exercises at sea, where plaintiffs claimed the sonar would injure them because they "observ[ed]" and "photograph[ed]" marine mammals in the area and "conduct[ed] scientific research."  555 U.S. at 13-14, 25-26.  The Court explained that "the District Court and the Ninth Circuit significantly understated the burden the preliminary injunction would impose on the Navy's ability to conduct realistic training exercises, and the injunction's consequent adverse impact on the public interest in national defense," which "plainly outweighed" the harms asserted by the plaintiffs.  *Id.* at 24, 33.  And the Court explained that its "analysis of the propriety of preliminary relief [wa]s

40

applicable to any permanent injunction as well," which requires consideration of the same equitable factors. *Id.* at 33. Plaintiffs' interests are even less substantial than those in *Winter*, and the balance of equities likewise bars injunctive relief against the § 284 and § 2808 projects.

### 1. An Injunction Will Impose Substantial and Irreparable Harm on Defendants.

DHS identified the § 284 barrier projects at issue because of the high rates of drug smuggling between ports of entry in those areas of the border. *See* AR at 15–24. The record includes ample evidence of the severity of the problem; the limited effectiveness of the outdated barriers in those areas, which transnational criminal organizations have adjusted their tactics to evade; and the need for new barriers to redress these harms. *See id.* The Supreme Court has recognized that the Government has "compelling interests in safety and in the integrity of our borders." *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672 (1989). In addition, Congress has recognized the significance of border barriers in helping curtail the flow of "narcotics, and other contraband," that harm public safety. Public Law No. 109-367, § 2(b); *see also* H.R. Rep. 114-840 at 1147 (2016) (calling for additional use of § 284 because Congress is "concerned about the threat posed by the production and trafficking of heroin, fentanyl (and precursor chemicals), and other illicit drugs"); H.R. Rep. No. 110-652 at 420 (2008) (describing border fencing as an "invaluable counter-narcotics resource").

Defendants have similarly strong interests in the § 2808 projects. The President declared a national emergency because of the large number of aliens attempting to cross the border and the significant quantities of illegal drugs that are smuggled across the border each year. *See* Proclamation; *see also* Veto Message for H.J. Res. 46, 2019 WL 1219481 (Mar. 15, 2019); Veto Message for S.J. 54, 2019 WL 5206087 (Oct. 15, 2019). The President has also determined that the unique skills and resources of the armed forces are required to confront this crisis. *See id.*

41

Further, the Secretary of Defense has concluded that the § 2808 border barrier projects are necessary to support the use of the armed forces in the context of supporting DHS at the southern border.  The Government and the public thus have a compelling interest in ensuring that its military forces are properly supported and have the necessary resources to ensure mission success.  *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) (courts must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest."); *Winter*, 555 U.S. at 25 (military training and readiness are of the "utmost importance to the Navy and the Nation").

Border barriers have historically proven to be an extremely effective tool for deterring and impeding illegal crossings into the United States.  *See* Decl. of Jerry B. Martin ¶¶ 4–15 (Exhibit 5).[11]  A permanent injunction against the § 284 and § 284 projects would threaten public safety by prohibiting Defendants from taking critical steps needed to secure the southern border, prevent the continuing surge of illegal drugs from entering the country, and provide necessary support to the armed forces.  *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (acknowledging the "weighty" interest "in efficient administration of the immigration laws at the border"); *United States v. Guzman-Padilla*, 573 F.3d 865, 889 (9th Cir. 2009) (acknowledging the

---

[11] Relying on an audit report from the DHS Inspector General, CBD incorrectly contends that CBP has not provided meaningful data regarding the efficacy of border barriers.  *See* CBD Reply at 37 (citing DHS Office of Inspector General Report, No OIG-20-52 (July 14, 2020)).  The report focused on CBP's consideration of alternative solutions to gain operational control of the border.  It said nothing to suggest border barriers are ineffective to stop cross-border drug trafficking or illegal entry.  CBD also relies on a statement in a GAO report from 2017 that recommended CBP develop metrics "to assess the contributions of pedestrian and vehicle fencing to border security along the southwest border and apply this information, as appropriate, when making investment and resource allocation decisions."  GAO, Border Security Assessment of DHS's Broder Security Improvement Plan, GAO Report No. 19-538R at 18 (July 16, 2019).  That recommendation does not suggest border barriers are ineffective and, in any event, the report notes that CBP was taking steps to address the recommendation as of 2018.  *Id.*

government's "strong interests in protecting the nation's territorial integrity and interdicting the flow of drugs"); *Commonwealth of the N. Mariana Islands v. United States*, 670 F. Supp. 2d 65, 87-88 (D.D.C. 2009) (recognizing "weighty and legitimate" federal interests in "ensur[ing] effective border control procedures").

In addition, a permanent injunction would force DoD to incur potentially millions of dollars of unrecoverable fees and penalties to its contractors for each day that work is suspended—costs that DoD would not have to pay but for an injunction. *See* Decl. of Antoinette R. Gant (Exhibit 6) (explaining the fees and costs that would be incurred from enjoining each § 284 and § 2808 project); *see also id.* ¶ 43 (estimating that suspension costs for § 2808 projects would be approximately $32 million per month). DoD will have to pay these additional, unnecessary costs from the funds available for § 2808 and § 284 border barrier construction, thus diminishing the money available for construction. *See id.* ¶¶ 11, 41.

### 2.     Defendants' Interests Decisively Outweigh Plaintiffs' Environmental Interests.

Defendants' compelling interests "plainly outweigh[]" Plaintiffs' alleged environmental interests associated with, *inter alia*, hiking, kayaking, and birdwatching in drug-smuggling corridors along a narrow strip of land adjacent to the border. *Winter*, 555 U.S. at 26, 33. Plaintiffs assert the same interests that the Supreme Court determined were insufficient to grant a stay in the *Sierra Club* litigation, and those interests are equally insufficient to grant a permanent injunction here.

To support its claim to a permanent injunction, CBD focuses on the alleged environmental harms associated with the Tucson § 284 projects (Tucson 1, 2, and 3) in Arizona. *See* CBD Reply at 29–35. CBD contends that construction of these projects harms wildlife, vegetation, hydrology, and its members' recreational and aesthetic interests. *See id.* But CBD

43

has failed to show construction will substantially affect plant and wildlife species as a whole, or

that the projects will interfere with its members' use of surrounding areas.

At the outset, the Court should reject CBD's contention that injury to small numbers of

individual members of plant or animal species is sufficient to establish irreparable injury.  *See*

CBD at 30–31.   The D.C. Circuit rejected that argument in *Fund for Animals v. Frizzell*, 530

F.2d 982, 987 (D.C. Cir. 1975), a case CBD notably does not cite:

> We cannot accept [plaintiffs'] extreme contention that the loss of only one
> bird is sufficient injury to warrant a preliminary injunction; rather, a
> proponent of such an injunction must raise a substantial possibility that the
> harvest of excessive numbers of these waterfowl *will irretrievably damage
> the species*.  To equate the death of a small percentage of a reasonably
> abundant game species with irreparable injury without any attempt to show
> that the well-being of that species may be jeopardized is to ignore the plain
> meaning of the word.

*Id.* at 987 (emphasis added); *see also Water Keeper Alliance* v. *Dep't of Def.*, 271 F.3d 21, 34

(1st Cir. 2001) (death of "single member of an endangered species" does not qualify as

irreparable harm absent showing of how "probable deaths . . . may impact the species").  Any

finding of irreparable injury therefore must be based upon the existence of *species-level* harm

that would permanently affect the enjoyment of wildlife by CBD's members.  *Cf. Chaplaincy of

Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("This court has set a high

standard for irreparable injury.").  None of CBD's proffered injuries meet that standard.

CBD first alleges injuries to its members' interests in several animal species, including

ferruginous pygmy-owls, Peninsular bighorn sheep, Sonoran pronghorn, jaguar, ocelot, and

Sonoyta mud turtle.  CBD acknowledges its burden to show species-level harm, but makes no

serious attempt at the lift.  *See* CBD Reply at 31 (offering the conclusory allegation that

construction will "result in population level impacts to wildlife species.").  Even if CBD had

attempted to support its allegations of harm to these species, those allegations would lack merit

44

for each species concerned.  Pygmy owls are not imperiled by the projects at issue here; the pygmy owl is "common," Enriquez Decl. ¶ 79 (citing 76 Fed. Reg. at 61,892), and its range extends well beyond the project areas, allowing continued cross-border migration.  *Id.*  Similarly, the Peninsular bighorn sheep will not lose access to its known movement corridors, which fall outside of the construction footprints for these projects.  *Id.* ¶ 75.  For the Sonoran pronghorn, the recovery plan envisions separate populations in Mexico and the United States "due to the physical barriers of Mexican Highway 2 and associated fencing."  *Id.* ¶ 61.  The challenged projects will not fragment pronghorn habitat within Arizona, which is abundant, *id.* ¶ 62, nor has increased border enforcement harmed the pronghorn's recovery.  *Id.* ¶ 63 (discussing increasing population of Sonoran pronghorn between 2001 and 2018).

Jaguar and ocelot are rare in the United States, *Id.* ¶ 65, and CBD's interests in these species are theoretical; none of CBD's declarants allege to have seen a jaguar or ocelot in the project areas.  While CBD's declarants may "hope" to one day see a jaguar or ocelot, *see* Bird Decl. ¶ 12; Jordahl Decl. (May 26, 2019) ¶ 14; McKinnon Decl. ¶ 9-11; Robinson Decl. ¶ 19, it is entirely speculative—and in fact very unlikely—that CBD's members will, regardless of whether construction goes forward.  *See Lujan*, 504 U.S. at 564 (holding "some day" intentions to see a threatened species insufficient to support even standing to sue); *Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) (cautioning that an injury warranting injunctive relief "must be both certain and great; it must be actual and not theoretical.").  In any event, the Tucson projects will not prevent jaguar or ocelot inclined to enter the United States from doing so, as there will continue to be gaps in the barrier east of the project areas and CBP is continuing to work with U.S. Fish and Wildlife Service (FWS) on barrier designs that may provide openings for cats.  Enriquez Decl. ¶ 67.  Lastly, CBD expresses vague and unsubstantiated concern for the

Sonoyta mud turtle, offering only the conclusory assertion that the mud turtle will be harmed as a species.  CBD Reply at 31.  But well before the current projects were authorized, FSW found that genetic exchange between mud turtle populations in the United States and Mexico "unlikely due to complete lack of hydrological connection."  Enriquez Decl. ¶ 68 (quoting *United States Fish and Wildlife Service, Species Status Assessment Report for the Sonoyta Mud Turtle, Version 2.0*, at 24 (August 2017)).  The challenged projects will not alter the status quo for the mud turtle.

CBD next argues that border wall construction will irreparably harm its members' interests in plant life—specifically by removing saguaro and organ pipe cactus within the construction footprint.  CBD Reply at 31–32 (citing Jordahl Decl. (May 26, 2020) ¶ 7).  Again, construction is only taking place within a narrow strip of land that parallels the southern border and that is previously disturbed, including by patrol roads and existing border infrastructure.  Enriquez Decl. ¶ 85.  The Government is undertaking efforts to limit clearing of vegetation and to relocate cacti—including saguaro, ocotillo, and organ pipe—where possible.  *Id.*  CBD makes no effort to show that species-level impacts to saguaro or organ pipe will result from these projects, nor can CBD do so, given the limited construction footprint.  Instead, CBD offers a single sentence from a fifty-year-old district court opinion where the court found that "[p]laintiffs would suffer irreparable injury in the removal of trees from their neighborhood and, perhaps more importantly, in the derogation of [defendant]'s obligations under the law."  *Saunders v. Wash. Metro. Area Transit Auth.*, 359 F. Supp. 457, 462 (D.D.C. 1973).  As the opinion makes clear, the district court was primarily concerned with WMATA's failure to provide an opportunity for homeowners to express their concerns with the planned metro expansion, *id.* at 460-62, a procedural injury of a type not implicated here.  Further, CBD's

members' interests in cacti are not analogous to a homeowner's interest in the trees adjacent to his or her home, which affect shade for the home, the character of the neighborhood, and property values.  Rather, CBD's members' interests are in their ability to recreate on public lands and observe cacti, both of which will continue to be available on the vast public lands mere feet to the north of the projects.

Next, Plaintiffs aver that border wall construction is "significantly impacting the hydrology of the Federally protected lands."  CBD Reply at 33 (citing Segee Decl. at 34).  The letter from the Bureau of Land Management to the U.S. Border Patrol on which CBD chiefly relies for this allegation, ECF No. 72-1 at 33-37, explicitly states that it was written without the benefit of review of the proposed design for the segments of border infrastructure crossing the San Pedro River, and recommends that the barrier be designed to take sediment and debris into account.  Segee Decl. at 34.  Unsurprisingly, that is what the government has done, approving a "design that has been subjected to hydrological modeling and review by CBP, DOD, USIBWC, and federal land and resource managers" that "is better able to accommodate the flow of water" than previous designs.  Enriquez Decl. ¶ 87.  CBD provides no evidence to the contrary, and its declarants offer nothing beyond lay opinion and concerns regarding outdated and unrelated border infrastructure designs.  *See* Hoslin Decl. ¶ 10; Silver Decl. ¶¶ 17-22.  In sum, CBD has produced no competent evidence that the projects at issue will result in hydrological injury to its members' interests.

CBD also offers alleged injuries to its members' recreational and aesthetic interests.  CBD Reply at 33-35.  But these allegations overstate the projects' impacts.  The projects "will not result in any change to the existing land uses."  Enriquez Decl. ¶ 89.  CBP's members will continue to be able to recreate in the surrounding areas, including hundreds of thousands of acres

on the Cabeza Prieta National Wildlife Refuge, the Oregon Pipe Cactus National Monument, the

San Pedro Riparian National Conservation Area, and the San Bernardino National Wildlife

Refuge.  *Id.* ¶ 90.  Construction impacts will be contained to the limited, already-disturbed area

adjacent to the border, which functions primarily as a law enforcement corridor.  *Id.* ¶ 89.

CBD's members' subjective opinion that a bollard-style border barrier is more unsightly than the

existing vehicle barriers does not warrant the extraordinary remedy they seek.

     Next, CBD asks this court to presume harm to wildlife and wildlife habitat from the

absence of NEPA review.  CBD Reply at 32–33.  This argument fails for several reasons.  First,

the Court denied CBD's NEPA claim on the basis of a waiver from DHS, *see* Mem. Op. at 26–

28, and CBD's inapposite NEPA authorities say nothing about the projects at issue here.

     Second, CBD wrongly suggests that the Government did not consider possible

environmental impacts from the challenged projects.  Though not required by NEPA, the

Government did perform environmental reviews.  *See* Enriquez Decl. ¶¶ 39-55.  These reviews

included consultation with other government agencies, stakeholder engagement, and

recommended best management practices and mitigations.  *Id.*

     Third, the Supreme Court has repeatedly instructed that courts may not presume

irreparable harm, even for environmental cases.  *Monsanto Co.*, 561 U.S. at 157 (2010) ("No

such thumb on the scales is warranted."); *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531,

544 (1987) (rejecting rule that "[i]rreparable damage is presumed when an agency fails to

evaluate thoroughly the environmental impact of a proposed action.").  CBD, like any other

litigant, bears the burden "to demonstrate that irreparable injury is *likely* in the absence of an

injunction."  *Winter*, 555 U.S. at 22 (emphasis in original) (citations omitted).  CBD cannot

satisfy this burden by pointing to the absence of a NEPA document or by demanding a

government-produced report explaining how removal of completed segments of border wall would benefit CBD's members' interests.  *See* CBD Reply at 28–29.  CBD must prove up its entitlement to injunctive relief.  That it admits it cannot do so should end the inquiry.

Likewise, RGISC's environmental interests do not outweigh Defendants' compelling interests in border security, supporting the armed forces, and preventing mass quantities of illegal drugs from entering the country.  *See* RGISC Reply at 29–43.

RGISC alleges that RGV Projects 04, 09, and 10 will exacerbate and alter flood conditions from Rio Grande flood incidents.  *See id.* at 40 (citing declarations).  RGISC's allegations are at odds with the extensive analysis commissioned by CBP and reviewed and approved by the USIBWC, the federal entity empowered by statute "to preserve the Rio Grande and the Colorado River as the [international] boundary by preventing the construction of works which may cause deflection or obstruction of the normal flow of the rivers or of their floodflows," 22 U.S.C. § 277d-34.  *See also* "*Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande and Colorado River as the International Boundary,*" U.S.- Mex., Art. IV, Nov. 23, 1970, T.I.A.S. 7313 (the "1970 Treaty").  Enriquez Decl. ¶ 98.  In fact, the floodplain analysis that RGISC's declarant, Mr. Tompkins, alleges to have reviewed in reaching his opinion directly contradicts his conclusion, finding instead that the projects conform with the treaty because they will not "cause deflection or obstruction of the normal flow of [the Rio Grande] or its floodflows."  *Id.*  Mr. Tompkins's opinion to the contrary, based in part on analysis of a privately-constructed wall that did not receive USIBWC review and concurrence, does not overcome the reasoned analysis of an expert agency.  *Id.* ¶¶ 98-100; *see also Sierra Club v. U. S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013) ("As genuine as these concerns may be, Plaintiffs have not shown that a damaging [event] is likely to occur, and it is

bedrock law that injunctions will not issue to prevent injuries neither extant nor presently

threatened, but only merely feared.") (internal quotations omitted).

  RGISC's concerns about impacts to burial sites and access to the Jackson Ranch Church,

Jackson Ranch Cemetery, and Eli Jackson Cemetery are similarly misplaced.  RGISC Reply at

40 (citing declarations).  Regarding potential hydrological impacts to burial sites, the 1970

Treaty prohibits construction that would impact the flow of the Rio Grande or its flood flows,

and the RGV 04 project has been designed so as not to exacerbate natural erosion or flooding.

*Id.* ¶ 98.  Further, construction will occur only on federally-owned land north of the cemeteries,

*id.* ¶ 97, preventing construction impacts on burial sites.  For lands outside of the cemeteries, not

only has CBP "surveyed the RGV Project Areas for historic and cultural resources," but "its

standard BMPs include a requirement to stop work if historic or cultural resources are found

within a work site."  *Id.* ¶ 102.  Finally, Plaintiff Ramirez will not lose access to the historic

church or cemeteries.  CBP has worked with landowners in the past to ensure adequate gate

dimensions and to share access codes with landowners and first responders.  *Id.* ¶ 96.  RGISC's

bare speculation that CBP may fail to provide for adequate access here is insufficient to show

irreparable harm.  *Winter*, 555 U.S. at 22.

  RGISC also alleges that impacts associated with border wall construction will harm

wildlife, injuring RGISC's members' interests in observing wildlife and RGISC's own ability to

put on its programming.  RGISC Reply at 40–42.  These allegations are confused and

insufficiently supported.  For example, RGISC alleges that border wall construction will injure

its interests in the Peninsular bighorn sheep by injuring its habitat and migration corridors in the

Jacumba Wilderness.  *Id.* at 40 (citing Jorgensen Decl. and Suppl. Jorgensen Decl.).  But none of

these projects implicate the Jacumba Wilderness.  Enriquez Decl. ¶ 73.  El Centro A, a separate

project not at issue here, will be built in a limited portion of the Jacumba Wilderness.  But
completion of that project will still leave large, unfenced areas to the east and west, allowing
continued cross-border migration, including along known bighorn movement corridors in the
East Jacumba Mountains or to the west of the Davies Valley.  *Id.* ¶¶ 74-75.  Mr. Jorgensen also
speculates that increased border patrols in the area could cause the bighorn sheep to abandon the
area, but the projects at issue here do not call for increased patrols, *id.* ¶ 76, and completion of El
Centro A will reduce disturbance to bighorn from illegal southern border crossings.

RGISC also alleges harms from construction of Laredo 7, s*ee* RGISC Reply at 39–43, but
that project is still in the initial planning stages and DoD is taking appropriate steps to mitigate
potential environmental harm from construction of the project.  *See* Decl. of Alex A. Beehler
(Aug. 14, 2020) (Beehler Decl. (8/14/20)) ¶¶ 8–14 (Exhibit 7).  For example, RGISC alleges that
the Laredo 7 project will imperil the Texas hornshell mussel.  *See* RGISC Reply at 40.  But DoD
has included wildlife mitigations, including passages for wildlife along known migration routes,
in past § 2808 projects.  Beehler Decl. (8/14/20) ¶ 20.  USACE is aware of previous detections of
Texas hornshell along confluences between the Rio Grande and tributaries adjacent to the Laredo
7 project area, and is contracting with experts for environmental baseline surveys to determine
whether the mussel is present in the area adjacent to the construction footprint.[12]  *Id.* ¶ 22.
USACE will implement appropriate mitigations, including hydro-seeding for temporary erosion
control and silt fences, to mitigate against potential sediment impacts to the hornshell, if they are
present.  *Id.*  RGISC cannot show that these measures are insufficient to prevent species-level

---

[12] Environmental baseline surveys "will be used, to the extent possible, to forecast potential
impacts from construction activities and further develop or refine measures to avoid or minimize
impacts to environmentally sensitive resources that could be undertaken without impeding
expeditious construction of Laredo 7" and may involve coordination with federal, state, or tribal
entities, and other stakeholders, to the extent appropriate.  Beehler Decl. (Aug. 14, 2020) ¶ 17.

harms to any hornshell, if present, within the project area. *Frizzell*, 530 F.2d at 987; *see* Beehler

Decl. (8/14/20) ¶¶ 18–22 (addressing other species)

RGISC similarly asserts speculative allegations that Laredo 7 will increase flood risks,

but DoD's preliminary assessment, based on data collection and modeling, indicates that the

majority of the project will be outside the floodplain and DoD is coordinating with the USIBWC

to ensure that Laredo 7 does not obstruct the normal flow of the Rio Grande or its flood flows

beyond the IBWC's requirements. *See* Beehler Decl. (8/14/20) ¶¶ 15–16. The Court should

therefore reject RGISC's speculative assertions of environmental harm. *See England*, 454 F.3d

at 298 (holding that speculative injury is insufficient to warrant injunctive relief).

Finally, RGISC alleges that the construction of Laredo 7 will harm its organizational

mission by impeding access to recreation opportunities along the Rio Grande River. RGISC

Reply at 42. The land adjacent to the Rio Grande in the Laredo 7 project area is held by private

landowners; "[p]ublic access to the Rio Grande in the project area, for recreational or other

purposes, is already significantly restricted" and requires landowner permission. Beehler Decl.

(8/14/20) ¶ 23. Existing public access points upstream and downstream of the project area will

not be impacted. *Id.* While the project is still in the design stage, USACE is evaluating whether

and where to install gates along the barrier to allow landowner access and to facilitate law

enforcement and emergency response activities. *Id.* ¶ 24. In sum, Laredo 7 will not significantly

alter lawful access to the Rio Grande in the project area.

### 3. The Public Interest Weighs Against Injunctive Relief.

An injunction preventing the construction of projects under § 284 and § 2808 harms not

only Defendants but also the public. The interests of the federal government and of the public

merge when the federal government is a party. *Guedes v. Bur. of Alcohol, Tobacco, Firearms &*

*Explosives*, 920 F.3d 1, 10 (D.C. Cir.) (citing *Nken*, 556 U.S. at 435).  Accordingly, for the same reasons why Defendants will suffer irreparable harm if the projects are enjoined, the interests of the public also strongly counsel in favor of denying Plaintiffs' requested permanent injunction.

Plaintiffs do not dispute that the Government's interest and the public interest in protecting the integrity of the Nation's border and in supporting the armed forces are compelling. And they cannot reasonably disagree that those interests are directly served by reducing drug-smuggling and other criminal activity in areas of known vulnerability between border crossings, and that enjoining construction activity therefore threatens public safety.

Instead, RGISC and CBD assert that the public interest favors enjoining alleged unlawful action, RGISC Reply at 44; CBD Reply at 36–37; but a party cannot show that the equities weigh in its favor by assuming that it will prevail on the merits.  *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (rejecting equitable balancing arguments "premised on" a litigant's "view of the merits").  Rather, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987).  Here, that balance favors Defendants.

CBD also incorrectly contends that Congress balanced the public interest regarding border barrier construction through its passage of the CAA.  *See* CBD Reply at 37–38.  In appropriating funds to DHS, however, Congress did not express any opinion about the equitable balance between Defendants' interests in supporting the armed forces and border security, and the particular environmental interests asserted by these Plaintiffs.  In no event did § 230 of the CAA preordain the equitable balancing required for a permanent injunction.  Moreover, Congress could have enacted restrictions similar to § 231 of the CAA that would have prohibited

DoD from spending its appropriated funds on border-barrier construction, or from invoking its authority under § 284 and §2808.  Congress's decision not to enact such restrictions undermines CBD's claim to an injunction in furtherance of the public interest.[13]

**4.      The Court Should Reject Plaintiffs' Overbroad Injunction.**

In the event the Court determines that injunctive relief is appropriate, Plaintiffs are not entitled to a nationwide injunction stopping construction of every § 2808 and § 284 project simply because the Court finds a statutory violation.

It is a basic principle of Article III that "a plaintiff's remedy must be limited to the inadequacy that produced his injury in fact."  *Gill*, 138 S. Ct. at 1930 (quotation omitted).  An injunction "should be no more burdensome to the defendant than necessary to provide complete relief."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Indeed, the D.C. Circuit has "long held that an injunction must be narrowly tailored to remedy the specific harm shown."  *Nebraska Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006).

Applying these principles here, a properly tailored injunction must be limited solely to the specific border barrier projects for which the Court determines Plaintiffs have established standing and an equitable entitlement to an injunction.  This type of project-by-project approach

---

[13] In addition to an injunction, RGISC asks the Court to issue a declaratory judgment that Defendants' use of the Treasury Forfeiture Fund, § 2808, and § 284 to construct border barriers is unlawful.  *See* RGISC Reply at 37–39.  Declaratory judgments are common in cases where plaintiffs prevail in challenging the legality of Executive Branch action, but to the extent RGISC asserts that a declaratory judgment would "terminate the controversy" by providing the same relief as an injunction, that claim is mistaken.  *See, e.g., Steffel v. Thompson*, 415 U.S. 452, 466, (1974) (explaining that "declaratory relief" was intended to be a "milder alternative" to "the strong medicine of the injunction"); *Mitchell v. Donovan*, 398 U.S. 427, 430 (1970) ("While there are similarities between injunctions and declaratory judgments, there are also important differences."); *see also Monsanto*, 561 U.S. at 164–66 (distinguishing between vacatur of agency decision and injunction).

54

is consistent with the way other courts have addressed the remedy issue in the related cases

pending in other jurisdictions.  *See State of Washington v. Trump*, 441 F. Supp. 3d 1101, 1127

(W.D. Wash. 2020) ("The Court declines the State's request to enjoin the Defendants'

redirection of all $3.6 billion in military construction funds" because "this Court is required to

narrowly tailor the relief requested to fully address Washington's alleged injuries, but no

more."); *Sierra Club v. Trump*, 2019 WL 2715422, at *4 (N.D. Cal. June 28, 2019) (concluding

that plaintiffs have submitted sufficient evidence to warrant a permanent injunction as to six

specific § 284 projects), *aff'd* 963 F.3d at 884–86 (conducting standing and injury analysis on a

project-by-project basis).  An injunction tailored to the specific projects for which Plaintiffs have

carried their evidentiary burden to establish standing and irreparable injury would fully remedy

their asserted harms.  There is no basis for the Court to go further to provide Plaintiffs with

complete relief.  *See Friends of the Earth*, 528 U.S. at 193 (stating that courts should ensure "the

framing of relief no broader than required by the precise facts.").

    The Court should also reject CBD's request for a mandatory injunction that that would

require Defendants to tear down completed sections of any projects.  *See* CBD Reply at 28.

CBD provides no support for that type of extraordinary mandatory injunction that would likely

require months, if not years, of planning and construction work at significant costs.  *See Singh v.

Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016) ("Judges on this Court have required the moving

party to meet a higher standard [to obtain a mandatory injunction] than in the ordinary case by

showing clearly that he or she is entitled to relief or that extreme or very serious damage will

result from the denial of the injunction.").  CBD points to statements in Defendants' motion for a

stay in the Supreme Court in the *Sierra Club* litigation that noted the possibility of removing any

barriers found to be unlawful.  *See* CBD Reply at 28.  But those statements simply recognized

that construction does not inflict irreparable harm because it is always possible to remove

structures after construction is completed.  The statements in no way conceded that such relief

would be appropriate at the conclusion of the litigation.  *See Finca Santa Elena, Inc. v. U.S.*

*Army Corps of Engineers*, 62 F. Supp. 3d 1, 5 (D.D.C. 2014) ("The Court is aware of no case,

and plaintiffs cite none, where a court in a NEPA case ordered a defendant to dismantle a

completed construction project.").

Indeed, a sweeping injunction requiring Defendants to remove potentially hundreds of

miles of border barrier would be inconsistent with traditional equitable principles.  *See In re*

*Metroplex on the Atl., LLC*, 545 B.R. 786, 796 (Bankr. E.D.N.Y. 2016) ("The balance of the

equities, however, will generally cut against requiring an owner to tear down a completed

structure.") (citing cases).  Such an overbroad injunction would be vastly disproportionate to

remedy any technical violation of a appropriations restriction (§ 739 or § 8005) or authorization

limitation (§ 284 or § 2808) on a federal agency—which Congress itself may well have viewed

as inconsequential, or at least insufficient to warrant the wastefulness of spending huge sums of

money to destroy projects for which funds have already been expended.  That is particularly true

here, where none of the statutes at issue protects CBD's interests nor provides them with any

individually-enforceable rights.  Moreover, CBD did not request this relief in its Amended

Complaint, *see* ECF No. 16, and never filed a preliminary injunction to stop ongoing

construction of the projects during the nearly two years of this litigation.  These decisions

undercut any equitable claim they might otherwise have to an order requiring DoD to tear down

the barriers, as opposed to stopping ongoing construction as other courts have ordered.  Further,

none of the projects are infringing on CBD's or its members' property, and even if that were the

case, courts have refused to order the removal of completed buildings where there was no

showing of bad faith, as is the case here.  *See e.g., Fenwick v. City of Burlington*, 167 Vt. 425,

433 (1997) (refusing to order house torn down because of zoning violation where a builder had

legal authorization to do so during period of contested litigation); *Hargreaves v. Skrbina*, 662

P.2d 1078, 1080 (Colo. 1983) (reversing injunction requiring the removal of a building for

zoning violation where building was constructed in good faith).  *Compare Bird v. Delaware*

*Muncie Metro. Plan Comm'n,* 416 N.E.2d 482, 490 (Ind. Ct. App. 1981) (ordering removal of

structure where defendant continued to build after permit revoked and stop-work order issued);

*Zelios v. City of Dallas*, 568 S.W.2d 173, 175 (Tex. Civ. App. 1978) (granting mandatory

injunction where builder knowingly constructed property in violation of two permit denials).

      CBD appears to concede that a tear-down order may not even remedy their alleged

injuries.  CBD presents no evidence to support its position and goes so far as to ask the Court to

order Defendants to conduct a two months' long environmental study of the projects to

determine the environmental benefits of removal.  Setting aside the complete absence of any

authority for the Court to order such a report, the fact that CBD states that it needs a court-

ordered environmental study undercuts any claim of entitlement to a mandatory injunction that it

asserts.  *Sierra Club v. Johnson*, 374 F. Supp. 2d 30, 33 (D.D.C. 2005) (stating that a "mandatory

injunction is an extraordinary remedy, especially when directed at the United States

Government").  CBD also provides no basis for DoD to prepare a report about the estimated cost

of removal and the availability of funding.  CBD Reply at 28.  In doing so, CBD appears to

recognize the potential Appropriations Clause objections to its request, which further cuts against

granting the relief sought here.  *See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 426

(1990) (holding that judicial use of the equitable doctrine of estoppel "cannot override the

command of the Appropriations Clause").

**B.      Vacatur of Secretary of Defense's Decisions is Not an Appropriate Remedy.**

CBD also argues that the Court should vacate the Secretary of Defense's three decisions authorizing the funding and construction of the § 284 and § 2808 projects.  *See* CBD Reply at 24–27.  CBD's argument is based on a provision of the APA, 5 U.S.C. § 706(2), which provides the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations."  As relevant to these cases, this remedial provision is cabined by two important limitations.

First, the APA's statutory vacatur remedy is limited solely to CBD's one remaining APA claim challenging the projects as a violation of § 739.  The Court previously dismissed CBD's other APA claims, and CBD's challenge to § 8005 and § 2808 are brought under an equitable *ultra vires* cause of action outside of the APA.  *See* Mem. Op. at 32–54.  It would defy both law and logic for the Court to allow CBD to assert an equitable *ultra vires* cause of action to evade the APA's zone-of-interests requirement while also permitting CBD to rely on the APA's statutory remedy provision.  Having chosen to pursue an equitable *ultra vires* cause of action, CBD cannot pick and choose the specific APA provisions it wants the Court to ignore and apply.  Indeed, CBD cites no case in which a court applied § 706(2) as a remedy for an equitable *ultra vires* cause of action.  CBD contends that *United Steel v. MSHA*, 925 F.3d 1279 (D.C. Cir. 2019), supports its position, but that case involved an APA claim, not an implied equitable cause of action.  *Id.* at 1283.  Thus, the APA's vacatur remedy would apply if, and only if, the Court concludes that Defendants exceed the statutory limits of § 739 as part of CBD's APA claim.

Second, the text of APA § 706(2) does not support CBD's position that the Secretary's decisions, if found to violate § 739 of the CAA, should be "set aside" in total rather than as to specific projects for which CBD has standing to challenge.  The defects with overbroad

injunctions discussed above apply with equal force to vacaturs, and there is no basis to conclude that § 706 allows, much less requires, a court to set aside agency action without regard to Article III's limitations, beyond what is necessary to redress a plaintiff's own cognizable injuries. Indeed, the APA limits vacatur to specific "agency action" and here the actions under review are the decisions of the Secretary to authorize six § 284 projects and 11 § 2808 projects. Consequently, vacatur must be limited only to the specific projects that the Court finds caused CBD's injury-in-fact. *See Lewis*, 518 U.S. at 357–58 (holding that the court lacked power to enjoin practices that "ha[d] not been found to have harmed any plaintiff in this lawsuit, and hence were not the proper object of this District Court's remediation").

Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co.* v. *Bowles*, 321 U.S. 321, 329 (1944). Indeed, the APA preserves all ordinary principles of equity. *See* 5 U.S.C. § 702(1) ("Nothing herein affects . . . the power or duty of the court to . . . deny relief on any other appropriate legal or equitable ground[.]"). Here, there is no equitable reason for the Court to issue a nationwide vacatur of the Secretary's decisions for all 18 projects when CBD's interests would be fully remedied by a more limited order commensurate with the specific projects the Court concludes CBD has standing to challenge. *See Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."); *Lewis*, 518 U.S. at 357 (rejecting argument that "once a plaintiff [has] demonstrated harm from one particular inadequacy in government administration, the court [is] authorized to remedy *all* inadequacies in that administration. The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.").

###### C.     The Court Should Stay Any Relief Pending Appeal.

In the event the Court grants any relief to Plaintiffs, the Court should stay its order pending appeal.  Allowing any such relief to take immediate effect would conflict with the Supreme Court's stay order in the *Sierra Club* litigation.  *See Sierra Club*, 140 S. Ct. at 1.  The Supreme Court recently denied a request by the *Sierra Club* plaintiffs to lift that stay, thus further reinforcing the Supreme Court's view that the border barrier projects should be permitted to proceed pending a final resolution of the merits.  *Trump*, 2020 WL 4381616, at *1.  Indeed, since the Supreme Court issued its original stay in July 2019, courts in the other circuits addressing these same issues have either denied or stayed injunctions prohibiting construction of the § 284 and § 2808 projects.  *See El Paso County v. Trump*, No. 19-51144 (5th Cir. Jan. 8, 2020) (staying § 2808 injunction); *El Paso Cty., Texas v. Trump*, 407 F. Supp. 3d 655, 665 (W.D. Tex. 2019) (denying § 284 injunction); *California v. Trump*, 407 F. Supp. 3d 869, 907 (N.D. Cal. 2019) (staying § 2808 injunction); *Sierra Club v. Trump*, No. 19-17501 (9th Cir. Dec. 30, 2019) (denying motion to lift stay of § 2808 injunction).

The Supreme Court's stay decision reflects a determination that the balance of the harms and the public interest support a stay, and that balance is identical here.  *See Nken*, 556 U.S. at 434.  Indeed, Plaintiffs assert the same types of environmental interests that the plaintiffs in *Sierra Club* unsuccessfully advanced to the Supreme Court.  The Supreme Court granted a stay over those objections and there is no basis for this Court to reach a different decision here.  Accordingly, the Court should stay any relief pending appeal.

### CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment and deny Plaintiffs' motions for summary judgment.

DATE: August 14, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources
Division

/s/ *Tyler M. Alexander*
TYLER M. ALEXANDER
(CA Bar No. 313188)
Natural Resources Section
Trial Attorney
PO Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0238
Fax: (202) 305-0506
Email: tyler.alexander@usdoj.gov

ETHAN P. DAVIS
Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

/s/ *Andrew I. Warden*
ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel

/s/ *Kathryn C. Davis*
KATHRYN C. DAVIS (DC Bar No. 985055)
Senior Trial Counsel

MICHAEL J. GERARDI
LESLIE COOPER VIGEN
RACHAEL WESTMORELAND
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:   (202) 616-5084
Fax:   (202) 616-8470
Email:  Andrew.Warden@usdoj.gov

*Attorneys for Defendants*