# EXHIBIT 7

**DECLARATION OF
ALEX A. BEEHLER
ASSISTANT SECRETARY OF THE ARMY
(INSTALLATIONS, ENERGY AND ENVIRONMENT)**

I, Alex A. Beehler, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Assistant Secretary of the United States Army (Installations, Energy and Environment). Among other duties reflected in General order No. 2019-01 (Assignment of Functions and Responsibilities Within Headquarters, Department of the Army), I am principally responsible for developing and overseeing policies and programs regarding military construction, management of real property and installations, real estate contracting, environmental compliance and conservation, and oversight of all execution functions performed by the U.S. Army Corps of Engineers (USACE) related to the Army's military construction, real property, real estate, and environmental programs.

2. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

3. On September 3, 2019, pursuant to the memorandum, "Guidance for Undertaking Military Construction Projects Pursuant to Section 2808 of Title 10, U.S. Code," the Secretary of Defense directed the then-Acting Secretary of the Army to undertake expeditiously eleven border barrier military construction projects as authorized by 10 U.S.C. § 2808. These border barrier military construction projects include the project referred to as "Laredo 7."

4. I have previously submitted a declaration addressing allegations of environmental harms allegedly resulting from the § 2808 projects in two others cases: *State of California v. Trump*, 4:19-cv-00872-HSG (N.D. Cal. 2019) and *Sierra Club v. Trump*, 4:19-cv-00892-HSG (N.D. Cal. 2019). The October 25, 2019 declaration I submitted in the *State of California* and *Sierra Club* cases is attached hereto as Exhibit A and incorporated herein by reference. The views I expressed in the attached declaration have not changed.

5. As approved by the Secretary of Defense, Laredo 7 includes a single primary barrier with adjacent maintenance (landward side) and patrol (riverside) roads. I have been informed by USACE that primary barrier construction includes the barrier, access roads, lighting (including power to supply the lighting), and fiber optic detection cables. The barrier will generally be a 30-foot bollard barrier, with bollards at four-inch intervals.

6. I am further informed by USACE that the barrier construction projects require an approximately 210-foot wide construction area that will encompass the barrier, both maintenance and patrol roads, lighting, utilities, and up to a 150-foot enforcement zone on the riverside of the barrier.

7. A map showing the Laredo 7 is attached (Attachment 1).

Laredo 7

8.  Laredo 7 involves the construction of approximately 52 miles of new primary pedestrian barrier in Webb County, Texas. It will start at the Laredo-Columbia Solidarity Port of Entry Northwest, and extend north along the Rio Grande River. The project is still in the initial planning stages. A preliminary alignment, informed by hydrology and hydraulic modeling from the International Boundary and Water Commission (IBWC) and Customs and Border Protection (CBP) operational requirements has been established. USACE is currently in the process of obtaining real estate rights of entry to begin due diligence efforts for that alignment. Final design to determine the ultimate project alignment and associated footprint will begin once the planning phase has been completed. The contract(s) for the construction of the project is not expected to be advertised before May of 2021.

9.  For Laredo 7, as with all Section 2808 projects, USACE intends to include construction Best Management Practices (BMPs), following the practice prepared by CBP for construction in the CBP Sectors, in order to minimize or avoid potential environmental impacts, to the extent practicable.

10. I am informed by USACE that construction BMPs will address general construction activities, biological resources, air quality, water resources, and cultural resources. Although proposed site specific BMPs for Laredo 7 are still being developed, other projects can serve as examples of the type of measures that will likely by undertaken. For example, construction BMPs developed for the Yuma Sector were included in the Yuma 2 and Yuma 10/27 construction contracts. These BMPs include, but are not limited to: (i) using established roads to the maximum extent practicable and using areas already disturbed by past activities, when available, for staging, parking and equipment storage; (ii) limiting the application of soil-binding agents to areas that lack vegetation or are not in or near (i.e., within 100 feet of) surface waters and to months in late summer or early fall to avoid affecting Federally listed species; (iii) washing hauling and construction equipment entering the site to prevent the introduction of invasive species, removing plant/vegetation and soil/debris from construction vehicles leaving the site, to prevent the removal of invasive specifies from the site and using vegetation removal methods that allow root systems to remain intact to prevent disturbance that encourages establishment of invasive plant species; (iv) prohibiting the use of herbicides in streams or other bodies of water, and areas suitable for or designated as critical habitat of threatened or endangered plant species; and (v) requiring that treated water from outside the immediate construction area be used if pumping local groundwater has an adverse effect on the aquatic, marsh, or riparian dwelling of threatened or endangered species.

11. As with all of the Section 2808 projects, USACE will provide for on-site environmental monitors for Laredo 7 during construction, to ensure that contractors adhere to the BMPs. Construction crews are provided with pre-construction briefings and environmental awareness training regarding federally protected species to be aware of on project sites, as well as the process for notifying the on-site monitors, who will raise to USACE to determine the appropriate response.

12. Additionally, USACE staff are currently conducting the first outreach meetings with resource agencies (e.g., land management agencies, U.S. Fish and Wildlife Service (USFWS), State resource agencies, and local Tribal governments) for Laredo 7. The input from these meetings will inform additional outreach and other environmental measures that the Department of the Army and USACE may consider implementing. These environmental measures may include identifying sensitive areas to be avoided during construction, minimizing impacts to sensitive species, and additional construction BMPs to be incorporated into Laredo 7 construction contracts. The Department of the Army and USACE may also develop mitigation measures, in coordination with relevant resource agencies, which may include small wildlife passages (SWPs), data recovery for archeological or cultural resource sites, restoration of adjacent areas, and adjusting the project footprint. Data recovery for archeological or cultural resource sites may include hiring a consultant to measure and photograph the site, and to recover items to be catalogued off-site in a museum setting. Adjusting the project footprint may include actions such as designing a bend in a patrol road to avoid a sensitive resource.

13. USACE will develop environmental documentation regarding additional measures undertaken during construction, which will include consideration of pre-construction site conditions, construction impacts, and any mitigation measures implemented.

14. If construction or clearing activities are scheduled to take place during nesting season (typically March 1 through September 1), USACE, either directly or through a contracted environmental firm, will perform a pre-construction survey for migratory bird species to identify active nests prior to the start of any construction or clearing activity. If construction activities will result in the disturbance or harm of a migratory bird, then USACE will coordinate with the USFWS and relevant State departments of natural resources. A buffer zone, designed in consultation with USFWS and shaped by the birds' characteristics, may be established around active nests until nestlings have fledged and abandoned the nest.

<u>Increase in Flood Risk and Associated Potential Damage</u>

15. Efforts are underway to analyze the hydraulics and hydrology of the landscape within the Laredo 7 project area. SPB has contracted with an engineering consulting firm to collect topographical data and build a hydraulic model of the Rio Grande River within the project area. This model will be used to delineate the flood plain within the project limits. This information will be used to place the border barrier infrastructure outside of the Rio Grande flood plain where possible, which will help to minimize potential impacts. The preliminary alignment, based on the IBWC model, indicates that the majority of the project will be constructed outside the floodplain. In the areas where the floodplain cannot be avoided, such as in arroyos, the project impacts to the flood plain will be limited to the extent determined to be permissible by the IBWC.

16. Under a 1970 treaty between the United States and Mexico entitled "*Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande and Colorado River as the International Boundary*," U.S.- Mex., Art. IV, Nov. 23, 1970, T.I.A.S. 7313 (the "1970

Treaty"), the United States and Mexico agreed that the international boundary between the two countries is the "middle channel occupied by the normal flow of the Rio Grande River. 1970 Treaty, Article IV, § 2.A, available at https://www.ibwc.gov/Files/1970_Treaty.pdf. To preserve that international boundary, the 1970 Treaty prohibits the construction of any works that may "cause deflection or obstruction of the normal flow of the [Rio Grande] or its flood flows." 1970 Treaty, Article IV, § B(1). The IBWC has jurisdiction to review and approve works that are constructed in or adjacent to the Rio Grande River to ensure compliance with the 1970 Treaty. 22 U.S.C. § 277d-34. Coordination with the IBWC is ongoing to ensure that Laredo 7 does not obstruct the normal flow of the Rio Grande or its flood flows beyond IBWC's requirements.

<u>Specific or Unique Impacts</u>

17. The specific and unique impacts that border infrastructure construction may have in the Laredo 7 project area are still being determined. USACE is in the process of contracting professional services to conduct Environmental Baseline Surveys (EBS) prior to construction of Laredo 7. EBS will survey, describe, and document the occurrence of cultural resources, general habitat characteristics and the presence and extent of any environmental contaminants, and the presence of any protected species or habitats. EBS reports will be used, to the extent possible, to forecast potential impacts from construction activities and further develop or refine measures to avoid or minimize impacts to environmentally sensitive resources that could be undertaken without impeding expeditious construction of Laredo 7. In preparing this report, USACE may also informally coordinate with other Federal and State agencies, federally recognized Indian Tribes, and other stakeholders that may have information relevant to the EBS. With other 2808 projects mitigation, minimization, and avoidance measures have been included to address considerations identified in the EBSs. Examples of this include: for cultural resources identified within some segments of El Paso Project 2, certain areas of the project site were reduced in width to avoid cultural resources, and data recovery was conducted for a historic site that could not be avoided; for sensitive plant species identified within the Yuma 3 and 10/27 project sites, state listed saguaro cactus were relocated where they could not be avoided in place.

<u>Generally Expected Wildlife Impacts / Impassability and Fragmentation</u>

18. Construction, of any kind, in natural settings has the potential to harm or displace wildlife and their habitats. In the Laredo 7 project area, past and current disturbances include oil and gas exploration and extraction, cattle ranching, and widespread ground picking and contouring. However, there are natural communities, including protected habitats and species in the area. Efforts are underway to gather information regarding the presence of protected species and their existing conditions, including the size and location of their habitats.

19. This information will be used to inform potential alignment and design of border barrier infrastructure to avoid and minimize impacts to wildlife and their habitats. Any construction and ground disturbance would be limited to areas already disturbed to the maximum extent practicable to limit environmental impacts. Any temporary ground disturbance that occurs

would be re-graded to match its previous condition as well as revegetated with native species to limit habitat loss.

20. Additionally, opportunities for small wildlife passages will be assessed and larger gaps may be placed strategically to help offset habitat connectivity losses and facilitate access to water sources. Small wildlife passages have been included with other 2808 projects, such as Yuma 3, for use by small reptiles and mammals based on known migrations routes identified in coordination with USFWS. No conservations areas, such as National Wildlife Refuges, National Parks, State Parks, or State Wildlife Management Areas, are present within or in the immediate vicinity of the Laredo 7 project area.

21. Approximate distances from Laredo 7 project area to prominent conservation areas in the region:
    - Santa Ana NWR: 160 miles
    - Bentsen-Rio Grande Valley SP: 130 miles
    - National Butterfly Center: 140 miles
    - Lower Rio Grande Valley NWR Complex: 80 miles (closet parcel is south of Falcon Lake)
    - Chaparral WMA: 40 miles
    - Lake Casa Blanca International SP: 20 miles

22. Because the project is currently in the initial planning stages, specific species USACE will consider when assessing the impact of construction have not yet been identified. The following information, however, is under active consideration:

    a. USACE and the Army currently do not know whether the burrowing owl lives within the Laredo 7 project area. The EBS will capture the presence and/or potential for burrowing owls to live in the project area.

    b. The Gulf Coast Jaguarondi, Ocelot, Least Tern, Piping Plover, Red Knot, Texas Hornshell, and Ashy Dogweed, all Federally protected species under the Endangered Species Act, may be present in the project area. Based on USFWS' Information for Planning and Consultation Project Planning Tool, no designated critical habitat exists within or immediately adjacent to the Laredo 7 project area. Nevertheless, the EBS will determine whether these species in fact are present in or have the potential to be present in the project area.

    c. Based on information received from the Texas Parks and Wildlife Department's Natural Diversity Database, Texas Hornshell have been previously detected in several confluences between the Rio Grande and tributaries adjacent to the Laredo 7 project area. EBS surveys will assess current distribution of the Texas Hornshell in the project area.

    d. USACE will also ensure that construction areas are hydro-seeded for temporary erosion control measures with only native plant species appropriate to the surrounding habitat, in addition to implementing other erosion and sedimentation

BMPs, such as silt fences. These BMP were developed based on recommendations from USFWS.

Generally Expected Recreational & Aesthetic Impacts

23. The Laredo 7 project area extends approximately 52 miles from the Laredo-Columbia Solidarity International Bridge north along the Rio Grande River. Private landowners hold all of the property adjacent to the Rio Grande in this area. Public access to the Rio Grande in the project area, for recreational or other purposes, is already significantly restricted, unless landowner permission is granted, or the Rio Grande is accessed from public access points either up or downstream of the project area.

24. Project staff are evaluating the need/potential locations for gates within planned border barrier infrastructure that would be used to facilitate law enforcement and emergency services activities, as well as allow landowners access to their property.

* * * * * * *

I hereby declare, under penalty of perjury, that the foregoing is true and correct to the best of my current knowledge.

Alex A. Beehler

**Dated:** August 14, 2020

**Declaration of Alex A. Beehler (Aug. 14, 2020)**

**EXHIBIT A**

DECLARATION OF ALEX A. BEEHLER

I, ALEX A. BEEHLER, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Assistant Secretary of the United States Army (Installations, Energy and Environment). Among other duties, which are generally reflected in General Order No. 2019-01 "Assignment of Functions and Responsibilities Within Headquarters, Department of the Army," I am responsible for developing and overseeing policies and programs regarding military construction, management of real property and installations, real estate contracting, environmental compliance and conservation, and oversight of all execution functions performed by the U.S. Army Corps of Engineers (USACE) related to the Army's military construction, real property, real estate, and environmental programs.

2. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

*Section 2808 Project Locations*

3. On September 3, 2019, pursuant to the memorandum, "Guidance for Undertaking Military Construction Projects Pursuant to Section 2808 of Title 10, U.S. Code," the Secretary of Defense directed the then-Acting Secretary of the Army to undertake expeditiously eleven border barrier military construction projects as authorized by 10 U.S.C. § 2808. As previously described in the fifth declaration of Kenneth Rapuano, these eleven border barrier military construction projects are San Diego 4, San Diego 11, El Centro 5, El Centro 9, Yuma 6, Yuma 2, Yuma 10/27, Yuma 3, El Paso 8, El Paso 2, and Laredo 7.

4. The projects approved by the Secretary of Defense include a combination of primary and secondary pedestrian barrier. I have been informed by USACE that primary barrier projects include the barrier, lighting (including power to supply the lighting), fiber optic detection cable, and a patrol road on the north side of the barrier. Secondary barrier projects include only the barrier. Both primary and secondary pedestrian barrier will generally be a 30 ft. bollard barrier, with bollards at four-inch intervals. There may be certain projects where, based on site conditions and other factors, the bollard barrier may be 18 ft. For projects where there is an existing patrol road, those roads may be improved by laying four inches of gravel and a concrete surface if the grade exceeds 15% or crosses water.

5. I am further informed by USACE that primary fence construction projects require a 60-foot-wide construction area from the border. Secondary fencing requires a 150 foot-wide construction area.

6. USACE has produced a map for all Section 2808 projects that is included at Attachment 1. The following project-specific information is informed, in part, by information made available to me by U.S. Customs and Border Protection (CBP):

1

San Diego 4

7.  The San Diego 4 project will involve the construction of 1.5 miles of new primary pedestrian barrier and 2 miles of new secondary pedestrian barrier. The San Diego 4 project area is in San Diego County, California. It starts 3.6 miles east of the Otay Mesa Port of Entry and extends east for 2 miles.

8.  There is no existing barrier along the 1.5 mile segment of the international border where USACE will construct the primary pedestrian barrier portion of the San Diego 4 project. The new primary pedestrian barrier will fill a gap between segments of existing primary pedestrian barrier.

9.  The new secondary barrier will run parallel to and be situated north of the 1.5 miles of new primary pedestrian barrier that will be constructed as a part of the San Diego 4 project and then extend east for an additional one-half mile, where it will run parallel to and be situated north of an existing 18-foot bollard-style primary pedestrian barrier.

10. There are existing patrol roads primarily in the eastern portion of the San Diego 4 project area. Given the terrain, the existing patrol roads run parallel to, but are not always situated directly adjacent to, the international border.

San Diego 11

11. The San Diego 11 project will involve the construction of approximately three miles of new secondary pedestrian barrier, which will span both sides of the Tecate Port of Entry. The San Diego 11 project area is in San Diego County, California. It starts 2 miles west of the Tecate Port of Entry and extends east to 1.5 miles east of the Tecate Port of Entry.

12. Within the San Diego 11 project area there is an existing 10-foot landing-mat-style primary pedestrian barrier, which consists of panels of corrugated steel that are welded or attached to metal posts. There is also a patrol road situated immediately north of the primary pedestrian barrier and mobile light stands have been deployed in the area. As a part of a separate fence replacement project, CBP is currently replacing the existing landing mat barrier with 30-foot bollard-style pedestrian barrier and improving the existing patrol road. The new secondary pedestrian barrier that will be constructed as a part of the San Diego 11 project will be situated north of—and run parallel to—the existing primary pedestrian barrier and patrol road.

13. On the U.S. side of the border, the areas immediately adjacent to the Tecate Port of Entry are developed and urbanized. Similarly, on the Mexican side of the border, the areas that surround San Diego 11 project area are urbanized and appear to be densely-populated.

El Centro 5

14. The El Centro 5 project will involve the construction of approximately 1 mile of new secondary pedestrian barrier that will span both sides of the Calexico West Port of Entry.

2

The El Centro 5 project area is in Imperial County, California. It starts approximately .5 miles west of the Calexico West Port of Entry and extends east to approximately 1 mile east of the Calexico West Port of Entry.

15. Within the El Centro 5 project area there is 30-foot bollard-style primary pedestrian barrier. There is an existing patrol road that is situated immediately north of the existing pedestrian barrier. There are also lighting and cameras. The new secondary pedestrian barrier that will be constructed as a part of the El Centro 5 project will be situated north of the existing primary pedestrian barrier and patrol road.

16. For the entire length of the El Centro 5 project area, the areas that surround the project area on both sides of the international border are urbanized, heavily developed, and appear to be densely-populated, with the city of Calexico, California, on the U.S. side of the border and the city of Mexcali, Mexico, on the Mexican side of the border.

El Centro 9

17. The El Centro 9 project will involve the construction of approximately 12 miles of new secondary pedestrian barrier. The approximately 12 miles of new secondary pedestrian barrier will be built in two segments, which will be situated on either side of the El Centro 9 project area. The El Centro 9 project area is in Imperial County, California. To the west of the Calexico West Port of Entry, the El Centro 9 project area begins 1.5 miles west of Border Monument 223 and extends east to Border Monument 221, which abuts the western terminus of the El Centro 9 project area. To the east of the Calexico West Port of Entry, the El Centro 9 project area begins one mile east of the Calexico West Port of Entry at or near the eastern terminus of the El Centro 9 project area and extends east for approximately 3 miles.

18. Within the El Centro 9 project area there is a 30-foot bollard-style primary pedestrian barrier. There is a patrol road that is situated north of the primary pedestrian barrier. There are also lighting and cameras. The new secondary barrier that will be constructed as a part of the El Centro 9 project will be situated north of the primary pedestrian barrier and patrol road.

19. On the U.S. side of the border, the areas that surround the El Centro 9 project area appear to be comprised primarily of privately owned land that is used for agricultural purposes. On the Mexican side of the border, the areas that surround the western portion of the El Centro 9 project are also comprised of land that appears to be used for agricultural purposes. In the eastern portion of the El Centro 9 project area, the Mexican side of the border is urbanized, heavily developed, and appears to be densely-populated.

Yuma 6

20. The Yuma 6 project will involve the construction of approximately 1 mile of new primary pedestrian barrier and construction of 2 miles of new secondary pedestrian barrier. The Yuma 6 project area is in Imperial County, California, and Yuma County, Arizona. It starts west of the Andrade Port of Entry one-half of a mile west of the Border Monument 208 and extends east to the Colorado River. It then resumes on the east side of the Colorado River

3

and extends south for approximately one mile.  Approximately 0.2 miles of primary barrier and 1.5 miles of secondary barrier will be built California.

21. Within the Yuma 6 project area there is existing border infrastructure.  In the portions of the project area that are situated west of the Andrade Port of Entry, there is an existing primary pedestrian barrier and patrol road that is situated immediately north of the primary pedestrian barrier.  There is a mix of existing primary pedestrian barrier west of the Andrade Port of Entry.  Near the Andrade Port of Entry, the existing pedestrian barrier is a 10-foot landing-mat barrier.  Further west, the existing primary pedestrian barrier is an 18-foot bollard-style barrier.  In the area that is immediately adjacent to the Andrade Port of Entry and extends east to the Alamo Canal, there is no existing barrier.  A portion of the new primary pedestrian barrier that will be constructed as a part of the Yuma 6 project will fill this gap.  East of the Andrade Port of Entry, between the Alamo Canal and the Colorado River, there is a 10-foot landing mat-style primary pedestrian barrier.  The remaining portion of new primary pedestrian barrier that will be constructed as a part of the Yuma 6 project will be situated east of the Colorado River, where there is currently no primary pedestrian barrier.  The new secondary barrier that will be constructed as a part of the Yuma 6 project will be situated behind the primary pedestrian barrier and patrol road.

Yuma 2

22. The Yuma 2 project will involve the replacement of approximately two miles of existing fencing with new primary pedestrian barrier.  The Yuma 2 project area is in Yuma County, Arizona, on the Barry M. Goldwater Range (BMGR).  It starts 2.5 miles west of Border Monument 198 and extends east to Border Monument 197.

23. The existing pedestrian barrier that will be replaced as a part of the Yuma 2 project is a 12-foot bollard and mesh-style fencing.  There is also an existing patrol road that is situated north of the existing pedestrian barrier.

Yuma 10/27

24. The Yuma 10/27 project will involve the construction of approximately 31 miles of new secondary pedestrian barrier on the BMGR.  The Yuma 10/27 project area is in Yuma County, Arizona.  It starts near the western boundary of the BMGR and extends 31 miles east to the base of the Tinajas Atlas Mountains near the eastern boundary of the BMGR.

25. There is an existing primary pedestrian barrier within the project area.  From the western boundary of BMGR to approximately 2.5 miles east of Border Monument 198, the existing 12-foot bollard and mesh-style fencing is being replaced with 30-foot bollard-style barrier by CBP as a part of a separate fence replacement project.  As noted above, from 2.5 miles east of Border Monument 198 to Border Monument 197, as a part of the Yuma 2 project, USACE will be replacing the existing 12-foot bollard and mesh-style fencing with new primary pedestrian barrier.  There is also an existing patrol road that is situated immediately north of the existing primary pedestrian barrier.  The new secondary pedestrian barrier that will be

4

constructed as a part of the Yuma 10/27 project will be situated north of the pedestrian barrier and patrol road.

Yuma 3

26. The Yuma 3 project will involve the replacement of 31 miles of vehicle barrier with new primary pedestrian barrier. The Yuma 3 project area is in Yuma County, Arizona. It begins approximately .4 miles east of the eastern boundary of the BMGR and extends east for 31 miles on or adjacent to the Cabeza Prieta National Wildlife Refuge (Cabeza Prieta) to the Yuma County and Pima County line.

27. There is existing post and rail-style vehicle barrier within the Yuma 3 project area, which, as noted above, will be replaced with primary pedestrian barrier as a part of the Yuma 3 project. There is also an existing patrol road that is situated immediately north of the existing vehicle barrier in most of the project area.

El Paso 8

28. The El Paso 8 project will involve the replacement of approximately 6 miles of existing vehicle barrier with primary pedestrian barrier and the construction of approximately 6 miles of new secondary pedestrian barrier. The El Paso 8 project area is in Hidalgo County, New Mexico. It starts 1.5 miles west of Border Monument 64 and extends to 2 miles east of Border Monument 63.

29. Within the El Paso 8 project area there is existing Normandy-style vehicle barrier, which will be replaced with primary pedestrian barrier as a part of the El Paso 8 project. In addition, there is an existing patrol road that is situated immediately north of the existing vehicle barrier. The new secondary barrier will be north of the new primary pedestrian barrier and the existing patrol road.

El Paso 2

30. The El Paso 2 project will involve replacing 23.51 miles of existing vehicle barrier with primary pedestrian barrier in three noncontiguous segments. The El Paso 2 project area is in Hidalgo and Luna Counties, New Mexico. The first two segments of the El Paso 2 project area are in Hidalgo County, New Mexico. The first segment starts approximately 5.1 miles east of the Arizona-New Mexico Border and extends east for approximately 4.5 miles. The second segment starts approximately 3 miles west of the Antelope Wells Port of Entry and extends to approximately 3 miles east of the Antelope Wells Port of Entry. The third segment is in Luna County, New Mexico. It starts approximately 20 miles west of the Columbus Port of Entry and extends west for approximately 12.84 miles.

31. There is existing Normandy-style vehicle barrier within the El Paso 2 project area, which will be replaced with primary pedestrian barrier. There is also an existing patrol road that is situated immediately north of the existing pedestrian barrier.

Laredo 7

32. Laredo Project 7 involves the construction of approximately 52 miles of new primary pedestrian barrier. The Laredo 7 project area is in Webb County, Texas. It starts at the Laredo-Columbia Solidarity Port of Entry Northwest, and extends north along the Rio Grande River for approximately 52 miles.

*USACE Environmental Planning and Mitigation Efforts*

Construction Best Management Practices (BMPs)

33. For all Section 2808 projects, USACE intends to include construction BMPs previously prepared by CBP for work in the CBP sectors containing Section 2808 projects in order to minimize or avoid to the extent practicable potential environmental impacts.

34. I am informed by USACE that construction BMPs address general construction activities, biological resources, air quality, water resources, and cultural resources. For example, construction BMPs developed for the Yuma Sector have already been included in the first Requests for Proposal for the Yuma 2 and Yuma 10/27 construction contracts. These BMPs include, but are not limited to: (i) using established roads to the maximum extent practicable and using areas already disturbed by past activities, when available, for staging, parking and equipment storage; (ii) limiting the application of soil-binding agents to areas that lack vegetation or are not in or near (i.e., within 100 feet of) surface waters and to months in late summer or early fall to avoid affecting Federally listed species; (iii) washing hauling and construction equipment entering the site to prevent the introduction of invasive species, removing plant/vegetation and soil/debris from construction vehicles leaving the site, to prevent the removal of invasive specifies from the site and using vegetation removal methods that allow root systems to remain intact to prevent disturbance that encourages establishment of invasive plant species; (iv) prohibiting the use of herbicides in streams or other bodies of water, and areas suitable for or designated as critical habitat of threatened or endangered plant species; and (v) requiring that treated water from outside the immediate construction area be used if pumping local groundwater has an adverse effect on the aquatic, marsh, or riparian dwelling of threatened or endangered species.

35. USACE will provide for on-site environmental monitors during construction to ensure that contractors adhere to the BMPs.

USACE Environmental Support Teams (ENVst)

36. In addition, I am informed that USACE ENVst are conducting and will continue to conduct Environmental Baseline Surveys (EBS) prior to construction of Section 2808 projects. EBS reports will identify, to the extent possible, potential impacts from construction activities and measures to avoid or minimize impacts to environmentally sensitive resources that could be undertaken without impeding expeditious construction of Section 2808 projects. In preparing these reports, USACE may also informally coordinate with other Federal and State agencies,

Federally recognized Indian Tribes, and other stakeholders that may have information relevant to the EBS. The completed EBS reports will be provided to construction personnel.

37. ENVst teams include USACE chemists, environmental engineers, biologists, explosive specialists, engineering technicians, and environmental specialists.

38. I am further informed by USACE that ENVst are currently conducting the first outreach meetings with resource agencies (e.g., land management agencies, U.S. Fish and Wildlife Service (USFWS), State resource agencies, and local Tribal governments). The input from these outreach meetings will inform additional outreach and other environmental measures that the Department of the Army and USACE may consider implementing. These environmental measures may include identifying sensitive areas to be avoided during construction, minimizing impacts to sensitive species, and additional construction BMPs for Section 2808 construction contracts. The Department of the Army and USACE may also develop mitigation measures, in coordination with the resource agencies, which may include small wildlife passages (SWPs), data recovery for archeological or cultural resource sites, restoration of adjacent areas, and adjusting the project footprint. Data recovery for archeological or cultural resource sites may include hiring a consultant to measure the site, photograph the site, and recover items to be catalogued off-site in a museum setting. Adjusting the project footprint may include such actions as designing a bend in a patrol road to avoid a cactus.

39. USACE will develop environmental documentation regarding additional measures undertaken during construction, which will include consideration of pre-construction site conditions, construction impacts, and any mitigation measures that USACE implements.

Biological Resources

40. I am informed by USACE that, before any ground-disturbing activities or vegetation removal or trimming begins, a biologist (either employed by USACE or contracted by USACE) will present an environmental awareness program to all personnel who will be on-site. The presentation will include, at a minimum, information regarding migratory bird species, the Sonoran pronghorn, the Acuña cactus, the northern jaguar, the Sonoran desert tortoise, the desert bighorn sheep, the golden eagle, the burrowing owl, the chuckwalla, and the flat-tailed horned lizard. This presentation will include general identification information for the species, a description of species habitat, and the sensitivity of the species to human activity, and will describe measures for avoiding and protecting the species during construction. Following this presentation, photographs of each species will be posted in the office of the contractor and resident engineer, where the photographs will remain for the duration of the construction project. The contractor is responsible for ensuring that employees are aware of the listed species.

41. These presentations for contractors involved in construction and maintenance of facilities will also include information regarding the protection of cacti and preservation of a suitable habitat for cacti.

7

42. If construction or clearing activities are scheduled to take place during nesting season (typically March 1 through September 1), USACE, either directly or through a contracted environmental firm, will perform a preconstruction survey for migratory bird species to identify active nests prior to the start of any construction or clearing activity. If construction activities will result in the disturbance or harm of a migratory bird, then USACE will coordinate with the USFWS and relevant State departments of natural resources. A buffer zone, designed in consultation with USFWS and shaped by the birds' characteristics, may be established around active nests until nestlings have fledged and abandoned the nest.

43. USACE will also ensure that construction areas that are hydro-seeded for temporary erosion-control measures only be native plant species appropriate to the surrounding habitat.

44. Additionally, USACE will ensure that removal of trees and brush in habitats for Federally listed species will be limited to the smallest amount needed to meet contract requirements.

45. USACE requires contractors to stop work and notify the USACE contracting officer when a Federally listed species is found in a project area. Any species of concern, including but not limited to the Sonoran pronghorn, the northern jaguar, the Sonoran desert tortoise, the golden eagle, the desert bighorn sheep, the burrowing owl, and the flat-tailed horned lizard, must not be harmed, harassed, or disturbed. Work may resume when a biologist safely removes the animal or the animal moves away on its own. A biologist will relocate any Federally listed species found in the project areas that require relocation.

46. USACE requires all on-site workers to check under their parked vehicles and equipment prior to driving to see whether there is a Sonoran desert tortoise sheltering underneath the vehicle or equipment. If a desert tortoise is found sheltering underneath a parked vehicle or equipment, the desert tortoise must be allowed to move out from under the vehicle or equipment on its own or a biologist must be contacted to relocate the animal before the vehicle or equipment can be moved. Any biologist-facilitated relocation will adhere to current handling guidelines for the Sonoran desert tortoise issued by the Arizona Game and Fish Department, Revised September 2014.

47. USACE will provide contractors with the Flat-tailed Horned Lizard Rangewide Management Strategy, which includes mitigation measures to minimize impacts to the lizards and their habitat.

48. USACE requires contractors to design light poles and other pole-like structures to discourage roosting by birds, particularly ravens and raptors.

49. To prevent entrapment of wildlife species during construction, all excavated, steep-walled holes or trenches more than 2 feet deep must be covered at the close of each working day by plywood or installed with one or more escape ramps constructed of dirt fill or wooden planks. The ramps will be located at no greater than 1,000-foot intervals and will be sloped less than 45 degrees. Each morning before the start of construction, and before such holes or trenches are filled, contractors must thoroughly inspect any holes or trenches for trapped animals. Any animals discovered must be allowed to escape voluntarily (by escape ramps or

temporary structures) and without harassment, or be removed from the trench or hole by a biologist before construction activities resume.

50. To prevent entrapment of wildlife during construction, all hollow vertical bollards must be covered. Contractors must also use covers from the time the bollards are erected to the time they are filled.

51. To prevent attracting predators of protected animals, all trash related to food—e.g., wrappers, cans, bottles, and food scraps—must be disposed of in closed containers and removed daily from the project sites.

52. USACE is also implementing general construction requirements related to clearing, grubbing, and plant relocation to mitigate adverse environmental impacts. For example, contractors will be required to protect the Saguaro cactus "in place." For Yuma 2 and Yuma 10/27, if a Saguaro cactus interferes with construction operations, contractors must relocate the cactus if it is less than ten feet tall. The government has identified 200 Saguaro cacti of various sizes located within the Yuma 2 and Yuma 10/27 project boundaries. For Yuma 3, if Saguaro cacti interfere with construction operations, they are to be relocated in accordance with ¶53 of this declaration. The government has identified approximately 45 Saguaro cacti of various sizes located within the Yuma 3 project boundaries. In all cases, USACE will attempt to relocate cacti as long as they are viable. USACE will develop further specific criteria as it formulates subsequent requests for proposal.

53. When relocating plants, including the Saguaro cactus, contractors will provide a licensed arborist or biologist to prepare a relocation plan and oversee the relocation effort. Affected plants are to be relocated to undisturbed areas at least 10 feet away from proposed lighting and electrical features. Contractors will submit a plant relocation plan, indicating existing and proposed locations for plants to be relocated, to the USACE contracting officer. The plant relocation plan will include: (i) the method of removal and placement; (ii) procedures for fertilizing and watering the plant; (iii) methods for bracing and stabilizing the plant; (iv) provisions for marking relocated plants so that they will be identifiable during the 12-month period required for the plant to establish roots in the new soil; and (v) proposed locations for electrical components, lighting, and fiber optic features.

54. As noted in ¶61 of the April 25, 2019 Enriquez declaration, the conversion from wire mesh fencing to bollard barrier fencing will have beneficial impacts for some smaller species, including the flat-tailed horned lizard. For prior projects where CBP constructed mesh-style fencing, CBP incorporated small holes in the bottom of the fence that would allow for migration of smaller species, such as the flat-tailed horned lizard. The bollard fencing will not require these holes because smaller species will be able to travel through the four-inch gaps between bollards.

Air Quality

55. USACE requires contractors to water the soil to minimize airborne particulate matter created from construction activities and to cover bare ground with erosion protection following

9

construction. Mitigation measures will be incorporated to ensure that PM10 emission levels do not rise above the de minimus threshold required in 40 CFR 51.853(b)(1). These measures include dust suppression methods to minimize airborne particulate matter that will be created during construction activities. Standard construction BMPs, such as routine watering of the patrol, drag, and access roads, will be used to control dust during construction. Additionally, all construction equipment and vehicles will be kept in good operating condition to minimize exhaust emissions.

Water Resources

56. USACE requires contractors to implement standard construction procedures to minimize the potential for erosion and sedimentation during construction. For example, contractors must minimize or avoid the potential for trapping surface water flows within the roadbed caused by grading. The specific procedures implemented by contractors will differ depending on the project location and contractor design submissions. In past, similar projects, contractors have employed drainage ditches and check dams to control erosion. The depth of any pits created must also be minimized so animals do not become trapped. Water tankers that convey untreated surface water must not discard unused water where it has the potential to enter surface waters or drainages. The contractor's environmental monitor, a USACE-contracted environmental monitor, or representative from USACE will advise as to appropriate sites for discarding unused water. If untreated surface water is used, all pumps, hoses, tanks, and other water storage devices must be cleaned and disinfected with a 10% bleach solution at an appropriate facility before the equipment is employed at another site. This 10% bleach solution must not enter any surface water area. If a new water source is used that is not from a treated or groundwater source, additional cleaning is required to kill any residual disease-carrying organisms or invasive species that may affect local threatened or endangered species.

57. Materials used for on-site erosion control in native habitats must be free of non-native plant seeds and other plant parts to limit the potential for infestation by non-native species. Since natural materials cannot be certified as completely weed-free, if natural materials are used for erosion control, there must be follow-up monitoring to document whether non-native species have been inadvertently planted and whether appropriate, time-bound control measures should be implemented in the site restoration plan.

Cultural Resources

58. I am informed that any known cultural resources will be clearly flagged by USACE environmental monitors for avoidance during construction. Flagging must be completed before any ground disturbing activities take place. If it is not practicable to avoid such sites and there may be impacts to known cultural resources, USACE may be required to undertake other data recovery efforts before beginning any ground disturbing activities. Should any hitherto unknown archaeological artifacts or human remains be found during construction, all ground disturbing activities in the vicinity of the discovery must stop and the contractor must immediately notify the USACE Contracting Officer. Work will not resume until it is authorized by the USACE contracting officer.

*Harm to Wildlife and Other Natural Resources in California and New Mexico*

59. I have been informed by USFWS that statements made in the declaration of Paul Enriquez, dated April 25, 2019, regarding threatened and endangered species are still accurate. Additional information from USFWS and USACE regarding allegations found in the Plaintiffs' Motion for Summary Judgment and accompanying declarations are as follows:

Chiricahua Leopard Frog

60. I am informed by USFWS that there is no USFWS designated critical habitat for the Chiricahua leopard frog in the project areas, and so no critical habitat will be lost. I am also informed by USFWS that critical habitat for the Chiricahua leopard frog does not cross the international border and, as stated above, the bollard barrier will allow small species to traverse the border. For these reasons, the plaintiff's alleged harms concerning the Chiricahua leopard frog are misplaced.

Gila Monster

61. USFWS has provided the following additional information on the expected effect of Section 2808 construction on Gila monsters in New Mexico. This information corresponds to ¶¶ 58 and 59 of the Enriquez declaration:

    a. Records of Gila monsters in the counties of Dona Ana, New Mexico, and Luna, New Mexico, are exceedingly rare and outside the range where most State records document the presence of Gila monsters.

    b. Indirect effects to Gila monsters caused by the presence of border barriers, such as limiting their movement patters, are not expected based on the size and physical abilities of Gila monsters compared to potential restrictions associated with proposed bollard fencing.

    c. Gila monsters are expected to occur in various densities along the Yuma Projects, particularly where habitat complexity and vegetation heterogeneity are higher and where rock structures or subsurface retreats are common. Specifically, in the Lower Colorado subdivision of Sonoran Desertscrub where the Yuma projects occur, Gila monsters are more frequently encountered between the creosote bush-white bursage series and the paloverde-cactus of the Arizona upland, where topographical relief tends to be greater. Since such topography is less common in the Yuma project areas, there are fewer expected impacts to Gila monsters.

    d. I am informed that, for the foregoing reasons, in the region that includes the Yuma Projects, and particularly where mountain ranges intersect with the international border, the potential for loss of an unknown number of individual Gila monsters as a result of construction activity, would not have an appreciable effect on the larger, contiguous population of Gila monsters.

Burrowing Owl

62. USACE advises that the construction BMPs used for Yuma 2 and Yuma 10/27 Requests for Proposal include provisions requiring that burrowing owl surveys be conducted 30 days

before any construction begins in burrowing owl areas; active burrows be flagged and include a 250-foot buffer; and active burrows that cannot be avoided be collapsed. There are two restrictions on whether contractors may collapse a burrow. If construction is taking place during the owl's nesting period, which lasts from February 15 through September 15, contractors will first ascertain whether there are eggs or young in the burrow before a burrow is collapsed, consistent with guidelines developed by the Burrowing Owl Consortium of California. See Attachment 2. If young are present, burrows will not be collapsed until they fledge.

Flat-Tailed Horned Lizard

63. USACE has advised me that the contractors for Yuma 2 and Yuma 10/27 are required to comply with the mitigation and compensation measures identified in the Flat-tailed Horned Lizard Rangewide Management Strategy (Flat-tailed Horned Lizard Interagency Coordinating Committee. 2003, pp. 58-62). In addition, the Requests for Proposal for Yuma 2 and Yuma 10/27 include construction BMPs specific to the flat-tailed horned lizard, among other construction BMPs. These construction BMPs require that:

   a. All on-site personnel must attend a worker awareness presentation given by a biologist that holds a letter of completion for attending the flat-tailed horned lizard biomonitor training, prior to conducting any construction activity in the Yuma Desert Management Area;
   b. A biologist will be present during construction activities. The biologist will oversee compliance with protective measures for the flat-tailed horned lizard and serve as the primary field contact for matters related to the flat-tailed horned lizard. The biologist is responsible for telling the construction supervisor to halt activities that violate the mitigation terms and conditions;
   c. A biologist must be present to monitor any ground-disturbing construction activities  The biologist will survey the work area before ground clearing to locate and remove any flat-tailed horned lizards present in the active work area; and
   d. A biologist must inspect areas that will be disturbed by construction activities before any such activities take place and relocate any flat-tailed horned lizards, in danger of being injured or killed. The biologist must also inspect all excavations for flat-tailed horned lizards before backfilling any excavated land and relocate any such animals found during excavation, provided that such an inspection is safe and practical. Any land that is left excavated overnight must be covered or have an escape ramp installed to prevent entrapment of the flat-tailed horned lizard. The biologist will inspect for flat-tailed horned lizards under all equipment that has remained idle for 15 minutes or more prior to moving the equipment.

Northern Jaguar

64. As conceded in the States' Summary Judgment brief, Section 2808 projects are only "adjacent" to a northern jaguar critical habitat in New Mexico. According to the USFWS, passage across the international border in Arizona will still be possible notwithstanding Section 2808 construction. USFWS defines a critical habitat as those areas that contain the

12

physical and biological features essential to the conservation of a species. Critical habitat is generally limited to those areas that are either occupied by the species or those areas outside the geographic area occupied by the species that are essential to the conservation of the species. According to USFWS' critical habitat designation, there have only been seven individual jaguars detected in the United States since 1982, with all of them occurring in areas where critical habitat has been designated. Further, the most recent known breeding event in the United States, according to USFWS, was in 1910. Thus, the States' assertion that the New Mexico project will "bisect" a jaguar migration corridor (States' SJ Brief at 30) is exaggerated. In light of the above, the evidence does not support plaintiffs' suggestion or assertion that the Yuma and El Paso Projects will significantly harm the jaguar population or jaguar recovery in the United States.

White-Sided Jackrabbit

65. The white-sided jackrabbit population crosses the border at the Animas Valley. Plaintiffs claim that the species will be harmed by construction of border barrier at El Paso 2 and El Paso 8. I am informed that the segment of El Paso 2 between monuments 67 and 69 is on the west side of the Animas Valley. Additionally, the east side of the Animas Valley is not included in El Paso Project 8. Furthermore, USFWS declined to list the jackrabbit or any of its subspecies or populations as threatened or endangered and to designate critical habitat under the Endangered Species Act. 75 Fed. Reg. 53615 (Sept. 1, 2010). USFWS rejected the assertion that impacts with Border Security vehicles was a cause of the species' decline. Id. at 53623-24. In declining to list the United States populations of the jackrabbit as threatened or endangered, USFWS also determined that the portion of the jackrabbit population in the United States "represent[s] less than one percent of the range of the species," that the United States populations "are peripheral populations occurring in an area where the species was never known to be abundant," and that "[t]he loss of these populations is not likely to result in a significant gap in the range of the taxon." Id. at 53628.

Mexican Wolf and Aplomado Falcon

66. Plaintiffs claim that, "[t]he New Mexico Projects will bisect important wildlife habitats, impairing the access of the Mexican Wolf and other endangered species to those habitats. Id. Ex. 4 (Nagano Decl. ¶ 25); Ex. 5 (Traphagen Decl. ¶¶ 18-19, 23-24)." States SJ Brief at 25. More generally, plaintiffs also assert that there are credible threats to the Aplomado falcon. Nagano ¶ 13-34; Vanderplank ¶ 20-22.

67. There is insufficient evidence to support the suggestion that Section 2808 projects will significantly harm the population or recovery of the Mexican wolf or Aplomado falcon. As stated in ¶55 of the Enriquez declaration, the recovery criteria for Mexican wolf specifically contemplates "two demographically and environmentally independent populations," one in the United States and one in Mexico, "such that negative events (e.g. diseases, severe weather, natural disasters) are unlikely to affect both populations simultaneously." Id. According to USFWS, having two resilient populations provides redundancy, which in turn provides security against extinction from catastrophic events that could affect a population. Recovery criteria also call for achieving a specific genetic target to ensure that genetic threats

13

are adequately alleviated.  USFWS recognizes the benefits of connectivity (wolves naturally dispersing between populations) to improve genetic diversity, but has also stated that it "do[es] not expect the level of dispersal predicted between any of the sites (particularly between the United States and northern Sierra Madre Occidental) to provide for adequate gene flow between populations to alleviate genetic threats or ensure representation of the captive population's gene diversity in both populations." Id.  Therefore, USFWS crafted a recovery strategy for the Mexican wolf that relies on the initial release of wolves from captivity to the wild and the translocation of wolves between populations as a necessary form of management to alleviate genetic threats during the recovery process. Id.  USFWS specifically stated that "connectivity or successful migrants are not required to achieve recovery" of the Mexican wolf. Id. at 15.

68. Similarly, according to USFWS, Aplomado falcon pairs likely number into the hundreds and are distributed among three populations and four countries.  The Simpson Draw pair likely account for less than 1% of Aplomado falcons.  Therefore, I am informed that, even if the proposed construction resulted in the loss of one pair, it is not likely to significantly reduce the subspecies' survival or recovery probabilities.  Further, at stated at ¶57 of the Enriquez declaration, USFWS has not designated any critical habitat for the Aplomado falcon because there is ample suitable habitat to support falcons in Arizona and New Mexico.  Similarly, USFWS has not designated any critical habitat for Mexican wolf.

## Mule Deer, Mountain Lion, and Bighorn Sheep

69. The States' allege that the Section 2808 projects in New Mexico "will completely block habitat corridors for [mule deer, mountain lions, and bighorn sheep] and impair New Mexico's ability to protect these important corridors." States' SJ Brief at 25.  As stated at ¶61 of the Enriquez declaration, these assertions are directly at odds with CBP's prior analysis of similar projects, including the recent Santa Teresa project.  In the Santa Teresa project, CBP concluded that such construction would result only in minor adverse effects to wildlife.

## Quino Checkerspot Butterfly, California Gnatcatcher, and Vernal Pool Species

70. Neither the Clark nor the Gibson declarations identifies any members of these species that have been found in the Section 2808 project areas.  As stated above, USACE will complete EBS reports that will identify, to the extent possible, potential impacts from construction activities and measures to avoid or minimize impacts to environmentally sensitive resources that could be undertaken without impeding expeditious construction of Section 2808 projects.

*Recreational and Aesthetic Harms*

## San Diego 4

71. The San Diego 4 project area is undeveloped, mountainous, and is situated south of the Otay Mountain Wilderness Area.
    a.  *Sierra Club – Guerrero Declaration*

14

   i.   Guerrero claims to visit the Otay Open Space Preserve once a month. (¶ 5)
    The Otay Open Space Preserve is at least three miles north of the San
    Diego 4 project area. Therefore, San Diego 4 is unlikely to affect
    Guerrero's recreational or aesthetic experience in the Area.

   ii.   Guerrero claims that construction would add a destructive human element
    to a peaceful desert landscape. (¶ 6) As noted in ¶10 of this declaration,
    there are already roads in the construction area, and CBP patrols the
    region regularly. In addition, there is existing primary pedestrian barrier
    in the eastern portion of the San Diego 4 project area. Therefore,
    construction at San Diego 4 would not constitute an additional
    "destructive" human element and a more secure border barrier may
    actually reduce the need for other border enforcement activities in the
    area. Furthermore, the Otay Mountain Wilderness and surrounding
    undeveloped areas are large relative to the narrow construction corridor
    required for USACE activity.

 b.   *Sierra Club – Watman Declaration*

   i.   Watman claims to hike in the Otay Mountain Wilderness frequently to
    "get away from hustle and bustle" and to lead tours in the wilderness (¶¶
    6-8). Watman further claims that construction would "block" his ability to
    enjoy the Wilderness (¶ 12), thereby preventing further border tours, and
    ruin his sense of tranquility and being alone in nature (¶ 13). These claims
    are exaggerated for the reasons stated above, i.e., there is existing
    infrastructure and CBP already patrols the area. Again, the surrounding
    protected and undeveloped areas are large when compared to the narrow
    construction corridor required for this project. The Otay Mountain
    Wilderness is approximately 18,500 acres, or approximately 26 square
    miles.

 c.   *Sierra Club – Wellhouse Declaration*

   i.   Wellhouse also mentions the Otay Open Space Preserve and her concern
    that San Diego 4 could destroy habitat within the Area (¶ 6). As discussed
    above, the Otay Open Space Preserve is at least three miles north of the
    San Diego 4 project area, and there will be no construction activities
    within the Area.

   ii.   Wellhouse also claims that border barrier construction will severely
    impact her enjoyment of open spaces around the project area (¶ 8). These
    claims are exaggerated for the reasons stated above.

## San Diego 11

72. As stated above, the land on either side of the border at this location already appears to be
heavily developed and urbanized.

    a. *Sierra Club – Watman Declaration*

        i. Watman claims, among other things, that the secondary barrier will mar his views of the American mountain ranges when he visits Mexico (¶ 18). As noted above, primary fence is already being replaced with 30-foot bollard fencing through a CBP replacement project. Therefore, the project area consists largely of previously disturbed land that already functions as a CBP law enforcement zone.

    b. *Sierra Club – Wellhouse Declaration*

        i. Wellhouse claims that the construction will severely affect her enjoyment of open spaces around the project area (¶ 8). This claim is exaggerated given the existing infrastructure, CBP patrols, and narrow construction corridor related to this project. Additionally, the San Diego 11 project area already functions as a law enforcement zone and most of land is already disturbed.

## El Centro 5

73. As stated above, for the entire length of the El Centro 5 project area, the areas that surround the project area on both sides of the international border are urbanized, heavily developed, and appears to be densely-populated.

    a. *Sierra Club – Ramirez Declaration*

        i. Ramirez claims that "Construction along the border will make me less likely to hike Mount Signal and enjoy outdoor recreational activities; and when I do undertake those activities, my enjoyment of them will be irreparably diminished. This additional barrier will further obstruct my sight line into Mexico." (¶ 5)

        ii. These claims are exaggerated because it is unclear how a secondary fence prohibits views of the mountains. Further, the area is already disturbed, functions as law enforcement zone, and is urbanized on both sides of the port of entry. El Centro 5 will not alter Ramirez's ability to enter Mexico to hike Mount Signal—or return to the United States—through the Calexico port of entry.

## El Centro 9

74. As described above, on the U.S. side of the border, the areas that surround the El Centro 9 project area appear to be comprised of primarily privately-owned land that is used for agricultural purposes. On the Mexican side of the border, the areas that surround the western portion of the El Centro 9 project are also comprised of land that appears to be agricultural land. In the eastern portion of the El Centro 9 project area, the Mexican side of the border is urbanized, densely-populated, and appears to be heavily developed.

16

a. *Sierra Club – Ramirez Declaration*

    i. Ramirez claims that "Construction along the border will make me less likely to hike Mount Signal and enjoy outdoor recreational activities; and when I do undertake those activities, my enjoyment of them will be irreparably diminished. This additional barrier will further obstruct my sight line into Mexico." (¶ 5)

    ii. It is unclear how a secondary fence prohibits views of the mountains. Further, the area is already disturbed, functions as law enforcement zone, and is urbanized on both sides of the port of entry. An additional pedestrian fence in this urbanized landscape will not substantially alter the view. El Centro 9 will not alter Ramirez's ability to enter Mexico to hike Mount Signal—or return to the United States—through the Calexico port of entry.

## Yuma 6

*Sierra Club – Bevins Declaration*

75. Bevins claims that this project will fragment the vista in this area and disrupt desert views. He implies that, due to this project, he won't be able to birdwatch or enjoy the natural features of the land. (¶¶ 7-8) Bevins further claims that the area is currently "not heavily fortified." Id.

76. As noted above, there is already fencing near the project area. Thus, there is no basis to claim that the project will have significant aesthetic impacts. The new pedestrian fencing will be situated immediately adjacent to the Andrade port of entry and for approximately one mile along the Colorado River. Most of the new secondary fencing will be located behind existing fencing. This area already functions as a law enforcement zone and is mostly disturbed land.

*Sierra Club – Del Val Declaration*

77. Del Val is concerned that construction will detract from natural beauty. (¶ 7) Again, there is already significant existing infrastructure in the area, which Del Val admits by mentioning other wall projects. (¶ 8) The area also already functions as a law enforcement zone.

*Sierra Club – Meister Declaration*

78. Meister says that she feels uncomfortable that CBP watches her as she bird watches and that the Yuma 6 project could exacerbate the issue. (¶ 16) However, there is existing infrastructure in the project area. Further, the area is already functioning as a law enforcement zone, this is already a factor in her use of the area. USACE construction does nothing to change this dynamic.

Projects on BMGR (Yuma 2 and Yuma 10/27)

79. Management of BMGR is shared between the U.S. Air Force (BMGR East) and the U.S. Marine Corps (BMGR West).  As shown in Figure 1.1 in the BMGR Integrated Natural Resource Management Plan (INRMP) (Attachment 3), the southernmost point of BMGR East is not near the U.S.-Mexico border.

80. The Department of the Navy has informed me that approximately 75 percent of BMGR West is made available to the public for recreational use, as shown in Figure 7.1 of the BMGR INRMP.  Regarding the border itself, approximately 10 miles of the 31 miles of border fence on BMGR West are accessible to members of the public with a U.S. Marine Corps-issued permit.  These 10 miles of border can be accessed through three roads or any number of foot trails.  Only these three roads leading to the border through BMGR West are accessible to the public, and these roads require a U.S. Marine Corps-issued permit.  There is no unfettered public access anywhere in BMGR West.

81. I am further informed that areas within BMGR West that are currently open to the public for recreation through a U.S. Marine Corps-issued permit will remain open to the public for such purposes, subject to occasional temporary closures to support military activities that present safety hazards or have security requirements.  Roads that are currently open to the public within BMGR West will remain open to the public, although accessibility to some roads may be limited while construction projects are underway.  Additional details regarding public access to BMGR and recreation in BMGR are provided in Figures 2.8 and 7.1 and Sections 2.3.6 and 7.2 of the BMGR INRMP.

Yuma 2

*Sierra Club – Broyles Declaration*

82. Broyles claims that "my enjoyment of these areas also will also be damaged by the incessant lighting associated with the wall and its construction, and the widening of roads and attendant noise and dust associated with construction." (¶ 17)  While Broyles does not specify exactly which areas are concerned, it appears that Broyles is referring to BMGR and Cabeza Prieta. (¶ 18)  Broyles also claims that barrier construction will "blight a landscape whose core attractions include unimpeded views across the border" (¶ 18) and that that "the presence of a thirty-foot wall would reduce the size of the Refuge and Range available for enjoyable public use." (¶ 16).  These claims are exaggerated because there is already a pedestrian barrier and patrol road in this area, the small corridor required for construction already functions like a law enforcement zone, and construction impacts will be temporary.

*Sierra Club – Hartman Declaration*

83. Hartman claims that "wall segments will fundamentally alter my experience of these lands [i.e., Yuma 2, 3, and 10/27], by intruding upon the natural beauty, and historical connectedness of people and species, that I visit these areas to experience.  The roads and lighting will likewise diminish the features I hold dear." (¶ 15)  These claims are conclusory

and exaggerated due to the existing infrastructure, narrow construction corridor, and given that the area already functions like a law enforcement zone.

*Sierra Club – Tuell Declaration*

84. Tuell expresses concern about the impact of construction on Organ Pipe Cactus National Monument and Quitobaquito Springs.  (¶ 10)  Neither this nor any other Section 2808 project is on or affects these two areas.

Yuma 10/27

*Sierra Club – Broyles Declaration*

85. See ¶ 82 of this declaration.

*Sierra Club – Hartman Declaration*

86. See ¶ 83 of this declaration.

Yuma 3

87. As discussed above, there is existing post and rail-style vehicle barrier within the Yuma 3 project area, which will be replaced with primary pedestrian barrier as a part of the Yuma 3 project.  There is also an existing patrol road that is situated immediately north of the existing vehicle barrier in most of the project area.

   a.  *Sierra Club – Broyles Declaration*

      i.  Broyles also claims that barrier construction will "blight a landscape whose core attractions include unimpeded views across the border." (¶ 18) There is already existing vehicle barrier on this land, which is being replaced with pedestrian barrier.

   b.  *Sierra Club – Hartman Declaration*

      i.  Hartman claims that "wall segments will fundamentally alter my experience of these lands (i.e., Yuma 2, 3, and 10/27), by intruding upon the natural beauty, and historical connectedness of people and species, that I visit these areas to experience.  The roads and lighting will likewise diminish the features I hold dear." (¶ 15).  This claim is exaggerated due to the existing barrier infrastructure in the Yuma 3 project area, the narrow corridor required for construction, and the fact that this already functions as a law enforcement zone.

19

El Paso 8

88. Within the El Paso 8 project area there is existing Normandy-style vehicle barrier, which will be replaced with primary pedestrian barrier as a part of the El Paso 8 project.  In addition, there is an existing patrol road that is situated immediately north of the vehicle barrier.  The new secondary barrier will be constructed immediately north of the new primary pedestrian barrier and the existing patrol road.

    a. *Sierra Club – Ardovino and Bixby Declarations*

        i. Ardovino and Bixby both claim to recreate in these areas; however, there appears to be only private land surrounding this project area.  In addition, there will be a small construction footprint relative to the size of the surrounding land.

    b. *Sierra Club – Roemer Declaration*

        i. Roemer claims that pedestrian barrier will negatively impact views of the area. (¶ 15)  This claim is exaggerated given the narrow construction corridor relative to the size of the surrounding land.

    c. *Sierra Club – Walsh Declaration*

        i. Walsh claims that the project will affect her "interest in enjoying and recreating in the large geographic zone in the El Paso Sector." (¶ 10)  This claims is exaggerated because, as she notes herself, the area surrounding this project is vast and the construction corridor required for this project is relatively narrow.

El Paso 2

89. As noted above, there is existing Normandy-style vehicle barrier within the El Paso 2 project area, which will be replaced with primary pedestrian barrier.  There is also an existing patrol road that is situated immediately north of the existing pedestrian barrier.

    a. The facts related to El Paso 8 claims in the Ardovino, Bixby, Roemer, and Walsh Declarations apply equally to El Paso 2.

Laredo 7

*Sierra Club – Miller Declaration*

90. Miller claims that the project will affect him "aesthetically" as he conducts research along the Rio Grande River. (¶ 10)  As noted above, all land along this project is private land.

*Sierra Club – Thompson Declaration*

91. Thompson claims that the project will make it "impossible or extremely difficult" to view historic sections of the border in the future. (¶ 13)  This claim is exaggerated since all land along this project is private land.

***

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge.

Executed on:   October 25, 2019

Alex A. Bechler

**Declaration of Alex A. Beehler (Aug. 14, 2020)**

**ATTACHMENT 1**



**Laredo Project 7** (S1,268M): Construction of approximately 52 miles of a new primary pedestrian fence system starting from the Laredo-Columbia Solidarity POE North West for approximately 52 miles along the Rio Grande River.

Laredo 7
52.45904 miles
LAT/LON Start: 28.196854, -100.208841
LAT/LON End: 28.121442, -100.070333

2808 PROJECT SEGMENT

Port of Entry

Laredo 7

CBP
Detailed
Sectors

Roosson
Resona

US/Mexi
Boundar

1 inch = 4 miles

0  1.25 2.5       5       7.5
|___|___|___|___|___| Miles

Sources:

Projection:
GCS, WGS, 1984

Page 9 of 9
15 October 2019

LAREDO 7

U.S. ARMY CORPS OF ENGINEERS
TASK FORCE BARRIER